1    IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3   In Re:  Local TV Advertising       )  Docket No. 18 C 06785
    Antitrust Litigation               )
4                                      )
                                       )  Chicago, Illinois
5                                      )  November 19, 2018

6

7
                    TRANSCRIPT OF PROCEEDINGS
8            BEFORE THE HONORABLE VIRGINIA M. KENDALL

9
    APPEARANCES:
10

11  For Cellino & Barnes,    LOWEY DANNENBERG, P.C. by
    P.C.:                    MS. BARBARA J. HART (Via Telephone)
12                           44 South Broadway, Suite 1100
                             White Plaines, New York  10601
13
    For One Source Heating   BLEICHMAR FONTI & AULD LLP by
14  and Cooling, LLC:        MS. LESLEY E. WEAVER
                             555 12th Street, Suite 1600
15                           Oakland, California  94607

16  For My Philly Lawyer:    SPECTOR ROSEMAN AND KODROFF PC by
                             MR. WILLIAM CALDES
17                           1818 Market Street, Suite 2500
                             Philadelphia, Pennsylvania  19103
18
    For Law Offices of       KESSLER TOPAZ MELTZER & CHECK LLP by
19  Peter Miller, P.A.:      MS. KIMBERLY A. JUSTICE
                             280 King of Prussia Road
20                           Radnor, Pennsylvania  19087

21

22  Court Reporter:          GAYLE A. McGUIGAN, CSR, RMR, CRR
                             Federal Official Court Reporter
23                           219 South Dearborn, Room 2318-A
                             Chicago, Illinois 60604
24                           (312) 435-6047
                             Gayle_McGuigan@ilnd.uscourts.gov
25

```
1   A P P E A R A N C E S :   (Continued)

2

3   For Northtown            MILLER LAW LLC by
    Automotive Companies     MR. ANDREW SZOT
4   Inc.:                    115 South Wacker Drive, Suite 2910
                             Chicago, Illinois  60603
5
    For Crowley Webb and     KAPLAN FOX & KILSHEIMER LLP by
6   Associates:              MR. GARY L. SPECKS
                             423 Sumac Road
7                            Highland Park, Illinois  60035

8                            KAPLAN FOX & KILSHEIMER LLP by
                             MS. ELANA KATCHER
9                            850 Third Avenue, 14th Floor
                             New York, New York  10022
10
11  For John O'Neil          CLIFFORD LAW OFFICES PC by
    Johnson Toyota:          MR. ROBERT A. CLIFFORD
12                           MS. SHANNON MARIE McNULTY
                             120 North LaSalle Street, Suite 3100
13                           Chicago, Illinois  60602

14                           CUNEO GILBERT & LaDUCA LLP by
                             MS. VICTORIA ROMANENKO SIMS
15                           4725 Wisconsin Avenue, Suite 200
                             Washington, DC  20016
16
17  For Randal S. Ford:      HAUSFELD, LLP by
                             MS. MEGAN ELIZABETH JONES
18                           1146 19th Street, NW, 5th Floor
                             Washington, DC  20036
19                           SCHARF BANKS MARMOR LLC by
                             MS. STEPHANIE ANN SCHARF
20                           333 West Wacker Drive, Suite 450
                             Chicago, Illinois  60606
21
22  For The Barnes Firm:     MOGIN RUBIN LLP by
                             MR. DANIEL JAY MOGIN (Via Telephone)
                             MS. JODIE MICHELLE WILLIAMS
23                           MS. JENNIFER M. OLIVER
                             One America Plaza
24                           600 West Broadway, Suite 3300
                             San Diego, California  92101
25
```

```
 1   A P P E A R A N C E S :   (Continued)

 2

 3   For Thoughtworx, Inc.:  FREED KANNER LONDON
                               & MILLEN, LLC by
 4                           MR. ROBERT J. WOZNIAK
                             2201 Waukegan Road, Suite 130
                             Bannockburn, Illinois  60015
 5

 6   For Masseys Jewelers:   ROBBINS GELLER RUDMAN
                               & DOWD LLP by
 7                           MR. JAMES E. BARZ
                             200 South Wacker Drive, Suite 3100
                             Chicago, Illinois  60606
 8

 9                           ROBBINS GELLER RUDMAN
                               & DOWD LLP by
10                           MS. ALEXANDRA S. BERNAY
                             655 West Broadway, Suite 1900
                             San Diego, California  92101
11

12   For Curb Appeal         GUSTAFSON GLUEK PLLC by
     Madison LLC:            MR. DANIEL C. HEDLUND
13                           MS. MICHELLE J. LOOBY
                             Canadian Pacific Plaza
14                           120 South 6th Street, Suite 2600
                             Minneapolis, Minnesota  55402

15   For Holmen Locker &     JOSEPH SAVERI LAW FIRM by
     Meat Market:            MR. STEVEN WILLIAMS
16                           601 California Street, Suite 1000
                             San Francisco, California  94108
17

18   For The Bon-Ton Stores: DICELLO LEVITT & CASEY LLC by
                             MR. ADAM J. LEVITT
19                           MR. ADAM M. PROM
                             MS. AMY ELISABETH KELLER
20                           MR. JOHN E. TANGREN
                             Ten North Dearborn Street, 11th Floor
21                           Chicago, Illinois  60602

22                           LABATON SUCHAROW LLP by
                             MR. GREGORY ASCIOLLA
23                           MS. KARIN E. GARVEY
                             140 Broadway, 33rd Floor
24                           New York, New York  10005

25
```

```
 1   A P P E A R A N C E S :   (Continued)

 2

 3   For LM SAC, LLC:          BURNS CHAREST LLP by
                              MR. WARREN T. BURNS
 4                            900 Jackson Street, Suite 500
                              Dallas, Texas  75202
 5
                              BURNS CHAREST LLP by
 6                            MS. AMANDA KLEVORN
                              MR. KOREY NELSON (Via Telephone)
 7                            365 Canal Street, Suite 1170
                              New Orleans, Louisiana  70130
 8
                              COHEN MILSTEIN SELLERS & TOLL by
 9                            MR. CHRISTOPHER CORMIER (Via Telephone)
                              5290 Denver Tech Center Pkwy., Suite 150
10                            Greenwood Village, Colorado  80111

11   For Southern Chevrolet   BURNS CHAREST LLP by
     Cadillac, Inc.:          MR. KOREY NELSON (Via Telephone)
12                            365 Canal Street, Suite 1170
                              New Orleans, Louisiana  70130
13
                              COHEN MILSTEIN SELLERS & TOLL by
14                            MR. CHRISTOPHER CORMIER (Via Telephone)
                              5290 Denver Tech Center Pkwy., Suite 150
15                            Greenwood Village, Colorado  80111

16   For Dozier Law Firm      WEXLER WALLACE LLP by
     LLC:                     MR. KENNETH A. WEXLER
17                            MR. JUSTIN NICHOLAS BOLEY
                              55 West Monroe Street, Suite 3300
18                            Chicago, Illinois  60603

19                            GUSTAFSON GLUEK PLLC by
                              MR. DANIEL C. HEDLUND
20                            MS. MICHELLE J. LOOBY
                              Canadian Pacific Plaza
21                            120 South 6th Street, Suite 2600
                              Minneapolis, Minnesota  55402
22

23

24

25
```

```
 1    A P P E A R A N C E S :   (Continued)

 2

 3    For Clay, Massey &        ROBINS KAPLAN LLP by
      Associates, P.C.:         MS. HOLLIS SALZMAN
 4                              MS. JENNIFER JONES (Via Telephone)
                                MS. KELLIE LERNER (Via Telephone)
 5                              399 Park Avenue, Suite 3600
                                New York, New York  10022
 6
      For Mowrer for Iowa:      SUSMAN GODFREY LLP by
 7                              MS. KALPANA SRINIVASAN
                                MR. BRYAN CAFORIO (Via Telephone)
 8                              1901 Avenue of the Stars, Suite 950
                                Los Angeles, California  90067
 9
                                MASSEY & GAIL LLP by
10                              MR. SUYASH AGRAWAL
                                50 East Washington Street, Suite 400
11                              Chicago, Illinois  60602

12    For Kevin Forbes:         SCOTT SCOTT LLP by
                                MS. KRISTEN M. ANDERSON
13                              707 Broadway, 10th Floor
                                San Diego, California  92101
14
      For Hoglund               REINHARDT WENDORF & BLANCHFIELD by
15    Chwialkowski              MR. GARRETT D. BLANCHFIELD, JR.
      & Mrozik, PLLC:           332 Minnesota Street, Suite W 1050
16                              St. Paul, Minnesota  55101

17
      For Hearst Television     HEARST CORP. OFFICE OF GENERAL COUNSEL
18    Inc.:                     MS. EVA M. SAKETKOO
                                300 West 57 Street, 40th Floor
19                              New York, New York  10019

20                              CRAVATH SWAINE & MOORE LLP by
                                MS. JULIE NORTH
21                              825 Eighth Avenue, Suite 3900
                                New York, New York  10019-7415
22
                                DENTONS US LLP by
23                              MS. NATALIE J. SPEARS
                                233 South Wacker Drive, Suite 5900
24                              Chicago, Illinois  60606

25
```

```
 1    A P P E A R A N C E S :   (Continued)

 2

 3    For Gray Television      COOLEY LLP by
      Inc.:                    MR. MAZDA ANTIA
 4                             MR. JON F. CIESLAK (Via Telephone)
                               4401 Eastgate Mall
 5                             San Diego, California  92121

 6                             COOLEY LLP by
                               MS. BEATRIZ MEJIA (Via Telephone)
 7                             101 California Street, 5th Floor
                               San Francisco, California  94111
 8
      For Nexstar Media        KIRKLAND & ELLIS LLP by
 9    Group Inc.:              MR. ELIOT A. ADELSON
                               MR. JACOB H. JOHNSTON (Via Telephone)
10                             555 California Street, 29th Floor
                               San Francisco, California  94104
11
                               KIRKLAND & ELLIS LLP by
12                             MR. PETER M. McCORMACK
                               601 Lexington Avenue, 45th Floor
13                             New York, New York  10022

14    For Tegna, Inc.:         JENNER & BLOCK LLP by
                               MR. ROSS BENJAMIN BRICKER
15                             MR. ANDREW MERRICK
                               MS. RACHEL SANDEL MORSE
16                             353 North Clark Street
                               Chicago, Illinois  60654
17
      For Tribune Media        PAUL WEISS RIFKIND WHARTON
18    Company:                    & GARRISON LLP by
                               MR. JAY COHEN
19                             MR. WILLIAM B. MICHAEL
                               1285 Avenue of the Americas
20                             New York, New York  10019-6064

21

22

23

24

25
```

1    A P P E A R A N C E S :   (Continued)

2

3    For Sinclair Broadcast    SHEARMAN & STERLING LLP by
     Group, Inc.:              MR. JEROME STEVEN FORTINSKY
4                              599 Lexington Avenue
                               New York, New York  10022
5
                               SCANDAGLIA RYAN LLP by
6                              MR. GREGORY J. SCANDAGLIA
                               55 East Monroe Street, Suite 3440
7                              Chicago, Illinois  60603

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Proceedings heard in open court:)
 2                THE CLERK:  In Re. Local TV Advertising, 18 C 6785.
 3                THE COURT:  Oh, we either have a patent case or an
 4     MDL, right?
 5          (Laughter.)
 6                THE COURT:  My goodness.
 7                Well, good morning, everyone.
 8                MULTIPLE COUNSEL:  Good morning, your Honor.
 9                THE COURT:  This is my first MDL.  And it's just a
10     little itty-bitty baby one, they tell me, so ...
11          (Laughter.)
12                THE COURT:  They used to call me and ask me if I would
13     take them, and I always said, "Oh, I'm not really that
14     interested."  Finally, I said, "I'm interested," and look what
15     happened.
16          (Laughter.)
17                THE COURT:  All right.  So I guess we'll get
18     everybody's name on the record, right?
19                So let's start by this table.
20                Mr. Clifford, maybe you can start, and we'll go
21     around.
22                MR. CLIFFORD:  Thank you, your Honor.  Good morning.
23     Robert Clifford.  And my partner Shannon McNulty.
24                MS. McNULTY:  Good morning, your Honor.
25                THE COURT:  No, you stand up and introduce yourself.

1    Women introduce themselves in Judge Kendall's
2    courtroom.
3    MS. McNULTY:  Good morning, your Honor.  Shannon
4    McNulty on behalf of O'Neil Toyota.
5    THE COURT:  Okay.  Good morning.
6    MR. LEVITT:  Good morning, your Honor.  Adam Levitt on
7    behalf of The Bon-Ton Stores.
8    THE COURT:  Okay.  Good morning.
9    MS. GARVEY:  Good morning, your Honor.  Karin Garvey
10   from Labaton Sucharow, also on behalf of The Bon-Ton Stores.
11   THE COURT:  Good morning.
12   MS. KATCHER:  Good morning, your Honor.  Elana Katcher
13   from Kaplan, Fox & Kilsheimer on behalf of Crowley Webb and
14   Associates.
15   THE COURT:  Okay.  Good morning.
16   MS. OLIVER:  Good morning, your Honor.  Jennifer
17   Oliver, MoginRubin, on behalf of The Barnes Firm.
18   MR. WILLIAMS:  Good morning, your Honor.  My name is
19   Steve Williams of the Joseph Saveri Law Firm.  My client is
20   Holmen Meat Locker.
21   THE COURT:  Okay.  Good morning.
22   MS. SRINIVASAN:  Good morning, your Honor.  Kalpana
23   Srinivasan of Susman Godfrey representing plaintiff Mowrer for
24   Iowa.
25   THE COURT:  Good morning.

