**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **IN RE LOCAL TV ADVERTISING ANTITRUST LITIGATION** | MDL No. 2867<br>No. 18-cv-6785<br><br>**CONSOLIDATED AMENDED ANTITRUST CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

## Table of Contents

I.     THE NATURE OF DEFENDANTS' UNLAWFUL CONDUCT ..................................... 1

II.    JURISDICTION AND VENUE ARE PROPER HERE ...................................................... 4

III.   DEFENDANTS' CONDUCT AFFECTED INTERSTATE COMMERCE ..................... 4

IV.   THE PARTIES AND UNNAMED AGENTS AND CO-CONSPIRATORS ................. 5

    A.   The Identities of the Plaintiffs ................................................................. 5

    B.   The Identities of the Defendants ............................................................. 5

    C.   The Identities of Unnamed Agents and Co-Conspirators ........................... 8

V.    DEFENDANTS FORMED AND PARTICIPATED IN AN UNLAWFUL PRICE
       FIXING CARTEL FACILITATED BY AN INFORMATION EXCHANGE ................. 9

    A.   Defendants Agreed to Fix Prices for Broadcast Television Spot Advertising Sales
        and That Agreement Was Facilitated by An Information Exchange .......................... 9

        1.   Defendants Exchanged Competitively Sensitive Information Through Sales Rep
           Firms and Directly With One Another ............................................................ 9

        2.   Such Systematic Exchanges of Non-Public Competitively Sensitive Information
           Violate Section 1 of the Sherman Act ............................................................ 11

    B.   The Department of Justice Investigation and Requirement for Injunctive Relief
        Underscore the Conclusion That the Defendants Violated Section 1 of the Sherman
        Act ...................................................................................................... 14

    C.   The Lack of Fines, Indictments, or Pleas is Immaterial ............................. 16

    D.   The Economic Evidence—Namely, Increased Prices and Skyrocketing Revenues in
        the Face of Declining Demand—Supports the Existence of a Cartel ...................... 18

VI.   DEFENDANTS EXCERCISED MARKET POWER AND THEIR CONDUCT HAD
      ANTICOMPETIVE EFFECTS IN A RELEVANT ANTITRUST MARKET ............... 26

VII.  "PLUS FACTORS" FURTHER EVINCE THE EXISTENCE OF DEFENDANTS' *PER
      SE* UNLAWFUL PRICE FIXING CARTEL ................................................... 29

    A.   Defendants' Information Exchange is a "Super Plus Factor" Evincing the Existence
        of a *Per Se* Unlawful Price Fixing Cartel ................................................ 29

    B.   Defendants' Motive to Conspire—Declining Viewership and Revenue—is a Plus
        Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful ... 30

C. Defendants' Opportunities and Invitations to Collude are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful ...................................... 32

    1. Invitations and Opportunities to Collude Through the TIP Initiative ............... 32

    2. Opportunities to Collude Through Joint Service Agreements ........................... 33

    3. Opportunities to Collude Through the TVB Trade Association ....................... 33

    4. Opportunities to Collude Through the NAB Trade Association ....................... 34

    5. Opportunities to Collude Through the MRC Trade Association....................... 34

D. Defendants' High Market Shares and High Concentration in the Broadcast Television Spot Advertising Market are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful ............................................................. 35

E. High Barriers to Entry in the Broadcast Television Spot Advertising Market is a Plus Factor Supporting the Existence of a Price Fixing Cartel That is *Per Se* Unlawful .. 39

VIII. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CARTEL THROUGH, *INTER ALIA*, PUBLIC STATEMENTS IN SECURITIES FILINGS THAT THEY AND THE MARKET WERE FUNCTIONING COMPETIVELY .......................................... 41

IX. CLASS CERTIFICATION IS APPROPRIATE HERE .................................................. 44

COUNT ONE Price Fixing in Violation of Section 1 of the Sherman Act ................................. 47

COUNT TWO Information Exchange in Violation of Section 1 of the Sherman Act ................ 47

PRAYER FOR RELIEF ........................................................................................................ 48

JURY DEMAND .................................................................................................................... 49

Plaintiffs THOUGHTWORX, INC. D/B/A MCM SERVICES GROUP and ONE SOURCE HEATING & COOLING, LLC (collectively, "Plaintiffs"), individually and on behalf of all other similarly situated direct purchasers of broadcast television spot advertising (the "Class," more fully defined *infra*), bring this action under Section 1 of the Sherman Act for treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws, demanding a trial by jury of all issues so triable. Plaintiffs allege as follows based upon personal knowledge as to the facts pertaining to themselves, and upon information and belief and the investigation of counsel as to all other matters:

## I.     THE NATURE OF DEFENDANTS' UNLAWFUL CONDUCT

1.      This antitrust class action arises from a price fixing cartel facilitated by an anticompetitive information exchange between and among certain major television station owners and operators to artificially inflate the prices of broadcast television spot advertisements[1] in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

2.      Beginning on or around January 1, 2014, Dreamcatcher Broadcasting LLC, Griffin Communications, LLC, Meredith Corporation, Nexstar Media Group, Inc., Gray Television, Inc. (through its acquisition of Raycom Media, Inc.), Sinclair Broadcast Group, Inc., Tribune Broadcasting Company, LLC, and Tribune Media Company (collectively, "Defendants")—firms that collectively account for billions of dollars in annual broadcast television spot advertising revenue—secretly orchestrated a scheme to supracompetitively impact the price levels of broadcast television spot advertisements by agreeing to fix prices and exchange competitively sensitive historic, current, and forward-looking sales data, including

---

[1] The television advertisements are purchased directly from broadcast television stations (as opposed to cable operators) and are referred to herein as "broadcast television spot advertising."

pacing data. Pacing information is used to compare a broadcast station's revenues booked for a certain time period to the revenues booked for the same point in time in the previous year (the exchange of which allows Defendants to forecast their would-be competitors' remaining inventory of broadcast television spot advertising availabilities).

3.     The information exchanged covered both local and national broadcast television spot advertising and was disseminated to individuals within Defendants' organizations with authority over pricing, with Defendants' knowledge and at their direction. By allowing Defendants to better understand, in real time, the availability of their would-be competitors' inventory through the exchange of pacing data—with inventory being a, if not *the*, key factor affecting pricing negotiations—the scheme derailed the competitive process and allowed Defendants to avoid price competition, harming direct purchasers of broadcast television spot advertising. The exchange also served as a means to monitor the members of the price fixing cartel, as any deviation from the scheme (*i.e.*, what is referred to in the literature as "cheating" on the cartel) could be easily detected and punished. This information exchange not only facilitated the Defendants' price fixing cartel, but also itself is separately unlawful under Section 1 of the Sherman Act.

4.     As the United States Department of Justice ("DOJ") explained, "Advertisers rely on competition among owners of broadcast television stations to obtain reasonable advertising rates, but this unlawful sharing of information lessened that competition and thereby harmed the local businesses and the consumers they served."

5.     Thus, the DOJ intervened to end what it characterized as "***concerted action between horizontal competitors*** in the broadcast television spot advertising market," filing a series of Proposed Judgments and Stipulations and Orders with Defendants Dreamcatcher

Broadcasting, LLC, Griffin Communications, LLC, Meredith Corporation, Nexstar Media Group Inc., Raycom Media, Inc.,[2] Sinclair Broadcast Group, Inc., and Tribune Media Company on November 13, 2018 and December 12, 2018 (the "Judgments").

6.     As described in the DOJ's Competitive Impact Statement (the "Statement") discussed below, the Judgments included a number of provisions designed to "***terminate Defendants' illegal conduct***, prevent recurrence of the same or similar conduct, and ensure that Defendants establish an antitrust compliance program," thereby "***putting a stop to the anticompetitive information sharing***."

7.     The DOJ noted in the Statement that these remedial efforts were "***necessary*** in light of the ***extensive history of communications*** among rival stations that ***facilitated Defendants' agreements***" in restraint of trade, and in its Complaint, the DOJ action "challenge[d] under Section 1 of the Sherman Act Defendants' agreements to unlawfully exchange competitively sensitive information among broadcast television stations."

8.     As Justice Sotomayor held before her ascension to the United States Supreme Court, "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) (noting that information exchanges can both be evidence of a *per se* unlawful price fixing cartel and separately unlawful in and of themselves).[3]

9.     Plaintiffs bring this antitrust class action lawsuit on behalf of themselves and all similarly situated direct purchasers of broadcast television spot advertising—who remain

---

[2] As mentioned below, while Gray Television, Inc. was not named as a defendant in any of the suits brought by the DOJ, in January of 2019, it finalized the acquisition of Raycom Media, Inc., and thereby assumed liability for the acts of the acquired entity.

[3] All emphases to quoted material in the complaint have been added.

uncompensated for the anticompetitive harm they suffered as a result of the Defendants'
unlawfully earned gains.

## II.      JURISDICTION AND VENUE ARE PROPER HERE

10.      Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of
the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the
costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive
conduct; and for such other relief as is afforded under the laws of the United States for
Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

11.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337,
and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

12.      Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton
Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at
all times relevant to the Complaint, one or more of the Defendants resided, transacted business,
was found, or had agents in this District or a transferor District.

## III.     DEFENDANTS' CONDUCT AFFECTED INTERSTATE COMMERCE

13.      Billions of dollars of transactions in broadcast television spot advertisements are
entered into each year in interstate commerce in the United States and the payments for those
transactions flowed in interstate commerce. Each Defendant sells broadcast television spot
advertising to advertisers throughout the United States or owns and operates broadcast television
stations in multiple states or in Designated Market Areas ("DMAs," defined *infra*) that often
cross state lines. Additionally, Sales Rep Firms (defined *infra*) represent Defendants throughout
the United States in the sale of broadcast television spot advertising to advertisers.

14.      Defendants' manipulation of the market for the sale of broadcast television spot

advertising thus was in the flow of, and had a direct, substantial, and foreseeable impact on, interstate commerce.

