**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE: | MDL No. 2867 |
| | No. 18 C 6785 |
| LOCAL TV ADVERTISING ANTITRUST LITIGATION | |
| | Honorable Virginia M. Kendall |
| *This Document Relates to All Actions* | |

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ....................................................................................... 6

    A.    The Parties ...................................................................................... 6

    B.    Broadcast Television Stations Compete in Local DMAs ....................................... 7

    C.    DOJ Investigation and Consent Decrees................................................ 8

    D.    The Complaint ................................................................................ 9

LEGAL STANDARDS:  INFORMATION EXCHANGE AND PRICE FIXING...................... 11

ARGUMENT ............................................................................................................ 13

I.     PLAINTIFFS' PRICE-FIXING CLAIM (COUNT ONE) SHOULD BE
DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE FACTS
EVIDENCING AN AGREEMENT TO FIX PRICES ...................................... 13

    A.    Plaintiffs Do Not Attempt to Allege Direct Evidence of a Conspiracy............... 14

    B.    Plaintiffs Do Not Allege Facts Circumstantially Establishing a Price-
Fixing Agreement ......................................................................... 14

         1.    Plaintiffs Fail to Allege Facts Showing Any Parallel Pricing.................. 15

         2.    Plaintiffs Fail to Allege "Plus Factors" Evidencing a Price-Fixing
Agreement................................................................................. 18

    C.    Plaintiffs' References to the DOJ Proceeding Do Not Cure the
Deficiencies in Their Allegations ........................................................ 25

II.    PLAINTIFFS' INFORMATION EXCHANGE CLAIM (COUNT TWO)
SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD FACTS
SUGGESTING THAT DEFENDANTS' ALLEGED EXCHANGE OF PACING
DATA WAS UNLAWFUL. ................................................................. 26

    A.    Plaintiffs Do Not Allege an Agreement in any DMA.......................... 27

    B.    Plaintiffs Do Not Allege a Plausible Market ...................................... 28

         1.    Plaintiffs Do Not Allege a Plausible Product Market............................. 28

         2.    Plaintiffs Do Not Allege a Plausible Geographic Market........................ 31

# TABLE OF CONTENTS
## (Continued)

**Page**

C.    Plaintiffs Do Not Plausibly Allege Actual Anticompetitive Effects ................... 33

    1.    Plaintiffs Do Not Plausibly Allege Market Power .................................... 33

    2.    Plaintiffs Do Not Plausibly Allege an Anticompetitive Effect in any DMA. ................................................................................................. 35

III.    PLAINTIFFS DO NOT ALLEGE ANTITRUST INJURY BECAUSE THEY DO NOT PLEAD THAT THEY PURCHASED ADVERTISING TIME IN A MARKET WHERE ANY PURPORTEDLY UNLAWFUL CONDUCT OCCURRED ........................................................................................................... 37

CONCLUSION ............................................................................................................... 40

## TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps;">Cases</span>

*Agnew v. National Collegiate Athletic Ass'n,*
  683 F.3d 328 (7th Cir. 2012) ................................................................................ passim

*In re Aluminum Warehousing Antitrust Litig.,*
  833 F.3d 151 (2d Cir. 2016) ................................................................................37, 39

*Am. Channel, LLC v. Time Warner Cable, Inc.,* No. CIV 06-2175 DWF/SRN,
  2007 WL 1892227 (D. Minn. June 28, 2007) ...........................................................31

*Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n,* No. 84-C-1824,
  1986 WL 949 (N.D. Ill. Apr. 13, 1986) ...................................................................34

*Anderson News, L.L.C. v. Am. Media, Inc.,* No. 09 Civ. 2227,
  2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015) ......................................................3, 19

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters,*
  459 U.S. 519 (1983) ................................................................................................37

*Atl. Richfield Co. v. USA Petroleum Co.,*
  495 U.S. 328 (1990) ................................................................................................37

*In re Baby Food Antitrust Litig.,*
  166 F.3d 112 (3d Cir. 1999) ........................................................................15, 20, 25

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.,*
  784 F.2d 1325 (7th Cir. 1986) ............................................................................33, 35

*In re Beef Industry Antitrust Litig.,*
  907 F.2d 510 (5th Cir. 1990) ....................................................................................18

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................ passim

*Besser Pub. Co. v. Pioneer Press, Inc.,*
  571 F. Supp. 640 (N.D. Ill. 1983) .............................................................................31

*Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan,*
  203 F.3d 1028 (8th Cir. 2000) ...................................................................................15

*Brown Shoe Co. v. United States,*
  370 U.S. 294 (1962) ............................................................................................28, 32

## **TABLE OF AUTHORITIES**
### **(Continued)**

**Page(s)**

*Bunker Ramo Corp. v. United Bus. Forms, Inc.*,
   713 F.2d 1272 (7th Cir. 1983) ........................................................................33, 36

*Burtch v. Milberg Factors, Inc.*,
   662 F.3d 212 (3d Cir. 2011)...................................................................... passim

*Car Carriers, Inc. v. Ford Motor Co.*,
   745 F.2d 1101 (7th Cir. 1984) ........................................................................30

*Chapman v. N.Y. State Div. for Youth*,
   546 F.3d 230 (2d Cir. 2008).......................................................................29, 30

*Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*, No. 15-cv-05488,
   2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016)........................................................31

*United States v. Citizens & S. Nat'l Bank*,
   422 U.S. 86 (1975)......................................................................................11, 26

*Collins v. Associated Pathologists, Ltd.*,
   676 F. Supp. 1388 (C.D. Ill. 1987) ........................................................................32

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-cv-36390,
   2013 WL 4506000 (N.D. Ill. Aug. 23, 2013) ........................................................38

*Frantzides v. Northshore Univ. HealthSystem Faculty Practice Assocs., Inc.*,
   787 F. Supp. 2d 725 (N.D. Ill. 2011) ........................................................................27

*H.O.P.E., Inc. v. Eden Mgmt. LLC*,
   128 F. Supp. 3d 1066 (N.D. Ill. 2015) ........................................................................37

*Hackman v. Dickerson Realtors, Inc.*,
   520 F. Supp. 2d 954 (N.D. Ill. 2007) .......................................................27, 28

*Harry v. Total Gas & Power N. Am., Inc.*,
   889 F.3d 104 (2d Cir. 2018).......................................................................................39

*Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, No. 13 C 1129,
   2013 WL 4599903 (N.D. Ill. Aug. 29, 2013) .......................................................29, 30

*Jack Walters & Sons Corp. v. Morton Bldg., Inc.*,
   737 F.2d 698 (7th Cir. 1984) ........................................................................34

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ........................................................................14

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Kleen Products LLC v. Georgia-Pacific LLC*,
   910 F.3d 927 (7th Cir. 2018) ..................................................21

*Law Offices of Peter Miller, P.A. v. Sinclair Broad. Grp.*,
   No. 18-cv-02316-TDC (D. Md. July 27, 2018) ........................8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) .................................................................24

*Lewis v. Casey*,
   518 U.S. 343 (1996) .................................................................40

*Mayor of Baltimore, Md. v. Citigroup, Inc.*,
   709 F.3d 129 (2d Cir. 2013) ...............................................13, 18

*Midwest Radio Co, Inc. v. Forum Pub. Co*,
   942 F.2d 1294 (8th Cir. 1991) ............................................30, 31

*Moore v. Boating Indus. Assocs.*,
   819 F.2d 693 (7th Cir. 1987) ..................................................21

*In re Musical Instruments and Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ............................................16, 20

*Neagle v. Goldman Sachs Grp., Inc*, No. 6:18-CV-00754-MC,
   2019 WL 1102199 (D. Or. Mar. 1, 2019) ...........................22, 23

*Omnicare, Inc. v. UnitedHealth Group Inc.*,
   629 F.3d 697 (7th Cir. 2011) ....................................11, 12, 26, 35

*Quality Auto Body, Inc. v. Allstate Ins. Co.*,
   660 F.2d 1195 (7th Cir. 1981) ................................................18

*Quality Auto Painting Ctr, v. State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) (*en banc*) .............................17

*Rao v. Gondi*, No. 14 C 66,
   2014 WL 5423441 (N.D. Ill. Oct. 23, 2014).............................35

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
   87 F. Supp. 3d 874 (N.D. Ill. 2015) ....................................28, 30

*Rozema v. Marshfield Clinic*, No. 96-C-592,
   1997 WL 416292 (N.D. Ill. Mar. 10, 1997)........................37, 38

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Sci. Prod. Co. v. Chevron Chem. Co.,*
    384 F. Supp. 793 (N.D. Ill. 1974) ........................................................................29

*Serfecz v. Jewel Food Stores,*
    67 F.3d 591 (7th Cir. 1995) .........................................................................20, 21

*United States v. Sinclair Broad. Grp.,*
    No. 18-cv-02609-TSC (D.D.C.) ..................................................................4, 8, 9

*Standard Iron Works v. ArcelorMittal,*
    639 F. Supp. 2d 877 (N.D. Ill. 2009) ................................................................19

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,*
    830 F.2d 1374 (7th Cir. 1987) ..........................................................................39

*Tampa Elec. Co. v. Nashville Coal Co.,*
    365 U.S. 320 (1961) ...........................................................................................32

*Tanaka v. Univ. of S. Cal.,*
    252 F.3d 1059 (9th Cir. 2001) ..........................................................................31

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006) ...............................................................................................23

*In re Text Messaging Antitrust Litig.,*
    630 F.3d 622 (7th Cir. 2010) ......................................................................13, 14

*In re Text Messaging Antitrust Litig.,*
    782 F.3d 867 (7th Cir. 2015) ......................................................................21, 22

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) .................................................................11, 12, 35

*United States v. U.S. Gypsum Co.,*
    438 U.S. 422 (1978) ................................................................................... passim

*Valley Liquors, Inc. v. Renfield Importers, Ltd.,*
    822 F.2d 656 (7th Cir. 1987) ............................................................................34

*Washington Cty. Health Care Auth., Inc.* v. *Baxter Int'l Inc.,*
    328 F. Supp. 3d 824 (N.D. Ill. 2018) ..................................................... passim

**OTHER AUTHORITIES**

1-1, ABA Antitrust Section, Antitrust Law Developments (8th ed. 2017)............................18, 19

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

Bill Baer, *Prosecuting Antitrust Crimes*, U.S. Department of Justice, at 1 (Sept. 10, 2014), https://www.justice.gov/atr/file/517741/download ..............................................25

Drew FitzGerald & Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, Wall St. J. (July 26, 2018), https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979 ..........................................................................8

Fed. R. Civ. P. 12(b)(6)...........................................................................................1, 29

Makan Delrahim, *Statement of Assistant Attorney General Makan Delrahim Before the U.S. House of Representatives Subcommittee on Regulatory Reform, Commercial and Antitrust Law* (Dec. 12, 2018), https://www.justice.gov/opa/speech/statement-assistant-attorney-general-makan-delrahim-us-house-representatives-subcommittee......................................25

