**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE:<br>LOCAL TV ADVERTISING ANTITRUST LITIGATION | MDL No. 2867<br>No. 18 C 6785<br><br>**CONSOLIDATED SECOND AMENDED ANTITRUST CLASS ACTION COMPLAINT**<br><br>Honorable Virginia M. Kendall<br><br><u>JURY TRIAL DEMANDED</u> |

**Table of Contents**

I. THE NATURE OF DEFENDANTS' UNLAWFUL CONDUCT ..................................... 1

II. JURISDICTION AND VENUE ARE PROPER HERE ........................................ 4

III. DEFENDANTS' CONDUCT AFFECTED INTERSTATE COMMERCE ..................... 5

IV. THE PARTIES ............................................................................. 5

    A. The Identities of the Plaintiffs ............................................... 5

    B. The Identities of the Defendants ............................................. 6

V. THE DOJ BRINGS AN ENFORCEMENT ACTION AGAINST BROADCASTERS AND A REP FIRM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT .... 17

VI. DEFENDANTS FORMED AND PARTICIPATED IN AN UNLAWFUL PRICE FIXING CARTEL FACILITATED BY AN INFORMATION EXCHANGE ............... 18

    A. Defendants Agreed to Fix Prices for Broadcast Television Spot Advertising Sales and That Agreement Was Facilitated by an Information Exchange ......................... 18

        1. The Broadcaster Defendants Exchanged Competitively Sensitive Information Through Sales Rep Firms and Directly With One Another ............................... 18

        2. Such Systematic Exchanges of Non-Public Competitively Sensitive Information Violate Section 1 of the Sherman Act ................................................. 21

    B. The Department of Justice Investigation and Requirement for Injunctive Relief Underscore the Conclusion That the Defendants Violated Section 1 of the Sherman Act ................................................................................. 28

    C. The Lack of Fines, Indictments, or Pleas is Immaterial ........................... 30

    D. The Economic Evidence—Namely, Increased Prices and Skyrocketing Revenues in the Face of Declining Demand—Supports the Existence of a Cartel ...................... 31

VII. DEFENDANTS EXCERCISED MARKET POWER AND THEIR CONDUCT HAD ANTICOMPETIVE EFFECTS IN A RELEVANT ANTITRUST MARKET ............... 44

VIII. "PLUS FACTORS" FURTHER EVINCE THE EXISTENCE OF DEFENDANTS' *PER SE* UNLAWFUL PRICE FIXING CARTEL ................................................. 51

    A. Defendants' Information Exchange is a "Super Plus Factor" Evincing the Existence of a *Per Se* Unlawful Price Fixing Cartel ................................................. 52

    B. The Broadcaster Defendants' Motive to Conspire—Declining Viewership and Revenue—is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful ............................................................................. 52

C.  The Broadcaster Defendants' Action Against Their Unilateral Self-Interest (Rising Prices in the Face of Declining Demand) is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful ........................................................... 54

D.  Defendants' Opportunities and Invitations to Collude are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful ...................................... 55

  1.  Invitations and Opportunities to Collude Through the TIP Initiative ................55
  2.  Opportunities to Collude Through Joint Service Agreements ...........................56
  3.  Opportunities to Collude Through the TVB Trade Association .........................57
  4.  Opportunities to Collude Through the NAB Trade Association .........................57
  5.  Opportunities to Collude Through the MRC Trade Association..........................58

E.  The Broadcaster Defendants' High Market Shares and High Concentration in the Broadcast Television Spot Advertising Market are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful ...................................... 58

F.  High Barriers to Entry in the Broadcast Television Spot Advertising Market is a Plus Factor Supporting the Existence of a Price Fixing Cartel That is *Per Se* Unlawful.. 63

IX.  DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONDUCT THROUGH, *INTER ALIA*, PUBLIC STATEMENTS IN SECURITIES FILINGS THAT THEY AND THE MARKET WERE FUNCTIONING COMPETIVELY ........................................... 65

X.  CLASS CERTIFICATION IS APPROPRIATE HERE ................................................. 69

COUNT ONE Price Fixing in Violation of Section 1 of the Sherman Act ................................. 72

COUNT TWO Information Exchange in Violation of Section 1 of the Sherman Act ................ 72

PRAYER FOR RELIEF ...................................................................................................... 73

JURY DEMAND ................................................................................................................ 74

APPENDIX A ..................................................................................................................... 77

Plaintiffs THOUGHTWORX, INC. D/B/A MCM SERVICES GROUP and ONE SOURCE HEATING & COOLING, LLC (collectively, "Plaintiffs"), individually and on behalf of all other similarly situated direct purchasers of broadcast television spot advertising (the "Class," more fully defined *infra*), bring this action under Section 1 of the Sherman Act for treble damages, injunctive relief, and other relief pursuant to the federal antitrust laws, demanding a trial by jury of all issues so triable. Plaintiffs allege as follows based upon personal knowledge as to the facts pertaining to themselves, and upon information and belief and the investigation of counsel as to all other matters:

## I.    THE NATURE OF DEFENDANTS' UNLAWFUL CONDUCT

1.    This antitrust class action arises from a price fixing cartel facilitated by an anticompetitive information exchange between and among certain major television station owners and operators and sales representative firms to artificially inflate the prices of broadcast television spot advertisements[1] in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

2.    Beginning on or around January 1, 2014, CBS Corporation, Cox Enterprises, Inc., Cox Media Group, LLC, Dreamcatcher Broadcasting, LLC, The E.W. Scripps Company, Griffin Communications, LLC, Fox Corporation, Katz Media Group, Inc., Meredith Corporation, Nexstar Media Group, Inc., Gray Television, Inc. (through its acquisition of Raycom Media, Inc.), Sinclair Broadcast Group, Inc., TEGNA, Inc., Tribune Broadcasting Company, LLC, and Tribune Media Company (collectively, "Defendants")—firms that collectively account for billions of dollars in annual broadcast television spot advertising revenue—secretly orchestrated a unitary, overarching scheme to supracompetitively impact the price levels of broadcast

---

[1] The television advertisements are purchased directly from broadcast television stations (as opposed to cable operators) and are referred to herein as "broadcast television spot advertising."

television spot advertisements by agreeing to fix prices and exchange competitively sensitive historic, current, and forward-looking sales data, including pacing data. Pacing data is used to compare a broadcast station's revenues booked for a certain time period to the revenues booked for the same point in time in the previous year (the exchange of which allows Defendants to forecast their would-be competitors' remaining inventory of broadcast television spot advertising), typically expressed as a plus or minus percentage (*e.g.*, plus or minus 20%).

3. Both the existence of this data exchange and the data itself was withheld from purchasers of broadcast television spot advertising, creating an asymmetrical information advantage for the Broadcaster Defendants (defined *infra*) in their dealings with their customers concerning the price of broadcast television spot advertising.

4. The information exchanged covered both local and national broadcast television spot advertising and was disseminated to individuals within the Broadcaster Defendants' organizations with authority over pricing, with the Broadcaster Defendants' knowledge and at their direction. By allowing the Broadcaster Defendants to better understand, in real time, the availability of their would-be competitors' inventory through the exchange of pacing data—with inventory being a, if not *the*, key factor affecting pricing negotiations—the scheme derailed the competitive process and allowed the Broadcaster Defendants to avoid price competition, harming direct purchasers of broadcast television spot advertising in Designated Market Areas ("DMAs") throughout the United States. The United States Department of Justice ("DOJ") explained the anticompetitive effects of Defendants' conduct as allowing them to "better [] anticipate whether their competitors were likely to raise, maintain, or lower spot advertising prices" and "gauge competitors' and advertisers' negotiation strategies," "help[ing Defendants] resist more effectively advertisers' attempts to obtain lower prices" and "distort[ing] the normal price-setting

mechanism in the spot advertising market."

5. As the DOJ explained, "Advertisers rely on competition among owners of broadcast television stations to obtain reasonable advertising rates, but this unlawful sharing of information lessened that competition and thereby harmed the local businesses and the consumers they served."

6. Thus, the DOJ intervened to end what it characterized as "***concerted action between horizontal competitors*** in the broadcast television spot advertising market," filing a series of Proposed Judgments and Stipulations and Orders with Defendants CBS Corporation, Cox Enterprises, Inc., Dreamcatcher Broadcasting, LLC, the E.W. Scripps Company, Griffin Communications, LLC, Fox Corporation, Meredith Corporation, Nexstar Media Group Inc., Raycom Media, Inc.,[2] Sinclair Broadcast Group, Inc., TEGNA, Inc., and Tribune Media Company on November 13, 2018, December 13, 2018, and June 17, 2019 (the "Judgments").

7. As described in the DOJ's Competitive Impact Statement (the "Statement") discussed below, the Judgments included a number of provisions designed to "***terminate Defendants' illegal conduct***, prevent recurrence of the same or similar conduct, and ensure that Defendants establish an antitrust compliance program," thereby "***putting a stop to the anticompetitive information sharing***."

8. The DOJ noted in the Statement that these remedial efforts were "***necessary*** in light of the ***extensive history of communications*** among rival stations that ***facilitated Defendants' agreements***" in restraint of trade, and in its Complaint, the DOJ action "challenge[d] under Section 1 of the Sherman Act Defendants' agreements to unlawfully

---

[2] As mentioned below, while Gray Television, Inc. was not named as a defendant in any of the suits brought by the DOJ, in January of 2019, it finalized the acquisition of Raycom Media, Inc., and thereby assumed liability for the acts of the acquired entity.

3

exchange competitively sensitive information among broadcast television stations."

9.     As Justice Sotomayor held before her ascension to the United States Supreme Court, "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) (noting that information exchanges can both be evidence of a *per se* unlawful price fixing cartel and separately unlawful in and of themselves).[3]

10.     The scheme was widespread and effectuated in large part through the same two national Sales Rep Firms, Katz and Cox Media (defined *infra*), which served as the Broadcaster Defendants' agents in virtually every relevant DMA (identified in Appendix A) and thus served as the focal points and conduits of the unitary, overarching scheme among Defendants.

11.     The exchange also served as a means to monitor the members of the price fixing cartel, as any deviation from the scheme (*i.e.*, what is referred to in the literature as "cheating" on the cartel) could be easily detected and punished. This exchange not only facilitated the price fixing cartel, but also itself is separately unlawful under Section 1 of the Sherman Act.

12.     Plaintiffs bring this antitrust class action lawsuit on behalf of themselves and all similarly situated direct purchasers of broadcast television spot advertising—who remain uncompensated for the anticompetitive harm they suffered as a result of the Defendants' unlawfully earned gains.

## II.     JURISDICTION AND VENUE ARE PROPER HERE

13.     Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' anticompetitive conduct; and

---

[3] All emphases to quoted material have been added.

for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

15.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District or a transferor District.

## III.   DEFENDANTS' CONDUCT AFFECTED INTERSTATE COMMERCE

16.     Billions of dollars of transactions in broadcast television spot advertisements are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce. Each Broadcaster Defendant sells broadcast television spot advertising to advertisers throughout the United States or owns and operates broadcast television stations in multiple states or in DMAs as defined by the television ratings company Nielsen Holdings, Inc. that often cross state lines. Additionally, the Sales Rep Firms represent the Broadcaster Defendants throughout the United States in the sale of broadcast television spot advertising to advertisers.

17.     Defendants' manipulation of the market for the sale of broadcast television spot advertising thus was in the flow of, and had a direct, substantial, and foreseeable impact on, interstate commerce.

## IV.    THE PARTIES

### A.     The Identities of the Plaintiffs

18.     Plaintiff Thoughtworx, Inc. d/b/a MCM Services Group ("Thoughtworx") is an

advertising company headquartered in Minnesota and organized under the laws of Minnesota. Thoughtworx provides a bundle of services to its advertiser-clients, including consulting, television advertisement development and research, and purchasing broadcast television spot advertising time. In order to provide those services, Thoughtworx purchased broadcast television spot advertising during the Class Period (defined *infra*) directly from Defendants Cox Enterprises, Inc., CBS Corp., Fox Corp., TEGNA Inc., The E.W. Scripps Company, Sinclair Broadcast Group, Inc., and Tribune Media Company at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

19.    Plaintiff One Source Heating & Cooling, LLC ("One Source") is a heating, cooling, and HVAC services provider headquartered in Alabama and organized under the laws of Alabama. One Source purchased broadcast television spot advertising during the Class Period directly from Defendants Raycom Media, Inc. and Sinclair Broadcast Group, Inc. at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

20.    A comprehensive accounting of those DMAs in which multiple Broadcaster Defendants purportedly compete (as of 2017) and in which Thoughtworx and One Source purchased broadcast television spot advertising from one or more Broadcaster Defendants is set forth in Appendix A.

**B.    The Identities of the Defendants**

21.    Each of the Defendants named herein entered into consent decrees with the DOJ, except Gray Television, Inc., which purchased an entity (Raycom Media, Inc.) that did so, Cox Media (the subsidiary of an entity that did so) and Katz, which, like Cox Media, knowingly participated in and facilitated the unlawful scheme.

6

22.     Defendant CBS Corp. ("CBS") is a Delaware corporation with its headquarters at 51 West 52nd Street, New York, New York, 10019. CBS owns or operates 28 television stations in 18 DMAs and had over $14.5 billion in revenues in 2018.

   a.   CBS was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

   b.   That same day, CBS settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement is slated to be approved on or about August 17, 2019.

23.     Defendant Cox Enterprises, Inc. ("Cox Enterprises"), is a Delaware corporation with its headquarters at 6205-A Peachtree Dunwoody Road, Atlanta, Georgia 30328, that provides communications and media services. Cox Enterprises owns or operates 14 television stations in 10 DMAs and had an estimated $20 billion in revenues in 2018. Through its subsidiary Cox Reps, Inc. ("Cox Reps"), Cox Enterprises provides national sales representation to broadcast station groups in their sales of broadcast television spot advertising to advertisers.

   a.   Cox Enterprises was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

   b.   That same day, Cox Enterprises settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement is slated to be approved on or about August 17, 2019.

24.     Defendant Dreamcatcher Broadcasting, LLC ("Dreamcatcher") is a Delaware corporation, headquartered at 2016 Broadway, Santa Monica, California 90404, that owned three full-power television stations in two DMAs and had over $50 million in revenues in 2017.

      a.     Dreamcatcher was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

      b.     That same day, Dreamcatcher settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

25.     Defendant Fox Corp. ("Fox") is a Delaware corporation with its headquarters at 1211 Avenue of the Americas, New York, New York, 10036, that owns or operates 17 television stations in 17 DMAs. Fox is a corporate entity recently created from certain former 21st Century Fox assets, including its broadcast station assets, after The Walt Disney Company acquired 21st Century Fox and spun-out Fox. Fox's television segment earned over $5 billion in 2017.

      a.     Fox was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

      b.     That same day, Fox settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement is slated to be approved on August 17, 2019.

