**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE:<br><br>LOCAL TV ADVERTISING ANTITRUST LITIGATION<br><br>*This Document Relates to All Actions* | MDL No. 2867<br>No. 18 C 6785<br><br>Honorable Virginia M. Kendall |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED SECOND AMENDED ANTITRUST**
**CLASS ACTION COMPLAINT AND MOTION TO STRIKE**

## TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................. 1

II.  THE CAC2'S WELL-PLED ALLEGATIONS STATE CLAIMS FOR RELIEF ................. 5

   A.  The CAC2 Pleads Each Broadcaster Defendant Raised Prices in Parallel. ......................... 5

   B.  The CAC2 Pleads Important Plus Factors Supporting the Inference That Defendants Entered into A Price Fixing Agreement. ............................................................................... 5

   C.  The CAC2 Pleads a Reciprocal Exchange of Confidential Information. ............................ 7

   D.  The CAC2 Pleads Antitrust Injury and Anticompetitive Effects. ....................................... 8

   E.  The CAC2 Pleads Market Power in a Well-Defined Product Market. ................................ 9

III. THE PLEADING STANDARD IN AN ANTITRUST CASE .............................................. 12

LEGAL ARGUMENT ....................................................................................................... 13

IV.  THE CAC2 PLEADS A *PER SE* UNLAWFUL PRICE FIXING AGREEMENT .............. 13

   A.  The CAC2 Plausibly Alleges Defendants Increased Their Prices in Parallel. .................... 14

   B.  The CAC2 Plausibly Alleges Numerous Important Plus Factors. ....................................... 18

      1.  Defendants' Information Exchange Supports an Inference of Price Fixing. .............. 18

      2.  Defendants' Price Increases in the Face of Declining Demand Are Actions Against Self-Interest and Support an Inference of Price Fixing. ................................ 19

      3.  The Context and Timing of Defendants' Opportunities to Collude Support an Inference of Price Fixing. ....................................................................................... 20

      4.  Declining Demand for Broadcast Television Spot Advertising Provides a Motive to Collude and Supports an Inference of Price Fixing. ............................... 22

      5.  The Structure of the Broadcast Television Spot Advertising (High Concentration and Entry Barriers) Supports an Inference of Price Fixing. ....................................... 22

   C.  The DOJ's Investigation is Probative of the Existence of a Price Fixing Agreement and the DOJ Consent Decrees Do Not Exonerate Defendants. ............................................ 23

V.   THE CAC2 PLEADS AN UNLAWFUL INFORMATION EXCHANGE ......................... 25

   A.  Plaintiffs Have Plausibly Alleged an Agreement to Exchange Information. ...................... 25

   B.  Plaintiffs Have Plausibly Alleged Resulting Anticompetitive Effects. ............................... 25

   C.  Plaintiffs Have Pled Market Power in a Plausibly Defined Antitrust Market Consisting of Broadcast Television Spot Advertising Sales. ............................................... 29

VI.  THE CAC2 PLEADS ANTITRUST INJURY ............................................................... 32

VII. DEFENDANTS' MOTION TO STRIKE IS PREMATURE ............................................... 35

CONCLUSION ................................................................................................................ 40

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aftermarket Filters Antitrust Litig.*,
No. 08 C 4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009)...........................................16, 34

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
No. 06-MD-1175, 2014 WL 7882100 (E.D.N.Y. Oct. 15, 2014),
*R&R adopted* 2015 WL 5093503 (E.D.N.Y. July 10, 2015).................................38

*Am. Needle, Inc. v. New Orleans La. Saints*,
No. 04-cv-7806, 2014 WL 1364022 (N.D. Ill. Apr. 4, 2014).................................31

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)...........................................................................35

*Anderson News, L.L.C. v. Am. Media, Inc.*,
123 F. Supp. 3d 478 (S.D.N.Y. 2015),
*aff'd,* 899 F.3d 87 (2d Cir. 2018) ........................................19

*Anderson News, L.L.C. v. Am. Media, Inc.*,
No. 09-cv-2227, 2015 WL 5003528 (S.D.N.Y. Aug. 20, 2015)...........................19

*Arreola v. Godinez*,
546 F.3d 788 (7th Cir. 2008) ...............................................34

*In re Auto. Parts Antitrust Litig.*,
No. 12-MD-02311, 2014 WL 4272784 (E.D. Mich. Aug. 29, 2014)......................24

*Baker v. Home Depot USA, Inc.*,
No. 11-C-6768, 2013 WL 271666 (N.D. Ill. Jan. 24, 2013)................................40

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544, 556 (2007)..................................................12

*In re Blood Reagents Antitrust Litig.*,
756 F. Supp. 2d 623 (E.D. Pa. 2010) ...................................17

*Bohn v. Boiron,* No. 11-cv-08704,
2013 WL 3975126 (N.D. Ill. Aug. 1, 2013) ...........................40

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) ........................................... *passim*

*Brown v. Swagway, LLC*,
　　No. 3:15-CV-588, 2017 WL 899949 (N.D. Ind. Mar. 7, 2017)...............................................35

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
　　429 U.S. 477 (1977)....................................................................................................................32

*Butler v. Sears, Roebuck and Co.*,
　　727 F.3d 796 (7th Cir. 2013) ......................................................................................................37

*In re Capacitors Antitrust Litig.*,
　　106 F. Supp. 3d 1051 (N.D. Cal. 2015) ......................................................................................33

*Cason-Merenda v. Detroit Med. Ctr.*,
　　862 F. Supp. 2d 603 (E.D. Mich. 2012)......................................................................................18

*Cinema Village Cinemark, Inc. v. Regal Entm't Grp.*,
　　No. 15-cv-05488, 2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016) ..............................................31

*City of Rockford v. Mallinckrodt ARD, Inc.*,
　　360 F. Supp. 3d 730 (N.D. Ill. 2019) ..........................................................................................13

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
　　370 U.S. 690 (1962)....................................................................................................................14

*In re Cox Enters, Inc. Set-Top Cable Television Box Antitrust Litig.*,
　　No. 09-ML-2048-C, 2011 WL 6826813 (W.D. Okla. Dec. 28, 2011) ........................................39

*In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*,
　　No. 12-ML-2048-C, 2014 WL 104964 (W.D. Okla. Jan. 9, 2014) .............................................39

*De Falco v. Vibram USA, Inc.*,
　　No. 12-C-7238, 2013 WL 1122825 (N.D. Ill. Mar. 18, 2013) ...................................................37

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
　　313 F. Supp. 3d 931 (N.D. Ill. 2018) ...............................................................................4, 22, 29

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
　　No. 18-cv-864, 2018 WL 6629250 (N.D. Ill. Oct. 22, 2018) ..............................................13, 17

*Dochak v. Polskie Linie Lotnicze Lot S.A.*,
　　189 F. Supp. 3d 798 (N.D. Ill. 2017) ..........................................................................................37

*In re Domestic Airline Travel Antitrust Litig.*,
　　221 F. Supp. 3d 46 (D.D.C. 2016)..........................................................................................17, 18

*E&G, Inc. v. Am. Hotel Register Co.*,
　　No. 17-cv-1011, 2018 WL 1334934 (N.D. Ill. Mar. 15, 2018) ...........................................35, 39

iii

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
    504 U.S. 451 (1992)..........................................................................32

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)..............................................17

*Fleischman v. Albany Med. Ctr.*,
    728 F. Supp. 2d 130 (N.D.N.Y. 2010)..............................................18

*Fontana Aviation, Inc. v. Cessna Aircraft Co.*,
    617 F.2d 478 (7th Cir. 1980) ........................................................4, 34

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d Cir. 2016)..........................................................29, 32

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1982).........................................................................35

*Hackman v. Dickerson Realtors, Inc.*,
    595 F. Supp. 2d 875 (N.D. Ill. 2009) ..............................................13

*Haley Paint Co. v. E.I. DuPont de Nemours & Co.*,
    804 F. Supp. 2d 419 (D. Md. 2011) ................................................17

*Hicks v. PGA Tour, Inc.*,
    897 F.3d 1109 (9th Cir. 2018) ........................................................31

*In re High Fructose Corn Syrup Antitrust Litig.*,
    295 F.3d 651 (7th Cir. 2002) ..................................................1, 2, 23

*Hogan v. Cleveland Ave. Restaurant Inc.*,
    No. 15-cv-2883, 2018 WL 1475398 (S.D. Ohio Mar. 26, 2018)...........18

*Int'l Equip. Trading, Ltd. v. AB Sciex LLC*,
    No. 13 C 1129, 2013 WL 4599903 (N.D. Ill. Aug. 29, 2013)..........29, 30

*Jamsports & Entm't., LLC v. Paradama Prods., Inc.*,
    No. 02 C 2298, 2003 WL 1873563 (N.D. Ill. Apr. 15, 2003)................31

*Jones v. BRG Sports, Inc.*,
    No. 18-cv-7250, 2019 WL 3554374 (N.D. Ill. Aug. 1, 2019) ................40

*Kasalo v. Harris & Harris, Ltd.*,
    656 F.3d 557 (7th Cir. 2011) ..........................................................36

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
    910 F.3d 927 (7th Cir. 2018) ......................................................2, 20

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
   775 F. Supp. 2d 1071 (N.D. Ill. 2011) .......................................................................14, 17, 20

*Kleen Prods. LLC v. Int'l Paper*,
   306 F.R.D. 585 (N.D. Ill. 2015)..................................................................................................36

*Lee v. Children's Place Retail Stores*,
   No. 14-cv-3258, 2014 WL 5100608 (N.D. Ill. Oct. 8, 2014) ...................................................40

*Lewis v. Casey*,
   518 U.S. 343 (1996)......................................................................................................................34

*Lucas v. Vee Pak, Inc.*,
   68 F. Supp. 3d 870 (N.D. Ill. 2014) ...........................................................................................35

*McDonnell v. Nature's Way Prods, LLC*,
   No. 16-C-5011, 2017 WL 1149336 (N.D. Ill. Mar. 28, 2017) ...............................................34

*In re: Mexican Gov't Bonds Antitrust Litig*,
   2019 WL 4805854 (S.D.N.Y. Sept. 30, 2019)..........................................................................17

*Mid-West Radio Co., Inc. v. Forum Pub. Co.*,
   942 F.2d 1294 (8th Cir. 1991) ...................................................................................................30

*Miller v. Motorola*,
   76 F.R.D. 516 (N.D. Ill. Jan. 24, 2013) ....................................................................................40

*Minn-Chem, Inc. v. Agrium Inc.*,
   683 F. 3d 845 (7th Cir. 2012) .....................................................................................................17

*Murdock-Alexander v. Tempsnow Employment*,
   No. 16-CV-5182, 2016 WL 6833961 (N.D. Ill. Nov. 21, 2016) .............................................37

*In re Musical Instruments & Equipment Antitrust Litigation*,
   798 F.3d 1186 (9th Cir. 2015) ...................................................................................................18

*Mussatt v. IQVIA Inc.*,
   No. 17-C-8841, 2018 WL 5311903 (N.D. Ill. Oct. 26, 2018) ..........................................35, 37

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
   795 F.3d 1124 (9th Cir. 2015) ...................................................................................................18

*Nitsch v. Dreamworks Animation SKG Inc.*,
   315 F.R.D. 270 (N.D. Cal. 2016)................................................................................................26

*In re Northwest Airlines Corp.*,
   208 F.R.D. 175 (E.D. Mich. 2002) ............................................................................................38

*Omnicare, Inc. v. UnitedHealth Group, Inc.*,
  629 F.3d 697 (7th Cir. 2011) ...................................................................2, 18, 19

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
  281 F.3d 629 (7th Cir. 2002) ...............................................................................34

*Payton v. Cty. of Kane*,
  308 F.3d 673 (7th Cir. 2002) ...............................................................................34

*In re Pharm. Indus. Average Wholesale Price Litig.*,
  491 F. Supp. 2d 20 (D. Mass. 2007),
  *aff'd*, 582 F.3d 156 (1st Cir. 2009).............................................................17, 26

*Pilgrim v. Universal Health Card, LLC*,
  660 F.3d 943 (6th Cir. 2011) ...............................................................................40

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) .......................................................... *passim*

*In re: Pork Antitrust Litigation*,
  No. 18-cv-1776, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) .....................17

*In re Ready-Mixed Concrete Antitrust Litig.*,
  261 F.R.D. 154 (S.D. Ind. 2009)...........................................................................36

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*,
  87 F. Supp. 3d 874 (N.D. Ill. 2015) ................................................9, 11, 29, 30

*In re Ry. Indus. Emp. No-Poach Antitrust Litig.*,
  395 F. Supp. 3d 464 (W.D. Pa. 2019).................................................................39

*Sci. Prod. Co. v. Chevron Chem. Co.*,
  384 F. Supp. 793 (7th Cir. 1974) ...................................................................29, 30

*Serfecz v. Jewel Food Stores*,
  67 F.3d 591 (7th Cir. 1995) ..................................................................................22

