**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ) | |
| ) | |
| ) | MDL No. 2867 |
| ) | No. 18 C 6785 |
| IN RE: LOCAL TV ADVERTISING ) | |
| ANTITRUST LITIGATION ) | Judge Virginia M. Kendall |
| ) | |
| ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Judicial Panel on Multidistrict Litigation consolidated before this Court antitrust actions pending in multiple jurisdictions because the cases involve common questions of fact and centralization will promote the just and efficient conduct of this litigation.  (Dkt. 1).  The actions each allege a conspiracy to artificially inflate the prices of local television spot advertisements throughout the United States. Before the Court are three Motions to Dismiss Plaintiffs' Consolidated Second Amended Antitrust Class Action Complaint for failure to state a claim and a Motion to Strike the Class Allegations.   For the reasons set forth below, the Broadcaster Defendants' Motion to Dismiss (Dkt. 328) is denied, Gray TV's Motion to Dismiss (Dkt. 330) is granted, Katz's Motion to Dismiss (Dkt. 346) is denied, and the Motion to Strike the Class Allegations (Dkt. 328) is denied.

### BACKGROUND

On a motion to dismiss under Rule 12(b)(6), the Court accepts the Complaint's well-pleaded factual allegations and draws all reasonable inferences in the non-moving party's favor. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014).  The facts below come from Plaintiffs' Consolidated Second Amended Antitrust Complaint ("Complaint") (Dkt. 292) and

the Court accepts them as true for purposes of reviewing this Motion. *See Vinson v. Vermillion Cty., Ill.*, 776 F.3d 924, 925 (7th Cir. 2015).

## I.    The Parties

Plaintiff Thoughtworx, Inc. is an advertising company that purchases broadcast television spot advertising time for advertiser clients. (Dkt. 292 ¶ 18). Thoughtworx purchased spot advertising from several Defendants during the Class Period.[1] (*Id.*). Plaintiff One Source Heating & Cooling is a company that purchased broadcast television spot advertising during the Class Period directly from Defendants Raycom Media and Sinclair Broadcast Group. (*Id.* ¶ 19). Defendants are broadcasters and advertising sales firms who sold television spot advertising during the Class Period. (*Id.* ¶¶ 21–41).

## II.    Framework of Defendant's Alleged Antitrust Scheme

Plaintiffs allege that during the Class Period, Defendants[2] secretly orchestrated a unitary scheme to supra-competitively raise the prices of broadcast television spot advertisements by agreeing to fix prices and exchange sales data, including pacing data.[3] (Dkt. 292 ¶ 2). The existence of the data exchange and the data itself were kept secret from the purchasers of broadcast television spot advertising. (*Id.* ¶ 3). The information Defendants exchanged included both local

---

[1] The "Class Period" begins in the first quarter of 2014 and continues until "the effects of the unlawful conduct are adjudged to have ceased." (Dkt. 292 ¶ 220).

[2] The Court uses the term "Defendants" to refer collectively to CBS Corporation ("CBS"), Cox Enterprises, Inc. ("Cox Enterprises"), Cox Media Group, LLC ("Cox Media"), Dreamcatcher Broadcasting, LLC ("Dreamcatcher"), The E.W. Scripps Company ("E.W. Scripps"), Griffin Communications, LLC ("Griffin"), Fox Corporation ("Fox"), Katz Media Group, Inc. ("Katz"), Meredith Corporation ("Meredith"), Nexstar Media Group, Inc. ("Nexstar"), Gray Television, Inc. ("Gray TV")—through its acquisition of Raycom Media, Inc. ("Raycom")—, Sinclair Broadcast Group, Inc. ("Sinclair"), TEGNA, Inc. ("TEGNA"), Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), and Tribune Media Company ("Tribune Media").

[3] According to the Complaint, pacing data "is used to compare a broadcast station's revenues booked for a certain time period (either a current or future period) to the revenues booked for the same point in time in the previous year. It is accompanied by a percentage figure (*i.e.*, that a station's revenue indicates that it is pacing plus or minus 10%, 20%, 30%, or so on). Pacing indicates how each station is performing compared to the rest of the market and provides insight into each station's remaining broadcast television spot advertising inventory for a current or future period. The exchange of pacing information reveals the Broadcaster Defendants' remaining supply, with supply being a, if not the, key factor informing negotiations over price." (Dkt. 292 ¶ 54).

and national broadcast television spot advertising data and was shared, with the Broadcaster Defendants'[4] knowledge and at their direction, with individuals within the Broadcaster Defendants' organizations with authority over pricing. (*Id.* ¶ 4). The scheme derailed the competitive process and allowed the Broadcaster Defendants to avoid price competition, harming direct purchasers of broadcast television spot advertising in Designated Market Areas ("DMAs") throughout the United States because it enabled the Broadcaster Defendants to better understand the availability of their would-be competitors' inventory through the exchange of pacing data. (*Id.*).

Cox Media and Katz, the "Sales Rep Firms," function "as extensions of a station's sales staff and are familiar with various rate cards (prices) and program research demographics." (*Id.* ¶ 41). The Sales Rep Firms are industry participants that regularly communicate with each Broadcaster Defendant to serve the Broadcaster Defendants' demands. (*Id.*). The Sales Rep Firms facilitated the "exchange [of] real-time pacing information" between Defendants. (*Id.*). Defendants' alleged price-fixing cartel was facilitated in large part through a reciprocal exchange of competitively sensitive information, which included: (1) pacing information, (2) average price data through a third-party called Kantar, available at a granular level broken down by DMA and inventory type (*e.g.*, early news, late news, prime time), and (3) other forms of competitively sensitive sales information. (*Id.* ¶ 50).

Plaintiffs allege that, as revealed in the DOJ's investigations, related court filings, and the investigation of counsel, Defendants' exchange of competitively sensitive information took at least

---

[4] The Court uses the term "Broadcaster Defendants" to refer collectively to CBS, Cox Enterprises, Dreamcatcher, Fox, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune as (Dkt. 292 ¶ 40). The Court uses the term "Sales Rep Firms" to refer collectively to Cox Media and Katz.

two forms. First, Defendants agreed to regularly and reciprocally exchange local sales pacing information through the Sales Rep Firms, including real-time pacing information regarding each station's revenues, and reported the information to the Broadcaster Defendants in the DMA. (*Id.* ¶¶ 52–53). The information exchanges included data on individual stations' booked sales for current and future months as well as comparisons to past periods. (*Id.* ¶ 55). These information exchanges occurred in DMAs across the United States. (*Id.* ¶ 58). Specifically, at least once per quarter, the Sales Rep Firms in a given DMA exchanged real-time pacing information regarding the broadcast stations within that DMA and reported the information to the Broadcaster Defendants and to the station owners in the DMA. (*Id.*). In those DMAs in which the Sales Rep Firms represented more than one Broadcaster Defendant, they erected firewalls intended to prohibit and prevent the dissemination of competitively sensitive information between the teams representing different Broadcaster Defendants. (*Id.* ¶ 56). In those DMAs, the Sales Rep Firms facilitated these information exchanges among rival Broadcaster Defendants in violation of and in intentional disregard of those firewalls. (*Id.*). Once the Sales Rep Firms shared the information with the Broadcaster Defendants, their competitors' pacing information was then disseminated to individuals within the Broadcaster Defendants with authority over pricing and sales. (*Id.* ¶ 57).

