**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| IN RE:<br>LOCAL TV ADVERTISING ANTITRUST LITIGATION | MDL No. 2867<br>No. 18 C 6785<br><br>**NEXSTAR DEFENDANTS' ANSWER TO THE CONSOLIDATED THIRD AMENDED ANTITRUST CLASS ACTION COMPLAINT**<br><br>**PROVISIONALLY FILED UNDER SEAL**<br><br>Honorable Virginia M. Kendall<br><br><u>JURY TRIAL DEMANDED</u> |

Dreamcatcher Broadcasting LLC ("Dreamcatcher"), Nexstar Media Group, Inc. ("Nexstar Media"), Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), and Tribune Media Company (together with "Tribune Broadcasting," "Tribune") (the foregoing entities collectively, "Nexstar"), through its undersigned counsel of record, answers and responds ("Answer") to Thoughtworx, Inc. D/B/A MCM Services Group, One Source Heating & Cooling, LLC, Hunt Adkins, Inc. and Fish Furniture's (collectively, "Plaintiffs") Consolidated Third Amended Antitrust Class Action Complaint ("Third Amended Complaint" or "TAC") as follows:

Except as otherwise expressly recognized herein, Nexstar denies each and every allegation contained in the Third Amended Complaint. Nexstar states that the headings, sub-headings, images, and footnotes in the Third Amended Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response is required, Nexstar denies the allegations in the headings, sub-headings, images, and footnotes in the Third Amended Complaint. Nexstar further states that cited articles and documents in the Third Amended Complaint speak for themselves. Nexstar expressly reserves the right to seek to amend or supplement its Answer as may be necessary.

## I.     THE NATURE OF DEFENDANTS' UNLAWFUL CONDUCT

1.     This antitrust class action arises from a price fixing cartel facilitated by an anticompetitive information exchange between and among certain major television station owners and operators and sales representative firms to artificially inflate the prices of broadcast television spot advertisements[2] in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER**:  Deny.

---

[2] The television advertisements are purchased directly from broadcast television stations (as opposed to cable operators) and are referred to herein as "broadcast television spot advertising."

2.      Beginning on or around January 1, 2014, CBS Corporation, Cox Media Group, LLC,[3] Dreamcatcher Broadcasting, LLC, The E.W. Scripps Company, Griffin Communications, LLC, Fox Corporation, Meredith Corporation, Nexstar Media Group, Inc., Gray Media Group (through its acquisition of Raycom Media, Inc.), Sinclair Broadcast Group, Inc., TEGNA, Inc., Tribune Broadcasting Company, LLC, and Tribune Media Company (collectively, "Defendants")—firms that collectively account for billions of dollars in annual broadcast television spot advertising revenue—secretly orchestrated a unitary, overarching scheme to supracompetitively impact the price levels of broadcast television spot advertisements by agreeing to fix prices and exchange competitively sensitive historic, current, and forward-looking sales data, including inventory or pacing data.  Pacing data is used to compare a broadcast station's revenues booked for a certain time period to the revenues booked for the same point in time in the previous year (the exchange of which allows Defendants to forecast their would-be competitors' remaining inventory of broadcast television spot advertising), typically expressed as a plus or minus percentage (*e.g.*, plus or minus 20%).

**ANSWER**:  Deny.

3.      Both the existence of this data exchange and the data itself were withheld from purchasers of broadcast television spot advertising, creating an asymmetrical information

---

[3] Plaintiffs dismissed all claims against Cox Media Group LLC's parent entity Cox Enterprises, Inc. ("Cox Enterprises") on October 3, 2019.  See Pls.' Notice of Dismissal, ECF No. 315. On or around December 17, 2019, Cox Enterprises completed the sale of its portfolio of television and radio stations, Ohio assets, and its affiliated Cox Reps Inc. ("Cox Reps") and Gamut national advertising businesses to a new media company now named CMG Media Corporation (f/k/a Terrier Media Buyer, Inc. and d/b/a Cox Media Group).  Cox Reps and the Cox television station assets that are the subject of this Third Amended Complaint are currently owned or operated by subsidiaries of CMG Media Corporation (f/k/a Terrier Media Buyer, Inc. and d/b/a Cox Media Group).  Although the legal entity called Cox Media Group, LLC still exists as a subsidiary of Cox Enterprises, Plaintiffs understand that it does not currently own or operate Cox Reps nor any of the television station assets at issue in this Third Amended Complaint. Thus, all non-historical allegations regarding Cox Media Group, LLC or Cox Reps in this Third Amended Complaint, i.e., those that post-date December 17, 2019, shall be interpreted to mean CMG Media Corporation (f/k/a Terrier Media Buyer, Inc. and d/b/a Cox Media Group).

advantage for the Broadcaster Defendants (defined *infra*) in their dealings with their customers concerning the price of broadcast television spot advertising.

**ANSWER**: Deny.

4.      The information exchanged covered both local and national broadcast television spot advertising and was disseminated to individuals within the Broadcaster Defendants' organizations with authority over pricing, with the Broadcaster Defendants' knowledge and at their direction. By allowing the Broadcaster Defendants to better understand, in real time, the availability of their would-be competitors' inventory through the exchange of pacing data—with inventory being a, if not *the*, key factor affecting pricing negotiations—the scheme derailed the competitive process and allowed the Broadcaster Defendants to avoid price competition, harming direct purchasers of broadcast television spot advertising in Designated Market Areas ("DMAs") throughout the United States. The United States Department of Justice ("DOJ") explained the anticompetitive effects of Defendants' conduct as allowing them to "better [] anticipate whether their competitors were likely to raise, maintain, or lower spot advertising prices" and "gauge competitors' and advertisers' negotiation strategies," "help[ing Defendants] resist more effectively advertisers' attempts to obtain lower prices" and "distort[ing] the normal price-setting mechanism in the spot advertising market."

**ANSWER**: Nexstar admits that Paragraph 4 appears to quote statements made by the DOJ in its Complaint in matter 1:18-cv-0269 before the United States District Court for the District of Columbia, and refers to that Complaint for a complete and accurate statement of its contents. To the extent a response is required to the legal conclusions in the DOJ's Complaint, Nexstar denies them. Nexstar denies all other allegations of Paragraph 4 not specifically admitted.

5.      As the DOJ explained, "Advertisers rely on competition among owners of broadcast television stations to obtain reasonable advertising rates, but this unlawful sharing of information lessened that competition and thereby harmed the local businesses and the consumers they served."

**ANSWER**:  Nexstar admits that Paragraph 5 appears to quote a statement made by the DOJ on November 13, 2018, and refers to that statement for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, it is denied.

6.      Thus, the DOJ intervened to end what it characterized as "***concerted action between horizontal competitors*** in the broadcast television spot advertising market," filing a series of Proposed Judgments and Stipulations and Orders with Defendants CBS Corporation, Cox Media Group LLC, Dreamcatcher Broadcasting, LLC, the E.W. Scripps Company, Griffin Communications, LLC, Fox Corporation, Meredith Corporation, Nexstar Media Group Inc., Raycom Media, Inc.,[4]  Sinclair Broadcast Group, Inc., TEGNA, Inc., and Tribune Media Company on November 13, 2018, December 13, 2018, and June 17, 2019 (the "Judgments").

**ANSWER**:  Nexstar admits that Paragraph 6 appears to quote a statement made by the DOJ in the Judgments, and refers to those Judgments for a complete and accurate statement of their contents, including that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law."  To the extent a response is required to the legal conclusions in the DOJ's Judgments, Nexstar denies those conclusions.

7.      As described in the DOJ's Competitive Impact Statement (the "Statement") discussed below, the Judgments included a number of provisions designed to "***terminate***

---

[4] As mentioned below, while Gray Television, Inc. was not named as a defendant in any of the suits brought by the DOJ, in January of 2019, it finalized the acquisition of Raycom Media, Inc., and Meredith thereby assumed liability for the acts of the acquired entities.

***Defendants' illegal conduct***, prevent recurrence of the same or similar conduct, and ensure that Defendants establish an antitrust compliance program," thereby "***putting a stop to the anticompetitive information sharing.***"

**ANSWER:** Nexstar admits that Paragraph 7 appears to quote a statement made by the DOJ in its Statement, and refers to that Statement for a complete and accurate statement of its contents. To the extent a response is required to the content of the Statement, it is denied.

8.      The DOJ noted in the Statement that these remedial efforts were "***necessary*** in light of the ***extensive history of communications*** among rival stations that ***facilitated Defendants' agreements***" in restraint of trade, and in its Complaint, the DOJ action "challenge[d] under Section 1 of the Sherman Act Defendants' agreements to unlawfully exchange competitively sensitive information among broadcast television stations."

**ANSWER**: Nexstar admits that Paragraph 8 appears to quote phrases made by the DOJ in its Statement, and refers to that Statement for a complete and accurate statement of its contents. To the extent a response is required to the content of the Statement, it is denied.

9.      As Justice Sotomayor held before her ascension to the United States Supreme Court, "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) (noting that information exchanges can both be evidence of a *per se* unlawful price fixing cartel and separately unlawful in and of themselves).[5]

**ANSWER**: Nexstar admits that Paragraph 9 appears to quote a phrase from Justice Sotomayor in *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001), and refers to that case for a complete and accurate statement of its contents. Nexstar denies the existence of the

---

[5] All emphases to quoted material have been added.

anticompetitive scheme alleged in Plaintiffs' Complaint and denies any remaining allegations in Paragraph 9, including any implicit allegation that Nexstar acted wrongfully or unlawfully. Footnote 5 does not contain factual allegations and therefore does not require a response.

10.     The scheme was widespread and effectuated in large part through the same two national Sales Rep Firms, Katz and Cox Reps (defined *infra*), which served as the Broadcaster Defendants' agents in virtually every relevant DMA (identified in Appendix A) and thus served as the focal points and conduits of the unitary, overarching scheme among Defendants.

**ANSWER**:  Deny.

11.     Also, a number of the Defendants used a common consultant and software company, ShareBuilders, to help with their inventory management and pricing.  ShareBuilders provided some of its clients with rate cards and/or recommendations that were used to implement the alleged conspiracy.

**ANSWER**:  Nexstar admits that certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs use services provided by Sharebuilders.  Nexstar denies all other allegations of Paragraph 11 not specifically admitted.

12.     The exchange also served as a means to monitor the members of the price fixing cartel, as any deviation from the scheme (*i.e.*, what is referred to in the literature as "cheating" on the cartel) could be easily detected and punished.  This exchange not only facilitated the price fixing cartel, but also itself is separately unlawful under Section 1 of the Sherman Act.

**ANSWER**:  Deny.

13.     Plaintiffs bring this antitrust class action lawsuit on behalf of themselves and all similarly situated direct purchasers of broadcast television spot advertising—who remain

uncompensated for the anticompetitive harm they suffered as a result of the Defendants' illicit gains.

**ANSWER**:  Nexstar admits that Plaintiffs filed this action, which purports to assert claims on behalf of a class as defined in the Third Amended Complaint, but denies that Plaintiffs state a claim or that any portion of the Third Amended Complaint is suitable for class treatment. Nexstar denies all other allegations of Paragraph 13 not specifically admitted.

## II.    JURISDICTION AND VENUE ARE PROPER HERE

14.    Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of costs of suit, including reasonable attorneys' fees; to enjoin Defendants' and ShareBuilders' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:**  Paragraph 14 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

15.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

**ANSWER:**  Paragraph 15 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

16.    Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants named herein and/or ShareBuilders resided, transacted business, was found, or had agents in this District or a transferor District.

**ANSWER:**  Paragraph 16 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

### III. DEFENDANTS' CONDUCT AFFECTED INTERSTATE COMMERCE

17.     Billions of dollars of transactions in broadcast television spot advertisements are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.  Each Broadcaster Defendant sells broadcast television spot advertising to advertisers throughout the United States or owns and operates broadcast television stations in multiple states or in DMAs as defined by the television ratings company Nielsen Holdings, Inc., that often cross state lines.  Additionally, the Sales Rep Firms represent the Broadcaster Defendants throughout the United States in the sale of broadcast television spot advertising to advertisers, and Defendant ShareBuilders provides its services to Broadcaster Defendants throughout the United States.

**ANSWER:**  Nexstar admits that its stations sell broadcast television spot advertising to advertisers in the United States or that it owns and operates broadcast television stations in multiple states or in DMAs as defined by the television ratings company Nielsen Holdings, Inc. Nexstar admits that Katz Media Group, Inc. and Cox Media represent Nexstar in certain DMAs in the sale of broadcast television spot advertising to advertisers.  Nexstar admits that Sharebuilders provides some services to certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs.  Nexstar denies all other allegations of Paragraph 17 not specifically admitted.

18.     Defendants' and ShareBuilders' manipulation of the market for the sale of broadcast television spot advertising thus was in the flow of, and had a direct, substantial, and foreseeable impact on, interstate commerce.

**ANSWER**:  Deny.

IV. **THE PARTIES**

A. **The Identities of the Plaintiffs**

19. Plaintiff Thoughtworx, Inc. d/b/a MCM Services Group ("Thoughtworx") is an advertising company headquartered in Minnesota and organized under the laws of Minnesota. Thoughtworx provides a bundle of services to its advertiser-clients, including consulting, television advertisement development and research, and purchasing broadcast television spot advertising time. In order to provide those services, Thoughtworx purchased broadcast television spot advertising during the Class Period (defined *infra*) directly from Defendants Cox Media Group LLC, CBS Corp., Fox Corp., TEGNA Inc., The E.W. Scripps Company, Sinclair Broadcast Group, Inc., and Tribune Media Company at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**ANSWER:** Nexstar admits that Plaintiff Thoughtworx purchased broadcast television spot advertising directly from certain Tribune stations. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19 as they relate to other entities, and on that basis denies them. Nexstar denies all other allegations of Paragraph 19 not specifically admitted.

20. Plaintiff One Source Heating & Cooling, LLC ("One Source") is a heating, cooling, and HVAC services provider headquartered in Alabama and organized under the laws of Alabama. One Source purchased broadcast television spot advertising during the Class Period directly from Defendants Raycom Media, Inc. and Sinclair Broadcast Group, Inc. at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20 and on that basis denies them.

9

21.     Plaintiffs Hunt Adkins, Inc. ("Hunt Adkins") is a creative brand advertising agency located in Minnesota. Hunt Adkins conducts a full spectrum of brand development services, which includes television advertisement development and research.  Hunt Adkins purchased broadcast television spot advertising during the Class Period directly from at least Defendants CBS Corp., Cox Media Group, Fox Corp., Nexstar Broadcast Corp., E.W. Scripps, Sinclair Broadcast Group, Inc., and TEGNA, Inc., and Tribune Media Co. at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**ANSWER:**  Nexstar admits that Plaintiff Hunt Adkins purchased broadcast television spot advertising directly from certain Nexstar and Tribune stations.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21 as they relate to other entities, and on that basis denies them.  Nexstar denies all other allegations of Paragraph 21 not specifically admitted.

22.     Plaintiff Fish Furniture is a furniture store in Cleveland, Ohio.  Fish Furniture purchased broadcast television spot advertising during the Class Period directly from at least Defendants Tribune, Raycom, and Scripps at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**ANSWER:**  Nexstar admits that Plaintiff Fish Furniture purchased broadcast television spot advertising directly from certain Nexstar and Tribune stations.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22 as they relate to other entities, and on that basis denies them.  Nexstar denies all other allegations of Paragraph 22 not specifically admitted.

23.     A comprehensive accounting of those DMAs in which multiple Broadcaster Defendants purportedly compete (as of 2017) and in which Hunt Adkins, One Source, and Thoughtworx purchased broadcast television spot advertising from one or more Broadcaster Defendants is set forth in Appendix A.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23 and Appendix A and on that basis denies them.

### B.     The Identities of the Defendants

24.     Most of the Defendants named herein entered into consent decrees with the DOJ, except Gray Media Group, which purchased an entity (Raycom Media, Inc.) that did so, Cox Media (the subsidiary of an entity that did so) and ShareBuilders.

**ANSWER**:  Nexstar admits that certain Defendants entered into consent decrees with the DOJ, and that the consent decrees stated "that nothing in th[e] Stipulation or the attached proposed Final Judgment should be interpreted to mean that the United States takes any position on the legality or competitive effects of (a) any Cooperative Agreement […] referenced in or implicated by the proposed Final Judgment, (b) any type of Cooperative Agreement, or (c) Cooperative Agreements in general."  Nexstar denies all other allegations of Paragraph 24 not specifically admitted.

25.     Defendant CBS Corp. ("CBS") is a Delaware corporation with its headquarters at 51 West 52nd Street, New York, New York, 10019.  CBS owns or operates 28 television stations in 18 DMAs and had over $14.5 billion in revenues in 2018.

   a.   CBS was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

     b. That same day, CBS settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement was approved on and final judgment was entered by the court on December 3, 2019.

**ANSWER:** Nexstar admits CBS was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019. Nexstar admits that CBS settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 25 and on that basis denies them.

26. Defendant Dreamcatcher Broadcasting, LLC ("Dreamcatcher") was a Delaware corporation, headquartered at 2016 Broadway, Santa Monica, California 90404, that owned three full-power television stations in two DMAs and had over $50 million in revenues in 2017.

     a. Dreamcatcher was named as a defendant by the DOJ in U.*S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

     b. That same day, Dreamcatcher settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the court on May 22, 2019.

**ANSWER:**  Nexstar admits Dreamcatcher was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.  Nexstar admits that Dreamcatcher settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar admits the remaining allegations of Paragraph 26.

27.     Tribune Company announced on December 27, 2021, that it completed the final steps necessary to close its acquisition of Local TV Holdings, LLC. As a result of this acquisition, Tribune obtained 39 television stations across the country. In addition, Tribune provided certain services to support the operations of three former Local TV stations owned by Dreamcatcher Broadcasting LLC.

**ANSWER**:  Nexstar denies the allegations of Paragraph 27 on the basis that the "Tribune Company" did not exist in 2021.  Nexstar acquired the Tribune Media Company on August 31, 2019 and Tribune ceased to exist.  Nexstar admits that Tribune acquired Local TV Holdings prior to its acquisition by Nexstar, but denies that Tribune obtained 39 television stations as a result of this acquisition.  Nexstar denies all other allegations of Paragraph 27 not specifically admitted.

28.     Defendant Fox Corp. ("Fox") is a Delaware corporation with its headquarters at 1211 Avenue of the Americas, New York, New York, 10036, that owns or operates 17 television stations in 17 DMAs.  Fox is a corporate entity recently created from certain former 21st Century Fox assets, including its broadcast station assets, after The Walt Disney Company acquired 21st Century Fox and spun-out Fox. Fox's television segment earned over $5 billion in 2017.

    a. Fox was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

    b. That same day, Fox settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement was approved and final judgment was entered by the court on December 3, 2019.