1      MS. M. JONES:  Good morning.  Megan Jones from

2   Hausfeld, LLP representing Randal S. Ford today.

3      THE COURT:  Good morning.

4      MS. SCHARF:  Good morning, your Honor.  Stephanie

5   Scharf from Scharf Banks Marmor representing Randal S. Ford.

6      THE COURT:  Good morning.

7      MS. SIMS:  Good morning, your Honor.  Victoria Sims

8   from Cuneo Gilbert & LaDuca, and I represent John O'Neil

9   Johnson Toyota.

10     THE COURT:  Okay.  Good morning.

11     Let's start over here then with this table.  Stand up,

12  please.  Thanks.

13     MR. FORTINSKY:  Good morning, your Honor.  Jerry

14  Fortinsky from Shearman and Sterling in New York on behalf of

15  Sinclair Broadcast Group.

16     THE COURT:  Good morning.

17     MR. SCANDAGLIA:  Good morning, your Honor.  Greg

18  Scandaglia from Scandaglia Ryan, also on behalf of Sinclair

19  Broadcast Group.

20     THE COURT:  Okay.  Good morning.

21     MR. ADELSON:  Eliot Adelson of Kirkland & Ellis for

22  Nexstar Media.

23     THE COURT:  Okay.

24     MR. ANTIA:  Good morning, your Honor.  Mazda Antia

25  from Cooley for Gray Television.

1          MS. SPEARS:  Good morning, your Honor.  Natalie Spears

2    from Dentons on behalf of Hearst Television, local counsel.

3          THE COURT:  Good morning.

4          MS. NORTH:  Good morning, your Honor.  Julie North

5    from Cravath Swaine & Moore on behalf of Hearst Television,

6    Inc.

7          THE COURT:  Good morning.

8          MR. COHEN:  Good morning, your Honor.  Jay Cohen from

9    Paul Weiss for Tribune.

10         THE COURT:  Good morning.

11         MR. BRICKER:  Good morning, your Honor.  Ross Bricker

12   from Jenner & Block on behalf of Tegna.

13         THE COURT:  Okay.  Good morning.

14         MS. MORSE:  Good morning.  Rachel Morse from Jenner &

15   Block on behalf of Tegna.

16         THE COURT:  Good morning.

17         MR. MERRICK:  Good morning, your Honor.  Andrew

18   Merrick with Jenner & Block, also on behalf of Tegna.

19         THE COURT:  Good morning.

20         MR. MICHAEL:  Good morning, your Honor.  William

21   Michael of Paul Weiss on behalf of Tribune.

22         THE COURT:  Okay.  So, obviously, you've done this

23   before because I've got defendants sitting on one side in the

24   right spot.

25         Are these all attorneys here?  Okay.  Let's start back

1    there then.

2           MS. JUSTICE:  Good morning, your Honor.  Kimberly

3    Justice from Kessler Topaz Meltzer & Check on behalf of the Law

4    Offices of Peter Miller.

5           COURT REPORTER:  Peter Miller did you say?

6           MS. JUSTICE:  Yes.

7           THE COURT:  How about this, Gayle?  Why don't we take

8    the microphone and move it to the end of the table.  Can we do

9    that?  And then those people that are not near a microphone

10   could maybe walk over?  Does it have enough of a cord?

11          That's great.  Thank you.

12          MS. SALZMAN:  Thank you, your Honor.

13          Hollis Salzman --

14          THE COURT:  Wait, it's not on.  Hang on.  I've got to

15   play with it.

16          UNIDENTIFIED SPEAKER:  This one works.

17          THE COURT:  She's turning it on.  Okay.  There you go.

18          MS. SALZMAN:  Hollis Salzman from Robins Kaplan on

19   behalf of Clay, Massey & Associates.

20          THE COURT:  Okay.  Good morning.

21          MS. WEAVER:  Good morning, your Honor.  Lesley Weaver

22   of Bleichmar Fonti and Auld on behalf of One Source Heating and

23   Cooling.

24          THE COURT:  Good morning.

25          MR. WOZNIAK:  Good morning, your Honor.  Robert

1     Wozniak, Freed Kanner London & Millen on behalf of Thoughtworx,

2     Inc.

3          THE COURT:  Good morning.

4          MS. SAKETKOO:  Good morning, your Honor.  Eva Saketkoo

5     from Hearst Office, the general counsel for Hearst TV, Inc.

6          THE COURT:  Got it.  Good morning.

7          Anyone else over there?

8          MS. McCORMACK:  Hi.  Peter McCormack, Kirkland &

9     Ellis, for Nexstar.

10          THE COURT:  Okay.  Good morning.

11          MR. SZOT:  Good morning, your Honor.  Andy Szot from

12     Miller Law on behalf of Northtown Automotive.

13          THE COURT:  Okay.  Good morning.

14          MR. CALDES:  Good morning, your Honor.  Bill Caldes on

15     behalf of My Philly Lawyer from Spector Roseman & Kodroff.

16          THE COURT:  Okay.  Good morning.

17          MR. BLANCHFIELD:  Good morning, your Honor.  Garrett

18     Blanchfield from Reinhardt Wendorf & Blanchfield on behalf of

19     plaintiff Hoglund Chwialkowski & Mrozik.

20          THE COURT:  Good morning.  Is that all of the -- oh,

21     no, you're coming up?

22          UNIDENTIFIED SPEAKER:  There's plaintiffs on the other

23     side, so --

24          THE COURT:  Okay, yes, that's fine.  That's fine.

25     Because we have to get into the jury box next.

1              Do you have the jury turned on, by the way?

2              THE CLERK:  I will double-check.

3              THE COURT:  Yes, go look at the jury box mics.  That

4    will help us.

5              Go ahead.

6              MR. AGRAWAL:  Good morning, your Honor.  Suyash

7    Agrawal, Massey and Gail, on behalf of Mowror For Treasurer.

8              THE COURT:  Okay.  Good morning.

9              MR. SPECKS:  Good morning, your Honor.  Gary Specks,

10   Kaplan Fox, on behalf of Crowley Webb and Associates.

11             THE COURT:  Okay.  Good morning.

12             All right.  Everybody is over there.

13             Now let's turn -- let's turn -- hello.  We can start

14   with you since you're standing there.

15             MR. BARZ:  Good morning, your Honor.  Jim Barz with

16   Robbins Geller on behalf of Masseys Jewelers.  I lost the race

17   to the table, so I didn't know if you could see me.

18             THE COURT:  Oh, that's fine.  Good morning.

19             Let's start in the jury box.  I think that there's

20   microphones that might pick you up.  Okay?

21             MR. PROM:  Good morning, your Honor.  Adam Prom from

22   DiCello Levitt & Casey on behalf of The Bon-Ton Stores.

23             THE COURT:  Good morning.

24             MS. KELLER:  Good morning, your Honor.  Amy Keller,

25   also DiCello Levitt & Casey, on behalf of Bon-Ton.

1          THE COURT:  Good morning.

2          MR. ASCIOLLA:  Good morning, your Honor.  Greg

3  Asciolla from Labaton Sucharow on behalf of The Bon-Ton Stores.

4          THE COURT:  Good morning.

5          MR. TANGREN:  Good morning, your Honor.

6          THE COURT:  They're okay, I think.

7          Gayle, are you hearing him?  Or do you want the

8  hand-held?

9          COURT REPORTER:  No, I can hear them.  Thank you.

10          THE COURT:  Okay.  Got it.

11          MR. TANGREN:  John Tangren, also of Dicello Levitt &

12  Casey, on behalf of Bon-Ton.

13          THE COURT:  Good morning.

14          MS. BERNAY:  Good morning, your Honor.  Alexandra

15  Bernay from Robbins Geller on behalf of Masseys Jewelers.

16          THE COURT:  Good morning.

17          MR. BURNS:  Good morning, your Honor.  Warren Burns

18  from Burns Charest on behalf of LM SAC.

19          THE COURT:  Okay.  Good morning.

20          MS. WILLIAMS:  Good morning, your Honor.  Jodie

21  Williams from MoginRubin on behalf of The Barnes Firm.

22          MR. WEXLER:  Good morning, your Honor.  Ken Wexler

23  from Wexler Wallace on behalf of the Dozier Law Firm.

24          THE COURT:  Okay.  Good morning.

25          MR. BOLEY:  Good morning, your Honor.  Justin Boley

1      from the Wexler Wallace law firm on behalf of the Dozier Law

2      Firm.

3                  THE COURT:  Okay.

4                  MS. LOOBY:  Good morning, your Honor.  Michelle Looby

5      from Gustafson Gluek on behalf of the Dozier Law Firm and Curb

6      Appeals, LLC.

7                  THE COURT:  Good morning.

8                  MR. HEDLUND:  Good morning, your Honor.  Dan Hedlund,

9      Gustafson Gluek, also on behalf of plaintiffs Curb Appeal and

10     Dozier Law.

11                 THE COURT:  Good morning.

12                 MS. ANDERSON:  Good morning, your Honor.  Kristen

13     Anderson from Scott and Scott on behalf of plaintiff Kevin

14     Forbes.

15                 THE COURT:  Good morning.

16                 And I got you already, Mr. Barz.

17                 Okay.  Anyone else that I didn't get?

18                 And then I know there's some on the phone that we have

19     the list for, so we don't need to go through that because we

20     have the list, right?

21                 THE CLERK:  Correct.

22                 THE COURT:  Okay.  Pardon?

23                 THE CLERK:  I put it up there for you, right there.

24                 THE COURT:  Oh, okay.  But they -- but they're listen

25     only.

1            THE CLERK:  They're just listening.

2            THE COURT:  Okay.  All right.  Well, why don't I put

3    it, for the record, for you, Gayle, that we have Jennifer Jones

4    and Kellie Lerner or Clay, Massey & Associates.

5            We have Jacob Johnston for Nexstar Media Group.

6            We have Daniel Mogin from The Barnes Firm.

7            John Cieslak and Beatrice Mejia-Gray -- oh.  I'm not

8    sure, it must be who the -- Gray Television, right?  So it's

9    John Cieslak and Beatriz Mejia on behalf of Gray Television.

10           Bryan Caforio and Kalpana Srinivasan, Mowrer for Iowa.

11           I'll give you the list.

12           Christopher Cormier and Korey Nelson on behalf of S.

13   Chevrolet Cadillac and LM, SAC, LLC and S. Chevrolet Cadillac.

14           And Barbara Hart, Cellino & Barnes.

15           Okay?  Do you have that list?

16           COURT REPORTER:  I do, Judge.

17           THE COURT:  Okay, great.

18           All right, folks.  Well, start out with the

19   understanding that you've got a newbie on MDLs, but I've been

20   doing my research and reading and trying to get up to speed.

21   So I am not in any way embarrassed if you want to instruct me

22   on something.  That is not the kind of judge I am.  I don't

23   mind that at all.  So I will not be offended if someone says,

24   "Well, this is really the proper way to go about business."

25           Something tells me with all of you in the room that

1    you won't all agree on the proper way --

2         (Laughter.)

3              THE COURT:  -- to go about business.

4              Thank you for the joint status report.  It's clear

5    that I need to get you your interim counsel.

6              I don't know if anyone has a position on this; but I

7    have seen in the past where sometimes those position papers,

8    you have a little bit of a three-minute presentation to the

9    Court.  And I have no problem doing that.

10             Is that something that those who have put in for

11   counsel would be interested in?

12             UNIDENTIFIED SPEAKER:  Yes, your Honor.

13             UNIDENTIFIED SPEAKER:  Yes, your Honor.

14             THE COURT:  Okay.  I'll tell you what we're going to

15   have to do for Gayle is just state your name first and then say

16   yes.

17             MS. M. JONES:  Megan Jones from Hausfeld.

18             THE COURT:  Okay.

19             MS. M. JONES:  That is an appropriate way to proceed,

20   your Honor.

21             THE COURT:  Okay.  Is there anyone who thinks that's a

22   bad idea?

23         (No affirmative response.)

24             THE COURT:  Okay.  So the next thing then is when.

25   And I know you're from all over the place.  I'm actually going

1    to be out for a short -- a few weeks because I'm getting a new

2    knee immediately.  And so December 19th is a day that I'm

3    coming back.

4         Is that a day that people might be able to consider?

5    And if -- is it too close to the holidays?  Because I'm more

6    than willing to punt it into the new year if that's too close.

7         MR. LEVITT:  Adam Levitt on behalf of The Bon-Ton

8    Stores.

9         I think the understanding among a lot of people in the

10   room that -- and we're all ready to go right now if your Honor

11   is ready to go.

12        THE COURT:  Oh, I see.  I don't know if I can fit it

13   today, but it would be nice if I could.  I didn't realize that.