## IV.    THE PARTIES AND UNNAMED AGENTS AND CO-CONSPIRATORS

### A.    The Identities of the Plaintiffs

15.    Plaintiff Thoughtworx, Inc. d/b/a MCM Services Group ("Thoughtworx") is an advertising company headquartered in Minnesota and organized under the laws of Minnesota. Thoughtworx provides a bundle of services to its advertiser-clients, including consulting, television advertisement development and research, and purchasing broadcast television spot advertising time. In order to provide those services, Thoughtworx purchased broadcast television spot advertising during the Class Period (defined *infra*) directly from Defendants Sinclair Broadcast Group, Inc. and Tribune Media Company at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

16.    Plaintiff One Source Heating & Cooling, LLC ("One Source") is a heating, cooling, and HVAC services provider headquartered in Alabama and organized under the laws of Alabama. One Source purchased broadcast television spot advertising during the Class Period directly from Defendants Raycom Media, Inc. and Sinclair Broadcast Group, Inc. at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

17.    A comprehensive accounting of those DMAs in which multiple Defendants purportedly compete (as of 2017) and in which Thoughtworx and One Source purchased broadcast television spot advertising from one or more Defendants in is set forth in Appendix A.

### B.    The Identities of the Defendants

18.    Each of the Defendants named herein entered into consent decrees with the DOJ,

except Gray Television, Inc., which purchased an entity (Raycom Media, Inc.) that did so.

19.     Defendant Dreamcatcher Broadcasting, LLC ("Dreamcatcher") is a Delaware corporation, headquartered at 2016 Broadway, Santa Monica, California 90404, that owned three full-power television stations in two television markets and had over $50 million in revenues in 2017.

20.     Defendant Gray Television, Inc. ("Gray TV"),[4] is a Georgia corporation headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319, that owns and operates television stations and digital assets in the United States. As of February 23, 2018, Gray TV owned and operated television stations in 57 television markets, broadcasting approximately 200 program streams, including approximately 100 channels affiliated with the CBS Network, the NBC Network, the ABC Network, and the FOX Network.

21.     Defendant Griffin Communications, LLC ("Griffin") is an Oklahoma corporation, headquartered at 7401 North Kelley Avenue Oklahoma City, Oklahoma 73111, that owned four full-power television stations in two television markets and had over $60 million in revenues in 2017.

22.     Defendant Meredith Corporation ("Meredith") is an Iowa corporation, headquartered at 1716 Locust Street, Des Moines, Iowa 50309, that owned or operated 16 television stations in twelve television markets and had over $1.7 billion in revenues in 2017.

23.     Defendant Nexstar Media Group, Inc. ("Nexstar"), is a Delaware corporation, headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062, that operates as a television broadcasting and digital media company in the United States. As of December 31,

---

[4] Plaintiffs do not allege, at this time, that Gray TV participated in the alleged conduct directly; merely that Gray TV is liable for the acts of Raycom Media, Inc., which it acquired.

2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 television markets.

24.     Defendant Raycom Media, Inc. ("Raycom") is a Delaware corporation, headquartered at 201 Monroe Street, Montgomery, Alabama 36104, that owned or operated 65 television stations in 45 television markets and had over $670 million in revenues in 2017. Raycom was purchased by Gray TV in 2018 for $3.65 billion in a deal that was finalized in January of 2019.

25.     Defendant Sinclair Broadcast Group, Inc. ("Sinclair"), is a Maryland corporation, headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030, that operates as a television broadcast company in the United States. As of December 31, 2017, it owned, operated, and/or provided services to 191 stations in 89 television markets, which broadcast 601 channels. In 2017, it reported revenues in excess of $2.7 billion.

26.     Defendant Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), is a Delaware limited liability company headquartered at 515 North State Street, Chicago, Illinois 60654, and operates as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owned 42 broadcast television stations in approximately 33 television markets in 2017. It had over $670 million in revenues in 2017.

27.     Defendant Tribune Media Company ("Tribune Media," and collectively with Tribune Broadcasting, "Tribune"), is a Delaware corporation headquartered at 435 North

7

Michigan Avenue, Chicago, Illinois 60611, and operates, through its subsidiaries, as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owned 42 television stations in 33 television markets in 2017.

### C.    The Identities of Unnamed Agents and Co-Conspirators

28.    Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof. Such additional co-conspirators include the two major national Sales Rep Firms in the United States, which operate throughout the nation.  These Sales Rep Firms "function as extensions of a station's sales staff and are familiar with various rate cards (prices) and program research demographics." And as the DOJ noted, these two Sales Rep Firms facilitated the "exchange[ of] real-time pacing information" between Defendants.

29.    One of the Sales Rep Firms is CoxReps, a division of the Cox Media Group. As of March 2019, CoxReps represented 30 of Tribune's owned and operated full-power television stations, 33 Sinclair full-power television stations, 4 Griffin full-power stations, 12 Meredith full-power stations, and 16 full-power Nexstar stations. CoxReps represented Raycom's television stations prior to the latter's acquisition by Gray TV.

30.    The second Sales Rep Firm is Katz Television Group ("Katz"), a division of the Katz Media Group. As of March 2019, Katz represented 86 Nexstar owned and operated full-power television stations, two Meredith full-power stations, 8 Tribune full-power stations, and

66 Sinclair full-power television stations.

31.     Katz and CoxReps are collectively referred to as the "Sales Rep Firms."

## V.     DEFENDANTS FORMED AND PARTICIPATED IN AN UNLAWFUL PRICE FIXING CARTEL FACILITATED BY AN INFORMATION EXCHANGE

### A.     Defendants Agreed to Fix Prices for Broadcast Television Spot Advertising Sales and That Agreement Was Facilitated by An Information Exchange

32.     Beginning no later than January 1, 2014, the Defendants have participated in an unlawful price fixing cartel to supracompetitively impact the price levels of broadcast television spot advertising in geographies in which they were, purportedly, supposed to be direct competitors.

33.     Defendants price fixing cartel was facilitated in large part through a reciprocal exchange of competitively sensitive information.[5] This exchange included (a) pacing information as well as (b) other forms of competitively sensitive sales information.

34.     As discussed above and below, merely exchanging competitively sensitive information among competitors can cause anticompetitive effects and violate the Sherman Act.

### 1.     Defendants Exchanged Competitively Sensitive Information Through Sales Rep Firms and Directly With One Another

35.     As revealed in the DOJ's investigation and related court filings, this exchange of competitively sensitive information took at least two forms.

36.     *First*, Defendants regularly exchanged pacing information through the Sales Rep Firms, including real-time pacing information regarding each station's revenues, and reported the information to the Defendants in the DMA.

---

[5] The DOJ defined "Competitively Sensitive Information" as "Non-Public Information relating to pricing or pricing strategies, pacing, holding capacity, revenues, or market shares" as well as "reports" that are "customized or confidential to a particular Station or broadcast television station group."

37.     Pacing information is used to compare a broadcast station's revenues booked for a certain time period to the revenues booked for the same point in time in the previous year. Pacing indicates how each station is performing compared to the rest of the market and provides insight into each station's remaining broadcast television spot advertising inventory for the period. Simply put, the exchange of pacing information reveals the Defendants' remaining supply, with supply being a, if not the, key factor informing negotiations over price.

38.     Those exchanges included data on individual stations' booked sales for current and future months as well as a comparison to past periods. The exchanges covered not just historic competitively sensitive information, but current and forward-looking information as well.

39.     Once the Sales Rep Firms shared the information with the Defendants, their competitors' pacing information was then disseminated to individuals with authority over pricing and sales.

40.     The exchanges by Sales Rep Firms were widespread, occurring in DMAs across the United States, and they occurred with the knowledge of and frequently at the instruction of Defendants. As of March 2019, CoxReps or Katz represented at least one Defendant in 89 of 90 DMAs where more than one Defendant was present and in 36 of those DMAs (identified in Appendix A) CoxReps or Katz counted more than one Defendant as their client.

41.     *Second*, in some DMAs, Defendants exchanged competitively sensitive information directly with one another, without using the Sales Rep Firms as a conduit.

42.     These direct inter-seller exchanges included both "local sales" pacing data as well as "all sales" or "national sales" pacing data.

43.     Further, the DOJ's proposed final consent decrees list several types of

10

competitively sensitive information that Defendants are prohibited from exchanging for seven years: "pricing, pricing strategies, pacing, holding capacity, revenues, or market shares."

44.     Furthermore, the information shared (whether direct inter-seller exchanges or exchanges through the Sales Rep Firms) was not made available to Plaintiffs and the members of the Class and was not otherwise publicly available or accessible.

> ### 2.     Such Systematic Exchanges of Non-Public Competitively Sensitive Information Violate Section 1 of the Sherman Act

45.     Defendants' conduct amounts to an agreement—implicit or express—violative of Section 1 of the Sherman Act.

46.     Specifically, the DOJ stated that "[t]he *exchanges were systematic* and typically included non-public pacing data on national revenues, local revenues, or both, depending on the DMA. The Complaint further alleges that certain Defendants engaged in the exchange of other forms of competitively sensitive information relating to spot advertising in certain DMAs."

47.     In its 2017 Annual Report, Sinclair stated that "fluctuations in advertising rates and availability of inventory" was an "Industry Risk," so clearly knowing its rival's inventory would illegally temper and mitigate that risk.

48.     These exchanges, whether direct or through the Sales Rep Firms as conduits, also violate the information exchange safe harbors enumerated by the Federal Trade Commission ("FTC") in 2014 and the DOJ in 2016.

> a.  First, those safe harbors dictate that the exchange consist of information that is relatively old, while here, the exchanges were of real-time and forward-looking information.
>
> b.  Second, those safe harbors dictate that the exchange of information be operated by a neutral third party, while here, the exchanges were made

directly between competitors and through interested Sales Rep Firms that also stood to profit from the information exchange.

    c.   Third, those safe harbors dictate that the information exchange be of aggregated data. Here, to the contrary, the exchange involved disaggregated data specific to individual competitors.