P. Areeda & H. Hovenkamp, Antitrust Law (3d & 4th eds., 2018 Cum. Supp. 2010–17) ......................................................................................................15

Richard A. Posner, *Antitrust Law* (2d ed. 2001)..........................................................24

Defendants Dreamcatcher Broadcasting LLC ("Dreamcatcher"), Gray Television, Inc. ("Gray TV"), Griffin Communications, LLC ("Griffin"), Meredith Corporation ("Meredith"), Nexstar Media Group, Inc. ("Nexstar"), Raycom Media, Inc. ("Raycom"), Sinclair Broadcast Group, Inc. ("Sinclair"), Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), and Tribune Media Company ("Tribune Media," and collectively with Tribune Broadcasting, "Tribune") respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Amended Antitrust Class Action Complaint ("Complaint," ECF No. 223) of Plaintiffs Thoughtworx, Inc. d/b/a MCM Services Group ("Thoughtworx") and One Source Heating & Cooling, LLC ("One Source"), pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## INTRODUCTION

Plaintiffs' lawsuit is a theory in search of facts. Within one day of a *Wall Street Journal* article last July reporting that the United States Department of Justice ("DOJ") was investigating certain local television broadcast stations for allegedly exchanging certain information with each other, several plaintiffs began filing complaints asserting a massive price-fixing conspiracy. There was no indication at the time that the DOJ was even investigating price fixing. But the plaintiffs apparently hoped that the facts would break in their favor. That did not happen. Since then, the DOJ has filed civil complaints challenging the exchange of certain non-price information only and entered into consent decrees under which Defendants paid no fines and admitted no wrongdoing. The DOJ did not allege that there has been price fixing or any other per se violation of the antitrust laws.

Plaintiffs nevertheless continue to assert that Defendants conspired to fix the prices of broadcast television "spot" advertising in each of 90 different local markets, known as Designated Market Areas ("DMAs"), across the United States. Plaintiffs' price-fixing claim

(Count One of the Complaint) must fail. Plaintiffs allege no facts plausibly suggesting that Defendants entered into any agreement to set the price of advertising. Instead, Plaintiffs hazard a guess that because some Defendants allegedly exchanged some non-price information in some unidentified localities, Defendants must have been colluding on price in each named DMA where any two Defendants compete. Plaintiffs' speculation is far short of what is required to state a claim.

Plaintiffs plead no facts at all about who agreed to do what, with whom, when, where, and how, much less any "smoking gun" evidence that Defendants agreed to fix prices. Plaintiffs do not even allege that any Defendants engaged in parallel pricing conduct in any DMA. They do not allege that Defendants raised prices for local broadcast TV advertising simultaneously or in lockstep in any DMA. Indeed, they allege nothing about the specific prices charged by any Defendant in any DMA. Instead, Plaintiffs assert only that prices for some types of advertising charged by broadcast TV stations generally (including many non-defendants) rose *on average and in the aggregate* during selected parts of the time period at issue. (*See, e.g.*, Compl. ¶ 82.) Any numbers can be aggregated and averaged, so the Complaint's generalized allegations about industry-wide prices and revenues do not come close to suggesting that Defendants engaged in parallel pricing conduct, let alone raising a plausible inference of conspiracy. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556–57 (2007) ("Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

Plaintiffs instead pin their claim of a price-fixing conspiracy to "plus factors" (*i.e.*, factors that would tend to suggest that parallel conduct was the product of a pre-existing conspiracy). Plaintiffs argue that the exchange of competitive information is a "super" plus factor supporting

an inference of conspiracy. But there is no such thing as a "super" plus factor in Sherman Act jurisprudence. To Defendants' knowledge, the term has been used in only one federal court decision. That decision called the term "a label conjured up for litigation rather than the product of reliable principles and methods," and excluded expert testimony using it. *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09 Civ. 2227, 2015 WL 5003528, at *3 (S.D.N.Y. Aug. 20, 2015). And, the exchange of information among competitors is not itself a per se violation of the Sherman Act. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). For information sharing to matter at all to Plaintiffs' price-fixing claim, they must adequately plead facts sufficient to establish the existence of a separate price-fixing agreement, which Plaintiffs have failed to do here.

None of the other "plus factors" that Plaintiffs allege push their claims across the line from merely possible to plausible; rather, they are all consistent with "a wide swath of rational and competitive business strategy." *Twombly*, 550 U.S. at 554. Plaintiffs try to make normal business conduct, like participation in trade organizations, sound sinister by saying it provided an "opportunity" for Defendants to collude. But such conduct is present "in virtually every industry," "serve[s] numerous legitimate and pro-competitive purposes," and thus "fail[s] to move the needle" on a claim of conspiracy. *Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018). Likewise, Plaintiffs' assertions that Defendants had a "motive" to collude because they would make more money colluding fail to support an inference of conspiracy. If accepted, Plaintiffs' position would transform any instance of parallel behavior into a plausible conspiracy, because all businesses in every industry have a motive to make more money.

In the end, Plaintiffs' price-fixing claim hinges on the DOJ investigation into the sharing of non-price "pacing" information—essentially, a measure of revenue performance against prior time periods. But that investigation does not supply the facts that the Complaint is missing. To the contrary, as is evident from the Complaint, the DOJ did not prosecute any of the Defendants criminally, did not allege price fixing, and did not seek fines or other penalties. And the consent decrees specifically provide that they do "not constitute any evidence against or admission by any party regarding any issue of fact or law." Final Judgment for Tribune Media at 1, *United States* v. *Sinclair Broad. Grp*., No. 18-cv-02609-TSC (D.D.C. May 23, 2019), ECF No. 36 (hereinafter, "Final Judgment").

For all these reasons, and as discussed further below, the Court should dismiss Count One of the Complaint ("Price Fixing in Violation of Section 1 of the Sherman Act").

Plaintiffs' other claim—Count Two—is more of the same. Plaintiffs contend that Defendants' purported agreements to exchange non-price information in 90 DMAs across the country caused them to pay higher prices for local advertising. Because information exchanges among competitors can be competition-enhancing or competition-neutral, they are evaluated under the rule of reason. The crux of rule-of-reason analysis is whether an agreement facilitates or enhances the exercise of market power in a well-defined market in a way that harms competition in that market. Plaintiffs fail to allege facts that support a claim under the rule of reason.

*First*, Plaintiffs fail to allege an agreement in each (or any) of the 90 DMAs because they do not allege direct evidence, parallel conduct, plus factors, or any facts about any supposed agreement(s). The bare assertion that Defendants reached an agreement, without any allegations

about the agreement within each DMA Plaintiffs allege is a relevant market, is not sufficient to plausibly allege a violation of the Sherman Act.

*Second*, Plaintiffs' allegations concerning the relevant product and geographic market are internally inconsistent and implausible. Plaintiffs assert that the relevant market is local television advertising, but then admit that other media outlets, including digital media, are commonly substituted for television advertising, and are therefore part of the relevant product market.

Plaintiffs' allegations regarding the relevant geographic market also fail. Although Plaintiffs spend their entire Complaint explaining that the relevant competition takes place at the local levels, Plaintiffs' formal allegation of the geographic market obfuscates whether Plaintiffs intend to allege a market in each of 90 DMAs or one market consisting of 90 DMAs. That inconsistency is grounds for dismissing the Complaint. If Plaintiffs intended to allege a single market encompassing 90 DMAs scattered across the country, that market does not correspond to the commercial reality of *local* broadcast television, in which—as Plaintiffs concede—stations compete for advertisers with other media in the same DMA.

*Third*, Plaintiffs do not allege market power in a relevant market or an actual anticompetitive effect. Plaintiffs allege only that Defendants shared pacing data about revenue. Plaintiffs then make the unsupported and implausible leap that sharing pacing data would permit Defendants to determine their competitors' inventory, which would then permit price increases. However, a variety of factors, including ordinary price fluctuations, affect revenue, and Plaintiffs do not allege facts showing that aggregated revenue data would inform Defendants of the type of inventory remaining to their competitors. Even if Defendants could estimate their competitors' remaining inventory, that would not facilitate price increases because low remaining inventory

would suggest that many advertisers in a particular market had already purchased spots, thereby reducing remaining demand. And even assuming Defendants learned how much inventory their competitors had, that knowledge by itself does not mean market-wide prices actually increased in each DMA, and Plaintiffs do not allege facts suggesting otherwise.

For all these reasons, and as discussed further below, the Court should dismiss Count Two ("Information Exchange in Violation of Section 1 of the Sherman Act").

Finally, the Court should dismiss both counts for one further, and independently sufficient, reason: Plaintiffs do not allege that they suffered any antitrust injury. To plead antitrust injury, Plaintiffs would have to plead facts showing that they were among those harmed by Defendants' alleged misconduct. Here, neither Plaintiff alleges that it purchased advertising in any market that was purportedly affected by the conduct asserted in the Complaint. Accordingly, neither Plaintiff pleads antitrust injury.

In short, Plaintiffs do not plead any direct evidence that Defendants entered into an agreement to fix prices, do not plead that Defendants engaged in parallel pricing conduct, do not plead any "plus" factors sufficient to establish a conspiracy, do not plead the elements needed to state a Section 1 claim under a rule-of-reason analysis, and do not plead antitrust injury. The Court should accordingly dismiss the Complaint (which Plaintiffs have already amended once) with prejudice.

## FACTUAL BACKGROUND

A.     The Parties

Plaintiff Thoughtworx is an advertising company headquartered in Minnesota that provides advertising-related services to its clients. (Compl. ¶ 15.) Plaintiff One Source is a heating, cooling and HVAC services provider headquartered in Alabama. (*Id.* ¶ 16.) Plaintiffs allege that they are representative of a putative class that has directly purchased broadcast

6

television spot advertising time since January 1, 2014 from one or more Defendants in DMAs where two or more Defendants operate broadcast television stations.  (*Id.* ¶ 159.)

Defendants Dreamcatcher, Gray TV, Griffin, Meredith, Nexstar, Raycom, Sinclair, and Tribune own and operate local broadcast television stations in certain DMAs in the United States.  (*Id.* ¶¶ 19–27.)

B.     Broadcast Television Stations Compete in Local DMAs

As Plaintiffs acknowledge throughout the Complaint, competition to sell local broadcast television advertising takes place at the local level.  (*See id.* ¶ 87 (asserting that the relevant geographic markets are "the specific DMAs in which two or more Defendants purportedly compete").)  Plaintiffs acknowledge that each of the 90 DMAs that are the focus of the Complaint (out of the 210 DMAs across the country) has its own market structure.  (*See id.* app. A (stating that select Defendants own or operate 2 stations in 66 out of the 90 identified DMAs, 3 stations in 21 out of the 90 identified DMAs, and 4 stations in the remaining 3 identified DMAs).)