8

26.     Defendant Gray Television, Inc. ("Gray TV"),[4] is a Georgia corporation headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319, that owns and operates television stations and digital assets in the United States. As of February 23, 2018, Gray TV owned and operated television stations in 57 DMAs, broadcasting approximately 200 program streams, including approximately 100 channels affiliated with the CBS Network, the NBC Network, the ABC Network, and the FOX Network. Gray TV, via its subsidiary, Gray Media Group, acquired Raycom Media, Inc. ("Raycom"), in January 2019.

   a.    Raycom was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

   b.    That same day, Raycom Media, Inc. settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

27.     Raycom was named in the DOJ's enforcement action on November 13, 2018, and Gray TV thus purchased Raycom with knowledge of Raycom's liability to its customers for violation of the antitrust laws. As part of the acquisition:

   a.    Raycom's President and Chief Executive Officer, Pat LaPlatney, became Gray TV's President and Co-Chief Executive Officer. In addition, LaPlatney and Raycom's prior President and CEO, Paul McTear, joined Gray TV's Board of Directors, as well as multiple former Raycom managers joined Gray TV as

---

[4] Plaintiffs do not allege, at this time, that Gray TV participated in the alleged conduct directly; merely that Gray TV is liable for the acts of Raycom Media, Inc., which it acquired.

Senior Vice Presidents, including Raycom's Sandy Breland and Brad Streit. Further, Ellenann Yelverton, Raycom's General Counsel, became Gray TV's Vice President and Deputy General Counsel, overseeing Gray TV's legal department; Becky Sheffield, from Raycom, joined Gray TV as Vice President, Controller; and former Raycom executive David Burke became Gray TV's new Senior Vice President and Chief Technology Officer, overseeing all of Gray TV's engineering and information technology;

b. Gray TV assumed and fulfilled Raycom's pending acquisitions of WUPV-DT in the Richmond, VA market and KYOU-TV in the Ottumwa, IA market;

c. Gray TV acquired, and now operates, 48 television stations from Raycom under the Gray TV name;

d. Gray TV presently services former Raycom customers through Raycom's former stations, but now under Gray TV's name; and

e. The same employees who worked for Raycom have mostly all maintained their prior positions, working in the same capacities but now for the financial benefit of Gray TV.

28. Defendant Griffin Communications, LLC ("Griffin") is an Oklahoma corporation, headquartered at 7401 North Kelley Avenue Oklahoma City, Oklahoma 73111, that owned four full-power television stations in two DMAs and had over $60 million in revenues in 2017.

a. Griffin was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

b. That same day, Griffin settled with the DOJ over those allegations, entering

10

into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

29.    Defendant Meredith Corporation ("Meredith") is an Iowa corporation, headquartered at 1716 Locust Street, Des Moines, Iowa 50309, that owned or operated 16 television stations in twelve DMAs and had over $1.7 billion in revenues in 2017.

    a.    Meredith was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

    b.    That same day, Meredith settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

30.    Defendant Nexstar Media Group, Inc. ("Nexstar"), is a Delaware corporation, headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062, that operates as a television broadcasting and digital media company in the United States. As of December 31, 2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 DMAs.

    a.    Nexstar was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on December 13, 2018.

    b.    That same day, Nexstar settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the

competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

31.     Defendant Raycom is a Delaware corporation, headquartered at 201 Monroe Street, Montgomery, Alabama 36104, that owned or operated 65 television stations in 45 DMAs and had over $670 million in revenues in 2017. Raycom was purchased by Gray TV in 2018 for $3.65 billion in a deal that was finalized in January of 2019.

   a. Raycom was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

   b. That same day, Raycom settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

32.     Defendant The E.W. Scripps Company ("Scripps") is an Ohio corporation headquartered at 312 Walnut Street, Cincinnati, Ohio, 45202, that owns or operates 60 television stations in 42 DMAs and had over $917 million in revenues in 2018.

   a. Scripps was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

   b. That same day, Scripps settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement is slated to be approved on or about August 17, 2019.

33.     Defendant Sinclair Broadcast Group, Inc. ("Sinclair"), is a Maryland corporation, headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030, that operates as a television broadcast company in the United States. As of December 31, 2017, it owned, operated, and/or provided services to 191 stations in 89 DMAs, which broadcast 601 channels. In 2017, it reported revenues in excess of $2.7 billion.

   a.   Sinclair was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

   b.   That same day, Sinclair settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

34.     Defendant TEGNA Inc. ("TEGNA") is a Delaware corporation headquartered at 8350 Broad Street, Tysons, Virginia 22102, that owns or operates 49 television stations in 41 DMAs and had $2.2 billion in revenues in 2018.

   a.   TEGNA was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

   b.   That same day, TEGNA settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement is slated to be approved on or about August 17, 2019.

35.     Defendant Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), is a

Delaware limited liability company headquartered at 515 North State Street, Chicago, Illinois 60654, that operates as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owned 42 broadcast television stations in approximately 33 DMAs in 2017. It had over $670 million in revenues in 2017.

36.     Defendant Tribune Media Company ("Tribune Media," and collectively with Tribune Broadcasting, "Tribune"), is a Delaware corporation headquartered at 435 North Michigan Avenue, Chicago, Illinois 60611, and operates, through its subsidiaries, as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owned 42 television stations in 33 DMAs in 2017.

a.  Tribune was named as a civil defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

b.  That same day, Tribune settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved

14

and final judgment was entered by the Court on May 22, 2019.

37.     Defendant Cox Media Group, LLC, ("Cox Media") is a Delaware corporation headquartered at 6205 Peachtree Dunwoody Road, Atlanta, Georgia, 30328, and operates, through its subsidiaries, as a media company in the United States. It is a subsidiary of Cox Enterprises and holds Cox Enterprises' broadcasting, publishing, digital, and sales units. Cox Media operates in 20 DMAs and reaches approximately 52 million Americans weekly. Through its division, Cox Reps, it operates as a national television representative company (a Sales Rep Firm) in the United States. As of March 2019, Cox Reps represented 30 of Tribune's owned and operated full-power television stations, 33 Sinclair full-power television stations, 4 Griffin full-power stations, 12 Meredith full-power stations, 16 full-power Nexstar stations, 3 Scripps full-power stations, 10 Cox full-power stations, 7 CBS full-power stations, 2 Fox full-power stations, and 39 TEGNA full-power stations. Cox Reps represented Raycom's television stations prior to the latter's acquisition by Gray TV.

> a.     As described above, Cox Media's parent, Cox Enterprises, was named as a civil defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) on June 17, 2019 and settled with the DOJ on the same day, entering into a proposed consent decree for alleged violation of Section 1 of the Sherman Act, in part as a result of the unlawful acts of Cox Media as a conduit of the anticompetitive scheme.

38.     Defendant Katz Media Group, Inc. ("Katz"), a subsidiary of iHeartMedia, Inc., is a Delaware corporation headquartered at 125 West 55th Street, New York, New York 10019. Katz is a national media representation company in the United States, including operating as a national television representative company (a Sales Rep Firm). Through its division, Katz

Television Group, Katz represents the assets of television stations to provide marketing solutions to advertisers and agencies. As of March 2019, Katz represented 86 Nexstar owned and operated full-power television stations, 2 Meredith full-power stations, 8 Tribune full-power stations, 66 Sinclair full-power stations, 23 Scripps full-power stations, 1 Cox full-power station, 2 Fox full-power stations, and 5 TEGNA full-power stations.

39.     While the DOJ has not yet named Katz, the DOJ has stated that "Cox Reps is one of *two* large 'Rep Firms' in the industry that assist broadcast stations in sales to national advertisers. The Rep Firms are alleged to have participated in the unlawful information sharing conduct." Katz is the only other major, national Rep Firm the DOJ could be referencing. The DOJ's investigation has not yet closed, but remains "ongoing."

40.     CBS, Cox Enterprises, Dreamcatcher, Fox, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune are referred to collectively as the "Broadcaster Defendants."

41.     Cox Media and Katz are referred to collectively as the "Sales Rep Firms." These Sales Rep Firms "function as extensions of a station's sales staff and are familiar with various rate cards (prices) and program research demographics." And as the DOJ noted, these two Sales Rep Firms facilitated the "exchange[ of] real-time pacing information" between Defendants. The Sales Rep Firms are sophisticated industry participants that regularly communicate with each Broadcaster Defendant remotely (e.g., emails, telephone calls) and in person to serve the Broadcaster Defendants' demands. And the Sales Rep Firms' continued profitability is tied to satisfying those demands and maintaining relationships with the Broadcaster Defendants.

42.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and

16

made statements in furtherance thereof.

## V.    THE DOJ BRINGS AN ENFORCEMENT ACTION AGAINST BROADCASTERS AND A REP FIRM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

43.    On November 13, 2018, the DOJ filed its original complaint in *United States v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.), along with proposed settlements with six defendants, Raycom, Meredith, Griffin, Dreamcatcher, Sinclair, and Tribune.

44.    On Dec. 13, 2018, the Department filed an amended complaint and a proposed settlement with a seventh defendant, Nexstar.

45.    The court entered final judgment against all seven defendants on May 22, 2019.

46.    On June 17, 2019, the DOJ filed a second amended complaint along with proposed settlements with five additional defendants, CBS, Cox, Scripps, Fox, and TEGNA.

47.    In its June 17, 2019 press release, the DOJ once again stated how the information exchange orchestrated by Defendants hurt the competitive process: "By exchanging pacing information, the five new defendants and other broadcasters were better able to anticipate whether their competitors were likely to raise, maintain, or lower spot advertising prices, which in turn helped inform their stations' own pricing strategies and negotiations with advertisers. As a result, the information exchanges harmed the competitive price-setting process in markets for the sale of spot advertisements."

48.    The DOJ's Judgments prohibit the exchange of several types of competitively sensitive information for seven years: "pricing, pricing strategies, pacing, holding capacity, revenues, or market shares."

## VI. DEFENDANTS FORMED AND PARTICIPATED IN AN UNLAWFUL PRICE FIXING CARTEL FACILITATED BY AN INFORMATION EXCHANGE

### A. Defendants Agreed to Fix Prices for Broadcast Television Spot Advertising Sales and That Agreement Was Facilitated by an Information Exchange

49. Beginning no later than January 1, 2014, the Defendants have participated in an unlawful price fixing cartel to supracompetitively impact the price levels of broadcast television spot advertising in DMAs in which they were, purportedly, supposed to be direct competitors.

50. Defendants' price fixing cartel was facilitated in large part through a reciprocal exchange of competitively sensitive information.[5] This exchange included (a) pacing information (*i.e.*, data on remaining inventory or supply) (b) average price data through third party Kantar, available at a granular level broken down by DMA and inventory type (*e.g.*, early news, late news, prime time) as well as (c) other forms of competitively sensitive sales information.

51. As discussed above and below, merely exchanging competitively sensitive information among competitors can cause anticompetitive effects and violate the Sherman Act.

### 1. The Broadcaster Defendants Exchanged Competitively Sensitive Information Through Sales Rep Firms and Directly With One Another

52. As revealed in the DOJ's investigation, related court filings, and the investigation of counsel, this exchange of competitively sensitive information took at least two forms.

53. *First*, Defendants agreed to regularly and reciprocally exchange local sales pacing information through the Sales Rep Firms, including real-time pacing information regarding each station's revenues, and reported the information to the Broadcaster Defendants in the DMA.

54. Pacing information is used to compare a broadcast station's revenues booked for a

---

[5] The DOJ defined "Competitively Sensitive Information" as "Non-Public Information relating to pricing or pricing strategies, pacing, holding capacity, revenues, or market shares" as well as "reports" that are "customized or confidential to a particular Station or broadcast television station group."

certain time period (either a current or future period) to the revenues booked for the same point in time in the previous year. It is accompanied by a percentage figure (*i.e.*, that a station's revenue indicates that it is pacing plus or minus 10%, 20%, 30%, or so on). Pacing indicates how each station is performing compared to the rest of the market and provides insight into each station's remaining broadcast television spot advertising inventory for a current or future period. The exchange of pacing information reveals the Broadcaster Defendants' remaining supply, with supply being a, if not the, key factor informing negotiations over price.

55.     Those exchanges were systematic and included data on individual stations' booked sales for current and future months as well as a comparison to past periods. The exchanges covered not just historic competitively sensitive information, but current and forward-looking information as well. Specifically, but not exclusively, at least once per quarter, but frequently more often, the Sales Rep Firms representing the Big 4 Stations (ABC, CBS, Fox, and NBC, and their affiliated networks) in a DMA exchanged real-time pacing information regarding the  broadcast stations within that DMA and reported the information to the Broadcaster Defendants and to the other Big 4 Station owners in the DMA.

56.     In those DMAs in which the Sales Rep Firms represented more than one Broadcaster Defendant, they erected firewalls intended to prohibit and prevent the dissemination of competitively sensitive information between the teams representing different Broadcaster Defendants. In those DMAs, the Sales Rep Firms facilitated these information exchanges among rival Broadcaster Defendants in violation of and in intentional disregard of those firewalls.

57.     Once the Sales Rep Firms shared the information with the Broadcaster Defendants, their competitors' pacing information was then disseminated to individuals within the Broadcaster Defendants with authority over pricing and sales, always with the Broadcaster

Defendants' knowledge and frequently at their explicit direction.

58.     The exchanges by Sales Rep Firms were widespread, occurring in DMAs across the United States, and they occurred with the knowledge of and frequently at the instruction of the Broadcaster Defendants. As of March 2019, Cox Media or Katz represented at least one Broadcaster Defendant in 125 of 127 DMAs where more than one Broadcaster Defendant was present and in 68 of those DMAs (identified in Appendix A) Cox Media or Katz counted more than one Broadcaster Defendant as a client.

59.     **Second**, in some DMAs, the Broadcaster Defendants exchanged competitively sensitive information directly with one another, without using the Sales Rep Firms as a conduit.

60.     These direct inter-seller exchanges included both "local sales" pacing data as well as "all sales" or "national sales" pacing data.

61.     Additionally, the Broadcaster Defendants all provide data to Kantar's SRDS platform, which then disseminates that data in an aggregated form to Defendants.

62.     Kantar collects advertisement airing data by continuously monitoring local television stations' broadcast feeds, while the Broadcaster Defendants provide retrospective (45-90 days' old) average pricing data for broadcast television spot advertising data to Kantar, which in turn creates reports that are purchased by and disseminated to the Broadcaster Defendants. Kantar's SRDS Media Planning Platform's data is broken down granularly by, *inter alia*, DMA (*i.e.*, by relevant geographic market) and inventory type (*e.g.*, early news, late news, prime time). Kantar's website states that: "Agencies and brands use SRDS as an affordable, all-in-one resource to find and compare digital and traditional media across business, consumer and geographic audiences. They rely on this extensive dataset of U.S. media to make informed decisions and initiate contact with media reps directly from the planning platform."

63. The information provided tells the Broadcaster Defendants, among other things, the average cost-per-point (*i.e.*, the price) for broadcast spot television advertising broken down by specific DMA and by specific daypart (*e.g.*, early news, late news, prime time). Multiplying the average cost-per-point for a market profile (*i.e.*, DMA and daypart) times the Nielsen ratings for a given television program provides the Broadcaster Defendants with an estimate of how pricing would be set for a given program in a given DMA.