*Standard Iron Works v. ArcelorMittal*,
  639 F. Supp. 2d 877 (N.D. Ill. 2009) ...................................................................14

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010).................................................................................24

*State of Ala. v. Blue Bird Body Co., Inc.*,
  573 F.2d 309, 323 (5th Cir. 1978) .......................................................................38

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) .................................................................25

*Suchanek v. Sturm Foods, Inc.*,
  764 F.3d 750 (7th Cir. 2014) ................................................................................38

*In re Sulfuric Acid Antitrust Litig.*,
  No. 03-C-4576, 2007 WL 898600 (N.D. Ill. Mar. 21, 2007) ...........................36, 38

*Swanson v. Citibank, N.A.*,
  614 F.3d 400 (7th Cir. 2010) ..............................................................4, 13, 16, 18

*Szabo v. Bridgeport Machs., Inc.*,
  249 F.3d 672, 674 (7th Cir. 2001). .......................................................................40

*Tanaka v. Univ. of S. Cal.*,
  252 F.3d 1059 (9th Cir. 2001) .............................................................................31

*Texaco v. Dagher*,
  547 U.S. 1 (2006).................................................................................................21

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ...................................................................... *passim*

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) ..........................................................................21, 22

*Tichy v. Hyatt Hotels Corp.*,
  376 F. Supp. 3d 821 (N.D. Ill. 2019) ...................................................6, 7, 20, 22

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001)......................................................................... *passim*

*Toys "R" US, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ..........................................................................9, 26

*United States v. H&R Block, Inc.*,
  833 F. Supp. 2d 36 (D.D.C. 2011) ........................................................................31

*US Airways, Inc. v. Sabre Holdings Corp.*,
  938 F.3d 43 (2d Cir. 2019)...................................................................................11

*Valley Liquors, Inc. v. Renfield Imps., Ltd.*,
  822 F.2d 656 (7th Cir. 1987) ...............................................................................32

*Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*,
  328 F. Supp. 3d 824 (N.D. Ill. 2018) ....................................................14, 21, 22, 32

*Wright v. Family Dollar, Inc.*,
  No. 10 C 4410, 2010 WL 4962838 (N.D. Ill. Nov. 30, 2010)...........................37, 40

*Zemeckis v. Global Credit & Collection Corp.*,
   679 F.3d 632 (7th Cir. 2012) ...................................................................12

**Federal Rules of Civil Procedure**

Rule 8 ...............................................................................................................21

Rule 9(b) ..........................................................................................................21

Rule 12(b)(6) ...................................................................................................29

Rule 23 ......................................................................................................34, 36

Rule 23(a)(4) ...................................................................................................40

Rule 23(b)(3) ...................................................................................................39

Rule 23(c)(4) ...................................................................................................38

**Other Authorities**

Phillip Areeda & Herbert Hovenkamp, Antitrust Law
   (3d & 4th eds., 2018 Cum. Supp. 2010–17) ..............................4, 25, 32

Joseph E. Stiglitz, *Information and the Change in the Paradigm in Economics*,
   The American Economic Review, Vol. 92, No. 3 (June 2002) ...............26

Kadhim Shubber, *Price-Fixing Prosecutions under Trump Are at a Historic Low
   for Third Year*, Los Angeles Times (Nov. 6, 2019) ...............................24

Leah Nylen, *Under Delrahim, DOJ Wary About Filing Criminal Antitrust
   Charges, Indictments*, MLex Market Insight (Mar. 21, 2019) ...............24

William B. Rubenstein, Newberg on Class Actions (5th ed.) ................35, 40

## I.     INTRODUCTION

Despite the fact that the Department of Justice's ("DOJ") ongoing investigation into anticompetitive conduct has now resulted in twelve settlements, ECF No. 292 ("CAC2") ¶¶ 3-4, 22-26, 28-37, Defendants[1] still characterize this antitrust MDL as a *Wall Street Journal* article case where the facts did not "break in [Plaintiffs'] favor." ECF No. 329 ("Mem.") at 1. Contrary to Defendants' assertions, the settlements resolve serious allegations by the DOJ that the Broadcaster Defendants violated Section 1 of the Sherman Act, "distorted the normal price-setting mechanism," "harmed the competitive process," were able to "resist . . . attempts to obtain lower prices" and "harmed the local businesses and consumers they served." *Id.* ¶¶ 4, 5, 73-74, 90, 95. The DOJ also asserted that the conduct was "systematic" and predicated on an "extensive history of communications among rival stations" "in DMAs across the United States"—causing anticompetitive effects predicated on the same theory of harm and antitrust product market advanced by Plaintiffs. *Id.* ¶¶ 4, 5, 10, 55-58, 73-74, 90, 95.

Defendants' motion to dismiss is largely premised on a conclusion that the DOJ ***did not actually reach***: one exonerating Defendants of price fixing. Feb. 22, 2019 H'r Tr. at 34:5 ("THE COURT: [The DOJ] didn't say there's no price fixing."); *see* Mem. at 1 ("the DOJ did not allege price fixing"); *id.* at 10, 12, 17, 22. But the Seventh Circuit has consistently rejected arguments that just "because the Justice Department has not moved against [an] alleged [] price-fixing conspiracy, there must not have been one." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 664-65 (7th Cir. 2002).[2] This Court should not credit decisions not actually made by

---

[1] "Defendants" refers to all named Defendants. *See* CAC2 ¶ 2. "Broadcaster Defendants" refers to those entities ***except*** Gray Television, Inc. and Katz Media Group, Inc. ("Katz"). *Id.* ¶ 40. "Sales Rep Firms" refers to Katz and Cox Media Group, LLC's subsidiary Cox Reps, Inc. *Id.* ¶¶ 23, 37, 41.

[2] This is because "limited resources," the more onerous "beyond a reasonable doubt" standard in criminal price fixing cases, and the likelihood "that the antitrust class action bar had both the desire and

the DOJ; the task before the Court is to determine whether the CAC2 contains sufficient factual content from which the Court can draw the reasonable inference that Defendants engaged in a conspiracy to fix prices (**Count One**) and an unreasonable information exchange (**Count Two**). While Defendants conflate Plaintiffs' Counts and their applicable antitrust pleading standards, Plaintiffs clearly set forth below how each Count has met the pleading standards in this Circuit.

**For Count One (Price Fixing),** the CAC2 contains enough facts, taken as true, to meet the pleading standard in this Circuit. Plaintiffs can show that the Defendants had "a unity of purpose," or a "common design and understanding" to keep prices artificially high. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 789 (N.D. Ill. 2017); *Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("even a wink and a nod [suffice]— formal agreements have never been required") ("*Kleen III*"). Like other antitrust cases, the CAC2 pleads parallel price increases and the presence of important plus factors.

Specifically, here Plaintiffs plead parallel price increases in the face of declining demand, with broadcast television spot advertising prices rising sharply from the first quarter of 2014 to the first quarter of 2015, after the formation of the cartel. CAC2 ¶ 113 & Figs. 3.a-3.c. The CAC2 also contains allegations that the Broadcaster Defendants—both directly and through the Sales Rep Firms—engaged in a reciprocal and systematic exchange of competitively sensitive information, *id.* ¶¶ 2-4, 7-8 10-11, 47, 50, 52-67, which the Seventh Circuit has repeatedly held "support[s] an inference of a price-fixing agreement," *e.g.*, *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 709, 711 (7th Cir. 2011) ("we keep it in mind as we work toward completing the evidentiary picture") (citation omitted). This evidence also includes that the

---

the resources to prosecute such a suit vigorously" also drive the DOJ's decision to charge criminally. *High Fructose*, 295 F.3d at 664-65. Here, the DOJ was assured of the private bar's desire and resources, since Plaintiffs were on file **before** the DOJ announced any of its twelve settlements.

parallel price increases, in the face of declining demand, were irrational and against each Broadcaster Defendant's self-interest if they had acted alone, CAC2 ¶¶ 105-11, 113 & Figs. 3.a-3.c, 149-159, which Defendants concede is an especially probative factor, ECF No. 268 at 18 n.3 ("among the most important plus factors are . . . [actions] contrary to [unlateral] self-interest"). The CAC2 provides further context setting the stage for a price fixing agreement, including Defendants' motive to collude (declining television viewership), opportunities to collude, CAC2 ¶¶ 149-55, 160-73, and an industry structure conducive to collusion, id. ¶¶ 174-98.

"[A] price fixing conspiracy would be expected to leave little publicly available evidence of its existence. Price fixing conspiracies are therefore often inferred from context." *Broiler Chicken*, 290 F. Supp. 3d at 804. These allegations provide this context and viewed together, sufficiently state a price fixing claim in this Circuit. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-29 (7th Cir. 2010) ("*Text Messaging I*").

**For Count Two (Information Exchange),** the CAC2 contains enough facts, taken as true, to meet the pleading standards in this Circuit. The CAC2 specifically pleads that the Broadcaster Defendants engaged in a reciprocal exchange of one another's individual, confidential and competitively sensitive, historic, real-time, and forward-looking pacing information. CAC2 ¶¶ 5-8, 10-11, 22-26, 28-37, 47, 50, 52-65, 73-74, 90, 95. The CAC2 alleges that the conduct occurred in 68 particular DMAs, of which Plaintiffs purchased in 67, as well as the existence of an additional 59 potentially affected DMAs, of which Plaintiffs purchased in 51. *Id.* ¶¶ 58, 66 & App. A. Plaintiffs further allege that Defendants had market power, *id.* ¶¶ 142, 174-88 & App. A (shares averaged 60 and as high as 100 percent), and that the exchange of information removed the would-be competitors' uncertainty about their relative competitive positions, thereby altering their incentives to compete on price and harming Plaintiffs, *id.* ¶ 73.

Finally, as the DOJ did, Plaintiffs allege that this exchange harmed competition in a properly defined relevant market consisting of broadcast television spot advertising. These allegations state a claim. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.).

Defendants' suggestion that the CAC2 fails to allege they "agreed ***with each other*** to share information," Mem. at 22-23, simply misunderstands that because the exchange requires knowing reciprocation, the "information exchange ***itself*** embodies a conspiracy to [] exchange, and that conspiracy may be illegal if unreasonable because it is likely to contribute to anticompetitive results without adequate justification." Ex. 1, P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1436b2 (3d & 4th eds., 2018 Cum. Supp. 2010–17) (emphasis added).

Defendants' other arguments contesting the CAC2's plausibility all merely contest the truth of the CAC2's factual allegations or offer alternative inferences the Court should draw from them. But such arguments are not an appropriate basis for dismissal at the motion to dismiss stage. *Broiler Chicken*, 290 F. Supp. 3d at 796 n.8 ("arguments that test the truth of Plaintiffs' allegations" are "for summary judgment"); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (a court is not "to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences"); *In re Dealer Mgmt. Sys. Antitrust Litig.*, 313 F. Supp. 3d 931, 958 (N.D. Ill. 2018) (St. Eve, J.) (fact-bound "arguments are. . . ill-timed for th[e pleading] stage of the case.").

And Defendants' arguments that Plaintiffs have not suffered antitrust injury ignore: (a) that Plaintiffs ***have*** pled that the challenged anticompetitive conduct occurred in particular DMAs in which they purchased; (b) the import of joint-and-several liability; (c) that questions about absent class members are logically antecedent to standing concerns and hence not yet ripe; and (d) that under the well-trodden rule set forth in *Fontana Aviation, Inc. v. Cessna Aircraft*

*Co.*, 617 F.2d 478, 481 (7th Cir. 1980), there are no "indirect" purchases here.

Finally, Defendants' motion to strike the class allegations is a transparent recognition that the CAC2 states plausible claims to relief that will reach class certification. Such motions are disfavored and granted only under rare circumstances inapplicable to antitrust claims.

For these reasons and those below, Defendants' motion should be denied in its entirety.

## II. THE CAC2'S WELL-PLED ALLEGATIONS STATE CLAIMS FOR RELIEF

### A. The CAC2 Pleads Each Broadcaster Defendant Raised Prices in Parallel.

The CAC2 pleads that, after the formation of Defendants' price fixing cartel in early 2014, broadcast television spot advertising prices rose sharply from the first quarter of 2014 to the first quarter of 2015, departing from their flat-to-downward trajectory in earlier, pre-cartel periods. CAC2 ¶ 113 & Figs. 3.a-3.c. Each Broadcaster Defendant is individually tied to this sudden market shift in at least two ways. *First*, despite declining viewership and demand, the Broadcaster Defendants' aggregate revenues jumped meaningfully during the cartel period while all but one (discussed *infra*) of their **individual** revenues outpaced the industry, sometimes dramatically. *Id.* ¶¶ 112 & Figs. 2.a-2.k, 114 & Fig 4. This indicates that each Broadcaster Defendant was raising its prices at a time when market dynamics dictated that prices (and in turn revenues) should decrease. *Id.* ¶¶ 105-14, 149-55. *Second*, the DOJ asserted that **each** Broadcaster Defendant "distorted the normal price-setting mechanism," "harmed the competitive process," was able to "resist . . . advertisers' attempts to obtain lower prices" and "harmed the local businesses and consumers they served." *Id.* ¶¶ 4, 5, 22-26, 28-37, 73-74, 90, 95. The DOJ's assertions are inconsistent with competitive pricing and support an inference of inflated prices.