Second, Plaintiffs allege that in some DMAs, the Broadcaster Defendants also exchanged sensitive information directly with one another, without using the Sales Rep Firms as intermediaries. (*Id.* ¶ 59). The Broadcaster Defendants accomplished this by exchanging DMA-specific pacing data and national pacing data. (*Id.* ¶ 60). Broadcaster Defendants also facilitated their information exchange by providing data to a third-party, Kantar, which then disseminated that data in an aggregated form back to Defendants in its SRDS Media Planning Platform. (*Id.* ¶ 61). Kantar collects advertisement airing data by continuously monitoring local television

stations' broadcast feeds. (*Id.* ¶ 62). The Broadcaster Defendants in turn provide retrospective (45–90 days' old) average pricing data for broadcast television spot advertising to Kantar. (*Id.*) Kantar uses this information to create reports that the Broadcaster Defendants purchase from Kantar. (*Id.*) Kantar's SRDS Media Planning Platform's data is broken down granularly by, among other things, DMA and inventory type (*e.g.*, early news, late news, prime time) and tells the Broadcast Defendants the price for broadcast spot television advertising broken down by specific DMA and by time of day. (*Id.* at ¶¶ 62–63). If one multiplies the average cost-per-point for a particular market profile (*e.g.*, daytime in a given DMA) by the Nielsen ratings for that program, one can estimate how pricing would be set for that given program in a given DMA. (*Id.* ¶ 63). Defendants' ability to make this calculation increases the efficacy of the pacing data exchange and allows the Broadcaster Defendants to better rule out the possibility that an increase or decrease in revenue pacing was being driven by increases or decreases in the prices of broadcast spot television advertising. (*Id.* at ¶¶ 63–64).

The data exchanged among Defendants was not made available to Plaintiffs or, if it was publicly available, it was only available at a substantial cost. (*Id.* ¶ 65). Plaintiffs contend that "by concealing the exchange from their customers and making the information non-public, Defendants reveal that the exchange was for an anticompetitive purpose." (*Id.* ¶ 65).

## III. DOJ Antitrust Actions

In order to end what it characterized as "concerted action between horizontal competitors in the broadcast television spot advertising market," the United States Department of Justice brought civil antitrust complaints alleging unlawful restraints on trade under the Sherman Act against the Broadcaster Defendants on November 13, 2018, December 13, 2018, and June 17, 2019. (*Id.* ¶¶ 6, 89). The DOJ also filed proposed judgments, which included a number of

provisions designed to "terminate Defendants' illegal conduct, prevent recurrence of the same or similar conduct, and ensure that Defendants establish an antitrust compliance program," thereby "putting a stop to the anticompetitive information sharing." (*Id.* ¶¶ 7, 90). Each of the defendants entered into consent decrees with the DOJ, except for Gray, Cox Media, and Katz. (*Id.* ¶ 21).

When announcing the consent decrees with Broadcaster Defendants, the DOJ described its theory of the anti-competitive nature of Defendants' alleged actions as follows: "[b]y exchanging pacing information, the broadcasters were better able to anticipate whether their competitors were likely to raise, maintain, or lower spot advertising price . . . harming the competitive price-setting process." (*Id.* ¶ 73). The DOJ's Assistant Attorney General for the Antitrust Division, Makam Delrahim, noted that "[a]dvertisers rely on competition among owners of broadcast television stations to obtain reasonable advertising rates, but this unlawful sharing of information lessened that competition and thereby harmed the local businesses and the consumers they serve." (*Id.*).

On November 13, 2018, December 13, 2018, and June 17, 2019, the DOJ filed complaints, which stated that "Defendants' agreements are restraints of trade that are unlawful under Section 1 of the Sherman Act." (*Id.* ¶ 89). The settlements stemming from those antitrust actions mandate that for seven years, Defendants (less Katz, but including Gray TV, by virtue of its acquisition of Raycom, and Cox Media, by virtue of its subsidiary-parent relationship with Cox Enterprises) must refrain from sharing competitively sensitive information directly or indirectly (including pricing information, pricing strategies, pacing holding capacity, revenues, or market shares), establish antitrust whistleblower policies, designate Antitrust Compliance Officers responsible for implementing training and compliance program, cooperate in the ongoing DOJ investigation, and certify annual compliance with the Judgments' terms and conditions. (*Id.* ¶ 91). This injunctive

relief extends to all DMAs in the United States. (*Id.* ¶ 92). Although the DOJ complaints refer to the conduct at issue as "illegal" and "unlawful," DOJ declined to prosecute Defendants criminally. (*Id.* ¶¶ 93, 98–104). After reaching these settlements, DOJ's Delrahim stated that DOJ had reached settlements with "seven broadcast television companies who [DOJ] alleged had colluded with their competitors to reduce competition in the market for broadcast advertising." (*Id.* ¶ 96).

## IV. Economic Evidence of Antitrust Scheme & "Plus Factors"

According to Plaintiffs, economic evidence in this case supports the existence of a cartel. (*Id.* ¶¶ 105–14). The number of people who actually view television advertising has been dwindling, and media spending continues to shift from traditional to digital products and services at a rapid pace. (*Id.* ¶¶ 108–09). But the broadcast television spot advertising market has not responded to declining demand in the way one would expect of a competitive market. (*Id.* ¶ 111). Namely, one would expect these conditions to lead broadcasters to lower prices to compete for and preserve market share. (*Id.*). Instead, the market exhibits indicia of cartel activity, including increased prices and increased revenues. (*Id.*).

Between 2008 and 2016, the broadcast television spot advertising market lost two percent in revenue. (*Id.* ¶ 112). With one exception, all Defendants outpaced the market as a whole in percent gains in over the air ("OTA") revenue, some by as much as 97 percent, 164 percent, and 218 percent. (*Id.* ¶ 112). The sole Defendant that failed to outpace the industry, Fox, was also the only Defendant that was selling broadcast stations (and their attendant revenue streams) during the relevant period. (*Id.*).

Beginning in the first quarter of 2014, television spot advertising prices began rising on a cost per point ("CPP")[5] basis. (*Id.* ¶ 113). These increased prices coincided with an increase in the Broadcaster Defendants' revenues. (*Id.* ¶ 114).

Plaintiffs allege that several "plus factors" are present in this case, which Plaintiffs define as "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." (*Id.* ¶ 145). The plus factors Plaintiffs allege include: the Defendants' exchange of competitively sensitive information, a motive to conspire, actions and conduct that would be against the Broadcaster Defendants' unilateral self-interest in the absence of an anticompetitive agreement, opportunities and invitations to collude at trade associations and otherwise, high market concentration, and high barriers to entry. (*Id.* ¶¶ 146–98).

Plaintiffs contend that Defendants' alleged information exchange is a "super plus factor." (*Id.* ¶¶ 147–48). Plaintiffs claim that Broadcaster Defendants irrationally raised their prices in the face of declining demand that should have caused prices for broadcast television spot advertising to fall. (*Id.* ¶ 157). "[A] firm acting alone is uncertain how a rival will price, and so the economically rational decision is to lower prices commensurate with the declining demand to retain existing, or even to gain additional, market share," but because the Defendants raised prices, it "strongly suggests" they acted in concert. (*Id.* ¶¶ 158–59). Plaintiffs further allege that Defendants had ample opportunities and invitations to collude, including through trade associations, initiatives, and Joint Service Agreements. (*Id.* ¶¶ 160–73). Additionally, Broadcaster Defendants have a high market share and a high concentration in the broadcast television spot advertising market, which is another plus factor. (*Id.* ¶¶ 174–88). As of 2017, the Broadcaster

---

[5] Cost per point pricing refers to the cost to reach one percent of television households in a specified area. (Dkt. 292 ¶ 113).