**ANSWER:** Nexstar admits Fox was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019. Nexstar admits that Fox settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 28 and on that basis denies them.

29. Defendant Gray Media Group ("GMG")[6] is a Georgia corporation headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319, that owns and operates television stations and digital assets in the United States.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 29 and on that basis denies them.

30. On January 2, 2019, Gray Television, Inc. ("Gray TV") acquired Raycom Media, Inc. ("Raycom"), and Raycom became a wholly-owned subsidiary of Gray TV. On January 31,

---

[6] Plaintiffs do not allege, at this time, that Gray TV participated in the alleged conduct directly; merely that Gray TV is liable for the acts of Raycom Media, Inc., which it acquired.

2019, Raycom changed its corporate name to GMG and, as of that date, GMG included, among other assets, the legacy Raycom owned broadcast television stations. GMG and Raycom are the same entity. Counsel for GMG has previously referred to, and continues to refer to, GMG and Raycom as "Raycom" to remain consistent with the Complaint's allegations. On December 1, 2021, Gray TV acquired Meredith Corporation ("Meredith"), which included Meredith's Local Media Group (consisting of its broadcast television station business) and all associated assets. As of January 2, 2022, an entity holding Meredith's television station business, and associated assets, was merged into GMG. GMG now includes, among other assets, the legacy Raycom and Meredith broadcast television station businesses. To remain consistent with the Complaint's allegations, Plaintiffs will refer to Raycom in reference to matters relating to television stations owned by Raycom at the time of the acquisition by Gray TV and will refer to Meredith in reference to matters relating to television stations owned by Meredith at the time of the acquisition by Gray TV.

**ANSWER**: Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 30 and on that basis denies them.

31.    Gray TV, via its subsidiary, Gray Media Group, acquired Raycom Media, Inc. ("Raycom"), in January 2019.

    a.    Raycom was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

    b.    That same day, Raycom settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the

competition harmed by the alleged conduct." That settlement was approved
and final judgment was entered by the Court on May 22, 2019.

**ANSWER:** Nexstar admits Raycom was named as a defendant by the DOJ in *U.S. v.
Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section
1 of the Sherman Act on November 13, 2018. Nexstar admits that Raycom settled with the DOJ
and entered into a proposed consent decree, but states that the "Final Judgment does not
constitute any evidence against or admission by any party regarding any issue of fact or law."
Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the
remaining allegations of Paragraph 31 and on that basis denies them.

32.     Raycom was named in the DOJ's enforcement action on November 13, 2018, and
Gray TV thus purchased Raycom with knowledge of Raycom's liability to its customers for
violation of the antitrust laws. As part of the acquisition:

    a.  Raycom's President and Chief Executive Officer, Pat LaPlatney, became Gray
        TV's President and Co-Chief Executive Officer. In addition, LaPlatney and
        Raycom's prior President and CEO, Paul McTear, joined Gray TV's Board of
        Directors, as well as multiple former Raycom managers joined Gray TV as
        Senior Vice Presidents, including Raycom's Sandy Breland and Brad Streit.
        Further, Ellenann Yelverton, Raycom's General Counsel, became Gray TV's
        Vice President and Deputy General Counsel, overseeing Gray TV's legal
        department; Becky Sheffield, from Raycom, joined Gray TV as Vice
        President, Controller; and former Raycom executive David Burke became
        Gray TV's new Senior Vice President and Chief Technology Officer,
        overseeing all of Gray TV's engineering and information technology;

     b.   Gray TV assumed and fulfilled Raycom's pending acquisitions of WUPV- DT in the Richmond, VA market and KYOU-TV in the Ottumwa, IA market;

     c.   Gray TV acquired, and now operates, 48 television stations from Raycom under the Gray TV name;

     d.   Gray TV presently services former Raycom customers through Raycom's former stations, but now under Gray TV's name; and

     e.   The same employees who worked for Raycom have mostly all maintained their prior positions, working in the same capacities but now for the financial benefit of Gray TV.

    **ANSWER**:  Nexstar admits that Raycom was named in the DOJ's enforcement action on November 13, 2018.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 32 and on that basis denies them.

    33.    Defendant Griffin Communications, LLC ("Griffin") is an Oklahoma corporation, headquartered at 7401 North Kelley Avenue Oklahoma City, Oklahoma 73111, that owned four full-power television stations in two DMAs and had over $60 million in revenues in 2017.

     a.   Griffin was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

     b.   That same day, Griffin settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct."  That settlement was approved and final judgment was entered by the Court on May 22, 2019.

**ANSWER:** Nexstar admits Griffin was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018. Nexstar admits that Griffin settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 33 and on that basis denies them.

34.     Defendant Meredith Corporation ("Meredith") is an Iowa corporation, headquartered at 1716 Locust Street, Des Moines, Iowa 50309, that owned or operated 16 television stations in twelve DMAs and had over $1.7 billion in revenues in 2017.

      a.  Meredith was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

      b.  That same day, Meredith settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

      c.  On December 1, 2021, Gray TV closed on its acquisition of Meredith Corporation's Local Media Group's 17 television stations.

**ANSWER:** Nexstar admits Meredith was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018. Nexstar admits that Meredith settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not

constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 34 and on that basis denies them.

35.     Defendant Nexstar Media Group, Inc. ("Nexstar"), is a Delaware corporation, headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062, that operates as a television broadcasting and digital media company in the United States.  As of December 31, 2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 DMAs.

        a.  Nexstar was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on December 13, 2018.

        b.  That same day, Nexstar settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the court on May 22, 2019.

**ANSWER:**  Nexstar admits that Nexstar was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on December 13, 2018.  Nexstar admits that it settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law."  Nexstar admits the remaining allegations of Paragraph 35.

36.     On September 19, 2019, Nexstar announced that it completed the acquisition of Tribune Media Company in an accretive transaction valued at approximately $7.2 billion

including the assumption of Tribune Media's outstanding debt. Pursuant to the merger

agreement, Nexstar acquired all outstanding shares of Tribune Media for $46.687397 per share

in cash, inclusive of $0.187397 per share to reflect the final closing date relative to the August

31, 2019 targeted closing date.

    **ANSWER**:  Admit.

37.    Defendant Raycom is a Delaware corporation, headquartered at 201 Monroe

Street, Montgomery, Alabama 36104, that owned or operated 65 television stations in 45 DMAs

and had over $670 million in revenues in 2017.  Raycom was purchased by Gray TV in 2018 for

$3.65 billion in a deal that was finalized in January of 2019.

    a.   Raycom was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

    b.   That same day, Raycom settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

    **ANSWER:**  Nexstar admits Raycom was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section

1 of the Sherman Act on November 13, 2018.  Nexstar admits that Raycom settled with the DOJ

and entered into a proposed consent decree, but states that the "Final Judgment does not

constitute any evidence against or admission by any party regarding any issue of fact or law."

Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations of Paragraph 37 and on that basis denies them.

38.     Defendant The E.W. Scripps Company ("Scripps") is an Ohio corporation headquartered at 312 Walnut Street, Cincinnati, Ohio, 45202, that owns or operates 60 television stations in 42 DMAs and had over $917 million in revenues in 2018.

      a.     Scripps was named as a defendant by the DOJ in U.*S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

      b.     That same day, Scripps settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement was approved and final judgement was entered by the court on or about December 3, 2019.

**ANSWER:**  Nexstar admits Scripps was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.  Nexstar admits that Scripps settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law."  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 38 and on that basis denies them.

39.     Defendant Sinclair Broadcast Group, Inc. ("Sinclair"), is a Maryland corporation, headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030, that operates as a television broadcast company in the United States.  As of December 31, 2017, it owned, operated, and/or provided services to 191 stations in 89 DMAs, which broadcast 601 channels. In 2017, it reported revenues in excess of $2.7 billion.

    a.   Sinclair was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

    b.   That same day, Sinclair settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

**ANSWER:** Nexstar admits Sinclair was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018. Nexstar admits that Sinclair settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 39 and on that basis denies them.

    40.   Defendant TEGNA Inc. ("TEGNA") is a Delaware corporation headquartered at 8350 Broad Street, Tysons, Virginia 22102, that owns or operates 49 television stations in 41 DMAs and had $2.2 billion in revenues in 2018.

    a.   TEGNA was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

    b.   That same day, TEGNA settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That

settlement was approved and final judgment was entered by the court on December 3, 2019.

**ANSWER:** Nexstar admits TEGNA was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019. Nexstar admits that TEGNA settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 40 and on that basis denies them.

41. Defendant Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), is a Delaware limited liability company headquartered at 515 North State Street, Chicago, Illinois 60654, that operates as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owned 42 broadcast television stations in approximately 33 DMAs in 2017. It had over $670 million in revenues in 2017.

**ANSWER:** Nexstar admits that Tribune Broadcasting Company, LLC was formerly a Delaware limited liability corporation headquartered in Chicago, Illinois, but asserts that Tribune Broadcasting Company has merged into Tribune Media Company. Nexstar admits the remaining allegations of Paragraph 41.

42.     Defendant Tribune Media Company ("Tribune Media," and collectively with Tribune Broadcasting, "Tribune"), is a Delaware corporation headquartered at 435 North Michigan Avenue, Chicago, Illinois 60611, and operates, through its subsidiaries, as a media and entertainment company in the United States.  It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owned 42 television stations in 33 DMAs in 2017.

    a.     Tribune was named as a civil defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

    b.     That same day, Tribune settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the court on May 22, 2019.

**ANSWER:**  Nexstar admits that Tribune Media Company was headquartered at 515 North State Street, Chicago, Illinois 60654.  Nexstar admits that Tribune Media Company was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018. Nexstar admits that Tribune Media Company settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or

admission by any party regarding any issue of fact or law." Nexstar admits the remaining allegations of Paragraph 42.

43. Defendant Cox Media Group, LLC, ("Cox Media") is a Delaware corporation headquartered at 6205 Peachtree Dunwoody Road, Atlanta, Georgia, 30328, and operates, through its subsidiaries, as a media company in the United States. It is a subsidiary of Cox Enterprises and holds Cox Enterprises' broadcasting, publishing, digital, and sales units. Cox Media operates in 20 DMAs and reaches approximately 52 million Americans weekly. Through its division, Cox Reps, it operates as a national television representative company (a Sales Rep Firm) in the United States. As of March 2019, Cox Reps represented 30 of Tribune's owned and operated full-power television stations, 33 Sinclair full-power television stations, 4 Griffin full-power stations, 12 Meredith full-power stations, 16 full-power Nexstar stations, 3 Scripps full-power stations, 10 Cox full-power stations, 7 CBS full-power stations, 2 Fox full-power stations, and 39 TEGNA full-power stations. Cox Reps represented Raycom's television stations prior to the latter's acquisition by Gray TV.

**ANSWER:** Nexstar admits that Cox Reps represented certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 43 and on that basis denies them.

44. As described above, Cox Media's parent, Cox Enterprises, was named as a civil defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) on June 17, 2019 and settled with the DOJ on the same day, entering into a proposed consent decree for alleged violation of Section 1 of the Sherman Act, in part as a result of the unlawful acts of Cox Media as a conduit of the anticompetitive scheme.

**ANSWER**:  Nexstar admits Cox Enterprises was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.  Nexstar admits that Cox Enterprises settled with the DOJ and entered into a proposed consent decree, but states that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 44 and on that basis denies them.

45.     Defendant ShareBuilders, Inc. ("ShareBuilders") is an Illinois corporation headquartered at 90 Eastgate DR, Washington, Illinois, 61571.  ShareBuilders is a national media company that operates as a provider of yield management solutions for the broadcast media sales industry in the United States. ShareBuilders' clientele includes over 300 television stations.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 45 and on that basis denies them.

46.     CBS, Cox Media Group LLC, Dreamcatcher, Fox, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune are referred to collectively as the "Broadcaster Defendants."

**ANSWER**:  Paragraph 46 contains no factual allegations, and therefore no response is required.  To the extent a response is required, Nexstar denies the allegations

47.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

**ANSWER**:  Deny.

48.    Katz Media Group, Inc. ("Katz") [7] is a national media representation company in the United States, including operating as a national television representative company (a Sales Rep Firm). Through its division, Katz Television Group, Katz represents the assets of television stations to provide marketing solutions to advertisers and agencies. As of March 2019, Katz represented 86 Nexstar owned and operated full-power television stations, 2 Meredith full-power stations, 8 Tribune full-power stations, 66 Sinclair full-power stations, 23 Scripps full-power stations, 1 Cox full-power station, 2 Fox full-power stations, and 5 TEGNA full-power stations.

**ANSWER**: Nexstar admits that Katz represented certain Nexstar and Tribune stations in certain DMAs. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 48 and on that basis denies them.

49.    While the DOJ did not name Katz, the DOJ has stated that "Cox Reps is one of two large 'Rep Firms' in the industry that assist broadcast stations in sales to national advertisers. The Rep Firms are alleged to have participated in the unlawful information sharing conduct." Katz is the only other major, national Rep Firm the DOJ could be referencing.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 49 and on that basis denies them.

50.    Cox Reps and Katz are referred to collectively as the "Sales Rep Firms." These Sales Rep Firms "function as extensions of a station's sales staff and are familiar with various rate cards (prices) and program research demographics." And as the DOJ noted, these two Sales Rep Firms facilitated the "exchange [of] real-time pacing information" between Defendants. The Sales Rep Firms are sophisticated industry participants that regularly communicate with each

---

[7] Katz was previously named as a defendant in this case. Katz petitioned for bankruptcy protection in March 2018, and a bankruptcy plan discharged any of Plaintiffs' claims in May 2019.

Broadcaster Defendant remotely (*e.g.*, emails, telephone calls) and in person to serve the Broadcaster Defendants' demands. And the Sales Rep Firms' continued profitability is tied to satisfying those demands and maintaining relationships with the Broadcaster Defendants.

**ANSWER**:  The first sentence of Paragraph 50 contains no factual allegations, and therefore no response is required.  To the extent a response is required, Nexstar denies the allegations.  Nexstar admits that Paragraph 50 appears to quote a statement by Harold L. Vogel in Entertainment Industry Economics: A Guide for Financial Analysis, and refers to that statement for a complete and accurate statement of its contents.  Nexstar admits that Paragraph 50 appears to quote the DOJ, and refers to that statement for a complete and accurate statement of its contents.  To the extent a response is required to the content of either statement, it is denied.  Nexstar denies all other allegations in Paragraph 50 not specifically admitted.

## V.   THE DOJ BRINGS AN ENFORCEMENT ACTION AGAINST BROADCASTERS AND A REP FIRM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

51.   On November 13, 2018, the DOJ filed its original complaint in *United States v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.), along with proposed settlements with six defendants, Raycom, Meredith, Griffin, Dreamcatcher, Sinclair, and Tribune.

**ANSWER:**  Nexstar refers to the original complaint and proposed settlements in *United States v. Sinclair Broadcast Group, Inc., et al*, No. 1:18-cv-2609 (D.D.C.) for their true and complete contents.

52.   On Dec. 13, 2018, the Department filed an amended complaint and a proposed settlement with a seventh defendant, Nexstar.

**ANSWER:** Nexstar refers to the amended complaint and proposed settlement in *United States v. Sinclair Broadcast Group, Inc., et al*, No. 1:18-cv-2609 (D.D.C.) for their true and complete contents.

53. The court entered final judgment against all seven defendants on May 22, 2019.

**ANSWER:** Nexstar refers to the final judgment *United States v. Sinclair Broadcast Group, Inc., et al*, No. 1:18-cv-2609 (D.D.C.) for its true and complete contents.

54. On June 17, 2019, the DOJ filed a second amended complaint along with proposed settlements with five additional defendants, CBS, Cox, Scripps, Fox, and TEGNA.

**ANSWER:** Nexstar refers to the second amended complaint and proposed settlements in *United States v. Sinclair Broadcast Group, Inc., et al*, No. 1:18-cv-2609 (D.D.C.) for their true and complete contents.

55. In its June 17, 2019 press release, the DOJ once again stated how the information exchange orchestrated by Defendants hurt the competitive process: "By exchanging pacing information, the five new defendants and other broadcasters were better able to anticipate whether their competitors were likely to raise, maintain, or lower spot advertising prices, which in turn helped inform their stations' own pricing strategies and negotiations with advertisers. As a result, the information exchanges harmed the competitive price-setting process in markets for the sale of spot advertisements."

**ANSWER:** Nexstar admits that Paragraph 55 appears to quote statements made by the DOJ in its June 17, 2019 press release, and refers to that press release for a complete and accurate statement of its contents. To the extent a response is required to the content of the statement, it is denied. Nexstar denies all other allegations in Paragraph 55 not specifically admitted.

29

56.     The court entered final judgment against these additional defendants on December 3, 2019.

**ANSWER**:  Nexstar refers to the Final Judgements in *United States v. Sinclair Broadcast Group, Inc., et al*, No. 1:18-cv-2609 (D.D.C.) for their true and complete contents.

57.     The DOJ's Judgments prohibit the exchange of several types of competitively sensitive information for seven years: "pricing, pricing strategies, pacing, holding capacity, revenues, or market shares."

**ANSWER:**  Nexstar admits that Paragraph 57 appears to quote a statement made by the DOJ in its Judgments, and refers to the Judgments for a complete and accurate statement of its contents, including that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law."  To the extent a response is required to the content of the statement, it is denied.

## VI.     DEFENDANTS FORMED AND PARTICIPATED IN AN UNLAWFUL PRICE FIXING CARTEL FACILITATED BY AN INFORMATION EXCHANGE

### A.     Defendants Agreed to Fix Prices for Broadcast Television Spot Advertising Sales and That Agreement Was Facilitated by an Information Exchange

58.     Beginning no later than January 1, 2014, Defendants participated in an unlawful price fixing cartel to supracompetitively impact the price levels of broadcast television spot advertising in DMAs in which Broadcasters Defendants were, purportedly, supposed to be direct competitors.

**ANSWER:**  Deny.

59. Defendants' price fixing cartel was facilitated in large part through a reciprocal exchange of competitively sensitive information.[8] This exchange included, among other things, (a) pacing information (*i.e.*, data on remaining inventory or supply) (b) average price data through third party Kantar, available at a granular level broken down by DMA and inventory type (*e.g.*, early news, late news, prime time) as well as (c) other forms of competitively sensitive sales information (including but not limited to information exchanged through ShareBuilders).

**ANSWER:** Deny.

60. As discussed above and below, merely exchanging competitively sensitive information among competitors can cause anticompetitive effects and violate the Sherman Act.