14   I'm sorry, I didn't realize that.  Okay.  Thank you.

15        Go ahead.

16        MR. BURNS:  This is Warren Burns from Burns Charest,

17   your Honor.  We're happy to come back in December if that fits

18   into your schedule.

19        THE COURT:  Okay.  So the other intriguing angle that

20   I have which is messing with the schedule today is that I have

21   a 34-defendant Latin Kings gang case scheduled for January, and

22   I gave the defendants kind of a date where I said you might not

23   get your last point for acceptance of responsibility once the

24   U.S. Marshal starts shipping in all these deputies from all

25   around the world and they're going to do that the day before

1    Thanksgiving.  So guess what happened?  I have ten changes of

2    plea tomorrow, and I have three today.

3              But let me just take a look and see how crazy this is

4    because -- if I give you just a few minutes, how many

5    applications do I have?

6              MS. M. JONES:  Your Honor, Megan Jones.

7              It's less than ten.  So if we did five minutes per

8    group, we could probably get it done in an hour.

9              THE COURT:  That's good.  That's very good.

10             All right.  Let me see what I've got.

11             Do you have the schedule for today?

12             THE CLERK:  I do, your Honor.

13          (Tendered.)

14             THE COURT:  It's horrible.  Okay.

15             All right.  So I have a sentencing at 10:30 and then a

16   meeting and then -- then the changes of plea begin.

17             Well, can we do a little bit of state court feel and

18   start out at 12:30?  And then if I have to take a change of

19   plea, we break for it, and then pick up again.  Would anybody

20   be averse to that?

21             MR. WILLIAMS:  Your Honor, Steve Williams.

22             I think that's fine.  And I just wanted -- it's less

23   than ten.  It's six.  There's six applications --

24             THE COURT:  Oh, that's --

25             MR. WILLIAMS:  -- if my count is right.  If we --

1          THE COURT:  We can definitely do it.

2          MR. WILLIAMS:  -- were to do it five minutes max each.

3          And if I can make a suggestion, which would be -- my

4     perspective would be it should just be those applying rather

5     than other people getting up and saying, "Here's why I think

6     you should pick A or B," because all of us could bring our

7     friends in to do that.  I don't find that to be particularly

8     helpful.

9          THE COURT:  It's such a beauty pageant.

10         (Laughter.)

11         THE COURT:  Well, we'll see how it goes.  It's all

12    going to be on my schedule, okay?

13         So we'll start at 12:30.  And then if anyone -- I'm

14    going to leave it up to those who filed a petition to work with

15    each other in case someone has an earlier flight, okay?  So if

16    there's an earlier flight, let that person go earlier and then

17    the others can stay later, just because you're going to be in a

18    holding pattern between these other court calls, okay?

19         All right.  So that should take care of that, and that

20    will give me an opportunity to help you with the appointment of

21    counsel.

22         Now, the next question that seems to be in big dispute

23    is your discovery issue regarding the DOJ material.

24         It seems completely appropriate for me to hold off

25    until I have my interim counsel to give me a nice fair argument

1    regarding that and then from defense to let me know what your

2    position is.

3             This three million DOJ documents does not intimidate

4    me, nor should it be a situation that should make you nervous.

5    We'll work on some kind of program to get it to you in the

6    appropriate fashion and the right material to you.  So that's

7    not a concern as far as the size.

8             Confidentiality orders.  I think if I give you an

9    interim lead counsel soon enough, you ought to just be able to

10   work out your confidentiality order and get it online before

11   the end of the year.  You'll send it to me.  And I'll do it the

12   way the Northern District of Illinois does it with the red

13   line, and I can make my own edits to it.  That seems to be the

14   appropriate situation.  So if I give you a lead counsel by next

15   week, then all of this can just fall into place, I think.

16            Okay.  Now, a few things that I am a little bit

17   confused about because I haven't done one before are the

18   tag-along cases.

19            For starters, everything that's come in, I've directed

20   to the Clerk's Office.  They're doing your review for

21   pro hac vice applications.  Most of you should be getting all

22   of those approved as they come through.  We have to just check

23   the roster, and then it goes out.  So I think you should be

24   getting those automatically.  And they're also consolidating

25   automatically, so they're coming in together.  And I'm just

1    getting the list as they're coming along.

2           But if there's something that is not appropriate in

3    that, I'd love to hear from anybody if they think that I'm

4    doing it the wrong way.

5           (No affirmative response.)

6           THE COURT:  I had to talk with the Clerk's Office

7    about how they do these things.

8           Okay.  Let's see.  What else do I have out there for

9    any -- oh, okay.  Who wants to tell me -- can I please just get

10   from some -- maybe I'll pick a couple plaintiffs right now,

11   just to give me what you say is the overarching claims, the

12   federal antitrust claims and the state antitrust claims, and

13   then the difference between the direct purchasers, indirect

14   purchasers.  And then, similarly, I'll call on a few defense

15   attorneys to give me your overarching sense of the defense.

16   Just so I -- that's what I would do at an initial status, okay?

17          So I'll take volunteers.  Any plaintiffs want to jump

18   up?

19          There's the first guy.

20          And you can be second, and you can be third, and you

21   can be fourth.  And then I'll get four over here.  All right?

22          So please stand.

23          What do you intend to prove?

24          MR. WILLIAMS:  Thank you, your Honor.  Steve Williams

25   on behalf of Holmen.

1      So I'm glad you raise this.  I think this is a really

2  critical question as to (inaudible).

3      Some of the applicants --

4      COURT REPORTER:  I'm sorry, I can't hear you.

5      THE COURT:  Yes, I tell you what, why don't you come

6  to the front.  And he said:  This is a really critical question

7  as to what we have to do.

8      Okay.  Go ahead.

9      MR. WILLIAMS:  Thank you.

10      So the Court may have noticed, some of the

11  applications actually call out this issue.

12      So, for example, the application Ms. Sims has put in

13  is to represent a class of state law purchasers with indirect

14  claims.

15      And without going through all of the details, because

16  it's a somewhat complicated area, there's two bodies of law

17  that provide damage claims in antitrust cases.

18      Federal law says you can only bring a claim for

19  damages if you dealt directly with the defendant.  There are

20  very limited exceptions to that, and exceptions are not freely

21  granted.

22      Various states have said you may bring cases for

23  damages for antitrust violations even if you didn't deal

24  directly with the defendants.

25      So there's only one complaint before the Court and one

1    case that explicitly says it seeks state law claims.  That is

2    Ms. Sims.  No one else has asserted that.

3          However, for the rest of the claims, some -- such as

4    the motion I brought, specifically say we want to represent

5    those seeking claims for federal damages.

6          Similarly, the Kaplan Fox group has submitted that

7    they want to represent agencies because they recognize there's

8    going to be an issue because agencies purchase for advertisers,

9    but the question is who deals directly with the defendant.

10          That is -- it's apparent from the papers submitted so

11    far, that's going to be an issue that has to be addressed.

12          So it's really a matter of deciding how to put

13    leadership in place at the time the Court does it that respects

14    the fact that there are separate state claims that need to be

15    in a separate state law complaint; separate federal claims that

16    need to be in a federal complaint; and then the question of, as

17    between agencies and advertisers, who is the proper plaintiff

18    for the federal damage claims.

19          And I think that's something that it's going to be

20    important for the Court to address at the earliest point to

21    prevent problems and speed bumps about three months from now.

22          THE COURT:  But it's not uncommon, right?  That you

23    would have both the federal and state claims in an MDL like

24    this?

25          MR. WILLIAMS:  It is not uncommon; it is, in fact,

1    common.  But it is routine practice that they would be in

2    separate consolidated complaints with separate representation

3    accounts.

4            THE COURT:  Got it.  Okay.  Thank you.

5            MR. WILLIAMS:  Thank you.

6            THE COURT:  And whoever I called on next.  Thank you.

7    Come on up and introduce yourself, please.

8            MS. SRINIVASAN:  Thank you, your Honor.  Kalpana

9    Srinivasan from Susman Godfrey on behalf of the plaintiff

10   Mowrer for Iowa.

11           To get back to the Court's initial question as to the

12   claims here, the claims that counsel here and plaintiffs have

13   alleged has to do with price-fixing and being able to share

14   competitive information in the market for local advertising.

15           As the Court is aware since the parties have filed

16   complaints, the defendants in this case and a number of other

17   defendants have been involved in a consent order with the

18   Justice Department which has provided some additional detail

19   and illuminated some of the nature of those allegations,

20   including parties sharing information about their inventory and

21   other information that's deemed competitive and allows them to

22   be able to adjust their price.  And that's really the core of

23   the allegations in this case.

24           I expect -- you know, your Honor referenced the

25   documents and the issue of the Justice Department's

1    investigation.  I do believe that those are going to be able to

2    further enhance the allegations that the parties have already

3    put together.  And as you've seen from the different plaintiffs

4    in this case, the impact -- for example, my client had to

5    purchase political advertising -- the impact of the price

6    elevation and of the inappropriate sharing of competitive

7    information had a direct impact, particularly in this very

8    specialized market for local advertising.

9            THE COURT:  So wouldn't there be some of those

10   documents, however, that would be protected in the DOJ

11   investigation -- I mean, I don't know.  I'll talk to you all

12   when I get to you as far as where they stand with that.  But, I

13   mean, it seems that was the one flag that I saw popping up as

14   far as what you want and what you're able to get.

15           MS. SRINIVASAN:  Yes, your Honor.  In other cases,

16   we've had entry of a protective order prior to the production

17   of those documents.  Typically, defendants will be ordered to

18   produce those after an initial case management conference, and

19   they will produce the investigatory documents that they

20   initially turned over to the government.

21           In terms of coordinating for additional documents the

22   government has been able to obtain, I imagine that we will have

23   ongoing discussions about how to do that while protecting the

24   work that the government has done as well.

25           THE COURT:  Got it.  Okay.  Thank you very much.

1              MS. SRINIVASAN:  Thank you, your Honor.

2              THE COURT:  Anyone else, please?

3              MS. SIMS:  Good morning, your Honor.  Victoria Sims.

4     I'm from the law firm of Cuneo Gilbert & LaDuca, and I'm here

5     on behalf of John O'Neil Johnson Toyota.

6              So as stated previously, this case is about

7     overpayment for advertising time as a result of

8     information-sharing by the defendants who own a variety of

9     local television stations.  So we have folks who purchased

10    directly from the television stations; we have folks who

11    purchased from advertising agencies.  My client did both.

12             My client is the only one, as Mr. Williams stated, who

13    is asserting the indirect purchaser claims under indirect

14    purchaser laws.  So that's under a variety of state laws:

15    State antitrust laws, state consumer laws, state unjust

16    enrichment laws.

17             So it is typical when there are state law claims,

18    those do not go in the same complaint as purely direct

19    purchaser claims.  They can be included in a complaint with

20    direct purchaser damage claims, however.  So I can give you a

21    number of examples --

22             THE COURT:  So how does it play out then later down

23    the line?  So we get all of our work done, and then we say

24    we're going to go to trials, I mean -- so you're separated into

25    the state court and the rest are in the federal court?

1          MS. SIMS:  No, no.  All of the claims are here in

2     federal court.

3          THE COURT:  As far as trials.

4          MS. SIMS:  Correct.

5          THE COURT:  When you go to trial.

6          MS. SIMS:  Correct, correct.

7          THE COURT:  Okay.  I've done plenty of bellwether

8     trials for my colleagues who have done these and plenty of

9     others that have been shot back; but, you know, they're all

10    usually tied up and ready for me to go, so I don't know how to

11    do the beginning.

12         All right.  Thanks very much.

13         MS. SIMS:  So just --

14         THE COURT:  Go ahead.

15         MS. SIMS:  Just to clarify, what we seek to represent

16    is a class of purchasers who are asserting indirect purchase

17    claims.

18         THE COURT:  I get it.

19         MS. SIMS:  They're not limited to those indirect

20    purchase claims.  They're, of course, not waiving their direct

21    purchaser claims.

22         THE COURT:  Got it.

23         MS. SIMS:  They do want to make sure that they assert

24    those in the same complaint.  They wouldn't split up their

25    claims between different complaints.  But they're seeking their

1    own complaint, their own case, because they have these unique

2    claims --

3              THE COURT:  Got it.

4              MS. SIMS:  -- which are litigated differently.

5              Thank you so much.

6              THE COURT:  I get it.  Thank you.  Okay, thanks.

7              MS. M. JONES:  Briefly, your Honor, not to repeat

8    what's already been covered.  Megan Jones, Hausfeld.

9              I think most of the issues that you'll hear later

10   today -- the indirect versus the direct controversy, as well as

11   leadership of a certain category of plaintiffs -- can all be

12   handled once lead counsel is appointed.

13             An example, Ms. Hollis Salzman and I are co-lead

14   counsel in *Cargo*.  We had the very same issue.  The court

15   appointed co-lead counsel.  And they decided whether separate

16   counsel for certain classes were warranted --

17             THE COURT:  Okay.

18             MS. M. JONES:  -- and so I think the issues that

19   you'll face today can be decided once we --

20             THE COURT:  Right.

21             MS. M. JONES:  -- decide lead counsel.

22             THE COURT:  It sounds like I get to turn over a lot to

23   you all who get to do a lot of work.