49.    A 2010 report prepared by the DOJ and submitted to the Organization for Economic Cooperation and Development notes that: "In addition to serving as evidence of an unlawful agreement, information exchanges likely to affect prices may, under certain circumstances, be illegal in and of themselves."

50.    2010 Guidance from the DOJ also notes that information exchanges can "serv[e] as evidence of an unlawful agreement" to fix prices, and also "be illegal in and of themselves," constituting "concerted action [] sufficient to establish a combination or conspiracy in violation of Sherman Act § 1."

51.    2014 Guidance from the FTC confirms that when "competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion . . . in violation of the antitrust laws."

52.    Likewise, 2016 guidance from the DOJ confirms that "[e]ven if an individual does not agree explicitly to fix [prices] or other terms [of sale], exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement."

53.    One academic notes that "[w]ith regard to firm-specific production information, again there is no reasonable explanation for such a conveyance by a noncollusive seller to another noncollusive seller. Unilateral knowledge of a rival's capacity utilization, inventory levels, or production costs will increase expected returns in any competitive bidding process."

54.     In 2006, the Swedish Competition Authority commissioned several papers on the economic effects of information sharing by competitors. These articles contain references to a large number of scholarly publications. The introductory essay states: "information sharing is most naturally defined as the sharing of such information that is normally regarded as confidential: production costs, detailed information about quantities sold, actual transactions prices (*i.e.*, including individual discounts), planned future pricing, et cetera." The introduction also states that "if competitors secretively share information on intended future pricing and output, this comes very close to actually making anti-competitive agreements." Another article in the same volume states: "[i]ndeed, in some circumstances it may be that the mere exchange of information will in itself be sufficient ***to eliminate normal competitive activity***. The overriding principle is that certain forms of contact between competitors should be avoided."

55.     Another article by Baltzer Overgaard and H. Peter Mollgaard states that "it is relatively well-established in the economics literature that horizontal coordination/collusion (whether tacit or explicit) is made difficult—if not impossible—if firms compete under a veil of ignorance concerning the actions of rivals. . . . Speedy access to accurate information about the individual past transactions and future intentions of rivals ***will generally have a strong coordinating potential***." The summary characterization of the research that is reviewed in this article is as follows. "Pulling the two sides of the market together, we may (tentatively) conclude that improved information flow on the firm side will *likely* enhance the scope for coordinated firm behavior, while improved information on the consumer side *may* enhance competition. . . . Ideally, antitrust practice should attempt to [promote a regime where] actual competitors are covered by a veil of ignorance with respect to the actions of their rivals."

56.     The Antitrust Guidelines for Collaborations Among Competitors states:

13

Nevertheless, in some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information related to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information.

57.     Nexstar's own "Code of Business Conduct" acknowledged that there is an unethical and improper way to gather competitively sensitive information: "Competitive information is a valuable tool that allow us to understand and manage our markets, products, and services so we can better meet our customers' needs. However, we must gather and use that information **properly**. **It is important that we comply with the law in acquiring information**. . . . It is also important that we acquire information **ethically**."

58.     Implicit, as well as express, agreements are *per se* illegal under Section 1 of the Sherman Act because "[s]ophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016); *see also Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement (even a wink and a nod—formal agreements have never been required for purposes of Sherman Act section 1").

**B.      The Department of Justice Investigation and Requirement for Injunctive Relief Underscore the Conclusion That the Defendants Violated Section 1 of the Sherman Act**

58.     Much of the conduct in the foregoing section was investigated by the DOJ in a

probe that was first publicly reported in July of 2018.

59.     On November 13, 2018 and December 13, 2018, the DOJ filed complaints, which stated that "Defendants' agreements are restraints of trade that are unlawful under Section 1 of the Sherman Act."

60.     The DOJ also filed the Judgments and the Statement as to all Defendants except for Gray TV (after these dates, Gray TV finalized its acquisition of Raycom, which was implicated in the DOJ filings), for violating Section 1 through "concerted action between horizontal competitors in the broadcast television spot advertising market," describing the offense as having had anticompetitive effects by "disrupting the normal mechanisms for negotiating and setting prices and harming the competitive process," and that the "offense [was] likely to continue and recur unless the requested relief [was] granted."

61.     The Judgments mandate Defendants' (and Gray TV, by virtue of its acquisition of Raycom), conduct for seven years, wherein Defendants must:

   a.   refrain from sharing competitively sensitive information directly or indirectly, including information on:

      i.    pricing;

      ii.   pricing strategies;

      iii.  pacing;

      iv.   holding capacity;

      v.    revenues; or

      vi.   market shares;

   b.   establish antitrust whistleblower policies;

   c.   designate Antitrust Compliance Officers responsible for implementing training

15

and compliance programs;

    d.   cooperate in the ongoing DOJ investigation; and

    e.   certify annual compliance with the Judgments' terms and conditions.

62.    The injunctive relief required by the DOJ extends to all DMAs in the United States and is not limited to "certain" DMAs.

63.    Both the November and December complaints refer to the conduct at issue as "illegal" and "unlawful."

64.    The Statement referred to the injunctive relief requested in the Final Judgments as "terminat[ing] Defendants' illegal conduct, prevent[ing] recurrence of the same or similar conduct, and ensur[ing] that Defendants establish an antitrust compliance program," thereby "putting a stop to the anticompetitive information sharing." The DOJ concluded in the Statement that this injunctive relief was "necessary in light of the extensive history of communications among rival stations that facilitated Defendants' agreements" in restraint of trade.

65.    The Chief of the DOJ's Antitrust Division, Assistant Attorney General Makan Delrahim, elaborated: "The unlawful exchange of competitively sensitive information allowed these television broadcast companies to disrupt the normal competitive process of spot advertising in markets across the United States."

66.    The DOJ has been unequivocal, then, that the millions of pages of documents it reviewed contained proof of a violation of Section 1 of the Sherman Act.

### C.    The Lack of Fines, Indictments, or Pleas is Immaterial

67.    For several reasons, the fact that the DOJ declined to prosecute criminally does nothing to undermine the plausibility of Plaintiffs' price fixing claims under the *per se* standard.

68.    First, both the 2016 DOJ and 2014 FTC guidance concludes that information

exchanges are facilitating practices that can evidence a price fixing cartel. Likewise, the United States delegation to the Organization for Economic Cooperation & Development's Competition Committee in 2010 stated that "[i]nformation exchanges can be treated as circumstantial evidence of an unlawful price fixing or market allocation agreement among competitors, and in such a case are analyzed under the *per se* rule."

69.     Second, the priorities of the DOJ vary annually and across administrations. The DOJ's own statistics show that it allocates its resources differently from year to year.  In 2018 and 2019, the DOJ has only filed a combined 17 criminal antitrust complaints (6 of which relate to legacy investigations initiated by the prior administration). In 2017, the DOJ filed only 17 criminal antitrust complaints.

70.     Comparatively, the Antitrust Division of the DOJ filed aproximately: 50 criminal complaints in 2008, 54 criminal complaints in 2009, 66 criminal complaints in 2010, 84 criminal complaints in 2011, 52 criminal complaints in 2012, 59 criminal complaints in 2013, 54 criminal complaints in 2014, 47 criminal complaints in 2015, and 32 criminal complaints in 2016.

71.     No inference can be drawn as to the seriousness of the legal violation at issue here from the lack of a parallel criminal prosecution; and this is particularly true in light of an apparent DOJ resource shift resulting in fewer criminal antitrust prosecutions.

72.     Moreover, the "fact that Defendants did not plead guilty to wide-ranging conduct does not limit the civil action. Relatively few defendants plead guilty to all of the charges against them, and limitations on government resources may play as much a role in the agreement as the conduct involved." *In re Auto. Parts Antitrust Litig.,* No. 12-MD-02311, 2014 WL 4272784, at *8 (E.D. Mich. Aug. 29, 2014); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664–665 (7th Cir. 2002) (refusing to infer lack of a civil conspiracy from the government's

17

decision not to move against certain defendants, acknowledging that the DOJ may decide to limit the scope of an investigation for numerous reasons, including differing standards of proof in a criminal case and the knowledge that the private bar "had both the desire and the resources to prosecute [the] suit").

73.     Third, the plausibility of Plaintiffs' *per se* price fixing claim is bolstered by the additional allegations in this action concerning economic evidence of cartel behavior (*infra*) and the existence of numerous "plus factors" evincing a cartel (*infra*).

**D.     The Economic Evidence—Namely, Increased Prices and Skyrocketing Revenues in the Face of Declining Demand—Supports the Existence of a Cartel**

74.      The sale of broadcast television spot advertising on respective television stations to advertising customers is a primary source of revenue for broadcasting companies, including Defendants.[6] The objective of the television station owner is to meet the needs of their advertising customers by delivering to significant audiences in key demographics.

75.     In a competitive market, one would expect horizontal competitors such as Defendants to compete for audience share and advertising revenue with other stations in their respective DMAs by competing on price. This is particularly true in a market facing disruption and decreased demand. The broadcast television spot advertising market is such a market.

76.      The broadcast television spot advertising market has been faced with rapid change, as consumers' media time continues to shift away from traditional sources and towards digital and online mediums, such as Instagram, Netflix, Hulu, YouTube, and Facebook. Broadcast television spot advertising has been grappling with ratings erosion and viewers

---

[6] Nexstar and Sinclair's advertising revenues made up almost 50 percent of their total revenue in 2018. Tribune's "television and entertainment" advertising revenue made up roughly 65 percent of its total revenue in 2018.

canceling television subscriptions in favor of, *inter alia*, streaming services, which, in a competitive market, should drive prices, profits, and revenues down.