Even within these DMAs, Plaintiffs admit broadcast television stations compete for advertising revenue with other broadcast television stations which are not owned by Defendants as well as with other platforms, such as cable television networks, radio stations, websites, newspapers, magazines, and digital advertisements on social media platforms.  (*See, e.g.*, *id.* ¶ 148 (citing Meredith's 2015 10-K for the statement that its television stations compete for advertising dollars against other local television stations, radio stations, cable television providers, digital websites and mobile sites).)  While Plaintiffs make the conclusory assertion that other forms of advertising are "insufficiently substitutable with" broadcast television advertising (*id.* ¶¶ 89–93), they acknowledge that advertisers have shifted in recent years away

from broadcast television and other traditional platforms to substitutes such as digital platforms as viewers have changed their viewing and reading habits. (*See, e.g.*, *id.* ¶¶ 76–78.)

    C.    <u>DOJ Investigation and Consent Decrees</u>

Plaintiffs began filing the complaints that gave rise to this MDL one day after the *Wall Street Journal* reported that the DOJ was investigating communications among certain of the Defendants. *See* Drew FitzGerald & Keach Hagey, *Justice Department Investigates TV Station Owners Over Advertising Sales*, Wall St. J. (July 26, 2018);[1] Complaint, *Law Offices of Peter Miller, P.A. v. Sinclair Broad. Grp.*, No. 18-cv-02316-TDC (D. Md. July 27, 2018), ECF No. 1. The focus of the DOJ's investigation was the potential sharing of pacing information in certain local television markets. Am. Compl. ¶ 17, *United States* v. *Sinclair Broad. Grp*., No. 18-cv-2609-TSC (D.D.C. Dec. 13, 2018), ECF No. 24 (hereinafter, "DOJ Compl."). Months later, seven Defendants entered into consent decrees with the DOJ. Proposed Final Judgments at 1, *United States* v. *Sinclair Broad. Grp*., No. 18-cv-2609-TSC, ECF Nos. 2-2, 2-4, 2-6, 2-8, 2-10, 2-12, 25-2. The DOJ filed complaints simultaneously with these consent decrees. (*See id.*; Compl. ¶ 59.) Plaintiffs' Complaint relies heavily on the allegations and statements made by the DOJ in its public filings. (*See, e.g.*, Compl. ¶¶ 58–66.)

Plaintiffs define "pacing information"—which is the information allegedly exchanged— as information used to compare a station's advertising revenues booked for a certain time period to its advertising revenues booked for the same point in time in the previous year. (*Id.* ¶ 37.) As this definition itself makes clear, pacing information is not pricing information. The DOJ did not allege that Defendants exchanged pricing information. (*See generally* DOJ Compl.) Nor did the DOJ allege that Defendants reached any agreement regarding pricing. The DOJ investigation

---

[1]    *Available* at https://www.wsj.com/articles/justice-department-investigates-tv-station-owners-over-advertising-sales-1532633979.

resulted in the filing of civil complaints and simultaneous consent decrees under which Defendants admitted no wrongdoing and paid no fines or penalties. (Compl. p. 16 Heading C, ¶¶ 18, 71; Final Judgment at 1.) While the consent decrees prohibit Defendants from exchanging various types of information in addition to pacing information in the future, the DOJ Complaint does not allege that Defendants ever actually exchanged any of these additional categories of information in the past.[2] (Compl. ¶¶ 43, 61.)

D.    The Complaint

In their Complaint, Plaintiffs allege that Defendants engaged in a per se illegal price-fixing conspiracy (Count One) and also that Defendants' alleged exchange of information, on its own, is unlawful under a per se or "quick look" standard, or under the rule of reason (Count Two). (*See, e.g.*, *id.* ¶¶ 170, 172, 176, 178.) In support of these claims, Plaintiffs contend that Defendants exchanged pacing information and other unidentified forms of information among local television stations in DMAs scattered across the country. (*Id.* ¶¶ 33, 40.) Plaintiffs do not identify the DMAs in which Defendants allegedly exchanged information, and allege only that the information exchanges involving national sales firms (the "Sales Rep Firms") were "widespread" and that direct exchanges took place in "some" DMAs. (*Id.* ¶¶ 40–41.) Plaintiffs theorize that these purported information exchanges either facilitated a separate price-fixing agreement (*id.* ¶¶ 32–33), or, absent a price-fixing agreement, restrained competition among Defendants' local television stations and enabled them to raise prices. (*Id.* ¶¶ 176–77.)

With no facts supporting a price-fixing agreement among Defendants, Plaintiffs contend that "[e]conomic [e]vidence" suggests that Defendants must have used the pacing information

---

[2]    In its Competitive Impact Statement, the DOJ made clear that the consent decrees were designed to prevent the recurrence of not only the same conduct the DOJ investigated—the exchange of pacing information—but also the occurrence of other, "similar conduct." Competitive Impact Statement at 5, *United States v. Sinclair Broad. Grp.*, No. 18-cv-02609-TSC, (D.D.C. Nov. 13, 2018), ECF No. 3.

they exchanged to fix prices. (*Id.* p. 18 Heading D.) This "economic evidence" consists of (i) allegations that Defendants' revenues for the period from 2008 through 2016, in the aggregate and on average, outpaced revenues for the "market as a whole," and (ii) allegations that prices for broadcast television advertising in the "Top 100 DMAs" (which are not the same set of DMAs that are the subject of the Complaint) increased, in the aggregate and on average, for the first quarters of each year from 2012 through 2015. (*Id.* ¶¶ 74–83.)

Plaintiffs make no allegations concerning parallel pricing movements by Defendants or about the pricing or revenue of any individual Defendant, much less any Defendant in any DMA. Plaintiffs do not even allege anything about pricing levels in any particular DMA. While Plaintiffs seem to allege that the relevant geographic markets are each of the 90 individual DMAs where at least two of the Defendants own or operate stations, their "economic evidence" is limited to nationwide data for a set of DMAs that does not match the DMAs in this case. (*Id.* ¶¶ 82, 87, app. A.)

In an effort to plead "plus factors"—factors tending to establish price fixing circumstantially—Plaintiffs contend that the alleged exchange of information is a "super plus factor" that raises a "strong inference of explicit collusion." (*Id.* ¶¶ 97, 99.) They also assert that Defendants had a "motive and opportunity" to conspire. (*Id.* ¶¶ 101–21.) The alleged "motive" to collude is the fact that Defendants' profitability has been threatened by "[d]eclining [v]iewership and [r]evenue"—essentially, that Defendants could make more money by colluding than by not colluding. (*Id.* p. 30 Heading B, ¶¶ 101–07.) The alleged "opportunity" to collude is based on Defendants' participation in trade associations, industry initiatives, and joint service agreements. (Compl. ¶¶ 109–21.)

Finally, Plaintiffs allege certain structural features of the local broadcast TV industry that they claim make anticompetitive effects more likely. They allege, for example, that the broadcast TV industry is "concentrated," as evidenced by the average concentration level across all DMAs in which two or more Defendants compete. (*Id.* ¶ 133.) Their own Appendix A, however, shows significantly lower concentration levels in many DMAs—including many in which the "market" would be considered "unconcentrated" even according to Plaintiffs' own definition. With these allegations, Plaintiffs try to suggest that Defendants are insulated from competition and therefore able to collude effectively. Yet Plaintiffs also heavily rely on the argument that broadcast television stations compete with digital and online media, which, according to Plaintiffs themselves, have been siphoning Defendants' revenues. (*See, e.g.*, Compl. ¶¶ 76–78.)

**LEGAL STANDARDS: INFORMATION EXCHANGE AND PRICE FIXING**

Both counts of the Complaint—per se illegal price fixing and anticompetitive information exchange—center on Defendants' alleged exchange of pacing information. This alleged information exchange was also the focus of the DOJ investigation. In *United States v. Citizens & Southern National Bank*, 422 U.S. 86, 113 (1975) and *Gypsum*, 438 U.S. at 441 n.16, the Supreme Court held plainly that agreements among competitors to exchange information are not per se illegal. *See also Omnicare, Inc. v. UnitedHealth Group Inc.*, 629 F.3d 697, 709 (7th Cir. 2011) (information exchange is "not on its own demonstrative of anticompetitive behavior"; competitors may exchange price information "for legitimate business reasons"); *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 223 (3d Cir. 2011); *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001). At most, such agreements may be found illegal under the rule of reason, but only if the plaintiff establishes all of the elements required for a full rule-of-reason case. Specifically, the plaintiff must establish a proper relevant market, market power, and anticompetitive effects

11

caused by the alleged conduct. *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335–37 (7th Cir. 2012) (discussing plaintiff's burden in a rule-of-reason case); *Burch*, 662 F.3d at 222; *Todd*, 275 F.3d at 199.

Information exchange agreements may also be relevant in a case of alleged price fixing, which is per se illegal. However, in such a case, the plaintiff cannot prevail simply by showing the existence of an agreement to exchange information. Rather, the plaintiff must adequately and plausibly allege (and eventually prove) that the information exchange agreement evidences the existence of *another* agreement—an agreement to fix prices. *Todd*, 275 F.3d at 198; *see also Omnicare*, 629 F.3d at 709 & n.2 (information exchange is an "analytically distinct" claim from price fixing). Where a plaintiff proceeds on such a per se price-fixing theory, it must allege facts showing that the alleged information exchange, in combination with other factors, establishes that defendants engaged in a price-fixing agreement. Under *Twombly*, these allegations may not be conclusory; they must plausibly raise an inference of conspiracy to fix prices. 550 U.S. at 556–57; *see also Burch*, 662 F.3d at 225–26 (affirming dismissal of conclusory assertions that information exchange evidenced a price-fixing agreement).

Plaintiffs fail to state a claim under either of these two alternative theories of liability—*i.e.*, they fail to allege facts showing that Defendants engaged in either price fixing or unlawful information exchange. Plaintiffs' per se price-fixing claim (Count One) should be dismissed because the Complaint fails to plausibly allege any agreement to fix prices. Plaintiffs' information exchange claim (Count Two) should be dismissed because (a) there is no legal basis for analyzing information exchange under any standard other than the rule of reason and (b) Plaintiffs' alleged market is internally inconsistent with facts they themselves allege and they

fail to allege facts showing that the alleged information exchange had any anticompetitive effects in any relevant antitrust market, as is required under the rule of reason.

## ARGUMENT

### I. PLAINTIFFS' PRICE-FIXING CLAIM (COUNT ONE) SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE FACTS EVIDENCING AN AGREEMENT TO FIX PRICES

Count One of the Complaint asserts that Defendants conspired to fix prices in 90 different DMAs for local TV broadcast spot advertising, a per se violation of Section 1 of the Sherman Act. To state such a claim, Plaintiffs may allege either direct or circumstantial evidence of a price-fixing conspiracy. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628–29 (7th Cir. 2010).

To plead a conspiracy using direct evidence, a plaintiff must allege "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Burch*, 662 F.3d at 225 (quoting *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324 (3d Cir. 2010)). Alternatively, a plaintiff can plead a conspiracy by alleging facts constituting circumstantial evidence. Such evidence generally takes the form of allegations of parallel conduct and additional facts and circumstances—"plus factors"—that "raise[] a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557; *see also Mayor of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 137 (2d Cir. 2013). Parallel conduct alone is insufficient because such conduct is common throughout many industries and often is the expected result of competition. *Twombly*, 550 U.S. at 556–57.