64. This exchange served to bolster the efficacy of the pacing data exchange, by allowing the Broadcaster Defendants to better rule out the possibility that an increase or decrease in revenue pacing was being driven by increases or decreases in, *inter alia*, the prices of broadcast spot television advertising, and stabilizing prices at anticompetitive levels by removing uncertainty surrounding price discovery.

65. Furthermore, the direct inter-seller exchanges and exchanges through the Sales Rep Firms were not made available to Plaintiffs and the members of the Class and were not otherwise publicly available or accessible; while the Nielsen ratings and Kantar SRDS data is publicly available, if at all, only at a substantial cost. The only conceivable procompetitive purpose of exchanging this information would be if it were freely shared with advertising customers, allowing them to better time their purchases or construct their media plans. By concealing the exchange from their customers and making the information non-public, Defendants reveal that the exchange was for an anticompetitive purpose.

## 2. Such Systematic Exchanges of Non-Public Competitively Sensitive Information Violate Section 1 of the Sherman Act

66. Defendants' conduct amounts to an unlawful agreement—implicit or express— violative of Section 1 of the Sherman Act. The conduct affected many DMAs across the country, including **at a minimum** every DMA in which a Sales Rep Firm represented two or more

Broadcaster Defendant owners or operators, as identified in Appendix A.

67.     Specifically, the DOJ stated that "[t]he **exchanges were systematic** and typically included non-public pacing data on national revenues, local revenues, or both, depending on the DMA. The Complaint further alleges that certain Defendants engaged in the exchange of other forms of competitively sensitive information relating to spot advertising in certain DMAs."

68.     In its 2017 Annual Report, Sinclair stated that "fluctuations in advertising rates and availability of inventory" was an "Industry Risk," so clearly knowing its rival's inventory would illegally temper and mitigate that risk.

69.     In the broadcast television spot advertising market, there is—all else equal—an inverse relationship between inventory and pricing strategy. If behaving competitively, firms with moderate to high remaining inventory are more incentivized to compete on price because if they price aggressively high, they risk a large loss of market share; conversely, firms with low remaining inventory are less subject to the risk of a large loss of market share (because they have already sold most of their inventory) and thus are less incentivized to compete on price.

70.     However, if a firm knows that both it and its rival have low remaining inventory (and knows that its rival shares this knowledge), the low inventory firms' incentives to compete on price are further dampened because the rivals know neither's inventory situation is likely to compel it to engage in a price war with the another (*i.e.*, they are more confident that there is not a moderate to high inventory firm in the mix that is more incentivized to compete on price). Indeed, if rivals know that one another have high or moderate remaining inventory (and know that each firm shares that knowledge), the scheme works effectively the same: the firms can be confident one another are on a level playing field, in essentially the same position of strength in terms of price negotiations (although their customers remain unaware of this), and thereby chill

22

the incentive to compete aggressively on price by removing competitive uncertainty.

71.     In fact, even in situations where one firm has higher and another lower inventory, their incentives to compete are distorted. Suppose firm A has high inventory and firm B has low inventory and each firm knows the other's relative position. Because of the asymmetrical information problem created by the information exchange, firms A and B have an informational advantage—which their customers do not—that enables firm A to foresee that firm B will not compete on price because of firm B's low inventory. This knowledge allows firm A to more confidently keep prices high because it is no longer uncertain about firm B's competitive position; without this knowledge, the uncertainty would have incentivized firm A to compete more vigorously on price to maintain market share. In the same vein, firm B *knows that firm A possesses this knowledge* and that firm A can thus confidently keep prices high, allowing firm B to safely avoid the temptation to compete with firm A on price that would persist if the firms remained uncertain about their respective competitive situations.

72.     In each situation, the anticompetitive effects are only amplified by the fact that the advertising customers do not have the confidential information exchanged among the Defendants or are even aware of the fact that Defendants are exchanging that confidential information, putting them at a severe asymmetrical information disadvantage vis-à-vis the Broadcaster Defendants with respect to the pricing of broadcast television spot advertising.

73.     Indeed, this is precisely the theory of anticompetitive effects advanced by the DOJ: "By exchanging pacing information, the broadcasters *were better able to anticipate whether their competitors were likely to raise, maintain, or lower spot advertising prices* . . . . [H]arming the competitive price-setting process." In that same public statement, the DOJ's Assistant Attorney General for the Antitrust Division Makam Delrahim confirmed the

anticompetitive effects of Defendants' unlawful conduct, noting "[a]dvertisers rely on competition among owners of broadcast television stations to obtain reasonable advertising rates, but this unlawful sharing of information lessened that competition and thereby harmed the local businesses and the consumers they serve."

74.     The DOJ elaborated in its June 17, 2019 Competitive Impact Statement that "[u]nderstanding competitors' pacing can help stations gauge competitors' and advertisers' negotiation strategies, inform their own pricing strategies, and help them ***resist more effectively advertisers' attempts to obtain lower prices*** by playing stations off of one another. [Defendants'] information exchanges therefore distorted the normal price-setting mechanism in the spot advertising market and harmed the competitive process within the affected DMAs."

75.     The information exchange thus eliminates or softens price competition by distorting the incentives of the firms involved. And even in DMAs where the Broadcaster Defendants ostensibly faced some meaningful degree of competition from non-colluding rivals, the higher prices among the colluding firms created residual demand for broadcast spot television advertising that in turn increases the prices offered even by the non-colluding firms. This means that the non-colluding firms do not discipline the cartel's supracompetitive pricing.

76.     The exchanges also helped the Broadcaster Defendants monitor the cartel. The Broadcaster Defendants were deterred from breaking from the cartel by lowering prices to steal market share (*i.e.*, "cheating" on the cartel) because lowering prices to competitive levels to any meaningful degree, and the commensurate market share shift, would be easily identified through the exchanged information.

77.     These exchanges, whether direct or through the Sales Rep Firms as conduits, also violate the information exchange safe harbors enumerated by the Federal Trade Commission

24

("FTC") in 2014 and the DOJ in 2016.

    a. First, those safe harbors dictate that the exchange consists of information that is relatively old, while here, the exchanges were of real-time and forward-looking information.

    b. Second, those safe harbors dictate that the exchange of information be operated by a neutral third party, while here, the exchanges were made directly between competitors and through interested Sales Rep Firms that also stood to profit from the information exchange.

    c. Third, those safe harbors dictate that the information exchange be of aggregated data. Here, to the contrary, the exchange involved disaggregated data specific to individual competitors.

78. A 2010 report prepared by a United States delegation (including the DOJ) and submitted to the Organization for Economic Cooperation and Development notes that: "In addition to serving as evidence of an unlawful agreement, information exchanges likely to affect prices may, under certain circumstances, be illegal in and of themselves."

79. That 2010 Guidance from the DOJ also notes that information exchanges can "serv[e] as evidence of an unlawful agreement" to fix prices, and also "be illegal in and of themselves," constituting "concerted action [] sufficient to establish a combination or conspiracy in violation of Sherman Act § 1."

80. 2014 Guidance from the FTC confirms that when "competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion . . . in violation of the antitrust laws."

81. Likewise, 2016 guidance from the DOJ confirms that "[e]ven if an individual

25

does not agree explicitly to fix [prices] or other terms [of sale], exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement."

82.     One academic notes that "[w]ith regard to firm-specific production information, again there is no reasonable explanation for such a conveyance by a noncollusive seller to another noncollusive seller. Unilateral knowledge of a rival's capacity utilization, inventory levels, or production costs will increase expected returns in any competitive bidding process."

83.     In 2006, the Swedish Competition Authority commissioned several papers on the economic effects of information sharing by competitors. These articles contain references to a large number of scholarly publications. The introductory essay states: "information sharing is most naturally defined as the sharing of such information that is normally regarded as confidential: production costs, detailed information about quantities sold, actual transactions prices (*i.e.*, including individual discounts), planned future pricing, et cetera." The introduction also states that "if competitors secretively share information on intended future pricing and output, this comes very close to actually making anti-competitive agreements." The same volume states: "[i]ndeed, in some circumstances it may be that the mere exchange of information will in itself be sufficient ***to eliminate normal competitive activity***. The overriding principle is that certain forms of contact between competitors should be avoided."

84.     Another article by Baltzer Overgaard and H. Peter Mollgaard states that "it is relatively well-established in the economics literature that horizontal coordination/collusion (whether tacit or explicit) is made difficult—if not impossible—if firms compete under a veil of ignorance concerning the actions of rivals. . . . Speedy access to accurate information about the individual past transactions and future intentions of rivals ***will generally have a strong coordinating potential***." The summary characterization of the research that is reviewed in this

26

article is as follows. "Pulling the two sides of the market together, we may (tentatively) conclude that improved information flow on the firm side will *likely* enhance the scope for coordinated firm behavior, while improved information on the consumer side *may* enhance competition. . . . Ideally, antitrust practice should attempt to [promote a regime where] actual competitors are covered by a veil of ignorance with respect to the actions of their rivals."

85.     The Antitrust Guidelines for Collaborations Among Competitors states:

> Nevertheless, in some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information related to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information. Finally, other things being equal, the sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data.

86.     Nexstar's own "Code of Business Conduct" acknowledged that there is an unethical and improper way to gather competitively sensitive information: "Competitive information is a valuable tool that allows us to understand and manage our markets, products, and services so we can better meet our customers' needs. However, we must gather and use that information **properly**. **It is important that we comply with the law in acquiring information**. . . . It is also important that we acquire information **ethically**."

87.     Implicit, as well as express, agreements are *per se* illegal under Section 1 of the Sherman Act because "[s]ophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825

27

(S.D.N.Y. 2016); *see also Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement (even a wink and a nod—formal agreements have never been required for purposes of Sherman Act section 1)[.]").

**B.    The Department of Justice Investigation and Requirement for Injunctive Relief Underscore the Conclusion That the Defendants Violated Section 1 of the Sherman Act**

88.    Much of the conduct in the foregoing section was investigated by the DOJ in a probe that was first publicly reported in July of 2018.

89.    On November 13, 2018, December 13, 2018, and June 17, 2019, the DOJ filed complaints, which stated that "Defendants' agreements are restraints of trade that are unlawful under Section 1 of the Sherman Act."

90.    The DOJ also filed the Judgments and the Statement as to all Defendants except for Gray TV (after these dates, Gray TV finalized its acquisition of Raycom, which was implicated in the DOJ filings) and Katz for violating Section 1 through "concerted action between horizontal competitors in the broadcast television spot advertising market," describing the offense as having had anticompetitive effects by "disrupting the normal mechanisms for negotiating and setting prices and harming the competitive process," and that the "offense [was] likely to continue and recur unless the requested relief [was] granted."

91.    The Judgments mandate Defendants' (less Katz, but including Gray TV, by virtue of its acquisition of Raycom, and Cox Media, by virtue of its subsidiary-parent relationship with Cox Enterprises), conduct for seven years, wherein Defendants must:

    a.   refrain from sharing competitively sensitive information directly or indirectly, including information on:

      i.  pricing;

     ii.  pricing strategies;

   iii.  pacing;

   iv.  holding capacity;

    v.  revenues; or

   vi.  market shares;

b. establish antitrust whistleblower policies;

c. designate Antitrust Compliance Officers responsible for implementing training and compliance programs;

d. cooperate in the ongoing DOJ investigation; and

e. certify annual compliance with the Judgments' terms and conditions.

92.     The injunctive relief required by the DOJ extends to all DMAs in the United States and is not limited to "certain" DMAs.

93.     Both the November, December, and June DOJ complaints refer to the conduct at issue as "illegal" and "unlawful."

94.     The Statement referred to the injunctive relief requested in the Judgments as "terminat[ing] Defendants' illegal conduct, prevent[ing] recurrence of the same or similar conduct, and ensur[ing] that Defendants establish an antitrust compliance program," thereby "putting a stop to the anticompetitive information sharing." The DOJ concluded in the Statement that this injunctive relief was "necessary in light of the extensive history of communications among rival stations that facilitated Defendants' agreements" in restraint of trade.

95.     The Chief of the DOJ's Antitrust Division, Assistant Attorney General Makan Delrahim, elaborated: "The unlawful exchange of competitively sensitive information allowed

these television broadcast companies to disrupt the normal competitive process of spot advertising in markets across the United States."

96.     During the DOJ's Public Workshop on Competition in Television and Digital Advertising in May 2019, Makam Delrahim also stated that "[s]ince last November, [DOJ] ha[s] reached settlements with seven broadcast television companies who [DOJ] *alleged had colluded with their competitors* to reduce competition in the market for broadcast advertising."

97.     The DOJ has been unequivocal, then, that the millions of pages of documents it reviewed contained proof of a violation of Section 1 of the Sherman Act.

### C.     The Lack of Fines, Indictments, or Pleas is Immaterial

98.     For several reasons, the fact that the DOJ declined to prosecute criminally does nothing to undermine the plausibility of Plaintiffs' price fixing claims under the *per se* standard.

99.     First, both the 2016 DOJ and 2014 FTC guidance conclude that information exchanges are facilitating practices that can evidence a price fixing cartel. Likewise, the United States delegation to the Organization for Economic Cooperation & Development's Competition Committee in 2010 stated that "[i]nformation exchanges can be treated as circumstantial evidence of an unlawful price fixing or market allocation agreement among competitors, and in such a case are analyzed under the *per se* rule."

100.    Second, the priorities of the DOJ vary annually and across administrations. The DOJ's own statistics show that it allocates its resources differently from year to year.  In 2018 and 2019 *combined*, the DOJ has only filed 21 criminal antitrust complaints (7 of which relate to legacy investigations initiated by the prior administration). In 2017, the DOJ filed only 17 criminal antitrust complaints.

101.    Comparatively, the Antitrust Division of the DOJ filed roughly: 50 criminal

30

complaints in 2008, 54 criminal complaints in 2009, 66 criminal complaints in 2010, 84 criminal

complaints in 2011, 52 criminal complaints in 2012, 59 criminal complaints in 2013, 54 criminal

complaints in 2014, 47 criminal complaints in 2015, and 32 criminal complaints in 2016.

102.    No inference can be drawn as to the seriousness of the legal violation at issue here

from the lack of a parallel criminal prosecution; and this is particularly true in light of an

apparent DOJ resource shift resulting in fewer criminal antitrust prosecutions.

103.    Moreover, the "fact that Defendants did not plead guilty to wide-ranging conduct

does not limit the civil action. Relatively few defendants plead guilty to all of the charges against

them, and limitations on government resources may play as much a role in the agreement as the

conduct involved." *In re Auto. Parts Antitrust Litig.,* No. 12-MD-02311, 2014 WL 4272784, at

*8 (E.D. Mich. Aug. 29, 2014); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651,

664–665 (7th Cir. 2002) (refusing to infer lack of a civil conspiracy from the government's

decision not to move against certain defendants, acknowledging that the DOJ may decide to limit

the scope of an investigation for numerous reasons, including differing standards of proof in a

criminal case and the knowledge that the private bar "had both the desire and the resources to

prosecute [the] suit").