### B. The CAC2 Pleads Important Plus Factors Supporting the Inference That Defendants Entered into A Price Fixing Agreement.

The CAC2 includes numerous important plus factors that move the needle on Plaintiffs'

*per se* price fixing claim from merely possible to plausible. These plus factors include the exchange of confidential, competitively sensitive information (described in detail in Sections II.C, IV.B.1, and V., *infra*). And that the Broadcaster Defendants' decision to raise pricing in the face of declining viewership and demand was against their unilateral self-interest in the absence of an agreement. CAC2 ¶¶ 105-11, 113 & Figs. 3.a-3.c, 149-59. Other plus factors include Defendants' numerous opportunities to collude, such as their participation in the Television Bureau of Advertising, Inc. ("TVB"), National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"). CAC2 ¶¶ 166-73. Defendants also participated in the "TIP Initiative," where they voiced their "shared commitment to working together" to grow sales. *Id.* ¶¶ 161-62; *see also In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1001 (N.D. Ill. 2011) (opportunity to conspire at "private meetings" is a factor).

And Defendants interacted through joint service agreements ("JSAs"), a practice where stations are "separately owned on paper but operated jointly" that "proliferated in 2011, and was widespread by 2013." *Id.* ¶¶ 163-64. This practice reached its tipping point suspiciously close to the cartel's formation in early 2014 and the abrupt resulting increase in market prices. Opportunities to collude are particularly significant where "suspicious timing" of opportunities and subsequent "market movements" "help to fill-out the picture of Defendants' alleged conspiratorial agreement." *Broiler Chicken*, 290 F. Supp. 3d at 799-800.

Disruptive events such as the rise of "cord-cutters" and "cord-nevers" and pressure from complementary services like digital advertising gave Defendants motive and incentive to collude, yet another plus factor. CAC2 ¶¶ 105-11 & Fig. 1, 149-55; *see also Tichy v. Hyatt Hotels Corp.,* 376 F. Supp. 3d 821, 835-36 (N.D. Ill. 2019) ("motive and incentive to 'collude'" relevant if not pled "in isolation"). These events caused declining viewership and demand for broadcast

television spot advertising and **should have** caused declining prices. *Id.* And finally, the market structure facilitates collusion. *Text Messaging I*, 630 F.3d at 627-28 ("an industry structure that facilitates collusion constitutes supporting evidence of collusion"). The Broadcaster Defendants average 60 percent share across all DMAs (peaking at 100 percent in certain DMAs) and **every DMA** meets the DOJ's threshold for moderate concentration and between 80 and 89 for high concentration. CAC2 ¶¶ 142, 174-88 & App. A. The market is also characterized by high barriers to entry, including government policy and the need to obtain FCC licenses, the inability of an entrant to access sufficient content to make its platform attractive to viewers (and in turn, advertisers), the need for significant capital expenditures, and problems of economies of scale. *Id.* ¶¶ 189-97. To be sure, the last meaningful market entry was **23 years ago**. *Id.* ¶ 198.

### C. The CAC2 Pleads a Reciprocal Exchange of Confidential Information.

The CAC2 pleads that the Broadcaster Defendants engaged in a reciprocal exchange of one another's individual, confidential and competitively sensitive, historic, real-time, and forward-looking pacing information. CAC2 ¶¶ 5-8, 10-11, 22-26, 28-37, 47, 50, 52-65, 73-74, 90, 95. The exchange occurred both through the Sales Rep Firms and directly between the Broadcaster Defendants—with the direct exchange covering not just "local" pacing information, but also "regional" and national" data. *Id.* ¶¶ 4, 50, 59-60. The Sale Rep Firm exchange occurred "at least once per quarter, but frequently more often." *Id.* ¶¶ 18-20, 55-58, 60. Such exchanges are both an important plus factor that constitutes evidence of a *per se* unlawful price fixing cartel and separately unlawful under the rule of reason. *Todd*, 275 F.3d at 198.

The exchange included pacing data for individual stations, which compares a broadcast station's revenues booked for a past time period to the revenues booked for the same point in time in current **and future** periods, typically expressed as a plus or minus percentage (*e.g.*, plus

or minus 20%). CAC2 ¶¶ 2, 54. By comparing revenues for previous periods to current and future periods, the Broadcaster Defendants were able to determine whether a competing station's remaining inventory was "pacing" ahead or below their inventory in the prior period, *id.* ¶¶ 2, 54, with remaining inventory being a, if not *the*, most critical factor in determining pricing, *id.* ¶ 4.

The CAC2 specifically pleads that the challenged conduct occurred in no fewer than the 68 "DMA[s] in which a Sales Rep Firm represented two or more Broadcaster Defendant owners or operators, as identified in Appendix A," of which Plaintiffs purchased in 67. CAC2 ¶¶ 58, 66 & App. A. The CAC2 continues to allege that the challenged conduct—which as the DOJ noted was "systematic" and predicated on an "extensive history of communications among rival stations" "in DMAs across the United States," *id.* ¶¶ 10, 55-58, 60 could have affected as many as another 59 DMAs, of which Plaintiffs purchased in 51, *id.* App. A.

### D. The CAC2 Pleads Antitrust Injury and Anticompetitive Effects.

The CAC2 alleges in detail how the Broadcaster Defendants derived an asymmetrical information advantage through the information exchange that removed competitive uncertainty and altered their competitive incentives, as well as the causal relationship between those altered incentives and the observed price increases. For example, the CAC2 pleads:

> [I]f a firm knows that both it and its rival have low remaining inventory (and knows that its rival shares this knowledge), the low inventory firms' incentives to compete on price are further dampened because the rivals know neither's inventory situation is likely to compel it to engage in a price war with the other (*i.e.*, they are more confident that there is not a moderate to high inventory firm in the mix that is more incentivized to compete on price). Indeed, if rivals know that one another have high or moderate remaining inventory (and know that each firm shares that knowledge), the scheme works effectively the same: the firms can be confident one another are on a level playing field, in essentially the same position of strength in terms of price negotiations (although their customers remain unaware of this), and thereby chill the incentive to compete aggressively on price by removing competitive uncertainty.

CAC2 ¶ 70.[3] The CAC2 goes on to explain how altered competitive incentives and the removal of competitive uncertainty "soften competition" even in DMAs occupied by non-colluding rivals, as the resulting higher prices create residual demand "that in turn increases the prices offered by the non-colluding firms[,]" who then fail to discipline the market's cartel-like results. *Id.* ¶ 75.

And the DOJ asserted that each Broadcaster Defendant harmed competition, the price setting process, and their advertising customers like Plaintiffs through this very same theory of harm: "By exchanging pacing information, the broadcasters were better able to anticipate whether their competitors were likely to raise, maintain, or lower spot advertising prices," allowing them resist "lower prices" and "harm[] the competitive price-setting process." CAC2 ¶ 73; *id.* ¶¶ 4, 5, 22-26, 28-37, 39, 73-74, 90, 95; *Toys "R" US, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) ("coordination of action among competitors" that prevents them "from having to lower [their] prices" is "proof of actual anticompetitive effects"). So far, the DOJ's ongoing investigation into these serious claims has resulted in settlements with all **twelve** broadcasters.

### E. The CAC2 Pleads Market Power in a Well-Defined Product Market.

The CAC2 plausibly pleads the Broadcaster Defendants possess market power in each geographic market and a well-defined product market of broadcast television spot advertising.

As to the product market, the CAC2 shows that broadcast television spot advertising is not reasonably interchangeable with other forms of advertising for the use to which it is put. Interchangeability, or "[t]he use or uses to which a product is put[,] controls the boundaries of the relevant market." *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 87 F. Supp.

---

[3] *See also* CAC2 ¶ 69 (explaining the inverse relationship between inventory and price levels for broadcast television spot advertising); *id.* ¶ 71 (explaining how the removal of uncertainty about **disparately situated** firms' competitive situations also allows those firms to "safely avoid the temptation to compete" that would persist if they "remained uncertain about their respective competitive situations"); *id.* ¶¶ 3, 65, 72, 77 (explaining that the exchange was nonpublic and violated the DOJ and Federal Trade Commission ("FTC") safe harbors, depriving it of any procompetitive potential).

3d 874, 886 (N.D. Ill. 2015) (Kendall, J.) (citation omitted).

*First*, broadcast television spot advertising serves a different purpose than other forms of advertising: to drive brand awareness by reaching the broadest audience, spanning the widest demographics, possible. CAC2 ¶ 123. Because broadcast television is available for free over-the-air through an antenna in addition to through a cable television or streaming package, it "reaches the largest population of any form of advertising in a DMA . . . making it particularly effective for promoting brand awareness in a lasting way." *Id.* ¶¶ 123, 125, 136. Broadcast television penetrates ninety percent of the households in a DMA. *Id.* ¶ 135. It also offers "popular programming such as local news, sports, and primetime" shows that capture large audiences, while fewer and fewer households subscribe to a traditional cable provider, instead foregoing cable programming and receiving broadcast television programming for free. *Id.* ¶¶ 124, 135.

Comparatively, cable television stations reach far fewer households within a DMA because cable channels offer "specialized programming that appeal to niche audiences." CAC2 ¶ 125; *see also id.* ¶ 137 (broadcast also has a larger advertising inventory available to purchase vis-à-vis cable). Digital advertising likewise targets narrow demographic subsets of a population based on known traits and serves a purpose other than generating brand awareness: to "generate an immediate response (in the form of a click through or purchase)." *Id.* ¶ 123. Newspapers, radio, billboards, and other mediums likewise target a narrow audience. *Id.* ¶ 122.

*Second*, broadcast television spot advertising has different characteristics and traits as compared with other advertising mediums that make it particularly suitable for its purpose. Broadcast television advertising "combines sight, sound, and motion that appeal to viewers and attract their attention in ways that other advertising mediums do not." CAC2 ¶ 121. Mediums like radio, newspaper, billboard, and direct-mail, for example, do not combine sight, sound, and

motion, and lack the ability to "capture consumers with emotive storytelling." *Id.* ¶ 122. Most forms of digital advertisement (*e.g.*, search page banner ads), also lack these traits. *Id.* ¶ 123.

Even those forms of digital advertising that do combine sight, sound, and motion possess characteristics and traits that put them at a severe limitation. For one, they can be skipped, minimized, or outright blocked by computer programs. CAC2 ¶¶ 123, 133. When a digital advertisement appears, many people immediately close the unwanted distraction, with the advertisement playing only as long as it takes to find the "close" icon. *Id.* ¶ 134. As a result, the average playing time for digital advertisements that include video, sound, or both is 1.7 seconds, with industry participants noting "it's kinda hard to get a message across in 1.7 seconds." *Id.*

*Third*, Plaintiffs are not the first to describe the market in this way. Industry participants and government regulators (including the DOJ) consistently recognize that broadcast television spot advertising is its own, unique product market. CAC2 ¶¶ 120, 126, 139-41. For example, Mark Lieberman, the President and CEO of Viamedia, the nation's largest cross-media advertising company that offers advertising solutions through both television and digital media outlets, stated in May 2019 that he views the products as "complement[s], not a[s] substitute[s]." *Id.* ¶ 128 ("***TV and digital are not equal***, and they are not yet considered a holistic buy").[4] The DOJ has consistently recognized broadcast television spot advertising as a distinct product market—as recently as this summer. *Id.* ¶¶ 139-41; *see also US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 65 n.7 (2d Cir. 2019) (crediting market definition where DOJ "conclude[d,]

---

[4] Another distinguishing factor is that digital advertising is not "brand safe." Broadcast television is safe for brands, in that it is "not unsavory, salacious, pornographic, or ideologically or politically charged and so unlikely to associate the brand with divisive or detrimental content or imagery." CAC2 ¶ 131. Digital advertisement is sold based on the number of "impressions," and advertisers have little insight into where those impressions are generated; digital advertisements "can and often do end up on websites, social media pages, or other digital media outlets" that are not safe, with some advertisements appearing on "***ISIS terrorist training videos***." *Id.* ¶¶ 131-32; *see also id.* ¶¶ 129-130 (describing the separate problem of "outright fraud," where advertisers pay for impressions falsely generated by "bots").

after review of an extensive record[,] that [it] constitute[d] a separate relevant antitrust market").

As to market power, the CAC2's allegations are sufficient because the CAC2 pleads sufficiently high market shares in each DMA. *See* Section II.B., *supra* and Section V.C., *infra*.