Defendants collectively owned 471 "full-power" stations, up 85 percent from 254 stations in 2008. (*Id.* ¶ 175). The Broadcaster Defendants in total own 688 revenue generating stations, up over 150 percent from 268 stations in 2008, which evinces the potential for collusion as a highly concentrated market is more susceptible to collusion and other anticompetitive practices as compared to less concentrated markets. (*Id.* ¶¶ 175–76). There are also significant barriers preventing new players from entering this market, specifically: (1) governmental policy, especially FCC licensing, (2) the presence of dominant broadcasters, (3) access to content, (4) audience behavior, (5) consumer costs, and (6) capital requirements. (*Id.* ¶ 190). Plaintiffs allege that these barriers help facilitate the formation of cartels and market-allocation agreements. (*Id.* ¶¶ 189–98).

Plaintiffs claim that Defendants fraudulently concealed their conduct through public statements in securities filings that they and the market were functioning competitively. (*Id.* ¶¶ 199–219). Plaintiffs and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged in this action prior to disclosure of a DOJ investigation on July 26, 2018. (*Id.* ¶ 200). Public statements made by Defendants include filings made with the Securities and Exchange Commission (*Id.* ¶¶ 202–04) and publicly posted codes of conduct. (*Id.* ¶¶ 206–18).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Olson v. Champaign Cty.*, 784 F.3d 1093,

1099 (7th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 734 (7th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). The plaintiff must "give enough details about the subject-matter of the case to present a story that holds together." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019) (quoting *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)). And the complaint's "factual allegations must be enough to raise a right to relief above the speculative level. *Twombly*, 550 U.S. at 555. Evaluating whether a claim is sufficiently plausible to survive a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 676 (7th Cir. 2016) (quoting *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011); *Iqbal*, 556 U.S. at 678)).

## DISCUSSION

### I.     Antitrust Injury & Article III Standing

Broadcaster Defendants first seek to dismiss the Complaint on the grounds that it does not contain an adequate allegation of an antitrust injury, and that Plaintiffs accordingly lack standing to sue. Section 1 of the Sherman Act declares illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. There are three elements to a § 1 claim: "'(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury.'" *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)). To satisfy the injury requirement, Plaintiffs must allege that their "claimed injuries are 'of the type the antitrust laws were intended to prevent' and 'reflect the anticompetitive effect of either the

violation or of anticompetitive acts made possible by the violation.'" *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Local 150*, 433 F.3d 1024, 1031 (7th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Here, Plaintiffs allege that they paid higher prices because of Defendants' price-fixing scheme. (Dkt. 292 ¶¶ 4–8, 18–20, 47, 50, 73–74, 90, 95). This is a quintessential antitrust injury. In determining whether an antitrust injury has been properly alleged, the Court "focuses on the connection between the purpose of the antitrust laws (protecting market competition) and the alleged injury. When the plaintiff's injury is linked to the injury inflicted upon the market, such as when consumers pay higher prices because of a market monopoly or when a competitor is forced out of the market, the compensation of the injured party promotes the designated purpose of the antitrust law—the preservation of competition." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 597 (7th Cir. 1995); *see also Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 539 (2013) ("'[T]he principal objective of antitrust policy is to maximize consumer welfare by encouraging firms to behave competitively.'" (citations omitted)). Considerations courts take into account in assessing whether an antitrust injury exists include: (1) the causal connection between the alleged antitrust violation and the harm to the plaintiff, (2) the presence of improper motive, (3) the directness between the injury and the market restraint, (4) the speculative nature of the damages, and (5) the risk of duplicate recoveries or complex damages apportionment. *See Loeb Indus., Inc. v. Sumitomo Corp.*, 306 F.3d 469, 484 (7th Cir. 2002) (citing *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 537–45 (1983)).

Plaintiffs claim that Defendants' collusion and price-fixing scheme allowed the Broadcaster Defendants to avoid price competition, harming direct purchasers of broadcast television spot advertising in DMAs throughout the United States. (Dkt. 292 ¶¶ 4–8). Plaintiffs

11

each purchased broadcast television spot advertising during the Class Period from various Defendants at prices that were supra-competitively impacted as a result of the alleged misconduct. (Dkt. 292 ¶¶ 18–20). There is a direct link between the alleged injury and market restraint, and there does not appear to be any proper motive, speculative damages, or risk of duplicate recoveries.

Relying on a strained reading of case law, Defendants suggest that Plaintiffs have failed to allege that the wrongful conduct and resultant injury occurred in the same market. But the relevant market to recover for an antitrust injury here is the television advertising market as a whole, of which Plaintiffs are consumers. Defendants seek to apply additional requirements by having them plead a specific injury in each of the 127 DMAs at issue in this case, but that is an issue to be raised at the class certification stage; it is not relevant to the question of whether an antitrust injury has been adequately alleged. The cases Defendants cite as support simply do not require the enhanced pleading requirements they wish to impose on Plaintiffs. The court in *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, for example, required the indirect purchaser plaintiffs to plead injuries under each state's laws in which they pursued state-law antitrust claims in addition to federal antitrust claims. 09 CV 3690, 2013 WL 4506000, at *8 (N.D. Ill. Aug. 23, 2013). The court dismissed the state-law claims related to states in which the indirect purchaser plaintiffs did not purchase Defendants' dairy products. *Id.* For the federal antitrust claims, however, the court considered the Chicago Mercantile Exchange cheese market and milk futures market as a whole in determining whether an adequate injury had been alleged for standing purposes. *Id.* at * 10. If Plaintiffs were bringing state-law claims here, certainly the Court would be required to delve into local markets; however, the harm alleged here is a federal antitrust claim and the market for such a claim is the national television advertising market. Plaintiffs have sufficiently alleged an antitrust injury in the relevant market.

Defendants' timing argument—that Plaintiffs do not allege that they purchased advertisements during any particular time period affected by Defendants' information exchange— is equally unavailing. Indeed, if Plaintiffs had failed to allege that they purchased advertisements during periods affected by anticompetitive conduct, they would lack standing. *Kochert v. Greater Lafayette Health Servs., Inc.*, 463 F.3d 710, 716 (7th Cir. 2006) (plaintiff lacked standing where she failed to allege that she participated in the market during the same time in which she alleged that defendants' anticompetitive conduct influenced the market). This is not the case here; Plaintiffs allege that they purchased broadcast spot advertising at prices impacted by Defendants' illegal conduct during the Class Period. (Dkt. 292 ¶¶ 18–20). Defendants focus on the timing of the information exchange, but the relevant question is whether Plaintiffs allege that they purchased advertising during the Class Period that was priced higher than it would be under normal market conditions. Plaintiffs allege that there were information exchanges and that those exchanges caused Plaintiffs to pay more than they would have absent those exchanges. That is sufficient to allege an antitrust injury.