**ANSWER:** Paragraph 60 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

1. **The Broadcaster Defendants Exchanged Competitively Sensitive Information Through Sales Rep Firms and Directly With One Another**

61. As revealed in the DOJ's investigation, related court filings, and the investigation of counsel, this exchange of competitively sensitive information took at least two forms.

**ANSWER:** Deny.

62. *First*, Defendants agreed to regularly and reciprocally exchange local sales pacing information through the Sales Rep Firms, including real-time pacing information regarding each station's revenues, and reported the information to the Broadcaster Defendants in the DMA.

**ANSWER:** Deny.

---

[8] The DOJ defined "Competitively Sensitive Information" as "Non-Public Information relating to pricing or pricing strategies, pacing, holding capacity, revenues, or market shares" as well as "reports" that are "customized or confidential to a particular Station or broadcast television station group."

63. Pacing information is used to compare a broadcast station's revenues booked for a certain time period (either a current or future period) to the revenues booked for the same point in time in the previous year. It is accompanied by a percentage figure (*i.e.*, that a station's revenue indicates that it is pacing plus or minus 10%, 20%, 30%, or so on). Pacing indicates how each station is performing compared to the rest of the market and provides insight into each station's remaining broadcast television spot advertising inventory for a current or future period. The exchange of pacing information reveals the Broadcaster Defendants' remaining supply, with supply being a, if not the, key factor informing negotiations over price.

**ANSWER:** Deny.

64. Those exchanges were systematic and included data on individual stations' booked sales for current and future months as well as a comparison to past periods. The exchanges covered not just historic competitively sensitive information, but current and forward-looking information as well. Specifically, but not exclusively, at least once per quarter, but frequently more often, the Sales Rep Firms representing the Big 4 Stations (ABC, CBS, Fox, and NBC, and their affiliated networks) in a DMA exchanged real-time pacing information regarding the broadcast stations within that DMA and reported the information to the Broadcaster Defendants and to the other Big 4 Station owners in the DMA.

**ANSWER:** Deny.

65. Corroborating the DOJ's claim of systematic exchanges, ███████████████

██████████████████████████████████

████████████████████████████████████

███████████████████████████████████

████████████████████████████████

**ANSWER:** Nexstar lacks knowledge or information to form a belief as to the truth of the allegations of Paragraph 65 and on that basis denies them.

66.     In those DMAs in which the Sales Rep Firms represented more than one Broadcaster Defendant, they erected firewalls intended to prohibit and prevent the dissemination of competitively sensitive information between the teams representing different Broadcaster Defendants. In those DMAs, the Sales Rep Firms facilitated these information exchanges among rival Broadcaster Defendants in violation of and in intentional disregard of those firewalls.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 66 and on that basis denies them.

67.     Once the Sales Rep Firms shared the information with the Broadcaster Defendants, their competitors' pacing information was then disseminated to individuals within the Broadcaster Defendants with authority over pricing and sales, always with the Broadcaster Defendants' knowledge and frequently at their explicit direction.

**ANSWER:** Deny.

68.     The exchanges by Sales Rep Firms were widespread, occurring in DMAs across the United States, and they occurred with the knowledge of and frequently at the instruction of the Broadcaster Defendants. As of March 2019, Cox Reps or Katz represented at least one Broadcaster Defendant in 125 of 127 DMAs where more than one Broadcaster Defendant was present and in 68 of those DMAs (identified in Appendix A) Cox Media or Katz counted more than one Broadcaster Defendant as a client.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 68 and Appendix A and on that basis denies them.

69. **Second**, in some DMAs, the Broadcaster Defendants exchanged competitively sensitive information directly with one another, without using the Sales Rep Firms as a conduit.

**ANSWER:** Deny.

70. These direct inter-seller exchanges included both "local sales" pacing data as well as "all sales" or "national sales" pacing data.

**ANSWER:** Deny.

71. Additionally, the Broadcaster Defendants all provide data to Kantar's SRDS platform, which then disseminates that data in an aggregated form to Defendants.

**ANSWER:** Nexstar admits that certain Nexstar stations provided data to Kantar's SRDS platform. Nexstar denies all other allegations of Paragraph 71 not specifically admitted.

72. Kantar collects advertisement airing data by continuously monitoring local television stations' broadcast feeds, while the Broadcaster Defendants provide retrospective (45-90 days' old) average pricing data for broadcast television spot advertising data to Kantar, which in turn creates reports that are purchased by and disseminated to the Broadcaster Defendants. Kantar's SRDS Media Planning Platform's data is broken down granularly by, *inter alia*, DMA (*i.e.*, by relevant geographic market) and inventory type (*e.g.*, early news, late news, prime time). Kantar's website states that: "Agencies and brands use SRDS as an affordable, all- in-one resource to find and compare digital and traditional media across business, consumer and geographic audiences. They rely on this extensive dataset of U.S. media to make informed decisions and initiate contact with media reps directly from the planning platform."

**ANSWER:** Nexstar admits that certain Nexstar stations purchased reports from Kantar. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 72 and on that basis denies them.

73.     The information provided tells the Broadcaster Defendants, among other things, the average cost-per-point (*i.e.*, the price) for broadcast spot television advertising broken down by specific DMA and by specific daypart (*e.g.*, early news, late news, prime time). Multiplying the average cost-per-point for a market profile (*i.e.*, DMA and daypart) times the Nielsen ratings for a given television program provides the Broadcaster Defendants with an estimate of how pricing would be set for a given program in a given DMA.

**ANSWER:** Deny.

74.     This exchange served to bolster the efficacy of the pacing data exchange, by allowing the Broadcaster Defendants to better rule out the possibility that an increase or decrease in revenue pacing was being driven by increases or decreases in, *inter alia*, the prices of broadcast spot television advertising, and stabilizing prices at anticompetitive levels by removing uncertainty surrounding price discovery.

**ANSWER:** Deny.

75.     Furthermore, the direct inter-seller exchanges and exchanges through the Sales Rep Firms were not made available to Plaintiffs and the members of the Class and were not otherwise publicly available or accessible; while the Nielsen ratings and Kantar SRDS data is publicly available, if at all, only at a substantial cost.  The only conceivable procompetitive purpose of exchanging this information would be if it were freely shared with advertising customers, allowing them to better time their purchases or construct their media plans.  By concealing the exchange from their customers and making the information non-public, Defendants reveal that the exchange was for an anticompetitive purpose.

**ANSWER:** Nexstar admits that Nielsen ratings and Kantar SRDS data are publicly available.  Nexstar denies all other allegations of Paragraph 75 not specifically admitted.

### 2. Such Systematic Exchanges of Non-Public Competitively Sensitive Information Violate Section 1 of the Sherman Act

76. Defendants' conduct amounts to an unlawful agreement—implicit or express—violative of Section 1 of the Sherman Act. The conduct affected many DMAs across the country, including *at a minimum* every DMA in which a Sales Rep Firm represented two or more Broadcaster Defendant owners or operators, as identified in Appendix A.

**ANSWER:** Deny.

77. Specifically, the DOJ stated that "[t]he *exchanges were systematic* and typically included non-public pacing data on national revenues, local revenues, or both, depending on the DMA. The Complaint further alleges that certain Defendants engaged in the exchange of other forms of competitively sensitive information relating to spot advertising in certain DMAs."

**ANSWER:** Nexstar admits that Paragraph 77 appears to quote statements made by the DOJ in its Statement, and refers to the Statement for a complete and accurate statement of its contents. To the extent a response is required to the content of the Statement, it is denied.

78. In its 2017 Annual Report, Sinclair stated that "fluctuations in advertising rates and availability of inventory" was an "Industry Risk," so clearly knowing its rival's inventory would illegally temper and mitigate that risk.

**ANSWER:** Nexstar admits that Paragraph 78 appears to quote Sinclair's 2017 Annual Report, and refers to the Report for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 78 not specifically admitted.

79. In the broadcast television spot advertising market, there is—all else equal—an inverse relationship between inventory and pricing strategy. If behaving competitively, firms with moderate to high remaining inventory are more incentivized to compete on price because if they price aggressively high, they risk a large loss of market share; conversely, firms with low

remaining inventory are less subject to the risk of a large loss of market share (because they have already sold most of their inventory) and thus are less incentivized to compete on price.

**ANSWER:** Deny.

80. However, if a firm knows that both it and its rival have low remaining inventory (and knows that its rival shares this knowledge), the low inventory firms' incentives to compete on price are further dampened because the rivals know neither's inventory situation is likely to compel it to engage in a price war with the another (*i.e.*, they are more confident that there is not a moderate to high inventory firm in the mix that is more incentivized to compete on price). Indeed, if rivals know that one another have high or moderate remaining inventory (and know that each firm shares that knowledge), the scheme works effectively the same: the firms can be confident one another are on a level playing field, in essentially the same position of strength in terms of price negotiations (although their customers remain unaware of this), and thereby chill the incentive to compete aggressively on price by removing competitive uncertainty.

**ANSWER:** Deny.

81. In fact, even in situations where one firm has higher and another lower inventory, their incentives to compete are distorted. Suppose firm A has high inventory and firm B has low inventory and each firm knows the other's relative position. Because of the asymmetrical information problem created by the information exchange, firms A and B have an informational advantage—which their customers do not—that enables firm A to foresee that firm B will not compete on price because of firm B's low inventory. This knowledge allows firm A to more confidently keep prices high because it is no longer uncertain about firm B's competitive position; without this knowledge, the uncertainty would have incentivized firm A to compete more vigorously on price to maintain market share. In the same vein, firm B **knows that firm A**

***possesses this knowledge*** and that firm A can thus confidently keep prices high, allowing firm B

to safely avoid the temptation to compete with firm A on price that would persist if the firms

remained uncertain about their respective competitive situations.

**ANSWER:**  Deny.

82.    In each situation, the anticompetitive effects are only amplified by the fact that the

advertising customers do not have the confidential information exchanged among the Defendants

or are even aware of the fact that Defendants are exchanging that confidential information,

putting them at a severe asymmetrical information disadvantage vis-à-vis the Broadcaster

Defendants with respect to the pricing of broadcast television spot advertising.

**ANSWER:**  Deny.

83.    Indeed, this is precisely the theory of anticompetitive effects advanced by the

DOJ: "By exchanging pacing information, the broadcasters ***were better able to anticipate***

***whether their competitors were likely to raise, maintain, or lower spot advertising prices*** . . . .

[H]arming the competitive price-setting process."  In that same public statement, the DOJ's

Assistant Attorney General for the Antitrust Division Makam Delrahim confirmed the

anticompetitive effects of Defendants' unlawful conduct, noting "[a]dvertisers rely on

competition among owners of broadcast television stations to obtain reasonable advertising rates,

but this unlawful sharing of information lessened that competition and thereby harmed the local

businesses and the consumers they serve."

**ANSWER:**  Nexstar admits that Paragraph 83 appears to quote statements made by the

DOJ and Assistant Attorney General for the Antitrust Division Makam Delrahim in a November

13, 2018 press release, and refers to that press release for a complete and accurate statement of

its contents.  To the extent a response is required to the content of those statements, it is denied.

Nexstar denies all other allegations of Paragraph 83 not specifically admitted.

84.     The DOJ elaborated in its June 17, 2019 Competitive Impact Statement that

"[u]nderstanding competitors' pacing can help stations gauge competitors' and advertisers'

negotiation strategies, inform their own pricing strategies, and help them ***resist more effectively***

***advertisers' attempts to obtain lower prices*** by playing stations off of one another.

[Defendants'] information exchanges therefore distorted the normal price-setting mechanism in

the spot advertising market and harmed the competitive process within the affected DMAs."

**ANSWER**:  Nexstar admits that Paragraph 84 appears to quote statements made by the

DOJ in its Statement, and refers to that statement for a complete and accurate statement of its

contents.  To the extent a response is required to the content of the Statement, it is denied.

85.     The information exchange thus eliminates or softens price competition by

distorting the incentives of the firms involved.  And even in DMAs where the Broadcaster

Defendants ostensibly faced some meaningful degree of competition from non-colluding rivals,

the higher prices among the colluding firms created residual demand for broadcast spot

television advertising that in turn increases the prices offered even by the non-colluding firms.

This means that the non-colluding firms do not discipline the cartel's supracompetitive pricing.

**ANSWER**:  Deny.

86.     The exchanges also helped the Broadcaster Defendants monitor the cartel.  The

Broadcaster Defendants were deterred from breaking from the cartel by lowering prices to steal

market share (*i.e.*, "cheating" on the cartel) because lowering prices to competitive levels to any

meaningful degree, and the commensurate market share shift, would be easily identified through

the exchanged information.

**ANSWER:** Deny.

87. These exchanges, whether direct or through the Sales Rep Firms as conduits, also violate the information exchange safe harbors enumerated by the Federal Trade Commission ("FTC") in 2014 and the DOJ in 2016.

  a. First, those safe harbors dictate that the exchange consists of information that is relatively old, while here, the exchanges were of real-time and forward-looking information.

  b. Second, those safe harbors dictate that the exchange of information be operated by a neutral third party, while here, the exchanges were made directly between competitors and through interested Sales Rep Firms that also stood to profit from the information exchange.

  c. Third, those safe harbors dictate that the information exchange be of aggregated data. Here, to the contrary, the exchange involved disaggregated data specific to individual competitors.

**ANSWER:** Deny.

88. A 2010 report prepared by a United States delegation (including the DOJ) and submitted to the Organization for Economic Cooperation and Development notes that: "In addition to serving as evidence of an unlawful agreement, information exchanges likely to affect prices may, under certain circumstances, be illegal in and of themselves."

**ANSWER:** Nexstar admits that Paragraph 88 appears to quote a statement in the cited 2010 report, and refers to that report for a complete and accurate statement of its contents. To the extent a response is required to the content of the statement, Nexstar states that Paragraph 88 does not allege any facts against Nexstar and denies the statement's applicability to this case.

89.     That 2010 Guidance from the DOJ also notes that information exchanges can "serv[e] as evidence of an unlawful agreement" to fix prices, and also "be illegal in and of themselves," constituting "concerted action [] sufficient to establish a combination or conspiracy in violation of Sherman Act § 1."

**ANSWER:**  Nexstar admits that Paragraph 89 appears to quote the DOJ in its 2010 Guidance, and refers to the Guidance for a complete and accurate statement of its contents.  To the extent a response is required to the content of the Guidance, Nexstar states that Paragraph 89 does not allege any facts against Nexstar and denies the statement's applicability to this case.

90.     2014 Guidance from the FTC confirms that when "competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion . . . in violation of the antitrust laws."

**ANSWER:**  Nexstar admits that Paragraph 90 appears to quote a December 11, 2014 statement from the FTC, and refers to that statement for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, Nexstar states that Paragraph 90 does not allege any facts against Nexstar and denies the statement's applicability to this case.

91.     Likewise, 2016 guidance from the DOJ confirms that "[e]ven if an individual does not agree explicitly to fix [prices] or other terms [of sale], exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement."

**ANSWER:**  Nexstar admits that Paragraph 91 appears to quote the 2016 guidance, and refers to that document for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, Nexstar states that Paragraph 91 does not allege any facts against Nexstar and denies the statement's applicability to this case.

92.     One academic notes that "[w]ith regard to firm-specific production information, again there is no reasonable explanation for such a conveyance by a noncollusive seller to another noncollusive seller. Unilateral knowledge of a rival's capacity utilization, inventory levels, or production costs will increase expected returns in any competitive bidding process."

**ANSWER:**  Nexstar admits that Paragraph 92 appears to quote the cited statement, and refers to that statement for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, Nexstar states that Paragraph 92 does not allege any facts against Nexstar and denies the statement's applicability to this case.

93.     In 2006, the Swedish Competition Authority commissioned several papers on the economic effects of information sharing by competitors.  These articles contain references to a large number of scholarly publications. The introductory essay states: "information sharing is most naturally defined as the sharing of such information that is normally regarded as confidential: production costs, detailed information about quantities sold, actual transactions prices (*i.e.*, including individual discounts), planned future pricing, et cetera."  The introduction also states that "if competitors secretively share information on intended future pricing and output, this comes very close to actually making anti-competitive agreements."  The same volume states: "[i]ndeed, in some circumstances it may be that the mere exchange of information will in itself be sufficient *to eliminate normal competitive activity*.  The overriding principle is that certain forms of contact between competitors should be avoided."

**ANSWER:**  Nexstar admits that Paragraph 93 appears to quote the cited statements from the papers commissioned by the Swedish Competition Authority, and refers to the papers for a complete and accurate statement of its contents.  To the extent a response is required to the

42

content of the statements, Nexstar states that Paragraph 93 does not allege any facts against Nexstar and denies the statements' applicability to this case.

94.     Another article by Baltzer Overgaard and H. Peter Mollgaard states that "it is relatively well-established in the economics literature that horizontal coordination/collusion (whether tacit or explicit) is made difficult—if not impossible—if firms compete under a veil of ignorance concerning the actions of rivals. . .  Speedy access to accurate information about the individual past transactions and future intentions of rivals *will generally have a strong coordinating potential*."  The summary characterization of the research that is reviewed in this article is as follows. "Pulling the two sides of the market together, we may (tentatively) conclude that improved information flow on the firm side will *likely* enhance the scope for coordinated firm behavior, while improved information on the consumer side *may* enhance competition. . . . Ideally, antitrust practice should attempt to [promote a regime where] actual competitors are covered by a veil of ignorance with respect to the actions of their rivals."

**ANSWER:**  Nexstar admits that Paragraph 94 appears to quote the cited article by Baltzer Overgaard and H. Peter Mollgaard, and refers to that article for a complete and accurate statement of its contents.  To the extent a response is required to the content of the quoted statements, Nexstar states that Paragraph 94 does not allege any facts against Nexstar and denies the statements' applicability to this case.

95.     The Antitrust Guidelines for Collaborations Among Competitors states:

> Nevertheless, in some cases, the sharing of information related to a market in which the collaboration operates or in which the participants are actual or potential competitors may increase the likelihood of collusion on matters such as price, output, or other competitively sensitive variables. The competitive concern depends on the nature of the information shared. Other things being equal, the sharing of information related to price, output, costs, or strategic planning is more likely to raise competitive concern than the sharing

of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information. Finally, other things being equal, the sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data.

**ANSWER:**  Nexstar admits that Paragraph 95 appears to quote the Antitrust Guidelines for Collaborations Among Competitors, and refers to that document for a complete and accurate statement of its contents.  To the extent a response is required to the content of the quoted statements, Nexstar states that Paragraph 95 does not allege any facts against Nexstar and denies the statements' applicability to this case.