24             Go ahead.

25             MS. GARVEY:  Good morning, your Honor.  Karin Garvey

1    for The Bon-Ton Stores.

2            I largely agree with what's been said and what

3    Ms. Jones just said as well regarding the fact that conflicts,

4    should there even be any conflicts with regard to the direct

5    purchasers, those can certainly be handled by lead counsel.

6    And that's what Judge Shah has recently done in the *VIX* case.

7            THE COURT:  Okay.

8            MS. GARVEY:  The one element that I wanted to mention

9    that I think was omitted from the description of the nature of

10   the case as well as the nature of the Department of Justice's

11   complaint and what they said in their competitive impact

12   statement was the significance of the designated market areas

13   throughout the country.

14           The country is divided by Nielsen into different

15   market areas, and those market areas are how advertising time

16   is bought throughout the country.  And that played a

17   significant role, frankly, in the description of what the

18   conduct -- the anti-competitive conduct of defendants was in

19   the DOJ's mind in the sense that it matters where the

20   defendants have overlapping DMAs.  These television station

21   owners own stations in various markets throughout the country.

22   They don't own them in every market.  Sometimes they overlap in

23   a market.  Sometimes it might just be that one of the

24   defendants is in a given market.  And with one in a given

25   market, a conspiracy is a little bit different, of course.

1          THE COURT:  Got it.

2          MS. GARVEY:  Thank you, your Honor.

3          THE COURT:  Anyone chomping at the bit that I -- that

4    the others didn't say something that you feel should be said?

5          Go ahead, Mr. Barz.

6          MR. BARZ:  I'm not going to speak for the sake of

7    speaking.  I think I would repeat -- what you've heard here is

8    two arguments.  You asked a question what the case is about and

9    you heard some people weaving in why they might be appointed,

10   but I'm going to save that for later.

11         THE COURT:  Okay.  That's fine.  All right.  Anyone

12   else who feels the need?

13         Go ahead.  Come on up.

14      (Approaching.)

15         THE COURT:  And you can move the microphone so we can

16   hear you.

17         MS. KATCHER:  I'm used to this.

18         THE COURT:  You're accustomed to that, right?

19         MS. KATCHER:  I just wanted to speak really quickly

20   because I will save my discussion of advertising agencies for

21   our five-minute talks, but I just wanted to clarify.

22         There can be good reason to make sure that the initial

23   lead structure actually is representative of the way -- the

24   realities of the way people purchase in the marketplace.

25         There are two generally different kinds of direct

1    purchaser plaintiffs.  There are individual businesses of the

2    type that most of the lawyers here are representing who will go

3    directly to a TV station, make a purchase for their advertising

4    spot.

5            Then there's another group that will go through

6    advertising agencies.  Advertising agencies will purchase

7    directly as part of a range of services that they offer to

8    their clients.

9            You would want both types of plaintiffs, when you see

10   that there's two groups like that, actually represented in the

11   leadership structure so that potential standing issues,

12   conflicts, can be dealt with early and that those plaintiffs

13   feel they have representation.

14           We had attached to our papers a recent case just this

15   month in the *CRT* case that shows some of the results if you

16   don't have that starting out.

17           THE COURT:  I saw that.  Okay.  Thanks very much.

18           Go ahead.  Come on.  Good morning.

19           MS. OLIVER:  Good morning, your Honor.  I'll be very

20   brief as well.

21           Jennifer Oliver, *MoginRubin*, for The Barnes Firm.

22           I would like to also advocate that we establish a

23   structure for leadership as opposed to allowing plaintiffs'

24   counsel to sort of figure out the direct and indirect and

25   advertising agency leadership amongst themselves.

1          The Barnes Firm feels strongly that a strong

2   leadership structure that accounts for directs, indirects,

3   other classes of plaintiffs, as well as various regional and

4   geographic aspects of the case is very important to establish

5   up front.  And so we would advocate, as Ms. Katcher said, the

6   importancy of establishing a leadership structure.

7          THE COURT:  Okay.  Thanks.

8          MS. OLIVER:  Thank you.

9          THE COURT:  I'm going to turn over to the defendants

10  now.  Anybody want to jump in?

11         Thank you.  Make sure you say your name first when you

12  get to the lectern for me.  Thank you.

13         MR. COHEN:  Yes, your Honor.  Jay Cohen from Paul

14  Weiss for Tribune.

15         THE COURT:  Okay.

16         MR. COHEN:  So we're not going to address the

17  leadership structure.  We think the Court is going about this

18  the right way.  Let's establish that.  And we'll work things

19  out with them hopefully in the way we would --

20         THE COURT:  Well, because you don't even think there's

21  an antitrust violation --

22         MR. COHEN:  Correct.

23         THE COURT:  -- right?

24     (Laughter.)

25         MR. COHEN:  I'm going to sit down now, your Honor.

1    THE COURT:  Right?  I got it.

2    MR. COHEN:  No, we don't think there's antitrust

3    violation alleged in the complaints we've seen so far.

4    There was simply a story in the *Wall Street Journal*

5    which contained a leak from the Department of Justice, which

6    led to two dozen complaints which have no more information than

7    is present in the *Wall Street Journal* article.  That doesn't

8    begin to address what's required under *Twombly* to plead an

9    antitrust case.  We don't think they can plead an antitrust

10   case.  We don't think the proposed final judgment that only

11   some of the defendants entered into -- my client has a proposed

12   final judgment, but a number of folks sitting at the table have

13   not entered into proposed final judgments with the government,

14   so we're not all similarly situated in that way -- but those

15   judgments on their face don't constitute an admission of

16   liability.  And we don't think there are any facts that are

17   pled in the complaint and they're not, of course, admitted by

18   us; but those facts would not allege an antitrust conspiracy

19   that could survive a motion to dismiss.  So we --

20   THE COURT:  So is it like -- it's a judgment -- it's

21   not a consent --

22   MR. COHEN:  It's a consent --

23   THE COURT:  It's a consent decree --

24   MR. COHEN:  Just like at the SEC, Department of

25   Justice, same thing.

1     THE COURT:  Okay.

2     MR. COHEN:  It's without -- it's an express denial of

3  liability.  It's without any finding that the facts have been

4  proven by the government.  It is a way of ending a government

5  investigation.

6     THE COURT:  Okay.  And just to show my naivete on this

7  issue, so this isn't something that the MDL panel, before they

8  send it all off to me, has looked at as to whether it states a

9  claim?

10    MR. COHEN:  They have not.  They have not.  They have

11 not.  The MDL panel, as I understand it, your Honor --

12    THE COURT:  It seems a little backward.

13    MR. COHEN:  Well, I think you've been given the honor

14 of deciding, rather than us deciding it 25 times --

15    THE COURT:  Okay.

16    MR. COHEN:  -- but, you know, we'll work with the

17 plaintiffs to come up with a timely schedule for --

18    THE COURT:  Sure.

19    MR. COHEN:  -- motions to dismiss, and we'll see if

20 there's an operative complaint that's left after that.

21    THE COURT:  Got it.  Okay.  Thank you very much.

22    MR. COHEN:  Thank you, your Honor.

23    THE COURT:  Who else would like to speak?

24    Oh, wow, you're all in -- you're unified.

25    MR. FORTINSKY:  I'll just add one thing, if I may.

1          (Laughter.)

2               MR. FORTINSKY:  Jerry Fortinsky for Sinclair.

3               Mr. Cohen addressed everything we need to say.

4               I just want to underscore that the -- the plaintiffs

5     seem to have in mind a model where the Department of Justice

6     does a criminal investigation, and then at the end they

7     discover that they get settlements with some parties that have

8     acknowledged their -- that have pleaded guilty and acknowledged

9     their guilt.  This is not like that.  This is a civil matter.

10    There were no fines.  There was no penalties --

11              THE COURT:  Oh, there's no fines or penalties imposed?

12              MR. FORTINSKY:  Right.  This was not that model at

13    all.

14              And, in fact, as Mr. Cohen said, there was no

15    finding -- no admission of wrongdoing, no finding of

16    wrongdoing, no admission of liability.

17              THE COURT:  So what does the consent decree comprise?

18    An agreement of how to behave in the future?  Is that how it

19    works?

20              MR. FORTINSKY:  Essentially, it was the DOJ

21    establishing norms for what is to be done in the future.

22              I would also underscore that, as one of the

23    plaintiffs' counsel said, in this business there are DMAs.

24    It's not one national market, which is another way in which

25    this case is different from the kind of standard model template

1    that I think many of the plaintiffs' counsel seem to have in

2    mind.

3              This is not simply one purported nationwide

4    conspiracy.  This is not like that at all.  There's no

5    conspiracy to begin with.

6              But beyond that, we're talking about DMAs throughout

7    the country representing separate markets.

8              THE COURT:  Okay.  Thank you for that.

9              Anyone else from the defense that wants to add

10   anything?

11       (No affirmative response.)

12             THE COURT:  Okay.  All right.  So if I'm on the right

13   track -- and I hope I am, and you're free to correct me if I'm

14   not -- I'm going to do this little fashion show that you do --

15       (Laughter.)

16             THE COURT:  -- and then I'll make my determination.  I

17   intend to do so quickly so that it gets you some guidance.

18             Then once I make that determination, I will expect

19   that you -- I'll give you a date for a proposed confidentiality

20   order.

21             And then from that date, I will give you a proposed

22   motion to dismiss scheduling order.

23             Does that sound like a plan?

24             MULTIPLE COUNSEL:  Yes.

25             THE COURT:  Okay.  Is there something I'm missing in

```
 1     all of that?
 2              MS. M. JONES:  Megan Jones from Hausfeld.
 3              You're not missing anything, your Honor.  But for a
 4     good order sake, I would propose that the lead counsel
 5     petitions be heard in the order that they were filed, unless
 6     there's a flight, and that will help everyone --
 7              THE COURT:  Doesn't bother me.
 8              MS. M. JONES:  -- organize theirselves.
 9              THE COURT:  You're all professionals.  I think you can
10     work that out.  I never micromanage good lawyers, so I don't
11     mind -- whatever fashion you want.
12              Sir?
13              MR. BURNS:  Your Honor, just briefly.  It's Warren
14     Burns from Burns Charest.
15              I am an applicant.  Unfortunately, I have a family
16     matter that requires me to leave this afternoon, and I would
17     not be able to attend the hearing.
18              My colleague Amanda Klevorn from my firm is here, and
19     she can present on our behalf.
20              THE COURT:  That's fine.  I don't mind.  Okay.
21              All right.  So does it make sense before you all break
22     up that I give you that schedule with the idea that I would --
23     I mean, I hate to give myself a deadline for the filing, but if
24     I can work off of, like, an internal deadline, and then give
25     you something maybe before you leave?  Does that sound like a
```

1  plan?

2          MR. COHEN:  Just to be clear, we're going to need a

3  consolidated complaint.  I assume that's what your Honor

4  means --

5          THE COURT:  Yes, exactly --

6          MR. COHEN:  -- filing of the consolidated --

7          THE COURT:  You need to do a consolidated complaint.

8  And then I would need to do the motions and the response.

9          MR. COHEN:  Yes.

10          THE COURT:  And then does it make sense to do that

11  before the interim counsel or wait?

12          MR. COHEN:  Well, we have actually conferred and

13  agreed on a schedule --

14          THE COURT:  Okay.

15          MR. COHEN:  -- which is in the order --

16          THE COURT:  Oh, I don't remember that.

17          MR. COHEN:  -- in the status report --

18          MR. WILLIAMS:  I think what counsel is --

19          THE COURT:  Wait, wait.

20          MR. WILLIAMS:  Defendants have agreed on a schedule --

21          THE COURT:  Oh, okay.  Hold on, hold on.  Hold on.

22  You have to say your name before you speak.

23          MR. WILLIAMS:  I apologize.  It's Steve Williams.

24          MR. COHEN:  Your Honor, we have agreed on a motion --

25  a schedule.  That is correct.

1          MR. WILLIAMS:  That is correct.

2          MR. COHEN:  Right.  So it's in Section D of the status

3     report.  So that upon the filing of a consolidated complaint,

4     60 days for the motion to dismiss, 60 days for opposition, and

5     30 days for reply.

6          THE COURT:  That's fine then.  I can use that from

7     when I give you your deadlines.  Okay.  That's not a problem.

8          MR. WILLIAMS:  Your Honor, if I may, what I wanted to

9     respond to is to the extent what counsel is suggesting is that

10    the other documents that the Court referred to, such as the

11    confidentiality order, need to await the complaint.  I think

12    all of us on our side would disagree with that.  There's no

13    reason for those documents -- protective order, discovery

14    orders, et cetera -- to wait until the consolidated complaint

15    and the motion practice has ended.

16         THE COURT:  Okay.  I'll take a look at it and see.

17         Anything else that needs to be addressed before I go

18    through your presentations?  Anyone?

19         MR. ANTIA:  Your Honor, Mazda Antia on behalf of Gray

20    Television.

21         To the extent the consolidated complaint, when we see

22    it, has issues that are unique to certain defendants, we want

23    to reserve the right to file separate motions to dismiss.