77.     In a McKinsey 2015 Global Report, this was made clear: "Spending on media continues to shift from traditional to digital products and services at a rapid pace. By 2019, we believe digital spending will account for more than 50 percent of overall media spend. Within this, the digital video spending will overtake physical spending by 2018, two years earlier than we had previously forecast. Digital, consisting of Internet and mobile advertising, will become the largest advertising category by 2017, surpassing TV one year earlier than forecast, and mobile will more than double its share of the digital ad market."

78.     The number of persons who actually view television advertising has also been dwindling. The McKinsey report also states that "[a]s digital media gains ground, advertisers are increasingly accepting the validity and persuasiveness of advertising on these media, moving away from the typically high cost-per-thousand (CPM) traditional media to less expensive, low-CPM Internet and mobile advertising—further accelerating the shift of analog dollars to digital." Those who consume television advertising are also declining: the rise of "cord cutters" and "cord nevers" continues to grow. In fact, eMarketer estimates that traditional television viewers will drop 2.4 percent (or by roughly 5 million people) by the end of 2018, while the cord-cutter and cord-never populations will grow by a total of 15 percent (or by almost 7 million people) this year. This impacts where advertisers spend their dollars, and a decreased demand for television advertising. Television's command over the United States advertising revenues has given way to digital, which is expected to bring in nearly half of all ad revenue in 2018.



79.     In light of these challenges, the broadcast television spot advertising market has

not responded to declining demand in the way one would expect a competitive market to

respond; instead, it exhibits indicia of cartel activity.

80.    As depicted in Figure 1, from 2008 to 2016, viewership for morning news, early local evening news, and local late-night news has fallen 13 percent, 18 percent, and 29 percent, respectively, while total Defendant revenue has increased in the face of this declining demand by *a staggering 65 percent* over the same time period.

**Figure 1: Defendants' Revenues Have Skyrocketed in the Face of Declining Viewership**

81.     As depicted in Figure 2, the Defendants' 65 percent gains in over the air ("OTA") revenue have outpaced the market as a whole, which *lost 2 percent in revenue over that same time period*.

**Figure 2: Defendants' Revenues Have Grossly Outpaced the Industry**



82.     Figures 3.a, 3.b., and 3.c show that beginning in the first quarter of 2014 (the beginning of the conduct period identified by the DOJ and the Class Period here), broadcast television spot advertising price levels rose dramatically from their immediately preceding years.[7]

**Figure 3.a: Defendants' Conduct Has Caused**
**Broadcast Television Spot Advertising Prices to Rise**
**(Early News)**



---

[7] Broadcast television spot advertising is priced on a cost per thousand ("CPM") basis, which is the cost for an advertisement per 1,000 viewers, or a cost per point ("CPP") basis, which is the cost to reach one percent of television households in a specified area.

**Figure 3.b: Defendants' Conduct Has Caused
Broadcast Television Spot Advertising Prices to Rise
(Late News)**



**Figure 3.c: Defendants' Conduct Has Caused
Broadcast Television Spot Advertising Prices to Rise
(Primetime)**



83. Finally, Figure 4 shows a commensurate jump in Defendants' revenues at the start of the Class Period in 2014. This is not how a competitive market responds to *declining* viewership and declining demand; these effects would only be expected in a cartelized market not subject to normal competitive forces.

**Figure 4: Defendants' Conduct Has Caused Their Revenues to Rise**



## VI. DEFENDANTS EXCERCISED MARKET POWER AND THEIR CONDUCT HAD ANTICOMPETIVE EFFECTS IN A RELEVANT ANTITRUST MARKET

84. Defendants' price fixing agreement is unlawful under the *per se* standard, while the information exchange that facilitated the cartel is either unlawful *per se*, or alternatively is unlawful under either a quick look[8] or full-fledged rule of reason analysis.

---

[8] "Quick look" is an abbreviated version of the rule of reason analysis, where the Court does not need to conduct analysis of the market and anticompetitive effects, but rather must only show a form of market injury to the Plaintiffs and members of the Class.

85.     Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined.

86.     Should a relevant product market need to be defined in this action, it is the sale of broadcast television spot advertising on local television stations.

87.     Should a geographic market need to be defined in this action, it is the specific DMAs in which two or more Defendants purportedly compete.

88.     The broadcast television spot advertising landscape in the United States is comprised of parent companies like Defendants that own and operate dozens of television stations. These stations carry programming distributed through their broadcast platforms, provided by third-party networks and syndicators, news stations, their own networks, and other original programming.

89.     Industry analysts have recognized, *inter alia*, that broadcast television spot advertising reaches more people than radio, e-mails, social media, and the Internet. Other forms of advertising, such as targeted Internet advertisements, are insufficiently substitutable with broadcast television spot advertising to constrain broadcast television spot advertising prices to the competitive level.[9]

90.     Broadcast television spot advertisements typically penetrate about ninety percent of the households in a DMA, while cable television spot advertisements penetrate far fewer homes. A significant and growing number of television households do not even subscribe to a traditional cable provider, instead receiving broadcast television signals over the air for free.

---

[9] In a 2011 review of top traditional and online advertising agencies, 24 of the top 25 online agencies did not offer television advertising services in-house and, similarly, 24 of the 25 top traditional advertising agencies did not offer search advertising in-house. This implies that clients for these two advertising verticals do not see the other as interchangeable.

Even in households that do subscribe to cable television, the package they receive almost always includes all broadcast channels but often excludes many cable channels. As a result, some cable television spot advertisements cannot be seen even by households with cable.

91. Additionally, broadcast television spot advertisement is much more appealing than cable television spot advertising, because most advertisers are looking to capture a wide audience and broadcast programming has broader appeal to viewers. A broadcast spot reaches more viewers with more ratings points than a single spot on a cable channel. Cable audiences are fragmented across numerous stations that cater to niche populations, and thus advertisers looking to reach a large share of a DMA cannot do so through cable spot advertisements.

92. Finally, broadcast stations have a larger advertising inventory than cable stations. Due to the limited inventory and lower ratings associated with cable spot advertising, cable providers cannot offer the same volume of ratings points or broad enough household penetration to match broadcast television spot advertising.

93. Because of these factors, advertisers are not likely to respond to a small but significant increase in the prices charged for broadcast television spot advertising in a given DMA by switching to cable television spot advertising in large enough numbers to make that price increase unprofitable. Accordingly, cable spot advertising is not a substitute for broadcast television spot advertising.

94. On average, Defendant station owners held between 24 percent and 100 percent market share in the multi-defendant DMAs listed in Appendix A (measured as of 2017 data, and including Raycom's, but not Gray TV's, commerce).

95. Defendants' conduct alleged herein has caused injury to Plaintiffs and the Class members in the form of having paid overcharges (*i.e.*, artificially inflated prices) for broadcast

television spot advertising. This is injury of the type that the antitrust laws were meant to deter, punish, and prevent. As shown in Figures 1 through 4, at the onset of the conduct period identified by the DOJ (the start of the Class Period here), Defendants' prices and revenues exceed those of the non-colluding firms and spiked in the face of declining demand.

96.     Moreover, the economic literature (discussed *supra*, in Section V.A.2) is clear that the conduct and market outcomes observed here evince cartel behavior, lead to anticompetitive harm, and cause a reduction in consumer welfare.

## VII.    "PLUS FACTORS" FURTHER EVINCE THE EXISTENCE OF DEFENDANTS' *PER SE* UNLAWFUL PRICE FIXING CARTEL

97.     Prominent legal and economic antitrust scholars studying collusive behavior have developed the concept of "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." They refer to the plus factors that provide the most probative value and "those that lead to a strong inference of explicit collusion as 'super plus factors.'"

98.     Here, plus factors plausibly inferring the existence of a *per se* illegal cartel include: high market shares, high market concentration, opportunities and invitations to collude at trade associations and otherwise, a motive to conspire, in particular, facing declining viewership and revenue, and high barriers to entry.

### A.     Defendants' Information Exchange is a "Super Plus Factor" Evincing the Existence of a *Per Se* Unlawful Price Fixing Cartel

99.     One of the "super plus factors" academics enumerate addresses the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private to each firm, or where: "A firm or subset of firms has knowledge of the details of another firm's

29

transactions, production, sales, and/or inventories where the latter firm would be competitively disadvantaged by conveying that information unilaterally."

100.    A super plus factor plausibly inferring the existence of a *per se* illegal cartel includes the information exchange detailed *supra*.

### B.    Defendants' Motive to Conspire—Declining Viewership and Revenue—is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful

101.    As discussed above, overall viewership and revenue have been falling for broadcast television spot advertising. While the Defendants' revenues have gone up tremendously (as a result of their unlawful conduct), industry revenues overall are down, the result of pressure from Internet and other media outlets.

102.    Television viewership has declined in recent years. According to the Pew Research Center, "[s]ince 2007, the average audience for late night newscasts has declined 31 percent, while morning audience declined 12 percent and early evening audience fell 19 percent." In 2018, the Pew Research Center found that "the gap between the share of Americans who get news online and those who do so on television is narrowing," with only 50 percent of United States adults regularly getting news from television in 2017, down from 57 percent in 2016. Typically, local news is the largest source of revenue for local broadcast affiliates, comprising roughly 50 percent of total revenue. In 2016, advertising revenue for local "news-producing stations" made up 84 percent of total advertising revenue for the industry overall.

103.    Broadcast television spot advertising sales have begun to decline in the last decade. In real terms, broadcast television spot advertising industry-wide revenue reached its non-election year peak in 2011 at $16.2 billion (in 2008 dollars). It has declined every two years since then to $14.9 billion in 2017 (again, expressed in 2008 dollars), a decline of 8.25 percent.

The same pattern has held for election-years: in real terms, presidential election-year real local television advertising spending fell from $20.0 billion in 2008 to $18.1 billion in 2012 to $17.6 billion in 2016, a total decline of 12.1 percent. And, for mid-term election years, real spending fell by $1.9 billion dollars (4.9 percent) from $18. billion in 2010 to $17.4 billion in 2014.