Here, the Complaint alleges *neither* direct evidence that the Defendants conspired to fix prices *nor* circumstantial evidence from which the Court could draw a plausible inference of conspiracy.

13

A.     Plaintiffs Do Not Attempt to Allege Direct Evidence of a Conspiracy

Direct evidence is "the smoking gun in a price-fixing case"—for example, "an admission by an employee of one of the conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy to raise price." *In re Text Messaging*, 630 F.3d at 628. Plaintiffs fail to plead any direct evidence of a conspiracy. There are no allegations that directly answer basic questions about such a conspiracy—"who, did what, to whom (or with whom), where, and when?"—in any DMA, much less in 90 DMAs. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *see Twombly*, 550 U.S at 565 n.10; *Burtch*, 662 F.3d at 225–26. Hence, the sufficiency of Plaintiffs' pleading as to price fixing must rise or fall on the adequacy of the alleged circumstantial evidence.

B.     Plaintiffs Do Not Allege Facts Circumstantially Establishing a
       Price-Fixing Agreement

Circumstantial evidence consists of facts from which a court can plausibly infer an agreement to fix prices. The Supreme Court in *Twombly* observed that factual allegations showing that competitors engaged in "'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties'" could be sufficient to state a Section 1 claim. 550 U.S. at 556 n.4 (quoting 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1434 (2d ed. 2003)).

Plaintiffs do not come close to this, failing to allege any facts to show even that Defendants engaged in parallel pricing (*see* Part I.B.1 below), or any facts establishing the kinds of "plus factors" that, alone or in combination with an allegation of parallel conduct, would support an inference that Defendants formed an agreement to fix prices. (*See* Part I.B.2 below.) Accordingly, the Complaint "stops short of the line between possibility and plausibility of

14

entitle[ment] to relief" for Plaintiffs' price-fixing claim. *Twombly*, 550 U.S. at 557 (internal quotation marks omitted, alteration in original).

### 1.   *Plaintiffs Fail to Allege Facts Showing Any Parallel Pricing.*

When courts examine circumstantial evidence to assess the likelihood of a price-fixing agreement, the *starting* point is typically allegations of parallel pricing conduct by defendants. The courts must then determine whether such alleged parallel behavior is the product of explicit collusion, which is illegal, or non-collusive factors, such as "conscious parallelism," which is lawful.  *See Twombly*, 550 U.S. at 556–57; *see also Blomkest Fertilizer, Inc. v. Potash Corp. of Saskatchewan*, 203 F.3d 1028, 1033 (8th Cir. 2000) (granting summary judgment to defendant potash manufacturers who had exchanged pricing information and then simultaneously adopted nearly identical prices; the court found that the plaintiffs failed to proffer circumstantial evidence to show that the parallel prices were the product of a secret collusive agreement); P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1434a (3d & 4th eds., 2018 Cum. Supp. 2010–17) (Exhibit A).

In this case, the Complaint does not even allege facts to show that Defendants priced their products in parallel.  The Complaint contains no factual allegations regarding "uniform conduct of pricing by competitors," *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 121 (3d Cir. 1999), or "unprecedented changes in pricing structure" that might be used in support of an inference of conspiracy, *Twombly*, 550 U.S. at 557 n.4.  Instead, Plaintiffs present what they call "economic evidence" to raise suspicion that Defendants were supporting "the [e]xistence of a [c]artel." (Compl. p. 18 Heading D.)  But this "evidence," consisting of graphs (from an unidentified source) depicting purported increases in Defendants' collective average revenues as well as in nationwide average prices for spot advertising, provides no support for the allegations that Defendants engaged in parallel pricing conduct.

15

Plaintiffs' "economic evidence" all relates to *aggregate* revenues and *average* prices across the entire industry, and says nothing about prices in the 90 DMAs that are the focus of the Complaint. For instance, while Plaintiffs include snapshots of pricing trends in the "Top 100 DMAs," that set of DMAs does not coincide with the 90 DMAs at issue in this case. (Compl. ¶ 82, app. A.) Likewise, the alleged increase in average prices (across the industry as a whole) and in Defendants' total revenues says nothing about the prices for broadcast television advertising in specific DMAs, or even the revenues of any individual Defendant in any DMA. These various figures do nothing to address whether all Defendants adopted similar prices in any DMA, or whether they did so simultaneously or in lockstep. *See In re Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1197 (9th Cir. 2015) (dismissing antitrust claim relying on averaged and over-inclusive data).

Other than conclusory assertions that Plaintiffs paid elevated prices, the Complaint alleges no facts at all about the prices Defendants charged for local advertising time. For example, Figure 2, in paragraph 81 of the Complaint, purports to show that the increase in Defendants' aggregate revenues exceeded the increase for the industry as a whole. (*See also* Compl. ¶ 83 fig. 4.) But revenues are not prices, and the Complaint itself explains why Defendants' revenue increased: Defendants acquired more stations. (*See* Compl. ¶ 123 (observing that Defendants increased the number of stations they own from 147 stations in 2008 to 332 stations in 2017).)

The graphs purporting to show an increase in spot advertising prices are misleading at best. (*See* Compl. ¶ 82 figs. 3.a, 3.b, 3.c.) First, though the class period begins on January 1, 2014 and lasts "until the effects of the unlawful conduct are adjudged to have ceased" (Compl. ¶ 159), Plaintiffs present "data" for the "top 100 DMAs" for 2012–15. Second, they do not even

present full data from those years, but instead select data only from the first quarter in each year. Even then, the only quarter that shows a material increase in spot advertising prices is the first quarter of 2015, and the same graphs show a downward trend in prices for the previous period. (*See* Compl. ¶ 82 fig. 3.c.)  Third, average prices that Plaintiffs report are not limited to prices charged by Defendants—they include the prices of other firms in other DMAs not alleged to be part of the supposed cartel.  (*See id.*)  Fourth, the prices are not specific to any DMA where Plaintiffs allege price fixing, but rather are aggregated across 100 DMAs that are not even the same set of DMAs in which Plaintiffs claim prices were fixed.  (*Id.*)

Without allegations of parallel pricing, Plaintiffs have not begun to make out a circumstantial case of price fixing.  Instructive is a recent *en banc* opinion of the Eleventh Circuit affirming the dismissal of a case alleging information exchange as a "plus factor" for price fixing on the ground that the plaintiffs failed to adequately allege any parallel conduct that might give rise to an inference of collusion in the first place. *Quality Auto Painting Ctr, v. State Farm Indem. Co.*, 917 F.3d 1249 (11th Cir. 2019) (*en banc*).  A group of automobile repair shops sued a group of insurance companies, alleging that the insurance companies colluded to lower repair prices.  *Id.* at 1257.  The court stated that plaintiffs' theory required that "defendants must have adopted a uniform price," *id.* at 1263, but found no such facts alleged.  The court observed that the degree of homogeneity in defendants' actions that raises an inference of collusion must be much more than a generic claim that defendants' conduct was parallel.  *Id.* at 1264 (citing *FTC v. Cement Institute*, 333 U.S. 683 (1948)).  The court affirmed dismissal of plaintiffs' allegations that defendants' "uniformity of tactics" was suggestive of an agreement on price, finding plaintiffs' assertions "conclusory" and unsupported by facts showing the kind of parallel tactics that might evidence collusion.  *Id.* at 1268–69.

Here, Plaintiffs' allegations are even more lacking. Plaintiffs fail to allege that Defendants took any relevant pricing actions in parallel, let alone allege any facts sufficient to place any parallel conduct "in a context that raises a suggestion of a preceding agreement" to fix prices in any specific DMAs. *Twombly*, 550 U.S. at 557; *see also Burch*, 662 F.3d at 228 (affirming dismissal where "allegations fall far short of demonstrating parallel behavior"); *In re Beef Industry Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) ("When an antitrust plaintiff relies on circumstantial evidence of conscious parallelism to prove a § 1 claim, he must first demonstrate that the defendants' actions were parallel."); *Washington Cty. Health Care Auth.*, 328 F. Supp. 3d at 835–36 (granting motion to dismiss where, among other things, the alleged parallel conduct, involving product recalls, was "not really 'parallel'" insofar as the timing and magnitude of the defendants' recalls differed from one another).

2. *Plaintiffs Fail to Allege "Plus Factors" Evidencing a Price-Fixing Agreement.*

Even if Plaintiffs had alleged parallel pricing by Defendants, that would not be sufficient to infer the existence of a price-fixing agreement. *Twombly*, 550 U.S. at 553–57 ("an allegation of parallel conduct and a bare assertion of conspiracy will not suffice[; w]ithout more, parallel conduct does not suggest conspiracy"); *Mayor of Baltimore*, 709 F.3d at 136 ("[A]lleging parallel conduct alone is insufficient, even at the pleading stage"). Instead, courts typically require plaintiffs to plead other facts and circumstances, often referred to as "plus factors," that tend to demonstrate the existence of an agreement. *See Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1201 (7th Cir. 1981) ("Parallel behavior without more (a 'plus factor') is not enough to establish a Sherman Act violation.").[3]

---

[3] While courts have not generally laid out a specific hierarchy of plus factors, they have considered that among the most important plus factors are facts and circumstances that indicate that the parties' conduct would have been "contrary to their self-interest if they acted alone." 1-1, ABA Antitrust

Plaintiffs attempt to obfuscate these relevant legal standards by asserting that the alleged information exchange among Defendants is a "super plus factor" whose presence is enough to "plausibly infer[] the existence of a *per se* illegal cartel." (Compl. ¶ 100.) But no federal court has endorsed the "super plus factor" theory that Plaintiffs present here. Rather, that term has properly been deemed a "label conjured up for litigation rather than the product of reliable principles and methods" and excluded on that basis. *Anderson News*, 2015 WL 5003528, at *3 (internal quotation marks omitted). That holding is consistent with the Supreme Court precedent that because the "exchange of price data and other information among competitors does not invariably have anticompetitive effects"—and "can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive"—"such exchanges of information do not constitute a *per se* violation of the Sherman Act." *Gypsum*, 438 U.S. at 441 n.16. If, as Plaintiffs contend, an alleged information exchange was on its own sufficient to infer a per se illegal price-fixing agreement, then the Supreme Court's holding that an information exchange is not per se illegal would be rendered meaningless. Accordingly, Plaintiffs' allegation that Defendants exchanged information is not sufficient by itself to plausibly plead a price-fixing agreement, especially since the alleged information exchanged did not pertain to price. *See supra* at 12 (describing legal standard for when information exchanges can be relevant for a price-fixing claim).