104.    Third, the plausibility of Plaintiffs' *per se* price fixing claim is bolstered by the

additional allegations in this action concerning economic evidence of cartel behavior (*infra*) and

the existence of numerous "plus factors" evincing a cartel (*infra*).

**D.      The Economic Evidence—Namely, Increased Prices and Skyrocketing
          Revenues in the Face of Declining Demand—Supports the Existence of a
          Cartel**

105.    The sale of broadcast television spot advertising on respective television stations

to advertising customers is a primary source of revenue for broadcasting companies, including

31

Defendants.[6] The objective of the television station owner is to meet the needs of their advertising customers by reaching significant audiences across key demographics.

106.    In a competitive market, one would expect horizontal competitors such as Defendants to compete for audience share and advertising revenue with other stations in their respective DMAs by competing on price. This is particularly true in a market facing disruption and decreased demand. The broadcast television spot advertising market is such a market.

107.    The broadcast television spot advertising market has been faced with rapid change, as consumers' media time continues to shift away from traditional sources and towards digital and online mediums, such as Instagram, Netflix, Hulu, YouTube, and Facebook. Broadcast television spot advertising has been grappling with ratings erosion and viewers canceling television subscriptions in favor of, inter alia, streaming services, which, in a competitive market, should drive prices, profits, and revenues down.

108.    In a McKinsey 2015 Global Report, this was made clear: "Spending on media continues to shift from traditional to digital products and services at a rapid pace. By 2019, we believe digital spending will account for more than 50 percent of overall media spend. Within this, the digital video spending will overtake physical spending by 2018, two years earlier than we had previously forecast. Digital, consisting of Internet and mobile advertising, will become the largest advertising category by 2017, surpassing TV one year earlier than forecast, and mobile will more than double its share of the digital ad market."[7]

---

[6] Nexstar and Sinclair's advertising revenues made up almost 50 percent of their total revenue in 2018. Tribune's "television and entertainment" advertising revenue made up roughly 65 percent of its total revenue in 2018.

[7] While demand continues to decline, these projections turned out to be incorrect, as BIA Advisory Services showed that digital advertising spend had not surpassed television advertising spend as of the end of 2018 and is not projected to do so through at least 2023. *See* Section VIII.B., *infra*.

109.     The number of persons who actually view television advertising has also been dwindling. The McKinsey report also states that "[a]s digital media gains ground, advertisers are increasingly accepting the validity and persuasiveness of advertising on these media, moving away from the typically high cost-per-thousand (CPM) traditional media to less expensive, low-CPM Internet and mobile advertising—further accelerating the shift of analog dollars to digital." Those who consume television advertising are also declining: the rise of "cord cutters" and "cord nevers" continues to grow. In fact, eMarketer estimates that traditional television viewers will drop 2.4 percent (or by roughly 5 million people) by the end of 2018, while the cord-cutter and cord-never populations will grow by a total of 15 percent (or by almost 7 million people) this year. This impacts where advertisers spend their dollars, and a decreased demand for television advertising. The report opined that television's command over the United States advertising revenues has given way to digital, which in 2015 was expected in to bring in nearly half of all ad revenue in 2018—although digital advertising spend fell far short of this projection.



110.     As depicted in Figure 1, from 2008 to 2016, viewership for morning news, early local evening news, and local late-night news has fallen 13, 18, and 29 percent, respectively.

**Figure 1: Local News Viewership Has Declined**



111. In light of these challenges, the broadcast television spot advertising market has not responded to declining demand in the way one would expect a competitive market to respond (*i.e.*, by lowering price to compete for and preserve market share); instead, it exhibits indicia of cartel activity, including *increased* prices and *increased* revenues.

112. As depicted in Figures 2.a through 2.k, all but one of the Defendants' percent gains in over the air ("OTA") revenue have outpaced the market as a whole, which *lost 2 percent in revenue* over that same time period. All but one Defendant outpaced the industry over this time period, some by as much as 97 percent, 164 percent, and 218 percent. The sole Defendant that failed to outpace the industry, Fox, was also the only Defendant that was *selling* broadcast stations (and their attendant revenue streams) during the relevant period.

34

**Figure 2.a to 2.k:** [8]

**Most Defendants' Broadcast Spot Ad Revenues Have Outpaced the Industry**

**Figure 2.a (CBS)**



**Figure 2.b (Cox)**



[8] Data for Dreamcatcher is only available from 2013 through 2016. Over that period, Dreamcatcher's revenue increased by 17%.

35

**Figure 2.c (Fox)**



**Figure 2.d (Griffin)**



**Figure 2.e (Meredith)**



**Figure 2.f (Nexstar)**



**Figure 2.g (Raycom)**



**Figure 2.h (Scripps)**



**Figure 2.i (Sinclair)**



**Figure 2.j (TEGNA)**



**Figure 2.k (Tribune)**



113.     Figures 3.a, 3.b., and 3.c show that beginning in the first quarter of 2014 (the beginning of the conduct period identified by the DOJ and the Class Period here), broadcast television spot advertising price levels rose dramatically from their immediately preceding years.[9] Figures 3.a through 3.c include data on the Top 100 DMAs. Of the Top 100 DMAs reflected in Figures 3.a through 3.c, 92 are among the multi-defendant DMAs identified in Appendix A, representing 96 percent of households in the Top 100 DMAs. The Broadcaster Defendants are a collective of the largest broadcast station owners and operators in the nation and are thus the primary drivers of the price movement reflected in Figures 3.a through 3.c.

---

[9] Broadcast television spot advertising is priced on a cost per thousand ("CPM") basis, which is the cost for an advertisement per 1,000 viewers, or a cost per point ("CPP") basis, which is the cost to reach one percent of television households in a specified area.

**Figure 3.a: Defendants' Conduct Has Caused
Broadcast Television Spot Advertising Prices to Rise (Early News)**



**Figure 3.b: Defendants' Conduct Has Caused
Broadcast Television Spot Advertising Prices to Rise (Late News)**



**Figure 3.c: Defendants' Conduct Has Caused
Broadcast Television Spot Advertising Prices to Rise (Primetime)**



114.    Finally, Figure 4 shows a commensurate jump in the Broadcaster Defendants'

revenues at the start of the Class Period in 2014. This is not how a competitive market responds

to *declining* viewership and *declining* demand; these effects would only be expected in a

cartelized market not subject to normal competitive forces.

**Figure 4: Defendants' Conduct Caused The Broadcaster Defendants' Revenues to Rise**



## VII.    DEFENDANTS EXCERCISED MARKET POWER AND THEIR CONDUCT HAD ANTICOMPETIVE EFFECTS IN A RELEVANT ANTITRUST MARKET

115.    Defendants' price fixing agreement is unlawful under the *per se* standard, while

the information exchange that facilitated the cartel is either unlawful *per se*, or alternatively is

unlawful under either a quick look[10] or full-fledged rule of reason analysis.

116.    Under the *per se* standard, and additionally where, as here, there are demonstrable

_____

[10] "Quick look" is an abbreviated version of the rule of reason analysis, where the Court does not need to conduct analysis of the market to show anticompetitive effects, but rather must only show a form of market injury to the Plaintiffs and members of the Class.

anticompetitive effects, a relevant product and geographic market need not be defined.

117.    Should a relevant product market need to be defined in this action, it is the sale of broadcast television spot advertising on broadcast television stations.

118.    Should geographic markets need to be defined in this action, they are each individual, specific DMA in which two or more Broadcaster Defendants purportedly compete, identified in Appendix A.

119.    The broadcast television spot advertising landscape in the United States is comprised of parent companies like the Broadcaster Defendants that own and operate dozens of television stations. These stations carry programming distributed through their broadcast platforms, provided by third-party networks and syndicators, news stations, their own networks, and other original programming.

120.    Industry analysts and government regulators have consistently recognized that digital media advertising and other forms of advertising are not effective substitutes for broadcast television spot advertising.

121.    Broadcast television spot advertising combines sight, sound, and motion that appeal to viewers and attract their attention in ways that other advertising mediums do not.

122.    Radio, newspaper, billboard, and direct-mail advertising do not combine sight, sound, and motion, and consequently lack broadcast television spot advertising's ability to capture consumers with emotive storytelling. They also do not reach as many viewers as broadcast television spot advertising and so cannot drive brand awareness to the same extent as broadcast television spot advertising.

123.    Most forms of digital and Internet advertising (such as search page and website banner advertisements) lack the combination of sight, sound, and motion that characterize

45

broadcast spot television advertising, and even those online video advertisements that do include that combination face prohibitive challenges in that they can be skipped, minimized, or blocked by computer programs. Digital advertising also serves a different purpose, targeting narrow demographic subsets of a population and seeking to generate an immediate response (in the form of a click through or purchase), while broadcast television spot advertising reaches the largest population of any form of advertising in a DMA (including but not limited to radio, e-mails, social media, the Internet, cable television spot advertising, and streaming services), making it particularly effective for promoting brand awareness in a lasting way.

124. Advertisers want to advertise on broadcast stations (as opposed to cable stations and digital mediums) because broadcast stations offer popular programming such as local news, sports, and primetime and syndicated shows that are especially attractive in reaching a broad demographic base and a large audience of viewers.

125. Cable television spot advertising reaches far fewer television households within a DMA, is limited in supply, and generally encompasses more specialized programs that appeal to niche audiences. Comparatively, broadcast television spot advertising can be viewed by anyone with a traditional cable package (which includes major broadcast stations like ABC, CBS, Fox, and NBC and their affiliated networks in addition to cable channels), people who stream their television through the internet on services like Hulu (which almost ubiquitously carry the local affiliates of the major broadcast stations), and can be viewed by anyone with an antenna, for free.

126. With respect to digital advertising, in a 2011 review of top traditional and online advertising agencies, 24 of the top 25 online agencies did not offer television advertising services in-house and, similarly, 24 of the 25 top traditional advertising agencies did not offer search advertising in-house. This implies that clients for these two advertising verticals do not see the

46

other as interchangeable or substitutable, but rather as complementary products (*i.e.*, advertisers need to purchase both to reach as many potential consumers as possible).

127.    Indeed, Mark Lieberman, President and CEO of Viamedia, the nation's largest cross-media advertising company that offers advertising solutions through both television and digital media stated in May 2019 that:

> We're going to be talking a lot today about TV and digital, and from my standpoint, ***TV and digital are not equal***, and they are not yet considered a holistic buy, for a few reasons, one is . . . television provides a ***brand safe environment***, . . . second is that the [advertising] agencies actually have different buyers [for digital and television], . . . fourth . . . there is no connective tissue between the digital world, digital ad tech . . . and tv ad tech . . . [as to] ***measurement***, there is no unified cross-media measurement platform [to assess how TV advertising is performing versus digital], and lastly, when it comes to privacy . . . there is a privacy paradox [with digital advertising] . . . regulation [of digital data] will inhibit the use of [digital] data to hit [advertising targets].

128.    Mark Lieberman therefore concluded that he views digital advertising "as a complement, not a substitute," to television advertising.

129.    As to "measurement," while audience size and other performance for broadcast television spot advertising is measured by neutral third parties, such as Nielsen, for digital media, "impressions," "views," and other digital media performance is measured by the self-interested advertisement sellers themselves and often there are invalid, inaccurate, or outright fraudulent reporting of impressions, clicks, and other metrics.

130.    Marc Pritchard, Chief Brand Officer at Procter & Gamble, stated in May 2019 that digital advertising has a "dark side," including "outright fraud," where advertisers cannot tell if digital advertisers are being viewed by a human or a fraudulent robot application, or "bot."

131.    As to "brand safety," while most television programming is "safe" for brands—it is not unsavory, salacious, pornographic, or ideologically or politically charged and so unlikely to associate the brand with divisive or detrimental content or imagery—digital advertisements

47

can and often do end up on websites, social media pages, or other digital media outlets that are not "safe," either because they are politically charged and so may divide a consumer base, are pornographic or otherwise contain offensive imagery, or are otherwise inappropriate contexts.

132.    Marc Pritchard elaborated on the brand safety issue, noting that some of his digital advertisements had appeared in "unacceptable graphic and horrible content," including "*ISIS terrorist training videos*." This can obviously endanger a brand.

133.    Additionally, "ad blocking" applications can automatically prevent a consumer from viewing a digital advertisement, while avoiding a broadcast television spot advertisement requires that a viewer take affirmative action (e.g., change the channel, leave the room) to avoid viewing a broadcast television spot advertisement.

134.    Finally, more broadcast television spot advertisements are actually viewed to their completion than digital advertisements. When a pop-up advertisement or other digital advertisement is played, many people immediately close the unwanted distraction after just a few seconds have passed, with the digital advertisement often playing only as long as it takes the consumer to find the "close" box. Marc Pritchard noted that the "average view time for a social media ad is 1.7 seconds" and that "it's kinda hard to get a message across in 1.7 seconds."

135.    As compared to cable, broadcast television spot advertisements typically penetrate about 90 percent of the households in a DMA, while cable television spot advertisements penetrate far fewer homes. A significant and growing number of television households do not even subscribe to a traditional cable provider, instead receiving broadcast television signals over the air for free. In households that subscribe to cable television, the package they receive almost always includes all broadcast channels, but often excludes many cable channels. As a result, some cable television spot advertisements cannot be seen even by households with cable.

48

136.    Additionally, broadcast television spot advertisement is much more appealing than cable television spot advertising, because most advertisers are looking to capture a wide audience and broadcast programming has broader appeal to viewers. A broadcast spot reaches more viewers with more ratings points than a single spot on a cable channel. Cable audiences are fragmented across numerous stations that cater to niche populations, and thus advertisers looking to reach a large share of a DMA cannot do so through cable television spot advertisements.

137.    Finally, broadcast stations have a larger advertising inventory than cable stations. Due to the limited inventory and lower ratings associated with cable spot advertising, cable providers cannot offer the same volume of ratings points or broad enough household penetration to match broadcast television spot advertising.

138.    Because of these factors, advertisers are not likely to respond to a small but significant increase in the prices charged for broadcast television spot advertising in a given DMA by switching to other forms of media in large enough numbers to make that price increase unprofitable. Accordingly, other forms of advertising are not a substitute for broadcast television spot advertising. Conversely, broadcast television stations *are* generally substitutable for one another. If a broadcast station suffers a blackout in a given DMA, viewers are likely to turn to another such station in the DMA to watch similar content, such as sports, primetime shows, local news, movies, and/or weather.

139.    In 2013 the DOJ stated that it "has repeatedly concluded that the purchase of broadcast television spot advertising constitutes a relevant antitrust market because advertisers view spot advertising on broadcast television stations as sufficiently distinct from advertising on other media." The DOJ similarly stated that it has "repeatedly concluded that the purchase of broadcast television spot advertising constitutes a relevant market because advertisers view spot

49

advertising on broadcast television stations as sufficiently distinct from other forms of media (such as radio and newspapers)."