## III.    THE PLEADING STANDARD IN AN ANTITRUST CASE

When deciding a motion to dismiss, the Court accepts all well-pleaded facts as true and construes all inferences in favor of the plaintiff. *Zemeckis v. Global Credit & Collection Corp.,* 679 F.3d 632, 634 (7th Cir. 2012)*. Bell Atlantic Corp. v. Twombly* calls for "a complaint with enough factual matter (taken as true) to suggest that" a violation of the Sherman Act occurred. 550 U.S. 544, 556 (2007). *Twombly* "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556; *see also Text Messaging I*, 630 F.3d at 629 ("probability need not be as great as such terms as 'preponderance of the evidence' connote."). *Twombly* permits a complaint to "proceed even if it strikes a savvy judge that actual proof of those facts is improbable" or recovery "very remote and unlikely." *Id.* at 556 (quotation omitted).

Relying in large part on **summary judgment** decisions, however, Defendants repeatedly suggest that Plaintiffs must plead an agreement with heightened specificity[5] and rule out Defendants' alternative interpretations of the pleadings.[6] Defendants misstate Plaintiffs' burden. Plaintiffs need not plead their antitrust claims with specifics. *Twombly*, 550 U.S. at 570. Instead,

---

[5] *E.g.*, Mem. at 1 (criticizing (the purported) lack of allegations of "specific conduct" in "particular DMA[s]"); *id.* at 9 (criticizing (the purported) lack of "specific allegations about the exchanges of information"); *id.* at 29-30 & n.17 (criticizing (the purported) lack of allegations of conduct "in any specific DMA"); *id.* at 33 (criticizing (the purported) lack of allegations that Plaintiffs "purchased advertising in any specific DMA" during the challenged conduct period).

[6] *E.g.*, Mem. at 19 (urging dismissal on the basis that Defendants' price increases in the face of declining demand **could equally** be consistent with price fixing or non-conspiratorial pricing); Mem. at 28 (arguing that the pacing data exchange "could equally" convey only innocuous market information).

as courts in this District acknowledge:

> [T]he Supreme Court has [] recognized that Congress drafted the antitrust laws with the express purpose of encouraging private enforcement. If private plaintiffs, who do not have access to *inside information*, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together *from publicly available data*.

*Plasma-Derivative*, 764 F. Supp. 2d at 1003 n.10 (citation omitted) (emphases added);[7] *see also*

*In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18-cv-864, 2018 WL 6629250, at *11 (N.D. Ill. Oct. 22, 2018) (Dow, J.) ("specific allegations" of the "who, what, where, and when" not required). Indeed, in antitrust cases the proof is largely in the hands of the alleged conspirators. As such, Plaintiffs need not plead direct evidence such as "an admission by an employee of one of the conspirators that . . . defendants had met and agreed explicitly." *Text Messaging I*, 630 F.3d at 628-29 ("plaintiffs have conducted no discovery" which "may reveal the smoking gun").

Nor is it "necessary that the factual allegations tend to exclude the alternative explanations offered by defendants. That is the standard appropriate for a summary judgment motion." *Plasma-Derivative*, 764 F. Supp. 2d at 1002; *Hackman v. Dickerson Realtors, In*c., 595 F. Supp. 2d 875, 879 (N.D. Ill. 2009). Plaintiffs' allegations need only be plausible; they need not be *more* plausible than Defendants' alternative explanations. *Swanson*, 614 F.3d at 404 (a court is not "to stack up inferences side by side"). The CAC2 readily meets this standard.

## LEGAL ARGUMENT

## IV.     THE CAC2 PLEADS A *PER SE* UNLAWFUL PRICE FIXING AGREEMENT

As to Count One (Price Fixing), Plaintiffs' only burden at the pleading stage is to "allege

---

[7] "Circumstantial evidence is the lifeblood of antitrust law because direct evidence will rarely be available to prove the existence of a price-fixing conspiracy." *City of Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019) (internal quotation omitted). "More often, plaintiffs must rely on circumstantial evidence to demonstrate that the observed behavior resulted from a meeting of the minds rather than independent decisions." *Plasma-Derivative*, 764 F. Supp. 2d at 998.

facts from which the Court can plausibly infer that the defendants 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Broiler Chicken*, 290 F. Supp. 3d at 789 (to show agreement, allegations need only show "a unity of purpose," a "common design and understanding," or a "meeting of the minds"). In urging dismissal, Defendants analyze the CAC2 line by line, rather than as a whole. *See generally* Mem. at 13-21. This is improper. "The character and effect of a conspiracy are not to be judged by dismembering it and viewing it as its separate parts, but only by looking at it as a whole." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) (ignoring "Defendants' attempt to parse the complaint" and instead relying on "all" of the facts set forth by Plaintiffs when denying dismissal).

### A.     The CAC2 Plausibly Alleges Defendants Increased Their Prices in Parallel.

Defendants claim that Plaintiffs must prove **both** "parallel conduct <u>and</u> plus factors" to state a *per se* price fixing claim. Mem. at 11, 15. That is incorrect. While the CAC2 does show parallel pricing, its absence would not doom Plaintiffs' case. *Washington Cty. Health Care Auth., Inc. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 840 (N.D. Ill. 2018) (parallel pricing, which "is but one of many varieties of circumstantial evidence plaintiffs can employ to state a" *per se* price fixing claim). "The Supreme Court has long held that simultaneous action is not a requirement to demonstrate parallel conduct." *Broiler Chicken*, 290 F. Supp. 3d at 791 (citation omitted). "And while *Twombly* changed the law with respect to the weight of parallel conduct in the pleading equation, it said nothing about what is necessary to allege parallel conduct in the first place." *Id.*

Courts in this District have found parallel conduct where prices increased at different times over the course of as many as five years. *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077-78 (N.D. Ill. 2011) ("*Kleen I*"); *Plasma-Derivative*, 764 F. Supp. 2d

at 996 (sufficient allegations of parallel conduct where actions occurred over two years).

The CAC2 shows that beginning in early 2014 each Broadcaster Defendant raised its prices for broadcast television spot advertising in parallel. CAC2 ¶¶ 5, 6, 22-26, 28-37, 47, 50, 73-74, 90, 95, 113, Figs. 3.a-3.c. For example, average pricing for broadcast television spot advertising in the Top 100 DMAs was either flat or declining from 2012 to 2014, but rose sharply from 2014 through 2015, after formation of the cartel. *Id.* ¶ 113.

Defendants criticize the inclusion of data for 2012 and 2013 because those periods show flat or downward pricing. Mem. at 14 n.4. That is precisely the point of the inclusion of this data. Pre-cartel period data is included to show that pricing trajectory changed ***after*** the cartel was formed in early 2014, making the alleged conspiracy more plausible.

Defendants also complain that Figures 3.a through 3.c include data from the Top 100 DMAs, not the 127 DMAs included in Appendix A to the CAC2, and include data from broadcasters not alleged to be a part of the cartel. *Id.* The data, however, corresponds to 92 of the 127 DMAs reflected in Appendix A (reflecting 96% of households in the top 100 DMAs), while the Broadcaster Defendants "are a collective of the largest broadcast station owners and operators in the nation and are thus the primary drivers of the price movement." CAC2 ¶ 113 & Figs. 3.a-3.c. Defendants claim this cannot show "simultaneous or [] lockstep" pricing," Mem. at 14, or "unprecedented changes in pricing structure," Mem. at 13, but even if Defendants were right (and they are not), Plaintiffs are not required to plead simultaneous, lockstep, or unprecedented pricing, *Broiler Chicken*, 290 F. Supp. 3d at 790-91.[8]

The probative value of the data cannot be discounted, particularly where Plaintiffs

---

[8] The data is quarterly and stops at 2015 because that is what was publicly available. *Plasma-Derivative*, 764 F. Supp. 2d at 1003 n.10 ("private plaintiffs [] do not have access to inside information" and "the pleading standard must take into account that a complaint will ordinarily be limited to . . . publicly available data").

demonstrate each Broadcaster Defendant's participation in the observed price increases. *First*, the CAC2 shows each Broadcaster Defendant's own individual revenues (not "aggregated" revenues) have outpaced industry revenue, by as much as 218%, while overall industry revenue is trending down in the face of declining demand. CAC2 ¶¶ 112 & Figs. 2.a-2.k, 149-159. These anomalous revenue streams tie each Broadcaster Defendant to the parallel price increases.

*Second*, the DOJ asserted that ***each*** individual Broadcaster Defendant: "distorted the normal price-setting mechanism in the spot advertising market and harmed the competitive process"; "harmed the competitive price-setting process"; were able to "resist . . . advertisers' attempts to obtain lower prices"; and "harmed the local businesses and consumers they served." CAC2 ¶¶ 4, 5, 22-26, 28-37, 73-74, 90, 95. One does not distort prices, harm the competitive process, resist discounts, and harm their customers through competitive pricing; one does it through inflated prices. No contrary inference can be drawn from these well-pled facts.

Defendants' remaining criticisms all ring hollow.[9] Defendants fault Plaintiffs for not alleging specific prices charged by specific Defendants in specific DMAs, Mem. at 14, and claim that averaged pricing cannot evidence price fixing or parallel conduct, *id.* at 13-14. Plaintiffs "cannot be expected to know or allege such details at this early stage in the case." *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3754041, at *4 (N.D. Ill. Nov. 5,

---

[9] Defendants note that Fox's revenues were going down, Mem. at 14 n.5, but Plaintiffs have already explained that that was because Fox was selling broadcast stations during the relevant period, CAC2 ¶ 112. And they argue that it is equally plausible that the revenue gains were due to broadcast station acquisitions and not price increases. Mem. at 14. Four Defendants (Sinclair, Nexstar, Tegna, and Tribune) acquired broadcast stations during the time period depicted in Figures 2.a-2.k. CAC2 ¶ 177. But to determine at this stage that those Defendants' revenue gains were driven entirely by acquisitions and not price increases is a complex economic inquiry that would improperly weigh the plausibility of Plaintiffs' allegations and Defendants' alternative explanations. *Broiler Chicken*, 290 F. Supp. 3d at 804-05 (arguments that "requires analysis of complex economic theories and data" improper at the pleading stage); *see also Swanson*, 614 F.3d at 404-05.

2009); *see also Plasma-Derivative*, 764 F. Supp. 2d at 1002 n.10; *Dealer Mgmt.*, 2018 WL

6629250, at *11 (Dow, J.); *Broiler Chicken*, 290 F. Supp. 3d at 804. And Defendants complain

that the Broadcaster Defendants' gains in revenues vary, Mem. at 14, but those gains need not be

"identical to give rise to an inference of agreement," *Kleen I*, 775 F. Supp. 2d at 1077-78.

    An examination of recent antitrust cases' treatment of "averaged"[10] data and statistics

demonstrates why Defendants' parallel pricing arguments fail. In *In re: Mexican Gov't Bonds

Antitrust Litig*, the defendants challenged the use of average data to show parallel conduct. No.

18-cv-2830 (JPO), 2019 WL 4805854, at *7 (S.D.N.Y. Sept. 30, 2019). There, the Court found

that the "aggregated statistics," some of which did "not distinguish between Defendants and non-

defendant[s]," were "not irrelevant to Plaintiffs' claim that a conspiracy existed[,]" but that "in

the absence of any other allegations that would allow the Court to infer the participation of the

individual Defendants," the "statistical pleadings cannot carry the day." *Id.* Similarly, in *In re:

Pork Antitrust Litigation*, the plaintiffs again relied "almost exclusively on industry-wide data

and ask[ed] the Court to infer that the individual Defendants all contributed to the" trends in the

data. No. 18-cv-1776, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019). Unlike *Mexican Gov't

Bonds* and *Pork*, there is no question here that Plaintiffs plead other allegations that "allow the

---

[10] Courts inside and outside the Seventh Circuit uphold price fixing claims supported in part by averaged data with regularity. *See, e.g.*, *Minn-Chem, Inc. v. Agrium Inc.*, 683 F. 3d 845, 849-50 (7th Cir. 2012) (*en banc*) (affirming denial of motion to dismiss complaint alleging "*average* fertilizer price indices rose from 1.0 to 2.2" coupled with "earnings by cartel members reinforc[ing] this picture of financial gain even in the face of waning demand"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 63-64 (D.D.C. 2016) (complaint alleging inflation of "the *average* fare per route" upheld); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 679 (S.D.N.Y. 2012) (complaint alleging "the price of new bestselling eBooks increased by forty percent on *average*" upheld); *Haley Paint Co. v. E.I. DuPont de Nemours & Co.*, 804 F. Supp. 2d 419, 423 (D. Md. 2011) (complaint alleging "[t]he *average* price per ton of titanium dioxide increased nearly a third between 2002 and 2006, and Defendants increased their operating incomes and margins" upheld); *In re Blood Reagents Antitrust Litig.*, 756 F. Supp. 2d 623, 626 (E.D. Pa. 2010) (complaint alleging that "*[a]verage* test prices rose from an *average* of $0[.]25 per test to $1[.]25 per test" upheld) (all emphases added).