Plaintiffs have also adequately alleged Article III standing. Three elements comprise the "irreducible constitutional minimum" of standing: (1) a concrete and particularized injury in fact that is (2) fairly traceable to the alleged action of the defendant and (3) that is likely to be redressed by a favorable decision. *McGarry & McGarry, LLC v. Bankr. Mgmt. Solutions, Inc.*, 937 F.3d 1056, 1063 (7th Cir. 2019) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Plaintiffs allege that they paid higher prices due to Defendants' price-fixing scheme, and "financial injuries are prototypical of [Article III] injuries." *Id.* (citing *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017). There is a clear causal connection between the injury and the Court can remedy that injury with a favorable order. Thus, Plaintiffs have Article III standing to sue.

## II.     Count I: Price-Fixing in Violation of Section 1 of the Sherman Act

Count One alleges that Defendants entered into and engaged in a contract, combination, or conspiracy regarding television spot advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act in order to artificially raise prices.  (Dkt. 292 at ¶ 230–31).  In order to show a *per se* violation of the Sherman Act, Plaintiffs must show either direct or circumstantial evidence of an illegal agreement.  *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("*Text Messaging I*").  Direct evidence of an agreement "'is explicit and requires no inferences to establish the proposition or conclusion being asserted.'"  *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig*, 60 F. Supp.3d 914, 950 (N.D. Ill. 2014) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d. Cir. 1999)).  Direct evidence is equivalent to a "smoking gun," and it is quite rare.  *Omnicare, Inc. v. UnitedHealth Grp., Inc.,* 629 F.3d 697, 706 (7th Cir. 2011); a*ccord In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) ("an admission by the defendants that they agreed to fix their prices is all the proof a plaintiff needs").  Circumstantial evidence consists of facts "from which the existence of such an agreement can be inferred."  *High Fructose Corn Syrup*, 295 F.3d at 654. "[M]ost cases are constructed out of a tissue of [ambiguous] statements, and other circumstantial evidence . . . ." *Id.* at 662. Indeed, "circumstantial evidence is the lifeblood of antitrust law" because direct evidence will rarely be available to prove the existence of a price-fixing conspiracy.  *City of Rockford v. Mallinckrodt ARD, Inc*., 360 F. Supp. 3d 730, 749 (N.D. Ill. 2019).  But mere allegations of "parallel conduct," without more, do not "exclude the possibility of independent action," and are therefore insufficient. *Twombly*, 550 U.S. at 554.

Defendants claim there is no direct evidence of collusion. Indeed, Plaintiffs have not pled the existence of a smoking gun agreement among Defendants nor do they dispute that their allegations are circumstantial in nature. *High Fructose Corn Syrup*., 295 F.3d at 654.

In considering whether sufficient circumstantial evidence of collusion exists, the Court asks whether Plaintiffs have alleged parallel conduct and additional factual circumstances or "plus factors," that are indicative of an agreement. *Twombly*, 550 U.S. at 556–57; *Text Messaging I*, 630 F.3d at 628–29; *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017). Circumstantial evidence can be enough if it includes "a mixture of parallel behaviors, details of industry structure, and industry practices, that facilitate collusion." *U.S. Bd. of Oral Implantology v. Am Bd. of Dental Specialties*, 390 F. Supp. 3d 892, 902–03 (N.D. Ill. 2019) (citing *Text Messaging I*, 630 F.3d at 627)). Parallel behaviors include those which "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties," and "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement." *Id*. at 903. The Court must also consider whether there are "alternative, non-conspiratorial explanations for Defendants' conduct." *Broiler Chicken*, 290 F. Supp. 3d at 790.

### A. Parallel Behavior

"Parallel behavior" by competitors (*i.e.*, competitors following the same course of conduct) can be circumstantial evidence of an agreement not to compete. *See Twombly*, 550 U.S. at 553. Without more, however, allegations of parallel conduct are "merely consistent with," but do not "plausibly suggest" the existence of an agreement. *Id*. at 557. Defendants claim that Plaintiffs have not alleged parallel conduct sufficient to state a claim. Specifically, Defendants say there are

no factual allegations regarding uniform conduct of pricing by competitors and that Plaintiffs instead present unsupportive economic evidence. But as the Seventh Circuit explains:

> Commentators have offered several examples of parallel conduct allegations that would state a [Sherman Act] § 1 claim under this standard . . . [namely,] 'parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties' . . . [;] 'conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement.' . . . '[C]omplex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' would support a plausible inference of conspiracy.

*Text Messaging I*, 630 F.3d at 628. Consistent with this standard from *Text Messaging*, Plaintiffs allege specific data to show that beginning in early 2014, each Broadcaster Defendant raised its prices for broadcast television spot advertising in parallel. Defendants claim that Plaintiffs allegations are insufficient because they have only alleged price increases in the aggregate. Defendants point out that other courts have dismissed claims premised solely on aggregate data. *See e.g. In re Musical Instruments & Equipment Antitrust Litigation*, 798 F.3d 1186, 1197 (9th Cir. 2015) (Plaintiffs did not "allege any facts connecting the purported price increase to an illegal agreement among competitors. And without such a connection, there is simply no basis from which we can infer an agreement."). Unlike the plaintiffs in *Musical Instruments*, however, Plaintiffs do not fail to connect the aggregate data to price increases; instead, they specifically allege that Defendants' conduct has caused broadcast spot advertising prices to rise. (Dkt. 292 at ¶ 113, Figures 3.a, 3.b, and 3.c). Other courts have dismissed cases due to plaintiffs' reliance on aggregate data but have only done so where the plaintiffs failed to connect the aggregate data to the presence of a potential conspiracy. *See, e.g.*, *In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d 380, 390 (S.D.N.Y. 2019) (holding that plaintiffs' aggregated statistics were not irrelevant to a claim that a conspiracy existed but that plaintiffs needed to present additional

allegations for them to suffice); *In re Pork Antitrust Litigation*, 18 CV 1776, 2019 WL 3752497, *8 (D. Minn. Aug. 8, 2019) (granting motion to dismiss where plaintiffs relied "almost exclusively on industry-wide data and asked the Court to infer that the individual Defendants all contributed to the decreased production, seemingly simply because they make up the majority of the industry.").

Here, Plaintiffs allege a number of plus factors in addition to the aggregate data and they directly connect Defendants to an antitrust conspiracy through evidence of the settlements and consent decrees stemming from the DOJ investigations. Some courts have held that where allegations are sparse, the mere presence of a DOJ investigation is insufficient to give rise to the possibility of parallel conduct. *See In re Mexican Gov't Bonds Antitrust Litig.*, 412 F. Supp. 3d at 390 ("It is far from clear that an ongoing government investigation involving Defendants would, in the absence of more substantial allegations, weigh in favor of the complaint's plausibility."); *see also In re London Silver Fixing Antitrust Litigation*, 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016) ("[T]he mere fact that regulatory entities are investigating the possibility of . . . misconduct . . . is not a plus factor.") (internal quotation marks omitted)); *In re Aluminum Warehousing Antitrust Litig.*, 13 MD 2481, 2014 WL 4277510, at *34 (S.D.N.Y. Aug. 29, 2014) (holding that "inquiries or investigations alone can[not] plausibly support an alleged § 1 conspiracy"), *supplemented*, 2014 WL 4743425 (S.D.N.Y. Sept. 15, 2014), *and aff'd*, 833 F.3d 151 (2d Cir. 2016). Other Courts have held that DOJ investigations can bolster antitrust conspiracy arguments. *See GSE Bonds*, 396 F. Supp. 3d at 363 (holding, in the context of a claim involving allegations of direct evidence, that "the plausibility of the alleged conspiracy is bolstered, at least to some extent, by the ongoing Department of Justice investigation into the same alleged misconduct"); *Starr v. Sony BMG Music Enter.*, 592 F.3d 314, 325 (2d Cir. 2010) (finding an

inference of conspiracy plausible in part because DOJ investigated possible price fixing by defendants); *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 723 (S.D.N.Y. 2017) ("The presence of an ongoing investigation into the same subject matter as alleged in the pleadings here raises an inference of conspiracy.").