96.     Nexstar's own "Code of Business Conduct" acknowledged that there is an unethical and improper way to gather competitively sensitive information: "Competitive information is a valuable tool that allows us to understand and manage our markets, products, and services so we can better meet our customers' needs. However, we must gather and use that information *properly*. *It is important that we comply with the law in acquiring information*. . . It is also important that we acquire information *ethically*."

**ANSWER:**  Nexstar admits that Paragraph 96 appears to quote a portion of Nexstar's Code of Business Conduct, and refers to Nexstar's Code of Business Conduct for a complete and accurate statement of its contents.  Nexstar denies all other allegations of Paragraph 96 not specifically admitted.

97.     Implicit, as well as express, agreements are *per se* illegal under Section 1 of the Sherman Act because "[s]ophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016); see also *Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir.

2018) ("The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement (even a wink and a nod—formal agreements have never been required for purposes of Sherman Act section 1)[.]").

**ANSWER:** Nexstar admits that Paragraph 97 appears to quote the cases cited, and refers to those cases for a complete and accurate statement of their contents. The remaining allegations of Paragraph 97 consist of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

### 3. Additional Circumstantial Evidence Demonstrates the *Per Se* Nature of The Price-Fixing Agreement

98. Because of the secrecy involved in an illegal conspiracy to fix prices, "most cases are constructed out of a tissue of [ambiguous] statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial." *In re High Fructose Corn Syrup Antitrust Litigation*, 295 F.3d 651, 662 (7th Cir. 2002). In addition to the extensive exchange of pacing information among Defendants that was the subject of the U.S. Department of Justice's civil action and consent decrees, Defendants engaged in other contacts that demonstrates a *per se* price fixing violation of Section 1 of the Sherman Act.

**ANSWER**: Nexstar admits that the first sentence of Paragraph 98 appears to quote the cited case, and refers to that case for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 98.

### a. Use of Defendant ShareBuilders Among Defendant Broadcast Stations to Share Pricing and Holding Capacity Intelligence

99. ShareBuilders is a national media company that operates as a consultant and provider of so-called yield management solutions for the broadcast media sales industry in the United States. ShareBuilders' clientele includes over 300 television stations, some of which are owned or affiliated with Defendant Broadcaster stations.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 99 and on that basis denies them.

100.    For some period during the Class Period, ShareBuilders's clients have included at least Defendants ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████

**ANSWER**:  Nexstar admits that Sharebuilders provided some services to certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs for portions of the alleged Class Period. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 100 and on that basis denies them.

101.    ShareBuilders shared information among Defendant Broadcast stations, including

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████

**ANSWER**:  Nexstar admits that Sharebuilders provided some services to certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs for portions of the alleged Class Period. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 101 and on that basis denies them.

102.    ShareBuilders was overt about its purpose, which was to help television broadcasters "navigate the complexities of a competitive market" in television advertising.[9]  Its stated mission is "To increase client profitability by decreasing their **pricing workload** and increasing their revenue with sophisticated yield management concepts and software."[10] As ShareBuilders explains, "Yield management is the process of appropriately **managing pricing** and inventory to maximize or grow revenue. It's a **system of adjusting prices** in response to market behavior, and choreographing buying behavior, timing and pricing to get the best result."

**ANSWER**: Nexstar admits that Paragraph 102 appears to quote portions of ShareBuilders' website and refers to that website for a complete and accurate statement of its contents.   Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 102 and on that basis denies them.

103.    In fact, ShareBuilders claimed ████████████████████████

███████████████████████████████████████████

████████████████████████████████████

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 103 and on that basis denies them.

---

[9]   https://www.share-builders.com/products/sharebuilder-tv/.
[10]  https://web.archive.org/web/20031218181634/http://www.share-builders.com/.

104.    Since its founding in 1999, ShareBuilders has steadily expanded its influence over the pricing of broadcast television advertising.  The company highlights this trajectory in various marketing statements that it has made in different versions of its website over the years:

a.    In a 2003 version of the website, ShareBuilders claimed to be "pricing over $1 billion of local television time each year" and that its "clientele has grown to over 50 stations in 18 different broadcast groups in just over 2 years."[11]

b.    In a 2007 version of the website, ShareBuilders claimed to be "pricing over $2 billion of local television and radio time each year," that "[t]his equates to 1 out of every 10 commercials sold in the country in local TV," and that its "clientele has grown to over 150+ stations in 28 different broadcast groups in just over 6 years!"[12]

c.    In a 2011 version of the website, ShareBuilders claimed that "[i]n 2010, our local broadcast TV clients billed about $3.7 billion, which we estimate to be 1 out of every 5 commercials sold on English-speaking network affiliates" and that its "clientele has grown to over 200 stations . . . in just over 10 years!"[13]

d.    In a 2021 version of the website, ShareBuilders claimed that "[i]n 2017, our local broadcast TV clients billed almost $6.2 billion, about 36% of the total spot TV revenue that year. Our clientele has grown to over 300 television stations, radio stations, and cable MSO's."[14]

**ANSWER**:  Nexstar admits that Paragraph 104 and its subparts appear to quote portions of ShareBuilders' website and refers to that website for a complete and accurate statement of its

---

[11]  https://web.archive.org/web/20031218181634/http://www.share-builders.com/.
[12]  https://web.archive.org/web/20070808152738/http://www.share-builders.com/.
[13]  https://web.archive.org/web/20110420021735/http://www.share-builders.com/.
[14]  https://web.archive.org/web/20210412184347/https://www.share-builders.com/about-us/.

contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 104 and on that basis denies them.

105.    A website testimonial[15]—deleted since the inception of this litigation—explicitly revealed the interconnection between ShareBuilders and pricing: from Sarah Smith, General Sales Manager, KVUE: "I'll admit it took some time to trust the system and not waver from **the pricing structure**."

**ANSWER**:  Nexstar admits that Paragraph 105 appears to quote a portion of ShareBuilders' website and refers to that website for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 105 and on that basis denies them.

106.    Another website testimonial— again taken down since the inception of this litigation—featured another revealing testimonial from Defendant Scripps about how ShareBuilders's market insights influenced pricing: "ShareBuilders allows us to proactively price and have confidence to not engage in the '**race to the bottom**' . . .We feel the accuracy in holding capacity continues to help us price aggressively to get more than our fair share at times . . ."[16]

**ANSWER**:  Nexstar admits that Paragraph 106 appears to quote a portion of ShareBuilders' website and refers to that website for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 106 and on that basis denies them.

---

[15] https://web.archive.org/web/20060721114723/http://www.share-builders.com/testimonials.htm (emphasis in original).
[16] https://web.archive.org/web/20190331181408/https://www.share-builders.com/.

107.    Michelle Stiens, Director of Sales and Marketing, KHOU (owned by TEGNA), previously stated on ShareBuilders' website (that has since been deleted) that "Our traffic system downloads all the pertinent data in the Sharebuilder system and produces excellent **reports for pricing**."[17]

**ANSWER**:  Nexstar admits that Paragraph 107 appears to quote a portion of ShareBuilders' website and refers to that website for a complete and accurate statement of its contents.   Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 107 and on that basis denies them.

108.    ███████████████████████████████

████████████████████████████████████████████

███████████████████████████

**ANSWER**:  Nexstar denies that ████████████████████████

████████████████████████████████████ Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 108 and on that basis denies them.

109.    ShareBuilders also received ████████████ from at least one Defendant.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 109 and on that basis denies them.

110.    ShareBuilders promoted a yield management software to the Broadcaster Defendants as a way for them to effectively manage forecasting and pricing. ShareBuilders' marketing documents offered to give its clients a "picture of what is happening in the market as a whole" by giving access to "holding capacity" data.

---

[17] https://web.archive.org/web/20031125155250/http://share-builders.com/testimonials.htm.

**ANSWER**:  Nexstar admits that Paragraph 110 appears to quote a portion of ShareBuilders' website and refers to that website for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 110 and on that basis denies them.

111.    ShareBuilders' website described holding capacity as "a measurement of a station's ability to hold revenue within a Broadcast Television DMA… A useful Holding Capacity model will not only tell a client their expected share of a market's revenue, but also provide a picture of what is happening in the market as a whole. . . Holding Capacity is a tool that can be used to predict future share trends.  Remember, you're not forecasting and pricing in a vacuum!"

**ANSWER**:  Nexstar admits that Paragraph 111 appears to quote a portion of ShareBuilders' website and refers to that website for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 111 and on that basis denies them.

112.    █████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████

**ANSWER**:  Nexstar admits that certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs received ████████████████ from Sharebuilders for portions of the alleged Class Period.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 112 and on that basis denies them.

113.    ShareBuilders also created ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

**ANSWER**:  Nexstar admits that certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs received ████████████████ from Sharebuilders for portions of the alleged Class Period.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 113 and on that basis denies them.

114.    ███████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 114 appears to quote statements contained within a document produced by TEGNA, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 114 and on that basis denies them.

115. 

**ANSWER**:  Nexstar admits that Paragraph 115 appears to quote statements contained within a document produced by TEGNA, and refers to that document for a complete and

accurate statement of its contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 115 and on that basis denies them.

116.     In the Consent Decrees entered by the Department of Justice, some Defendants are prohibited from Communicating Competitively Sensitive Information to any Station in the same DMA Defendant does not own or operate; Knowingly use Competitively Sensitive Information[18] from or regarding any Station in the same DMA Defendant does not own or operate; Encourage or facilitate the Communication of Competitively Sensitive Information to or from any Station in the same DMA Defendant does not own or operate; or Attempt to enter into, enter into, maintain, or enforce any agreement to Communicate Competitively Sensitive Information with any Station in the same DMA Defendant does not own or operate. Notably, these prohibitions "apply to Defendant's Communicating or agreeing to Communicate through a Sales Representative Firm or a third-party agent at Defendant's instruction or request."[19]

**ANSWER**:  Nexstar admits that the Defendants entered into consent decrees with the DOJ, and refers to those consent decrees for a complete and accurate statement of their contents, including "that nothing in th[e] Stipulation or the attached proposed Final Judgment should be interpreted to mean that the United States takes any position on the legality or competitive effects of (a) any Cooperative Agreement […] referenced in or implicated by the proposed Final Judgment, (b) any type of Cooperative Agreement, or (c) Cooperative Agreements in general." Nexstar denies all other allegations of Paragraph 116 not specifically admitted.

117.     ████████████████████████████████████████████████

████████████████████████████████████

---

[18]  As noted above *supra* note 8, Competitively Sensitive Information was defined by the U.S. Department of Justice as "Non-Public Information relating to pricing or pricing strategies, **pacing**, holding capacity, revenues, or market shares.".

[19]  *See* DOJ Consent Decree.





**ANSWER**:  Nexstar admits that Paragraph 117 appears to quote statements contained within a document produced by TEGNA, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 117 and on that basis denies them.

118.  ████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

████████████

**ANSWER**:  Nexstar admits that certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs received ████████████████ from Sharebuilders for portions of the alleged Class Period.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 118 and on that basis denies them.

119. ██████████████████████████

████████████████████████

████████████████████████████

███████████████████████████

████████████████████████

**ANSWER**:  Nexstar admits that certain Nexstar, Tribune, and Dreamcatcher stations in certain DMAs received ██████ from Sharebuilders for portions of the alleged Class Period. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 119 and on that basis denies them.

120.    Documents from some Defendants show that these ████████████ were used in conjunction with setting the prices they charged in what was supposed to be (and indeed, should have been) a competitive market.

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 120 and on that basis denies them.

121. ██████████████████████████

████████████████████████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████████

███████

**ANSWER**:  Nexstar admits that Paragraph 121 appears to quote statements contained within a document produced by TEGNA, and refers to that document for a complete and

accurate statement of its contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 121 and on that basis denies them.

122. 

**ANSWER**: Nexstar admits that Paragraph 122 appears to quote statements contained within a document produced by TEGNA, and refers to that document for a complete and accurate statement of its contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 122 and on that basis denies them.

123. At least Defendants Cox Media Group, Dreamcatcher, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune received

**ANSWER**: Nexstar admits that certain Nexstar stations in certain DMAs received ⬛⬛⬛⬛⬛⬛⬛ from Sharebuilders for portions of the alleged Class Period. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 123 and on that basis denies them

> b.  *Extensive Communications among Defendants*

124. A preliminary review of Defendants' employees' subpoenaed telephone records

**ANSWER**:  Nexstar admits that certain subpoenaed telephone records from Nexstar employees ███████████████████████████████████████████████ ███████████ Nexstar denies Plaintiffs' characterization of the subpoenaed telephone records as "extraordinarily large."  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 124 and on that basis denies them.

125.    Some Defendants' executives also emailed each other. ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 125 appears to quote statements contained within a document produced by Nexstar, and refers to that document for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, it is denied.  Nexstar denies all other allegations of Paragraph 125 not specifically admitted.

> *c.*    *Warnings Issued by Defendant Broadcast Station Executives to Subordinates To Not Create and/or To Destroy Evidence of Price Collusion Among Defendants*

126.    Defendants were aware of the incriminating nature of memorializing the exchange of pricing and other competitively sensitive information with competitors. For example, emails show that ██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 126 appears to quote statements contained within a document produced by Sinclair, and refers to that document for a complete and accurate

statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 126 and on that basis denies them.

127. 

**ANSWER**:  Nexstar admits that Paragraph 127 appears to quote statements contained within a document produced by Cox Reps, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 127 and on that basis denies them.

128. 

**ANSWER**:  Nexstar admits that Paragraph 128 appears to quote statements contained within a document produced by TEGNA, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 128 and on that basis denies them.

*d.*        *Using Code Words to Hide Conspiratorial Activity*

129.        Rather than ask for prices from each other, some Defendants used code words to hide their conspiratorial activity. Doing so helped evade their actions from detection.  They used code words in their communications with each other and as names of files.

**ANSWER**:  Deny.

130. 

**ANSWER**:  Nexstar admits that Paragraph 130 appears to quote statements contained within a document produced by Katz, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 130 and on that basis denies them.

131.

**ANSWER**:  Nexstar admits that Paragraph 131 appears to quote statements contained within a document produced by Nexstar, and refers to that document for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, it is denied.  Nexstar denies all other allegations of Paragraph 131 not specifically admitted.

132.

**ANSWER**:  Deny.

        *e.*      *Participation, Knowledge and Approval of Executives of Collusive Activity*

133.    As seen from the evidence above, multiple executives had knowledge of the alleged collusive conduct.

**ANSWER**:  Deny.

134.    ███████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 134 and on that basis denies them.

135.    ███████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████

**ANSWER**:  Nexstar admits that Paragraph 135 appears to quote statements contained within a document produced by Raycom, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 135 and on that basis denies them.

136. 

**ANSWER**:  Nexstar admits that Paragraph 136 appears to quote statements contained within a document produced by Raycom, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 136 and on that basis denies them.

137.

**ANSWER**:  Nexstar admits that Paragraph 137 appears to quote statements contained within a document produced by Sinclair, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 137 and on that basis denies them.

138. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

**ANSWER**:  Nexstar admits that Paragraph 138 appears to quote statements contained within a document produced by Scripps, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 138 and on that basis denies them.

139. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 139 appears to quote statements contained within a document produced by Nexstar, and refers to that document for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, it is denied.  Nexstar denies all other allegations of Paragraph 139 not specifically admitted.

140.    Some Defendants' executives appear to have joked about ████████████████

███████████████████████

**ANSWER**:  Deny.

141. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 141 appears to quote statements contained within a document produced by Sinclair, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 141 and on that basis denies them.

142.  ████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 142 appears to quote statements contained within a document produced by Sinclair, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 142 and on that basis denies them.

143.  ████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 143 appears to quote statements contained within a document produced by Nexstar, and refers to that document for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, it is denied.  Nexstar denies all other allegations of Paragraph 143 not specifically admitted.

144. ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████

**ANSWER**:  Nexstar admits that Paragraph 144 appears to quote statements contained within a document produced by Nexstar, and refers to that document for a complete and accurate statement of its contents.  To the extent a response is required to the content of the statement, it is denied.

         *f.*      *Defendants' Internal Policies Define Anticompetitive Conduct and Prohibit Conduct Alleged in This Complaint*

145. ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

████████████████████████████

████████████████████

████████████████████████████████████████

████████

████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████

████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 145 appears to quote statements from Sinclair's Antitrust Compliance Guidelines, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 145 and on that basis denies them.

146. ██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████

**ANSWER**:  Nexstar admits that Paragraph 146 appears to quote statements from Sinclair's Antitrust Compliance Guidelines, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 146 and on that basis denies them.

147. ███████████████████████████



**ANSWER**: Nexstar admits that Paragraph 147 appears to quote statements from

Sinclair's Antitrust Compliance Guidelines, and refers to that document for a complete and

accurate statement of its contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 147 and on that basis denies them.

148. 

**ANSWER**: Nexstar admits that Paragraph 148 appears to quote statements from Sinclair's Antitrust Compliance Guidelines, and refers to that document for a complete and accurate statement of its contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 148 and on that basis denies them.

149.

**ANSWER**: Nexstar admits that Paragraph 149 appears to quote statements from Sinclair's Antitrust Compliance Guidelines, and refers to that document for a complete and accurate statement of its contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 149 and on that basis denies them.

150.



**ANSWER**:  Nexstar admits that Paragraph 150 appears to quote statements from Scripps' Antitrust Compliance Policy, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 150 and on that basis denies them.

151.



**ANSWER**:  Nexstar admits that Paragraph 151 appears to quote statements from Scripps' Antitrust Compliance Policy, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 151 and on that basis denies them.

152.



**ANSWER**:  Nexstar admits that Paragraph 152 appears to quote statements from Scripps' Antitrust Compliance Policy, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 152 and on that basis denies them.

153. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 153 appears to quote statements contained within a document produced by Fox, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 153 and on that basis denies them.

154. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

**ANSWER**:  Nexstar admits that Paragraph 154 appears to quote statements contained within a document produced by Fox, and refers to that document for a complete and accurate

72

statement of its contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 154 and on that basis denies them.

155. 

**ANSWER**: Nexstar admits that Paragraph 155 appears to quote a portion of Tribune's Code of Ethics and Business Conduct, and refers to that document for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 155 not specifically admitted.

156. 

**ANSWER**: Nexstar admits that Paragraph 156 appears to quote a portion of Tribune's Code of Ethics and Business Conduct, and refers to that document for a complete and accurate

statement of its contents.  Nexstar denies all other allegations of Paragraph 156 not specifically admitted.

157.   

**ANSWER**:  Nexstar admits that Paragraph 157 appears to quote a portion of Tribune's Code of Ethics and Business Conduct, and refers to that document for a complete and accurate statement of its contents.  Nexstar denies all other allegations of Paragraph 157 not specifically admitted.