24    We'll file an omnibus motion, but we wanted --

25         THE COURT:  I have no problem with that either.  I

1    look forward to it.  It's not going to be an issue.

2              MR. ANTIA:  Thank you.

3              THE COURT:  Okay.  No, that's not an issue.

4              Okay, folks.  Well, I look forward to this.  This will

5    be fun.

6         (Laughter.)

7              UNIDENTIFIED SPEAKER:  Famous last words.

8              THE COURT:  Famous last words, right.

9              I understand it's a baby one in comparison, so I'm not

10   too worried.

11             Okay.  So I will start up then at 12:30 in the order

12   that you want.  We'll give five minutes each.  And I have to

13   pick up right now with a sentencing and some other matters.

14   All right?

15             MULTIPLE COUNSEL:  Thank you, your Honor.

16             THE COURT:  You might as well start moving out so that

17   the prosecutors come in.

18             For those of you who are making presentations, there

19   is on this floor -- hold on, folks -- on this floor there is an

20   attorney trial bar room, kitty corner from my office.  And if

21   you want to discuss in there, it's got some space for you to do

22   so.  Okay?

23        (Judge Kendall attends to other matters.)

24             THE COURT:  All right.  For those of you waiting on

25   the MDL, you'll have to wait.  We haven't had a break yet from

1    the bench, so we'll come back to you at 1:00 o'clock, for those

2    waiting for oral arguments.

3              And then you get a little bit of a break.  Okay.

4              COURT REPORTER:  Thank you, Judge.

5              THE CLERK:  All rise.  Court is in recess.

6         (Brief recess.)

7         (Proceedings heard in open court:)

8              THE COURT:  Who is going first?  I heard that you were

9    going to take turns.

10             UNIDENTIFIED SPEAKER:  Yes.

11             THE COURT:  Thank you.

12             Guess what I have?  (Indicating.)  I got this -- this

13   is not -- this is not a red light.  This is like the Wicked

14   Witch of the West.

15        (Laughter.)

16             THE COURT:  Someone gave it to me as a joke because I

17   always tell people, you know, "You have three more minutes,"

18   and then they always go over.  And so guess what?  One has five

19   minutes on it.

20             MS. GARVEY:  We're just going to share our five

21   minutes.

22             THE COURT:  Go ahead.

23             MR. LEVITT:  Okay.  Thank you, your Honor.

24             Once again, I'm Adam Levitt, representing The Bon-Ton

25   Stores.

```
 1          As you'll see if you haven't seen already, I
 2   occasionally stutter when I speak.  Not a problem for me;
 3   shouldn't be for you.  If anything I say isn't entirely clear
 4   in my three minutes of magic, please let me know and I'll go
 5   right back over it.
 6          THE COURT:  It doesn't bother me at all.
 7          MR. LEVITT:  Okay.  Anyway, it's clear from the
 8   applications that everyone who has applied is probably capable
 9   of leading this case.  I think we have a lot of very high
10   quality lawyers here.
11          So the question becomes how to differentiate between
12   each applicant and figure out who should really lead this case.
13          While Ms. Garvey is going to talk about the
14   investigation we did and the scope of our group, I wanted to
15   speak about our client.
16          The Bon-Ton Stores is a larger client, a larger
17   plaintiff, I would submit, than every other plaintiff in this
18   case combined and doubled.  We are a very large plaintiff.  It
19   has purchased almost $100 million worth of ads in the class
20   period.  We have the most significant interest in this case.
21   In the class period, our purchases, as I said a minute ago, far
22   exceed everybody else's.
23          While this is not, admittedly, a PSLRA case where the
24   largest always wins, I'll explain to you why here the Manual
25   for Complex Litigation, Section Number 21, 272, as well as --
```

1    as well as other judges in this building, as well as right next

2    door, Judge Gottschall, have actually appointed leadership in

3    antitrust cases like this one based upon the size of the

4    plaintiff.

5            In *Blood Plasma Antitrust Litigation*, the Shapiro

6    Haber firm was appointed lead counsel.  They represented the

7    Mayo Clinic.  The Mayo Clinic's purchases of plasma far

8    exceeded anybody else's.  So, too, here the Bon-Ton Stores far

9    exceed any -- any other plaintiff here.

10           Likewise, in New York, in *LIBOR*, the Court said that,

11   and I'll quote, "The magnitude of a plaintiff's economic

12   interest is highly relevant in deciding who should be

13   appointed."

14           So here we have a situation that not only did our

15   client, The Bon-Ton Stores, purchase almost $100 million in

16   local television advertising time in the class period, but,

17   importantly, and as we began speaking about earlier, it made

18   those purchases across the United States.  So we're not just a

19   one -- one-market player, like almost every other proposed

20   plaintiff here.

21           We -- our client operated 270 retail stores across the

22   United States.  As Ms. Garvey spoke about earlier, the

23   importance of the existence of DMAs around the country, we are

24   in over 50 of them.  There isn't another plaintiff here who can

25   say anything like that.

1     So the breadth and depth that our client brings to

2  this case is one of the plus factors that sets us apart.

3     Also our client is a direct purchaser.  They purchase

4  through -- they purchase through a cost-plus contract with the

5  agents.  And it's been clear that when an agent is simply --

6  simply a purchasing agent, as the courts have stated, for

7  example, in *Cathode Ray*, as well as in *In Re. Toilet Seat*

8  *Antitrust Litigation*, where the fact is that --

9     THE COURT:  There's one I didn't get.

10  (Laughter.)

11     MR. LEVITT:  I understand.  It's the glamorous side of

12  the law, your Honor.

13     THE COURT:  Exactly.

14     MR. LEVITT:  It's just one of those things.  God knows

15  what the second choice name would have been in that case.

16     So here our client's contract with its advertising

17  agency specifies, for example, that our client will be charged

18  at the rates charged by the owners of the media, less any

19  agency commission.  Likewise, our client's contract specified

20  that its agent will purchase media on behalf of Bon-Ton as

21  directed by Bon-Ton and only with its prior written

22  authorization.  So the direct purchase link there is very

23  clear.

24     The agent -- I know that a lot of people are going to

25  probably say that the agency issue actually matters here.  I'll

1    be very clear.  It doesn't.  We are a direct purchaser.

2          Finally, and then I'll turn it over, is that we are a

3    Chicago law firm.  My office is right down the block.

4    Coincidentally, the indirect purchaser's counsel, Mr. Clifford,

5    for example, is here in Chicago, thereby increasing the

6    coordination aspects of the indirect piece of this case, the

7    direct piece of the case.

8          THE COURT:  So I had a plaintiff's lawyer who once

9    told me -- I said, "You've missed your last two statuses."  And

10   he said, "Well, Judge, I'm here in the building every day."

11   And I said, "What am I supposed to do?  Go out in the hallway

12   and go, Mr. So-and-So, come here."  And I thought maybe that's

13   what you're suggesting, I could just yell out the window, "I

14   need you, get over here."  Is that the idea?

15         MR. LEVITT:  We'll cross that bridge when we come to

16   it, your Honor.

17         (Laughter.)

18         MR. LEVITT:  Thank you very much.

19         THE COURT:  Thank you.  Okay.

20         MS. GARVEY:  Your Honor, Karin Garvey also for The

21   Bon-Ton Stores.

22         I first wanted to highlight the first 23(g) factor,

23   which is work done to investigate the case.

24         Earlier, Mr. Cohen for the defendants said that the

25   plaintiffs' complaints simply parroted back these bare fact

1    allegations that were included in a *Wall Street Journal*
2    article.
3            That's simply not the case for our client.  If you
4    take a look at our complaint, that is not what we did.
5            It may be what the 18 complaints did that were filed
6    before ours, but it is simply not what we did.
7            We spent nearly 375 hours prior to filing our
8    complaint investigating the nature of the claims here.  We
9    spoke with over 70 former employees and/or industry insiders to
10   try to learn what was going on.  We filed a FOIA request with
11   DOJ.  We've researched the defendants.  We worked with an
12   economist.
13           Through that investigation, we discovered the
14   significance of the designated market areas, the DMAs, and the
15   real significance of the overlapping DMAs in this industry, as
16   I explained earlier.
17           And, of course, this ties in to the size of our
18   client, as Mr. Levitt said a minute ago, because our client
19   purchased in over 50 DMAs.
20           I want to be very clear that we disagree with
21   Mr. Fortinsky that a DMA here has anything to do with what a
22   relevant market is.  It can have a nationwide conspiracy even
23   where DMAs play a role.
24           I also want to say that given your Honor's comment at
25   the outset of our hearing this morning that this is your first

1    MDL, I just wanted to say --

2            THE COURT:  Don't be -- I'm not afraid of it.

3        (Laughter.)

4            MS. GARVEY:  I just wanted to say a word about the

5    size and structure of the proposed leadership groups.

6            We've applied here as a two-firm structure.  We don't

7    need a liaison counsel because, as you noted, you could yell

8    out the window at Mr. Levitt and he would come running.  And

9    this is, in your words, a baby MDL.  It is not a massive MDL.

10   It just simply isn't.

11           And I'll also note that you might have seen in some of

12   the submissions firms filing papers in, quote, unquote, support

13   of other firms.

14           In our experience and the experience of multiple

15   courts who have spoken on this issue and the Third Circuit Task

16   Force which has written on this issue, support usually comes in

17   exchange for promises of work.  That's why firms support one

18   another.  Then they get to do work on the case.  We want to be

19   clear that we have not made any promises here to other firms in

20   exchange for support.  We did not promise work to anybody else.

21           And that's important because, again, it goes back to

22   the size of the case and the proposed leadership structures.

23           This isn't a case where you need five, six, seven,

24   even four firms working on it.  It's just not that large.

25           Of course, having said that, if we need help, we are

1    more than happy to reach out to other firms here.

2         If your Honor chooses to appoint your own leadership

3    structure involving other firms, we've worked with all of the

4    firms in the courtroom before and we'd happily do so again.  We

5    just don't think that anything larger than our two-firm

6    structure is needed here.  We think that our firms are more

7    than capable of handling this case.

8         We have decades and decades of antitrust experience.

9    We have decades of experience before this very Court.  We have

10   trial experience.  And significantly here, given the role of

11   the DOJ case, we should mention that we have a lot of

12   experience working with the government.

13        We also bring to the table diversity.  We have a team

14   assembled that is diverse in terms of gender, in terms of race,

15   in terms of sexual orientation, something that we know a lot of

16   courts have been focusing on of late because, of course, with

17   diversity comes various perspectives to a litigation that bring

18   a lot of value.

19        And I'd like to maybe just say one more personal note

20   about me.  I went into this in more detail in our papers.  But

21   I actually spent 18 years on that side of the V.  I'm very

22   familiar with defendants because I did it for almost two

23   decades.  And because of that, I bring a certain perspective to

24   a case that I think is often lacking.

25        I've been able to cut through so many issues and break

1    up so many log jams in my three years on the plaintiffs' side

2    of the V because I understand sort of what's driving the

3    defendants, what's driving, frankly, their clients who are

4    ultimately, of course, the decision-makers.  And that's brought

5    a lot of efficiency in the cases that I have worked on.

6          So unless your Honor has any questions --

7          THE COURT:  I don't.  Okay?

8          MS. GARVEY:  Thank you.

9          THE COURT:  Thanks very much.

10         And I didn't even, like, take out my crystal ball and

11    the flying monkeys.

12    (Laughter.)

13         THE COURT:  Okay.  Who is next?

14    (Approaching.)

15         THE COURT:  Good afternoon.

16         MS. OLIVER:  Good afternoon, your Honor.  Jennifer

17    Oliver on behalf of The Barnes Firm.

18         And I am here to argue for appointment of Daniel Mogin

19    to the leadership of this case.

20         Your Honor, if I may, I'd like to touch first upon --

21    and I did this earlier as well -- what we think is the

22    importance of establishing an effective leadership structure at

23    the outset for this case.

24         As some of my colleagues mentioned earlier, this is

25    inherently a local case.  It's in the name of the case.  And

1    there are a lot of regional sort of realities to the facts of

2    the case.  It is about local TV advertising.  And, therefore,

3    we are proposing a three-firm leadership structure, with one

4    firm from the West, one from the Mid-Continent, and one from

5    the East.

6         We are also proposing that the direct and indirect

7    purchasers should be separately represented, and that is due to

8    the additional burdens that the indirect purchasers will face

9    with regard to discovery and proving damages and things like

10   that.

11        And -- but within the direct purchasers, we're

12   proposing a three-firm leadership structure, and feel that it's

13   very important that the Court establish that up front rather

14   than just allowing counsel to sort of divvy up work among

15   themselves without all members of the class necessarily being

16   fairly represented.

17        One of the reasons we think it's very important to

18   establish a team is that, rather than a single mega plaintiffs'

19   firm sort of doling out work, a team will allow diverse

20   approaches and viewpoints to be brought to the case.

21        We would say that a team does not mean inefficient.

22   We have been party to many very efficient leadership teams and,

23   in fact, have worked with many of the folks in this room on

24   other MDLs in teams.