104. BIA Advisory Services forecasts that local television station OTA advertising revenues will grow slower than overall local advertising, predicting a 0.6 percent compound annual growth rate ("CAGR") from 2019 to 2023, outpaced by a forecasted CAGR of over 10 percent for local mobile video and over 15 percent for local online video. BIA Advisory Services predicts that "by 2023, local online/interactive/digital advertising revenue will be $78.2 billion, growing to nearly 48 percent of total local media advertising revenue from roughly a 37 percent share in 2018.

105. "In a healthy economy, we're looking at no growth in advertising from traditional media companies," said Michael Nathanson, an analyst with research firm MoffettNathanson. "That's a worrying trend." The decline in television viewership is accelerating as online rivals have increased their investments in the online video advertising market, capturing almost every new advertising dollar entering the marketplace. Almost half of the growth in local video ad spending during the next five years will go to digital platforms, including local mobile video, local online video and out-of-home video, according to a 2017 study on advanced television advertising published by BIA/Kelsey industry analysts. "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."

106. Declining viewership, coupled with a relatively fixed amount of available broadcast television spot advertising time, should lead to lower prices and the lack of

profitability that that entails. These factors provide a strong motivation for horizontal competitors to form and maintain a cartel, particularly in this industry, where broadcast television spot advertising makes up the majority of Defendants' revenues.

107.    For example, according to Sinclair's most recent Form 10-K filed with the SEC, a primary source of revenue for local television stations is "the sale of commercial inventory on . . . television stations to . . . advertising customers." However, Sinclair also concedes that "advertising revenue can vary substantially from period to period based on many factors beyond [its] control." Furthermore, "[t]his volatility affects [its] operating results and may reduce [its] ability to repay indebtedness or reduce the market value of [its] securities." Sinclair specifically admits that its "operating results depend on the amount of advertising revenue [it] generate[s]." The key revenue function underscores the strong incentive to collude rather than compete, which, as alleged above and below, Defendants acted upon.

C.    **Defendants' Opportunities and Invitations to Collude are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

108.    Further supporting the plausibility of the cartel were Defendants' frequent opportunities to, and apparent invitations to one another to, collude rather than compete.

1.    **Invitations and Opportunities to Collude Through the TIP Initiative**

109.    As one example, on November 20, 2017, a group of broadcast television companies, including Nexstar, Sinclair, and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners." The TIP Initiative is intended to be national in scope. It will provide for standardized automated transactions with customers for broadcast television spot advertising that will enable Defendants to share competitively sensitive

32

information. Nexstar's President and CEO made a public statement regarding TIP indicating that Defendants "must work together as an industry." The President and CEO of Sinclair echoed this sentiment stating that "[t]he TIP Initiative demonstrates the industry's ***shared commitment to working together***" to grow their advertising sales. Tribune's President and CEO also indicated that through the TIP Initiative, Defendants could "***actively work[] together***."

110.    Through the TIP Initiative, Defendants thus signaled their invitation to the industry to come together and collude rather than compete, and continue to disseminate competitively sensitive information, in order to maintain industry profitability in the face of declining demand.

### 2.    Opportunities to Collude Through Joint Service Agreements

111.    In addition, Defendants had numerous opportunities to meet and conspire with each other under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the cartel.

112.    In particular, almost 300 full-power local television stations changed hands in 2013 and many of these deals resulted in stations in the same market being separately owned on paper but operated jointly, a practice that has grown exponentially in recent years. As of 2014, joint service agreements of one kind or another existed in at least 94 markets (almost half of the 210 local television DMAs throughout the country), and up from 55 in 2011. As of March 2019, Defendants operated stations owned by different owners in approximately 66 DMAs.

113.    Specifically, Sinclair admits that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."

### 3.    Opportunities to Collude Through the TVB Trade Association

114.    Additionally, Defendants and their co-conspirators had numerous opportunities to

33

conspire through industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), conferences and meetings held by those associations, and merger negotiations.

115.    Nexstar, Sinclair, and Tribune are members of the TVB. Nexstar's President and CEO serves as the Chairman of TVB. TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry." The TVB is designed to bring together and encourage information sharing among employees of broadcast television companies, including Defendants, especially advertising sales representatives.

### 4.    Opportunities to Collude Through the NAB Trade Association

116.    Sinclair, Tribune, Meredith, and Nexstar are also members of the NAB, which describes itself as the "premier trade association for broadcasters."

117.    Nexstar's Chairman, President and CEO, Sinclair's President and CEO, Tribune's COO, Meredith's President, and Cox Media Group's Executive Vice President of Television, all serve on the NAB Television Board of Directors.

118.    The President of Cox Media Group, owner of CoxReps, also serves on the NAB's Executive Committee. NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

### 5.    Opportunities to Collude Through the MRC Trade Association

119.    Nexstar, Sinclair, Tribune, and several other local television station owners are also members of the MRC.

120.    The MRC boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.

121.    These invitations and opportunities to collude served to bolster and facilitate the

formation and maintenance of Defendants' price fixing cartel.

### D. Defendants' High Market Shares and High Concentration in the Broadcast Television Spot Advertising Market are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful

122.    As shown in Appendix A and alleged above, in the DMAs in which Defendants purportedly compete they consistently hold dominant shares of the market, averaging 53 percent, as high as 100 percent, and never any lower than 24 percent. Sinclair is the largest broadcast company in the nation, while Nexstar and Tribune are among the top five.

123.    As of 2017, Defendants in total owned 332 full-power stations, up 125 percent from 147 stations in 2008. Defendants in total own 504 revenue generating stations, up over 200 percent from 158 stations in 2008. As discussed in more detail *infra*, a wave of consolidation and station purchases has made some broadcast media owners considerably larger.

124.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

125.    In response to decreased advertisement spending, the local television industry has been consolidating in recent years. This consolidation of the industry continues "as station owners look to increase their leverage with broadcast networks, which supply much of their programming, and pay-TV distributors, which carry their channels." In 2013, "big owners of local TV stations got substantially bigger, thanks to a wave of station purchases." That wave is reflected in the following chart taken from a 2013 report by the Pew Research Center:



**Buying binge continues for local TV companies**

*Number of local TV stations owned by each company, as reported in SEC filings*

2004   2014   2016

Sinclair: 62, 150, 166 — 208, upon tentative acquisition of Tribune
Gray: 28, 58, 85
Nexstar: 42, 82, 104 — 171, upon 2017 merger with Media General
Tegna: 21, 46, 46
Tribune: 26, 42, 42

Note: Counts include stations that are reported in each company's SEC filing for each year ending Dec. 31 as being owned, operated or provided with programming and/or sales and other services. Low-power and satellite stations are excluded.
Source: Individual media company annual reports and SEC filings.

PEW RESEARCH CENTER

126.    As the Pew report states:

> Many of the 290 TV station purchases in 2013 occurred as group acquisitions by some of the largest owners, building their portfolios of stations even more. The Tribune Co. emerged from bankruptcy to make the richest single deal, spending $2.73 billion to acquire 19 stations from Local TV Holdings. Gannett completed a $2.2 billion transaction to buy 17 stations from Belo Corp., almost doubling Gannett's TV holdings and giving it national reach. Twelve stations changed hands when Media General merged with New Young Broadcasting.
>
> Sinclair Broadcasting acquired more individual stations than any other buyer, snapping up outlets owned by locally based companies like Fisher Communications in Seattle and Allbritton Communications in Washington, D.C. The company already owned the most local stations of any group; if all pending sales go through, Sinclair will own or provide services to 167 television stations in 77 markets, reaching almost 40 percent of the United States population. Nexstar Broadcasting made moves to increase its portfolio to 108 stations in 56 markets. In 37 of those markets, it will own or provides services to more than one station. Nexstar's chief executive, Perry Sook, predicted the "rolling M&A thunder" would continue throughout 2014, and it has. In March, Media General announced plans to buy LIN Media's 43 stations for $1.6 billion.

127.    Consolidation in the industry was also fueled by the proposed acquisition of

36

Tribune by Sinclair, announced on May 8, 2017, which would have created the largest station owner. Wary of Federal Communications Commission ("FCC") rejection of the deal, Sinclair and Tribune submitted a revised version of the merger plan to antitrust regulators, whereby Sinclair would acquire Tribune for $3.9 billion, forming a company that would own 215 broadcast television stations in 102 cities, reaching close to 60 percent of all United States television households. Sinclair and Tribune jointly have extreme market penetration, with Tribune currently reaching 43 percent of the nation's households and Sinclair reaching 38 percent of American homes.

128.    Indeed, analysts called the proposed merger between Sinclair and Tribune "a very transformative acquisition" that would create "a broadcaster with as close to a national footprint as you can get." Sinclair's Chief Executive Officer ("CEO"), Chris Ripley, echoed this belief, stating the combined company would reach "72 percent of  United States homes across 108 markets including 39 of the top 50" and "[t]his combination creates the largest TV broadcasting company in the country."

129.    The revised merger plan could only be accomplished by selling certain television stations to reduce the number of households jointly reached by Tribune and Sinclair (which currently is over 80 percent). However, Sinclair's revised plan called for selling certain stations to friends and other parties with whom it has a business relationship, for significantly less than fair value, raising questions about whether Sinclair would actually continue to control these stations.

130.    The FCC expressed concerns that Sinclair did not intend to actually relinquish control over television stations that it proposed to divest in order to comply with the National TV Ownership rule, and that Sinclair had been less than candid with the FCC. Indeed, the FCC

suspected that certain "'sidecar agreements' [ ] would allow Sinclair to retain control of stations without owning them." According to FCC Commissioner Michael O'Reilly, the vote to send the merger to an administrative law judge was a "*de facto* merger death sentence."