Plaintiffs also label a series of other alleged facts and circumstances about the local broadcast television industry as "plus factors." But these alleged facts and circumstances are

---

Section, Antitrust Law Developments § 1.B.1.b.(2) (8th ed. 2017) (Exhibit B); see also *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 896 (N.D. Ill. 2009) (stating actions against self-interest constitute a "widely recognized plus factor") (citation omitted). Plaintiffs, however, have not pled any facts to indicate that Defendants' conduct would have been contrary to their self-interest in the absence of collusion.

common across many industries and, individually and in total, do not push Plaintiffs' conspiracy allegations across the line from merely possible to plausible.

      (a)     Plaintiffs do not adequately plead that Defendants had a motive to conspire.

Plaintiffs allege that Defendants were motivated to enter into a price-fixing conspiracy because fiercer competition from and substitution to Internet-based media have led to declines in viewership and revenue for broadcast television. (Compl. ¶¶ 101–07.) Plaintiffs' allegations boil down to the suggestion that Defendants had a "motive" to conspire because they faced "lower prices" and "a lack of profitability." (*Id*. p. 30 Heading B; ¶ 106.)

The allegation that Defendants were "motivated" to conspire because conspiring would result in more profits than not conspiring is far from the sort of allegation sufficient to meet the "motivation" prong in a plus factors analysis. "In a free capitalistic society, profit is always a motivating factor in the conduct of a business. Profit is a legitimate motive in pricing decisions, and something more is required before a court can conclude that competitors conspired to fix pricing in violation of the Sherman Act." *In re Baby Food*, 166 F.3d at 134. Allegations that Defendants might want to increase profits apply to businesses universally and provide no indication of a conspiracy. *Burtch*, 662 F.3d at 229; *see also In re Musical Instruments & Equip.*, 798 F.3d at 1194 ("Any firm that believes that it could increase profits by raising prices has a motive to reach an advance agreement with its competitors. Thus, alleging 'common motive to conspire' simply restates that a market is interdependent . . . . Interdependence, however, does not entail collusion.").

Likewise, Plaintiffs' allegations that Defendants felt economic pressure from increased competition, and hence were motivated to conspire, can be applied to any industry in which changes to the competitive landscape pose a threat. *See Serfecz v. Jewel Food Stores*, 67 F.3d

591, 600–01 (7th Cir. 1995) (affirming summary judgment for defendants accused of conspiring against developer of neighboring shopping mall, since "[t]he mere existence of mutual economic advantage, by itself, does not tend to exclude the possibility of independent, legitimate action and supplies no basis for inferring a conspiracy.").  As such, these allegations do not begin to raise an inference that Defendants fixed prices.

> (b)  Plaintiffs do not adequately plead that Defendants had an opportunity to conspire.

Plaintiffs also allege that Defendants had an opportunity to collude because they participated in the same trade associations.  (Compl. ¶¶ 108–10, 114–21.)  Plaintiffs find sinister meaning in statements by some of these associations that the industry had a "shared commitment to working together" and that members "actively work together."  (*Id.* ¶ 110 (emphases omitted).)  They also consider it troubling that these associations state that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.  (*Id.* ¶ 120.)

While Plaintiffs may think they have described collusion, they have simply described trade associations and "mere membership in a trade association, attendance at trade association meetings and participation in trade association activities are not, in and of themselves, condemned or even discouraged by the antitrust laws." *Moore v. Boating Indus. Assocs.*, 819 F.2d 693, 712 (7th Cir. 1987) (citation omitted); *see also Kleen Products LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 938 (7th Cir. 2018) (stating, in a decision affirming summary judgment, that "having the *opportunity* to conspire does not necessarily imply that wrongdoing *occurred*," and that "plaintiffs must offer some evidence that moves beyond speculation about the content of what was conveyed"); *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015) ("[A]s there is no evidence of what information was exchanged at these [trade association]

meetings, there is no basis for an inference that they were using the meetings to plot prices [sic] increases.").

Indeed, as another court in this District recently observed, "trade organizations are ubiquitous and serve numerous legitimate and pro-competitive purposes." *Washington Cty. Health Care Auth.*, 328 F. Supp. 3d at 843. Accordingly, "[a]bsent additional facts addressing the content of defendants' discussions at or the (nefarious) subjects of trade organization meetings, allegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle." *Id.* (granting motion to dismiss a conspiracy claim based on alleged "plus factors" including participation in trade organizations). Plaintiffs here allege no such "additional facts."[4]

Plaintiffs also allege that Defendants had opportunities to collude through joint service agreements. (Compl. ¶¶ 111–13.) But Plaintiffs do not plead any facts—such as the identity of the Defendants who were parties to these agreements, the DMAs where Defendants allegedly entered into these agreements, and whether multiple Defendants were parties to the same service agreement—that would be required to even consider whether these agreements facilitated collusion. Merely pleading the existence of such an opportunity, which Plaintiffs do not allege to be unlawful on its own, is not sufficient to allege an unlawful conspiracy. *See Texaco Inc. v. Dagher*, 547 U.S. 1, 6 n.1, 7 (2006) (reciting economic justifications for creating joint ventures and stating that challenges to their legality must be examined under the rule of reason); *Neagle v. Goldman Sachs Grp., Inc*, No. 6:18-CV-00754-MC, 2019 WL 1102199, at *10 (D. Or. Mar. 1,

---

[4]    Plaintiffs' pleadings concerning the TIP Initiative, an industry consortium dedicated to streamlining advertising transactions, have the same flaws and do not contain allegations to support the claim that the TIP Initiative enabled collusion. (Compl. ¶¶ 109–10.)

2019) (describing a service agreement between defendants as "benign" in dismissing Section 1 claim).

> (c)     Plaintiffs do not adequately plead that the market structures support the existence of a price-fixing conspiracy.

Finally, Plaintiffs' allegations about market structure—high market shares, high concentration in certain DMAs,[5] and high barriers to entry (Compl. ¶¶ 122–43)—fail to suggest anything other than the mere *possibility* of collusion.  In *Washington County Health Care Authority*, the court acknowledged that the two defendants accounted for 90% of the IV saline market, that the product was homogenous, and that the market had a high barrier to entry, since any new competitors would have to develop manufacturing plants that met FDA requirements. 328 F. Supp. 3d at 828, 837 n.12.  Nevertheless, it dismissed the plaintiffs' complaint, observing:

> If the complaint's allegations must render it more than merely possible that the defendants entered into an illegal agreement, it cannot be the case that allegations that a market is oligopolistic and a product is homogenous are sufficient to survive a motion to dismiss.  If that were so, an antitrust complaint targeting any industry with those features would survive a motion to dismiss regardless of whether there were any additional facts suggesting an agreement.

*Id.* at 841.

Here, Plaintiffs plead even less compelling market features, since they cannot allege that advertising time for local broadcast television programs is homogenous.  To suggest the local broadcast television market is highly concentrated, they cite various reports concerning Defendants' acquisitions of other stations and their geographic reach.  (Compl. ¶ 123–32.)  But, even in Appendix A of the Complaint, Plaintiffs state that 18 DMAs, which make up 20% of the 90 DMAs identified by Plaintiffs, have a Herfindahl-Hirschman Index below 2,500—the number the Complaint recites as the standard for identifying a highly concentrated market.  (*Id.* ¶ 133,

---

[5]     Notably, Plaintiffs do not allege that these factors exists in all of the named DMAs.

app. A.)[6]  In any event, merely identifying certain market features such as "high" concentration or barriers to entry is insufficient here to plausibly plead Defendants fixed prices.  *See Washington Cty. Health Care Authority*, 328 F. Supp. 3d at 827, 841 (dismissing Section 1 claim even though DOJ and Federal Trade Commission had classified the IV saline market as "highly concentrated.")

*     *     *     *

In sum, Plaintiffs have failed to allege any parallel conduct that could serve as the predicate for a plausible inference that Defendants agreed to fix prices, and "each of the identified plus factors are either equally consistent with conscious parallelism, or to be expected regardless of whether the defendants unlawfully colluded." *Id.* at 844.  As a result, Plaintiffs are left with a bare allegation that Defendants agreed to exchange (non-price) information.  And, as discussed above, the Supreme Court has made clear that such agreements (even when they *do* involve pricing information) do not constitute a per se violation of the antitrust laws.[7]  *See Gypsum*, 438 U.S. at 441 n.16.

Plaintiffs cannot escape this result merely by labeling the information exchange itself as a "plus factor" or by adding adjectives like "super" to that label.  Because Plaintiffs have failed to

---

[6]  Moreover, despite arguing that advertisers consistently substitute between advertising on local television stations and advertising on other forms of media, including digital media, they fail to include this competition in discussing market structure.  (*See, e.g.*, Compl. ¶ 77 ("Spending on media continues to shift from traditional to digital products and services at a rapid pace . . . Digital, consisting of internet and mobile advertising, will become the largest advertising category by 2017, surpassing TV one year earlier than forecast."); *id.* ¶ 78 ("Television's command over the United States advertising revenues has given way to digital, which is expected to bring in nearly half of all ad revenue in 2018.").)

[7]  As Judge Posner wrote, information exchanges among competitors are not alone per se illegal because "[i]n the absence of collusive pricing, practices that increase the amount of information sellers have about the conditions of demand and supply may be presumed to increase the efficiency with which the market operates."  Richard A. Posner, *Antitrust Law* 169 (2d ed. 2001) (Exhibit C).  Per se rules are not appropriate when summary condemnation could thwart competition-enhancing activity.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 894–95 (2007).

allege any facts plausibly suggesting that Defendants entered into a price-fixing agreement—as opposed to merely an agreement to exchange information—Count One of the Complaint should be dismissed.  *See* Burtch, 662 F.3d at 229–30 (affirming grant of motion to dismiss where plaintiffs alleged information sharing but failed to "sufficiently plead any 'plus factors' to suggest that the [defendants] had entered into an agreement"); *see also* In re Baby Food, 166 F.3d at 137 (affirming grant of summary judgment where plaintiffs alleged defendants exchanged pricing information but failed to satisfy the "'plus factor' requirement").

C.    Plaintiffs' References to the DOJ Proceeding Do Not Cure the Deficiencies in Their Allegations

The DOJ action does not fill the void in Plaintiffs' Complaint.  Indeed, Plaintiffs try to distance themselves from the DOJ as much as they rely on the DOJ.  On the one hand, the Complaint alleges "[t]he Department of Justice Investigation and Requirement for Injunctive Relief Underscore the Conclusion That the Defendants Violated Section 1 of the Sherman Act." (Compl. p. 14 Heading B.)  On the other hand, Plaintiffs are faced with the fact that, after allegedly reviewing "millions of pages of documents" (*id.* ¶ 66), the DOJ did not lodge criminal charges, did not allege any Defendant fixed prices, and did not seek the imposition of any fine or other penalty, a decision that Plaintiffs wish away as "[i]mmaterial."  (*Id.* p. 16 Heading C.) Because the DOJ gives high priority to bringing criminal cases against price fixing,[8] Plaintiffs' reliance on the DOJ's investigation, where the investigation did *not* lead to prosecution, undercuts rather than supports an inference of unlawful behavior.