140.    For example, in a 2014 enforcement action, the DOJ explained that the proper relevant antitrust market was broadcast television spot advertising and that the market excluded all other forms of advertising, including "radio," "billboards," "newspaper," as well as "cable or satellite television." The DOJ noted in that action that cable and satellite television was not "a desirable substitute for broadcast television spot advertising for two important reasons." First, the DOJ noted that they do not have the same "reach" as broadcast television advertising, which reaches "90% of homes in a DMA." Second, the DOJ noted that because subscription services can offer over 100 channels, they fragment the audience into small demographic segments, so that broadcast television spot advertising "has higher ratings points than subscription programming," and so is "viewed as providing a much easier and more efficient means for an advertiser to reach a high proportion of its target demographic." Thus, the DOJ has consistently concluded in its regulatory actions that these advertising outlets are "not [] a substitute for broadcast television spot advertising, but rather as a supplement [*i.e.*, a complement]." In that action, the DOJ extended this analysis to "online video distributors, such as Netflix and Hulu."

141.    Indeed, as recently as *July 31, 2019*, the DOJ has maintained its firm and oft-repeated stance, consistently adopted by the courts overseeing DOJ regulatory actions, that broadcast television spot advertising is a properly drawn relevant antitrust market that excludes all other forms of advertising.

142.    On average, the Broadcaster Defendants held 60 percent, and as high as 100 percent, market share in the multi-defendant DMAs listed in Appendix A (measured as of 2017 data, and including Raycom's, but not Gray TV's, commerce).

143.    Defendants' conduct alleged herein has caused injury to Plaintiffs and the Class members in the form of having paid overcharges (*i.e.*, artificially inflated prices) for broadcast television spot advertising. This is injury is of the type that the antitrust laws were meant to deter, punish, and prevent. As shown in Figure 1, Figures 3.a to 3.c, and Figure 4, at the onset of the conduct period identified by the DOJ (the start of the Class Period here), the Broadcaster Defendants' prices and revenues have spiked in the face of *declining* demand. And Figures 2.a to 2.k show that the Broadcaster Defendants' revenues have outpaced their non-colluding rivals.

144.    Moreover, the economic literature (discussed *supra*, in Section V.A.2) is clear that the conduct and market outcomes observed here evince cartel behavior, lead to anticompetitive harm, and cause a reduction in consumer welfare.

## VIII.    "PLUS FACTORS" FURTHER EVINCE THE EXISTENCE OF DEFENDANTS' *PER SE* UNLAWFUL PRICE FIXING CARTEL

145.    Prominent legal and economic antitrust scholars studying collusive behavior have developed the concept of "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." They refer to the plus factors that provide the most probative value and "those that lead to a strong inference of explicit collusion as 'super plus factors.'"

146.    Here, plus factors plausibly inferring the existence of a *per se* illegal cartel include: the defendants' exchange of competitively sensitive information, a motive to conspire, actions and conduct that would be against the Broadcaster Defendants' unilateral self-interest in the absence of an anticompetitive agreement, opportunities and invitations to collude at trade associations and otherwise, high market concentration, and high barriers to entry.

A. **Defendants' Information Exchange is a "Super Plus Factor" Evincing the Existence of a *Per Se* Unlawful Price Fixing Cartel**

147. One of the "super plus factors" academics enumerate addresses the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private to each firm, or where: "A firm or subset of firms has knowledge of the details of another firm's transactions, production, sales, and/or inventories where the latter firm would be competitively disadvantaged by conveying that information unilaterally."

148. A super plus factor plausibly inferring the existence of a *per se* illegal cartel includes the information exchange detailed *supra*.

B. **The Broadcaster Defendants' Motive to Conspire—Declining Viewership and Revenue—is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

149. As discussed above, overall viewership and revenue have been falling for broadcast television spot advertising. While the Broadcaster Defendants' revenues have increased tremendously (as a result of their unlawful conduct), industry revenues overall are down, the result of pressure from Internet and other media outlets as certain consumers (e.g., "cord-cutters" and "cord-nevers") elect to consume non-traditional media.

150. Television viewership has declined in recent years. According to the Pew Research Center, "[s]ince 2007, the average audience for late night newscasts has declined 31 percent, while morning audience declined 12 percent and early evening audience fell 19 percent." In 2018, the Pew Research Center found that "the gap between the share of Americans who get news online and those who do so on television is narrowing," with only 50 percent of United States adults regularly getting news from television in 2017, down from 57 percent in 2016. Typically, local news is the largest source of revenue for local broadcast affiliates, comprising roughly 50 percent of total revenue. In 2016, advertising revenue for local "news-

52

producing stations" made up 84 percent of total advertising revenue for the industry overall.

151.    Broadcast television spot advertising sales have begun to decline in the last decade. In real terms, broadcast television spot advertising industry-wide revenue reached its non-election year peak in 2011 at $16.2 billion (in 2008 dollars). It has declined every two years since then to $14.9 billion in 2017 (again, expressed in 2008 dollars), a decline of 8.25 percent. The same pattern has held for election-years: in real terms, presidential election-year real local television advertising spending fell from $20.0 billion in 2008 to $18.1 billion in 2012 to $17.6 billion in 2016, a total decline of 12.1 percent. And, for mid-term election years, real spending fell by $1.9 billion dollars (4.9 percent) from $18. billion in 2010 to $17.4 billion in 2014.

152.    BIA Advisory Services forecasts that local television station OTA advertising revenues will grow slower than overall local advertising, predicting a 0.6 percent compound annual growth rate ("CAGR") from 2019 to 2023, outpaced by a forecasted CAGR of over 10 percent for local mobile video and over 15 percent for local online video. BIA Advisory Services predicts that "by 2023, local online/interactive/digital advertising revenue will be $78.2 billion, growing to nearly 48 percent of total local media advertising revenue from roughly a 37 percent share in 2018."

153.    "In a healthy economy, we're looking at no growth in advertising from traditional media companies," said Michael Nathanson, an analyst with research firm MoffettNathanson. "That's a worrying trend." The decline in television viewership is accelerating as online rivals have increased their investments in the online video advertising market, capturing almost every new advertising dollar entering the marketplace. Almost half of the growth in local video ad spending during the next five years will go to digital platforms, including local mobile video, local online video and out-of-home video, according to a 2017 study on advanced television

53

advertising published by BIA/Kelsey industry analysts. "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."

154.     Declining viewership, coupled with a relatively fixed amount of available broadcast television spot advertising time, should lead to lower prices, revenues, and profits. These factors provide a strong motivation for horizontal competitors to form and maintain a cartel, particularly in this industry, where broadcast television spot advertising makes up the majority of the Broadcaster Defendants' revenues.

155.     For example, according to Sinclair's most recent Form 10-K filed with the SEC, a primary source of revenue for local television stations is "the sale of advertising inventory on . . . television stations to . . . advertising customers." However, Sinclair also concedes that "advertising revenue can vary substantially from period to period based on many factors beyond [its] control." Furthermore, "[t]his volatility affects [its] operating results and may reduce [its] ability to repay indebtedness or reduce the market value of [its] securities." Sinclair specifically admits that its "operating results depend on the amount of advertising revenue [it] generate[s]." The key revenue function underscores the strong incentive to collude rather than compete, which, as alleged above and below, the Broadcaster Defendants acted upon.

**C.      The Broadcaster Defendants' Action Against Their Unilateral Self-Interest (Rising Prices in the Face of Declining Demand) is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

156.     As discussed in the allegations above and below, the Broadcaster Defendants undertook conduct that would be economically irrational as against their unilateral economic self-interest if it was undertaken in the absence of an agreement among the Broadcaster Defendants to fix prices.

157.     Specifically, the Broadcaster Defendants—faced with declining demand that should have caused prices for broadcast television spot advertising to fall—irrationally raised their prices.

158.     In the absence of an agreement among firms to maintain high prices, raising prices in the face of declining demand is against any one firm's unilateral economic self-interest because that firm would risk losing market share as customers shift their purchases away towards lower priced rivals. A firm acting alone is uncertain how a rival will price, and so the economically rational decision is to lower prices commensurate with the declining demand to retain existing, or even to gain additional, market share.

159.     However, a firm acting in concert with its rival by agreeing to maintain high prices avoids this uncertainty about competitive outcomes and can confidently maintain high prices even in the face of declining demand, knowing its rival will not undercut it and steal market share away. That the Broadcaster Defendants raised their prices in the face of declining demand strongly suggests that they were acting in concert as a cartel, rather than unilaterally.

**D.     Defendants' Opportunities and Invitations to Collude are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

160.     Further supporting the plausibility of the cartel were Defendants' frequent opportunities, and apparent invitations to one another, to collude rather than compete. As the FTC notes in its Spotlight on Trade Associations, "[d]ealings among competitors that violate the law would still violate the law even if they were done through a trade association[, including] . . . control[ing] or suggest[ing] prices of members[,] . . . . [and] us[ing] information-sharing programs . . . as a disguised means of fixing prices."

**1.     Invitations and Opportunities to Collude Through the TIP Initiative**

161.     As one example, on November 20, 2017, a group of broadcast television

55

companies, including Nexstar, Sinclair, TEGNA, and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners." The TIP Initiative is intended to be national in scope. It will provide for standardized automated transactions with customers for broadcast television spot advertising that will enable Defendants to share competitively sensitive information. Nexstar's President and CEO made a public statement regarding TIP indicating that Defendants "must work together as an industry." The President and CEO of Sinclair echoed this sentiment stating that "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales. Tribune's President and CEO also indicated that through the TIP Initiative, Defendants could "actively work[] together."

162.     Through the TIP Initiative, Defendants thus signaled their invitation to the industry to come together and collude rather than compete, and continue to disseminate competitively sensitive information, in order to maintain industry profitability in the face of declining demand.

### 2.     Opportunities to Collude Through Joint Service Agreements

163.     In addition, the Broadcaster Defendants had numerous opportunities to meet and conspire with each other under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the cartel.

164.     In particular, almost 300 full-power local television stations changed hands in 2013 and many of these deals resulted in stations in the same market being separately owned on paper but operated jointly, a practice that has grown exponentially in recent years. The practice proliferated beginning in 2011, and was widespread by 2013. As of 2014, joint service agreements of one kind or another existed in at least 94 markets (almost half of the 210 local

television DMAs throughout the country), and up from 55 in 2011. As of March 2019, the Broadcaster Defendants operated stations owned by different owners in 79 DMAs.

165. Specifically, Sinclair admits that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."

### 3. Opportunities to Collude Through the TVB Trade Association

166. Additionally, Defendants and their co-conspirators had numerous opportunities to conspire through industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), conferences and meetings held by those associations, and merger negotiations.

167. Cox Media, Katz, Nexstar, Sinclair, and Tribune are members of the TVB. Katz's president and Cox Media's Executive Vice President presently serve as chairpersons on TVB's Board of Directors. Nexstar's president and CEO, and TEGNA's president and CEO, are both former chairs of TVB. TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry." The TVB is designed to bring together and encourage information sharing among employees of broadcast television companies, including Defendants, especially advertising sales representatives.

### 4. Opportunities to Collude Through the NAB Trade Association

168. CBS, Cox Media, Fox, Scripps, Sinclair, TEGNA, Tribune, Meredith, and Nexstar are also members of the NAB, which describes itself as the "premier trade association for broadcasters."

169. CBS' Executive Vice President, Cox Media's Executive Vice President, Fox's Senior Vice President, Scripps' President of Local Media, TEGNA's President and CEO, Nexstar's Chairman, President and CEO, Sinclair's President and CEO, Tribune's COO, and

Meredith's President, all serve on the NAB Television Board of Directors.

170.    The President of Cox Media Group, owner of Cox Reps, also serves on the NAB's Executive Committee. NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

### 5.    Opportunities to Collude Through the MRC Trade Association

171.    Every named Defendant and many other local television station owners are also members of the MRC.

172.    The MRC boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.

173.    These invitations and opportunities to collude served to bolster and facilitate the formation and maintenance of Defendants' price fixing cartel.

### E.    The Broadcaster Defendants' High Market Shares and High Concentration in the Broadcast Television Spot Advertising Market are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful

174.    As shown in Appendix A and alleged above, in the DMAs in which the Broadcaster Defendants purportedly compete they consistently hold dominant shares of the market, averaging 60 percent and as high as 100 percent. Sinclair is the largest broadcast company in the nation, while Nexstar and Tribune are among the top five.

175.    As of 2017, the Broadcaster Defendants in total owned 471 full-power stations, up 85 percent from 254 stations in 2008. The Broadcaster Defendants in total own 688 revenue generating stations, up over 150 percent from 268 stations in 2008. As discussed in more detail *infra*, a wave of consolidation and station purchases has made some broadcast media owners considerably larger.

58

176. A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

177. In response to decreased advertisement spending, the local television industry has been consolidating in recent years. This consolidation of the industry continues "as station owners look to increase their leverage with broadcast networks, which supply much of their programming, and pay-TV distributors, which carry their channels." In 2013, "big owners of local TV stations got substantially bigger, thanks to a wave of station purchases." That wave is reflected in the following chart taken from a 2013 report by the Pew Research Center:



178. As the Pew report states:

> Many of the 290 TV station purchases in 2013 occurred as group acquisitions by some of the largest owners, building their portfolios of stations even more. The Tribune Co. emerged from bankruptcy to make the richest single deal, spending $2.73 billion to acquire 19 stations from Local TV Holdings. Gannett completed a $2.2 billion transaction to buy 17 stations from Belo Corp., almost doubling Gannett's TV holdings and giving it national reach. Twelve stations changed hands when Media General merged with New Young Broadcasting.

59

> Sinclair Broadcasting acquired more individual stations than any other buyer, snapping up outlets owned by locally based companies like Fisher Communications in Seattle and Allbritton Communications in Washington, D.C. The company already owned the most local stations of any group; if all pending sales go through, Sinclair will own or provide services to 167 television stations in 77 markets, reaching almost 40 percent of the United States population. Nexstar Broadcasting made moves to increase its portfolio to 108 stations in 56 markets. In 37 of those markets, it will own or provides services to more than one station. Nexstar's chief executive, Perry Sook, predicted the "rolling M&A thunder" would continue throughout 2014, and it has. In March, Media General announced plans to buy LIN Media's 43 stations for $1.6 billion.

179.     Consolidation in the industry was also fueled by the proposed acquisition of Tribune by Sinclair, announced on May 8, 2017, which would have created the largest station owner. Wary of Federal Communications Commission ("FCC") rejection of the deal, Sinclair and Tribune submitted a revised version of the merger plan to antitrust regulators, whereby Sinclair would acquire Tribune for $3.9 billion, forming a company that would own 215 broadcast television stations in 102 cities, reaching close to 60 percent of all United States television households. Sinclair and Tribune jointly have extreme market penetration, with Tribune currently reaching 43 percent of the nation's households and Sinclair reaching 38 percent of American homes.

180.     Indeed, analysts called the proposed merger between Sinclair and Tribune "a very transformative acquisition" that would create "a broadcaster with as close to a national footprint as you can get." Sinclair's CEO, Chris Ripley, echoed this belief, stating the combined company would reach "72 percent of United States homes across 108 markets including 39 of the top 50" and "[t]his combination creates the largest TV broadcasting company in the country."