Court to infer the participation of the individual Defendants," for example, the DOJ's assertion that each Broadcaster Defendant distorted prices, harmed the competitive process, resisted discounts, and harmed their customers. CAC2 ¶¶ 4, 5, 22-26, 28-37, 73-74, 90, 95. [11] With the averaged data, these well-pled facts carry the day.

In any event, parallel conduct is not a *sine qua non* of a price fixing claim. *Supra*.[12] While Plaintiffs plead parallel pricing, a contrary conclusion would not doom Count One.

## B.    The CAC2 Plausibly Alleges Numerous Important Plus Factors.

The CAC2 includes numerous plus factors, well-recognized in this Circuit as indicative of price fixing. Plus factors "must be evaluated holistically." *Domestic Airlines*, 221 F. Supp. 3d at 58; *Broiler Chicken*, 290 F. Supp. 3d at 797 (improper to "argue against Plaintiffs' claim by isolating each factor" based on "instances when courts have questioned their [individual] weight"). Viewed collectively, the identified factors strongly support an inference of price fixing.

### 1.    Defendants' Information Exchange Supports an Inference of Price Fixing.

"Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd*, 275 F.3d at 198; *Omnicare*, 629 F.3d at 709 (exchange "support[s] an inference of a price-fixing agreement"); *Text Messaging I*, 630 F.3d at

---

[11] *In re Musical Instruments & Equipment Antitrust Litigation* does not help Defendants. Mem. at 13. There, a "hub-and-spoke" conspiracy was dismissed *only* after affording "plaintiffs a chance to remedy the[ir pleading] problems by permitting some discovery." 798 F.3d 1186, 1190 (9th Cir. 2015). Unlike here, *Musical Instruments* pricing data included products outside the scope of the case, and so was not probative even of whether *market wide* prices for the products at issue were increasing. *Id.* at 1197 & n.12. Also, the Ninth Circuit requires the weighing of "obvious alternative explanations . . . when analyzing plausibility," *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers,* 795 F.3d 1124, 1130 (9th Cir. 2015), while the Seventh Circuit prohibits it, *e.g.*, *Swanson*, 614 F.3d at 404.

[12] *See also, e.g.*, *Hogan v. Cleveland Ave. Restaurant Inc.*, No. 15-cv-2883, 2018 WL 1475398, at *4 (S.D. Ohio Mar. 16, 2018) ("Plaintiffs are not required to show parallel conduct; it is merely a vehicle . . . that can be used to show circumstantial evidence of a conspiracy."); *Cason-Merenda v. Detroit Med. Ctr.*, 862 F. Supp. 2d 603, 626-28 (E.D. Mich. 2012) ("while parallel conduct can serve as one form of circumstantial evidence" "circumstantial evidence of any sort will do") (collecting cases); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 158 (N.D.N.Y. 2010) (plaintiffs "need not prove parallel pricing in order to prevail on [a] *per se* claim based on circumstantial evidence").

628 (exchange "facilitates price fixing"). Ignoring this well-developed body of law, Defendants'

suggestion that an information exchange becomes relevant "only if" the Plaintiffs have otherwise

alleged "an agreement to fix prices" ignores this body of law. Mem. at 10. Defendants'

hyperbolic (and incorrect) arguments would charge the Seventh Circuit with repeatedly issuing

opinions in price fixing cases that "render meaningless" Supreme Court jurisprudence. *Compare*

Mem. at 16 *with*, *e.g.*, *Text Messaging I*, 630 F.3d at 628; *Omnicare*, 629 F.3d at 709.

Defendants' claim that Plaintiffs are "side-step[ping]" the plus factor inquiry through the

"super plus factor" label, Mem. at 15, quarrels with semantics. Defendants concede that some

factors offer stronger inferences of agreement, ECF No. 268 at 18 n.3, and the very same court

Defendants identify as rejecting the ***use of the term*** "super plus factor" nonetheless concluded in

a separate opinion issued the very same day that an exchange of confidential information is

"especially probative" of an agreement, *compare Anderson News, L.L.C. v. Am. Media, Inc.*, 123

F. Supp. 3d 478, 504 (S.D.N.Y. 2015) ("Interfirm communications are especially probative

where there is evidence that defendants exchanged confidential information."), *aff'd*, 899 F.3d 87

(2d Cir. 2018) *with* Mem. at 15 (citing *Anderson News, L.L.C. v. Am. Media, Inc.*, No. 09-cv-

2227, 2015 WL 5003528, at *3 (S.D.N.Y. Aug. 20, 2015)). This is not side-stepping, it is a tried

and true pleading regime, repeatedly endorsed by the Seventh Circuit.[13]

### 2. Defendants' Price Increases in the Face of Declining Demand Are Actions Against Self-Interest and Support an Inference of Price Fixing.

As Defendants concede, actions against unilateral self-interest are among the "most

important" plus factors providing a strong inference of a price fixing agreement. ECF No. 268 at

18 n.3. Plaintiffs have plausibly pled that each Broadcaster Defendant raised prices in a period of

---

[13] Defendants' issue with the Kantar allegations misses the reason for their inclusion. Mem. at 16 n.7. The existence of the Kantar exchange bolsters the conclusion that the pacing data exchange caused anticompetitive effects under Count Two. *See* Note 21, *infra*.

declining demand, which would be against each's unilateral self-interest as each risked losing business to competitively priced rivals. *See* CAC2 ¶¶ 5, 6, 22-26, 28-37, 47, 50, 73-74, 90, 95, 105-11, 113 & Figs. 3.a-3.c, 149-59; *Tichy*, 376 F. Supp. 3d at 836 ("forego[ing] opportunities to take business away from the other Defendants" is against a firm's unilateral self-interest). Defendants claim that "price increases in the face of declining demand are consistent with non-conspiratorial pricing activity." Mem. at 19.[14] At the pleading stage, however, "[i]t is not necessary that the factual allegations tend to exclude the alternative explanations offered by defendants." *Plasma-Derivative*, 764 F. Supp. 2d at 1002.

Consider the motion to dismiss ruling in *Kleen I*.[15] There, Plaintiffs argued that "capacity and pricing decisions . . . were against their self-interest and thus suggest the presence of an agreement." 775 F. Supp. 2d at 1078-79. These allegations included that the defendants "increased prices notwithstanding declining demand." *Id.* at 1079. Although the defendants identified alternative, non-conspiratorial explanations for the price increases, the district court upheld the complaint, noting "it must be remembered that the present context requires only the plausibility of Plaintiffs' version" of events. *Id.* The result should be the same here.

### 3. The Context and Timing of Defendants' Opportunities to Collude Support an Inference of Price Fixing.

In the Seventh Circuit, opportunity to collude is a plus factor that constitutes circumstantial evidence of a price fixing agreement. *Text Messaging I*, 630 F.3d at 628; *Plasma-Derivative*, 764 F. Supp. 2d at 1001. Opportunities to collude are particularly significant where,

---

[14] Defendants' arguments about hypothetical cost increases are outside the four corners of the CAC2, Mem. at 19, and their suggestion that Plaintiffs must plead the absence of cost increases has no support in the law, Mem. at 19 n.9. Plaintiffs cannot be expected to know or plead the intricacies of a defendant's internal cost structure over time. *Plasma-Derivative*, 764 F. Supp. 2d at 1002 n.10.

[15] Defendants' citation to *Kleen* is to the ***summary judgment*** affirmance. Mem. at 19.

as here, they include allegations of the "suspicious timing" of opportunities to collude and subsequent "market movements" in prices. *Broiler Chicken*, 290 F. Supp. 3d at 799-800.[16]

The CAC2 shows Defendants' participation in and opportunities to collude through the TVB, NAB, and MRC. CAC2 ¶¶ 166-73. Additionally, through the "TIP Initiative," Defendants voiced their "***shared commitment to working together***" to grow sales. *Id.* ¶¶ 161-62 (emphasis added). The Seventh Circuit has found such opportunities probative of price fixing. *Text Messaging I*, 630 F.3d at 628 (participation in trade association whose "stated mission [was] to urge its members to substitute 'co-opetition' for competition" probative). More still, Defendants' interaction through JSAs reached a tipping point in 2013, CAC2 ¶¶ 163-65, suspiciously close to the beginning of the cartel and price increases in early 2014, "help[ing] to fill-out the picture of Defendants' alleged conspiratorial agreement." *Broiler Chicken*, 290 F. Supp. 3d at 799-800.[17]

*Washington Cty.* does not require the pleading of "additional facts," including the "nefarious content" of these encounters, as a precondition to their relevance. Mem. at 18. *Washington Cty.* alleged an antitrust conspiracy to restrict output through, *inter alia*, sham product recalls that gave a "lop-sided benefit to" one of the conspirators, which the court characterized as sounding in fraud and thus analyzed under Rule 9(b), not Rule 8. 328 F. Supp. 3d at 834 & n.8, 837. The court described the allegations as "an implausibly complex and outlandish scheme" distinguishable from "garden variety price-fixing." *Id.* at 843. Here, the opportunities to collude support the existence of the CAC2's garden variety price fixing claim.

---

[16] Defendants misleadingly cite to the summary judgment affirmance in *Text Messaging* for their purported requirement that Plaintiffs must plead "what information was exchanged at these meetings." Mem. at 18 (citing *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015) ("*Text Messaging II*")). There is no such obligation at the pleading stage. *Text Messaging I*, 630 F.3d at 628.

[17] Defendants' purported requirement that the rule of reason applies to Plaintiffs' JSA allegations would only hold if the ***joint venture agreements themselves*** were the only agreements challenged under the Sherman Act; it has no bearing on opportunities to collude through JSAs pled in support of ***a separate agreement*** to fix prices. Mem. at 19 (citing *Texaco v. Dagher*, 547 U.S. 1, 6 n.7 (2006)).

### 4. Declining Demand for Broadcast Television Spot Advertising Provides a Motive to Collude and Supports an Inference of Price Fixing.

Motive to collude is a widely recognized plus factor supporting an inference of a price fixing agreement. *Tichy*, 376 F. Supp. 3d at 835-36. To be sure, showing "a rational economic motive to conspire" is a ***requirement*** at the summary judgment stage, belying Defendants' claim that showing such a motive is immaterial at the pleading stage. *Dealer Mgmt.*, 313 F. Supp. 3d at 953 (St. Eve, J.) (citation omitted). The CAC2 provides a motive, as the broadcast television spot advertising industry faced disruptive events such as the rise of "cord-cutters" and "cord-nevers" and pressure from emerging complementary services. CAC2 ¶¶ 105-11 & Fig. 1, 149-55.

*Serfecz v. Jewel Food Stores*—a Seventh Circuit summary judgment decision—and the other out-of-circuit authorities cited by Defendants, stand only for the proposition that "mutual economic advantage, ***by itself***" does not infer conspiracy. 67 F.3d 591, 600-01 (7th Cir. 1995) (emphasis added); Mem. at 17 (collecting cases). If the ***totality*** of Plaintiffs' circumstantial evidence merely showed an industry "where the competitive landscape [was] changing," Mem. at 17, an inference of conspiracy would be improper. But that is plainly not the case here.

### 5. The Structure of the Broadcast Television Spot Advertising (High Concentration and Entry Barriers) Supports an Inference of Price Fixing.

Finally, the structure of the broadcast television spot advertising market is such that it cultivates collusive agreements. *Text Messaging I*, 630 F.3d at 627-28; *Text Messaging II*, 782 F.3d at 872 ("[i]mportant too is . . . . [whether] few firms can or want to enter the relevant market"). Plaintiffs plead market concentration, market shares as high as 100 percent, and entry barriers that have deterred entry for over two decades. *See* Section II.B., *supra*; CAC2 ¶¶ 174-97.

In their continued refusal to evaluate the allegations of the CAC2 as a whole, Defendants rely on *Washington Cty.* for the proposition that in the absence of other circumstantial evidence,

entry barriers and concentration are not alone particularly probative of price fixing. Mem. at 20-21. But here market structure is not pled in isolation from other circumstantial evidence.

Defendants' related arguments are all equally flawed. Mem. at 20-21. Each DMA is at least moderately concentrated, and Defendants cite no requirement that they each must meet the DOJ's highly concentrated threshold, even though as many as 89 do. Nor is there any rule that products **have to be** homogenous for market structure to matter, though broadcast television **is** homogenous, CAC2 ¶ 138 ("broadcast television stations are generally substitutable" and "[i]f a broadcast station suffers a blackout in a given DMA, viewers are likely to turn to another such station in the DMA to watch similar content, such a sports, primetime shows, local news, movies, and/or weather"). And Defendants' critiques about digital media concentration, Mem. at 21 n.10, fall with their relevant market arguments, *see* Section V.C., *infra*.

### C.     The DOJ's Investigation is Probative of the Existence of a Price Fixing Agreement and the DOJ Consent Decrees Do Not Exonerate Defendants.