The allegations about the DOJ settlements here implicate antitrust concerns far more than the mere presence of an investigation. Plaintiffs allege that Defendants settled with the DOJ and entered into a consent decree that would restore the competition that the alleged conduct vitiated. (Dkt. 292 ¶¶ 4, 5, 22–26, 28–37, 73–74, 90, 85). A DOJ investigation alone is not enough to support an inference of antitrust conspiracy, but the allegations here are that the investigations produced results, namely consent decrees and settlements. Considered together with the plus factors described below, Plaintiffs have alleged enough to state a claim in Count I.

### B.     Plus Factors

Plaintiffs allege more than just aggregate data and the existence of a DOJ settlement. While Defendants attempt to isolate certain pleadings, the Court must read the Complaint as a whole. *Text Messaging I*, 630 F.3d at 628–29 (analyzing factors as a whole); *Broiler Chicken*, 290 F. Supp. 3d at 790 (considering allegations of parallel conduct and plus factors in tandem); *Standard Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D.Ill.2009) ("Defendants' attempt to parse the complaint and argue that none of the allegations (*i.e.*, quoted public statements, parallel capacity decisions, trade association and industry meetings) support a plausible inference of conspiracy is contrary to the Supreme Court's admonition that '[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quoting *Cont'l Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)). Plus factors that courts consider may include "evidence of other circumstances giving rise to a less direct inference

of conspiracy, such as 'a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications.'" *Anderson News LLC v. American Media, Inc.*, 899 F.3d 87, 104 (2d Cir. 2018) (quoting *United States v. Apple, Inc.*, 791 F.3d 290, 315 (2d Cir. 2015)).

The plus factors that Plaintiffs allege include: an information exchange of competitively sensitive information, a motive to conspire, actions and conduct that would be against the Broadcaster Defendants' unilateral self-interest in the absence of an anticompetitive agreement, opportunities to collude through trade associations and otherwise, high market concentration, and high barriers to entry. (Dkt. 292 ¶¶ 146–98).

Plaintiffs contend that Defendants' alleged information exchange is a "super plus factor." (*Id.* ¶¶ 147–48). Whether the academic literature recognizes a "super plus factor" is immaterial; there is no doubt that Plaintiffs have alleged sufficient information on an information exchange, which is a plus factor. *Omnicare, Inc.*, 629 F.3d at 709. Plaintiffs have pleaded that a third-party called Kantar facilitated the Broadcaster Defendants' ability to exchange competitively sensitive information with one another and that the Sales Rep Firms also facilitated such exchanges. (*Id.* ¶¶ 52–65). Plaintiffs do not urge that information exchanges are *per se* violations of antitrust law, but only that one occurred here, and that the information exchange, in conjunction with other well-pleaded plus factors give rise to an inference of an antitrust conspiracy. As a consequence of that conspiracy, Broadcaster Defendants raised their prices despite declining demand that under normal market conditions would have caused broadcast television spot advertising prices to fall. (*Id.* ¶ 157).

Plaintiffs allegations related to plus factors like opportunities to collude, a motive to collude, and the market structure, all support an inference of price fixing. Plaintiffs allege that the Broadcaster Defendants raised their prices despite declining demand, which would ordinarily be against each Defendant's self-interest. In rebuttal, Defendants argue that their motive was only to increase their profits, which is of course a lawful goal. But Plaintiffs' allegation is not simply that Defendants increased their prices. Rather, Plaintiffs also allege that Defendants increased their prices despite a demonstrated lower demand for television spot advertising. Raising prices in the face of lower demand could be against Defendants' self-interest in the absence of collusion. While there may be explanations for the price increase other than collusion, Plaintiffs only have to allege what is plausible at this stage. *See, e.g. Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1079 (N.D. Ill. 2011) ("*Kleen I*") (noting—despite the defendants' presentation of alternative explanations for price increases—that at the motion to dismiss stage, plaintiffs' alleged explanation must only satisfy the plausibility test). Here, Plaintiffs' alleged explanation for increased prices in the face of declining demand—that Defendants exchanged sensitive information—satisfies the plausibility standard.

Plaintiffs allege that a proliferation of trade organizations has facilitated Broadcaster Defendants' ability to conspire. Defendants respond that "Plaintiffs have simply described trade organizations" (Dkt. 329 at 18), which is a toothless allegation. Certainly, there are innocuous reasons for companies to join trade organizations, but Plaintiffs make a specific allegation. Whether Broadcaster Defendants actually joined trade organizations for innocuous reasons is irrelevant at this stage; all that matters is that Plaintiffs allege that the trade organizations facilitated the unlawful exchange of information. That being said, "[a]bsent additional facts addressing the content of defendants' discussions at or the (nefarious) subjects of trade organization meetings,

20

allegations that defendants were members of the same trade organizations are unspectacular and fail to move the needle;" additional facts would include allegations such as "express vows of cooperation among competitors." *Washington Cty. Health Care Auth. v. Baxter Int'l Inc.*, 328 F. Supp. 3d 824, 843 (N.D. Ill. 2018).

This case is distinguishable from *Washington County* because Plaintiffs allege numerous instances in which Defendants' executives made express public statements regarding cooperation among Defendants through the TV Interface Practices ("TIP Initiative") trade organization. (Dkt. 292 at ¶¶ 161–62). According to public statements made by executives of Sinclair, Nexstar, and Tribune, TIP enabled Defendants to work together toward accelerating electronic advertising transactions for local TV broadcasters. (*Id.* ¶ 161.) Plaintiffs also explain that Defendants had opportunities to cooperate with one another through membership in the Television Bureau of Advertising, the National Association of Broadcasters, and the Media Rating Council. (*Id.* ¶¶ 166–73.) Plaintiffs also allege that Defendants cooperated through Joint Service Agreements beginning in 2011 and the conduct at issue was widespread by 2013. (*Id.* ¶ 164).

Although opportunities of this nature to collude are not *ipso facto* evidence of a conspiratorial agreement, when one considers them in the "larger context of the market and industry actions," plus suspicious timing of industry meetings, evidence of these opportunities helps to "plausibly fill-out the picture" of an alleged conspiratorial agreement. *Broiler Chicken*, 290 F. Supp. 3d at 799–800.[6]

---

[6] Defendants state that "absent evidence of what information was exchanged at [industry] meetings, there is no basis for an inference that they were using the meetings to plot prices [sic] increases." *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 878 (7th Cir. 2015) ("*Text Messaging II*"). But this case is in a different posture than *In re Text Messaging*, as discovery had already taken place in that case. In the current posture of this case, the Court does not look to evidence to which Plaintiffs do not have access and instead only concerns itself with the plausibility of the allegations in the pleadings.