158.   

**ANSWER**:  Nexstar admits that Paragraph 158 appears to quote a portion of Tribune's Code of Ethics and Business Conduct, and refers to that document for a complete and accurate

statement of its contents.  Nexstar denies all other allegations of Paragraph 158 not specifically admitted.

159. 

**ANSWER**:  Nexstar admits that Paragraph 159 appears to quote a portion of Meredith's Human Resources Handbook, and refers to that document for a complete and accurate statement of its contents.  Nexstar denies all other allegations of Paragraph 159 not specifically admitted.

**B.     The Department of Justice Investigation and Requirement for Injunctive Relief Underscore the Conclusion That the Defendants Violated Section 1 of the Sherman Act**

160.    Much of the conduct in the foregoing section was investigated by the DOJ in a probe that was first publicly reported in July of 2018.

**ANSWER:**  Nexstar admits that a DOJ investigation was publicly reported in July 2018. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 160 and on that basis denies them.

161.    On November 13, 2018, December 13, 2018, and June 17, 2019, the DOJ filed complaints, which stated that "Defendants' agreements are restraints of trade that are unlawful under Section 1 of the Sherman Act."

**ANSWER:** Nexstar admits that Paragraph 161 appears to quote the DOJ's complaints, and refers to those complaints for a complete and accurate statement of their contents. To the extent a response is required to the legal conclusions in the DOJ's complaints, Nexstar denies them.

162. The DOJ also filed the Judgments and the Statement as to all Defendants except for Gray TV (after these dates, Gray TV finalized its acquisition of Raycom, which was implicated in the DOJ filings) and Katz for violating Section 1 through "concerted action between horizontal competitors in the broadcast television spot advertising market," describing the offense as having had anticompetitive effects by "disrupting the normal mechanisms for negotiating and setting prices and harming the competitive process," and that the "offense [was] likely to continue and recur unless the requested relief [was] granted."

**ANSWER:** Nexstar admits that the DOJ filed Judgments and the Statement in *United States v. Sinclair Broadcast Group, Inc., et al*, No. 1:18-cv-2609 (D.D.C.), and refers to those Judgments and Statement for a complete and accurate statement of their contents, including that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." To the extent a response is required to the content of the statements, it is denied. Nexstar denies all other allegations of Paragraph 162 not specifically admitted.

163. The Judgments mandate Defendants' (less Katz, but including Gray TV, by virtue of its acquisition of Raycom, and Cox Media, by virtue of its subsidiary-parent relationship with Cox Enterprises), conduct for seven years, wherein Defendants must:

    a. refrain from sharing competitively sensitive information directly or indirectly, including information on:

       i.   pricing;

      ii.   pricing strategies;

     iii.   pacing;

     iv.   holding capacity;

      v.   revenues; or

     vi.   market shares;

b.   establish antitrust whistleblower policies;

c.   designate Antitrust Compliance Officers responsible for implementing training and compliance programs;

d.   cooperate in the ongoing DOJ investigation; and

e.   certify annual compliance with the Judgments' terms and conditions.

**ANSWER:** Nexstar admits that Paragraph 163 appears to quote a portion of the Judgments, and refers to the Judgments for a complete and accurate statement of their contents, including that the "Final Judgment does not constitute any evidence against or admission by any party regarding any issue of fact or law." Nexstar denies all other allegations of Paragraph 163 not specifically admitted.

164. The injunctive relief required by the DOJ extends to all DMAs in the United States and is not limited to "certain" DMAs.

**ANSWER:** Nexstar admits that the Judgments define DMA as "Designated Market Area as defined by A.C. Nielsen Company and used by the Investing in Television BIA Market Report 2018." Nexstar refers to those Judgments for a complete and accurate statement of their contents, including that the "Final Judgment does not constitute any evidence against or

admission by any party regarding any issue of fact or law." Nexstar denies all other allegations of Paragraph 164 not specifically admitted.

165. Both the November, December, and June DOJ complaints refer to the conduct at issue as "illegal" and "unlawful."

**ANSWER:** Nexstar admits that Paragraph 165 appears to quote the November, December, and June DOJ complaints, and refers to those complaints for a complete and accurate statement of their contents. To the extent a response is required to the legal conclusions in the DOJ's complaints, Nexstar denies them.

166. The Statement referred to the injunctive relief requested in the Judgments as "terminat[ing] Defendants' illegal conduct, prevent[ing] recurrence of the same or similar conduct, and ensur[ing] that Defendants establish an antitrust compliance program," thereby "putting a stop to the anticompetitive information sharing." The DOJ concluded in the Statement that this injunctive relief was "necessary in light of the extensive history of communications among rival stations that facilitated Defendants' agreements" in restraint of trade.

**ANSWER:** Nexstar admits that Paragraph 166 appears to quote the Statement, and refers to the Statement for a complete and accurate statement of its contents. To the extent a response is required to the content of the Statement, it is denied. Nexstar denies all other allegations of Paragraph 166 not specifically admitted.

167. The then-Chief of the DOJ's Antitrust Division, Assistant Attorney General Makan Delrahim, elaborated: "The unlawful exchange of competitively sensitive information allowed these television broadcast companies to disrupt the normal competitive process of spot advertising in markets across the United States."

**ANSWER:** Nexstar admits that Paragraph 167 appears to quote a statement made by the DOJ on November 13, 2018, and refers to that statement for a complete and accurate statement of its contents. To the extent a response is required to the content of the statement, it is denied. Nexstar denies all other allegations of Paragraph 167 not specifically admitted.

168. During the DOJ's Public Workshop on Competition in Television and Digital Advertising in May 2019, Makam Delrahim also stated that "[s]ince last November, [DOJ] ha[s] reached settlements with seven broadcast television companies who [DOJ] *alleged had colluded with their competitors* to reduce competition in the market for broadcast advertising."

**ANSWER:** Nexstar admits that Paragraph 168 appears to quote a statement made by Assistant Attorney General Makan Delrahim in May 2019, and refers to that statement for a complete and accurate statement of its contents. To the extent a response is required to the content of the statement, it is denied.

169. The DOJ has been unequivocal, then, that the millions of pages of documents it reviewed contained proof of a violation of Section 1 of the Sherman Act.

**ANSWER:** Deny.

**C.     The Lack of Fines, Indictments, or Pleas is Immaterial**

170. For several reasons, the fact that the DOJ declined to prosecute criminally does nothing to undermine the plausibility of Plaintiffs' price fixing claims under the *per se* standard.

**ANSWER:** Paragraph 170 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

171. First, both the 2016 DOJ and 2014 FTC guidance conclude that information exchanges are facilitating practices that can evidence a price fixing cartel. Likewise, the United States delegation to the Organization for Economic Cooperation & Development's Competition Committee in 2010 stated that "[i]nformation exchanges can be treated as circumstantial

evidence of an unlawful price fixing or market allocation agreement among competitors, and in such a case are analyzed under the *per se* rule."

**ANSWER:** Nexstar admits that the second sentence in Paragraph 171 appears to quote a statement made by the United States delegation to the Organization for Economic Cooperation & Development's Competition Committee in 2010, and refers to that statement for a complete and accurate statement of its contents. To the extent a response is required to the content of the statement, Nexstar states that Paragraph 171 does not allege any facts against Nexstar and denies the statement's applicability to this case. Nexstar denies all other allegations of Paragraph 171 not specifically admitted.

172. Second, the priorities of the DOJ vary annually and across administrations. The DOJ's own statistics show that it allocates its resources differently from year to year. In 2018 and 2019 **combined**, the DOJ has only filed 21 criminal antitrust complaints (7 of which relate to legacy investigations initiated by the prior administration). In 2017, the DOJ filed only 17 criminal antitrust complaints.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 172 and on that basis denies them.

173. Comparatively, the Antitrust Division of the DOJ filed roughly: 50 criminal complaints in 2008, 54 criminal complaints in 2009, 66 criminal complaints in 2010, 84 criminal complaints in 2011, 52 criminal complaints in 2012, 59 criminal complaints in 2013, 54 criminal complaints in 2014, 47 criminal complaints in 2015, and 32 criminal complaints in 2016.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 173 and on that basis denies them.

174. No inference can be drawn as to the seriousness of the legal violation at issue here from the lack of a parallel criminal prosecution; and this is particularly true in light of an apparent DOJ resource shift resulting in fewer criminal antitrust prosecutions.

**ANSWER:** Deny.

175. Moreover, the "fact that Defendants did not plead guilty to wide-ranging conduct does not limit the civil action. Relatively few defendants plead guilty to all of the charges against them, and limitations on government resources may play as much a role in the agreement as the conduct involved." *In re Auto. Parts Antitrust Litig.*, No. 12-MD-02311, 2014 WL 4272784, at *8 (E.D. Mich. Aug. 29, 2014); *High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 664–665 (refusing to infer lack of a civil conspiracy from the government's decision not to move against certain defendants, acknowledging that the DOJ may decide to limit the scope of an investigation for numerous reasons, including differing standards of proof in a criminal case and the knowledge that the private bar "had both the desire and the resources to prosecute [the] suit").

**ANSWER:** Nexstar admits that Paragraph 175 appears to quote the cases cited, and refers to those cases for a complete and accurate statement of their contents. To the extent a response is required to the content of the quoted statement, Nexstar states that Paragraph 175 does not allege any facts against Nexstar and denies the statement's applicability to this case. Nexstar denies all other allegations of Paragraph 175 not specifically admitted.

176. Third, the plausibility of Plaintiffs' *per se* price fixing claim is bolstered by the additional allegations in this action concerning economic evidence of cartel behavior (*infra*) and the existence of numerous "plus factors" evincing a cartel (*infra*).

**ANSWER:** Deny.

**D.** **The Economic Evidence—Namely, Increased Prices and Skyrocketing Revenues in the Face of Declining Demand—Supports the Existence of a Cartel**

177.    The sale of broadcast television spot advertising on respective television stations to advertising customers is a primary source of revenue for broadcasting companies, including Defendants.[20]  The objective of the television station owner is to meet the needs of their advertising customers by reaching significant audiences across key demographics.

**ANSWER:**  Nexstar admits that the sale of broadcast television spot advertising on its television stations to advertising customers is a source of revenue for Nexstar.  Nexstar denies all other allegations of Paragraph 177 not specifically admitted.

178.    In a competitive market, one would expect horizontal competitors such as Defendants to compete for audience share and advertising revenue with other stations in their respective DMAs by competing on price. This is particularly true in a market facing disruption and decreased demand. The broadcast television spot advertising market is such a market.

**ANSWER:**  Nexstar admits that it competes with numerous other outlets for advertising customers.  Nexstar further admits that competition is based upon many different factors, sometimes including price.  Nexstar denies all other allegations of Paragraph 178 not specifically admitted.

179.    The broadcast television spot advertising market has been faced with rapid change, as consumers' media time continues to shift away from traditional sources and towards digital and online mediums, such as Instagram, Netflix, Hulu, YouTube, and Facebook. Broadcast television spot advertising has been grappling with ratings erosion and viewers

---

[20]  Nexstar and Sinclair's advertising revenues made up almost 50 percent of their total revenue in 2018. Tribune's "television and entertainment" advertising revenue made up roughly 65 percent of its total revenue in 2018.

canceling television subscriptions in favor of, inter alia, streaming services, which, in a competitive market, should drive prices, profits, and revenues down.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the other allegations of Paragraph 179 and on that basis denies them.

180. In a McKinsey 2015 Global Report, this was made clear: "Spending on media continues to shift from traditional to digital products and services at a rapid pace. By 2019, we believe digital spending will account for more than 50 percent of overall media spend. Within this, the digital video spending will overtake physical spending by 2018, two years earlier than we had previously forecast. Digital, consisting of Internet and mobile advertising, will become the largest advertising category by 2017, surpassing TV one year earlier than forecast, and mobile will more than double its share of the digital ad market."[21]

**ANSWER:** Nexstar admits that Paragraph 180 appears to quote statements in the McKinsey 2015 Global Report, and refers to the McKinsey Global Report for a complete and accurate statement of its contents. To the extent a response is required to the content of the statements, Nexstar states that Paragraph 180 does not allege any facts against Nexstar and denies the statements' applicability to this case.

181. The number of persons who actually view television advertising has also been dwindling. The McKinsey report also states that "[a]s digital media gains ground, advertisers are increasingly accepting the validity and persuasiveness of advertising on these media, moving away from the typically high cost-per-thousand (CPM) traditional media to less expensive, low-CPM Internet and mobile advertising—further accelerating the shift of analog dollars to digital."

---

[21] While demand continues to decline, these projections turned out to be incorrect, as BIA Advisory Services showed that digital advertising spend had not surpassed television advertising spend as of the end of 2018 and is not projected to do so through at least 2023. *See* Section VIII.B., *infra*.

Those who consume television advertising are also declining: the rise of "cord cutters" and "cord nevers" continues to grow. In fact, eMarketer estimates that traditional television viewers will drop 2.4 percent (or by roughly 5 million people) by the end of 2018, while the cord-cutter and cord-never populations will grow by a total of 15 percent (or by almost 7 million people) this year. This impacts where advertisers spend their dollars, and a decreased demand for television advertising. The report opined that television's command over the United States advertising revenues has given way to digital, which in 2015 was expected in to bring in nearly half of all ad revenue in 2018—although digital advertising spend fell far short of this projection.



**ANSWER:** Nexstar admits that the second sentence in Paragraph 181 appears to quote a statement in the McKinsey 2015 Global Report, and refers to the McKinsey Global Report for a complete and accurate statement of its contents. To the extent a response is required to the content of the statement, Nexstar states that Paragraph 181 does not allege any facts against Nexstar and denies the statement's applicability to this case. Nexstar denies all other allegations of Paragraph 181 not specifically admitted.

182. As depicted in Figure 1, from 2008 to 2016, viewership for morning news, early local evening news, and local late-night news has fallen 13, 18, and 29 percent, respectively.

**Figure 1: Local News Viewership Has Declined**



**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the other allegations of Paragraph 182 and on that basis denies them.

183.    In light of these challenges, the broadcast television spot advertising market has not responded to declining demand in the way one would expect a competitive market to respond (*i.e.*, by lowering price to compete for and preserve market share); instead, it exhibits indicia of cartel activity, including *increased* prices and *increased* revenues.

**ANSWER:** Deny.

184.    As depicted in Figures 2.a through 2.k, all but one of the Defendants' percent gains in over the air ("OTA") revenue have outpaced the market as a whole, which *lost 2 percent in revenue* over that same time period. All but one Defendant outpaced the industry over this time period, some by as much as 97 percent, 164 percent, and 218 percent. The sole Defendant that failed to outpace the industry, Fox, was also the only Defendant that was *selling* broadcast stations (and their attendant revenue streams) during the relevant period.

**Figure 2.a to 2.k:** [22]
**Most Defendants' Broadcast Spot Ad Revenues Have Outpaced
the Industry**

**Figure 2.a (CBS)**



---

[22] Data for Dreamcatcher is only available from 2013 through 2016. Over that period, Dreamcatcher's revenue increased by 17%.

**Figure 2.b (Cox)**



**Figure 2.c (Fox)**



**Figure 2.d (Griffin)**



**Figure 2.e (Meredith)**



**Figure 2.f (Nexstar)**



**Figure 2.g (Raycom)**



**Figure 2.h (Scripps)**



**Figure 2.i (Sinclair)**



**Figure 2.j (TEGNA)**



**Figure 2.k (Tribune)**

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 184 and on that basis denies them.

185.    Figures 3.a, 3.b., and 3.c show that beginning in the first quarter of 2014 (the beginning of the conduct period identified by the DOJ and the Class Period here), broadcast television spot advertising price levels rose dramatically from their immediately preceding years.[23] Figures 3.a through 3.c include data on the Top 100 DMAs. Of the Top 100 DMAs reflected in Figures 3.a through 3.c, 92 are among the multi-defendant DMAs identified in Appendix A, representing 96 percent of households in the Top 100 DMAs. The Broadcaster Defendants are a collective of the largest broadcast station owners and operators in the nation and are thus the primary drivers of the price movement reflected in Figures 3.a through 3.c.

**Figure 3.a: Defendants' Conduct Has
Caused Broadcast Television Spot Advertising Prices
to Rise (Early News)**



---

[23]  Broadcast television spot advertising is priced on a cost per thousand ("CPM") basis, which is the cost for an advertisement per 1,000 viewers, or a cost per point ("CPP") basis, which is the cost to reach one percent of television households in a specified area.

**Figure 3.b: Defendants' Conduct Has
Caused Broadcast Television Spot Advertising
Prices to Rise (Late News)**



**Figure 3.c: Defendants' Conduct Has
Caused Broadcast Television Spot Advertising
Prices to Rise (Primetime)**



**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the

truth of the allegations of Paragraph 185 and on that basis denies them.

93

186.    Finally, Figure 4 shows a commensurate jump in the Broadcaster Defendants' revenues at the start of the Class Period in 2014.  This is not how a competitive market responds to **declining** viewership and **declining** demand; these effects would only be expected in a cartelized market not subject to normal competitive forces.

**Figure 4: Defendants' Conduct Caused The Broadcaster Defendants' Revenues to Rise**



**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Figure 4 in Paragraph 186 and on that basis denies them.  Nexstar denies all other allegations of Paragraph 186.

## VII.   DEFENDANTS EXERCISED MARKET POWER AND THEIR CONDUCT HAD ANTICOMPETITIVE EFFECTS IN A RELEVANT ANTITRUST MARKET

187.   Defendants' price fixing agreement is unlawful under the *per se* standard, while the information exchange that facilitated the cartel is either unlawful *per se*, or alternatively is unlawful under either a quick look[24] or full-fledged rule of reason analysis.

**ANSWER:**  Paragraph 187 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 187.

188.   Under the *per se* standard, and additionally where, as here, there are demonstrable anticompetitive effects, a relevant product and geographic market need not be defined.

**ANSWER:**  Paragraph 188 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 188.

189.   Should a relevant product market need to be defined in this action, it is the sale of broadcast television spot advertising on broadcast television stations.

**ANSWER:**  Paragraph 189 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 189.

190.   Should geographic markets need to be defined in this action, they are each individual, specific DMA in which two or more Broadcaster Defendants purportedly compete, identified in Appendix A.

---

[24]  Quick look" is an abbreviated version of the rule of reason analysis, where the Court does not need to conduct analysis of the market to show anticompetitive effects, but rather must only show a form of market injury to the Plaintiffs and members of the Class.

**ANSWER:** Paragraph 190 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required. To the extent a response is required, Nexstar denies the allegations in Paragraph 190 and Appendix A.