25        And as your Honor said earlier, it may not be a huge

1    case, but we don't really think that it's a baby case.  I think

2    you can see on this side of the room there are many lawyers

3    from many of the top defense firms in this country representing

4    large media companies.  There's going to be significant

5    discovery.  I think the term three million documents has

6    already been thrown around today.  So we would say it's not a

7    baby case.  And a team is, in fact, appropriate to handle the

8    case.  And at the end of the day, no one firm is going to

9    litigate this case on its own.

10             And, again, my colleague before me said this, but I

11   would also recognize that many in this room are very capable of

12   litigating this case, and so it's really a question of what

13   will best serve the class in terms of structure.

14             And I would next like to talk about our client as

15   well.  Our client, The Barnes Firm, is a truly direct

16   purchaser.  They do not purchase through any outside agents.

17   They deal directly with defendants.  And they have purchased

18   more than $15 million of ads during the class period.  They are

19   in three of the top 30 DMAs in the country, including Los

20   Angeles, which is the second largest; and San Francisco, which

21   is the eighth largest; and including overlapping DMAs, which is

22   an issue that some of my colleagues have discussed in their

23   complaints because DMAs, where there are overlapping

24   defendants, may have been especially affected here in this

25   price-fixing conspiracy.

1        And so our client has a very strong interest in the

2   outcome of the case.  We've already done a lot of diligence

3   with our client in gathering significant data on their ad buys

4   over the years.

5        And, in fact, our client is so ubiquitous that if you

6   look on YouTube, there are dozens of videos of toddlers singing

7   their jingle.  It's -- they have a very strong interest in the

8   outcome of this case, and it's very central to their business

9   motto.

10        And, finally, our client is the only Western client --

11   or Western plaintiff in the MDL.

12        So I'll direct your Honor to Exhibit B of the Daniel

13   Mogin declaration that was filed with our leadership

14   application.  And I do have a copy of it here if you would like

15   me to hand it up.  But you will see that the plaintiffs here

16   are actually quite concentrated in the East and Mid-Continent.

17   And The Barnes Firm really stands alone west of the Rockies as

18   a sole Western plaintiff.  And so if your Honor does choose to

19   adopt a proposed leadership structure of one West, one

20   Mid-Continent, and one East firm, our client is alone in the

21   West.  And we are -- our client does advertise in San Diego,

22   L.A., and San Francisco, some of the largest DMAs at issue

23   here.

24        And, finally, but very importantly, I would like to

25   talk about our firm and our firm's capabilities.  As I said

1    earlier, many firms here are very capable of litigating this

2    case.  But we, too, have a long history of litigating antitrust

3    matters, including in this district.

4         We recently litigated and partially settled the *Kleen*

5    case in this district for more than $350 million, along with --

6    we were lead counsel in that case.  And we were co-lead with

7    some others in this room.  And that was the third largest

8    antitrust settlement, we believe, ever to be reached in the

9    Northern District of Illinois.  And that was litigated by

10   Daniel Mogin and also my colleague here in the courtroom, Jodie

11   Williams.

12        Dan Mogin has more than 38 years' experience

13   litigating antitrust matters around the country, including in

14   this district, and he has been lead counsel in many.

15        We also have -- he's an antitrust professor.  And

16   he -- his partner, John Rubin, is a Ph.D. in economics.  So we

17   have quite strong econometric skill on our team as well.

18        As I mentioned, my colleague, Jodie, litigated the

19   *Kleen* case in this district for a significant settlement.

20   Partial settlement so far.  She's also very active in the ABA's

21   Antitrust Section and is the lead of the Antitrust Section of

22   the Women's Initiative.

23        And as my colleague before me said, I, too, have

24   litigated on this side of the V.  I was at Weil Gotshal for ten

25   years and have, in fact, tried complex actions, including on

1    behalf of media companies, such as ESPN and Walt Disney.

2         My colleague, Jodie, was also a former staff attorney
3    at the FTC, so we have experience on the government side as
4    well.

5         The firm has ample resources to litigate the case
6    efficiently, as we have done in other cases where we have
7    served as lead counsel, including working on name brand
8    prescription drugs, which was, in fact, the largest antitrust
9    settlement to be reached in this district.

10        And, by the way, the prescription drugs matter
11   involved a leadership team of four firms from around the
12   country, including West, East, and Mid-Continent.

13        And so, in sum, you can read our many accolades of our
14   firm in our papers and awards that we've received, as well as
15   the other firms here.  But we would suggest that the Court
16   apply our suggested structure of three firms -- East, West, and
17   Mid-Continent -- because that structure will best serve the
18   class as required by Rule 23.  And we request that Dan Mogin be
19   appointed, along with his team, to the -- any structure that
20   that Court -- that the Court should choose, and has ample
21   resources to litigate the case on our own or as a part of the
22   team that we propose.

23        So I'm not sure if your Honor has any questions, but
24   thank you for your consideration.

25        THE COURT:  Thank you very much.

```
 1              I feel like I'm in an episode of The Bachelor right
 2    now.
 3         (Laughter.)
 4              THE COURT:  I really do.
 5              MS. OLIVER:  I would love the honor of a rose, your
 6    Honor.
 7         (Laughter.)
 8              THE COURT:  I don't know the show that well to know
 9    what that means.
10         (Laughter.)
11              THE COURT:  Okay.  Come on forward.
12         (Approaching.)
13              MS. SRINIVASAN:  Thank you, your Honor.  Good
14    afternoon.  Kalpana Srinivasan on behalf of Susman Godfrey.
15    And with me is Suyash Agrawal from Massey & Gail.
16              We agree with the Court that this is a case that has a
17    cabin scope.  And while the claims here are really important
18    about competition in the market for local advertising, we
19    believe it is a case that's well suited for treatment and
20    handling by a single firm structure with a liaison counsel.
21              It's unlike some of the antitrust MDLs we've seen
22    which involves a ubiquitous product, like a cellphone or
23    multiple different products, and those have compelled larger
24    structures.
25              The reason for proposing a single-firm structure is
```

1    really three-fold:  One, our firm has had extensive experience

2    handling MDLs, as many of the firms here have, and really doing

3    so leanly.  I served as co-lead counsel in an antitrust MDL in

4    the Northern District of California against Qualcomm, which we

5    recently certified, involving 250 million class members.  We

6    did that with a team of one -- two co-lead law firms and a

7    plaintiff steering committee firm.  And, frankly, that involved

8    about, you know, 10 to 15 core lawyers really understanding the

9    case top to bottom.

10           The Court referenced here not being daunted by three

11   million documents, and that -- that is fair.  We are not

12   either.  That's a case in which we had something like 40

13   terabytes' worth of discovery.

14           But, again, we found that having a centralized team of

15   people who really know the documents, who can effectively

16   depose witnesses, who can argue and prepare briefs, is much

17   better than having a lot of decentralized assignment and work.

18           And by virtue of those -- both that action in which we

19   were coordinated with the Federal Trade Commission's case and

20   the *Auto Parts* MDL in which we work with the Justice

21   Department, and we've had a lot of experience working with

22   those regulatory agencies, and we think it will be extremely

23   important in initially getting the case going on obtaining

24   documents.

25           Beyond the general MDL experience, we have a lot of

1    experience trying to verdict class action cases.  Our firm has

2    tried more than a dozen antitrust class actions with over a

3    billion dollars in verdicts.

4            We have also tried the defense side of class action

5    cases to verdict.  I myself have tried two defense class

6    actions to their conclusion.

7            Our proposed liaison counsel also brings that

8    experience to the table of being on both the plaintiff and

9    defense side and substantial trial experience.  And we really

10   believe that aspect of it.  The experience in trying cases

11   affects the entire way in which the case is managed and run.

12   We try all kinds of cases, and not just class actions, but

13   other cases that we may take on a contingency where we bet

14   against ourselves.  And what we really try to do is make those

15   as efficient as possible, focusing on the outcome, trying to

16   figure out what the key issues are in the case.  And we do so

17   pursuing very large defendants on our own, including Samsung

18   and Apple, the largest banks in the country.

19           And, ultimately, we believe that kind of approach

20   enures to the benefit of the class by having people who really

21   have to know everything and who are very focused on that

22   particular case.

23           We have found it really productive and beneficial to

24   the class in terms of controlling the structure where the Court

25   has limited the leadership to a firm or potentially to two

1    firms and to place specific restrictions and guidance on how

2    work is assigned and how it is billed.

3            Finally, your Honor, a little bit about our plaintiff

4    who is -- you know, purchased political advertising during the

5    class period.  We really think that underscores the importance

6    of local advertising in that market and the ability of people

7    to be able to access it and the impact that price competition

8    has on it as well.

9            We are happy to work with other firms if that is what

10   the Court elects, but we do believe this is a case that can be

11   handled efficiently and with a focus on results for the class

12   by a single firm.

13           Thank you, your Honor.

14           THE COURT:  Thank you.

15           Oh, you're not going to say anything?  You just came

16   up as window dressing?

17       (Laughter.)

18           MS. SRINIVASAN:  He's my window dressing.

19           MR. AGRAWAL:  I'm happy to be window dressing.  And

20   I've always been told that when counsel has said it

21   effectively --

22           THE COURT:  Right.

23           MR. AGRAWAL:  -- the best thing to do is say nothing

24   at all.

25           THE COURT:  Right.  I say it all the time on the

1    bench.  Okay.

2         So if they're the suitors and I'm picking, then what

3    are you, like, the parents?  Making sure --

4        (Laughter.)

5         THE COURT:  -- making sure I don't bring in an in-law

6    into the -- into the suit that's going to make a mess out of

7    everything?

8         Okay.  Thank you.

9         MS. M. JONES:  Good afternoon, your Honor.  Megan

10    Jones for Hausfeld, LLP, speaking on behalf of myself, Robins

11    Kaplan, Kessler Topaz, Scharf Banks, and Freed Kanner.

12         THE COURT:  Okay.

13         MS. M. JONES:  Our submission is at Docket No. 106.

14         THE COURT:  Got it.

15         MS. M. JONES:  There are many good lawyers in the room

16    today, and what we want to talk to you about is determining the

17    best lawyers for this case.

18         We think there are four reasons.  We build MDL teams

19    all the time.  We're in some of the largest antitrust cases,

20    some of the most nuanced, in college athletics, not just

21    commodity products.  We have experience in antitrust cases.

22    This is what we do.

23         We are prepared to represent a large range of

24    interests.  In the cases that we represent, we represent

25    manufacturers that live across the United States.  We are

1    prepared to represent this class to the best of our ability

2    regardless of each class member's particular circumstances.

3           We also believe in diverse teams in terms of

4    geographics, capabilities, and gender.

5           We also have been heralded for professionalism by both

6    the bench and the bar.  And what we think answers the question

7    most solely in this case about what puts us apart is our

8    professionalism.

9           We have a team that I think is a dream team to lead

10   this case.  This Court can trust us to be consistently

11   professional.  We are well versed in working on building with

12   teams.  We know how to reach consensus with large groups of

13   plaintiffs, which will clearly come into play today.  We know

14   how to put together a litigation plan that has diverse and

15   often conflicting points of view.  We know how to avoid

16   unnecessary motion practice through strict negotiations on the

17   plaintiffs' side before it gets to you.  And we save our

18   conflict on the defense side for the most important legal

19   issues.

20          To make that point stronger, here is what others have

21   said from the bar and publications about us.  We are

22   personable.  We are highly respected.  We are professional

23   problem solvers.  We are respected from all contingents.  We

24   are well prepared.  And we know what's important and what

25   isn't.

1          And lest you think we're merely proficient, they've

2     also said that we're trailblazers, that we're heavyweight

3     practitioners.  We are outstanding and savvy.  And there are

4     those among us that have been awarded the International

5     Development Award of Distinction and the Antitrust Division's

6     Assistant Attorney General Award of Distinction.

7          So we respectfully submit that this Court should

8     combine our professional and innovative strengths and propose

9     the following structure:  Hausfeld as lead counsel, with Robins

10    Kaplan and Kessler Topaz as a member of a two-firm steering

11    committee, with Freed Kanner as liaison counsel.

12         Others do support this, but they do it because they

13    support our judgment.

14         At Docket 115, you'll see their support, which has an

15    express statement that they were not promised work in support

16    of that.  And I draw the Court's attention to that.

17         But this is because we -- our team combines decades of

18    antitrust experience.  *Blue Cross*, *Air Cargo*, *Interchange*, *VIX*,

19    *Auto Parts*.  Hollis Salzman and I have worked together as

20    co-lead counsel multiple times before, and we're a well-known

21    quantity.  We have media trial experience.  We have a former

22    DOJ antitrust federal prosecutor and trial lawyer.  We have a

23    former in-house counsel.  We have an electronic discovery

24    specialist that will save this Court time and headache by

25    nuanced negotiations with defendants about what actually works.

1    We have an accomplished local trial lawyer who has been a

2    member of this district's trial bar for 30 years, Ms. Stephanie

3    Scharf.  We have a deep and longstanding commitment to

4    diversity and inclusion.  We have a liaison counsel that's

5    gotten the top three antitrust settlements in the

6    Seventh Circuit.  We have third -- four FBI investigators at

7    our disposal to investigate this industry.  And in an express

8    point about how we're working together, our three firms have

9    already sent out, for the benefit of the class, letters to

10   third-party preservation.  We've already started working.