131.    The failure of the Sinclair-Tribune merger led Nexstar to announce its intention to acquire Tribune for over $4 billion in December of 2018. As one article noted:

> The deal would make Nexstar, whose stations reach nearly 39 percent of all United States television households, the biggest operator of local TV stations in the United States.
>
>      ****
>
> Tribune Media owns or operates 42 local TV stations that reach 50 million households, as well as the national network WGN. It also has a stake in the TV Food Network.
>
> Nexstar is the second-largest television station owner in the United States, with 171 outlets across the country, typically operating as affiliates with the four "major" United States television networks in small to mid-size markets. It also operates through local marketing agreement the stations owned by affiliate company Mission Broadcasting.

132.    Similarly, on June 25, 2018, as noted above, Gray TV agreed to buy Raycom in a $3.65 billion deal that would create a company that reaches nearly a quarter of United States television households. The combined company owns 142 television stations in 92 United States markets, reaching 24 percent of television households and owning the third-largest number stations.

38



133.     Herfindahl-Hirschman Index ("HHI") calculations further reveal industry concentration. HHI is a tool commonly employed in antitrust economics to measure market concentration. It is calculated by squaring the market share of each firm competing in a market and then summing the resulting numbers. Here, the average HHI across the DMAs in which two or more Defendants compete is 2,543 when considering ownership of stations and 2,713 when considering operation of stations, some of which station operators do not own.

134.     The DOJ considers an HHI measure above 2,500 to be a highly concentrated marketplace.

**E.     High Barriers to Entry in the Broadcast Television Spot Advertising Market is a Plus Factor Supporting the Existence of a Price Fixing Cartel That is *Per Se* Unlawful**

135.     A collusive arrangement that raises product prices above competitive levels, under basic economic principles, would normally tend to attract new entrants seeking to benefit from the supracompetitive pricing, which in turn could erode prices. But there are significant, even prohibitive, barriers to entry in the spot television broadcasting market that prevent entry from eroding collusively increased profits. Thus, barriers to entry help facilitate the formation and maintenance of cartels and market-allocation agreements.

136.    New entrants planning to enter into broadcasting markets typically face six critical barriers: (1) governmental policy; (2) the presence of dominant broadcasters; (3) access to content; (4) audience behavior; (5) consumer costs; and (6) capital requirements.

137.    Governmental policy, including regulatory or administrative practices, may restrict market access. The FCC issues licenses for television stations, and an entrant would be required to petition the Commission to assign a new channel to a community. Moreover, the FCC is not accepting any applications for new full power or television or LPTV stations until the current spectrum repacking process is complete, which is not expected to happen until July 2020.

138.    Responsible authorities take into account economic, as well as cultural and social, factors when issuing broadcasting licenses that may lead to distortions of competition.

139.    The existing dominant broadcasters usually have long-established relationships with their viewers and (most likely) also with advertisers. New entrants in the market would have to offer a better deal than the existing broadcasters in order to usurp any market share. Additionally, bigger companies have more clout to negotiate programming deals with networks or syndicators. "If you wanted a decent seat at the table talking to those guys, you had to have scale," said Barry Lucas, Senior Vice-President of Research at the investment firm Gabelli & Co. "Otherwise you were irrelevant and got pushed around." A newer entrant to the market would have to invest significant capital and time in establishing itself before it could work with networks.

140.    Additionally, successful entry into television broadcasting markets requires access at reasonable prices to desirable programming, including production and/or acquisition from third parties. Acquisition of this content, which is critical to attract viewers, is likely to constitute a significant cost to new market players.

141.    Commercial broadcasters, whose operations are primarily financed through advertising fees, must establish within a short period an audience base that will also attract a sufficient number of advertisers. Therefore, in the presence of established dominant broadcasters, new entrants must provide offers attractive enough to convince viewers to alter their already existing patterns of viewing and channel choice—a task that proves to be difficult.

142.    Finally, it would require considerable funding, time, and technical sophistication for a potential market entrant to gain the economies of scale and audience base achieved by Defendants necessary to compete in the market for broadcast television spot advertising. Where the level of capital required is prohibitively high, it constitutes a significant barrier to entry.

143.    For these reasons, there has not been meaningful recent entry into the industry. Of the major local broadcast station owners, Nexstar and Raycom (recently acquired by Gray TV), are the most recent to enter the industry, both in 1996. Many of the large station owners have been in the industry since the 1940s and 1950s, including Tribune, Meredith, and Griffin.

## VIII.   DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONDUCT THROUGH, *INTER ALIA*, PUBLIC STATEMENTS IN SECURITIES FILINGS THAT THEY AND THE MARKET WERE FUNCTIONING COMPETIVELY

144.    Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct.

145.    Plaintiffs and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein prior to disclosure of a DOJ investigation of certain Defendants on July 26, 2018.

146.    Further, the very nature of Defendants' conduct was secret and self-concealing. Defendants engaged in secret market manipulation that could not be detected by Plaintiffs and

the Class.

147. Throughout the Class Period, each of the publicly-traded Defendants made various representations in filings with the Securities and Exchange Commission ("SEC") that describe a competitive landscape in which they purport to vie for advertising revenue not only with other spot television broadcast companies, but also with numerous other entities.

148. For example, in its Form 10-K Annual Report filed with the SEC in June 2015, Meredith stated that its "television stations compete directly for advertising dollars and programming in their respective markets with other local television stations, radio stations, cable television providers, and digital websites and mobile sites."

149. Sinclair consistently claimed in its Form 10-K Annual Reports that its "television stations are located in highly competitive DMAs," while Tribune consistently listed among its main competitors the major networks and the "major broadcast television station owners," including Nexstar and Sinclair." Nexstar made similar statements in its Form 10-K Annual Reports throughout the Class Period.

150. Such representations by Defendants were intentionally misleading and concealed the unlawful anticompetitive activity described herein from Class members.

151. Additionally, Defendants had corporate codes of conduct that members of the Class reasonably relied on to assume that they were complying with federal antitrust laws.

152. For example, Sinclair has a publicly-posted "Code of Business Conduct and Ethics" that states that "Officers, directors and employees must comply with all laws, rules and regulations applicable to them or the Corporation, including, without limitation, . . . antitrust laws[.]"

153. Nexstar likewise has a public "Code of Business Conduct" that states:

42

All employees must comply fully with the laws and regulations that apply to the Company. When the application of such laws or regulations is uncertain, employees are urged to seek the guidance and advice of the General Manager or Chief Financial Officer. Employees are expected to recognize this duty to society above and beyond their obligations to the Company and their personal financial interests. While the Company must compete vigorously to maximize profits, Nexstar will at the same time do so in strict compliance with all laws and regulations applicable to our activities. No employee should at any time take any action on behalf of the Company, which is known or should be known to violate any applicable law or regulation.

154. Tribune has an extensive "Code of Ethics and Business Conduct" that spells out its obligations under the antitrust laws in great detail:

We believe in free and open competition and never engage in improper practices that may limit competition and we never look to gain competitive advantages through unethical or illegal business practices, but rather through superior performance.

We do not enter into agreements with competitors to engage in any anti-competitive behavior, including setting prices or dividing up customers, suppliers or markets.

****

Also, anti-trust and fair competition laws are complex and compliance requirements can vary depending on the circumstance, but in general, the following activities are red flags and should be avoided and reported to your supervisor, the Human Resources Department, the Law Department or Internal Audit:

COLLUSION — when companies secretly communicate or agree on how they will compete. This could include agreements or exchanges of information on pricing, terms, wages, or allocations of markets.

155. Nexstar maintains a "Code of Ethics," which was originally filed with the SEC on March 31, 2004 by Nexstar Broadcasting Group, Inc. and incorporated as an exhibit to Nexstar's Annual Report for the year ending December 31, 2003 on Form 10-K. The "Code of Ethics" states, "Each Relevant Officer owes a duty to the Company to act with integrity. . . . Specifically,

each Relevant Officer must: . . . . Adhere to a high standard of business ethics and not seek

competitive advantage through unlawful or unethical business practices."

156.    And Meredith has a "Code of Business Conduct and Ethics" that states:

> Obeying the law, both in letter and in spirit, is the foundation on
> which the Company's ethical standards are built. All employees
> must respect and obey the laws of the cities, states, and countries in
> which we operate. Although not all employees are expected to know
> the details of these laws, it is important to know enough to determine
> when to seek advice from supervisors, managers, or other
> appropriate personnel.

> We do not condone any act that violates the law, even when such
> action appears to be in the Company's best interest.

157.    These statements have now been demonstrated to be materially misleading; they

suggest that Defendants were law-abiding companies that recognized their antitrust obligations

and that Defendants and the broadcast television spot advertising market were functioning

competitively.

158.    As a result of Defendants' fraudulent concealment, all applicable statutes of

limitations affecting the Plaintiffs' and the Class members' claims have been tolled.

## IX.    CLASS CERTIFICATION IS APPROPRIATE HERE

159.    Plaintiffs bring this action on behalf of themselves and as a class action under

Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following

Class:

> All persons and entities in the United States who purchased
> broadcast television spot advertising from one or more Defendants
> in a DMA within which two or more of the Defendants sold
> broadcast television spot advertisements on broadcast television
> stations and who paid one or more Defendants directly for all or a
> portion of the cost of such broadcast television spot advertisements,
> or any current or former subsidiary or affiliate of Defendants during
> the period from at least and including January 1, 2014 until the
> effects of the unlawful conduct are adjudged to have ceased (the

"Class Period").[10]

160.    While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe the class size is numerous, and likely includes hundreds if not thousands of members.

161.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which focuses on the conduct of Defendants, not of any particular class member, and was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

- Whether Defendants and their co-conspirators engaged in a combination and conspiracy to to fix, raise, maintain or stabilize the price levels of broadcast television spot advertising time, that is *per se* illegal;

- The identity of the participants of the alleged cartel;

- The duration of the alleged cartel, and the acts carried out by Defendants and their co-conspirators in furtherance of the cartel;

- Whether the conduct alleged herein violated Section 1 of the Sherman Act; and

- Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for broadcast

---

[10] Excluded from the Class are Defendants and Sales Rep Firms, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators; the court, court staff, defense counsel, all respective immediate family members of these excluded entities, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

television spot advertising and the proper measure of such

overcharge damages.