---

[8]    Makan Delrahim, *Statement of Assistant Attorney General Makan Delrahim Before the U.S. House of Representatives Subcommittee on Regulatory Reform, Commercial and Antitrust Law* (Dec. 12, 2018), https://www.justice.gov/opa/speech/statement-assistant-attorney-general-makan-delrahim-us-house-representatives-subcommittee (stating that DOJ's Antitrust Division has "investigated and prosecuted criminal antitrust violations across many sectors the economy, with over $3.243 billion in criminal fines imposed" in 2016–17 fiscal year); Bill Baer, *Prosecuting Antitrust Crimes*, U.S. Department of Justice, at 1 (Sept. 10, 2014), https://www.justice.gov/atr/file/517741/download (characterizing DOJ's criminal prosecution of price fixing as the most "important work we do").

Simply put, the fact that Defendants entered into consent decrees (without admitting liability or wrongdoing) does not, under *Twombly*, establish the sufficiency of Plaintiffs' allegations. The decrees themselves expressly state that the decrees "[do] not constitute any evidence against or admission by any party regarding any issue of fact or law." *See, e.g.*, Final Judgment at 1. Plaintiffs' claims must therefore rest on the adequacy of their factual allegations, and, for all the reasons set forth above, Plaintiffs fail to allege facts sufficient to support a claim of price fixing.

## II. PLAINTIFFS' INFORMATION EXCHANGE CLAIM (COUNT TWO) SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO PLEAD FACTS SUGGESTING THAT DEFENDANTS' ALLEGED EXCHANGE OF PACING DATA WAS UNLAWFUL.

Plaintiffs also do not state a claim that the alleged exchange of "pacing data,"—*i.e.*, comparisons of "a broadcast station's revenues booked for a certain time period to the revenue booked for the same point in time in the previous year," (Compl. ¶ 2)—violated Section 1 of the Sherman Act.

The "dissemination of . . . information is not itself a per se violation of the Sherman Act," *Citizens & S. Nat. Bank,* 422 U.S. at 113, because it "does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *Gypsum,* 438 U.S. at 441 n.16; *see supra* at 24 n.7.

To determine whether an information exchange violates the Sherman Act, courts apply the rule of reason. *See Omnicare,* 629 F.3d at 709 (citing *Todd,* 275 F.3d at 198).[9] Plaintiffs

---

[9] Plaintiffs' suggestion that the legality of information sharing should be adjudicated using the per se standard or "quick look" analysis (Compl. ¶ 178) is contrary to this precedent and to the well-established principle that "[t]he standard framework for analyzing an action's anticompetitive effects on a market is the Rule of Reason." *Agnew,* 683 F.3d at 335.

proceeding under the rule of reason must allege "an agreement or contract [that] has an anticompetitive effect on a given market within a given geographic area," which requires "the showing of a precise market definition in order to demonstrate that a defendant wields market power." *Agnew*, 683 F.3d at 335, 337. Here, Plaintiffs fail to allege an agreement to exchange information in each (or any) DMA, fail to define a plausible market, and fail to allege that Defendants have market power or that the sharing of pacing data had an actual anticompetitive effect. Each of these failures is an independent basis for dismissing Plaintiffs' information-exchange claim.

A. Plaintiffs Do Not Allege an Agreement in any DMA

Plaintiffs' information-exchange claim fails at the outset because they have not adequately alleged that "Defendants entered into a contract, combination, or conspiracy" to exchange information in any DMA. *Frantzides v. Northshore Univ. HealthSystem Faculty Practice Assocs., Inc.*, 787 F. Supp. 2d 725, 731 (N.D. Ill. 2011). Stating a Section 1 "claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556. Here, there are no allegations about an agreement to exchange information in any of the 90 DMAs in which Plaintiffs allege multiple Defendants own or operate local television stations: no allegations as to when any alleged agreement to exchange information in a particular DMA was made, where it was made, how it was made, or by whom. A "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Hackman v. Dickerson Realtors, Inc.*, 520 F. Supp. 2d 954, 968 (N.D. Ill. 2007).

Plaintiffs affirmatively allege that the nature and content of exchanges varied by DMA, but critically do not specify their nature and content in any given DMA. (*See, e.g.*, Compl. ¶ 41 ("[I]n some DMAs, Defendants exchanged competitively sensitive information directly with one

another, without using the Sales Rep Firms as a conduit."); *id.* ¶ 46 (the content of the alleged exchanges "depend[ed] on the DMA.").)[10]  The Complaint contains no allegations about the information exchanged in each DMA or anything at all about the agreements allegedly made within each DMA.  That is not sufficient to allege an agreement to exchange information, *Hackman,* 520 F. Supp. 2d at 968, and Count Two of the Complaint should therefore be dismissed.

> B.    Plaintiffs Do Not Allege a Plausible Market

The Court also should dismiss Count Two of the Complaint for the independent reason that Plaintiffs fail to allege a plausible relevant market.  *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015) (Kendall, J.); *see also Agnew*, 683 F.3d at 338 n.4 ("[W]e need not analyze plaintiffs' assertions regarding the reasonableness of the NCAA's restraints or plaintiffs' alleged injury, since we ultimately conclude that plaintiffs failed to allege a relevant market in their complaint.").  Establishing a relevant market requires defining both an appropriate "geographic market and a product market."  *Right Field Rooftops, LLC*, 87 F. Supp. 3d at 886.  Plaintiffs have done neither.

> 1.    *Plaintiffs Do Not Allege a Plausible Product Market.*

Plaintiffs' proposed product market—"the sale of broadcast television spot advertising on local television stations" (Compl. ¶ 86)—fails because it excludes forms of advertising that *Plaintiffs* specifically allege are substitutes for advertising on local television stations.  (*Id.* ¶¶ 77–78, 101, 105.)  "The outer boundaries of a product market are determined by the reasonable interchangeability of use [by consumers] or the cross-elasticity of demand between the product itself and substitutes for it."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).  In

---

10    These allegations also undercut any suggestion of a single agreement governing all 90 DMAs, and 90 DMAs scattered throughout the country are not in any event a relevant geographic market for *local* television broadcasting.  *See infra* at 31–33.

other words, "products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market." *Int'l Equip. Trading, Ltd. v. AB Sciex LLC,* No. 13 C 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (Kendall, J.) (granting Rule 12(b)(6) motion to dismiss Sherman Act claims) (internal quotation marks omitted).

Plaintiffs attempt to limit their proposed product market to the sale of advertisements on one medium—broadcast television stations (Compl. ¶ 86.)—but also allege that there are other media through which advertisers market their products.  (*See, e.g.*, *id.* ¶¶ 76–78).  A single-medium product market is inappropriate here precisely because, as Plaintiffs repeatedly admit, advertisers consistently substitute between advertising on local television stations and advertising on other forms of media, including digital media.  (*See, e.g.*, Compl. ¶ 77 ("Spending on media continues to shift from traditional to digital products and services at a rapid pace . . . Digital, consisting of internet and mobile advertising, will become the largest advertising category by 2017, surpassing TV one year earlier than forecast."); *id.* ¶ 78 ("Television's command over the United States advertising revenues has given way to digital, which is expected to bring in nearly half of all ad revenue in 2018.").)

The Complaint further undermines its own product market definition by admitting the cross-elasticity of demand between advertising on broadcast television stations and other forms of advertising.  Where "competition cuts across product or industry lines, the product market must be drawn broadly to include competition as it exists." *Sci. Prod. Co. v. Chevron Chem. Co.*, 384 F. Supp. 793, 795 (N.D. Ill. 1974).  If a plaintiff "fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand . . . the relevant market is legally insufficient and a motion to dismiss may be granted."

29

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (quoting *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997)).  Plaintiffs specifically allege cross-elasticity of demand and competition between advertising on broadcast television and digital media.  (*See, e.g.*, Compl. ¶ 78 (advertisers are "moving away from the typically high cost-per-thousand (CPM) traditional media to less expensive, low-CPM Internet and mobile advertising—further accelerating the shift of analog dollars to digital"); *id.* ¶ 101 (broadcast "industry revenues overall are down," which is "the result of pressure from internet and other media outlets"); *id.* ¶ 105 ("[O]nline rivals have increased their investments in the online video advertising market, capturing almost every new advertising dollar entering the marketplace.").[11]

Courts routinely find proposed product markets implausible where, as here, allegations are internally inconsistent or contradictory.  For example, in *Right Field Rooftops, LLC*, the plaintiffs proposed a product market of live Cubs games, but also asserted that changes in quality or price of concerts or other events could negatively affect demand, and that broadcasting could substitute for going to see a game.  87 F. Supp. 3d at 887–88.  This Court noted plaintiffs' assertion and held it "effectively concede[d] that . . . [plaintiffs] failed to offer a plausible relevant market."  *Id.*  Likewise, in *Midwest Radio Co, Inc. v. Forum Pub. Co*, 942 F.2d 1294 (8th Cir. 1991), the Eighth Circuit rejected the plaintiff's proposed market of newspaper, commercial radio, and commercial television, because it excluded "other competitive advertising media, such as billboards, weekly newspapers, and direct mail," that plaintiff had "acknowledged

---

[11]  The only allegation in the Complaint to the contrary is the conclusory assertion that "[o]ther forms of advertising, such as targeted Internet advertisements, are insufficiently substitutable with broadcast television spot advertising to constrain broadcast television spot advertising prices to the competitive level."  (Compl. ¶ 89.)  This allegation is contradicted by other allegations in the Complaint, *see supra* at 11, and is not "a plausible explanation as to why a market should be limited in a particular way," *Int'l Equip. Trading, Ltd.*, 2013 WL 4599903, at *3.  "[I]nvocation of antitrust terms of art does not confer immunity from a motion to dismiss; to the contrary, these conclusory statements must be accompanied by supporting factual allegations."  *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1110 (7th Cir. 1984).

. . . competed directly with television, radio, and the daily newspaper." *Id.* at 1297. Since—by Plaintiffs' own admission—broadcast television and digital media compete for advertisers, the alleged product market of local-only TV advertising "does not encompass all interchangeable substitute products," and Count Two of the Complaint should be dismissed. *See Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (affirming dismissal where alleged relevant market of NCAA soccer in Los Angeles was inconsistent with plaintiff's allegation that she was recruited nationally); *Cinema Vill. Cinemart, Inc. v. Regal Entm't Grp.*, No. 15-cv-05488, 2016 WL 5719790, at *6 (S.D.N.Y. Sept. 29, 2016) ("[D]ismissal is appropriate where, as here, a plaintiff has defined the relevant market in an inconsistent and facially implausible way"), *aff'd*, 708 Fed. App'x 29 (2d Cir. 2017).