181.     The revised merger plan could only be accomplished by selling certain television stations to reduce the number of households jointly reached by Tribune and Sinclair (which currently is over 80 percent). However, Sinclair's revised plan called for selling certain stations

to friends and other parties with whom it has a business relationship, for significantly less than fair value, raising questions about whether Sinclair would actually continue to control these stations.

182.   The FCC expressed concerns that Sinclair did not intend to actually relinquish control over television stations that it proposed to divest in order to comply with the National TV Ownership rule, and that Sinclair had been less than candid with the FCC. Indeed, the FCC suspected that certain "'sidecar agreements' [ ] would allow Sinclair to retain control of stations without owning them." According to FCC Commissioner Michael O'Reilly, the vote to send the merger to an administrative law judge was a "de facto merger death sentence."

183.   The failure of the Sinclair-Tribune merger led Nexstar to announce its intention to acquire Tribune for over $4 billion in December of 2018. As one article noted:

> The deal would make Nexstar, whose stations reach nearly 39 percent of all United States television households, the biggest operator of local TV stations in the United States.
>
>     ****
>
> Tribune Media owns or operates 42 local TV stations that reach 50 million households, as well as the national network WGN. It also has a stake in the TV Food Network.
>
> Nexstar is the second-largest television station owner in the United States, with 171 outlets across the country, typically operating as affiliates with the four "major" United States television networks in small to mid-size markets. It also operates through local marketing agreement the stations owned by affiliate company Mission Broadcasting.

184.   Similarly, on June 25, 2018, as noted above, Gray TV agreed to buy Raycom in a $3.65 billion deal that would create a company that reaches nearly a quarter of United States television households. The combined company owns 142 television stations in 92 DMAs reaching 24 percent of television households and owning the third-highest number of stations.

61



**Scaling Up**
By buying Raycom, Gray Television will reach 24% of all U.S. television households.

185. Herfindahl-Hirschman Index ("HHI") calculations further reveal industry concentration. HHI is a tool commonly employed in antitrust economics to measure market concentration. It is calculated by squaring the market share of each firm competing in a market and then summing the resulting numbers.

186. Here, the average HHI across the DMAs in which two or more Broadcaster Defendants compete is 2,213 when considering ownership of stations and 2,303 when considering operation of stations, some of which station operators do not own.

187. Of the 127 DMAs in which two or more Broadcaster Defendants compete, 80 have HHI measures over 2,500 when considering ownership of stations, and 89 have HHI measures over 2,500 when considering operation of stations.

188. The DOJ considers an HHI measure between 1,500 and 2,500 to be a moderately concentrated market and above 2,500 to be a highly concentrated marketplace.

**F.** **High Barriers to Entry in the Broadcast Television Spot Advertising Market is a Plus Factor Supporting the Existence of a Price Fixing Cartel That is *Per Se* Unlawful**

189.    A collusive arrangement that raises product prices above competitive levels, under basic economic principles, would normally tend to attract new entrants seeking to benefit from the supracompetitive pricing, which in turn could erode prices. But there are significant, even prohibitive, barriers to entry in the spot television broadcasting market that prevent entry from new, non-collusive rivals and the erosion of collusively increased profits. Thus, barriers to entry help facilitate the formation and maintenance of cartels and market-allocation agreements.

190.    New entrants planning to enter into broadcasting markets typically face six critical barriers: (1) governmental policy; (2) the presence of dominant broadcasters; (3) access to content; (4) audience behavior; (5) consumer costs; and (6) capital requirements.

191.    Governmental policy, including regulatory or administrative practices, may restrict market access. The FCC issues licenses for television stations, and an entrant would be required to petition the Commission to assign a new channel to a community. Moreover, the FCC is not accepting any applications for new full-power or television or LPTV stations until the current spectrum repacking process is complete, which is not expected to happen until July 2020.

192.    Responsible authorities take into account economic, as well as cultural and social, factors when issuing broadcasting licenses that may lead to distortions of competition.

193.    The existing dominant broadcasters usually have long-established relationships with their viewers and (most likely) also with advertisers. New entrants in the market would have to offer a better deal than the existing broadcasters in order to usurp any market share. Additionally, bigger companies have more clout to negotiate programming deals with networks or syndicators. "If you wanted a decent seat at the table talking to those guys, you had to have

scale," said Barry Lucas, Senior Vice-President of Research at the investment firm Gabelli & Co. "Otherwise you were irrelevant and got pushed around."

194.    A newer entrant to the market would have to invest significant capital and time in establishing itself before it could work with networks.

195.    Additionally, successful entry into television broadcasting markets requires access at reasonable prices to desirable programming, including production and/or acquisition from third parties. Acquisition of this content, which is critical to attract viewers, is likely to constitute a significant cost to new market players.

196.    Commercial broadcasters, whose operations are primarily financed through advertising fees, must establish within a short period an audience base that will also attract a sufficient number of advertisers. Therefore, in the presence of established dominant broadcasters, new entrants must provide offers attractive enough to convince viewers to alter their already existing patterns of viewing and channel choice—a task that proves to be difficult.

197.    Finally, it would require considerable funding, time, and technical sophistication for a potential market entrant to gain the economies of scale and audience base achieved by Defendants necessary to compete in the market for broadcast television spot advertising. Where the level of capital required is prohibitively high, it constitutes a significant barrier to entry.

198.    For these reasons, there has not been meaningful recent entry into the industry. Of the major local broadcast station owners, Nexstar and Raycom (recently acquired by Gray TV), are the most recent to enter the industry, both in 1996. Many of the large station owners have been in the industry since the 1940s and 1950s, including Tribune, Meredith, and Griffin.

## IX. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONDUCT THROUGH, *INTER ALIA*, PUBLIC STATEMENTS IN SECURITIES FILINGS THAT THEY AND THE MARKET WERE FUNCTIONING COMPETIVELY

199. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct.

200. Plaintiffs and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein prior to disclosure of a DOJ investigation of certain Defendants on July 26, 2018.

201. Further, the very nature of Defendants' conduct was secret and self-concealing. Defendants engaged in secret market manipulation that could not be detected by Plaintiffs and the Class.

202. Throughout the Class Period, each of the publicly-traded Defendants made various representations in filings with the Securities and Exchange Commission ("SEC") that describe a competitive landscape in which they purport to vie for advertising revenue not only with other spot television broadcast companies, but also with numerous other entities.

203. For example, in its Form 10-K Annual Report filed with the SEC in June 2015, Meredith stated that its "television stations compete directly for advertising dollars and programming in their respective markets with other local television stations, radio stations, cable television providers, and digital websites and mobile sites."

204. Sinclair consistently claimed in its Form 10-K Annual Reports that its "television stations are located in highly competitive DMAs," while Tribune consistently listed among its main competitors the major networks and the "major broadcast television station owners," including Nexstar and Sinclair. Nexstar made similar statements in its Form 10-K Annual

Reports throughout the Class Period.

205.    Such representations by Defendants were intentionally misleading and concealed the unlawful anticompetitive activity described herein from Class members.

206.    Additionally, Defendants had corporate codes of conduct that members of the Class reasonably relied on to assume that they were complying with federal antitrust laws.

207.    For example, Sinclair has a publicly-posted "Code of Business Conduct and Ethics" that states that "Officers, directors and employees must comply with all laws, rules and regulations applicable to them or the Corporation, including, without limitation, . . . antitrust laws[.]"

208.    Nexstar likewise has a public "Code of Business Conduct" that states:

> All employees must comply fully with the laws and regulations that apply to the Company. When the application of such laws or regulations is uncertain, employees are urged to seek the guidance and advice of the General Manager or Chief Financial Officer. Employees are expected to recognize this duty to society above and beyond their obligations to the Company and their personal financial interests. While the Company must compete vigorously to maximize profits, Nexstar will at the same time do so in strict compliance with all laws and regulations applicable to our activities. No employee should at any time take any action on behalf of the Company, which is known or should be known to violate any applicable law or regulation.

209.    Tribune has an extensive "Code of Ethics and Business Conduct" that spells out its obligations under the antitrust laws in great detail:

> We believe in free and open competition and never engage in improper practices that may limit competition and we never look to gain competitive advantages through unethical or illegal business practices, but rather through superior performance.

> We do not enter into agreements with competitors to engage in any anti-competitive behavior, including setting prices or dividing up customers, suppliers or markets.

> ****

66

> Also, anti-trust and fair competition laws are complex and compliance requirements can vary depending on the circumstance, but in general, the following activities are red flags and should be avoided and reported to your supervisor, the Human Resources Department, the Law Department or Internal Audit:
>
> COLLUSION — when companies secretly communicate or agree on how they will compete. This could include agreements or exchanges of information on pricing, terms, wages, or allocations of markets.

210. Nexstar maintains a "Code of Ethics," which was originally filed with the SEC on March 31, 2004 by Nexstar Broadcasting Group, Inc. and incorporated as an exhibit to Nexstar's Annual Report for the year ending December 31, 2003 on Form 10-K. The "Code of Ethics" states, "Each Relevant Officer owes a duty to the Company to act with integrity. . . . Specifically, each Relevant Officer must: . . . . Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices."

211. Scripps has a "Company Code of Conduct" that directs employees to "not discuss pricing or price-related information with our competitors."

212. Fox maintains in its "Standard of Business Conduct" that it "is committed to fair competition" and that it "always engage[s] in fair competition in the free market, obeying all applicable antitrust and competition laws."

213. TEGNA's "Ethics Policy" states that the company "is committed to the concept of fair dealings, and free, fair and open competition . . . and [a]void[s] actions that restrict freedom of competitive opportunities."

214. Cox Media's "Code of Conduct" details the company's purported commitment to "conduct[ing] business lawfully." The Code states:

> Cox Media Group employees should not enter into any agreements or arrangements with other parties (competitors, vendors, customers, etc.) that could illegally limit or restrict competition.

****

> Don't communicate with our competitors about "fixing" prices (for example, setting minimum or maximum prices) . . . interfering with the competitive bidding process.

215. Likewise, in its "Code of Business Conduct and Ethics," iHeartMedia, Inc., Katz's parent, outlines its commitment to "competing for business fairly" and states that it "complies with competition laws wherever we do business." The Code also states that competition laws "generally forbid entering into formal or informal agreements with competitors that restrain trade, such as . . . sharing information regarding prices, terms or conditions, costs, marketing plans, customers or any other proprietary or confidential information," and warns its employees to "[b]e particularly cautious when attending trade events, seminars, or industry conferences [and] avoid conversations about competitively sensitive information with representatives of our competitors."

216. CBS has a lengthy "Business Conduct Statement" that lays out its responsibilities under the antitrust laws in significant detail:

> CBS seeks to excel and outperform its competition honestly and fairly. CBS seeks competitive advantages through superior performance, not from illegal or unethical business practices.
>
> The purpose of the antitrust trade and practice laws is to preserve a competitive economy in which free enterprise can flourish. CBS is committed to this principle and to full compliance with these laws in each jurisdiction within which it operates.
>
> ****
>
> CBS's policy requires that all of its prices be determined independently in light of costs, market conditions and competitive factors. Any agreement, written or unwritten, explicit or tacit, formal or informal, between competitors to fix, raise, peg, stabilize or even lower prices, or to eliminate or reduce price competition, is *per se* unlawful.
>
> ****

> If you participate in trade association meetings or other activities on behalf of CBS or your Company, you must be very careful to avoid even the appearance of reaching or seeking an agreement as to prices . . . including by sharing nonpublic price or market information, whether as part of "official" trade association meetings or in less formal discussions that may occur in conjunction with trade association activities.

217. And Meredith has a "Code of Business Conduct and Ethics" that states:

> Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All employees must respect and obey the laws of the cities, states, and countries in which we operate. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors, managers, or other appropriate personnel.

> We do not condone any act that violates the law, even when such action appears to be in the Company's best interest.

218. These statements have now been demonstrated to be materially misleading; they suggest that Defendants were law-abiding companies that recognized their antitrust obligations and that Defendants and the broadcast television spot advertising market were functioning competitively.

219. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and the Class members' claims have been tolled.

## X.     CLASS CERTIFICATION IS APPROPRIATE HERE

220. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities in the United States who purchased broadcast television spot advertising from one or more Broadcaster Defendants in a DMA within which two or more of the Broadcaster Defendants sold broadcast television spot advertisements on broadcast television stations and who paid one or more Broadcaster Defendants directly for all or a portion of the cost of such broadcast

television spot advertisements, or any current or former subsidiary or affiliate of a Broadcaster Defendants during the period from at least and including January 1, 2014 until the effects of the unlawful conduct are adjudged to have ceased (the "Class Period").[11]

221.    While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe the class size is numerous, and likely includes hundreds if not thousands of members.

222.    Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which focuses on the conduct of Defendants, not of any particular class member, and was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

- Whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the price levels of broadcast television spot advertising time, that is *per se* illegal;

- The identity of the participants of the alleged cartel;

- The duration of the alleged cartel, and the acts carried out by Defendants and their co-conspirators in furtherance of the cartel;

- Whether the conduct alleged herein violated Section 1 of the Sherman Act; and

---

[11] Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators; the court, court staff, defense counsel, all respective immediate family members of these excluded entities, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

70

▪ Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for broadcast television spot advertising and the proper measure of such overcharge damages.

223. Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for broadcast television spot advertising time provided by the Broadcaster Defendants.

224. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

225. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

226. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

227. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any

71

difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

228.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**COUNT ONE**
**Price Fixing in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

229.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

230.     During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy with regards to broadcast television spot advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

231.     The contract, combination or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize or maintain at artificially high levels the prices they charged for broadcast television spot advertising in the United States.

232.     Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharge damages paid for broadcast television spot advertising time purchased from the Broadcaster Defendants and their co-conspirators.

233.     This conduct is unlawful under the *per se* standard.

234.     Plaintiffs and members of the Class are entitled to treble damages, their attorneys' fee and costs, and an injunction against Defendants restraining the violations alleged herein.

**COUNT TWO**
**Information Exchange in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

235.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

236. During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy with regards to broadcast television spot advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

237. The contract, combination or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

238. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharge damages paid for broadcast television spot advertising time purchased from the Broadcaster Defendants and their co-conspirators.

239. This conduct is unlawful under the *per se* standard or alternatively under a quick look or full-fledged rule of reason mode of analysis.

240. As described above, the relevant product market affected adversely by the challenged conduct is the market for broadcast television spot advertising and the relevant geographic markets are those DMAs where two or more Defendants compete, markets where Defendants collectively have significant market power.