Defendants paradoxically accuse Plaintiffs of "try[ing] to distance themselves from the DOJ action while also relying on it," Mem. at 12, when it is Defendants—not Plaintiffs—who seek to do that very thing. Defendants ask this Court to ignore what the DOJ **actually said**: that the Defendants violated Section 1 of the Sherman Act, distorting prices and harming competition in the same relevant product market Plaintiffs defined. *See* Sections II.D., *supra*. The **only thing** Defendants ask the Court to have confidence in is something the Court has already recognized the DOJ never did: exonerate Defendants of price fixing. Feb. 22, 2019 H'r Tr. at 33:22-34:20.

Defendants further claim that the DOJ "emphatically declares" when it seeks to bring criminal charges against price fixing and that the DOJ's review of millions of pages of documents without filing such charges should end the inquiry here. Mem. at 12-13. This is not the law in the Seventh Circuit. *High Fructose*, 295 F.3d at 664-65. And the CAC2 also explains

that this DOJ has shifted its limited resources away from criminal enforcement of the antitrust laws, filing markedly fewer criminal cases. CAC2 ¶¶ 98-103.[18]

This argument is also wholly inconsistent with what Defendants themselves told the Court: that those millions of pages produced to the DOJ "had nothing to do with" Plaintiffs' antitrust claims and, if screened for relevance, the millions "would become thousands." Feb. 22, 2019 H'r Tr. at 45:8-47:15; *see also* ECF No. 200-1 at 15 ("the overwhelming majority of the documents . . . have nothing to do with Plaintiffs' claim, regardless of how broadly they may be construed"). Yet now, Defendants want this Court to preclude Plaintiffs' price fixing claims on the basis of the DOJ's failure to assert criminal charges based on largely "irrelevant" documents.

Defendants repeat that the consent decrees ***themselves*** do not constitute any evidence against or admission by any party regarding any issue of fact or law, Mem. at 13, but that does not undermine the probative force of the DOJ's investigation in its entirety, or the well-pled facts in the CAC2 drawn from sources other than the consent decrees (*e.g.*, the DOJ's complaints, competitive impact statements, press releases, and public statements), *e.g.*, CAC2 ¶¶ 4-8, 47, 50, 73-74, 90, 95. Courts have resoundingly rejected arguments such as Defendants. *E.g.*, *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2014 WL 4272784, at *8 (E.D. Mich. Aug. 29, 2014) ("limitations on government resources may play as much a role in [a settlement with the DOJ] as the conduct involved"); *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325-26 (2d Cir. 2010) ("defendants cite no case to support the proposition that a civil antitrust complaint must be

---

[18] *See also, e.g.*, Ex 2, Leah Nylen, *Under Delrahim, DOJ Wary About Filing Criminal Antitrust Charges, Indictments*, MLex Market Insight (Mar. 21, 2019) ("Over the past 18 months, the Justice Department has announced only three new criminal cases . . . . . During that same time period, senior officials in the DOJ's antitrust division have also nixed a number of proposed indictments and charges in several other cases[.]"); Ex. 3, Kadhim Shubber, *Price-Fixing Prosecutions under Trump Are at a Historic Low for Third Year*, Los Angeles Times (Nov. 6, 2019) ("Criminal prosecutions for price-fixing under President Trump have remained at historic lows . . . not seen since the 1970s.").

dismissed because an investigation undertaken by the [DOJ] found no evidence of conspiracy").

## V. THE CAC2 PLEADS AN UNLAWFUL INFORMATION EXCHANGE

As to Count Two (Information Exchange), at the pleading stage, Plaintiffs' burden under the rule of reason[19] is to plausibly allege (1) an exchange of information, (2) resulting anticompetitive effects, and (3) market power in proper antitrust markets. Plaintiffs have done so.

### A. Plaintiffs Have Plausibly Alleged an Agreement to Exchange Information.

Because an information exchange requires collective and knowing reciprocation by the participants, the exchange *itself* proves a unity of purpose, common understanding, or meeting of the minds. *E.g.*, Ex. 1, Areeda & Hovenkamp, Antitrust Law ¶ 1436b2 ("The [] information exchange *itself* embodies a conspiracy to [] exchange[.]"); *Todd*, 275 F.3d at 198 ("the violation lies in the information exchange *itself*"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) ("the exchange of price information *alone* . . . [can show] the initial ingredient of a violation") (all emphases added).

The Broadcaster Defendants, directly and through the Sales Rep Firms, engaged in a reciprocal exchange of one another's individual, confidential and competitively sensitive, historic, real-time, and forward-looking pacing information for local, regional, and national sales. *See* Section II.C., *supra*; CAC2 ¶¶ 4-8, 10-11, 22-26, 28-37, 47, 50, 52-65, 73-74, 90, 95. The CAC2 pleads that this conduct occurred in no fewer than 68 specific DMAs, with another 59 DMAs potentially affected. *See* Section II.C., *supra*; CAC2 ¶ 66 & App. A. These facts show "the initial ingredient of a violation" of Section 1. *SRAM*, 580 F. Supp. 2d at 902.

### B. Plaintiffs Have Plausibly Alleged Resulting Anticompetitive Effects.

Under the rule of reason, the challenged conduct must have caused a plausible, adverse

---

[19] For purposes of this motion, Plaintiffs proceed under a full rule of reason analysis, reserving for the proof stage whether the adduced evidence justifies quick look or truncated rule of reason treatment.

effect on competition, such as increased prices or reduced output. *Toys "R" US*, 221 F.3d at 937

Defendants' information exchange is of the type regularly condemned under the antitrust laws.

Nobel Laureate economist Joseph E. Stiglitz observed that "even a small amount of

information imperfection could have a profound effect on the nature of [market] equilibrium,"

and as such market actors "have an incentive to increase asymmetries of information in order to

enhance market power." Joseph E. Stiglitz, *Information and the Change in the Paradigm in

Economics*, The American Economic Review, Vol. 92, No. 3 at 461, 487 (Jun. 2002).[20] This

harm is not theoretical. *See, e.g.*, *Todd*, 275 F.3d at 197, 211-13 (frequent exchange of partially

aggregated current and future information "reduced the incentive for defendants to bid up

salaries"); *In re Pharm. Indus. Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 36-37 (D.

Mass. 2007) (crediting theory that "asymmetric information . . . pose[d] problems for price

competition," removing "competitive pressure on doctors to lower [] prices"), *aff'd,* 582 F.3d 156

(1st Cir. 2009); *Nitsch v. Dreamworks Animation SKG Inc.*, 315 F.R.D. 270, 297-98 (N.D. Cal.

2016) (showing anticompetitive effects through "economic models of asymmetric information").

In their treatise, Areeda and Hovenkamp describe these very same causal mechanisms:

> [U]ncertainty stands in the way of oligopolists' achieving cartel-like results through
> recognized interdependence. This uncertainty can be reduced by the adoption of one or
> more practices—for example by exchanges of information . . . about the desired direction
> of future price movements in a market. . . . Our concern is that such practices can make
> possible cartel-like prices or other anticompetitive results that would not otherwise occur
> at all or so frequently or so completely.

Ex. 4, Areeda & Hovenkamp, Antitrust Law ¶ 1435a. Areeda & Hovenkamp further explain that

"several types of agreements could be troublesome on this account[,]" including facilitating

practices like information exchanges or the exchange of so-called "price books." *Id.* ¶¶ 1435b,

---

[20] *See also id.* at 469 ("the research I describe here focuses on *asymmetries* of information, th[e] fact that different people know different things"); *id.* at 470 (market actors can "reduce competition" by "taking actions to increase information asymmetry").

1435g. Price books come in "many possible varieties" but—like pacing data—"the[ir] essential function is to provide a means for deriving a firm's offering price from known factors." *Id.*

The CAC2 pleads that the quarterly exchange of historic, current, and forward-looking pacing data—which violates the DOJ and FTC safe harbors—provided the Broadcaster Defendants with insight into one another's relative remaining inventory (a key factor for deriving anticipated prices) for individual broadcast stations. *See* Sections II.C. and V.A., *supra*; CAC2 ¶¶ 2, 50, 53-60, 77. The CAC2 pleads in detail the causal theory connecting the information exchange with asymmetrical information problems, altered competitive incentives, and higher prices—the same theory advanced by the DOJ. *See* Section II.D., *supra*; CAC2 ¶¶ 4, 5, 39, 65, 69-72, 74-75, 77, 90, 95. The exchange was secret, creating asymmetrical information problems and depriving the exchange of any procompetitive potential. *Id.* ¶ 65. And the trajectory of prices abruptly rose after the exchange began in early 2014. *See* Section II.A., *supra*; CAC2 ¶ 113 & Figs. 3.a-3.c. Defendants' attempts to paint this well-recognized theory as "conclusory" fail.[21]

*First*, Defendants claim that "knowing by what percentage a Defendant's revenue increased or decreased . . . [would not] allow[] any other Defendant to know that firm's inventory." Mem. at 27. The theory of anticompetitive harm advanced by Plaintiffs involves the removal of uncertainty around the would-be competitors *relative* inventory positions. CAC2 ¶¶ 69-75. Through their "extensive history of communications among rival stations" and long-running exchange of historic, current, and forward-looking pacing data, the Broadcaster

---

[21] Bolstering the anticompetitive effects of this exchange of pacing data is a separate practice whereby the Broadcaster Defendants exchanged retrospective pricing data for broadcast television spot advertising through a third-party firm, Kantar. CAC2 ¶ 62. This data was broken down granularly and provided average cost-per-point pricing by DMA and inventory type (*e.g.*, early news, late news, primetime). *Id.* ¶ 63. It allowed the Broadcaster Defendants to formulaically determine pricing by multiplying the average cost-per-point for a market profile (*i.e.*, DMA and daypart) times the Nielsen ratings for a given television program. *Id.* Coupled with the pacing data, this exchange allowed one to account for whether pacing changes were driven by changes in price levels or other factors. *Id.* ¶ 64.

Defendants were plausibly able to track and "pace" one another's relative inventory position over time and into the future. *Id.* ¶¶ 5-8, 10-11, 22-26, 28-37, 47, 50, 52-65, 73-74, 90, 95. If for example, a station's pacing data showed that it was pacing down 30% for the "late news" for January 1, 2016 versus January 1, 2015, while another station was pacing flat at 0%, they could be relatively confident that one was "outpacing" its prior performance and had less remaining inventory. It is equally revealing if one (or both) was pacing down, flat, or up.

*Second*, Defendants suggest that knowing whether "their competitors' remaining inventory was low . . . could equally imply that advertisers had already purchased spots, thereby reducing demand." Mem. at 28. But the CAC2 explains how this exchange affected competitive incentives in all situations, not just when one competitor's inventory was "low." CAC2 ¶¶ 69-75. The CAC2 also explains that the information exchange increased "residual demand," not lowered it. *Id.* ¶ 75. Defendants' alternative explanations and arguments that test the truth of Plaintiffs' facts fail at the pleading stage. *Plasma-Derivative*, 764 F. Supp. 2d at 1002.

*Third*, Defendants suggest that the exchange wouldn't allow the broadcasters to know the "type of inventory remaining." Mem. at 27. The CAC2 pleads the exchange of pacing data comparing a past period to another, such as "late news" on January 1, 2016 to "late news" on January 1, 2015. It is unclear what "period" Defendants believe the exchange pertains to if not to the specific "time of day," which the CAC2 pleads is how data in the industry is measured. *See* CAC2 ¶ 113 & Figs. 3.a-3.c. (measuring cost-per-point for early news, primetime, and late news). Since the pacing information was particular to ***individual*** broadcast stations, knowing the time of day easily allows one to determine the type of programming. Even drawing an inference in ***Defendants' favor*** that pacing was measured for a broader period, Defendants fail to engage with Plaintiffs' pled causal mechanism (predicated on removing uncertainty around ***relative***

inventory) *at all*, let alone explain how it depends on knowing the "type" of remaining inventory.

In any event, "[t]hese disputed claims of causation and injury cannot be decided on a Rule 12(b)(6) motion." *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 773 n.11 (2d Cir. 2016) (citation omitted); *Broiler Chicken*, 290 F. Supp. 3d at 796, 804-05 ("the pleading stage is not the place to make th[e] call" on "complex economic theories and data"). And Defendants' arguments ignore that the DOJ advanced *precisely* the same causal relationship between the exchange and resulting harm as the CAC2. CAC2 ¶¶ 4, 74. This shows anticompetitive effects.

### C. Plaintiffs Have Pled Market Power in a Plausibly Defined Antitrust Market Consisting of Broadcast Television Spot Advertising Sales.

"[M]arket definition is a deeply fact-intensive inquiry[.]" *Right Field*, 87 F. Supp. 3d at 886 (quoting *Todd*, 275 F.3d at 199-200). As such, "[c]ourts are generally hesitant to dismiss a Sherman Act claim for failure to allege a relevant product" market. *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, No. 13 C 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (Kendall, J.) (citing *Todd*, 275 F.3d at 199-200); *Dealer Mgmt.*, 313 F. Supp. 3d at 958 (St. Eve, J.) ("Courts should dismiss antitrust claims based on a market argument only when it is certain that the alleged relevant market clearly does not encompass all interchangeable substitute products.").

"Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand" or (2) a "failure to even attempt a plausible explanation as to why a market should be limited in a particular way." *Todd*, 275 F.3d at 200. Interchangeability controls the boundaries of the market and is influenced by, *inter alia*, "industry or public recognition" of separateness and a product's "peculiar characteristics and uses." *Sci. Prod. Co. v. Chevron Chem. Co.*, 384 F. Supp. 793, 795 (7th Cir. 1974).

The CAC2 does not in any way attempt to limit the product market to a single brand, franchise, institution, or similar entity. And far from failing to "even attempt a plausible

explanation," the CAC2 goes to painstaking detail to establish that broadcast television spot advertising is not reasonably interchangeable with other forms of advertising for the use to which it is put. *See* Section II.E., *supra*; CAC2 ¶¶ 117-41. *First*, broadcast television spot advertising, which reaches the widest set of demographics of any advertising medium by a large margin, penetrating over 90 percent of the households in a DMA, serves a unique purpose: to drive brand awareness in a lasting way by reaching the broadest audience possible. *See* Section II.E., *supra*; CAC2 ¶¶ 122-25, 135-37. *Second*, broadcast television spot advertising has unique traits—such as the ability to "capture consumers with emotive storytelling" by combining "sight, sound, and motion"—that other advertising mediums lack, or, if they do possess those traits, are plagued by problems of "brand safety," ad blocking habits and software, and outright fraud. *See* Section II.E., *supra*; CAC2 ¶¶ 121-23, 129-34. *Third*, industry participants and regulators, including the DOJ, have consistently recognized that broadcast television spot advertising is a separate market. *See* Section II.E., *supra*; CAC2 ¶¶ 120, 126, 128 139-41.

Each of Defendants' authorities is either inapposite on its facts or helpful to Plaintiffs. *Right Field* and *Int'l Equip.*, both involved attempts to cabin a market to a ***single brand*** of a product, 87 F. Supp. 3d at 886 (market "compris[ing] a single brand"); 2013 WL 4599903, at *4 (market limited to "mass spectrometers manufactured by" a specific company). *Sci. Prods.* was decided on a ***fully developed evidentiary record*** prior to trial under the "preponderance of the evidence standard," which is inapplicable at the pleading stage, 384 F. Supp. at 794, as was *Mid-West Radio Co., Inc. v. Forum Pub. Co.*, where the Eighth Circuit noted issue was "usually one of fact for the jury," but the plaintiff failed to produce any evidence ***at all*** to support its proposed market, 942 F.2d 1294, 1297 (8th Cir. 1991); *Text Messaging I*, 630 F.3d at 629 (plausibility "need not be as great as such terms as 'preponderance of the evidence'"). And in *Cinema Village*

*Cinemark, Inc. v. Regal Entm't Grp.*, No. 15-cv-05488, 2016 WL 5719790, at *6 (S.D.N.Y. Sept. 29, 2016), the court dismissed an inconsistently drawn *geographic* market, while in *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063, 1065 (9th Cir. 2001), the Ninth Circuit affirmed dismissal of a narrow *geographic* market predicated "solely on [the plaintiff's] own preferences" for the West Coast.

Defendants simply misstate the holding in *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018), where plaintiff-golf caddies did ***not*** try to limit the relevant market to "television advertising," as Defendants broadly claim, Mem. at 24, but rather limited it to "advertisements to golf fans" during "live-action [] golf tournaments" on television. 897 F.3d at 1121-22. The court credited that a narrow market of advertising to "professional golf fans" was proper, but found dismissal appropriate where there was no plausible explanation offered for excluding "forms of golf media" other than television. *Id.* at 1116, 1122. This ***helps*** Plaintiffs, who have explained that broadcast television spot advertising has unique traits, like golf fans, that justify its existence as a separate market, and have only excluded media lacking those traits. *Supra*.[22]

As to market power, the Broadcast Defendants held on average 60 percent and as high as 100 percent market share in the multi-defendant DMAs listed in Appendix A. *See* Sections II.B. and II.E., *supra*; CAC2 ¶¶ 142, 174-88 & App. A. Defendants' claim that share calculations must include other forms of advertising, Mem. at 25, fails with their arguments about the proper market boundaries, *supra*. Similarly, their claim that Plaintiffs must plead "entry barriers," Mem.

---

[22] Product markets are often much more limited than Defendants insist. *E.g., Am. Needle, Inc. v. New Orleans La. Saints*, No. 04-cv-7806, 2014 WL 1364022 at *6 (N.D. Ill. Apr. 4, 2014) (finding that NFL team hats are in a distinct market from hats bearing logos of teams from other sports); *Jamsports & Entm't, LLC v. Paradama Prods., Inc.*, Case No. 02 C 2298, 2003 WL 1873563 at *1 (N.D. Ill. Apr. 15, 2003) (finding supercross plausible market distinct from motorcycle racing or motor sports generally); *United States v. H&R Block, Inc.*, 833 F. Supp. 2d 36, 52-60 (D.D.C. 2011) (relevant product market consisted of digital do-it-yourself tax preparation products, such as TurboTax, but not "pen and paper" tax returns or "assisted preparation").

at 26, fails as Plaintiffs have pled barriers so high that there has been no meaningful entry since 1996. *See* Section II.B., *supra*; CAC2 ¶¶ 174-198. And the argument that the Broadcaster Defendants have smaller shares in a *de minimis* number of DMAs (*e.g.*, 18% in Miami and 24% in Raleigh, Mem. at 26 n.13) is somehow fatal to Plaintiffs' claims ignores Defendants' own cited authority. *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987) ("market share legally sufficient to sustain a finding *of monopolization* is between 17% and 25%") (emphasis added); ECF No. 268 at 24 (citing *Valley Liquors*).[23] To be sure, every DMA is at least moderately concentrated, which is "sufficiently troublesome" for an information exchange to warrant antitrust scrutiny. Ex. 1, Areeda & Hovenkamp, Antitrust Law ¶ 1436f4.

Plaintiffs' proposed market is well-defined and supports a claim under the rule of reason.

## VI. THE CAC2 PLEADS ANTITRUST INJURY

"[W]hen consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer" antitrust injury. *Gelboim*, 823 F.3d at 772 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). One "sustain[s] their burden of showing injury by alleging that they paid artificially fixed higher prices." *Id.* at 777; *see also Washington Cty.*, 328 F. Supp. 3d at 845 ("the complaint alleges that the defendants' scheme resulted in the plaintiffs paying higher prices than they otherwise would have," which is "paradigmatic antitrust injury"). Defendants do not contest that Plaintiffs plead they paid higher prices that no longer reflected ordinary market conditions. CAC2 ¶¶ 4-8, 18-20, 47, 50, 73-74, 90, 95, App. A. Instead, based on a misreading of the CAC2, Defendants posit that Plaintiffs did not "purchase[] advertising [(1)] in any market where the challenged conduct occurred or [(2)]

---

[23] Plaintiffs' burden to show market power under Section 1 is *lower* than in a monopolization case under Section 2. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992) ("Monopoly power under § 2 requires, of course, something greater than market power under § 1.").

during any period affected by the challenged conduct." Mem. at 28. They are wrong.

As to (1) the locality argument, Plaintiffs specifically plead that the conduct occurred in no fewer than 68 DMAs, of which they purchased in 67. *See* Section II.C. and V.A., *supra*; CAC2 ¶¶ 58, 66 & App. A. Plaintiffs further plead that the widespread and systematic conduct could have affected as many as 59 additional DMAs, of which Plaintiffs purchased in 51. *See id.* As to (2) the temporality argument, Defendants admit for pleading purposes that antitrust injury is plausible for any purchase made "during that quarter after the alleged information exchange occurred but before the end of the quarter." Mem. at 33. Plaintiffs plead that the Sales Rep Firm conduct occurred "at least once per quarter, but frequently more often" from January 2014 onward. CAC2 ¶¶ 18-20, 55-60. ***Every one*** of Plaintiffs' purchases during the conduct period thus occurs after an information exchange occurred and before the end of the quarter. Moreover, it cannot be overlooked that Defendants' temporality argument applies only to the information exchange. No temporal limitations can reasonably be inferred as to price fixing.

To the extent Defendants implicitly suggest that claims predicated on the 59 potentially affected DMAs should be dismissed, with only the 68 specifically identified DMAs surviving, they are incorrect. Mem. at 29-31. This is not even a standing argument, but an improper attempt to limit Defendants' exposure for damages on the pleadings. Plaintiffs cannot be expected to plead the precise contours of Defendants' secret unlawful conduct. *Plasma-Derivative*, 764 F. Supp. 2d at 1002 n.10; *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1063 (N.D. Cal. 2015) ("[T]here is simply no requirement that an antitrust plaintiff draw the boundaries of the alleged conspiracy (or conspiracies) in a complaint with the precision of a diamond cutter.").

To the extent Defendants implicitly suggest that claims predicated on the nine DMAs where Plaintiffs did not purchase (or where Plaintiffs purportedly purchased "indirectly") should

33

be dismissed, they are incorrect for three independent reasons. Mem. at 31-32. *First*, antitrust liability is joint and several, and since Plaintiffs suffer injury by virtue of their purchases in the 68 specifically identified DMAs, they may recover for absent class members' purchases too.[24]

*Second*, because Plaintiffs have established standing as to each Defendant, any questions concerning absent class members' purchases are class certification issues "logically antecedent" to the standing concerns, and so are reserved for the Rule 23 stage of the case. *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008) ("whether [a plaintiff] may serve as an adequate class representative for others asserting [similar] claims are separate questions"); *Lewis v. Casey*, 518 U.S. 343, 395 (1996) (Souter, J., Ginsburg J., Breyer J. concurring in part) ("[T]he standing issue focuses on whether the plaintiff is properly before the court, not whether the . . . absent class members are properly before the court.").[25]

*Third*, Plaintiffs have not pled any "indirect" purchases. In the 33 DMAs identified by Defendants as "indirect," Mem. at 32, Plaintiffs plead that they bought broadcast television spot advertising "directly 'from' [an out-of-market] Broadcaster Defendant, but [the advertising] was aired 'on' a broadcast station operated by a different, [in-market] Broadcaster Defendant pursuant to a joint sales agreement," CAC2 App. A (under notes). Because the in-market Broadcaster that runs the advertisement and the out-of-market Broadcaster that makes the sale "are both alleged to be co-conspirators," it is well-settled that the purchase is considered "direct." *Fontana Aviation*, 617 F.2d at 481; *Paper Sys.*, 281 F.3d at 631 ("[t]he first buyer from a

---

[24] *E.g.*, *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002) ("plaintiffs[] and members of their class" "may collect damages not just firm-by-firm according to the quantity each sold, but from all conspirators for all sales").

[25] *See also, e.g.*, *Payton v. Cty. of Kane*, 308 F.3d 673, 680 (7th Cir. 2002) (the Supreme Court has issued a "directive to consider issues of class certification prior to issues of standing"); *McDonnell v. Nature's Way Prods, LLC*, No. 16-C-5011, 2017 WL 1149336, at *4 (N.D. Ill. Mar. 28, 2017) (deferring standing issues to Rule 23 stage as the "class certification issues [are] 'logically antecedent' to the standing concerns"); *Aftermarket Filters*, 2009 WL 3754041, at *5 (same).

conspirator" or "the first purchaser[] from outside the conspiracy" is the "right party to sue").

## VII.    DEFENDANTS' MOTION TO STRIKE IS PREMATURE

Striking class allegations "may only be granted when, given the facts as pleaded, there is no possible way for those facts to sustain a class action." *E&G, Inc. v. Am. Hotel Register Co.*, No. 17-cv-1011, 2018 WL 1334934, at *1 (N.D. Ill. Mar. 15, 2018). "The moving party bears the burden" to show that class-wide "relief [is] unrecoverable as a matter of law." *Mussatt v. IQVIA Inc.*, No. 17-C-8841, 2018 WL 5311903, at *2 (N.D. Ill. Oct. 26, 2018) (Kendall, J.).[26]

"Courts disfavor motions to strike class allegations in part because a motion for class certification is a more appropriate vehicle for consideration of the relevant issues." *Brown*, 2017 WL 899949, at *1 (citation omitted). This is "because the shape and form of the class is to be given time to evolve through discovery." *Id.* "Indeed, a court abuses its discretion by not allowing appropriate discovery before deciding whether to certify a class." *Id.* (citation omitted).

Defendants ask the Court to strike Plaintiffs' class antitrust allegations on predominance and superiority grounds without the benefit of class discovery. Mem. at 36. But "[t]he questions of superiority and predominance are uniquely difficult to resolve based on the complaint alone." *Lucas v. Vee Pak, Inc.*, 68 F. Supp. 3d 870, 883 (N.D. Ill. 2014) (denying motion to strike). And "predominance is a test readily met in certain cases alleging . . . violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997); 6 Newberg on Class Actions § 20:52 (5th ed.) ("[c]lasses alleging horizontal price-fixing conspiracies will typically satisfy the predominance requirement"). Defendants' ill-fated request is evaluated under this framework.[27]

---

[26] "On a motion to strike class allegations (as opposed to a motion for class certification) the moving defendant bears the burden." *Brown v. Swagway, LLC,* No. 3:15-CV-588, 2017 WL 899949, at *1 (N.D. Ind. Mar. 7, 2017) (citation omitted).