Finally, Plaintiffs allege that the market structure supports an inference of a price-fixing conspiracy. (Dkt. 292 ¶¶ 174–97). Market structure is an important consideration because an "industry structure that facilitates collusion constitutes supporting evidence of collusion." *Text Messaging I*, 630 F.3d at 627–28; *see also Text Messaging II*, 782 F.3d at 872. Specifically, Plaintiffs allege market concentration—with market shares as high as 100 percent in certain DMAs—and high barriers to enter the market. (Dkt. 348 at 22). Defendants cite *Washington Cty.* to support the proposition that market structure suggests only the possibility of collusion; however, the court there only stated that "industry structure alone cannot get the complaint across the finish line," not that it is an irrelevant consideration. 328 F. Supp. 3d at 841. Here, Plaintiffs allege parallel conduct and a number of plus factors, that, when considered together, give rise to an inference of a price-fixing conspiracy sufficient to state a claim and survive the motion to dismiss.

## III. Count II: Information Exchange Claim

Count II of the Complaint alleges an information exchange in violation of Section 1 of the Sherman Act. (Dkt. 292 ¶¶ 235–41). Exchange of information is not illegal *per se* but can be found unlawful under a "rule of reason" analysis, which considers "a number of factors including most prominently the structure of the industry involved and the nature of the information exchanged." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (citing *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)). Under a rule of reason analysis, the plaintiff carries the burden to show that there was an agreement or contract among the defendants that has an anticompetitive effect on a given market within a given geographical area. *Agnew*, 683 F.3d 328, 335 (citing *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 321 (7th Cir.2006)).[7] Plaintiffs

---

[7] The Court could perform a "quick look" analysis, by which the Court asks whether "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). However, as the parties have fully briefed the rule of reason analysis, the Court will apply it. Some Courts

also have the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. *Ohio v. Am. Express Co.*, 138 S. Ct 2274, 2284 (2018). If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. *Id.* If the defendant satisfies that burden, the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Id.* Because Plaintiffs have met this burden, Count II states a plausible claim.

## A.   Agreement Among Defendants to Share Information

As discussed above in Part II, Plaintiffs have alleged sufficient circumstantial evidence of an agreement among Defendants to share anticompetitive information. Defendants seek to require Plaintiffs to affirmatively plead information to which they likely did not have access given that it is improbable that an antitrust defendant would openly make an agreement to exchange information to suppress competition. *Twombly*, 550 U.S. at 556, 570 (explaining that a Section 1 Sherman Act claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made but that "we do not require heightened fact pleading of specifics.") All that is required is that Plaintiffs "give enough details about the subject-matter of the case to present a story that holds together." *Vanzant*, 934 F.3d at 736 (citations omitted). Plaintiffs allege circumstantial evidence of an agreement, which suffices at this stage.

## B.   Plausible Product Market

To establish a relevant market for a rule of reason analysis, Plaintiffs must define both a geographic market and a product market. *Right Field Rooftops, LLC v. Chi. Baseball Holdings,*

---

within this Circuit have also held that the Court need not resolve which antitrust analysis applies at the motion to dismiss stage. *Rockford v. Mallinckrodt ARD, Inc.*, 360 F. Supp. 3d 730, 753–54 (N.D. Ill. 2019) (finding that the court did not need to determine which mode of antitrust analysis should be conducted because after discovery the court can better determine whether and how to take a more detailed look at the effects of defendants' conduct).

*LLC*, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015) (citing *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 738 (7th Cir. 2004)). Defendants claim that Plaintiffs have failed to allege a plausible product market and that Plaintiffs make inconsistent allegations about the breadth of the product market. The failure to allege the existence of a relevant commercial market is fatal to a Sherman Act claim, regardless of whether the Court applies a *per se* analysis, quick-look review, or rule-of-reason analysis. *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 952 (N.D. Ill. 2019) (citing *Agnew*, 683 F.3d 328, 337 ("It is the existence of a commercial market that implicates the Sherman Act in the first instance.")). Of course, the Court does not "blindly accept a market definition proposed in a complaint" and an antitrust claim lacks merit when a plaintiff "fails even to attempt a plausible explanation as to why a market should be limited in a particular way." *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, 13 CV 1129, 2013 WL 4599903, at *3 (N.D. Ill. Aug. 29, 2013) (internal citations and quotations omitted)). The Court should dismiss a claim when the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fails even to attempt a plausible explanation as to why a market should be limited in a particular way. *Id.* (citing *In re Dairy Farmers of America, Inc., Cheese Antitrust Litig.* 767 F.Supp.2d 880, 901 (N.D. Ill. 2011)). Courts are generally hesitant to dismiss Sherman Act claims for failure to allege a relevant product "[b]ecause market definition is a deeply fact-intensive inquiry." *Int'l Equip. Trading, Ltd*, 2013 WL 4599903, at *3 (citing *Todd*, 275 F.3d at 199–200).

Here, Plaintiffs do not limit the product market to a single brand, franchise, institution or similar entity and plausibly plead that broadcast television spot advertising is not reasonably interchangeable with other forms of advertising. (Dkt. 292 ¶¶ 117–41). Plaintiffs define the relevant product market as the "sale of broadcast television spot advertising on broadcast television

stations." (*Id.* ¶ 117). They define the geographic markets as "individual, specific DMAs in which two or more Broadcaster Defendants purportedly compete" (*id.* ¶ 118) and that "industry analysts and government regulators have consistently recognized that digital media advertising and other forms of advertising are not effective substitutes for broadcast television spot advertising." (*Id.* ¶ 120). Plaintiffs go on to describe, in detail, what distinguishes television advertising from other forms of advertising, such that it is appropriate to consider the market to be national in scope. (*Id.* ¶¶ 121–44).

Defendants contend that Plaintiffs plead inconsistent product markets and that the inconsistency is fatal to the information exchange claim. *See Cinema Village Cinemark, Inc. v. Regal Ent. Grp.*, 15 CV 5488, 2016 WL 5719790, at *6 (S.D.N.Y. Sept. 29, 2016) (citing *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) for the proposition that dismissal is appropriate where the plaintiff defines the relevant market in inconsistent or facially implausible ways). No such inconsistency or implausibility exists here. Plaintiffs do not allege that digital media and television advertisements are fungible products, only that the number of people who actually view television broadcast advertising is falling; while digital media, which is a separate product market, now accounts for a larger media spend. (Dkt. 292 ¶¶ 108–09, 149–53). These market dynamics provide Defendants a "strong incentive to collude rather than compete" in the broadcast television advertisement space. (*Id.* ¶ 154–55). Given the opposite trajectory of broadcast media and digital media advertising, it is reasonable to assume that the products are not interchangeable. In other words, they plausibly allege that television broadcasting advertisements have "unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market." *Int'l Equip. Trading, Ltd*, 2013 WL 4599903, *3 (citations omitted).

Plaintiffs correctly point out that Defendants' cited cases do not support their interpretation of pleading requirements as they pertain to product market allegations. For example, Defendants claim that in *Hicks v. PGA Tour, Inc.*, the plaintiffs tried to limit the relevant product market to television advertising, and the Court rejected this narrow definition of the product market. *See* 897 F.3d 1109, 121 (9th Cir. 2018)). The *Hicks* court did no such thing – it rejected plaintiffs' product market not because it narrowed in on television advertising, but rather because plaintiffs attempted to narrow the market to advertisements to golf fans during televised live action golf tournaments, and alleged that other forms of advertising, including digital, radio, and podcasts could feasibly be included within that proposed market. 897 F.3d at 1116–22.