191. The broadcast television spot advertising landscape in the United States is comprised of parent companies like the Broadcaster Defendants that own and operate dozens of television stations. These stations carry programming distributed through their broadcast platforms, provided by third-party networks and syndicators, news stations, their own networks, and other original programming.

**ANSWER:** Nexstar admits that it owns television stations in the United States, which carry programming distributed through their broadcast platforms, provided by third-party networks and syndicators, news stations, and other original programming. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 191 and on that basis denies them.

192. Industry analysts and government regulators have consistently recognized that digital media advertising and other forms of advertising are not effective substitutes for broadcast television spot advertising.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 192 and on that basis denies them.

193. Broadcast television spot advertising combines sight, sound, and motion that appeal to viewers and attract their attention in ways that other advertising mediums do not.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 193 and on that basis denies them.

194.    Radio, newspaper, billboard, and direct-mail advertising do not combine sight, sound, and motion, and consequently lack broadcast television spot advertising's ability to capture consumers with emotive storytelling.  They also do not reach as many viewers as broadcast television spot advertising and so cannot drive brand awareness to the same extent as broadcast television spot advertising.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 194 and on that basis denies them.

195.    Most forms of digital and Internet advertising (such as search page and website banner advertisements) lack the combination of sight, sound, and motion that characterize broadcast spot television advertising, and even those online video advertisements that do include that combination face prohibitive challenges in that they can be skipped, minimized, or blocked by computer programs.  Digital advertising also serves a different purpose, targeting narrow demographic subsets of a population and seeking to generate an immediate response (in the form of a click through or purchase), while broadcast television spot advertising reaches the largest population of any form of advertising in a DMA (including but not limited to radio, e- mails, social media, the Internet, cable television spot advertising, and streaming services), making it particularly effective for promoting brand awareness in a lasting way.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 195 and on that basis denies them.

196.    Advertisers want to advertise on broadcast stations (as opposed to cable stations and digital mediums) because broadcast stations offer popular programming such as local news, sports, and primetime and syndicated shows that are especially attractive in reaching a broad demographic base and a large audience of viewers.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 196 and on that basis denies them.

197. Cable television spot advertising reaches far fewer television households within a DMA, is limited in supply, and generally encompasses more specialized programs that appeal to niche audiences. Comparatively, broadcast television spot advertising can be viewed by anyone with a traditional cable package (which includes major broadcast stations like ABC, CBS, Fox, and NBC and their affiliated networks in addition to cable channels), people who stream their television through the internet on services like Hulu (which almost ubiquitously carry the local affiliates of the major broadcast stations), and can be viewed by anyone with an antenna, for free.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 197 and on that basis denies them.

198. With respect to digital advertising, in a 2011 review of top traditional and online advertising agencies, 24 of the top 25 online agencies did not offer television advertising services in-house and, similarly, 24 of the 25 top traditional advertising agencies did not offer search advertising in-house. This implies that clients for these two advertising verticals do not see the other as interchangeable or substitutable, but rather as complementary products (*i.e.*, advertisers need to purchase both to reach as many potential consumers as possible).

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 198 and on that basis denies them. Paragraph 198 also consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

199.     Indeed, Mark Lieberman, President and CEO of Viamedia, the nation's largest cross-media advertising company that offers advertising solutions through both television and digital media stated in May 2019 that:

> We're going to be talking a lot today about TV and digital, and from my standpoint, ***TV and digital are not equal***, and they are not yet considered a holistic buy, for a few reasons, one is . . . television provides a ***brand safe environment***, . . . second is that the [advertising] agencies actually have different buyers [for digital and television], . . . fourth . . . there is no connective tissue between the digital world, digital ad tech . . . and tv ad tech . . . [as to] ***measurement***, there is no unified cross-media measurement platform [to assess how TV advertising is performing versus digital], and lastly, when it comes to privacy . . . there is a privacy paradox [with digital advertising] . . . regulation [of digital data] will inhibit the use of [digital] data to hit [advertising targets].

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 199 and on that basis denies them.

200.     Mark Lieberman therefore concluded that he views digital advertising "as a complement, not a substitute," to television advertising.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 200 and on that basis denies them.

201.     As to "measurement," while audience size and other performance for broadcast television spot advertising is measured by neutral third parties, such as Nielsen, for digital media, "impressions," "views," and other digital media performance is measured by the self- interested advertisement sellers themselves and often there are invalid, inaccurate, or outright fraudulent reporting of impressions, clicks, and other metrics.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 201 and on that basis denies them.

202.     Marc Pritchard, Chief Brand Officer at Procter & Gamble, stated in May 2019 that digital advertising has a "dark side," including "outright fraud," where advertisers cannot tell if digital advertisers are being viewed by a human or a fraudulent robot application, or "bot."

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 202 and on that basis denies them.

203.     As to "brand safety," while most television programming is "safe" for brands—it is not unsavory, salacious, pornographic, or ideologically or politically charged and so unlikely to associate the brand with divisive or detrimental content or imagery—digital advertisements can and often do end up on websites, social media pages, or other digital media outlets that are not "safe," either because they are politically charged and so may divide a consumer base, are pornographic or otherwise contain offensive imagery, or are otherwise inappropriate contexts.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 203 and on that basis denies them.

204.     Marc Pritchard elaborated on the brand safety issue, noting that some of his digital advertisements had appeared in "unacceptable graphic and horrible content," including "***ISIS terrorist training videos***."  This can obviously endanger a brand.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 204 and on that basis denies them.

205.     Additionally, "ad blocking" applications can automatically prevent a consumer from viewing a digital advertisement, while avoiding a broadcast television spot advertisement requires that a viewer take affirmative action (e.g., change the channel, leave the room) to avoid viewing a broadcast television spot advertisement.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 205 and on that basis denies them.

206. Finally, more broadcast television spot advertisements are actually viewed to their completion than digital advertisements. When a pop-up advertisement or other digital advertisement is played, many people immediately close the unwanted distraction after just a few seconds have passed, with the digital advertisement often playing only as long as it takes the consumer to find the "close" box. Marc Pritchard noted that the "average view time for a social media ad is 1.7 seconds" and that "it's kinda hard to get a message across in 1.7 seconds."

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 206 and on that basis denies them.

207. As compared to cable, broadcast television spot advertisements typically penetrate about 90 percent of the households in a DMA, while cable television spot advertisements penetrate far fewer homes. A significant and growing number of television households do not even subscribe to a traditional cable provider, instead receiving broadcast television signals over the air for free. In households that subscribe to cable television, the package they receive almost always includes all broadcast channels, but often excludes many cable channels. As a result, some cable television spot advertisements cannot be seen even by households with cable.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 207 and on that basis denies them.

208. Additionally, broadcast television spot advertisement is much more appealing than cable television spot advertising, because most advertisers are looking to capture a wide audience and broadcast programming has broader appeal to viewers. A broadcast spot reaches more viewers with more ratings points than a single spot on a cable channel. Cable audiences

are fragmented across numerous stations that cater to niche populations, and thus advertisers looking to reach a large share of a DMA cannot do so through cable television spot advertisements.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to truth of the allegations of Paragraph 208 and on that basis denies them.

209.    Finally, broadcast stations have a larger advertising inventory than cable stations. Due to the limited inventory and lower ratings associated with cable spot advertising, cable providers cannot offer the same volume of ratings points or broad enough household penetration to match broadcast television spot advertising.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to truth of the allegations of Paragraph 209 and on that basis denies them.

210.    Because of these factors, advertisers are not likely to respond to a small but significant increase in the prices charged for broadcast television spot advertising in a given DMA by switching to other forms of media in large enough numbers to make that price increase unprofitable.  Accordingly, other forms of advertising are not a substitute for broadcast television spot advertising.  Conversely, broadcast television stations *are* generally substitutable for one another.  If a broadcast station suffers a blackout in a given DMA, viewers are likely to turn to another such station in the DMA to watch similar content, such as sports, primetime shows, local news, movies, and/or weather.

**ANSWER:** Nexstar denies the allegations of Paragraph 210.  Paragraph 210 also consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

211.    In 2013 the DOJ stated that it "has repeatedly concluded that the purchase of broadcast television spot advertising constitutes a relevant antitrust market because advertisers view spot advertising on broadcast television stations as sufficiently distinct from advertising on other media."  The DOJ similarly stated that it has "repeatedly concluded that the purchase of broadcast television spot advertising constitutes a relevant market because advertisers view spot advertising on broadcast television stations as sufficiently distinct from other forms of media (such as radio and newspapers)."

**ANSWER:**  Nexstar admits that Paragraph 211 appears to quote the 2013 DOJ filing, and refers to that statement for a complete and accurate statement of its contents.  To the extent a response is required to the legal conclusions in the filing, Nexstar denies them.

212.    For example, in a 2014 enforcement action, the DOJ explained that the proper relevant antitrust market was broadcast television spot advertising and that the market excluded all other forms of advertising, including "radio," "billboards," "newspaper," as well as "cable or satellite television."  The DOJ noted in that action that cable and satellite television was not "a desirable substitute for broadcast television spot advertising for two important reasons."  First, the DOJ noted that they do not have the same "reach" as broadcast television advertising, which reaches "90% of homes in a DMA."  Second, the DOJ noted that because subscription services can offer over 100 channels, they fragment the audience into small demographic segments, so that broadcast television spot advertising "has higher ratings points than subscription programming," and so is "viewed as providing a much easier and more efficient means for an advertiser to reach a high proportion of its target demographic."  Thus, the DOJ has consistently concluded in its regulatory actions that these advertising outlets are "not [] a substitute for

broadcast television spot advertising, but rather as a supplement [*i.e.*, a complement]." In that action, the DOJ extended this analysis to "online video distributors, such as Netflix and Hulu."

**ANSWER:** Nexstar admits that Paragraph 212 appears to quote the DOJ, and refers to the 2014 enforcement action for a complete and accurate statement of its contents. To the extent a response is required to the content of the statements, Nexstar states that Paragraph 212 does not allege any facts against Nexstar and denies the statements' applicability to this case. Nexstar denies all other allegations of Paragraph 212 not specifically admitted.

213. Indeed, as recently as *July 31, 2019*, the DOJ has maintained its firm and oft-repeated stance, consistently adopted by the courts overseeing DOJ regulatory actions, that broadcast television spot advertising is a properly drawn relevant antitrust market that excludes all other forms of advertising.

**ANSWER:** The July 31, 2019 DOJ filing speaks for itself. Nexstar denies all other allegations of Paragraph 213 not specifically admitted.

214. On average, the Broadcaster Defendants held 60 percent, and as high as 100 percent, market share in the multi-defendant DMAs listed in Appendix A (measured as of 2017 data, and including Raycom's, but not Gray TV's, commerce).

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to truth of the allegations of Paragraph 214 and Appendix A and on that basis denies them.

215. Defendants' conduct alleged herein has caused injury to Plaintiffs and the Class members in the form of having paid overcharges (*i.e.*, artificially inflated prices) for broadcast television spot advertising. This is injury is of the type that the antitrust laws were meant to deter, punish, and prevent. As shown in Figure 1, Figures 3.a to 3.c, and Figure 4, at the onset of the conduct period identified by the DOJ (the start of the Class Period here), the Broadcaster

Defendants' prices and revenues have spiked in the face of declining demand. And Figures 2.a to 2.k show that the Broadcaster Defendants' revenues have outpaced their non-colluding rivals.

**ANSWER**: Deny.

216. Moreover, the economic literature (discussed *supra*, in Section V.A.2) is clear that the conduct and market outcomes observed here evince cartel behavior, lead to anticompetitive harm, and cause a reduction in consumer welfare.

**ANSWER**: Deny.

## VIII. "PLUS FACTORS" FURTHER EVINCE THE EXISTENCE OF DEFENDANTS' *PER SE* UNLAWFUL PRICE FIXING CARTEL

217. Prominent legal and economic antitrust scholars studying collusive behavior have developed the concept of "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." They refer to the plus factors that provide the most probative value and "those that lead to a strong inference of explicit collusion as 'super plus factors.'"

**ANSWER**: Nexstar denies the allegations of Paragraph 217. Paragraph 217 also consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

218. Here, plus factors plausibly inferring the existence of a *per se* illegal cartel include: the defendants' exchange of competitively sensitive information, a motive to conspire, actions and conduct that would be against the Broadcaster Defendants' unilateral self-interest in the absence of an anticompetitive agreement, opportunities and invitations to collude at trade associations and otherwise, high market concentration, and high barriers to entry.

**ANSWER**: Deny.

A. **Defendants' Information Exchange is a "Super Plus Factor" Evincing the Existence of a *Per Se* Unlawful Price Fixing Cartel**

219.    One of the "super plus factors" academics enumerate addresses the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private to each firm, or where: "A firm or subset of firms has knowledge of the details of another firm's transactions, production, sales, and/or inventories where the latter firm would be competitively disadvantaged by conveying that information unilaterally."

**ANSWER:**  Nexstar denies the allegations of Paragraph 219.  Paragraph 219 also consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

220.    A super plus factor plausibly inferring the existence of a *per se* illegal cartel includes the information exchange detailed *supra*.

**ANSWER:**  Nexstar denies the allegations of Paragraph 220.  Paragraph 220 also consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

B. **The Broadcaster Defendants' Motive to Conspire—Declining Viewership and Revenue—is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

221.    As discussed above, overall viewership and revenue have been falling for broadcast television spot advertising. While the Broadcaster Defendants' revenues have increased tremendously (as a result of their unlawful conduct), industry revenues overall are down, the result of pressure from Internet and other media outlets as certain consumers (e.g., "cord-cutters" and "cord-nevers") elect to consume non-traditional media.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 221 and on that basis denies them. Nexstar further denies it has engaged in any unlawful conduct.

222. Television viewership has declined in recent years. According to the Pew Research Center, "[s]ince 2007, the average audience for late night newscasts has declined 31 percent, while morning audience declined 12 percent and early evening audience fell 19 percent." In 2018, the Pew Research Center found that "the gap between the share of Americans who get news online and those who do so on television is narrowing," with only 50 percent of United States adults regularly getting news from television in 2017, down from 57 percent in 2016. Typically, local news is the largest source of revenue for local broadcast affiliates, comprising roughly 50 percent of total revenue. In 2016, advertising revenue for local "news-producing stations" made up 84 percent of total advertising revenue for the industry overall.

**ANSWER:** Nexstar admits that Paragraph 222 appears to quote statements from the Pew Research Center, and refers to the Pew Research Center statements for a complete and accurate statement of its contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 222 and on that basis denies them.

223. Broadcast television spot advertising sales have begun to decline in the last decade. In real terms, broadcast television spot advertising industry-wide revenue reached its non-election year peak in 2011 at $16.2 billion (in 2008 dollars). It has declined every two years since then to $14.9 billion in 2017 (again, expressed in 2008 dollars), a decline of 8.25 percent. The same pattern has held for election-years: in real terms, presidential election-year real local television advertising spending fell from $20.0 billion in 2008 to $18.1 billion in 2012 to $17.6

billion in 2016, a total decline of 12.1 percent. And, for mid-term election years, real spending fell by $1.9 billion dollars (4.9 percent) from $18. billion in 2010 to $17.4 billion in 2014.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 223 and on that basis denies them.

224. BIA Advisory Services forecasts that local television station OTA advertising revenues will grow slower than overall local advertising, predicting a 0.6 percent compound annual growth rate ("CAGR") from 2019 to 2023, outpaced by a forecasted CAGR of over 10 percent for local mobile video and over 15 percent for local online video. BIA Advisory Services predicts that "by 2023, local online/interactive/digital advertising revenue will be $78.2 billion, growing to nearly 48 percent of total local media advertising revenue from roughly a 37 percent share in 2018."

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 224 and on that basis deny them.

225. "In a healthy economy, we're looking at no growth in advertising from traditional media companies," said Michael Nathanson, an analyst with research firm MoffettNathanson. "That's a worrying trend." The decline in television viewership is accelerating as online rivals have increased their investments in the online video advertising market, capturing almost every new advertising dollar entering the marketplace. Almost half of the growth in local video ad spending during the next five years will go to digital platforms, including local mobile video, local online video and out-of-home video, according to a 2017 study on advanced television advertising published by BIA/Kelsey industry analysts. "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 225 and on that basis denies them.

226. Declining viewership, coupled with a relatively fixed amount of available broadcast television spot advertising time, should lead to lower prices, revenues, and profits. These factors provide a strong motivation for horizontal competitors to form and maintain a cartel, particularly in this industry, where broadcast television spot advertising makes up the majority of the Broadcaster Defendants' revenues.

**ANSWER:** Nexstar denies the allegations of Paragraph 226. Paragraph 226 also consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

227. For example, according to Sinclair's most recent Form 10-K filed with the SEC, a primary source of revenue for local television stations is "the sale of advertising inventory on . . . television stations to . . . advertising customers." However, Sinclair also concedes that "advertising revenue can vary substantially from period to period based on many factors beyond [its] control." Furthermore, "[t]his volatility affects [its] operating results and may reduce [its] ability to repay indebtedness or reduce the market value of [its] securities." Sinclair specifically admits that its "operating results depend on the amount of advertising revenue [it] generate[s]." The key revenue function underscores the strong incentive to collude rather than compete, which, as alleged above and below, the Broadcaster Defendants acted upon.

**ANSWER:** Nexstar admits that Paragraph 227 appears to quote Sinclair's most recent Form 10-K filed with the SEC, and refers to that document for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 227 not specifically admitted.

C. **The Broadcaster Defendants' Action Against Their Unilateral Self-Interest (Rising Prices in the Face of Declining Demand) is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

228. As discussed in the allegations above and below, the Broadcaster Defendants undertook conduct that would be economically irrational as against their unilateral economic self-interest if it was undertaken in the absence of an agreement among the Broadcaster Defendants to fix prices.

**ANSWER**: Deny.

229. Specifically, the Broadcaster Defendants—faced with declining demand that should have caused prices for broadcast television spot advertising to fall—irrationally raised their prices.

**ANSWER**: Deny.

230. In the absence of an agreement among firms to maintain high prices, raising prices in the face of declining demand is against any one firm's unilateral economic self-interest because that firm would risk losing market share as customers shift their purchases away towards lower priced rivals. A firm acting alone is uncertain how a rival will price, and so the economically rational decision is to lower prices commensurate with the declining demand to retain existing, or even to gain additional, market share.

**ANSWER**: Deny.

231. However, a firm acting in concert with its rival by agreeing to maintain high prices avoids this uncertainty about competitive outcomes and can confidently maintain high prices even in the face of declining demand, knowing its rival will not undercut it and steal market share away. That the Broadcaster Defendants raised their prices in the face of declining demand strongly suggests that they were acting in concert as a cartel, rather than unilaterally.