11        We know everyone in this room, and we are happy to

12   build teams that make sense.  And I have to say that takes a

13   certain temperament with all these points of view, and I'm glad

14   to say we have it.

15        We will allow -- but our lean structure will allow

16   this Court to hold one person responsible, and that would be

17   me.  If there's overbilling, if there's overstaffing, if

18   there's over -- too many people at a deposition or a hearing,

19   you have a lean, mean structure that you can call onto the

20   carpet for the lack or to -- of progress in this case or to

21   praise it for what it has done.

22        We can be trusted to lead this case efficiently and

23   help the Court answer questions based on our years of

24   experience.

25        For example, it's premature for counsel right now to

1    be advocating for separate counsel for groups or regions.  I'll

2    just shortly say that we don't know the entirety of the class

3    right now.  We don't have the make-up, and nor is there a

4    record right now to submit or support subclasses for regions

5    and/or groups of plaintiffs.

6            I will call the Court's attention the -- in one of the

7    cases, the Mayo Clinic was heralded as an amazing plaintiff,

8    and the Court relied upon that in appointing class counsel, and

9    then the Mayo Clinic withdrew and was not included in the

10   amended complaint.

11           And so that's one of the reasons why large clients are

12   not part of the matrix.  It's really about the skills of the

13   lawyers, which I think we have.

14           And in terms of the subclasses and the conflicts, I

15   can tell you, every single plaintiff lawyer in this room is

16   highly incentivized to avoid conflicts and get a class cert.

17   upheld in the circuit.  And if there is a need for subclasses,

18   there's not a person among us that won't appoint someone.

19           And so Judge Gleason, Judge Koeltl, Judge Robinson, in

20   *Air Cargo*, *BuSpar*, and *Coumadin*, faced the exact same issue

21   that you did about whether they should appoint regional or

22   subclasses, and they chose not to do so.  They appointed lead

23   counsel, and let lead counsel determine what was in the best

24   interest of the class.

25           Thank you.

1          THE COURT:  Thank you.  Okay.  Number 5.

2          MR. BARZ:  Good afternoon, your Honor.

3          THE COURT:  Good afternoon.

4          MR. BARZ:  Jim Barz on behalf of Robbins Geller Rudman

5     & Dowd and Scott & Scott, which are seeking to be appointed

6     interim lead counsel.  And we're Docket No. 109.

7          So, your Honor, no one factor is dispositive.  Each of

8     the candidates has highlighted certain relative strengths.  I

9     want to highlight four of ours.

10         First, our two firms are not just plaintiffs' firms,

11    not just class action firms, but specifically antitrust.

12    Leading plaintiff antitrust firms.  There are very good defense

13    lawyers on the other side of the table.  And I agree with

14    everybody that's gone before me.  You've got some pretty good

15    choices here on the plaintiffs' side.  But I do think there are

16    differences even amongst the great candidates.

17         We are the largest plaintiffs' class action firm in

18    the country at nearly 200 lawyers.  We have a proven track

19    record individually and with the firm we've partnered with in

20    this application, Scott & Scott.

21         Together, our firms in the last several years have

22    settled four separate antitrust class actions and recovered

23    over $10 billion for the class, including what I believe is the

24    largest class action antitrust settlement ever in *Visa*

25    *Interchange*.  It also includes a case called *ISDAfix* antitrust,

1    which we settled last week before Judge Furman in the Southern

2    District of New York.  And when I heard your Honor mention that

3    this was your first MDL, I wanted to point out what Judge

4    Furman had said.  And it's in our papers.  He said last week at

5    the hearing:  "This was, I think it is fair to say, probably

6    the most complicated case I have had since I've been on the

7    bench.  I cannot really imagine how complicated it would have

8    been if I didn't have counsel who had done as admirable a job.

9    You have done, in my view, an extraordinary service to the

10   class."

11        And that's who we are.  And that's not just

12   individually, but working together.  We know how to work

13   together cooperatively.  And along with other firms, we've done

14   that as well.

15        So you've heard today about various complications.

16   And if I can borrow a TV ad, since it's a TV ad case, you know,

17   I would say that we're like the insurance commercials.  We know

18   a thing or two because we've seen a thing or two.  So all these

19   different complications --

20        THE COURT:  I hope there's no copyright lawyers --

21        (Laughter.)

22        THE COURT:  -- in here right now.

23        MR. BARZ:  All these complications you've heard

24   about -- different geographies, different types of buyers,

25   direct and indirect -- we've dealt with all these issues.  And

1    we believe that we're well capable of simplifying them and

2    crystallizing the disputes for the Court's consideration.

3            So -- and we've also put together -- well, let me turn

4    to my second factor, which is courts when they're assigned an

5    MDL often look to a local presence that can have advantages for

6    the class, such as saving money for time and travel expense,

7    and also the class benefits from having counsel who is familiar

8    with local rules and practice.  And that's something that I

9    obviously have.  I'm the head of our Chicago office, and I've

10   practiced here my entire year -- for 20 years.

11           We also, your Honor, I would note, have the largest

12   class action settlement after a trial in the Seventh Circuit's

13   history, as far as I know.  And that was our case, *Jaffe versus*

14   *Household*.  It was tried before Judge Guzman.  It was reversed

15   on damages at the Seventh Circuit, reassigned to Judge Alonso,

16   and settled on the morning of trial, before Patrick Fitzgerald

17   nonetheless.  And I thought that was a real badge of honor when

18   a client is willing to pay us that type of -- or when the

19   defendants are willing to settle a case for nearly $1.6 billion

20   rather than go to trial with that stellar of a team.  And I

21   think it speaks to our professionalism and our ability to

22   represent the class well here, too.

23           THE COURT:  I bet Alonso was happy.

24       (Laughter.)

25           THE COURT:  He was very new when he got that case.  I

1    don't think he was on the bench but maybe a year, I think.

2            MR. BARZ:  I think that's about right.

3            THE COURT:  Yes.

4            MR. BARZ:  I had a different PSLRA case in front of

5    him which settled, so I think it gave a good -- at least a

6    guidepost up to that point.

7            THE COURT:  He was probably grateful.

8            MR. BARZ:  And third relative advantage I would

9    highlight is we jointly represent -- Scott & Scott and Robbins

10   Geller -- the diverse members of the class.  You've heard a lot

11   today about whether there should be a separate representation

12   for advertising agencies versus the sort of retailers and

13   people just out advertising themselves.  We don't think there's

14   a need for two classes.  We think they're both just people that

15   are buying ads.  But we represent both.  We've got Massey

16   Jewelers, which is a local retailer advertising, and we've got

17   Kevin Forbes, who was an advertising consultant and acted a lot

18   of ways like advertising agencies.  So we think that puts us in

19   a unique position amongst the candidates to be sensitive to any

20   particular interests amongst all the class members.  And we

21   think that factor weighs more in favor than particular size.

22            You heard about size of lawsuits.  In the PSLRA,

23   Congress has specifically said we want to give priority to the

24   investor with the largest loss.  And I think it speaks volumes

25   that there's no such law passed for antitrust cases because it

1    recognizes that somebody who buys $100 million worth of ads

2    doesn't necessarily reflect your typical class member.  And

3    that's why the Courts have discretion to fashion who they

4    believe for that particular case is best suited.

5            Nothing I've heard so far suggests that you need to

6    appoint multiple counsel to represent various interests.  I

7    think if you start to go down that track, you run the risk of

8    parallel litigation inefficiencies.  Now the defendants, every

9    time they want to get an answer, they've got to call two

10   separate sets of lead counsel.  We think our structure is

11   efficient.  It provides one-stop shopping for the Court and the

12   defendants to get their answers.

13           And as Judge Dow in another MDL I'm in front of

14   recently noted, it's an interim appointment.  Right?  So it can

15   be reconsidered if there's a concrete dispute later on.

16           But at this time, we think -- we agree with those that

17   have advocated a lean structure.

18           I note, your Honor -- I'm not going to go through it

19   because you've heard all our beautiful bios and everything

20   else -- but we've submitted papers, too, that explain the

21   diverse team we have, people with very significant antitrust

22   experience.  I've done lots of things, including antitrust

23   cases.  Judge St. Eve recently appointed me to the Plaintiffs'

24   Steering Committee in the *DMS Antitrust Litigation* in this

25   court, with Mr. Clifford as liaison counsel.  So we've worked

1    well with others.  And I think the Court recognizes that we add

2    value in these cases.

3         Finally, your Honor, if there is a last tie-breaker I

4    could offer up, our firm, because of its size and because we

5    specialize in class action cases, I think is uniquely situated

6    amongst the firms, and we actually have the capability to host

7    our documents in-house, and that can represent a significant

8    savings to the class as well.

9         So unless you have any questions, we would rest on our

10   brief and those arguments.

11        THE COURT:  Okay.  Thank you.  I don't have any

12   questions.  Thanks very much.

13      (Approaching.)

14        THE COURT:  Good afternoon.

15        MS. KLEVORN:  Good afternoon.  Good afternoon, your

16   Honor.  My name is Amanda Klevorn, and I'm with the law firm of

17   Burns Charest, here on behalf of the plaintiff LM SAC, LLC.

18   And I'm speaking on behalf of Mr. Warren Burns' application --

19   he does apologize again, had to leave early.

20        THE COURT:  It's not a problem.

21        MS. KLEVORN:  And so I will just reiterate what

22   everyone has already said, which is obviously there are many

23   talented attorneys here today who are -- who have the

24   experience and who can capably lead this MDL.  And my firm is

25   comfortable resting on our written submission with respect to

1      our lawyers' experience and qualifications.

2              But what we wanted to focus on today is the work that

3      our firm has already put in to developing this case for the

4      good of the proposed class.

5              And I know Mr. Levitt's team earlier mentioned Rule

6      23(g), which provides that the Court should consider the work

7      that an applicant has done to identify potential claims.

8              And our view is that our firm really does stand out in

9      that respect.

10             We did not file a complaint for our client as soon as

11     the *Wall Street Journal* article came out or as soon as the

12     other media, you know, public coverage came out.  We actually

13     decided that it was indeed in our client's best interest to

14     examine the case more carefully, and so we expended our own

15     resources to hire our own experts.  Those experts spent months

16     looking at data that we acquired on media and advertising

17     pricing issues.  And the results of that economic analysis are

18     set forth in our complaint.  And that is something that really

19     sets our complaint apart, I think, from most of the other

20     complaints that are on file.  And we talked about the results

21     of that economic analysis in our application as well.  And the

22     short version is that the work we've done shows that

23     advertisers paid somewhere between 11 to 25 percent higher

24     prices in markets where the Defendant Sinclair and Defendant

25     Tribune both participated.

1        And so that's really -- the primary thing that we want

2    to emphasize here is we put a lot of time and effort and

3    resources into investigating this case, and so we think that

4    really sets us apart from many of the other applicants here

5    today.

6        And I will just conclude on that point.  We think that

7    economic analysis, paired with our firm's experience, sets us

8    apart.

9        And so we would respectfully request that Mr. Burns be

10   appointed as interim lead counsel for the proposed class on

11   those bases.

12       THE COURT:  Okay.  Thank you very much.

13       That was it, right?  Six?  Did we decide?

14       Oh, we have more?  Well, someone said ten, and then

15   someone said six.

16       UNIDENTIFIED SPEAKER:  My math was not very good.

17       THE COURT:  Oh, so there's ten.

18       UNIDENTIFIED SPEAKER:  No, nine.

19       THE COURT:  Nine.  Okay.  Go ahead.

20       MR. WILLIAMS:  Hi.  I'm Steve Williams, Joseph Saveri

21   Law Firm.  I'm responsible for that bad math.

22       I, along with the Gustafson Gluek firm and Wexler

23   Wallace, have moved for appointment.  We represent Holmen

24   Locker & Meat Market, Dozier Law Firm, Gibbons Ford, Curb

25   Appeal, and Hoglund Law Firm.

1          This is one of my least favorite parts of the practice
2    because all of us get up and tell you how we're so much better
3    than everyone else.
4          THE COURT:  It's such a fashion show I haven't seen
5    before.
6          MR. WILLIAMS:  It's very awkward.
7          THE COURT:  It is, indeed, an oddity in law.
8          MR. WILLIAMS:  Yes, it is.
9          I think that of the attorneys who are in this room,
10   not the firms, but the attorneys who are asking the Court to
11   appoint them to lead, no one has led more federal antitrust
12   class cartel classes than I have.  I began doing this in 1997.
13   I've done it consistently since then.  I've had more
14   appointments to lead those types of cases than anyone here.
15         I had the privilege of being asked by the Federal
16   Judicial Center to teach federal judges two consecutive years
17   the law of antitrust --
18         THE COURT:  I haven't taken his class, just in case
19   anyone is wondering.
20      (Laughter.)
21         MR. WILLIAMS:  We missed you.
22         This year I taught the law of Horizontal Restraints,
23   which is an issue in this case.  I've been co-lead counsel with
24   virtually every firm that's in this room.  And the reason I
25   talk about the experiences, this is going to be a somewhat

1    complex case.  I think it is going to benefit the Court and

2    it's going to benefit the class to have someone who has been

3    through a lot of antitrust cases and know this -- the types of

4    issues that arise.