162.    Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for broadcast television spot advertising time provided by Defendants.

163.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

164.    Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

165.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

166.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or

varying adjudications, establishing incompatible standards of conduct for Defendants.

167.   Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

## COUNT ONE
### Price Fixing in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

168.   Plaintiffs repeat the allegations set forth above as if fully set forth herein.

169.   During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy with regards to broadcast television spot advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

170.   The contract, combination or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize or maintain at artificially high levels the prices they charged for broadcast television spot advertising in the United States.

171.   Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharge damages paid for broadcast television spot advertising time purchased from Defendants and their co-conspirators.

172.   This conduct is unlawful under the *per se* standard.

173.   Plaintiffs and members of the Class are entitled to treble damages, their attorneys' fee and costs, and an injunction against Defendants restraining the violations alleged herein.

## COUNT TWO
### Information Exchange in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

174.   Plaintiffs repeat the allegations set forth above as if fully set forth herein.

175.   During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy with regards to broadcast television spot advertising in unreasonable

47

restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

176.    The contract, combination or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

177.    Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharge damages paid for broadcast television spot advertising time purchased from Defendants and their co-conspirators.

178.    This conduct is unlawful under the *per se* standard or alternatively under a quick look or full-fledged rule of reason mode of analysis.

179.    As described above, the relevant product market affected adversely by the challenged conduct is the market for broadcast television spot advertising and the relevant geographic market is those DMAs where two or more Defendants compete, markets where Defendants collectively have significant market power.

180.    Plaintiffs and members of the Class are entitled to treble damages, their attorneys' fee and costs, and an injunction against Defendants restraining the violations alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs and the Class respectfully request that:

A.      The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.      The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of

Section 1 of the Sherman Act (15 U.S.C. § 1);

      C.      The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

      D.      Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

      E.      The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: April 3, 2019                  Respectfully submitted,

                                  By: */s/ Robert J. Wozniak*
                                  Robert J. Wozniak
                                  Steven A. Kanner
                                  Michael J. Freed
                                  **FREED KANNER LONDON & MILLEN LLC**
                                  2201 Waukegan Road, Suite 130
                                  Bannockburn, IL 60015
                                  Tel: (224) 632-4500
                                  skanner@fklmlaw.com
                                  mfreed@fklmlaw.com

rwozniak@fklmlaw.com

Megan E. Jones*
**HAUSFELD LLP**
600 Montgomery St. #3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mjones@hausfeld.com

Michael D. Hausfeld**
Hilary K. Scherrer*
Melinda R. Coolidge*
**HAUSFELD LLP**
1700 K Street NW #650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeld.com
hscherrer@hausfeld.com

Gary I. Smith, Jr.**
Tamara R. Freilich*
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
gsmith@hausfeld.com
tfreilich@hausfeld.com

Hollis Salzman*
Meegan Hollywood**
Nathaniel Ament-Stone**
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Tel: (212) 980-740
Fax: (212) 980-7499
hsalzman@robinskaplan.com
mhollywood@robinskaplan.com
nament-stone@robinskaplan.com

Kimberly A. Justice*
Geoffrey C. Jarvis*
Jonathan F. Neumann*

50

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
kjustice@ktmc.com
gjarvis@ktmc.com
jneumann@ktmc.com

Stephanie A. Scharf
**SCHARF BANKS MARMOR LLC**
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Tel: (312) 726-6000
sscharf@scharfbanks.com

*Counsel for Plaintiffs and the Proposed Class*

*Admitted *Pro Hac Vice.*
**Pro Hac Vice* application forthcoming.

# Appendix A

## DMAs with Multiple Defendants Present

| No. | DMA | Defendants Present | Plaintiffs Purchased in the DMA During Class Period | Owned Stations Market Share (%) | Operated Stations Market Share (%) | Owned Stations HHI | Operated Stations HHI |
|---|---|---|---|---|---|---|---|
| 1. | Abilene-Sweetwater, TX*** | -Nexstar<br>-Sinclair Broadcast Group | | 79 | 94 | 3,392 | 4,602 |
| 2. | Albany, GA | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 86 | 86 | 5,407 | 5,476 |
| 3. | Albany-Schenectady-Troy, NY | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 62 | 72 | 2,732 | 3,377 |
| 4. | Amarillo, TX | -Gray (formerly Raycom)<br>-Nexstar<br>-Sinclair | X<br>(from Sinclair) | 89 | 100 | 2,885 | 3,445 |
| 5. | Augusta-Aiken, GA | -Gray (formerly Raycom)<br>-Nexstar | | 56 | 56 | 3,695 | 3,695 |
| 6. | Austin, TX | -Nexstar<br>-Sinclair | | 48 | 53 | 2,057 | 2,389 |
| 7. | Bakersfield, CA*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 66 | 66 | 2,771 | 2,771 |
| 8. | Baton Rouge, LA | -Gray (formerly Raycom)<br>-Nexstar | | 57 | 69 | 3,067 | 3,377 |
| 9. | Birmingham (Anniston and Tuscaloosa), AL*** | -Sinclair<br>-Gray (formerly Raycom)<br>-Nexstar | X<br>(from Sinclair) | 79 | 79 | 2,661 | 2,661 |
| 10 | Boise, ID | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 35 | 35 | 2,616 | 2,616 |
| 11 | Buffalo, NY*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 49 | 49 | 2,544 | 2,544 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 12 | Champaign/Springfield-Decatur, IL | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 54 | 70 | 2,635 | 3,396 |
| 13 | Charleston, SC | -Gray (formerly Raycom)<br>-Nexstar<br>-Sinclair | | 83 | 99 | 2,651 | 3,423 |
| 14 | Charleston-Huntington, WV*** | -Sinclair<br>-Nexstar | X<br>(from Sinclair) | 30 | 40 | 3,941 | 4,295 |
| 15 | Cincinnati, OH | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 46 | 57 | 2,099 | 2,707 |
| 16 | Cleveland-Akron (Canton), OH | -Gray (formerly Raycom)<br>-Tribune | X<br>(from Tribune) | 45 | 45 | 2,197 | 2,197 |
| 17 | Columbia, SC | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 56 | 56 | 2,562 | 2,562 |
| 18 | Columbus, GA (Opelika, GA) | -Gray (formerly Raycom)<br>-Nexstar | | 69 | 69 | 2,888 | 2,888 |
| 19 | Columbus-Chillicothe, OH | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 42 | 65 | 2,462 | 3,577 |
| 20 | Davenport, IA Rock Island-Moline, IL *** | -Nexstar<br>-Tribune | | 44 | 55 | 3,270 | 3,565 |
| 21 | Dayton, OH | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 30 | 44 | 3,251 | 3,568 |
| 22 | Des Moines-Ames, IA*** | -Nexstar<br>-Sinclair<br>-Tribune | X<br>(from Sinclair) | 57 | 57 | 3,170 | 3,170 |
| 23 | Dothan, AL | -Gray (formerly Raycom)<br>-Nexstar | X<br>(from Raycom) | 35 | 35 | 4,866 | 4,866 |
| 24 | El Paso-Las Cruces, TX/NM*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 52 | 52 | 2,335 | 2,335 |
| 25 | Evansville, IN | -Gray (formerly Raycom)<br>-Nexstar | | 70 | 81 | 2,888 | 3,645 |
| 26 | Flint-Saginaw-Bay City, MI | -Meredith<br>-Sinclair | X<br>(from Sinclair) | 64 | 67 | 3,148 | 3,321 |
| 27 | Fresno-Visalia, CA | -Nexstar | X | 51 | 51 | 2,163 | 2,163 |

| | | -Sinclair | (from Sinclair) | | | | |
|---|---|---|---|---|---|---|---|
| 28 | Ft. Smith-Fayetteville-Springdale-Rogers, AR*** | -Nexstar -Tribune | | 60 | 71 | 2,951 | 3,353 |
| 29 | Grand Rapids-Kalamazoo-Battle Creek, MI*** | -Nexstar -Sinclair -Tribune | X (from Sinclair and Tribune) | 81 | 81 | 2,529 | 2,529 |
| 30 | Green Bay-Appleton, WI | -Nexstar -Sinclair | X (from Sinclair) | 53 | 53 | 2,825 | 2,825 |
| 31 | Greensboro-High Point-Winston-Salem, NC | -Sinclair -Tribune | X (from Sinclair and Tribune) | 37 | 37 | 2,402 | 2,646 |
| 32 | Greenville-New Bern-Washington, NC*** | -Nexstar -Sinclair -Gray (formerly Raycom) | X (from Sinclair) | 89 | 89 | 2,890 | 2,890 |
| 33 | Greenville-Spartanburg-Asheville-Anderson, SC/NC*** | -Meredith -Sinclair** -Nexstar | X (from Sinclair) | 65 | 70 | 2,357 | 2,587 |
| 34 | Harlingen-Weslaco-Brownsville-McAllen, TX *** | -Nexstar -Sinclair | X (from Sinclair) | 24 | 24 | 1,991 | 1,991 |
| 35 | Harrisburg-Lancaster-Lebanon-York, PA*** | -Nexstar -Sinclair -Tribune | | 62 | 62 | 2,507 | 2,546 |
| 36 | Hartford-New Haven, CT*** | -Meredith -Nexstar -Tribune | X (from Tribune) | 73 | 73 | 2,321 | 2,321 |
| 37 | Hattiesburg-Laurel, MS | -Gray (formerly Raycom) -Nexstar | | 90 | 90 | 5,747 | 5,747 |
| 38 | Honolulu, HI | -Nexstar -Gray (formerly Raycom) | | 71 | 78 | 2,892 | 3,349 |
| 39 | Huntsville-Decatur-Florence, AL *** | -Gray (formerly Raycom) -Nexstar -Tribune | | 80 | 83 | 2,691 | 2,756 |
| 40 | Indianapolis, IN | -Nexstar | X | 43 | 43 | 2,573 | 2,573 |