2.     *Plaintiffs Do Not Allege a Plausible Geographic Market.*

Although the thrust of the Complaint is that the relevant competition takes place locally, when Plaintiffs formally state the scope of their geographic market, it is unclear whether Plaintiffs intend to allege 90 distinct geographic markets each consisting of a single DMA or one geographic market consisting of 90 DMAs scattered across the country. (Compl. ¶ 179 ("[T]he relevant geographic market is those DMAs where two or more defendants compete."); (*id.* ¶ 87 ("[S]hould a geographic market need to be defined . . . *it is* the specific DMAs in which two or more Defendants purportedly compete.") (emphasis added).) That ambiguity is grounds for dismissing Count Two of the Complaint. *Besser Pub. Co. v. Pioneer Press, Inc.*, 571 F. Supp. 640, 641 (N.D. Ill. 1983); *see also Am. Channel, LLC v. Time Warner Cable, Inc.*, No. CIV 06-2175 DWF/SRN, 2007 WL 1892227, at *6 (D. Minn. June 28, 2007) (finding "no cognizable geographic market" and dismissing complaint where plaintiffs alleged nationwide market, and that defendants created monopoly markets "in affected DMAs, but also regional clusters of such monopoly markets involving multiple DMAs").

Nonetheless, if Plaintiffs intend a single geographic market consisting of 90 DMAs, their geographic market allegations are implausible since, as Plaintiffs concede, *local* television stations compete for advertisers with other local media. (Compl. ¶ 74.) This, too, warrants dismissal. *Brown Shoe Co.*, 370 U.S. at 336–37 (a geographic market must "both correspond to the commercial realities of the industry and be economically significant") (internal quotation marks omitted); *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961) (geographic market "must be charted by careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies").

A single geographic market comprised of 90 DMAs would also be inconsistent with other allegations in the Complaint, which treat each DMA as a separate economic market. For example, Plaintiffs allege that they purchased local spot advertising in specific, identified DMAs (Compl. ¶ 17, app. A), and that they expected *intra-DMA* price competition between stations. (*Compare id.* ¶ 75 ("In a competitive market, one would expect horizontal competitors such as Defendants to *compete for audience share and advertising revenue with other stations in their respective DMAs* by competing on price.") (emphasis added) *with Collins v. Associated Pathologists, Ltd.*, 676 F. Supp. 1388, 1404 (C.D. Ill. 1987), *aff'd*, 844 F.2d 473 (7th Cir. 1988) (dismissing Sherman Act claim where alleged geographic market did not correspond with "the area of effective competition that the defendant encounters when it offers its product or services for sale").) Plaintiffs also assert that individual DMAs are the relevant unit for determining price cross-elasticity. (Compl. ¶ 93 ("[A]dvertisers are not likely to respond to a small but significant increase in the prices charged for broadcast television spot advertising *in a given DMA* by switching to cable television spot advertising.") (emphasis added).) In addition, Plaintiffs allege the purported information exchanges occurred only within DMAs (and varied by DMA), which

also suggests each DMA is a separate economic unit.  (*See, e.g.*, *id.* ¶ 36 (Sales Rep Firms

reported pacing information allegedly received from Defendants "*to the Defendants in the*

*DMA*"); *id.* ¶ 41 ("[I]n some DMAs, Defendants exchanged competitively sensitive information

directly with one another, without using the Sales Rep Firms as a conduit."); *id.* ¶ 46 (the content

of the alleged exchanges "depend[ed] on the DMA").)  Plaintiffs' attempts to measure market

share and market concentration are also divided by DMA (*see, e.g.*, *id.* ¶¶ 94, 122, 133, app. A),

which further highlight the variation among DMAs.

Thus, to the extent Plaintiffs allege a single geographic market consisting of 90 DMAs,

their rule-of-reason claim is implausible and should dismissed on that basis.[12]

C.    Plaintiffs Do Not Plausibly Allege Actual Anticompetitive Effects

Count Two of the Complaint should also be dismissed because Plaintiffs do not

adequately allege an actual anticompetitive effect caused by television stations allegedly sharing

pacing information.  The Complaint fails because "[i]t is necessary under the rule of reason to

show anticompetitive effects, or actual harm to competition, to establish an antitrust violation

and a cause of action."  *Bunker Ramo Corp. v. United Bus. Forms, Inc.*, 713 F.2d 1272, 1283

(7th Cir. 1983); *see also Agnew*, 683 F.3d at 335 (surviving a motion to dismiss requires alleging

"an agreement or contract [that] has an anticompetitive effect").

1.    *Plaintiffs Do Not Plausibly Allege Market Power.*

Plaintiffs do not allege that Defendants had "market power," which "is a necessary

ingredient in every case under the Rule of Reason."  *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins.,

Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986).  Without a market power allegation, the Complaint

fails:  "Unless the defendants possess market power, it is unnecessary to ask whether their

---

[12]    In addition, as described below, a theory based on harm to competition in 90 separate local markets
would create insurmountable standing issues for Plaintiffs.  *See infra* Part III.

conduct may be beneficial to consumers. Firms without power bear no burden of justification." *Id.* at 1334–35; *see also Jack Walters & Sons Corp. v. Morton Bldg., Inc.*, 737 F.2d 698, 702 (7th Cir. 1984) (plaintiff must show defendant has market power, "as this is a prerequisite to being able to restrain trade unreasonably") (internal citation omitted).[13]

*First*, the relevant product market cannot be limited to spot advertising on broadcast television stations because, as Plaintiffs acknowledge, advertisers can and do switch between local television advertising and other forms of advertising. *See supra* at 28–31; *see also Am. Floral Servs., Inc. v. Florists' Transworld Delivery Ass'n*, No. 84-C-1824, 1986 WL 949, at *3 (N.D. Ill. Apr. 13, 1986) ("[T]he ready availability of substitutes in the market undercuts market power."). Plaintiffs have not alleged that Defendants possess market power in any other market. This alone is dispositive. *E.g., Agnew*, 683 F.3d at 338 n.4.

*Second*, even assuming a product market is limited to the sale of spot advertising on local television stations, Plaintiffs have not alleged market power in many of the relevant geographic markets (assuming Plaintiffs are alleging each of the 90 DMAs is a separate market). "Market share analyses in section 1 cases have led to conclusions that approximately 70%–75% of market share constitutes market power . . . and that a 20%–25% market share or less does not constitute market power." *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 666 (7th Cir. 1987); *see also id.* (analogizing to Section 2 cases, in which "a substantial percentage of the sales is usually at least 50%"). Plaintiffs allege that in 3 of the 90 DMAs they identify, Defendants' collective market share of spot advertising on local television stations is 25% or below; in 14, it is 35% or below, and in 34, it is below 50%. (Compl. app. A.)

---

[13]  Nor do Plaintiffs allege any direct evidence of actual anticompetitive effects in any DMA, such as actual higher prices for spot advertising on broadcast television stations market-wide. *See infra* Part II.B.2.

2.     *Plaintiffs Do Not Plausibly Allege an Anticompetitive Effect in any DMA.*

Plaintiffs also fail to allege an actual anticompetitive effect caused by sharing pacing information in any DMA, let alone all of them.  A valid complaint must allege "an agreement or contract [that] has an anticompetitive effect." *Agnew*, 683 F.3d at 335.  An anticompetitive effect in this context means "higher prices or lower output," which are "the principal vices proscribed by the antitrust laws." *Ball Mem'l Hosp., Inc.*, 784 F.2d at 1334.  The Complaint does not adequately allege any such effect.

Plaintiffs allege Defendants exchanged only "pacing data," consisting of "a broadcast station's revenues booked for a certain time period to the revenue booked for the same point in time in the previous year."  (Compl. ¶ 2; *see also id.* ¶¶ 36–37.)[14]  Plaintiffs do not allege "[e]xchanges of current price information, [which] of course, have the greatest potential for generating anticompetitive effects," *Gypsum Co.*, 438 U.S. at 443 n.16, or information separated by advertiser, transaction, program, or day part.  *Omnicare,* 629 F.3d at 705 (sharing of "only . . . generalized and averaged high-level pricing data," was not "on its own demonstrative of anticompetitive behavior, even when pricing data is what is exchanged."); *see also Todd*, 275 F.3d at 212 (stating courts prefer that shared information does not contain "transactional specificity").

---

[14]  Plaintiffs also allege Defendants exchanged "sales data, including pacing data," (Compl. ¶ 2), "other forms of competitively sensitive information" (*id.* ¶ 33), and "data on individual stations' booked sales."  (*Id.* ¶ 38).  Plaintiffs do not allege what "sales data" other than "pacing data" was exchanged, if any, what "other forms of competitively sensitive information" means, or what anticompetitive effects, if any, such information purportedly had apart from the alleged anticompetitive effects attributed to the exchange of pacing data.  None of these conclusory allegations is sufficient to withstand a motion to dismiss.  *Rao v. Gondi*, No. 14 C 66, 2014 WL 5423441, at *3 (N.D. Ill. Oct. 23, 2014) (Kendall, J.) ("the Court need not accept as true 'threadbare recitals of the elements of a cause of action, supported by mere conclusory statements [.]'") (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)).

Nor do Plaintiffs allege that Defendants raised prices after allegedly exchanging pacing data. Instead, Plaintiffs allege at most that Defendants' purported exchange of pacing data allowed Defendants "to better understand . . . the availability of their would-be competitors' inventory" (Compl. ¶ 3), which is a "key factor informing negotiations over price" (*id.* ¶ 37), and which led to "prices that were supracompetitively impacted." (*Id.* ¶¶ 15–16.) These assertions are not sufficient to allege anticompetitive effects.

*First*, Plaintiffs allege Defendants exchanged revenue data, not information about inventory. (*Id.* ¶ 3.) Plaintiffs do not plausibly allege that knowing one Defendant's revenue, as compared to the previous year's revenue, would allow any other Defendant to attribute a change to an increase or decrease in inventory sold as opposed to another factor affecting revenue, such as a change in the price of advertisements. *Second*, even if it were possible to estimate inventory sold from total revenue, Plaintiffs do not allege that aggregated revenue data would tell Defendants the type of inventory remaining at their competitors (*i.e.*, advertising spots by time of day, type of program, etc.) or whether the spot would air in a current or future time period. (*See* Compl. ¶ 80 fig. 1 (breaking relevant advertising measures out by program type).) *Third*, Plaintiffs suggest, but do not explicitly allege, that if Defendants knew their competitors' remaining inventory was low, it would allow them to raise prices. (*See, e.g.*, *id.* ¶ 177 (alleging plaintiffs experienced "overcharge damages").) That is neither plausible—because low remaining inventory would also suggest many advertisers had already purchased spots, thereby reducing demand—nor sufficient to plead a violation of the Sherman Act. *Bunker Ramo Corp.*, 713 F.2d at 1285 (rejecting "bare allegation" that plaintiff "was charged an 'artificially high, non-competitive price'" and refusing "to construe pleadings so liberally as to imply an anticompetitive effect or harm to competition where there is not even a bare allegation of such an

36

effect and the alleged facts do not support one"). *Fourth*, Plaintiffs do not allege (except in the most conclusory manner) an actual anticompetitive effect. The mere allegation that Defendants learned about inventory, a supposed "key factor" informing negotiations, does not mean that possession of that information actually caused prices to increase. Plaintiffs do not explain how that allegedly occurred, or allege any facts to suggest it did occur.