241. Plaintiffs and members of the Class are entitled to treble damages, their attorneys' fees and costs, and an injunction against Defendants restraining the violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully request that:

A. The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B. The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in

furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.     Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.     The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: August 7, 2019                    Respectfully submitted,

                                         By: */s/Megan E. Jones*
                                         Megan E. Jones*
                                         **HAUSFELD LLP**
                                         600 Montgomery St. #3200
                                         San Francisco, CA 94111
                                         Tel: (415) 633-1908

Fax: (415) 358-4980
mjones@hausfeld.com

Michael D. Hausfeld*
Hilary K. Scherrer*
Melinda R. Coolidge*
**HAUSFELD LLP**
1700 K Street NW #650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeld.com
hscherrer@hausfeld.com

Gary I. Smith, Jr.*
Tamara R. Freilich*
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
gsmith@hausfeld.com
tfreilich@hausfeld.com

*Lead Counsel*

Hollis Salzman*
Meegan Hollywood*
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Tel: (212) 980-740
Fax: (212) 980-7499
hsalzman@robinskaplan.com
mhollywood@robinskaplan.com

Kimberly A. Justice
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
Fax: (224) 632-4521
kjustice@fklmlaw.com

*Plaintiffs' Steering Committee*

Robert J. Wozniak

Steven A. Kanner
Michael J. Freed
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
skanner@fklmlaw.com
mfreed@fklmlaw.com
rwozniak@fklmlaw.com

*Liaison Counsel*

Stephanie A. Scharf
**SCHARF BANKS MARMOR LLC**
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Tel: (312) 726-6000
sscharf@scharfbanks.com

*Counsel for Plaintiffs and the Proposed Class*

*Admitted *Pro Hac Vice.*

76

# Appendix A

## DMAs with Multiple Defendants Present

| No. | DMA | Defendants Present | Plaintiffs Purchased in the DMA During Class Period | Owned Stations Market Share (%) | Operated Stations Market Share (%) | Owned Station HHI | Operated Stations HHI |
|---|---|---|---|---|---|---|---|
| 1. | Abilene-Sweetwater, TX*** | -Nexstar<br>-Sinclair Broadcast Group<br>-TEGNA | X<br>(from Scripps on Nexstar) | 85 | 99 | 3,392 | 4,602 |
| 2. | Albany, GA | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair; from Scripps on Raycom) | 86 | 86 | 5,407 | 5,476 |
| 3. | Albany-Schenectady- Troy, NY | -Nexstar<br>-Sinclair | X<br>(from Sinclair; from Scripps on Nexstar; from TEGNA on Nexstar) | 62 | 72 | 2,732 | 3,377 |
| 4. | Amarillo, TX | -Gray (formerly Raycom)<br>-Nexstar<br>-Sinclair | X<br>(from Sinclair; from Scripps on Nexstar) | 89 | 100 | 2,885 | 3,445 |
| 5 | Atlanta, GA*** | -CBS<br>-Cox*<br>-Fox<br>-Meredith<br>-TEGNA | X<br>(from Scripps on Cox; from Sinclair on CBS; from Tribune on TEGNA) | 96 | 60 | 2,348 | 2,348 |
| 6. | Augusta-Aiken, GA | -Gray (formerly Raycom)<br>-Nexstar | X<br>(from Scripps on Nexstar) | 56 | 56 | 3,695 | 3,695 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 7. | Austin, TX*** | -Nexstar<br>-Sinclair<br>-Fox<br>-TEGNA | X<br>(from Scripps on Nexstar) | 87 | 93 | 2,057 | 2,389 |
| 8. | Bakersfield, CA*** | -Nexstar<br>-Sinclair<br>-Scripps | X<br>(from Sinclair; from Scripps on Nexstar) | 79 | 79 | 2,771 | 2,771 |
| 9 | Baltimore, MD | -CBS<br>-Scripps<br>-Sinclair | X<br>(from Sinclair; from Scripps; from Scripps on CBS; from Tribune on Sinclair) | 55 | 66 | 2,398 | 2,853 |
| 10. | Baton Rouge, LA | -Gray (formerly Raycom)<br>-Nexstar | X<br>(from Scripps on Nexstar; from Scripps on Raycom) | 57 | 69 | 3,067 | 3,377 |
| 11 | Beaumont-Port Arthur, TX*** | -Sinclair<br>-TEGNA | X<br>(from Sinclair) | 71 | 100 | 3,118 | 5,257 |
| 12 | Billings, MT | -Nexstar<br>-Scripps** | X<br>(from Scripps on Nexstar) | 14 | 82 | 4,305 | 4,492 |
| 13. | Birmingham (Anniston and Tuscaloosa), AL*** | -Sinclair<br>-Gray (formerly Raycom)<br>-Nexstar | X<br>(from Sinclair; from Scripps on Raycom; from Scripps on Nexstar; from Tribune on Sinclair; from TEGNA on Nexstar) | 79 | 79 | 2,661 | 2,661 |
| 14 | Boise, ID*** | -Gray (formerly Raycom)<br>-Scripps<br>-Sinclair<br>-TEGNA | X<br>(from Sinclair; from Scripps) | 91 | 91 | 2,616 | 2,616 |

| 15 | Boston, MA | -CBS<br>-Cox* | X<br>(from Sinclair on CBS; from Scripps on Cox) | 36 | 24 | 2,000 | 1,975 |
|----|-----------|---------------|------------------------------------------------|----|----|-------|-------|
| 16 | Buffalo, NY*** | -Nexstar<br>-Scripps<br>-Sinclair<br>-TEGNA | X<br>(from Scripps; from Sinclair; from TEGNA; from Scripps on Nexstar; from Tribune on TEGNA) | 97 | 97 | 2,544 | 2,544 |
| 17 | Butte-Bozeman, MT | -Scripps**<br>-Sinclair | | 26 | 83 | 4,222 | 4,222 |
| 18 | Cedar Rapids-Waterloo-Iowa City-Dubuque, IA | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 42 | 51 | 2,978 | 3,245 |
| 19 | Champaign/Springfield-Decatur, IL*** | -Nexstar<br>-Sinclair | (from Sinclair; from Scripps on Nexstar; from Tribune on Sinclair) | 54 | 70 | 2,635 | 3,396 |
| 20 | Charleston, SC | -Gray (formerly Raycom)<br>-Nexstar<br>-Sinclair | X<br>(from Sinclair; from Scripps on Raycom; from Scripps on Nexstar) | 83 | 99 | 2,651 | 3,423 |
| 21 | Charleston-Huntington, WV*** | -Sinclair<br>-Nexstar | X<br>(from Sinclair; from Scripps on Nexstar; from Tribune on Sinclair) | 30 | 40 | 3,941 | 4,295 |
| 22 | Charlotte, NC*** | -Cox*<br>-Fox<br>-Gray (formerly Raycom)<br>-TEGNA | X<br>(from Cox; from Fox; from TEGNA; from Scripps on Raycom) | 85 | 53 | 2,375 | 2,375 |
| 23 | Chicago, IL | -CBS<br>-Fox<br>-Tribune | | 46 | 46 | 1,662 | 1,662 |

| 24 | Cincinnati, OH*** | -Gray (formerly Raycom) -Scripps -Sinclair | X (from Scripps; from Sinclair; from Scripps on Raycom; from Tribune on Sinclair) | 66 | 77 | 2,099 | 2,707 |
| 25 | Cleveland-Akron (Canton), OH*** | -Gray (formerly Raycom) -Scripps -TEGNA -Tribune | X (from Scripps) | 93 | 93 | 2,197 | 2,197 |
| 26 | Colorado Springs-Pueblo, CO | -Nexstar -Scripps** | X (from Scripps on Nexstar) | 20 | 49 | 2,438 | 2,438 |
| 27 | Columbia, SC*** | -Gray (formerly Raycom) -Sinclair -TEGNA | X (from Sinclair; from Scripps on Raycom) | 79 | 79 | 2,562 | 2,562 |
| 28 | Columbus, GA (Opelika, GA) | -Gray (formerly Raycom) -Nexstar | X (from Scripps on Raycom; from Scripps on Nexstar) | 69 | 69 | 2,888 | 2,888 |
| 29 | Columbus-Chillcothe, OH | -Nexstar -Sinclair | X (from Sinclair; from Scripps on Nexstar; from Tribune on Sinclair) | 42 | 65 | 2,462 | 3,577 |
| 30 | Corpus Christi, TX | -Scripps** -Sinclair -TEGNA | | 37 | 82 | 3,237 | 3,237 |
| 31 | Dallas-Ft. Worth, TX*** | -CBS -Fox -TEGNA -Tribune | | 68 | 68 | 1,831 | 1,831 |
| 32 | Davenport, IA Rock Island-Moline, IL*** | -Nexstar -Tribune | X (from Scripps on Nexstar; from Tribune on Nexstar) | 44 | 55 | 3,270 | 3,565 |

| 33 | Dayton, OH | -Cox*<br>-Nexstar<br>-Sinclair | X<br>(from Sinclair; from Scripps on Nexstar; from Tribune on Sinclair; from Scripps on Cox) | 80 | 44 | 3,251 | 3,568 |
| 34 | Denver, CO*** | -CBS<br>-Scripps<br>-TEGNA<br>-Tribune | X<br>(from TEGNA; from Scripps) | 92 | 92 | 2,346 | 2,349 |
| 35 | Des Moines-Ames, IA*** | -Nexstar<br>-Sinclair<br>-Tribune | X<br>(from Sinclair; from Scripps on Nexstar; from TEGNA on Nexstar) | 57 | 57 | 3,170 | 3,170 |
| 36 | Detroit, MI | -CBS<br>-Fox<br>-Scripps | X<br>(from Scripps; from Sinclair on CBS; from Tribune on Scripps) | 73 | 73 | 2,466 | 2,466 |
| 37 | Dothan, AL | -Gray (formerly Raycom)<br>-Nexstar | X<br>(from Raycom; from Scripps on Nexstar) | 35 | 35 | 4,866 | 4,866 |
| 38 | El Paso-Las Cruces, TX/NM*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair; from Scripps on Nexstar) | 52 | 52 | 2,335 | 2,335 |
| 39 | Evansville, IN | -Gray (formerly Raycom)<br>-Nexstar | X<br>(from Scripps on Nexstar) | 70 | 81 | 2,888 | 3,645 |
| 40 | Flint-Saginaw-Bay City, MI*** | -Meredith<br>-Sinclair | X<br>(from Sinclair; from Tribune on Sinclair) | 64 | 67 | 3,148 | 3,321 |

| 41 | Fresno-Visalia, CA | -Nexstar<br>-Sinclair | X<br>(from Sinclair; from Scripps on Nexstar; from Tribune on Sinclair) | 51 | 51 | 2,163 | 2,163 |
|----|----|----|----|----|----|----|----|
| 42 | Ft. Smith-Fayetteville-Springdale-Rogers, AR*** | -Nexstar<br>-Tribune | X<br>(from Scripps on Nexstar) | 60 | 71 | 2,951 | 3,353 |
| 43 | Gainesville, FL | -Fox<br>-Sinclair** | | 18 | 45 | 3,772 | 4,077 |
| 44 | Grand Rapids-Kalamazoo-Battle Creek, MI*** | -Nexstar<br>-Sinclair<br>-TEGNA<br>-Tribune | X<br>(from Sinclair; from Scripps on Nexstar) | 97 | 97 | 2,529 | 2,529 |
| 45 | Green Bay-Appleton, WI | -Nexstar<br>-Scripps<br>-Sinclair | X<br>(from Scripps; from Sinclair; from Scripps on Nexstar; from TEGNA on Nexstar; from Tribune on Sinclair) | 70 | 70 | 2,825 | 2,825 |
| 46 | Greensboro-High Point-Winston-Salem, NC*** | -Sinclair<br>-TEGNA<br>-Tribune | X<br>(from Sinclair) | 64 | 64 | 2,402 | 2,646 |
| 47 | Greenville-New Bern-Washington, NC*** | -Nexstar<br>-Sinclair<br>-Gray (formerly Raycom) | X<br>(from Sinclair) | 89 | 89 | 2,890 | 2,890 |
| 48 | Greenville- Spartanburg-Asheville-Anderson, SC/NC*** | -Meredith<br>-Sinclair<br>-Nexstar | X<br>(from Sinclair; from Tribune on Sinclair) | 65 | 70 | 2,357 | 2,587 |
| 49 | Harlingen-Weslaco-Brownsville-McAllen, TX *** | -Nexstar<br>-Sinclair | X<br>(from Sinclair; from Scripps on Nexstar) | 24 | 24 | 1,991 | 1,991 |
| 50 | Harrisburg-Lancaster-Lebanon-York, PA*** | -Nexstar<br>-Sinclair<br>-Tribune | X<br>(from Scripps on Nexstar) | 62 | 62 | 2,507 | 2,546 |

| 51 | Hartford-New Haven, CT*** | -Meredith<br>-Nexstar<br>-Tribune | X<br>(from Scripps on Nexstar) | 73 | 73 | 2,321 | 2,321 |
| 52 | Hattiesburg-Laurel, MS | -Gray (formerly Raycom)<br>-Nexstar | X<br>(from Scripps on Raycom; from Scripps on Nexstar) | 90 | 90 | 5,747 | 5,747 |
| 53 | Honolulu, HI | -Nexstar<br>-Gray (formerly Raycom) | X<br>(from Tribune on Raycom; from Scripps on Raycom) | 71 | 78 | 2,892 | 3,349 |
| 54 | Houston, TX*** | -Fox<br>-TEGNA<br>-Tribune | | 42 | 42 | 1,507 | 1,507 |
| 55 | Huntsville-Decatur-Florence, AL *** | -Gray (formerly Raycom)<br>-Nexstar<br>-Tribune | X<br>(from Scripps on Raycom; from Scripps on Nexstar) | 80 | 83 | 2,691 | 2,756 |
| 56 | Indianapolis, IN*** | -CBS<br>-Nexstar<br>-Scripps<br>-Tribune | X<br>(from Scripps; from TEGNA on Nexstar; from Scripps on Nexstar; from Sinclair on Tribune) | 63 | 63 | 2,573 | 2,573 |
| 57 | Jackson, MS | -Gray (formerly Raycom)<br>-Nexstar | X<br>(from Tribune on Raycom; from Scripps on Raycom; from Scripps on Nexstar) | 58 | 58 | 2,457 | 2,542 |
| 58 | Jacksonville, FL | -Cox*<br>-TEGNA | | 64 | 25 | 2,865 | 3,337 |