[27] Defendants ignore their burden when they claim that "the Supreme Court and Seventh Circuit endorse striking allegations at the pleading stage." Mem. at 36. *Gen. Tel. Co. of Sw. v. Falcon*, did no

Defendants' motion lists purported (and pedestrian) differences in local competition—the number of cartelists in a region, varied market shares and concentration levels, the roles of Cox Reps or Katz (who were active in *all* of the 127 identified DMAs *except 2*, CAC2 ¶ 58), and purportedly material differences in the nature of the information exchanged. Mem. at 37-38. But Defendants *merely speculate* that discovery will reveal that these differences undermine the cohesiveness of the class. Their arguments fail for three separate reasons.

*First*, these sorts of economic factors can be and are regularly controlled for in this Circuit through econometric modeling. In *In re Ready-Mixed Concrete Antitrust Litig.*, the court endorsed the use of multiple regression analysis as a tool "for measuring the impact of price-fixing" at class certification in a market that has "*over 1,000* different mixes [of concrete] each with its own particular set of characteristics," varied "negotiated individual prices" and "distinct product and geographic markets." 261 F.R.D. 154, 170, 173 (S.D. Ind. 2009) (emphasis added). And in *Kleen Prods. LLC v. Int'l Paper*, a class was certified where multiple regression analysis—a methodology "firmly rooted in sound economic and econometric principles"—"went to great lengths to include . . . factors that might otherwise explain the price increases," including "downstream demand; production and delivery; inflation; and seasonal factors." 306 F.R.D. 585, 603, 605, 607 (N.D. Ill. 2015) ("*Kleen II*"). And in *In re Sulfuric Acid Antitrust Litig.*, a national class was certified, rejecting the defendants' contention that "regional variation in the market," "loose and unstructured" pricing, unstandardized transactions, and nonfungible products could not "be overcome through statistical analysis." No 03-C-4576, 2007 WL 898600, at *2, *7-9

---

such thing, instead remanding "to evaluate carefully" the fully-developed trial record below as "it was error for the District Court to presume" whether a Rule 23 requirement could be met. 457 U.S. 147, 158 (1982). And in *Kasalo v. Harris & Harris, Ltd.*, the Seventh Circuit affirmed in part a decision striking some class allegations *after* discovery and *after* the plaintiff "conceded th[ose] class claims . . . cannot proceed," remanding for the district to consider striking the remaining class allegations only "after permitting sufficient discovery into the[ir] propriety." 656 F.3d 557, 559, 563 (7th Cir. 2011).

(N.D. Ill. Mar. 21, 2007) (noting also that future complications "can be addressed by altering or amending the class"). It cannot be said at this early stage that Plaintiffs cannot utilize these same well-recognized and well-accepted econometric and statistical tools here.

*Second*, Defendants' arguments are inherently fact-driven. Motions to strike class allegations are improper "where the dispute is factual and discovery is needed to determine whether a class should be certified." *Murdock-Alexander v. Tempsnow Employment*, No. 16-CV-5182, 2016 WL 6833961, at *4 (N.D. Ill. Nov. 21, 2016). Instead, motions to strike class allegations are only appropriate when the defendants advance a purely "legal argument based on the pleadings." *Wright v. Family Dollar, Inc.*, No. 10 C 4410, 2010 WL 4962838, at *1 (N.D. Ill. Nov. 30, 2010). This Court has recognized this, granting a motion whose resolution turned on a purely legal consideration, *Mussat*, 2018 WL 5311903, at *4 (striking allegations based on purely legal issue of whether a nationwide class could be certified against an out-of-forum defendant in the absence of a statute authorizing nationwide service of process), and denying those whose resolutions required development of the record, *Dochak v. Polskie Linie Lotnicze Lot S.A.*, 189 F. Supp. 3d 798, 808 (N.D. Ill. 2017) (Kendall, J.) (arguments based on the "individual facts of each Plaintiffs' [situation]" improper basis to strike class allegations) (collecting cases); *De Falco v. Vibram USA, Inc.*, No. 12-C-7238, 2013 WL 1122825, at *9 (N.D. Ill. Mar. 18, 2013) (Kendall, J.) (factual challenges are "premature" and "are better raised after the parties have had an opportunity to conduct class discovery.") (collecting cases).

*Third*, this Court will have a number of tools at its disposal to address any issues with a nationwide class that may develop in discovery, including issue class certification, the use of subclasses, and post-certification individualized proceedings. *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 800 (7th Cir. 2013) ("[A] class action limited to determining liability on a class-

wide basis, with separate hearings to determine—if liability is established—the damages of individual class members, or homogeneous groups of class members, is permitted by Rule 23(c)(4) and will often be the sensible way to proceed."). Indeed, "[i]t is routine in class actions to have a final phase in which individualized proof must be submitted." *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014) (reversing denial of certification). If the facts break in Defendants' favor in discovery, "this Court retains th[ese] abilit[ies] should regional variations make the class untenable." *Sulfuric Acid*, 2007 WL 898600, at *9.[28]

While Defendants have unsurprisingly identified a collection of largely out-of-circuit cases where antitrust plaintiffs, ***after being afforded an opportunity for class discovery***, were unable to certify a class, Mem. at 39-40, they cite just ***one case*** (also out-of-circuit) striking federal antitrust class allegations at the pleading stage, *id.* at 38. The fact that all of these courts allowed class discovery despite the potential for geographic and other market variation underscores the impropriety of Defendants' request. Indeed, in *State of Ala. v. Blue Bird Body Co., Inc.*, which Defendants cite in support of their motion to strike, Mem. at 39-40, the Fifth Circuit reversed certification of a nationwide class because the district court ***had improperly denied the plaintiffs appropriate discovery prior to reaching the certification issue***, concluding:

> It would be unfair for us to make this determination based on the present state of the record since the plaintiffs have been placed at a severe disadvantage by the district court's decision to prohibit discovery. Consequently, a remand of this case is necessary, and, on remand, the plaintiffs should be afforded the opportunity to attempt to establish through appropriate discovery the proper predicate for class certification.

---

[28] *See also, e.g.*, *In re Northwest Airlines Corp.*, 208 F.R.D. 175, 179-80 & n.4 (E.D. Mich. 2002) (certifying antitrust class of "all passengers who" flew on one of "234 'Affected City-Pair Routes' that beg[a]n or end[ed] at one of the[] hub airports" with disparate competitive conditions); *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1175, 2014 WL 7882100, at *28 (E.D.N.Y. Oct. 15, 2014) (certifying singular class in worldwide air cargo conspiracy covering numerous routes around the globe with different defendant configurations and other competitive conditions over defendants' objection that the plaintiffs had only alleged a "collection of individual route-specific conspiracies" unsuitable for treatment as a single class), *R&R adopted* 2015 WL 5093503 (E.D.N.Y. July 10, 2015).

573 F.2d 309, 323 (5th Cir. 1978).

In *In re Cox Enters, Inc. Set-Top Cable Television Box Antitrust Litig.*, 09-ML-2048-C, 2011 WL 6826813, at \*11-12 (W.D. Okla. Dec. 28, 2011), cited by Defendants as an "instructive example," Mem. at 40, the district court, ***after allowing class discovery***, denied certification of a tying claim (not a price fixing or information exchange claim) that required proof that class members were ***"coerced" into making a purchase***. 2011 WL 6826813, at \*7, \*12. Under that claim, to show Cox had market power "to force a purchaser to do something he would not do in a competitive market," the court denied certification as "class members "face[d] different options" to the coerced sale "depending on where they lived." *Id.* (citation omitted). There is no forcing or coercion element here, and even still, after the *Cox* plaintiffs re-pled regional classes the court found a regional class certifiable under Rule 23(b)(3). *In re Cox Enters., Inc. Set-Top Cable Television Box Antitrust Litig.*, No. 12-ML-2048-C, 2014 WL 104964, at \*6-8 (W.D. Okla. Jan. 9, 2014). If anything, *Cox* only highlights the tools available to the Court to certify a class here.

Defendants' lone case striking federal antitrust class allegations without discovery is not helpful to them. *First*, it improperly places the burden on the non-movant plaintiff to establish a *prima facie* case of certifiability at the pleading stage. *In re Ry. Indus. Emp. No-Poach Antitrust Litig.*, 395 F. Supp. 3d 464, 497 -98(W.D. Pa. 2019). In this District, the burden is ***on the Defendants*** to show that there is "no possible way for [alleged] facts to sustain a class action." *E&G*, 2018 WL 1334934, at \*1. *Second*, unique Third Circuit precedent arguably had "foreclosed the possibility that a class maybe [sic] certified in a no-poach wage suppression case," and to the extent a path to certification remained, it required a specific form of unpled proof: "that the compensation structures of the defendants . . . were so rigid that the compensation of all class members were tethered together." *Ry. Indus.*, 395 F. Supp. at 514.

There are no such precedential hurdles here. *E.g.*, 6 Newberg on Class Actions § 20:52.

Defendants' remaining cases, ***none*** of which involved antitrust claims, are equally unavailing. Mem. at 36. In *Pilgrim v. Universal Health Card, LLC*, class allegations were stricken in a consumer protection case because of the need for individualized "legal determination[s]" of choice of law issues, of which "discovery or for that matter more time would [not] have helped." 660 F.3d 943, 949 (6th Cir. 2011). The same is true of *Jones v. BRG Sports, Inc.*, a "personal injur[y]" suit implicating the law of 18 states, No. 18-cv-7250, 2019 WL 3554374, at *5, *7 (N.D. Ill. Aug. 1, 2019). *Wright* struck class allegations based on conflicts of interest under Rule 23(a)(4), a class requirement Defendants do not challenge here, 2010 WL 4962838, at *3, as did *Lee v. Children's Place Retail Stores*, No. 14-cv-3258, 2014 WL 5100608, at *2-*3 (N.D. Ill. Oct. 8, 2014). *Miller v. Motorola* also struck class allegations on Rule 23(a)(4) grounds, as well as the purely legal issue that the class definition impermissibly covered "prospective" injuries that had not occurred. 76 F.R.D. 516, 518 (N.D. Ill. Jan. 24, 2013). *Bohn v. Boiron* struck class allegations on *res judicata* grounds (the claims had been previously litigated) and standing grounds (the class representative was not a member of the class), No. 11-cv-08704, 2013 WL 3975126, at *5-*6 (N.D. Ill. Aug. 1, 2013), while *Baker v. Home Depot USA, Inc.* struck class allegations in a multistate products liability case on comity grounds, No. 11-C-6768, 2013 WL 271666, at *4-5 (N.D. Ill. Jan. 24, 2013). None are apposite.

Finally, Defendants' superiority argument cites a single case, *Szabo v. Bridgeport Machs., Inc.*, Mem. at 39, a breach-of-warranty and fraud case "pos[ing] serious problems about choice of law" among all 50 states, 249 F.3d 672, 674 (7th Cir. 2001). It has no bearing here in a federal antitrust case, where varied state law is simply not at issue.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and strike should be denied.

Date: November 22, 2019

Respectfully submitted,

*/s/ Megan E. Jones*
Megan E. Jones*
**HAUSFELD LLP**
600 Montgomery St. #3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mjones@hausfeld.com

Michael D. Hausfeld*
Hilary K. Scherrer*
Melinda R. Coolidge*
**HAUSFELD LLP**
1700 K Street NW #650
Washington, DC 20006
Tel: (202) 540-7200
Fax: (202) 540-7201
mhausfeld@hausfeld.com
hscherrer@hausfeld.com

Gary I. Smith, Jr.*
Tamara R. Freilich*
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
gsmith@hausfeld.com
tfreilich@hausfeld.com

*Lead Counsel*

Hollis Salzman
Meegan Hollywood*
**ROBINS KAPLAN LLP**
399 Park Avenue, Suite 3600
New York, NY 10022
Tel: (212) 980-740
Fax: (212) 980-7499
hsalzman@robinskaplan.com
mhollywood@robinskaplan.com

Kimberly A. Justice
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
Fax: (224) 632-4521
kjustice@fklmlaw.com

*Plaintiffs' Steering Committee*

Robert J. Wozniak
Steven A. Kanner
Michael J. Freed
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
skanner@fklmlaw.com
mfreed@fklmlaw.com
rwozniak@fklmlaw.com

*Liaison Counsel*

Stephanie A. Scharf
**SCHARF BANKS MARMOR LLC**
333 West Wacker Drive, Suite 450
Chicago, IL 60606
Tel: (312) 726-6000
sscharf@scharfbanks.com

*Additional Counsel for Plaintiffs and the
Proposed Class*

\*Admitted *pro hac vice*