Plaintiffs sufficiently allege that broadcast television spot advertisements are interchangeable among one another but not readily interchangeable with other forms of advertisement. Given that determining the scope of a product market is a fact-intensive inquiry and that the Court should dismiss a complaint only when the alleged relevant market "'clearly does not encompass all interchangeable substitute products' or when a plaintiff 'fails even to attempt a plausible explanation as to why a market should be limited in a particular way,'" Plaintiffs have met their burden here. *See, e.g. Int'l Equip. Trading, Ltd*, 2013 WL 4599903, at *3 (citing *Dairy Farmers of America, Inc.*, 767 F. Supp. at 901).

### C.     Anticompetitive Effects

Defendants argue that Plaintiffs have failed to plead an anticompetitive effect, namely, "higher prices or lower output," which are the "principal vices proscribed by the antitrust laws." *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986); *see also* David Eisenstadt, *The Role of Economics in Truncated Rule of Reason Analysis*, 28-SUM Antitrust 52, 52 (2014) (explaining that plaintiffs show anticompetitive effects by demonstrating that prices

are higher or output is lower in a relevant market). Plaintiffs can show proof of anticompetitive effects either directly or indirectly. Direct evidence of anticompetitive effects would be "proof of actual detrimental effects on competition such as reduced output, increased prices, or decreased quality in the relevant market." *Am. Express Co.*, 138 S. Ct. at 2284 (internal citations omitted). Whereas "[i]ndirect evidence would be proof of market power plus some evidence that the challenged restraint harms competition." *Id.* (citations omitted). Plaintiffs allege that Defendants' information exchange resulted in higher prices, which is an anticompetitive effect. *See Toys "R" US, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) (explaining that "coordination of action among competitors" that prevents them "from having to lower . . . prices" is "proof of actual anticompetitive effects").

In particular, Plaintiffs plead that the quarterly exchange of pacing data provided the Broadcaster Defendants with insight into one another's relative remaining inventory, which removed uncertainty about each Broadcaster Defendants' relative inventory positions over time and into the future and allowed the Broadcaster Defendants to keep their prices artificially high as a result of this information exchange. (Dkt. 292 at ¶¶ 2, 4–5, 39, 50, 53–60, 65, 69–72, 74–75, 77, 90, 95). Not only that, but Plaintiffs allege that the information in question was not made public (*Id.* at ¶ 65), which creates a further inference that the information exchange was anticompetitive in nature. *Todd*, 275 F.3d at 213.

Defendants repeatedly cite to portions of Plaintiffs' pleadings where Plaintiffs clearly connect the dots between the alleged information exchange and the rise in price, but Defendants then go on to contend that Plaintiffs' allegations are "conclusory." While Defendants are correct that an information exchange is not always anticompetitive and can enhance competition, *Gypsum*, 438 U.S. at 441 n.16, as alleged here, the information exchange was intended to keep

27

prices high to the detriment of Plaintiffs and other consumers. The alleged facts indicate a plausible anticompetitive effect, and while there are certainly factual questions here, these are not to be resolved at the motion to dismiss stage. It is sufficient that Plaintiffs allege a plausible anticompetitive effect.

### D.    Market Power

Plaintiffs must also allege market power in order to show an antitrust violation under the rule of reason. "One traditional way to demonstrate market power is by defining the relevant product market and showing defendants' percentage share of that market." *Todd*, 275 F.3d at 199. As discussed above, Plaintiffs have alleged a sufficient product market. Plaintiffs have also alleged that Defendants have a concentrated share of the relevant market of broadcast television spot advertising on broadcast television stations. Plaintiffs plead that the Broadcaster Defendants "held 60 percent, and as high as 100 percent, market share in the multi-defendant DMAs listed in [A]ppendix A." (Dkt. 292 at ¶ 142; *see also* ¶¶ 174–98). That is more than sufficient market power to satisfy the market power prong. *See Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 667 (7th Cir. 1987) (explaining that the lowest possible market share legally sufficient to sustain a finding of monopolization is somewhere between 17% and 25%). Even so, market power defined as a percentage of market share is not the only way to demonstrate defendants' ability to have an adverse effect on competition. *Todd*, 275 F.3d at 206 (citing *Toys "R" Us, Inc.,* 221 F.3d at 937). If "a plaintiff can show that a defendant's conduct exerted an actual adverse effect on competition, this is a strong indicator of market power." *Id.* As discussed above, Plaintiffs can show an adverse effect on competition and so the lower market share in certain DMAs does not doom its claim.

## IV.    Katz's Motion to Dismiss

Defendant Katz Media Group, Inc. brings a separate Motion to Dismiss in which it contends that Katz cannot be liable for its participation in the alleged conspiracy because an agent acting only on behalf of a conspiring principal is not a separate co-conspirator.  (Dkt. 347). Because Katz served as an independent center of decision-making and the agency exception does not apply, Katz's Motion to Dismiss is denied.

### A.    Katz's Capacity to Form a Conspiracy

To form an agreement that violates the Sherman Act, the parties to the alleged agreement must be "independent centers of decisionmaking."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196 (2010).   Parties that are a "legally single entity" have been found liable where the party "was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity."  *Id.*   Under this theory, Katz believes the claims against it are barred because Katz was merely carrying out the principals' (in this case the Broadcaster Defendant clients) wishes.  (*Id.* at 3).

The authority Katz cites does not apply here.  First, Katz does not explain how it is not controlled by a single center of decisionmaking when it is alleged to have conspired with fourteen distinct economic actors, of whom only seven served as Katz principals, in a horizontal conspiracy. Plaintiffs allege that Katz participated in two separate horizontal trade restraints:  a price-fixing conspiracy and an information exchange, both of which violate Section 1 of the Sherman Act. (Dkt. 292 at ¶¶ 239–41).  Plaintiffs further allege that Katz joined the conspiracy in 2014 and collected and disseminated competitively sensitive information from each Broadcaster Defendant on a quarterly basis.  (*Id.* at ¶¶ 10, 21, 38–39, 41, 53–55, 58).  The case law Katz cites primarily applies to vertical restraints on trade and involve single firms and their own subsidiaries,

employees or agents. (Dkt. 347 at 3–5 (citing *Siegel Transfer, Inc. v. Carrier Express, Inc*., 54 F.3d 1125, 1135 (3d. Cir. 1995) (no conspiracy between two subsidiaries of one parent company and one of their agents); (*Pink Supply Corp. v. Hiebert Inc*., 788 F.2d 1313, 1316 -17 (8th Cir. 1986) (no conspiratorial relationship between furniture manufacturer and its sales agents); *Ill. Corp. Travel, Inc. v. Am. Airlines, Inc.*, 85 CV 7079, 1985 WL 2548, at *5–6 (N.D. Ill. Sept. 16, 1985), *aff'd*, 806 F.2d 772 (7th Cir. 1986) (airline incapable of conspiring with its travel agents in a vertical resale price maintenance claim*); Bill's Birds Inc. v. Trademarketing Resources Inc.*, 920 F. Supp. 2d 357, 365 (E.D.N.Y. 2013) (conspiracy not possible between automobile manufacturer and its licensing agent); *Belfiore v. N.Y. Times Co*., 826 F.2d 177, 182 (2d Cir. 1987) (no conspiracy between New York Times and its wholesalers)*; Fuchs Sugars & Syrups, Inc. v. Amstar Corp*., 602 F.2d 1025, 1031 (2d Cir. 1979) (no conspiracy between sugar refiner and its brokers).