**ANSWER**: Deny.

**D.** **Defendants' Opportunities and Invitations to Collude are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

232.     Further supporting the plausibility of the cartel were Defendants' frequent opportunities, and apparent invitations to one another, to collude rather than compete.  As the FTC notes in its Spotlight on Trade Associations, "[d]ealings among competitors that violate the law would still violate the law even if they were done through a trade association[, including] . . . control[ing] or suggest[ing] prices of members[,] . . . [and] us[ing] information-sharing Programs . . . as a disguised means of fixing prices."

**ANSWER:**  Nexstar admits that Paragraph 232 appears to quote the FTC, and refers to the FTC notes in its Spotlight on Trade Associations for a complete and accurate statement of their contents.  To the extent a response is required to the content of the statement, Nexstar states that Paragraph 232 does not allege any facts against Nexstar and denies the statement's applicability to this case.  Nexstar denies all other allegations of Paragraph 232 not specifically admitted.

**1.     Invitations and Opportunities to Collude Through the TIP Initiative**

233.     As one example, on November 20, 2017, a group of broadcast television companies, including Nexstar, Sinclair, TEGNA, and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners."  The TIP Initiative is intended to be national in scope.  It will provide for standardized automated transactions with customers for broadcast television spot advertising that will enable Defendants to share competitively sensitive information.  Nexstar's President and CEO made a public statement regarding TIP indicating that Defendants "must work together as an industry."  The President and CEO of Sinclair echoed this

sentiment stating that "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales. Tribune's President and CEO also indicated that through the TIP Initiative, Defendants could "actively work[] together."

**ANSWER:** Nexstar admits that Paragraph 233 appears to quote statements about the launch of the TIP Initiative, and refers to those statements for a complete and accurate statement of their contents. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 233 and on that basis denies them.

234. Through the TIP Initiative, Defendants thus signaled their invitation to the industry to come together and collude rather than compete, and continue to disseminate competitively sensitive information, in order to maintain industry profitability in the face of declining demand.

**ANSWER:** Deny.

### 2. Opportunities to Collude Through Joint Service Agreements

235. In addition, the Broadcaster Defendants had numerous opportunities to meet and conspire with each other under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the cartel.

**ANSWER:** Deny.

236. In particular, almost 300 full-power local television stations changed hands in 2013 and many of these deals resulted in stations in the same market being separately owned on paper but operated jointly, a practice that has grown exponentially in recent years. The practice proliferated beginning in 2011, and was widespread by 2013. As of 2014, joint service agreements of one kind or another existed in at least 94 markets (almost half of the 210 local television DMAs throughout the country), and up from 55 in 2011. As of March 2019, the Broadcaster Defendants operated stations owned by different owners in 79 DMAs.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 236 and on that basis denies them.

237. Specifically, Sinclair admits that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 237 and on that basis denies them.

### 3. Opportunities to Collude Through the TVB Trade Association

238. Additionally, Defendants and their co-conspirators had numerous opportunities to conspire through industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), conferences and meetings held by those associations, and merger negotiations.

**ANSWER:** Deny.

239. Cox Media, Katz, Nexstar, Sinclair, and Tribune are members of the TVB. Katz's president and Cox Media's Executive Vice President presently serve as chairpersons on TVB's Board of Directors. Nexstar's president and CEO, and TEGNA's president and CEO, are both former chairs of TVB. TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry." The TVB is designed to bring together and encourage information sharing among employees of broadcast television companies, including Defendants, especially advertising sales representatives.

**ANSWER:** Nexstar admits that Nexstar is and Tribune and Dreamcatcher were members of the TVB, and that Nexstar's president and CEO was a former chair of TVB. Nexstar admits that Paragraph 239 appears to quote the TVB website, and refers to that website for a complete and accurate statement of its contents. Nexstar lacks knowledge or information

sufficient to form a belief as to the truth of the remaining allegations of Paragraph 239 and on that basis denies them.

### 4. Opportunities to Collude Through the NAB Trade Association

240. CBS, Cox Media, Fox, Scripps, Sinclair, TEGNA, Tribune, Meredith, and Nexstar are also members of the NAB, which describes itself as the "premier trade association for broadcasters."

**ANSWER:** Nexstar admits that Nexstar is and Tribune was a member of the NAB. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 240 and on that basis denies them.

241. CBS' Executive Vice President, Cox Media's Executive Vice President, Fox's Senior Vice President, Scripps' President of Local Media, TEGNA's President and CEO, Nexstar's Chairman, President and CEO, Sinclair's President and CEO, Tribune's COO, and Meredith's President, all serve on the NAB Television Board of Directors.

**ANSWER:** Nexstar admits that its Chairman and CEO serves on the NAB Television Board of Directors. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 241 and on that basis denies them.

242. The President of Cox Media Group, owner of Cox Reps, also serves on the NAB's Executive Committee. NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 242 and on that basis denies them.

### 5. Opportunities to Collude Through the MRC Trade Association

243. Every named Defendant and many other local television station owners are also members of the MRC.

**ANSWER:**  Nexstar admits that Nexstar is and Tribune was a member of the MRC Trade Association.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 243 and on that basis denies them.

244.    The MRC boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 244 and on that basis denies them.

245.    These invitations and opportunities to collude served to bolster and facilitate the formation and maintenance of Defendants' price fixing cartel.

**ANSWER:**  Deny.

### 6.    Opportunities To Collude Through the Ancient Order of Hiberanians

246.    Certain employees of Defendants ██████████████████████

██████████████████

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 246 and on that basis denies them.

247.    Emails were sent to personnel from across the advertising industry in Atlanta, including cable, radio, broadcast tv, and sales representatives, including:





**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 247 and on that basis denies them.

248.

**ANSWER**:  Nexstar admits that Paragraph 248 appears to quote statements contained within a document produced by CBS, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 248 and on that basis denies them.

249.

**ANSWER**:  Nexstar admits that Paragraph 249 appears to quote statements contained within a document produced by CBS, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 249 and on that basis denies them.

250.

**ANSWER**:  Nexstar admits that Paragraph 250 appears to quote statements contained within a document produced by CBS, and refers to that document for a complete and accurate

statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 250 and on that basis denies them.

251. ███████████████████████████████████████

███████████████████████████

**ANSWER**:  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 251 and on that basis denies them.

### 7.    Other Opportunities to Collude

252. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

**ANSWER**:  Nexstar admits that Paragraph 252 appears to quote statements contained within a document produced by Raycom, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 252 and on that basis denies them.

253. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████

**ANSWER**:  Nexstar admits that Paragraph 253 appears to quote statements contained within a document produced by Sinclair, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 253 and on that basis denies them.

254. ███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████



**ANSWER**:  Nexstar admits that in 2016 certain Nexstar and Tribune employees received information about ████████████████.  Nexstar also admits that Paragraph 254 appears to quote statements contained within a document produced by Sinclair, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 254 and on that basis denies them.

255. ████████████████████████████

███████████████████████████



**ANSWER**:  Nexstar admits that Paragraph 255 appears to quote statements contained within a document produced by Sinclair, and refers to that document for a complete and accurate statement of its contents.  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 255 and on that basis denies them.

### E.  The Broadcaster Defendants' High Market Shares and High Concentration in the Broadcast Television Spot Advertising Market are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful

256.  As shown in Appendix A and alleged above, in the DMAs in which the Broadcaster Defendants purportedly compete they consistently hold dominant shares of the market, averaging 60 percent and as high as 100 percent.  Sinclair is the largest broadcast company in the nation, while Nexstar and Tribune are among the top five.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 256 and Appendix A and on that basis denies them.

257.  As of 2017, the Broadcaster Defendants in total owned 471 full-power stations, up 85 percent from 254 stations in 2008. The Broadcaster Defendants in total own 688 revenue

generating stations, up over 150 percent from 268 stations in 2008. As discussed in more detail *infra*, a wave of consolidation and station purchases has made some broadcast media owners considerably larger.

**ANSWER:** Nexstar admits that there have been station purchases since 2017. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 257 and on that basis denies them.

258. A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

**ANSWER:** Paragraph 258 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

259. In response to decreased advertisement spending, the local television industry has been consolidating in recent years. This consolidation of the industry continues "as station owners look to increase their leverage with broadcast networks, which supply much of their programming, and pay-TV distributors, which carry their channels." In 2013, "big owners of local TV stations got substantially bigger, thanks to a wave of station purchases." That wave is reflected in the following chart taken from a 2013 report by the Pew Research Center:



**Buying binge continues for local TV companies**

*Number of local TV stations owned by each company, as reported in SEC filings*

Note: Counts include stations that are reported in each company's SEC filing for each year ending Dec. 31 as being owned, operated or provided with programming and/or sales and other services. Low-power and satellite stations are excluded.
Source: Individual media company annual reports and SEC filings.

PEW RESEARCH CENTER

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 259 and on that basis denies them.

260. As the Pew report states:

> Many of the 290 TV station purchases in 2013 occurred as group acquisitions by some of the largest owners, building their portfolios of stations even more. The Tribune Co. emerged from bankruptcy to make the richest single deal, spending $2.73 billion to acquire 19 stations from Local TV Holdings. Gannett completed a $2.2 billion transaction to buy 17 stations from Belo Corp., almost doubling Gannett's TV holdings and giving it national reach. Twelve stations changed hands when Media General merged with New Young Broadcasting.
>
> Sinclair Broadcasting acquired more individual stations than any other buyer, snapping up outlets owned by locally based companies like Fisher Communications in Seattle and Allbritton Communications in Washington, D.C. The company already owned the most local stations of any group; if all pending sales go through, Sinclair will own or provide services to 167 television stations in 77 markets, reaching almost 40 percent of the United States population. Nexstar Broadcasting made moves to increase its portfolio to 108 stations in 56 markets. In 37 of those markets, it will own or provides services to more than one station. Nexstar's chief executive, Perry Sook, predicted the "rolling M&A thunder" would continue

throughout 2014, and it has. In March, Media General announced plans to buy LIN Media's 43 stations for $1.6 billion.

**ANSWER:** Nexstar admits that Paragraph 260 appears to quote statements made in the Pew report, and refers to the Pew report for a complete and accurate statement of its contents. To the extent a response is required to the content of the statements, Nexstar states that Paragraph 260 does not allege any facts against Nexstar and denies the statements' applicability to this case.

261. Consolidation in the industry was also fueled by the proposed acquisition of Tribune by Sinclair, announced on May 8, 2017, which would have created the largest station owner. Wary of Federal Communications Commission ("FCC") rejection of the deal, Sinclair and Tribune submitted a revised version of the merger plan to antitrust regulators, whereby Sinclair would acquire Tribune for $3.9 billion, forming a company that would own 215 broadcast television stations in 102 cities, reaching close to 60 percent of all United States television households. Sinclair and Tribune jointly have extreme market penetration, with Tribune currently reaching 43 percent of the nation's households and Sinclair reaching 38 percent of American homes.

**ANSWER:** Nexstar admits that a proposed acquisition of Tribune by Sinclair was announced on May 8, 2017, and the merger plan was subsequently revised. Nexstar denies all other allegations of Paragraph 261 not specifically admitted.

262. Indeed, analysts called the proposed merger between Sinclair and Tribune "a very transformative acquisition" that would create "a broadcaster with as close to a national footprint as you can get." Sinclair's CEO, Chris Ripley, echoed this belief, stating the combined company would reach "72 percent of United States homes across 108 markets including 39 of the top 50" and "[t]his combination creates the largest TV broadcasting company in the country."

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 262 and on that basis denies them.

263. The revised merger plan could only be accomplished by selling certain television stations to reduce the number of households jointly reached by Tribune and Sinclair (which currently is over 80 percent). However, Sinclair's revised plan called for selling certain stations to friends and other parties with whom it has a business relationship, for significantly less than fair value, raising questions about whether Sinclair would actually continue to control these stations.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 263 and on that basis denies them.

264. The FCC expressed concerns that Sinclair did not intend to actually relinquish control over television stations that it proposed to divest in order to comply with the National TV Ownership rule, and that Sinclair had been less than candid with the FCC. Indeed, the FCC suspected that certain "'sidecar agreements' [ ] would allow Sinclair to retain control of stations without owning them." According to FCC Commissioner Michael O'Reilly, the vote to send the merger to an administrative law judge was a "de facto merger death sentence."

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 264 and on that basis denies them.

265. The failure of the Sinclair-Tribune merger led Nexstar to announce its intention to acquire Tribune for over $4 billion in December of 2018. As one article noted:

> The deal would make Nexstar, whose stations reach nearly 39 percent of all United States television households, the biggest operator of local TV stations in the United States.

****

123

> Tribune Media owns or operates 42 local TV stations that reach 50 million households, as well as the national network WGN. It also has a stake in the TV Food Network.
>
> Nexstar is the second-largest television station owner in the United States, with 171 outlets across the country, typically operating as affiliates with the four "major" United States television networks in small to mid-size markets. It also operates through local marketing agreement the stations owned by affiliate company Mission Broadcasting.

**ANSWER:** Nexstar admits that Nexstar announced its intention to acquire Tribune in December 2018 for more than $4 billion. Nexstar admits that Paragraph 265 appears to quote an article about the announcement, and refers to the article for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 265 not specifically admitted.

266. Similarly, on June 25, 2018, as noted above, Gray TV agreed to buy Raycom in a $3.65 billion deal that would create a company that reaches nearly a quarter of United States television households. The combined company owns 142 television stations in 92 DMAs reaching 24 percent of television households and owning the third-highest number of stations.



**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 266 and on that basis denies them.

267.    Herfindahl-Hirschman Index ("HHI") calculations further reveal industry concentration. HHI is a tool commonly employed in antitrust economics to measure market concentration.  It is calculated by squaring the market share of each firm competing in a market and then summing the resulting numbers.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 267 and on that basis denies them.

268.    Here, the average HHI across the DMAs in which two or more Broadcaster Defendants compete is 2,213 when considering ownership of stations and 2,303 when considering operation of stations, some of which station operators do not own.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 268 and on that basis denies them.

269.    Of the 127 DMAs in which two or more Broadcaster Defendants compete, 80 have HHI measures over 2,500 when considering ownership of stations, and 89 have HHI measures over 2,500 when considering operation of stations.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 269 and on that basis denies them.

270.    The DOJ considers an HHI measure between 1,500 and 2,500 to be a moderately concentrated market and above 2,500 to be a highly concentrated marketplace.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 270 and on that basis denies them.

**F.    High Barriers to Entry in the Broadcast Television Spot Advertising Market are a Plus Factor Supporting the Existence of a Price Fixing Cartel That is *Per Se* Unlawful**

271.    A collusive arrangement that raises product prices above competitive levels, under basic economic principles, would normally tend to attract new entrants seeking to benefit

from the supracompetitive pricing, which in turn could erode prices. But there are significant, even prohibitive, barriers to entry in the spot television broadcasting market that prevent entry from new, non-collusive rivals and the erosion of collusively increased profits. Thus, barriers to entry help facilitate the formation and maintenance of cartels and market-allocation agreements.

**ANSWER:** Paragraph 271 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required. To the extent a response is required, Nexstar denies the allegations in Paragraph 271.

272. New entrants planning to enter into broadcasting markets typically face six critical barriers: (1) governmental policy; (2) the presence of dominant broadcasters; (3) access to content; (4) audience behavior; (5) consumer costs; and (6) capital requirements.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 272 and on that basis denies them.

273. Governmental policy, including regulatory or administrative practices, may restrict market access. The FCC issues licenses for television stations, and an entrant would be required to petition the Commission to assign a new channel to a community.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 273 and on that basis denies them.

274. Responsible authorities take into account economic, as well as cultural and social, factors when issuing broadcasting licenses that may lead to distortions of competition.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 274 and on that basis denies them.

275. The existing dominant broadcasters usually have long-established relationships with their viewers and (most likely) also with advertisers. New entrants in the market would

have to offer a better deal than the existing broadcasters in order to usurp any market share. Additionally, bigger companies have more clout to negotiate programming deals with networks or syndicators. "If you wanted a decent seat at the table talking to those guys, you had to have scale," said Barry Lucas, Senior Vice-President of Research at the investment firm Gabelli & Co. "Otherwise you were irrelevant and got pushed around."

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the quotes included in Paragraph 275 and on that basis denies them. Nexstar denies all other allegations of Paragraph 275.

276. A newer entrant to the market would have to invest significant capital and time in establishing itself before it could work with networks.

**ANSWER:** Deny.

277. Additionally, successful entry into television broadcasting markets requires access at reasonable prices to desirable programming, including production and/or acquisition from third parties. Acquisition of this content, which is critical to attract viewers, is likely to constitute a significant cost to new market players.

**ANSWER:** Deny.

278. Commercial broadcasters, whose operations are primarily financed through advertising fees, must establish within a short period an audience base that will also attract a sufficient number of advertisers. Therefore, in the presence of established dominant broadcasters, new entrants must provide offers attractive enough to convince viewers to alter their already existing patterns of viewing and channel choice—a task that proves to be difficult.

**ANSWER:** Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the first sentence of Paragraph 278 and on that basis denies them. Nexstar denies all other allegations of Paragraph 278.

279. Finally, it would require considerable funding, time, and technical sophistication for a potential market entrant to gain the economies of scale and audience base achieved by Defendants necessary to compete in the market for broadcast television spot advertising. Where the level of capital required is prohibitively high, it constitutes a significant barrier to entry.

**ANSWER:** Deny.

280. For these reasons, there has not been meaningful recent entry into the industry. Of the major local broadcast station owners, Nexstar and Raycom (recently acquired by Gray TV), are the most recent to enter the industry, both in 1996. Many of the large station owners have been in the industry since the 1940s and 1950s, including Tribune, Meredith, and Griffin.

**ANSWER:** Nexstar admits that Nexstar entered the industry in 1996. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 280 and on that basis denies them. Nexstar denies all other allegations of Paragraph 280 not specifically admitted.

## IX. DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONDUCT THROUGH, INTER *ALIA*, PUBLIC STATEMENTS IN SECURITIES FILINGS THAT THEY AND THE MARKET WERE FUNCTIONING COMPETITIVELY

281. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct.

**ANSWER:** Deny.

282.     Plaintiffs and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein prior to disclosure of a DOJ investigation of certain Defendants on July 26, 2018.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to whether Plaintiffs and the putative class members discovered the existence of the conduct alleged herein prior to disclosure of a DOJ investigation of certain Defendants on July 26, 2018, and on that basis denies the allegation.  Nexstar denies all other allegations of Paragraph 282 not specifically admitted.

283.     Further, the very nature of Defendants' conduct was secret and self-concealing. Defendants engaged in secret market manipulation that could not be detected by Plaintiffs and the Class.