5            And as one primary example is this issue of who has

6    the claims and is there a conflict.  And, respectfully, I think

7    that some are going over this a little too easily.

8            I, at the American Antitrust Institute conference in

9    Washington, D.C. last week, I spoke on this topic.  This is a

10   very important issue.  And, in fact, the Supreme Court a week

11   from today is going to hear a case that might change this rule.

12           This Court should have counsel who know those rules

13   intimately.

14           You heard about the *Air Cargo* case, and you heard a

15   suggestion that the lawyers should figure that out.  Well, I

16   agree with what the Court said earlier, that the lawyers are

17   here to solve problems for the Court.  And I will do that.  But

18   I was in *Air Cargo*, as was the Kaplan Fox firm.  That didn't

19   work out quite as easily.  Mid-case the parties had to retain

20   outside mediators and arbitrators to allocate between them what

21   would happen to the funds that were being recovered.  That

22   shouldn't have to happen if problems are looked at

23   prospectively.

24           And to that end, I want to modify what our proposal

25   is, because I've read the proposal of the Kaplan Fox firm.

1    Ms. Katcher is going to come up after me.  I've worked with

2    Kaplan Fox.  I know Ms. Katcher.  She's an outstanding

3    attorney.  I think they have identified a good point here.  And

4    I would recommend to the Court that our proposal -- Gustafson

5    Glick, my firm, with Wexler as liaison -- join with Kaplan Fox.

6    Maybe the issue never arises, as some of the attorneys have

7    told you.  But my view would be you're better protected to have

8    someone who is put in charge of dealing with that issue so it's

9    addressed prophylactically instead of three months or six

10   months from now when there are fights about who is the right

11   party to be in a complaint.  And I think that that would be an

12   outstanding way to address this.  The Kaplan Fox firm is

13   excellent.  I've worked with them.  We could work in a

14   structure like that.

15          They will speak for themselves, but that would be what

16   I would suggest to the Court.

17          In terms of the suggestions about size of plaintiffs,

18   I think as counsel have made clear, that's not a consideration

19   in an antitrust case.  It's not a PSLRA case.  It happens

20   occasionally.

21          But, really, the primary question for the Court is who

22   is best going to represent the class.

23          I've told you about my experience.

24          The Gustafson Gluek firm presently is handling a case

25   before Judge Durkin in this district, an MDL antitrust class

1    case, where they have just completed protective orders,

2    deposition protocols, ESI protocols, discovery practice,

3    Rule 26(f) conferences.  They just did that.  They have a

4    template from that case that they could bring here, and we

5    could get those things done quickly.

6         And, finally -- though it's somewhat off the point --

7    this morning you heard a lot about how there's really no case

8    here.  I know we're not deciding motions to dismiss yet, but I

9    do want to respond to some of the points you heard from defense

10   counsel by telling the Court what Makan Delrahim, the head of

11   Antitrust at the DOJ, said about the case, which was, quote:

12   "The unlawful exchange of competitively sensitive information

13   allowed these television broadcast companies to disrupt the

14   normal competitive process of spot advertising in markets

15   across the United States.  Advertisers rely on competition

16   among owners of broadcast television stations to obtain

17   reasonable advertising rates, but this unlawful sharing of

18   information lessened that competition and thereby harmed the

19   local businesses and the consumers they serve."

20        Those are the issues for whoever you pick to litigate

21   in this case, but they're certainly not settled issues.

22        Thank you, your Honor.

23        THE COURT:  Okay.  Thank you very much.

24        Number 8?

25        MS. KATCHER:  I believe that's me.

1          THE COURT:  That's you.  You had a preview of coming

2    attractions, right?

3          MS. KATCHER:  I will adjust the mic.

4          Good afternoon, your Honor.

5          THE COURT:  Good afternoon.

6          MS. KATCHER:  I appreciate Mr. Williams' words.  And I

7    would like to say right off the bat that Kaplan Fox does not

8    believe that only advertising plaintiffs should be represented

9    in the structure.

10          We're happy to work with Mr. Williams, who is an

11    excellent lawyer, who we've worked with on many cases before,

12    or -- or any of the others.  I think you have an embarrassment

13    of riches and a hard decision before you.  But certainly we

14    think that both the main types of plaintiffs in this case

15    should be at the table, should be the individual businesses --

16    in one case a political campaign who buy advertising directly

17    from the TV markets -- from the TV stations, as well as the

18    advertising agencies, who, it's my understanding, make the

19    majority of the purchases in this market.  I'm not ready -- I

20    have heard some numbers, but I don't want to represent the

21    exact figure in court until I'm sure.  But I think nobody in

22    this court would disagree with the fact that a substantial

23    amount of the purchases are made through advertising agencies.

24          And just a little bit about my client and why they are

25    an appropriate plaintiff and should be represented in the

1    leadership.  They are based in Buffalo, New York.  They've been

2    in business, in the advertising agency business, for about 30

3    years, three decades.  They have 80 employees, so they are not

4    an insignificant business.  They are what's known as a

5    full-service advertising agency.  Like other fields,

6    advertising agencies vary in scope of what they do.  Crowley

7    and Webb considers itself a full-service practice, which means

8    they do everything from purchasing the advertising, spot

9    advertising, to planning their clients' media budgets, to

10   planning it out, where the dollars should be spent, digital

11   versus television, and then doing the creative work if the

12   client would like, actually composing the commercials, doing

13   market research.  It would vary with the needs of the client.

14   They make a lot of their purchases in the New York media -- the

15   DMA, which is actually different than Buffalo.  New York is the

16   Number 1 market.  Buffalo is smaller.  53.  Chicago is Number

17   3, by the way.  But they do, like, again, law firms and other

18   businesses, they do whatever the client before them is

19   interested in doing.  So there's a diversity of DMAs there.

20          Some of their clients -- they have a website,

21   www.CrowleyWebb.com, and they tout clients that your Honor and

22   the people in this courtroom would have heard of:  M & T Bank,

23   Dunkin Donuts, Merck, Bristol-Myers Squibb, and Wilmington

24   Trust.

25          In addition to the issues that have come up here and

1   have been explored a bit in the preview, as you have put it,

2   there's -- there's a practical reason to have an advertising

3   agency in the mix in a case like this.  They're an ongoing

4   feature of this industry.  In these conspiracy cases, the

5   plaintiffs' side is at a built-in informational advantage.

6   It's the defendants who know the business, who know -- who have

7   all the facts that we hope to get discovery about.  But we

8   often represent purchasers who that's all they did, they made

9   the purchase.

10          Our client has an insight based on their 30 years in

11   the industry of how it works.  They're familiar with the

12   players, not just the defendants, but Cox and Katz, the reps of

13   the defendants that have come up in some of the DOJ pleadings

14   as having featured in the conspiracy as well.  And so they

15   offer a way for lead counsel to educate themselves in a way

16   that perhaps a smaller plaintiff, although they have perfectly

17   valid claims, doesn't have the same insight into.

18          Some of the actual risk of not -- of conflict -- it

19   may be a conflict.  We don't know at this stage of the case.

20   But just as when we're lawyers, we try to deal with foreseeable

21   conflicts at the time they appear.  Some of the things that

22   were said today indicate where the tension is.

23          For example, Bon-Ton noted that it does purchase -- at

24   least some of its advertising it purchased through advertising

25   agencies, but it characterized the contracts as something

1    called cost-plus contracts.  Cost-plus -- the terms "cost-plus

2    contracts" and "agency" has particular meanings in antitrust

3    law that don't necessarily correspond with our common

4    understanding of what they are.  And it's -- there's case law

5    that develops just in interpreting those terms.  And you need

6    to have counsel for the different parties to a contract like

7    that, to a representation like that, at the table to

8    sufficiently determine you're doing the best for the class as a

9    whole.

10          *Air Cargo* has come up repeatedly today.  My firm was

11   lead counsel as well in that case.  There was four co-leads, by

12   the way, none of which were picked through an offered

13   structure.  The judge there actually perceived some upcoming

14   tensions within the class and pretty wisely just picked four

15   counsels and made them co-equal co-lead counsels, and the

16   result of that was a $1.25 billion benefit to the class.  So it

17   worked out just fine.

18          But one thing in *Air Cargo* that occurred later in the

19   case -- Mr. Williams talked to you about something that

20   happened early in the case -- later in the case, after one of

21   the last settlements was approved, when we moved for

22   distribution of the funds, someone challenged the distribution

23   saying that they were a direct purchaser and they had been

24   improperly excluded from the class.  And our argument -- we

25   represented, as four of the five lead plaintiffs were -- were

1    entities called freight forwarders, who, much like an

2    advertising agency, included the purchase of cargo services as

3    part of a range of services they offered to their customer, and

4    also represented in that lead structure was a customer who

5    bought directly --

6            THE COURT:  Okay.  You're going to have to try to wrap

7    it up.

8            MS. KATCHER:  Oh, I'm sorry.

9            But the point was we were able to successfully deal

10   with the challenge because we had the representation amongst

11   the leads who were there, and they were at the table.  And we

12   had a satisfactory result for the clients.

13           I won't -- I have to wrap it up, so I'm not going to

14   talk about myself.  It's all in the papers --

15           THE COURT:  It's in the paper --

16           MS. KATCHER:  Thank you very much.

17           THE COURT:  Okay.  And last, but not least, are we --

18   uh-oh, it's Mr. Clifford.  We're never going to get --

19       (Laughter.)

20           MR. CLIFFORD:  Okay.  Well, that's a good intro.

21           Good afternoon, your Honor.

22           THE COURT:  Good afternoon.

23           MR. CLIFFORD:  Robert Clifford.  And our submission is

24   under Docket 122.

25           THE COURT:  Thank you.

1        MR. CLIFFORD:  Your Honor, I have the enviable task of

2  being the caboose here instead of the lead.  And he who speaks

3  last will speak least.

4        You know, as your Honor knows, historically this is

5  not my normal book of business.  And it has started, actually,

6  I think for me with the 9/11 case when --

7        THE COURT:  Right.

8        MR. CLIFFORD:  -- Judge Hellerstein made me liaison

9  counsel of the litigation there.  And we were successfully able

10  to conclude for, you know, a couple billion dollars, and then

11  most recently being lead counsel in the *State Farm* litigation

12  before Judge Herndon, which is a case that is up for a fairness

13  hearing in the middle of December.  But as of today, and the

14  time limit has expired, we only had one objector, which we

15  think and take as a testament to the idea of how we ran a case

16  like that.

17        And, frankly, I think there are a lot of parallels

18  because what I've observed in this area of practice is that the

19  more decentralized you are in your leadership team, the less

20  efficient it's going to be for the class.

21        Now, whether you've -- you've heard a lot of advocacy

22  here today for one lead, and I can certainly embrace that idea.

23  And I think our team, with Mr. Cuneo and Ms. Sims and

24  Ms. McNulty, works well in putting that together for the Court

25  because we're the ones with the indirect claims, with -- with

1    some direct claims there, but unlike the retailers and the

2    advertisers here, we're uniquely situated to, I think, put

3    together for the Court a leadership team that would be on

4    multiple tracks that would accommodate all of the interests and

5    deal with all of these tensions that you kind of sense from the

6    paperwork.

7            And I think particularly here -- you know, you've

8    heard from some very good lawyers today, whether it's

9    Ms. Jones, Mr. Levitt, of -- all the people that you've heard,

10   they're quality lawyers.  But certainly one of the ways that I

11   think our group would distinguish itself for your Honor would

12   be to prepare this case for trial and do it with a view that

13   maximizes the efficiencies for getting the case ready for

14   trial.  Because that's what will motivate, if there's ever to

15   be a resolution in this case, it's going to be because the case

16   can be put together, presented to a jury in a hot, fast,

17   efficient way that would be managed by the Court as you direct.

18           So, you know, on one track, if you're going to -- if

19   you're predisposed to make multiple co-lead appointments,

20   certainly we would ask, as we have said in our papers, that you

21   consider that with us as the indirect lead, including our

22   individual clients, direct claims that they have.  I think

23   there are others out there like that.

24           But if you were to focus on one lead counsel in a

25   traditional, with a liaison having what I think is an advantage

1    to the Court, local counsel, local firms, that would be here

2    and be accountable to you on a regular sustained basis.  You

3    won't have to yell out the door like -- Mr. Levitt is not that

4    far away, and neither, you know, are some of the other people.

5    And you have all good people before you, Judge.

6            THE COURT:  Okay.  Thank you very much.

7            MR. CLIFFORD:  Thank you.

8            THE COURT:  Gentlemen and ladies, over here, you don't

9    have anything to say on this, right?  You just watch the

10   fashion show and hope that I marry the right person.

11       (Laughter.)

12           THE COURT:  Okay.  I don't have time to go further

13   with you because I have a full docket for the rest of the day.

14           So thank you very much for your presentations.  And

15   you'll hear from me shortly.

16           Thank you.

17       (Proceedings adjourned.)

18              C E R T I F I C A T E

19       I certify that the foregoing is a correct transcript of the

20   record of proceedings in the above-entitled matter.

21

22

     */s/ GAYLE A. McGUIGAN*                    *November 26, 2018*
23   Gayle A. McGuigan, CSR, RMR, CRR                      Date
     Official Court Reporter
24

25