| | | -Tribune | (from Tribune) | | | | |
|---|---|---|---|---|---|---|---|
| 41 | Jackson, MS | -Gray (formerly Raycom) -Nexstar | | 58 | 58 | 2,457 | 2,542 |
| 42 | Johnstown-Altoona-State College, PA | -Sinclair -Nexstar | X (from Sinclair) | 79 | 79 | 3,328 | 3,328 |
| 43 | Kansas City, MO*** | -Meredith -Tribune | X (from Tribune) | 48 | 48 | 2,413 | 2,413 |
| 44 | Knoxville, TN | -Gray (formerly Raycom) -Nexstar | | 32 | 32 | 2,791 | 2,791 |
| 45 | Las Vegas, NV*** | -Meredith -Nexstar -Sinclair | X (from Sinclair) | 68 | 68 | 2,004 | 2,004 |
| 46 | Little Rock-Pine Bluff, AR*** | -Nexstar -Sinclair | X (from Sinclair) | 65 | 79 | 2,648 | 3,605 |
| 47 | Lubbock, TX | -Gray (formerly Raycom) -Nexstar | | 64 | 79 | 2,648 | 3,554 |
| 48 | Memphis, TN | -Gray (formerly Raycom) -Nexstar -Tribune | | 71 | 71 | 2,548 | 2,548 |
| 49 | Milwaukee, WI *** | -Sinclair -Tribune | X (from Sinclair) | 27 | 27 | 2,218 | 2,218 |
| 50 | Mobile-Pensacola (Ft. Walton Beach), FL*** | -Meredith -Nexstar -Sinclair | X (from Sinclair) | 98 | 98 | 3,579 | 3,579 |
| 51 | Myrtle Beach-Florence, SC | -Sinclair -Gray (formerly Raycom) -Nexstar | X (from Sinclair) | 80 | 86 | 2,691 | 2,961 |
| 52 | Nashville, TN*** | -Meredith -Nexstar -Sinclair | X (from Sinclair) | 63 | 66 | 2,393 | 2,505 |
| 53 | New Orleans, LA | -Gray (formerly Raycom) -Tribune | X (from Tribune) | 45 | 45 | 2,430 | 2,430 |
| 54 | Norfolk-Portsmouth-Newport News, VA | Dreamcatcher* -Nexstar | X (from Sinclair) | 79 | 79 | 3,203 | 3,203 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | -Tribune**<br>-Sinclair | | | | | |
| 55 | Odessa-Midland, TX | -Nexstar<br>-Gray (formerly Raycom) | | 50 | 50 | 2,563 | 2,563 |
| 56 | Oklahoma City, OK *** | -Griffin<br>-Sinclair<br>-Tribune | X<br>(from Sinclair and Tribune) | 75 | 75 | 2,470 | 2,470 |
| 57 | Paducah-Cape Girardeau-Harrisburg, MO | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 46 | 46 | 2,932 | 2,932 |
| 58 | Panama City, FL | -Gray (formerly Raycom)<br>-Nexstar | | 45 | 45 | 3,070 | 4,220 |
| 59 | Peoria-Bloomington, IL*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 38 | 44 | 3,944 | 4,301 |
| 60 | Phoenix-Prescott, AZ | -Meredith<br>-Nexstar | | 33 | 33 | 1,798 | 1,798 |
| 61 | Portland, OR Vancouver, WA*** | -Meredith<br>-Nexstar<br>-Tribune<br>-Sinclair | X<br>(from Sinclair) | 74 | 74 | 2,121 | 2,121 |
| 62 | Providence-New Bedford, RI | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 71 | 85 | 2,853 | 3,713 |
| 63 | Raleigh-Durham*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 24 | 24 | 3,117 | 3,117 |
| 64 | Richmond-Petersburg, VA*** | -Gray (formerly Raycom)<br>-Nexstar<br>-Sinclair<br>-Tribune | X<br>(from Sinclair) | 95 | 95 | 2,386 | 2,402 |
| 65 | Roanoke-Lynchburg, VA*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 43 | 43 | 2,562 | 2,562 |
| 66 | Rochester, NY*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 41 | 73 | 2633 | 3,571 |
| 67 | Salt Lake City-St. George, UT*** | -Nexstar<br>-Sinclair<br>-Tribune | X<br>(from Sinclair) | 71 | 71 | 2,317 | 2,317 |
| 68 | San Angelo, TX*** | -Nexstar | | 64 | 90 | 3,986 | 6,974 |

|    |                                                                                      |                                              |                                            |    |    |       |       |
| -- | ------------------------------------------------------------------------------------ | -------------------------------------------- | ------------------------------------------ | -- | -- | ----- | ----- |
|    |                                                                                      | -Sinclair                                    |                                            |    |    |       |       |
| 69 | Savannah, GA                                                                         | -Gray (formerly Raycom)<br>-Nexstar<br>-Sinclair | X<br>(from Sinclair)                   | 87 | 87 | 3,033 | 3,033 |
| 70 | Seattle-Tacoma, WA                                                                   | -Sinclair<br>-Tribune                        | X<br>(from Sinclair)                       | 42 | 42 | 2,058 | 2,058 |
| 71 | Shreveport, LA                                                                       | -Gray (formerly Raycom)<br>-Nexstar          |                                            | 45 | 45 | 2,764 | 2,764 |
| 72 | Sioux City, IA                                                                       | -Nexstar<br>-Sinclair                        | X<br>(from Sinclair)                       | 35 | 51 | 3,377 | 3,718 |
| 73 | Springfield-Holyoke,<br>MA                                                           | -Meredith<br>-Nexstar                        |                                            | 97 | 97 | 4,689 | 4,689 |
| 74 | St. Louis, MO***                                                                     | -Meredith<br>-Sinclair<br>-Tribune           | X<br>(from Sinclair<br>and Tribune)        | 70 | 70 | 2,902 | 2,902 |
| 75 | Syracuse, NY                                                                         | -Nexstar<br>-Sinclair                        | X<br>(from Sinclair)                       | 66 | 80 | 2,544 | 3,630 |
| 76 | Tallahassee, FL<br>Thomasville-GA                                                    | -Gray (formerly Raycom)<br>-Sinclair         | X<br>(from Sinclair)                       | 41 | 52 | 3,267 | 3,873 |
| 77 | Tampa-St. Petersburg-<br>Sarasota, FL                                                | -Gray (formerly Raycom)<br>-Nexstar          |                                            | 32 | 32 | 1,674 | 1,677 |
| 78 | Toledo, OH                                                                           | -Gray (formerly Raycom)<br>-Sinclair         | X<br>(from Sinclair)                       | 47 | 47 | 3,088 | 3,088 |
| 79 | Tri-Cities, TN-VA<br>(Bristol, VA;<br>Greenville, TN;<br>Johnson City, TN;<br>Kingsport; TN) *** | -Nexstar<br>-Sinclair            | X<br>(from Sinclair)                       | 84 | 84 | 3,656 | 3,656 |
| 80 | Tulsa, OK                                                                            | -Griffin<br>-Sinclair                        | X<br>(from Sinclair)                       | 56 | 56 | 2,786 | 2,786 |
| 81 | Tyler-Longview-<br>Lufkin-Nacogdoches,<br>TX                                         | -Gray (formerly Raycom)<br>-Nexstar          |                                            | 78 | 86 | 3,480 | 3,947 |
| 82 | Waco-Temple-Bryan,<br>TX                                                             | -Gray (formerly Raycom)<br>-Nexstar          |                                            | 30 | 30 | 2,967 | 2,988 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 83 | Washington, DC*** | -Sinclair<br>-Tribune<br>-Nexstar | X<br>(from Sinclair) | 25 | 25 | 2,165 | 2,166 |
| 84 | West Palm Beach-Ft. Pierce, FL | -Sinclair<br>-Gray (formerly Raycom) | X<br>(from Sinclair) | 42 | 42 | 2,230 | 2,658 |
| 85 | Wheeling, WV/ Steubenville, OH | -Nexstar<br>-Sinclair | | 100 | 100 | 5,404 | 5,404 |
| 86 | Wichita Falls-Lawton, TX | -Gray (formerly Raycom)<br>-Nexstar | | 71 | 81 | 3,011 | 3,853 |
| 87 | Wichita-Hutchinson, KS*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 34 | 36 | 2,680 | 2,804 |
| 88 | Cedar Rapids-Waterloo-Iowa City-Dubuque, IA | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 42 | 51 | 2,978 | 3,245 |
| 89 | Wilkes-Barre-Scranton-Hazleton, PA*** | - Dreamcatcher*<br>-Nexstar<br>-Tribune** | X<br>(from Sinclair) | 71 | 83 | 2,941 | 3,609 |
| 90 | Yakima-Pasco-Richland-Kennewick, WA | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 65 | 65 | 2,793 | 2,793 |
| | | | **Weighted Average** | 53 | 56 | 2,543 | 2,713 |

Notes:
[1] Revenue share and HHI figures are calculated based on 2017 spot advertising revenue. Station ownership status is also reflected as of year-end 2017. Station operator status is only available as of the present day and present-day station operators are assumed to have also operated the station in 2017, with the exception of the following: Tribune stations pending purchase by Nexstar are counted as Tribune stations above. Raycom stations bought by Gray in January 2019 are counted as Raycom stations above. Sales representative status is also only available as of the present day and present-day sales representatives are assumed to have also represented the station in 2017.
* Defendant owned but did not operate at least one station in DMA.
** Defendant operated but did not own at least one station in DMA. Unless otherwise noted, Defendant-associated stations in the DMA were both owned and operated by Defendants.
*** Cox or Katz worked with multiple Defendants in DMA.