## III. PLAINTIFFS DO NOT ALLEGE ANTITRUST INJURY BECAUSE THEY DO NOT PLEAD THAT THEY PURCHASED ADVERTISING TIME IN A MARKET WHERE ANY PURPORTEDLY UNLAWFUL CONDUCT OCCURRED

A plaintiff must adequately plead a purported injury "in the market in which trade was restrained."[15] *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 539 (1983). Plaintiffs fail to meet this basic requirement. They do not make a *prima facie* showing that they suffered an antitrust injury because they do not plead any facts demonstrating that the challenged conduct occurred in any markets in which they purchased advertising.[16]

Plaintiffs must make factual allegations to show that they have suffered antitrust injury caused by Defendants' purported conduct. *See H.O.P.E., Inc. v. Eden Mgmt. LLC*, 128 F. Supp. 3d 1066, 1076 n.10 (N.D. Ill. 2015) (citing *Payton v. Cty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002)). In other words, "both the wrongful conduct and the resulting injury must occur within the same market" in which plaintiffs participate. *Rozema v. Marshfield Clinic*, No. 96-C-592,

---

[15] Antitrust injury is part of the broader Section 1 antitrust standing inquiry, which requires a plaintiff to show that it is (i) injured by the competition-reducing aspect of an agreement; and (ii) properly positioned to enforce the antitrust laws. *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 157–58 (2d Cir. 2016).

[16] Plaintiffs must satisfy this standard whether the rule of reason or the per se rule applies. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341–42 (1990). The per se rule is inapplicable in this case, *see supra* Part I, but, even if it did apply, the antitrust standing inquiry, the Supreme Court has held, would have to be all the more exacting to ensure that plaintiff may recover only for losses stemming from a competition-reducing aspect or effect. *Id.* at 344.

1997 WL 416292, at *13 (N.D. Ill. Mar. 10, 1997) (citing *Serfecz*, 67 F.3d at 596).  Plaintiffs fail

to make this showing because they make no factual allegations whatsoever that the purported

conduct occurred in any market in which they purchased advertising.

As reflected in the very name of this case—the "Local TV Advertising Antitrust

Litigation"—and in the Complaint itself, the markets for local television advertising are local in

nature.  (Compl. ¶¶ 75, 86–87; *see supra* 31–33.)  In particular, Plaintiffs (ambiguously) allege

that the relevant competition between television stations takes place in 90 separate DMAs across

the country.  (*Id.* ¶¶ 40, 75, 87, app. A.)  Yet Plaintiffs do not allege that Defendants exchanged

information in each of these DMAs.  In fact, all that Plaintiffs allege to support their sweeping

antitrust claim is that Defendants exchanged information in "some" DMAs—and they do not

identify which ones those were.[17]  (*Id.* ¶ 41.)  Only advertisers that bought advertising time in a

DMA in which the purported information exchange occurred could have even conceivably been

injured.[18]  Since they fail to identify any specific DMA in which the purportedly unlawful

conduct occurred—much less allege facts to support such an assertion—Plaintiffs cannot allege

that they themselves were injured, even if some other advertiser may have been.

Plaintiffs' ill-defined allegations, not tied to any particular DMA, in effect ask the Court

to permit this case to proceed so that they can take discovery in DMAs across the country in

hopes of finding information sharing in one or more of them.  But that is not enough to plead

antitrust injury sufficient to survive a motion to dismiss.  A plaintiff must allege sufficient facts

---

[17]   Plaintiffs' allegation that Defendants exchanged information through the Sales Rep Firms is equally
flawed.  (Compl. ¶¶ 36–40.)  Plaintiffs allege the number of DMAs in which the Sales Rep Firms
represent one or more Defendants, but they make no allegations at all as to which DMAs were the
subject of any information sharing, alleging only that such information exchanges were "widespread."

[18]   Because of this failure to allege the markets in which the purportedly unlawful conduct occurred,
Plaintiffs cannot satisfy Article III's injury-in-fact requirement, much less the more stringent antitrust
injury requirement.  *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, No. 09-cv-36390,
2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013) (collecting cases).

to show that the defendants' conduct harmed competition and that that competitive injury damaged the plaintiff. *See* *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n, 830 F.2d 1374, 1379–80 (7th Cir. 1987)* (finding plaintiff did not suffer an antitrust injury when it did not participate in the market allegedly restrained by the conduct); *see also* *Harry v. Total Gas & Power N. Am., Inc.*, *889 F.3d 104, 115–16 (2d Cir. 2018)* (dismissing antitrust claims where plaintiff alleged a conspiracy in an area in which plaintiff did not transact); *In re Aluminum Warehousing*, *833 F.3d at 160* (finding no injury where plaintiff failed to allege that it "was a participant in the very market that [was] directly restrained"). Plaintiffs have not alleged any facts to indicate that Defendants' conduct harmed competition in any particular market or that they were impacted by that competitive injury. Nor does Plaintiffs' incorporation of Appendix A, which purports to show the markets in which two or more Defendants operate and the markets in which Plaintiffs purchased advertising, solve their deficient allegations of injury. Appendix A, like the rest of the Complaint, is silent about where, if anywhere, the allegedly unlawful conduct occurred. Unless Plaintiffs plead facts showing that the conduct occurred in DMAs in which they bought advertising, they cannot adequately allege that they suffered injury as a result of Defendants' supposed conduct.

If anything, Appendix A underscores the inadequacy of Plaintiffs' pleading. Plaintiffs purport to bring antitrust claims against Defendants in every DMA where two or more Defendants operate (Compl. ¶ 179), yet Appendix A shows that Plaintiffs did not purchase *any* advertising in 28 of these DMAs. (Compl. app. A.) Plaintiffs offer no theory, much less factual support, to explain how they were injured in DMAs where they did not purchase advertising. But by trying to advance claims in these DMAs, Plaintiffs expose a fundamental flaw in the Complaint as a whole—they impermissibly rely on the supposed injuries of absent class

members, not named plaintiffs.  *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.") (internal quotations omitted).  While this flaw is most evident as to the DMAs in which Plaintiffs did not allege that they purchased any advertising, the flaw is not limited to those DMAs.  By failing to make any factual allegations identifying the markets in which the alleged conduct took place, Plaintiffs cannot demonstrate that they themselves suffered an injury in any of the DMAs in which they contend that they purchased advertising.

Plaintiffs fail to allege that the allegedly unlawful conduct harmed them, and their Sherman Act claims (Counts One and Two) should be dismissed for failing to state an antitrust injury.

## **CONCLUSION**

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated:  June 5, 2019

*/s/ Jay Cohen*
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Jay Cohen (admitted *pro hac vice*)
William Michael (admitted *pro hac vice*)
Daniel H. Levi (admitted *pro hac vice*)
1285 Avenue of the Americas
New York, New York 10019-6064
 (212) 373-3000
jaycohen@paulweiss.com
wmichael@paulweiss.com
dlevi@paulweiss.com

**MOLOLAMKEN LLP**
Gerald P. Meyer
300 N. LaSalle St. Chicago, IL 60654
(312) 450-6700
gmeyer@mololamken.com

*Counsel for Defendants Dreamcatcher Broadcasting LLC, Tribune Media Company and Tribune Broadcasting Company, LLC*

*/s/ Eliot A. Adelson (with permission)*
**KIRKLAND & ELLIS LLP**
Eliot A. Adelson (admitted *pro hac vice*)
Jacob H. Johnston (admitted *pro hac vice*)
555 California Street, 29th Floor
San Francisco, CA 94104
(415) 439-1400
eliot.adelson@kirkland.com
jacob.johnston@kirkland.com

James H. Mutchnik
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
james.mutchnik@kirkland.com

*Counsel for Defendant Nexstar Media Group, Inc.*

Respectfully submitted,

*/s/ Jerome S. Fortinsky (with permission)*
**SHEARMAN & STERLING LLP**
Jerome S. Fortinsky (admitted *pro hac vice*)
599 Lexington Avenue
New York, New York 10022-6069
(212) 848-4000
jfortinsky@shearman.com

Brian Hauser
401 9th Street,
N.W. Suite 800
Washington, DC 20004-2128
(202) 508-8000
brian.hauser@shearman.com

*Gregory J. Scandaglia*
**SCANDAGLIA RYAN LLP**
Gregory J. Scandaglia
55 E. Monroe Street, Suite 3440
Chicago, IL 60603
(312) 580-2020
gscandaglia@scandagliaryan.com

*Counsel for Defendant Sinclair Broadcast Group, Inc.*

*/s/ John C. Dwyer (with permission)*
**COOLEY LLP**
Mazda K. Antia (admitted *pro hac vice*)
4401 Eastgate Mall
San Diego, CA 92121
(858) 550-6400
mantia@cooley.com

John C. Dwyer (admitted *pro hac vice*)
3175 Hanover Street
Palo Alto, CA 94304-1130
(650) 843-5228
dwyerjc@cooley.com

Beatriz Mejia (admitted *pro hac vice*)
101 California Street, 5th Floor
San Francisco, CA 94111-5800
(415) 693-2145
mejiab@cooley.com

*Counsel for Defendants Gray Television, Inc. and Raycom Media, Inc.*

*/s/ David E. Mills (with permission)*
**COOLEY LLP**
David E. Mills (admitted *pro hac vice*)
M. Howard Morse (admitted *pro hac vice*)
Deepti Bansal (admitted *pro hac vice*)
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004
(202) 776-2865
dmills@cooley.com
dbansal@cooley.com
hmorse@cooley.com

**SAUL EWING ARNSTEIN & LEHR LLP**
James A. Morsch
161 North Clark, Suite 4200
Chicago, IL 60601
(312) 876-7100
jim.morsch@saul.com

*Counsel for Meredith Corporation*

*/s/ Jennifer K. Schwab (with permission)*
**HONIGMAN LLP**
David A. Ettinger (admitted *pro hac vice*)
2290 First National Building
660 Woodward Ave.
Detroit, MI 48226
(313) 465-7368
dettinger@honigman.com

Jennifer Katherine Schwab
155 North Wacker Drive
Suite 3100
Chicago, IL 60606
(312) 701-9353
jschwab@honigman.com

**MCAFEE & TAFT**
Mark Richard Mullins (admitted *pro hac vice*)
211 N. Robinson Ave.
10th Floor Two Leadership Square
Oklahoma City, OK 73102
(405) 552-2263
rick.mullins@mcafeetaft.com

*Counsel for Griffin Communications, LLC.*

## <u>CERTIFICATE OF SERVICE</u>

I, Jay Cohen, certify that on June 5, 2019, I electronically caused the foregoing

Memorandum of Law in Support of Defendants' Motion to Dismiss to be filed with the Clerk of

the Court through the CM/ECF system, which will automatically send notifications of the filing

to all counsel of record.


<u>/s/ Jay Cohen</u>