| 59 | Johnstown-Altoona- State College, PA | -Sinclair<br>-Nexstar | X<br>(from Sinclair; from Scripps on Nexstar; from Tribune on Sinclair; from Scripps on Sinclair) | 79 | 79 | 3,328 | 3,328 |
| 60 | Kansas City, MO*** | -Meredith<br>-Scripps<br>-Tribune | X<br>(from Scripps; from Sinclair on Meredith) | 66 | 66 | 2,413 | 2,413 |
| 61 | Knoxville, TN*** | -Gray (formerly Raycom)<br>-Nexstar<br>-TEGNA | X<br>(from Scripps on Nexstar) | 70 | 70 | 2,791 | 2,791 |
| 62 | Lafayette, LA | -Nexstar<br>-Scripps** | X<br>(from Scripps on Nexstar) | 35 | 78 | 3,479 | 3,479 |
| 63 | Lansing, MI*** | -Nexstar<br>-Scripps | X<br>(from Scripps) | 61 | 61 | 3,039 | 3,062 |
| 64 | Las Vegas, NV*** | -Meredith<br>-Nexstar<br>-Scripps<br>-Sinclair | X<br>(from Sinclair; from Scripps; from Tribune on Sinclair) | 84 | 84 | 2,004 | 2,004 |
| 65 | Lexington, KY | -Scripps**<br>-Sinclair | X<br>(from Sinclair; from Scripps) | 14 | 46 | 2,861 | 2,861 |
| 66 | Little Rock-Pine Bluff, AR*** | -Nexstar<br>-Sinclair<br>-TEGNA | X<br>(from Sinclair; from Scripps on Nexstar) | 83 | 97 | 2,648 | 3,605 |
| 67 | Los Angeles, CA | -CBS<br>-Fox<br>-Tribune | | 38 | 38 | 1,360 | 1,360 |
| 68 | Louisville, KY | -Gray (formerly Raycom)<br>-TEGNA** | X<br>(from Scripps on Raycom) | 18 | 37 | 2,490 | 2,490 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 69 | Lubbock, TX | -Gray (formerly Raycom) <br> -Nexstar | X <br> (from Scripps on Raycom; from Tribune on Raycom; from Scripps on Nexstar) | 64 | 79 | 2,648 | 3,554 |
| 70 | Macon, GA | -Sinclair <br> -TEGNA | X <br> (from Sinclair) | 80 | 80 | 3,784 | 3,784 |
| 71 | Memphis, TN | -Cox* <br> -Gray (formerly Raycom) <br> -Nexstar <br> -Sinclair* <br> -Tribune** | X <br> (from Scripps on Nexstar; from Scripps on Cox) | 98 | 71 | 2,548 | 2,548 |
| 72 | Miami - Ft. Lauderdale, FL*** | -CBS <br> -Tribune | X <br> (from Sinclair on CBS) | 18 | 18 | 1,582 | 1,579 |
| 73 | Milwaukee, WI *** | -Scripps <br> -Sinclair <br> -Tribune | X <br> (from Sinclair; from Scripps) | 49 | 49 | 2,218 | 2,218 |
| 74 | Minneapolis - St. Paul, MN | -Cox* <br> -Fox <br> -Sinclair <br> -TEGNA | X <br> (from Sinclair) | 77 | 77 | 2,267 | 2,267 |
| 75 | Missoula, MT | -Scripps** <br> -Sinclair | | 32 | 82 | 3,820 | 3,820 |
| 76 | Mobile-Pensacola (Ft. Walton Beach), FL*** | -Meredith <br> -Nexstar <br> -Sinclair | (from Sinclair; from Scripps on Nexstar; from TEGNA on Nexstar) | 98 | 98 | 3,579 | 3,579 |
| 77 | Myrtle Beach-Florence, SC | -Sinclair <br> -Gray (formerly Raycom) <br> -Nexstar | X <br> (from Sinclair; from Scripps on Raycom; from Scripps on Nexstar; from Tribune on Nexstar) | 80 | 86 | 2,691 | 2,961 |

85

| 78 | Nashville, TN*** | -Meredith<br>-Nexstar<br>-Scripps<br>-Sinclair | X<br>(from Scripps; from Sinclair; from TEGNA on Nexstar; from Tribune on Sinclair) | 95 | 98 | 2,393 | 2,505 |
| 79 | New Orleans, LA*** | -Gray (formerly Raycom)<br>-Tribune<br>-TEGNA | X<br>(from Scripps on Raycom) | 77 | 77 | 2,430 | 2,430 |
| 80 | New York, NY | -CBS<br>-Fox<br>-Tribune | X<br>(from Sinclair on CBS) | 49 | 49 | 1,824 | 1,824 |
| 81 | Norfolk-Portsmouth-Newport News, VA | -Dreamcatcher*<br>-Nexstar<br>-TEGNA<br>-Tribune**<br>-Sinclair | X<br>(from Sinclair; from Tribune on Dreamcatcher; from Sinclair on Dreamcatcher; from Scripps on Nexstar) | 98 | 98 | 3,203 | 3,203 |
| 82 | Odessa-Midland, TX | -Nexstar<br>-Gray (formerly Raycom) | X<br>(from Scripps on Nexstar) | 50 | 50 | 2,563 | 2,563 |
| 83 | Oklahoma City, OK*** | -Griffin<br>-Sinclair<br>-Tribune | X<br>(from Sinclair) | 75 | 75 | 2,470 | 2,470 |
| 84 | Omaha, NE | -Scripps<br>-Sinclair | X<br>(from Scripps; from Sinclair; from Tribune on Sinclair) | 28 | 32 | 2,865 | 2,935 |
| 85 | Orlando-Daytona Beach-Melbourne, FL | -Cox*<br>-Fox | X<br>(from Scripps on Cox; from Tribune on Cox) | 47 | 19 | 2,278 | 2,281 |
| 86 | Paducah-Cape Girardeau-Harrisburg, MO | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 46 | 46 | 2,932 | 2,932 |

| 87 | Panama City, FL | -Gray (formerly Raycom) -Nexstar | X (from Scripps on Nexstar) | 45 | 45 | 3,070 | 4,220 |
| 88 | Peoria-Bloomington, IL*** | -Nexstar -Sinclair | X (from Sinclair; from Scripps on Nexstar; from Sinclair on Nexstar) | 38 | 44 | 3,944 | 4,301 |
| 89 | Philadelphia, PA*** | -CBS -Fox -Tribune | X (from Sinclair on CBS) | 47 | 47 | 1,954 | 1,954 |
| 90 | Phoenix-Prescott, AZ*** | -Fox -Meredith -Nexstar -Scripps -TEGNA | X (from Scripps; from Sinclair on Meredith; from Scripps on Nexstar; from Tribune on Scripps) | 80 | 80 | 1,798 | 1,798 |
| 91 | Pittsburgh, PA*** | -CBS -Cox* -Sinclair | X (from Sinclair; from Tribune on Sinclair; from Scripps on Cox) | 77 | 49 | 2,672 | 2,672 |
| 92 | Portland, OR Vancouver, WA*** | -Meredith -Nexstar -TEGNA -Tribune -Sinclair | X (from Sinclair) | 97 | 97 | 2,121 | 2,121 |
| 93 | Portland-Auburn, ME*** | -Sinclair -TEGNA | X (from Sinclair) | 68 | 78 | 2,834 | 3,466 |
| 94 | Providence, RI-New Bedford, MA | -Nexstar -Sinclair | X (from Sinclair; from Scripps on Nexstar) | 71 | 85 | 2,853 | 3,713 |
| 95 | Raleigh-Durham, NC*** | -Nexstar -Sinclair | X (from Sinclair; from Scripps on Nexstar; from Tribune on Sinclair) | 24 | 24 | 3,117 | 3,117 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 96 | Richmond-Petersburg, VA*** | -Fox* <br> -Gray (formerly Raycom) <br> -Nexstar <br> -Sinclair <br> -Tribune | X <br> (from Sinclair; from Scripps on Raycom; from Scripps on Nexstar) | 95 | 95 | 2,386 | 2,402 |
| 97 | Roanoke-Lynchburg, VA*** | -Nexstar <br> -Sinclair | X <br> (from Sinclair; from Scripps on Nexstar) | 43 | 43 | 2,562 | 2,562 |
| 98 | Rochester, NY*** | -Nexstar <br> -Sinclair | X <br> (from Sinclair; from Scripps on Nexstar; from Tribune on Sinclair) | 41 | 73 | 2633 | 3,571 |
| 99 | Sacramento-Stockton-Modesto, CA*** | -CBS <br> -TEGNA <br> -Tribune | X <br> (from CBS; from TEGNA; from Tribune) | 59 | 59 | 2,206 | 2.206 |
| 100 | Salt Lake City-St. George, UT*** | -Nexstar <br> -Sinclair <br> -Tribune | X <br> (from Sinclair; from Scripps on Nexstar) | 71 | 71 | 2,317 | 2,317 |
| 101 | San Angelo, TX*** | -Nexstar <br> -Sinclair <br> -TEGNA | X <br> (from Scripps on Nexstar) | 70 | 97 | 3,986 | 6,974 |
| 102 | San Antonio, TX | -Sinclair <br> -TEGNA | X <br> (from Sinclair) | 54 | 59 | 2,304 | 2,637 |
| 103 | San Diego, CA*** | -Scripps <br> -TEGNA** <br> -Tribune | X <br> (from Scripps) | 26 | 51 | 1,822 | 1,883 |
| 104 | San Francisco-Oakland-San Jose, CA*** | -CBS <br> -Fox <br> -Nexstar | X <br> (from Sinclair on CBS) | 51 | 51 | 1,793 | 1,793 |

| 105 | Savannah, GA | -Gray (formerly Raycom) -Nexstar -Sinclair | X (from Sinclair; from Scripps on Raycom; from Scripps on Nexstar; from Tribune on Sinclair) | 87 | 87 | 3,033 | 3,033 |
| 106 | Seattle-Tacoma, WA*** | -CBS -Cox* -Sinclair -TEGNA -Tribune | X (from Sinclair; from Scripps on TEGNA; from Scripps on Cox) | 94 | 76 | 2,058 | 2,058 |
| 107 | Shreveport, LA | -Gray (formerly Raycom) -Nexstar | X (from Scripps on Raycom; from Scripps on Nexstar; from TEGNA on Nexstar) | 45 | 45 | 2,764 | 2,764 |
| 108 | Sioux City, IA | -Nexstar -Sinclair | X (from Sinclair; from Scripps on Nexstar) | 35 | 51 | 3,377 | 3,718 |
| 109 | Springfield-Holyoke, MA | -Meredith -Nexstar | X (from Scripps on Nexstar) | 97 | 97 | 4,689 | 4,689 |
| 110 | St. Louis, MO*** | -Meredith -Sinclair -TEGNA -Tribune | X (from TEGNA; from Sinclair) | 98 | 98 | 2,902 | 2,902 |
| 111 | Syracuse, NY | -Nexstar -Sinclair | X (from Sinclair; from Scripps on Nexstar) | 66 | 80 | 2,544 | 3,630 |
| 112 | Tallahassee, FL Thomasville-GA*** | -Gray (formerly Raycom) -Sinclair | X (from Sinclair; from Scripps on Raycom) | 41 | 52 | 3,267 | 3,873 |

| 113 | Tampa-St. Petersburg-Sarasota, FL*** | -CBS<br>-Fox<br>-Gray (formerly Raycom)<br>-Nexstar<br>-Scripps<br>-TEGNA | X<br>(from Scripps; from Scripps on Nexstar) | 89 | 89 | 1,674 | 1,677 |
| 114 | Toledo, OH*** | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair; from Scripps on Raycom) | 47 | 47 | 3,088 | 3,088 |
| 115 | Tri-Cities, TN-VA (Bristol, VA; Greenville, TN; Johnson City, TN; Kingsport; TN) *** | -Nexstar<br>-Sinclair | X<br>(from Sinclair) | 84 | 84 | 3,656 | 3,656 |
| 116 | Tucson, AZ | -Gray (formerly Raycom)<br>-Scripps<br>-TEGNA | X<br>(from Scripps; from Tribune on Scripps) | 53 | 53 | 1,913 | 1,913 |
| 117 | Tulsa, OK*** | -Cox*<br>-Griffin<br>-Scripps<br>-Sinclair | X<br>(from Scripps; from Sinclair; from Tribune on Sinclair; from Scripps on Cox) | 97 | 70 | 2,786 | 2,786 |
| 118 | Twin Falls, ID | -Scripps<br>-TEGNA | X<br>(from Scripps) | 38 | 38 | 4,688 | 4,688 |
| 119 | Tyler-Longview-Lufkin-Nacogdoches, TX | -Gray (formerly Raycom)<br>-Nexstar<br>-TEGNA | X<br>(from Scripps on Raycom; from Scripps on Nexstar) | 91 | 99 | 3,480 | 3,947 |
| 120 | Waco-Temple-Bryan, TX*** | -Gray (formerly Raycom)<br>-Nexstar<br>-TEGNA | X<br>(from Scripps; from Scripps on Nexstar) | 59 | 59 | 2,967 | 2,988 |
| 121 | Washington, DC*** | -Fox<br>-Sinclair<br>-TEGNA<br>-Tribune<br>-Nexstar | X<br>(from Sinclair; from Scripps on Nexstar) | 69 | 69 | 2,165 | 2,166 |

| 122 | West Palm Beach-Ft. Pierce, FL | -Scripps<br>-Sinclair<br>-Gray (formerly Raycom) | X<br>(from Scripps; from Sinclair; from Scripps on Raycom; from Tribune on Sinclair; from Scripps on Sinclair) | 70 | 78 | 2,230 | 2,658 |
| 123 | Wheeling, WV/ Steubenville, OH | -Nexstar<br>-Sinclair | X<br>(from Scripps on Nexstar) | 100 | 100 | 5,404 | 5,404 |
| 124 | Wichita Falls-Lawton, TX | -Gray (formerly Raycom)<br>-Nexstar | X<br>(from Scripps on Nexstar) | 71 | 81 | 3,011 | 3,853 |
| 125 | Wichita-Hutchinson, KS*** | -Nexstar<br>-Sinclair | X<br>(from Sinclair; from TEGNA on Nexstar) | 34 | 36 | 2,680 | 2,804 |
| 126 | Wilkes-Barre-Scranton-Hazleton, PA*** | -Dreamcatcher*<br>-Nexstar<br>-Tribune** | X<br>(from Sinclair; from Tribune on Dreamcatcher; from Scripps on Nexstar; from TEGNA on Nexstar) | 71 | 83 | 2,941 | 3,609 |
| 127 | Yakima-Pasco-Richland-Kennewick, WA | -Gray (formerly Raycom)<br>-Sinclair | X<br>(from Sinclair) | 65 | 65 | 2,793 | 2,793 |
| | | | **Weighted Average** | 60 | 60 | 2,213 | 2,303 |

Notes:

[1] Revenue share and HHI figures are calculated based on 2017 spot advertising revenue. Station ownership status is also reflected as of year-end 2017. Station operator status is only available as of the present day and present-day station operators are assumed to have also operated the station in 2017, with the exception of the following: Tribune stations pending purchase by Nexstar are counted as Tribune stations above. Raycom stations bought by Gray in January 2019 are counted as Raycom stations above. Stations owned by Paramount Stations in 2017 are counted as CBS owned stations. Sales representative status is also only available

as of the present day and present-day sales representatives are assumed to have also represented the station in 2017. "From" designations mean that the advertisement was purchased directly "from" the identified Broadcaster Defendant and also aired on a broadcast station operated by that same Broadcaster Defendant. "From" and "on" designations mean that the advertisement was purchased directly "from" the first identified Broadcaster Defendant, but was aired "on" a broadcast station operated by a different, second identified Broadcaster Defendant pursuant to a joint sales agreement or other joint venture or undertaking.

* Defendant owned but did not operate at least one station in DMA.

** Defendant operated but did not own at least one station in DMA. Unless otherwise noted, Defendant-associated stations in the DMA were both owned and operated by Defendants.

*** Cox or Katz worked with multiple Defendant owners or operators in DMA.