This case presents different facts. Horizontal agreements, such as the one alleged here, are excluded from the agency exception. Phillip Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1473f (3d & 4th eds., 2018 Cum. Supp. 2010–17); *cf. In re Broiler Chicken Antitrust Litig.,* 16 CV 8637, 2019 WL 1003111, at *2 (finding that agent-defendant Agri-Stats was a knowing co-conspirator in allegations that they facilitated a horizontal cartel by collecting and disseminating commercially sensitive information among its clients); *Ill. Corp. Travel*, 1985 WL 2548, at *5–6 (finding that while no conspiracy between airline and travel agents in vertical restraint is possible, a conspiracy between airline and agents is possible where they conspired to eliminate horizontal competition).

Katz believes the pleadings indicate that it had a traditional agent-principal role that precludes it from liability. While this is not the case in a horizontal scheme such as the one alleged here, in any event, as Katz points out "'substance, not form, should determine whether a[n] . . .

entity is capable of conspiring under § 1." (*Am. Needle*, 560 U.S. at 194). Plaintiffs have plausibly alleged that Katz played a vital role in the price-fixing and information-sharing conspiracies, so the agency exception is inapplicable.

### B.      Katz's Liability for Conspiracy with Non-Client Third Parties

Katz moves to dismiss on the grounds that it cannot be held liable for conspiring with non-client defendants. However, Plaintiffs correctly distinguish *Aluminum Warehousing* from the instant case. (Dkt. 355 at 10 ("The critical distinctions between *Aluminum II* and the [Complaint]—(a) Katz did not always act at its principals' behest, and (b) joined a sprawling conspiracy involving fourteen separate economic actors, (i) only seven of which were Katz's principals and (ii) one of which was Katz's horizontal competitor, Cox Reps, Inc.")). Plaintiffs' pleadings plausibly give rise to the inference that Katz joined a horizontal conspiracy with all Broadcaster Defendants. Accordingly, Katz's Motion to Dismiss (Dkt. 346) is denied.

## V.      Gray TV's Motion to Dismiss

Gray TV also moves to dismiss the claims against it, on the grounds that Plaintiff does not allege that Gray TV participated in any of the alleged conduct. (Dkt. 330). Plaintiffs do not allege that Gray TV participated in the alleged conduct, only that Gray TV is liable for the acts of Raycom, which it acquired. (Dkt. 292 ¶ 26 n.4). Gray TV moves to dismiss because Plaintiffs have not alleged sufficient information to pierce the corporate veil. Plaintiffs claim that under the doctrine of federal successor liability, Gray TV has assumed Raycom's liability to Plaintiffs. Because Plaintiffs have not been left without an adequate remedy at law for the alleged harm caused by Defendant Raycom, Gray TV's Motion to Dismiss is granted.

A.    **Federal Successor Liability**

Plaintiffs sue Gray TV while admitting that Gray TV did not engage in any of the alleged illegal activity.  Plaintiffs claim this right to sue pursuant to the doctrine of federal successor liability.  Successor liability is an equitable doctrine, not an inflexible command, and "in light of the difficulty of the successorship question, the myriad factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate." *Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund v. Tasemkin, Inc.*, 59 F.3d 48, 49 (7th Cir. 1995) (citing *Howard Johnson Co., Inc. v. Detroit Local Joint Exec. Bd.,* 417 U.S. 249, 256 (1974)).  This doctrine typically applies when an entity has dissolved or gone bankrupt, leaving the plaintiff without a remedy aside from suing the entity's successor. *Id.*; *Upholsterers' Intern. Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1324 (7th Cir. 1990); *E.E.O.C. v. Northern Star Hosp., Inc.*, 777 F.3d 898, 900 (7th Cir. 2015).

Imposing federal successor liability is a form of equitable relief. *Tsareff v. ManWeb Servs.*, 794 F.3d 841, 845 (7th Cir. 2015).  "The absence of an adequate remedy at law is a precondition to any form of equitable relief." *Plumbers' Pension Fund, Local 130, U.A. v. Republic Piping Sys., Inc.*, 20 CV 774, 2020 WL 4437846, at *1 (N.D. Ill.  Aug. 3, 2020) (citing *Roland Mach. Co. v. Dresser Indus., Inc.,* 749 F.2d 380, 386 (7th Cir. 1984)).  An adequate remedy at law still exists here because Raycom is a surviving subsidiary of Gray TV and the Court takes judicial notice of the fact that Gray TV became Raycom's corporate parent through a reverse triangular merger. (Dkt. 331 at 2); *Takara Trust v. Molex Inc*., 429 F. Supp. 2d 960, 963 (N.D. Ill. 2006) (public filings and stock prices are judicially noticeable).  Since Plaintiffs have not alleged that they lack

an adequate remedy at law to recover against Raycom, the Court declines to impose on Gray TV the equitable remedy of successor liability.[8, 9]

## VI.    Motion to Strike Class Allegations

Defendants also move to strike Plaintiffs' class allegations.  (Dkt. 328).  This Motion is premature at this stage and is therefore denied.  Defendants argue that Plaintiffs' Sherman Act claims are inherently local and that none of the elements can be resolved on a nationwide basis. This is an inherently fact-intensive argument that is better adjudicated "after the parties have had an opportunity to conduct class discovery."  *De Falco v. Vibram USA, Inc*, 12 CV 7238, 2013 WL 1122825, * 9 (N.D. Ill. Mar. 18, 2013).

As Plaintiffs point out, of the cases Defendants cite as examples where antitrust plaintiffs' class allegations were stricken for being inherently local, all but one occurred after class discovery was conducted. In *Alabama v. Blue Bird Body Co*., 573 F.2d 309, 322–23 (5th Cir. 1978), which Defendants cite as an example of a nationwide class being rejected rejected for having local issues, the Fifth Circuit remanded because the district court could not make that determination based on the limited record before it as discovery had not yet been conducted.  Defendants' most compelling case of a court denying class certification of an antitrust case in the television industry is of limited utility to their argument because the denial there did not occur until two years into discovery.  *See In re Cox Enter., Inc. Set-Top Cable Television Box Antitrust Litig.*, 09 ML 2048-C, 2011 WL 6826813, at *2, (W.D. Okla. Dec. 28, 2011).  Striking class certification on account of factual considerations would be inappropriate because Plaintiffs have not yet had the benefit of discovery.

---

[8] Even if the Court were to reach the merits of the successor liability claim against Gray TV, the Court would still dismiss the claim because Raycom still exists as an entity, so it cannot appropriately be deemed Gray TV's successor.
[9] Gray TV initially argued that Plaintiffs cannot find Gray TV liable under a veil-piercing claim.  (Dkt. 331). Plaintiffs did not respond to Gray TV's arguments, instead arguing they could find Gray TV liable under federal successor liability.  (Dkt. 349).  Plaintiffs concede that the Complaint "did not invoke a veil piercing theory." (Dkt. 349 at 6).

## CONCLUSION

For the reasons set forth above, the Broadcaster Defendants' Motion to Dismiss (Dkt. 328) is denied, Gray TV's Motion to Dismiss (Dkt. 330) is granted, Katz's Motion to Dismiss (Dkt. 346) is denied, and the Motion to Strike the Class Allegations (Dkt. 328) is denied.

_____
Virginia M. Kendall
United States District Judge

Date: November 6, 2020