**ANSWER:**  Deny.

284.     Throughout the Class Period, each of the publicly-traded Defendants made various representations in filings with the Securities and Exchange Commission ("SEC") that describe a competitive landscape in which they purport to vie for advertising revenue not only with other spot television broadcast companies, but also with numerous other entities.

**ANSWER:**  Defendants' filings with the SEC speak for themselves.  Nexstar denies all other allegations of Paragraph 284 not specifically admitted.

285.     For example, in its Form 10-K Annual Report filed with the SEC in June 2015, Meredith stated that its "television stations compete directly for advertising dollars and programming in their respective markets with other local television stations, radio stations, cable television providers, and digital websites and mobile sites."

**ANSWER:** Nexstar admits that Paragraph 285 appears to quote a statement made by Meredith in its Form 10-K Annual Report filed with the SEC in June 2015, and refers to the Form 10-K for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 285 not specifically admitted.

286. Sinclair consistently claimed in its Form 10-K Annual Reports that its "television stations are located in highly competitive DMAs," while Tribune consistently listed among its main competitors the major networks and the "major broadcast television station owners," including Nexstar and Sinclair. Nexstar made similar statements in its Form 10-K Annual Reports throughout the Class Period.

**ANSWER:** Nexstar admits that Paragraph 286 appears to quote statements made by Sinclair, Tribune and Nexstar in their respective Form 10-K Annual Reports filed with the SEC in June 2015, and refers to the Form 10-Ks for a complete and accurate statement of their contents. Nexstar denies all other allegations of Paragraph 286 not specifically admitted.

287. Such representations by Defendants were intentionally misleading and concealed the unlawful anticompetitive activity described herein from Class members.

**ANSWER:** Deny.

288. Additionally, Defendants had corporate codes of conduct that members of the Class reasonably relied on to assume that they were complying with federal antitrust laws.

**ANSWER:** Nexstar admits that it has corporate codes of conduct requiring compliance with federal antitrust laws. Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 288 and on that basis denies them.

A.  **SINCLAIR**

289. For example, Sinclair has a publicly-posted "Code of Business Conduct and Ethics" that states that "Officers, directors and employees must comply with all laws, rules and

regulations applicable to them or the Corporation, including, without limitation, . . . antitrust laws[.]"

**ANSWER:** Nexstar admits that Paragraph 289 appears to quote a portion of Sinclair's Code of Business Conduct and Ethics, and refers to that document for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 289 not specifically admitted.

B. **NEXSTAR**

290. Nexstar likewise has a public "Code of Business Conduct" that states:

> All employees must comply fully with the laws and regulations that apply to the Company. When the application of such laws or regulations is uncertain, employees are urged to seek the guidance and advice of the General Manager or Chief Financial Officer. Employees are expected to recognize this duty to society above and beyond their obligations to the Company and their personal financial interests. While the Company must compete vigorously to maximize profits, Nexstar will at the same time do so in strict compliance with all laws and regulations applicable to our activities. No employee should at any time take any action on behalf of the Company, which is known or should be known to violate any applicable law or regulation.

**ANSWER:** Nexstar admits that Paragraph 290 appears to quote a portion of Nexstar's Code of Business Conduct, and refers to that document for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 290 not specifically admitted.

291. Nexstar maintains a "Code of Ethics," which was originally filed with the SEC on March 31, 2004 by Nexstar Broadcasting Group, Inc. and incorporated as an exhibit to Nexstar's Annual Report for the year ending December 31, 2003 on Form 10-K. The "Code of Ethics" states, "Each Relevant Officer owes a duty to the Company to act with integrity. . . . Specifically, each Relevant Officer must: . . . . Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices."

**ANSWER**:  Nexstar admits that Paragraph 291 appears to quote a portion of Nexstar's Code of Ethics, and refers to that document for a complete and accurate statement of its contents. Nexstar denies the remaining allegations of Paragraph 291.

### C.      SCRIPPS

292.      Scripps has a "Company Code of Conduct" that directs employees to "not discuss pricing or price-related information with our competitors."

**ANSWER:**  Nexstar admits that Paragraph 292 appears to quote a portion of Scripp's Company Code of Conduct, and refers to that document for a complete and accurate statement of its contents.  Nexstar denies all other allegations of Paragraph 292 not specifically admitted.

### D.      FOX

293.      Fox maintains in its "Standard of Business Conduct" that it "is committed to fair competition" and that it "always engage[s] in fair competition in the free market, obeying all applicable antitrust and competition laws."

**ANSWER:**  Nexstar admits that Paragraph 293 appears to quote a portion of Fox's Standard of Business Conduct, and refers to that document for a complete and accurate statement of its contents.  Nexstar denies all other allegations of Paragraph 293 not specifically admitted.

### E.      TEGNA

294.      TEGNA's "Ethics Policy" states that the company "is committed to the concept of fair dealings, and free, fair and open competition . . . and [a]void[s] actions that restrict freedom of competitive opportunities."

**ANSWER:**  Nexstar admits that Paragraph 294 appears to quote a portion of TEGNA's Ethics Policy, and refers to that document for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 294 not specifically admitted.

### F.    <u>COX</u>

295.    Cox Media's "Code of Conduct" details the company's purported commitment to "conduct[ing] business lawfully." The Code states:

> Cox Media Group employees should not enter into any agreements or arrangements with other parties (competitors, vendors, customers, etc.) that could illegally limit or restrict competition.
>
> ****
>
> Don't communicate with our competitors about "fixing" prices (for example, setting minimum or maximum prices) . . . interfering with the competitive bidding process.

<u>**ANSWER:**</u> Nexstar admits that Paragraph 295 appears to quote a portion of Cox Media's Code of Conduct, and refers to that document for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 295 not specifically admitted.

### G.    <u>KATZ</u>

296.    Likewise, in its "Code of Business Conduct and Ethics," iHeartMedia, Inc., Katz's parent, outlines its commitment to "competing for business fairly" and states that it "complies with competition laws wherever we do business." The Code also states that competition laws "generally forbid entering into formal or informal agreements with competitors that restrain trade, such as . . . sharing information regarding prices, terms or conditions, costs, marketing plans, customers or any other proprietary or confidential information," and warns its employees to "[b]e particularly cautious when attending trade events, seminars, or industry conferences [and] avoid conversations about competitively sensitive information with representatives of our competitors."

<u>**ANSWER:**</u> Nexstar admits that Paragraph 296 appears to quote a portion of iHeartMedia Inc.'s Code of Business Conduct and Ethics, and refers to that document for a

complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 296 not specifically admitted.

### H.    CBS

297.    CBS has a lengthy "Business Conduct Statement" that lays out its responsibilities under the antitrust laws in significant detail:

> CBS seeks to excel and outperform its competition honestly and fairly. CBS seeks competitive advantages through superior performance, not from illegal or unethical business practices.
>
> The purpose of the antitrust trade and practice laws is to preserve a competitive economy in which free enterprise can flourish. CBS is committed to this principle and to full compliance with these laws in each jurisdiction within which it operates.
>
> ****
>
> CBS's policy requires that all of its prices be determined independently in light of costs, market conditions and competitive factors. Any agreement, written or unwritten, explicit or tacit, formal or informal, between competitors to fix, raise, peg, stabilize or even lower prices, or to eliminate or reduce price competition, is *per se* unlawful.
>
> ****
>
> If you participate in trade association meetings or other activities on behalf of CBS or your Company, you must be very careful to avoid even the appearance of reaching or seeking an agreement as to prices . . . including by sharing nonpublic price or market information, whether as part of "official" trade association meetings or in less formal discussions that may occur in conjunction with trade association activities.

**ANSWER:**  Nexstar admits that Paragraph 297 appears to quote a portion of CBS's Business Conduct Statement, and refers to that statement for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 297 not specifically admitted.

### I.    MEREDITH

298.    And Meredith has a "Code of Business Conduct and Ethics" that states:

Obeying the law, both in letter and in spirit, is the foundation on which the Company's ethical standards are built. All employees must respect and obey the laws of the cities, states, and countries in which we operate. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from supervisors, managers, or other appropriate personnel.

We do not condone any act that violates the law, even when such action appears to be in the Company's best interest.

**ANSWER:** Nexstar admits that Paragraph 298 appears to quote a portion of Meredith's Code of Business Conduct and Ethics, and refers to that document for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 298 not specifically admitted.

**J.**     **TRIBUNE**

**ANSWER:** Nexstar admits that Paragraph 299 appears to quote a portion of Tribune's Code of Ethics and Business Conduct, and refers to that document for a complete and accurate statement of its contents. Nexstar denies all other allegations of Paragraph 299 not specifically admitted.

300.     These statements have now been demonstrated to be materially misleading; they suggest that Defendants were law-abiding companies that recognized their antitrust obligations and that Defendants and the broadcast television spot advertising market were functioning competitively.

**ANSWER:** Deny.

301.     As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and the Class members' claims have been tolled.

**ANSWER:** Deny.

## X.     CLASS CERTIFICATION IS APPROPRIATE HERE

302.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities in the United States who purchased broadcast television spot advertising from one or more Broadcaster Defendants in a DMA within which two or more of the Broadcaster Defendants sold broadcast television spot advertisements on broadcast television stations and who paid one or more Broadcaster Defendants directly for all or a portion of the cost of such broadcast television spot advertisements, or any current or former subsidiary or affiliate of a Broadcaster Defendants during the period from at least and including January 1, 2014 until the effects of the unlawful conduct are adjudged to have ceased (the "Class Period").[25]

---

[25] Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators; the court, court staff, defense counsel, all respective

**ANSWER:** Nexstar admits that Plaintiffs filed this action, which purports to assert claims on behalf of a class defined in the Third Amended Complaint. Nexstar denies that Plaintiffs state a claim or that any portion of the Third Amended Complaint is suitable for class treatment. The remaining allegations of Paragraph 302 consist of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

303. While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe the class size is numerous, and likely includes hundreds if not thousands of members.

**ANSWER:** Paragraph 303 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.

304. Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which focuses on the conduct of Defendants, not of any particular class member, and was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

- Whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the price levels of broadcast television spot advertising time, that is *per se* illegal;

- The identity of the participants of the alleged cartel;

- The duration of the alleged cartel, and the acts carried out by Defendants and their co-conspirators in furtherance of the cartel;

---

immediate family members of these excluded entities, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

- Whether the conduct alleged herein violated Section 1 of the Sherman Act; and

- Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for broadcast television spot advertising and the proper measure of such overcharge damages.

**ANSWER:**  Paragraph 304 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 304.

305.    Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for broadcast television spot advertising time provided by the Broadcaster Defendants.

**ANSWER:**  Paragraph 305 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 305.

306.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

**ANSWER:**  Paragraph 306 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 306.

307.     Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

**ANSWER:**  Nexstar lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 307 and on that basis denies them.

308.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

**ANSWER:**  Paragraph 308 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 308.

309.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.  Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER:**  Paragraph 309 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 309.

310.     Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**ANSWER:**  Paragraph 310 consists of legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent a response is required, Nexstar denies the allegations in Paragraph 310.

**COUNT ONE**
**Price Fixing in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

311.     Plaintiffs repeat the allegations set forth above as if fully set forth herein.

**ANSWER:**  Defendants repeat their responses to the allegations set forth above as if fully set forth herein.

312.     During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy with regards to broadcast television spot advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:**  Deny.

313.     The contract, combination or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize or maintain at artificially high levels the prices they charged for broadcast television spot advertising in the United States.

**ANSWER:**  Deny.

314.     Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharge damages paid for broadcast television spot advertising time purchased from the Broadcaster Defendants and their co-conspirators.

**ANSWER:**  Deny.

315.     This conduct is unlawful under the *per se* standard.

**ANSWER:**  Deny.

316.    Plaintiffs and members of the Class are entitled to treble damages, their attorneys' fee and costs, and an injunction against Defendants restraining the violations alleged herein.

**ANSWER:**  Deny.

### COUNT TWO
**Information Exchange in
Violation of Section 1 of the
Sherman Act (15 U.S.C. § 1)**

317.    Plaintiffs repeat the allegations set forth above as if fully set forth herein.

**ANSWER:**  Defendants repeat their responses to the allegations set forth above as if fully set forth herein.

318.    During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy with regards to broadcast television spot advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:**  Deny.

319.    The contract, combination or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

**ANSWER:**  Deny.

320.    Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharge damages paid for broadcast television spot advertising time purchased from the Broadcaster Defendants and their co-conspirators.

**ANSWER:**  Deny.

321.    This conduct is unlawful under the *per se* standard or alternatively under a quick look or full-fledged rule of reason mode of analysis.

**ANSWER:**  Deny.

322.     As described above, the relevant product market affected adversely by the challenged conduct is the market for broadcast television spot advertising and the relevant geographic markets are those DMAs where two or more Defendants compete, markets where Defendants collectively have significant market power.

**ANSWER:**  Deny.

323.     Plaintiffs and members of the Class are entitled to treble damages, their attorneys' fees and costs, and an injunction against Defendants restraining the violations alleged herein.

**ANSWER:**  Deny.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B.     The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C.     The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E.      The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**ANSWER:**  With regard to Plaintiffs' Prayer for Relief, including the "WHEREFORE" clause and subsequent subparagraphs (A) through (E), Nexstar denies that Plaintiffs state any cause of action or that they are entitled to any relief whatsoever.

## JURY DEMAND

Nexstar demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

## AFFIRMATIVE DEFENSES

Without admitting liability as to any of the claims asserted in the Complaint, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that otherwise would rest with Plaintiffs, Nexstar asserts the following affirmative and additional defenses.  Nexstar's investigation in this matter is ongoing, and Nexstar reserves the right to supplement or modify any portion of this Answer, including but not limited to by asserting further affirmative or additional defenses or claims not yet asserted herein, at any time and consistent with the Federal Rules of Civil Procedure.

**DEFENSE 1.**  Count I fails to state a claim upon which relief may be granted under Section 1 of the Sherman Act because the Complaint does not allege facts sufficient to show a *per se* illegal naked agreement to fix, raise, stabilize, or maintain at artificially high levels the

prices charged for broadcast television spot advertising in the United States. The Complaint does not allege any direct evidence of agreement, nor does it allege facts sufficient to show consciously parallel pricing behavior and plus factors from which one could infer such an agreement.

**DEFENSE 2.** Count II fails to state a claim upon which relief may be granted under Section 1 of the Sherman Act because it does not allege facts sufficient to show that the alleged exchanges of purportedly competitively sensitive information, either directly or through third parties, had any cognizable anticompetitive effects in any of the relevant geographic markets.

**DEFENSE 3.** Plaintiffs' claims are barred because the conduct they challenge is not *per se* illegal, and they fail to allege, and cannot prove, any cognizable geographic and/or product market for the purpose of asserting a rule of reason claim against Nexstar.

**DEFENSE 4.** Plaintiffs' claims with respect to advertising purchases made more than four years prior to filing are barred, in whole or in part, by the statutes of limitation applicable to antitrust claims.

**DEFENSE 5.** Plaintiffs and putative class members do not have standing to sue for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, or for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, because they will not be able to prove that they suffered antitrust injury caused by Nexstar's alleged conduct.

**DEFENSE 6.** Plaintiffs and putative class members who are indirect purchasers of broadcast television spot advertising are barred by *Illinois Brick v. Illinois*, 431 U.S. 720 (1977), from recovering damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, for any overcharges injury they may have incurred on those purchases.

**DEFENSE 7.**  Plaintiffs' claims for damages are barred, in whole or in part, to the extent they have not suffered damages and their alleged damages are speculative, cannot be ascertained with reasonably certainty, or are incapable of proof.

**DEFENSE 8.**  Plaintiffs' claims are barred, in whole or in part, because the alleged conduct complained of would have been lawful, justified, bona fide business competition, and procompetitive, and was carried out in furtherance of legitimate business interests.

**DEFENSE 9.**  Plaintiffs' claims are barred, in whole or in part, because the pro-competitive benefits of the conduct alleged by Plaintiffs outweigh any alleged anti-competitive effects.

**DEFENSE 10.**  Plaintiffs' claims are barred, in whole or in part, by the filed rate doctrine, insofar as they relate to political advertising, because the rates are filed with and/or regulated by the FCC.

**DEFENSE 11.**  Without admitting the existence of any contract, combination, or conspiracy in restraint of trade, Nexstar avers that it is entitled to set off any amounts paid to Plaintiffs and the putative class members by any other defendants who have settled, or do settle, any claims in this action.

**DEFENSE 12.**  Nexstar incorporates by reference and asserts to the extent applicable all other affirmative and additional defenses set forth in the Answers of each of the other defendants.

Nexstar hereby reserves the right to assert other defenses as this action proceeds up to and including the time of trial and any appeal thereof and hereby reserves its right to amend its Answer to assert any such defenses.

## PRAYER FOR RELIEF

WHEREFORE, Nexstar respectfully requests entry of judgment granting the following

relief:

    a.       dismissing the Complaint in its entirety with prejudice;

    b.       awarding Nexstar its costs of defending this action, including reasonable

            attorneys' fees; and

    c.       granting such other and further relief as this Court may deem just and proper.

Plaintiffs and the putative class members by any other defendants who have settled, or do

settle, any claims in this action.

Dated: April 13, 2022

*/s/ Eliot A. Adelson*
MORRISON & FOERSTER LLP
Eliot A. Adelson (admitted *pro hac vice*)
Bonnie Lau (admitted *pro hac vice*)
Margaret A. Webb (admitted *pro hac vice*)
425 Market Street
San Francisco, CA 94105
(415) 268-7000
eadelson@mofo.com
blau@mofo.com
mwebb@mofo.com

David D. Cross (admitted *pro hac vice*)
Megan E. Gerking (admitted *pro hac vice*)
Mary G. Kaiser (admitted *pro hac vice*)
2100 L Street NW
Washington, D.C. 20037
(202) 887-1500
dcross@mofo.com
mgerking@mofo.com
mkaiser@mofo.com

MOLOLAMKEN LLP
Gerald P. Meyer
300 N. LaSalle St.
Chicago, IL 60654
(312) 450-6700

gmeyer@mololamken.com

*Counsel for Defendants Dreamcatcher Broadcasting LLC, Nexstar Media Group, Inc., Tribune Broadcasting Company, LLC, and Tribune Media Group, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Eliot A. Adelson, certify that on April 13, 2022, I caused the foregoing **NEXSTAR DEFENDANTS' ANSWER TO THE CONSOLIDATED THIRD AMENDED ANTITRUST CLASS ACTION COMPLAINT** to be served by e-mail on all counsel of record, pursuant to and in accordance with the Stipulation, filed on November 17, 2020 (ECF No. 397), in this Action.

*/s/ Eliot A. Adelson*