## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| IN RE:<br>LOCAL TV ADVERTISING ANTITRUST | MDL No. 2867<br>No. 18 C 6785<br><br>**ANSWER TO CONSOLIDATED THIRD AMENDED ANTITRUST CLASS ACTION COMPLAINT**<br><br>**FILED UNDER SEAL**<br><br>Honorable Virginia M. Kendall |

Defendant TEGNA Inc. ("TEGNA"), by and through its undersigned counsel of record, answers and responds ("Answer") to Plaintiffs THOUGHTWORX, INC. D/B/A MCM SERVICES GROUP, ONE SOURCE HEATING & COOLING, LLC, HUNT ADKINS, INC., and FISH FURNITURE (collectively, "Plaintiffs") Consolidated Third Amended Antitrust Class Action Complaint dated March 16, 2022, ECF No. 556 ("Complaint") as follows:

Except as otherwise expressly recognized herein, TEGNA denies each and every allegation contained in the Complaint. TEGNA states that the headings, sub-headings, images, appendices, and footnotes in the Complaint do not constitute well-pleaded allegations of fact and therefore require no response. To the extent a response is required, TEGNA denies the allegations in the headings, sub-headings, images, appendices, and footnotes in the Complaint. TEGNA expressly reserves the right to seek to amend or supplement its Answer as may be necessary.

## I.  THE NATURE OF DEFENDANTS' UNLAWFUL CONDUCT

1.  This antitrust class action arises from a price fixing cartel facilitated by an anticompetitive information exchange between and among certain major television station owners and operators and sales representative firms to artificially inflate the prices of broadcast television spot advertisements[1] in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:** TEGNA denies the allegations in Paragraph 1.

2.  Beginning on or around January 1, 2014, CBS Corporation, Cox Media Group, LLC,[2] Dreamcatcher Broadcasting, LLC, The E.W. Scripps Company, Griffin Communications, LLC, Fox Corporation, Meredith Corporation, Nexstar Media Group, Inc., Gray Media Group (through its acquisition of Raycom Media, Inc.), Sinclair Broadcast Group, Inc., TEGNA, Inc., Tribune Broadcasting Company, LLC, and Tribune Media Company (collectively, "Defendants")—firms that collectively account for billions of dollars in annual broadcast television spot advertising revenue—secretly orchestrated a unitary, overarching scheme to supracompetitively impact the price levels of broadcast television spot advertisements by agreeing to fix prices and exchange competitively sensitive historic, current, and forward-looking sales data, including inventory or pacing data. Pacing data is used to compare a broadcast station's revenues booked for a certain time period to the revenues booked for the same point in time in the previous year (the exchange of which allows Defendants to forecast their would-be competitors' remaining inventory of broadcast television spot advertising), typically expressed as a plus or minus percentage (*e.g.*, plus or minus 20%).

**ANSWER:** TEGNA admits that pacing data could be used to compare a broadcast

station's revenues booked for a certain time period to the revenues booked for the same point in

---

[1] The television advertisements are purchased directly from broadcast television stations (as opposed to cable operators) and are referred to herein as "broadcast television spot advertising."

[2] Plaintiffs dismissed all claims against Cox Media Group LLC's parent entity Cox Enterprises, Inc. ("Cox Enterprises") on October 3, 2019. See Pls.' Notice of Dismissal, ECF No. 315. On or around December 17, 2019, Cox Enterprises completed the sale of its portfolio of television and radio stations, Ohio assets, and its affiliated Cox Reps Inc. ("Cox Reps") and Gamut national advertising businesses to a new media company now named CMG Media Corporation (f/k/a Terrier Media Buyer, Inc. and d/b/a Cox Media Group). Cox Reps and the Cox television station assets that are the subject of this Third Amended Complaint are currently owned or operated by subsidiaries of CMG Media Corporation (f/k/a Terrier Media Buyer, Inc. and d/b/a Cox Media Group). Although the legal entity called Cox Media Group, LLC still exists as a subsidiary of Cox Enterprises, Plaintiffs understand that it does not currently own or operate Cox Reps nor any of the television station assets at issue in this Third Amended Complaint. Thus, all non-historical allegations regarding Cox Media Group, LLC or Cox Reps in this Third Amended Complaint, i.e., those that post-date December 17, 2019, shall be interpreted to mean CMG Media Corporation (f/k/a Terrier Media Buyer, Inc. and d/b/a Cox Media Group).

time in the previous year, typically expressed as a plus or minus percentage (*e.g.*, plus or minus

20%). TEGNA denies the remaining allegations in Paragraph 2.

3.      Both the existence of this data exchange and the data itself were withheld from
purchasers of broadcast television spot advertising, creating an asymmetrical information
advantage for the Broadcaster Defendants (defined *infra*) in their dealings with their customers
concerning the price of broadcast television spot advertising.

**ANSWER:** TEGNA denies the allegations in Paragraph 3.

4.      The information exchanged covered both local and national broadcast television
spot advertising and was disseminated to individuals within the Broadcaster Defendants'
organizations with authority over pricing, with the Broadcaster Defendants' knowledge and at
their direction. By allowing the Broadcaster Defendants to better understand, in real time, the
availability of their would-be competitors' inventory through the exchange of pacing data—with
inventory being a, if not *the*, key factor affecting pricing negotiations—the scheme derailed the
competitive process and allowed the Broadcaster Defendants to avoid price competition, harming
direct purchasers of broadcast television spot advertising in Designated Market Areas ("DMAs")
throughout the United States. The United States Department of Justice ("DOJ") explained the
anticompetitive effects of Defendants' conduct as allowing them to "better [] anticipate whether
their competitors were likely to raise, maintain, or lower spot advertising prices" and "gauge
competitors' and advertisers' negotiation strategies," "help[ing Defendants] resist more
effectively advertisers' attempts to obtain lower prices" and "distort[ing] the normal price-setting
mechanism in the spot advertising market."

**ANSWER:** TEGNA admits that the DOJ made the quoted statements in Paragraph 4,

but denies that all of those statements were made by the DOJ in respect of TEGNA. TEGNA

refers to the DOJ statements for their content. TEGNA denies the remaining allegations in

Paragraph 4.

5.      As the DOJ explained, "Advertisers rely on competition among owners of
broadcast television stations to obtain reasonable advertising rates, but this unlawful sharing of
information lessened that competition and thereby harmed the local businesses and the
consumers they served."

**ANSWER:** TEGNA admits that the DOJ made the quoted statement in Paragraph 5, but

denies that this statement was made by the DOJ in respect of TEGNA. TEGNA refers to the

DOJ statement for its content. TEGNA otherwise lacks knowledge or information sufficient to

form a belief as to the truth or falsity of the allegations in Paragraph 5 and therefore denies those

allegations.

6.     Thus, the DOJ intervened to end what it characterized as "**_concerted action between_**
**_horizontal competitors_** in the broadcast television spot advertising market," filing a series of
Proposed Judgments and Stipulations and Orders with Defendants CBS Corporation, Cox Media
Group LLC, Dreamcatcher Broadcasting, LLC, the E.W. Scripps Company, Griffin
Communications, LLC, Fox Corporation, Meredith Corporation, Nexstar Media Group Inc.,
Raycom Media, Inc.,[3] Sinclair Broadcast Group, Inc., TEGNA, Inc., and Tribune Media
Company on November 13, 2018, December 13, 2018, and June 17, 2019 (the "Judgments").

**ANSWER:**  TEGNA admits that the DOJ filed Proposed Judgments and Stipulations and

Orders with the Defendants cited in Paragraph 6.  TEGNA further admits that the DOJ used the

quoted language in Paragraph 6.  TEGNA refers to those filings for their content.  TEGNA

otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations in Paragraph 6 and therefore denies those allegations.

7.     As described in the DOJ's Competitive Impact Statement (the "Statement")
discussed below, the Judgments included a number of provisions designed to "**_terminate_**
**_Defendants' illegal conduct_**, prevent recurrence of the same or similar conduct, and ensure that
Defendants establish an antitrust compliance program," thereby "**_putting a stop to the_**
**_anticompetitive information sharing_**."

**ANSWER:**  TEGNA admits that the DOJ's Competitive Impact Statement referred to in

Paragraph 7 contains the quoted language.  TEGNA refers to the Statement for its content and

otherwise denies the allegations in Paragraph 7.

8.     The DOJ noted in the Statement that these remedial efforts were "**_necessary_** in light
of the **_extensive history of communications_** among rival stations that **_facilitated Defendants'_**
**_agreements_**" in restraint of trade, and in its Complaint, the DOJ action "challenge[d] under
Section 1 of the Sherman Act Defendants' agreements to unlawfully exchange competitively
sensitive information among broadcast television stations."

---

[3] As mentioned below, while Gray Television, Inc. was not named as a defendant in any of the
suits brought by the DOJ, in January of 2019, it finalized the acquisition of Raycom Media, Inc.,
and Meredith thereby assumed liability for the acts of the acquired entities.

4

**ANSWER:** TEGNA admits that the DOJ's Competitive Impact Statement and Complaint referred to in Paragraph 8 contain the quoted language. TEGNA refers to the Statement and Complaint for their content and otherwise denies the allegations in Paragraph 8.

9. As Justice Sotomayor held before her ascension to the United States Supreme Court, "[i]nformation exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) (noting that information exchanges can both be evidence of a *per se* unlawful price fixing cartel and separately unlawful in and of themselves).[4]

**ANSWER:** Paragraph 9 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 9.

10. The scheme was widespread and effectuated in large part through the same two national Sales Rep Firms, Katz and Cox Reps (defined *infra*), which served as the Broadcaster Defendants' agents in virtually every relevant DMA (identified in Appendix A) and thus served as the focal points and conduits of the unitary, overarching scheme among Defendants.

**ANSWER:** TEGNA denies the allegations in Paragraph 10 and Appendix A. TEGNA lacks knowledge or information sufficient to form a belief as to whether the information contained in Appendix A is accurate. TEGNA denies the allegations contained in Appendix A.

11. Also, a number of the Defendants used a common consultant and software company, ShareBuilders, to help with their inventory management and pricing. ShareBuilders provided some of its clients with rate cards and/or recommendations that were used to implement the alleged conspiracy.

**ANSWER:** TEGNA admits that ShareBuilders is a contractor for certain TEGNA stations. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 11 regarding other Defendants or regarding ShareBuilders' relationship with its clients other than TEGNA or how those clients used or could have used ShareBuilders and therefore denies those allegations. TEGNA denies the remaining allegations in Paragraph 11.

---

[4] All emphases to quoted material have been added.

12.     The exchange also served as a means to monitor the members of the price fixing cartel, as any deviation from the scheme (*i.e.*, what is referred to in the literature as "cheating" on the cartel) could be easily detected and punished. This exchange not only facilitated the price fixing cartel, but also itself is separately unlawful under Section 1 of the Sherman Act.

**ANSWER:**  TEGNA denies the allegations in Paragraph 12.

13.     Plaintiffs bring this antitrust class action lawsuit on behalf of themselves and all similarly situated direct purchasers of broadcast television spot advertising—who remain uncompensated for the anticompetitive harm they suffered as a result of the Defendants' illicit gains.

**ANSWER:**  TEGNA admits that Plaintiffs purport to bring this antitrust class action lawsuit on behalf of themselves and a putative class referenced in Paragraph 13.  TEGNA denies that Plaintiffs' purported class is certifiable, or that Plaintiffs or the members of the purported class suffered injury or damage of any kind, or that any purported injury or damage was a result of TEGNA's conduct.  TEGNA denies the remaining allegations in Paragraph 13.

## II.     JURISDICTION AND VENUE ARE PROPER HERE

14.     Plaintiffs bring this antitrust class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover damages suffered by the Class and the costs of suit, including reasonable attorneys' fees; to enjoin Defendants' and ShareBuilders' anticompetitive conduct; and for such other relief as is afforded under the laws of the United States for Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:**  Paragraph 14 states legal conclusions to which no response is required.  To the extent a response is required, TEGNA denies the allegations in Paragraph 14, including denying that the Complaint describes activity giving rise to an action under Section 1 of the Sherman Act, that Plaintiffs can maintain their case on behalf of any purported class, or that Plaintiffs or the members of the purported class are entitled to any relief.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

**ANSWER:**  Paragraph 15 states legal conclusion to which no response is required.  To the extent a response is required, TEGNA denies the allegations in Paragraph 15, including

denying that any claim is properly asserted, or that Plaintiffs have suffered any injury or have standing to assert any claim.

16.     Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (15 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants named herein and/or ShareBuilders resided, transacted business, was found, or had agents in this District or a transferor District.

ANSWER: Paragraph 16 states legal conclusions to which no response is required.

## III.     DEFENDANTS' CONDUCT AFFECTED INTERSTATE COMMERCE

17.     Billions of dollars of transactions in broadcast television spot advertisements are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce. Each Broadcaster Defendant sells broadcast television spot advertising to advertisers throughout the United States or owns and operates broadcast television stations in multiple states or in DMAs as defined by the television ratings company Nielsen Holdings, Inc., that often cross state lines. Additionally, the Sales Rep Firms represent the Broadcaster Defendants throughout the United States in the sale of broadcast television spot advertising to advertisers, and Defendant ShareBuilders provides its services to Broadcaster Defendants throughout the United States.

ANSWER: TEGNA admits that individual TEGNA stations sell broadcast television spot advertising to advertisers and that TEGNA operates broadcast television stations in multiple states or DMAs.  TEGNA also admits that certain individual TEGNA stations are represented by the Sales Rep Firm(s) in the sale of broadcast television spot advertising to advertisers.  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 17 and therefore denies those allegations.

18.     Defendants' and ShareBuilders' manipulation of the market for the sale of broadcast television spot advertising thus was in the flow of, and had a direct, substantial, and foreseeable impact on, interstate commerce.

ANSWER: TEGNA denies the allegations in Paragraph 18.

## IV.     THE PARTIES

### A.     The Identities of the Plaintiffs

19.    Plaintiff Thoughtworx, Inc. d/b/a MCM Services Group ("Thoughtworx") is an advertising company headquartered in Minnesota and organized under the laws of Minnesota. Thoughtworx provides a bundle of services to its advertiser-clients, including consulting, television advertisement development and research, and purchasing broadcast television spot advertising time. In order to provide those services, Thoughtworx purchased broadcast television spot advertising during the Class Period (defined *infra*) directly from Defendants Cox Media Group LLC, CBS Corp., Fox Corp., TEGNA Inc., The E.W. Scripps Company, Sinclair Broadcast Group, Inc., and Tribune Media Company at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**ANSWER:** TEGNA admits that Plaintiff Thoughtworx has purchased advertisement time directly from certain local TEGNA stations in the time period from at least January 1, 2014 through the date of this Complaint. TEGNA denies that the Plaintiff Thoughtworx has purchased advertisement time at prices that were supracompetitively impacted or otherwise suffered any injury as a result of the allegations in the Complaint. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 19 and therefore denies those allegations.

20.    Plaintiff One Source Heating & Cooling, LLC ("One Source") is a heating, cooling, and HVAC services provider headquartered in Alabama and organized under the laws of Alabama. One Source purchased broadcast television spot advertising during the Class Period directly from Defendants Raycom Media, Inc. and Sinclair Broadcast Group, Inc. at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 20 and therefore denies those allegations.

21.    Plaintiffs Hunt Adkins, Inc. ("Hunt Adkins") is a creative brand advertising agency located in Minnesota. Hunt Adkins conducts a full spectrum of brand development services, which includes television advertisement development and research. Hunt Adkins purchased broadcast television spot advertising during the Class Period directly from at least Defendants CBS Corp., Cox Media Group, Fox Corp., Nexstar Broadcast Corp., E.W. Scripps, Sinclair Broadcast Group, Inc., and TEGNA, Inc., and Tribune Media Co. at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**ANSWER:** TEGNA admits that Plaintiff Hunt Adkins has purchased advertisement time from certain local TEGNA stations in the time period from at least January 1, 2014 through

8

the date of this Complaint. TEGNA denies that Plaintiff Hunt Adkins has purchased

advertisement time at prices that were supracompetitively impacted or otherwise suffered any

injury as a result of the allegations in the Complaint. TEGNA lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 21

and therefore denies those allegations.

22. Plaintiff Fish Furniture is a furniture store in Cleveland, Ohio. Fish Furniture purchased broadcast television spot advertising during the Class Period directly from at least Defendants Tribune, Raycom, and Scripps at prices that were supracompetitively impacted as a result of the conduct alleged herein and has thereby suffered antitrust injury.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 22 and therefore denies those allegations.

23. A comprehensive accounting of those DMAs in which multiple Broadcaster Defendants purportedly compete (as of 2017) and in which Hunt Adkins, One Source, and Thoughtworx purchased broadcast television spot advertising from one or more Broadcaster Defendants is set forth in Appendix A.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 23 and therefore denies those allegations. TEGNA

denies the allegations contained in Appendix A.

### B.    The Identities of the Defendants

24. Most of the Defendants named herein entered into consent decrees with the DOJ, except Gray Media Group, which purchased an entity (Raycom Media, Inc.) that did so, Cox Media (the subsidiary of an entity that did so) and ShareBuilders.

**ANSWER:** TEGNA admits that it entered into a consent decree with the DOJ. TEGNA

refers to the DOJ consent decrees for their content with respect to other Defendants. TEGNA

lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

remaining allegations in Paragraph 24 and therefore denies those allegations.

25. Defendant CBS Corp. ("CBS") is a Delaware corporation with its headquarters at 51 West 52nd Street, New York, New York, 10019. CBS owns or operates 28 television stations in 18 DMAs and had over $14.5 billion in revenues in 2018.

    a.    CBS was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

    b.    That same day, CBS settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement was approved on and final judgment was entered by the court on December 3, 2019.

    **ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with CBS for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 25 and therefore denies those allegations.

    26.    Defendant Dreamcatcher Broadcasting, LLC ("Dreamcatcher") was a Delaware corporation, headquartered at 2016 Broadway, Santa Monica, California 90404, that owned three full-power television stations in two DMAs and had over $50 million in revenues in 2017.

    a.    Dreamcatcher was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

    b.    That same day, Dreamcatcher settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the court on May 22, 2019.

    **ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with Dreamcatcher for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 26 and therefore denies those allegations.

    27.    Tribune Company announced on December 27, 2021, that it completed the final steps necessary to close its acquisition of Local TV Holdings, LLC. As a result of this acquisition, Tribune obtained 39 television stations across the country. In addition, Tribune provided certain services to support the operations of three former Local TV stations owned by Dreamcatcher Broadcasting LLC.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 27 and therefore denies those allegations.

28.    Defendant Fox Corp. ("Fox") is a Delaware corporation with its headquarters at 1211 Avenue of the Americas, New York, New York, 10036, that owns or operates 17 television stations in 17 DMAs. Fox is a corporate entity recently created from certain former 21st Century Fox assets, including its broadcast station assets, after The Walt Disney Company acquired 21st Century Fox and spun-out Fox. Fox's television segment earned over $5 billion in 2017.

      a.    Fox was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

      b.    That same day, Fox settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement was approved and final judgment was entered by the court on December 3, 2019.

**ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-

cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with

Fox for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the remaining allegations in Paragraph 28 and therefore denies those

allegations.

29.    Defendant Gray Media Group ("GMG")[5] is a Georgia corporation headquartered at 4370 Peachtree Road, NE, Suite 400, Atlanta, Georgia 30319, that owns and operates television stations and digital assets in the United States.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 29 and therefore denies those allegations.

30.    On January 2, 2019, Gray Television, Inc. ("Gray TV") acquired Raycom Media, Inc. ("Raycom"), and Raycom became a wholly-owned subsidiary of Gray TV. On January 31, 2019, Raycom changed its corporate name to GMG and, as of that date, GMG included, among other assets, the legacy Raycom owned broadcast television stations. GMG and Raycom are the same entity. Counsel for GMG has previously referred to, and continues to refer to, GMG and

---

[5]Plaintiffs do not allege, at this time, that Gray TV participated in the alleged conduct directly; merely that Gray TV is liable for the acts of Raycom Media, Inc. and Meredith, which it acquired.

Raycom as "Raycom" to remain consistent with the Complaint's allegations. On December 1, 2021, Gray TV acquired Meredith Corporation ("Meredith"), which included Meredith's Local Media Group (consisting of its broadcast television station business) and all associated assets. As of January 2, 2022, an entity holding Meredith's television station business, and associated assets, was merged into GMG. GMG now includes, among other assets, the legacy Raycom and Meredith broadcast television station businesses. To remain consistent with the Complaint's allegations, Plaintiffs will refer to Raycom in reference to matters relating to television stations owned by Raycom at the time of the acquisition by Gray TV and will refer to Meredith in reference to matters relating to television stations owned by Meredith at the time of the acquisition by Gray TV.

   **ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 30 and therefore denies those allegations.

   31.   Gray TV, via its subsidiary, Gray Media Group, acquired Raycom Media, Inc. ("Raycom"), in January 2019.

   a.   Raycom was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

   b.   That same day, Raycom settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

   **ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-

cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with

Raycom for its content. TEGNA lacks knowledge or information sufficient to form a belief as

to the truth or falsity of the remaining allegations in Paragraph 31 and therefore denies those

allegations.

   32.   Raycom was named in the DOJ's enforcement action on November 13, 2018, and Gray TV thus purchased Raycom with knowledge of Raycom's liability to its customers for violation of the antitrust laws. As part of the acquisition:

   a.   Raycom's President and Chief Executive Officer, Pat LaPlatney, became Gray TV's President and Co-Chief Executive Officer. In addition, LaPlatney and Raycom's prior President and CEO, Paul McTear, joined Gray TV's Board of Directors, as well as multiple former Raycom managers joined Gray TV as Senior Vice Presidents, including Raycom's Sandy

Breland and Brad Streit. Further, Ellenann Yelverton, Raycom's General Counsel, became Gray TV's Vice President and Deputy General Counsel, overseeing Gray TV's legal department; Becky Sheffield, from Raycom, joined Gray TV as Vice President, Controller; and former Raycom executive David Burke became Gray TV's new Senior Vice President and Chief Technology Officer, overseeing all of Gray TV's engineering and information technology;

b.    Gray TV assumed and fulfilled Raycom's pending acquisitions of WUPV-DT in the Richmond, VA market and KYOU-TV in the Ottumwa, IA market;

c.    Gray TV acquired, and now operates, 48 television stations from Raycom under the Gray TV name;

d.    Gray TV presently services former Raycom customers through Raycom's former stations, but now under Gray TV's name; and

e.    The same employees who worked for Raycom have mostly all maintained their prior positions, working in the same capacities but now for the financial benefit of Gray TV.

**ANSWER:** TEGNA refers to the DOJ's enforcement action for the content of that lawsuit. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 32 and therefore denies those allegations.

33.    Defendant Griffin Communications, LLC ("Griffin") is an Oklahoma corporation, headquartered at 7401 North Kelley Avenue Oklahoma City, Oklahoma 73111, that owned four full-power television stations in two DMAs and had over $60 million in revenues in 2017.

a.    Griffin was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

b.    That same day, Griffin settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

**ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with Griffin for its content. TEGNA lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the remaining allegations in Paragraph 33 and therefore denies those allegations.

34. Defendant Meredith Corporation ("Meredith") is an Iowa corporation, headquartered at 1716 Locust Street, Des Moines, Iowa 50309, that owned or operated 16 television stations in twelve DMAs and had over $1.7 billion in revenues in 2017.

    a. Meredith was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

    b. That same day, Meredith settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

On December 1, 2021, Gray TV closed on its acquisition of Meredith Corporation's

Local Media Group's 17 television stations.

**ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with Meredith for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 34 and therefore denies those allegations.

35. Defendant Nexstar Media Group, Inc. ("Nexstar"), is a Delaware corporation, headquartered at 545 East John Carpenter Freeway, Suite 700, Irving, Texas 75062, that operates as a television broadcasting and digital media company in the United States. As of December 31, 2017, the company owned, operated, programmed, or provided sales and other services to 170 television stations in 100 DMAs.

    a. Nexstar was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on December 13, 2018.

    b. That same day, Nexstar settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the court on May 22, 2019.

**ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with Nexstar for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 35 and therefore denies those allegations.

36.     On September 19, 2019, Nexstar announced that it completed the acquisition of Tribune Media Company in an accretive transaction valued at approximately $7.2 billion including the assumption of Tribune Media's outstanding debt. Pursuant to the merger agreement, Nexstar acquired all outstanding shares of Tribune Media for $46.687397 per share in cash, inclusive of $0.187397 per share to reflect the final closing date relative to the August 31, 2019 targeted closing date.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 36 and therefore denies those allegations

37.     Defendant Raycom is a Delaware corporation, headquartered at 201 Monroe Street, Montgomery, Alabama 36104, that owned or operated 65 television stations in 45 DMAs and had over $670 million in revenues in 2017. Raycom was purchased by Gray TV in 2018 for $3.65 billion in a deal that was finalized in January of 2019.

  a.     Raycom was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

  b.     That same day, Raycom settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

**ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with Raycom for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 37 and therefore denies those allegations.

38.    Defendant The E.W. Scripps Company ("Scripps") is an Ohio corporation headquartered at 312 Walnut Street, Cincinnati, Ohio, 45202, that owns or operates 60 television stations in 42 DMAs and had over $917 million in revenues in 2018.

> a.    Scripps was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

> b.    That same day, Scripps settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement was approved and final judgement was entered by the court on or about December 3, 2019.

**ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit.  TEGNA refers to the DOJ consent decree with Scripps for its content.  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 38 and therefore denies those allegations.

39.    Defendant Sinclair Broadcast Group, Inc. ("Sinclair"), is a Maryland corporation, headquartered at 10706 Beaver Dam Road, Hunt Valley, Maryland 21030, that operates as a television broadcast company in the United States. As of December 31, 2017, it owned, operated, and/or provided services to 191 stations in 89 DMAs, which broadcast 601 channels. In 2017, it reported revenues in excess of $2.7 billion.

> a.    Sinclair was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

> b.    That same day, Sinclair settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the Court on May 22, 2019.

**ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit.  TEGNA refers to the DOJ consent decree with Sinclair for its content.  TEGNA lacks knowledge or information sufficient to form a belief as to

the truth or falsity of the remaining allegations in Paragraph 39 and therefore denies those allegations.

40.     Defendant TEGNA Inc. ("TEGNA") is a Delaware corporation headquartered at 8350 Broad Street, Tysons, Virginia 22102, that owns or operates 49 television stations in 41 DMAs and had $2.2 billion in revenues in 2018.

   a.   TEGNA was named as a defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on June 17, 2019.

   b.   That same day, TEGNA settled with the DOJ over those allegations, entering into a proposed consent decree that, if approved by the court, the DOJ claimed "would resolve the competitive harm alleged in the complaint." That settlement was approved and final judgment was entered by the court on December 3, 2019.

**ANSWER:** TEGNA admits that it is a Delaware corporation headquartered at 8350 Broad Street, Tysons, Virginia 22102, that owns or operates 64 television stations in 51 DMAs and had $2.2 billion in revenues in 2018. TEGNA also admits that it was named as a defendant by the DOJ in the lawsuit referenced in Paragraph 40, reached settlement and entered into a proposed consent decree with the DOJ. TEGNA further admits that the DOJ made the quoted statement in Paragraph 40 and refers to the DOJ statement for its content. Finally, TEGNA admits that the settlement was approved by the court. TEGNA denies the remaining allegations in Paragraph 40.

41.     Defendant Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), is a Delaware limited liability company headquartered at 515 North State Street, Chicago, Illinois 60654, that operates as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owned 42 broadcast television stations in approximately 33 DMAs in 2017. It had over $670 million in revenues in 2017.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 41 and therefore denies those allegations.

17

42.     Defendant Tribune Media Company ("Tribune Media," and collectively with Tribune Broadcasting, "Tribune"), is a Delaware corporation headquartered at 435 North Michigan Avenue, Chicago, Illinois 60611, and operates, through its subsidiaries, as a media and entertainment company in the United States. It offers news, entertainment, and sports programming through Tribune Broadcasting local television stations, including FOX television affiliates, CW Network television affiliates, CBS television affiliates, ABC television affiliates, MY television affiliates, NBC television affiliates, and independent television stations; and television series and movies on WGN America, a national general entertainment cable network. Tribune owned 42 television stations in 33 DMAs in 2017.

        c.     Tribune was named as a civil defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al*., No. 1:18-cv-2609 (D.D.C.) for alleged violation of Section 1 of the Sherman Act on November 13, 2018.

        d.     That same day, Tribune settled with the DOJ over those allegations, entering into a proposed consent decree that the DOJ claimed would "restore the competition harmed by the alleged conduct." That settlement was approved and final judgment was entered by the court on May 22, 2019.

**ANSWER:** TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with Tribune for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 42 and therefore denies those allegations.

43.     Defendant Cox Media Group, LLC, ("Cox Media") is a Delaware corporation headquartered at 6205 Peachtree Dunwoody Road, Atlanta, Georgia, 30328, and operates, through its subsidiaries, as a media company in the United States. It is a subsidiary of Cox Enterprises and holds Cox Enterprises' broadcasting, publishing, digital, and sales units. Cox Media operates in 20 DMAs and reaches approximately 52 million Americans weekly. Through its division, Cox Reps, it operates as a national television representative company (a Sales Rep Firm) in the United States. As of March 2019, Cox Reps represented 30 of Tribune's owned and operated full-power television stations, 33 Sinclair full-power television stations, 4 Griffin full-power stations, 12 Meredith full-power stations, 16 full-power Nexstar stations, 3 Scripps full-power stations, 10 Cox full-power stations, 7 CBS full-power stations, 2 Fox full-power stations, and 39 TEGNA full-power stations. Cox Reps represented Raycom's television stations prior to the latter's acquisition by Gray TV.

**ANSWER:** TEGNA admits that CoxReps represented certain individual TEGNA stations. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 43 and therefore denies those allegations.

44. As described above, Cox Media's parent, Cox Enterprises, was named as a civil defendant by the DOJ in *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) on June 17, 2019 and settled with the DOJ on the same day, entering into a proposed consent decree for alleged violation of Section 1 of the Sherman Act, in part as a result of the unlawful acts of Cox Media as a conduit of the anticompetitive scheme.

ANSWER: TEGNA refers to *U.S. v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA refers to the DOJ consent decree with Cox Enterprises for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 44 and therefore denies those allegations.

45. Defendant ShareBuilders, Inc. ("ShareBuilders") is an Illinois corporation headquartered at 90 Eastgate DR, Washington, Illinois, 61571. ShareBuilders is a national media company that operates as a provider of yield management solutions for the broadcast media sales industry in the United States. ShareBuilders' clientele includes over 300 television stations.

ANSWER: TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 45 and therefore denies those allegations.

46. CBS, Cox Media Group LLC, Dreamcatcher, Fox, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune are referred to collectively as the "Broadcaster Defendants."

ANSWER: TEGNA admits that it is referred to as one of the "Broadcaster Defendants" in this Complaint. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 46 and therefore denies those allegations.

47. Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

ANSWER: The allegations in Paragraph 47 state legal conclusions that do not require a response. To the extent any response is required, TEGNA denies the allegations in Paragraph 47.

48.    Katz Media Group, Inc. ("Katz")[6] is a national media representation company in the United States, including operating as a national television representative company (a Sales Rep Firm). Through its division, Katz Television Group, Katz represents the assets of television stations to provide marketing solutions to advertisers and agencies. As of March 2019, Katz represented 86 Nexstar owned and operated full-power television stations, 2 Meredith full-power stations, 8 Tribune full-power stations, 66 Sinclair full-power stations, 23 Scripps full-power stations, 1 Cox full-power station, 2 Fox full-power stations, and 5 TEGNA full-power stations.

**ANSWER:**  TEGNA admits that Katz represented certain individual TEGNA stations.

TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of

the remaining allegations in Paragraph 48 and therefore denies those allegations.

49.    While the DOJ did not name Katz, the DOJ has stated that "Cox Reps is one of *two* large 'Rep Firms' in the industry that assist broadcast stations in sales to national advertisers. The Rep Firms are alleged to have participated in the unlawful information sharing conduct." Katz is the only other major, national Rep Firm the DOJ could be referencing.

**ANSWER:**  TEGNA admits that the DOJ made the quoted statement in Paragraph 49

and refers to the source for its content.  TEGNA lacks knowledge or information sufficient to

form a belief as to the truth or falsity of the remaining allegations in Paragraph 49 and therefore

denies those allegations.

50.    Cox Reps and Katz are referred to collectively as the "Sales Rep Firms." These Sales Rep Firms "function as extensions of a station's sales staff and are familiar with various rate cards (prices) and program research demographics." And as the DOJ noted, these two Sales Rep Firms facilitated the "exchange[ of] real-time pacing information" between Defendants. The Sales Rep Firms are sophisticated industry participants that regularly communicate with each Broadcaster Defendant remotely (e.g., emails, telephone calls) and in person to serve the Broadcaster Defendants' demands. And the Sales Rep Firms' continued profitability is tied to satisfying those demands and maintaining relationships with the Broadcaster Defendants.

**ANSWER:**  TEGNA admits that the DOJ made the quoted allegation in the third

sentence in Paragraph 50 in its complaint against TEGNA and refers to the DOJ complaint for

its content, but TEGNA denies the truth of the allegation.  TEGNA further admits that the Sales

---

[6]Katz was previously named as a defendant in this case. Katz petitioned for bankruptcy protection in March 2018, and a bankruptcy plan discharged any of Plaintiffs' claims in May 2019.

Rep Firms have communicated with certain individual TEGNA stations since January 1, 2014.

TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of

the remaining allegations in Paragraph 50 and therefore denies those allegations.

## V.     THE DOJ BRINGS AN ENFORCEMENT ACTION AGAINST BROADCASTERS AND A REP FIRM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

51.     On November 13, 2018, the DOJ filed its original complaint in *United States v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.), along with proposed settlements with six defendants, Raycom, Meredith, Griffin, Dreamcatcher, Sinclair, and Tribune.

**ANSWER:** TEGNA refers to *United States v. Sinclair Broadcast Group, Inc., et al.*, No.

1:18-cv-2609 (D.D.C.) for the content of that lawsuit.  TEGNA lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 51

and therefore denies those allegations.

52.     On Dec. 13, 2018, the Department filed an amended complaint and a proposed settlement with a seventh defendant, Nexstar.

**ANSWER:** TEGNA refers to *United States v. Sinclair Broadcast Group, Inc., et al.*, No.

1:18-cv-2609 (D.D.C.) for the content of that lawsuit.  TEGNA lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 52

and therefore denies those allegations.

53.     The court entered final judgment against all seven defendants on May 22, 2019.

**ANSWER:** TEGNA refers to *United States v. Sinclair Broadcast Group, Inc., et al.*, No.

1:18-cv-2609 (D.D.C.) for the content of that lawsuit.  TEGNA lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 53

and therefore denies those allegations.

54.     On June 17, 2019, the DOJ filed a second amended complaint along with proposed settlements with five additional defendants, CBS, Cox, Scripps, Fox, and TEGNA.

**ANSWER:** TEGNA refers to *United States v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA otherwise admits the allegations in Paragraph 54.

55. In its June 17, 2019 press release, the DOJ once again stated how the information exchange orchestrated by Defendants hurt the competitive process: "By exchanging pacing information, the five new defendants and other broadcasters were better able to anticipate whether their competitors were likely to raise, maintain, or lower spot advertising prices, which in turn helped inform their stations' own pricing strategies and negotiations with advertisers. As a result, the information exchanges harmed the competitive price-setting process in markets for the sale of spot advertisements."

**ANSWER:** TEGNA admits that the DOJ press release referred to in Paragraph 55 contains the quoted language and refers to the DOJ press release for its content. TEGNA denies the remaining allegations in Paragraph 55.

56. The court entered final judgment against these additional defendants on December 3, 2019.

**ANSWER:** TEGNA refers to *United States v. Sinclair Broadcast Group, Inc., et al.*, No. 1:18-cv-2609 (D.D.C.) for the content of that lawsuit. TEGNA otherwise denies the allegations in Paragraph 56.

57. The DOJ's Judgments prohibit the exchange of several types of competitively sensitive information for seven years: "pricing, pricing strategies, pacing, holding capacity, revenues, or market shares."

**ANSWER:** TEGNA admits that the DOJ's Judgments generally contain the quoted language in Paragraph 57 and refers to the Judgments for their content. TEGNA denies the remaining allegations in Paragraph 57.

## VI. DEFENDANTS FORMED AND PARTICIPATED IN AN UNLAWFUL PRICE FIXING CARTEL FACILITATED BY AN INFORMATION EXCHANGE

### A. Defendants Agreed to Fix Prices for Broadcast Television Spot Advertising Sales and That Agreement Was Facilitated by an Information Exchange

58. Beginning no later than January 1, 2014, Defendants participated in an unlawful price fixing cartel to supracompetitively impact the price levels of broadcast television spot

advertising in DMAs in which Broadcasters Defendants were, purportedly, supposed to be direct competitors.

**ANSWER:** TEGNA denies the allegations in Paragraph 58.

59.    Defendants' price fixing cartel was facilitated in large part through a reciprocal exchange of competitively sensitive information.[7] This exchange included, among other things, (a) pacing information (*i.e.*, data on remaining inventory or supply) (b) average price data through third party Kantar, available at a granular level broken down by DMA and inventory type (*e.g.*, early news, late news, prime time) as well as (c) other forms of competitively sensitive sales information (including but not limited to information exchanged through ShareBuilders).

**ANSWER:** TEGNA denies the allegations in Paragraph 59.

60.    As discussed above and below, merely exchanging competitively sensitive information among competitors can cause anticompetitive effects and violate the Sherman Act.

**ANSWER:** The allegations in Paragraph 60 state legal conclusions to which no response

is required.  To the extent a response is required, TEGNA denies the allegations in Paragraph 60.

> 1.    **The Broadcaster Defendants Exchanged Competitively Sensitive Information Through Sales Rep Firms and Directly With One Another**

61.    As revealed in the DOJ's investigation, related court filings, and the investigation of counsel, this exchange of competitively sensitive information took at least two forms.

**ANSWER:** TEGNA refers to the DOJ's investigation and related court filings cited in

Paragraph 61 for their content.  TEGNA denies the remaining allegations in Paragraph 61.

62.    *First*, Defendants agreed to regularly and reciprocally exchange local sales pacing information through the Sales Rep Firms, including real-time pacing information regarding each station's revenues, and reported the information to the Broadcaster Defendants in the DMA.

**ANSWER:** TEGNA denies the allegations in Paragraph 62.

63.    Pacing information is used to compare a broadcast station's revenues booked for a certain time period (either a current or future period) to the revenues booked for the same point in time in the previous year. It is accompanied by a percentage figure (*i.e.*, that a station's revenue indicates that it is pacing plus or minus 10%, 20%, 30%, or so on). Pacing indicates how each station is performing compared to the rest of the market and provides insight into each station's

---

[7]The DOJ defined "Competitively Sensitive Information" as "Non-Public Information relating to pricing or pricing strategies, pacing, holding capacity, revenues, or market shares" as well as "reports" that are "customized or confidential to a particular Station or broadcast television station group."

remaining broadcast television spot advertising inventory for a current or future period. The exchange of pacing information reveals the Broadcaster Defendants' remaining supply, with supply being a, if not the, key factor informing negotiations over price.

**ANSWER:** TEGNA admits that pacing information could be used to compare a broadcast station's revenues booked for a certain time period (either a current or future period) to the revenues booked for the same point in time in a previous year and that it can be accompanied by a percentage figure (*i.e.*, that a station's revenue indicates that it is pacing plus or minus 10%, 20%, 30%, or so on). TEGNA denies the remaining allegations in Paragraph 63.

64.    Those exchanges were systematic and included data on individual stations' booked sales for current and future months as well as a comparison to past periods. The exchanges covered not just historic competitively sensitive information, but current and forward-looking information as well. Specifically, but not exclusively, at least once per quarter, but frequently more often, the Sales Rep Firms representing the Big 4 Stations (ABC, CBS, Fox, and NBC, and their affiliated networks) in a DMA exchanged real-time pacing information regarding the broadcast stations within that DMA and reported the information to the Broadcaster Defendants and to the other Big 4 Station owners in the DMA.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the third sentence in Paragraph 64 and therefore denies those allegations. TEGNA denies the remaining allegations in Paragraph 64.

65.    Corroborating the DOJ's claim of systematic exchanges, Sinclair's Maria Stalter testified during her 2018 U.S. Department of Justice deposition that she would often request market competitive information from her contact at Katz, and would in turn provide Katz with Sinclair's current and competitively-sensitive pacing information to share with Sinclair's competitors. Stalter confirmed that this was "a common industry practice."

**ANSWER:** TEGNA refers to the deposition testimony cited in Paragraph 65 for its content. TEGNA lacks information or belief as to the truth or falsity of the remaining allegations in Paragraph 65 and therefore denies those allegations.

66.    In those DMAs in which the Sales Rep Firms represented more than one Broadcaster Defendant, they erected firewalls intended to prohibit and prevent the dissemination of competitively sensitive information between the teams representing different Broadcaster Defendants. In those DMAs, the Sales Rep Firms facilitated these information exchanges among rival Broadcaster Defendants in violation of and in intentional disregard of those firewalls.

24

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the Sales Rep Firms' firewalls in Paragraph 66 and therefore denies those allegations. TEGNA denies the remaining allegations in Paragraph 66.

67. Once the Sales Rep Firms shared the information with the Broadcaster Defendants, their competitors' pacing information was then disseminated to individuals within the Broadcaster Defendants with authority over pricing and sales, always with the Broadcaster Defendants' knowledge and frequently at their explicit direction.

**ANSWER:** TEGNA denies the allegations in Paragraph 67.

68. The exchanges by Sales Rep Firms were widespread, occurring in DMAs across the United States, and they occurred with the knowledge of and frequently at the instruction of the Broadcaster Defendants. As of March 2019, Cox Reps or Katz represented at least one Broadcaster Defendant in 125 of 127 DMAs where more than one Broadcaster Defendant was present and in 68 of those DMAs (identified in Appendix A) Cox Media or Katz counted more than one Broadcaster Defendant as a client.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the Sales Rep Firms' representations in Paragraph 68 and therefore denies those allegations. TEGNA denies the remaining allegations in Paragraph 68. TEGNA denies the allegations contained in Appendix A.

69. **_Second_**, in some DMAs, the Broadcaster Defendants exchanged competitively sensitive information directly with one another, without using the Sales Rep Firms as a conduit.

**ANSWER:** TEGNA denies the allegations in Paragraph 69.

70. These direct inter-seller exchanges included both "local sales" pacing data as well as "all sales" or "national sales" pacing data.

**ANSWER:** TEGNA denies the allegations in Paragraph 70.

71. Additionally, the Broadcaster Defendants all provide data to Kantar's SRDS platform, which then disseminates that data in an aggregated form to Defendants.

**ANSWER:** TEGNA denies the allegations in Paragraph 71.

72. Kantar collects advertisement airing data by continuously monitoring local television stations' broadcast feeds, while the Broadcaster Defendants provide retrospective (45-- 90 days' old) average pricing data for broadcast television spot advertising data to Kantar, which in turn creates reports that are purchased by and disseminated to the Broadcaster Defendants.

Kantar's SRDS Media Planning Platform's data is broken down granularly by, *inter alia*, DMA (*i.e.*, by relevant geographic market) and inventory type (*e.g.*, early news, late news, prime time). Kantar's website states that: "Agencies and brands use SRDS as an affordable, all-in-one resource to find and compare digital and traditional media across business, consumer and geographic audiences. They rely on this extensive dataset of U.S. media to make informed decisions and initiate contact with media reps directly from the planning platform."

**ANSWER:** TEGNA admits that Kantar's website contains the quoted statement and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 72.

73.    The information provided tells the Broadcaster Defendants, among other things, the average cost-per-point (*i.e.*, the price) for broadcast spot television advertising broken down by specific DMA and by specific daypart (*e.g.*, early news, late news, prime time). Multiplying the average cost-per-point for a market profile (*i.e.*, DMA and daypart) times the Nielsen ratings for a given television program provides the Broadcaster Defendants with an estimate of how pricing would be set for a given program in a given DMA.

**ANSWER:** TEGNA denies the allegations in Paragraph 73.

74.    This exchange served to bolster the efficacy of the pacing data exchange, by allowing the Broadcaster Defendants to better rule out the possibility that an increase or decrease in revenue pacing was being driven by increases or decreases in, *inter alia*, the prices of broadcast spot television advertising, and stabilizing prices at anticompetitive levels by removing uncertainty surrounding price discovery.

**ANSWER:** TEGNA denies the allegations in Paragraph 74.

75.    Furthermore, the direct inter-seller exchanges and exchanges through the Sales Rep Firms were not made available to Plaintiffs and the members of the Class and were not otherwise publicly available or accessible; while the Nielsen ratings and Kantar SRDS data is publicly available, if at all, only at a substantial cost. The only conceivable procompetitive purpose of exchanging this information would be if it were freely shared with advertising customers, allowing them to better time their purchases or construct their media plans. By concealing the exchange from their customers and making the information non-public, Defendants reveal that the exchange was for an anticompetitive purpose.

**ANSWER:** TEGNA admits that the Nielsen ratings and Kantar SRDS data is publicly available for purchase. TEGNA denies the remaining allegations in Paragraph 75.

2.    **Such Systematic Exchanges of Non-Public Competitively Sensitive Information Violate Section 1 of the Sherman Act**

76.    Defendants' conduct amounts to an unlawful agreement—implicit or express—violative of Section 1 of the Sherman Act. The conduct affected many DMAs across the country,

including *at a minimum* every DMA in which a Sales Rep Firm represented two or more Broadcaster Defendant owners or operators, as identified in Appendix A.

     **ANSWER:** TEGNA denies the allegations in Paragraph 76 and in Appendix A.

     77.    Specifically, the DOJ stated that "[t]he *exchanges were systematic* and typically included non-public pacing data on national revenues, local revenues, or both, depending on the DMA. The Complaint further alleges that certain Defendants engaged in the exchange of other forms of competitively sensitive information relating to spot advertising in certain DMAs."

     **ANSWER:** TEGNA admits that the DOJ made the statement quoted in Paragraph 77 and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 77.

     78.    In its 2017 Annual Report, Sinclair stated that "fluctuations in advertising rates and availability of inventory" was an "Industry Risk," so clearly knowing its rival's inventory would illegally temper and mitigate that risk.

     **ANSWER:** TEGNA refers to the report cited in Paragraph 78 for its content. TEGNA denies the remaining allegations in Paragraph 78.

     79.    In the broadcast television spot advertising market, there is—all else equal—an inverse relationship between inventory and pricing strategy. If behaving competitively, firms with moderate to high remaining inventory are more incentivized to compete on price because if they price aggressively high, they risk a large loss of market share; conversely, firms with low remaining inventory are less subject to the risk of a large loss of market share (because they have already sold most of their inventory) and thus are less incentivized to compete on price.

     **ANSWER:** TEGNA denies the allegations in Paragraph 79.

     80.    However, if a firm knows that both it and its rival have low remaining inventory (and knows that its rival shares this knowledge), the low inventory firms' incentives to compete on price are further dampened because the rivals know neither's inventory situation is likely to compel it to engage in a price war with the another (*i.e.*, they are more confident that there is not a moderate to high inventory firm in the mix that is more incentivized to compete on price). Indeed, if rivals know that one another have high or moderate remaining inventory (and know that each firm shares that knowledge), the scheme works effectively the same: the firms can be confident one another are on a level playing field, in essentially the same position of strength in terms of price negotiations (although their customers remain unaware of this), and thereby chill the incentive to compete aggressively on price by removing competitive uncertainty.

     **ANSWER:** TEGNA denies the allegations in Paragraph 80.

81.    In fact, even in situations where one firm has higher and another lower inventory, their incentives to compete are distorted. Suppose firm A has high inventory and firm B has low inventory and each firm knows the other's relative position. Because of the asymmetrical information problem created by the information exchange, firms A and B have an informational advantage—which their customers do not—that enables firm A to foresee that firm B will not compete on price because of firm B's low inventory. This knowledge allows firm A to more confidently keep prices high because it is no longer uncertain about firm B's competitive position; without this knowledge, the uncertainty would have incentivized firm A to compete more vigorously on price to maintain market share. In the same vein, firm B *knows that firm A possesses this knowledge* and that firm A can thus confidently keep prices high, allowing firm B to safely avoid the temptation to compete with firm A on price that would persist if the firms remained uncertain about their respective competitive situations.

**ANSWER:**  TEGNA denies the allegations in Paragraph 81.

82.    In each situation, the anticompetitive effects are only amplified by the fact that the advertising customers do not have the confidential information exchanged among the Defendants or are even aware of the fact that Defendants are exchanging that confidential information, putting them at a severe asymmetrical information disadvantage vis-à-vis the Broadcaster Defendants with respect to the pricing of broadcast television spot advertising.

**ANSWER:**  TEGNA denies the allegations in Paragraph 82.

83.    Indeed, this is precisely the theory of anticompetitive effects advanced by the DOJ: "By exchanging pacing information, the broadcasters *were better able to anticipate whether their competitors were likely to raise, maintain, or lower spot advertising prices* . . . . [H]arming the competitive price-setting process." In that same public statement, the DOJ's Assistant Attorney General for the Antitrust Division Makam Delrahim confirmed the anticompetitive effects of Defendants' unlawful conduct, noting "[a]dvertisers rely on competition among owners of broadcast television stations to obtain reasonable advertising rates, but this unlawful sharing of information lessened that competition and thereby harmed the local businesses and the consumers they serve."

**ANSWER:**  TEGNA admits that the DOJ made the statements quoted in Paragraph 83

and refers to the source for its content.  TEGNA denies the remaining allegations in Paragraph

83.

84.    The DOJ elaborated in its June 17, 2019 Competitive Impact Statement that "[u]nderstanding competitors' pacing can help stations gauge competitors' and advertisers' negotiation strategies, inform their own pricing strategies, and help them *resist more effectively advertisers' attempts to obtain lower prices* by playing stations off of one another. [Defendants'] information exchanges therefore distorted the normal price-setting mechanism in the spot advertising market and harmed the competitive process within the affected DMAs."

**ANSWER:** TEGNA admits that the DOJ made the statements quoted in Paragraph 84 in its June 17, 2019 Competitive Impact Statement and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 84.

85. The information exchange thus eliminates or softens price competition by distorting the incentives of the firms involved. And even in DMAs where the Broadcaster Defendants ostensibly faced some meaningful degree of competition from non-colluding rivals, the higher prices among the colluding firms created residual demand for broadcast spot television advertising that in turn increases the prices offered even by the non-colluding firms. This means that the non-colluding firms do not discipline the cartel's supracompetitive pricing.

**ANSWER:** TEGNA denies the allegations in Paragraph 85.

86. The exchanges also helped the Broadcaster Defendants monitor the cartel. The Broadcaster Defendants were deterred from breaking from the cartel by lowering prices to steal market share (*i.e.*, "cheating" on the cartel) because lowering prices to competitive levels to any meaningful degree, and the commensurate market share shift, would be easily identified through the exchanged information.

**ANSWER:** TEGNA denies the allegations in Paragraph 86.

87. These exchanges, whether direct or through the Sales Rep Firms as conduits, also violate the information exchange safe harbors enumerated by the Federal Trade Commission ("FTC") in 2014 and the DOJ in 2016.

     a.    First, those safe harbors dictate that the exchange consists of information that is relatively old, while here, the exchanges were of real-time and forward-looking information.

     b.    Second, those safe harbors dictate that the exchange of information be operated by a neutral third party, while here, the exchanges were made directly between competitors and through interested Sales Rep Firms that also stood to profit from the information exchange.

     c.    Third, those safe harbors dictate that the information exchange be of aggregated data. Here, to the contrary, the exchange involved disaggregated data specific to individual competitors.

**ANSWER:** TEGNA denies the allegations in Paragraph 87.

88. A 2010 report prepared by a United States delegation (including the DOJ) and submitted to the Organization for Economic Cooperation and Development notes that: "In addition to serving as evidence of an unlawful agreement, information exchanges likely to affect prices may, under certain circumstances, be illegal in and of themselves."

**ANSWER:** TEGNA admits the report referred to in Paragraph 88 contains the quoted language and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 88.

89. That 2010 Guidance from the DOJ also notes that information exchanges can "serv[e] as evidence of an unlawful agreement" to fix prices, and also "be illegal in and of themselves," constituting "concerted action [] sufficient to establish a combination or conspiracy in violation of Sherman Act § 1."

**ANSWER:** TEGNA admits the source referred to in Paragraph 89 contains the quoted language and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 89.

90. 2014 Guidance from the FTC confirms that when "competing companies seek market intelligence by exchanging price or other commercially sensitive information, that may facilitate collusion . . . in violation of the antitrust laws."

**ANSWER:** TEGNA admits that the FTC made the statement quoted in Paragraph 90 in a 2014 blog entry and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 90.

91. Likewise, 2016 guidance from the DOJ confirms that "[e]ven if an individual does not agree explicitly to fix [prices] or other terms [of sale], exchanging competitively sensitive information could serve as evidence of an implicit illegal agreement."

**ANSWER:** TEGNA refers to the cited source for its content. TEGNA denies the remaining allegations in Paragraph 91.

92. One academic notes that "[w]ith regard to firm-specific production information, again there is no reasonable explanation for such a conveyance by a noncollusive seller to another noncollusive seller. Unilateral knowledge of a rival's capacity utilization, inventory levels, or production costs will increase expected returns in any competitive bidding process."

**ANSWER:** TEGNA admits that the quoted language in Paragraph 92 generally appears in a law review article and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 92.

93.     In 2006, the Swedish Competition Authority commissioned several papers on the economic effects of information sharing by competitors. These articles contain references to a large number of scholarly publications. The introductory essay states: "information sharing is most naturally defined as the sharing of such information that is normally regarded as confidential: production costs, detailed information about quantities sold, actual transactions prices (*i.e.*, including individual discounts), planned future pricing, et cetera." The introduction also states that "if competitors secretively share information on intended future pricing and output, this comes very close to actually making anti-competitive agreements." The same volume states: "[i]ndeed, in some circumstances it may be that the mere exchange of information will in itself be sufficient ***to eliminate normal competitive activity***. The overriding principle is that certain forms of contact between competitors should be avoided."

**ANSWER:**  TEGNA admits that Paragraph 93 purports to describe publications by the

Swedish Competition Authority in 2006 and that a 2006 publication by the Swedish Competition

Authority generally contains the quoted language in Paragraph 93.  TEGNA refers to the source

for its content and denies the remaining allegations in Paragraph 93.

94.     Another article by Baltzer Overgaard and H. Peter Mollgaard states that "it is relatively well-established in the economics literature that horizontal coordination/collusion (whether tacit or explicit) is made difficult—if not impossible—if firms compete under a veil of ignorance concerning the actions of rivals. . . . Speedy access to accurate information about the individual past transactions and future intentions of rivals ***will generally have a strong coordinating potential***." The summary characterization of the research that is reviewed in this article is as follows. "Pulling the two sides of the market together, we may (tentatively) conclude that improved information flow on the firm side will *likely* enhance the scope for coordinated firm behavior, while improved information on the consumer side *may* enhance competition. . . . Ideally, antitrust practice should attempt to [promote a regime where] actual competitors are covered by a veil of ignorance with respect to the actions of their rivals."

**ANSWER:**  TEGNA admits that the article referred to in Paragraph 94 contains the

quoted language and refers to the source for its content.   TEGNA denies the remaining

allegations in Paragraph 94.

95.    The Antitrust Guidelines for Collaborations Among Competitors states:

> Nevertheless, in some cases, the sharing of information related to
> a market in which the collaboration operates or in which the
> participants are actual or potential competitors may increase the
> likelihood of collusion on matters such as price, output, or other
> competitively sensitive variables. The competitive concern
> depends on the nature of the information shared. Other things
> being equal, the sharing of information related to price, output,

costs, or strategic planning is more likely to raise competitive concern than the sharing of information relating to less competitively sensitive variables. Similarly, other things being equal, the sharing of information on current operating and future business plans is more likely to raise concerns than the sharing of historical information. Finally, other things being equal, the sharing of individual company data is more likely to raise concern than the sharing of aggregated data that does not permit recipients to identify individual firm data.

**ANSWER:** TEGNA admits that the Antitrust Guidelines for Collaborations Among Competitors issued by the FTC and the DOJ contains the quoted language in Paragraph 95 and refers to the source for its content. TEGNA denies the remaining allegation in Paragraph 95.

96. Nexstar's own "Code of Business Conduct" acknowledged that there is an unethical and improper way to gather competitively sensitive information: "Competitive information is a valuable tool that allows us to understand and manage our markets, products, and services so we can better meet our customers' needs. However, we must gather and use that information *properly*. *It is important that we comply with the law in acquiring information*. . . . It is also important that we acquire information *ethically*."

**ANSWER:** TEGNA admits that Nexstar's website contains the quoted language in Paragraph 96 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 96 and therefore denies those allegations.

97. Implicit, as well as express, agreements are *per se* illegal under Section 1 of the Sherman Act because "[s]ophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit." *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016); *see also Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("The task before any plaintiff is thus to find and produce evidence that reveals coordination or agreement (even a wink and a nod—formal agreements have never been required for purposes of Sherman Act section 1)[.]").

**ANSWER:** Paragraph 97 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 97.

3. **Additional Circumstantial Evidence Demonstrates the *Per Se* Nature of The Price-Fixing Agreement**

98.    Because of the secrecy involved in an illegal conspiracy to fix prices, "most cases are constructed out of a tissue of [ambiguous] statements and other circumstantial evidence, since an outright confession will ordinarily obviate the need for a trial." *In re High Fructose Corn Syrup Antitrust Litigation,* 295 F.3d 651, 662 (7th Cir. 2002). In addition to the extensive exchange of pacing information among Defendants that was the subject of the U.S. Department of Justice's civil action and consent decrees, Defendants engaged in other contacts that demonstrates a *per se* price fixing violation of Section 1 of the Sherman Act.

**ANSWER:** Paragraph 98 states legal conclusions to which no response is required. To

the extent a response is required, TEGNA denies the allegations in Paragraph 98.

   a. *Use of Defendant ShareBuilders Among Defendant Broadcast Stations to Share Pricing and Holding Capacity Intelligence*

99.    Share Builders is a national media company that operates as a consultant and provider of so-called yield management solutions for the broadcast media sales industry in the United States. ShareBuilders' clientele includes over 300 television stations, some of which are owned or affiliated with Defendant Broadcaster stations.

**ANSWER:** TEGNA admits that ShareBuilders is a contractor for certain TEGNA

stations.  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the remaining allegations in Paragraph 99 and therefore denies those allegations.



100.

**ANSWER:**

TEGNA admits that the cited TEGNA email contains the quoted language in the last

sentence of Paragraph 100 and refers to the source for its content.  TEGNA lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 100 and therefore denies those allegations.

101. ShareBuilders shared information among Defendant Broadcast stations, including Custom Station Reports, rate cards, and "Holding Capacity." ShareBuilders also provided "weekly bottom" prices for broadcast television advertising to several Defendants, which at least some of the Defendants used as the "lowest rates [they]... should go for any given program in a specific week."

**ANSWER:** TEGNA admits that ShareBuilders provided certain reports to TEGNA stations. TEGNA refers to the cited sources for the content of the quoted language in the second sentence of Paragraph 101. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 101 and therefore denies the remaining allegations in Paragraph 101, including as it relates to other parties.

102. ShareBuilders was overt about its purpose, which was to help television broadcasters "navigate the complexities of a competitive market" in television advertising.[8] Its stated mission is "To increase client profitability by decreasing their **pricing workload** and increasing their revenue with sophisticated yield management concepts and software." [9] As ShareBuilders explains, "Yield management is the process of appropriately **managing pricing** and inventory to maximize or grow revenue. It's a **system of adjusting prices** in response to market behavior, and choreographing buying behavior, timing and pricing to get the best result."

**ANSWER:** TEGNA admits the cited sources contain the quoted language in the first and second sentences of Paragraph 102 and refers to the sources for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 102 and therefore denies the remaining allegations in Paragraph 102.

103. In fact, ShareBuilders claimed that its research has shown that its client stations perform as much as 5% better in the first two years of working with it than its clients would have without its system. This translates into a profit margin of over 98% on average.

---

[8] https://www.share-builders.com/products/sharebuilder-tv/.
[9] https://web.archive.org/web/20031218181634/http://www.share-builders.com/.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 103 and therefore denies the allegations in Paragraph 103.

104. Since its founding in 1999, ShareBuilders has steadily expanded its influence over the pricing of broadcast television advertising. The company highlights this trajectory in various marketing statements that it has made in different versions of its website over the years:

    a.    In a 2003 version of the website, ShareBuilders claimed to be "pricing over $1 billion of local television time each year" and that its "clientele has grown to over 50 stations in 18 different broadcast groups in just over 2 years."[10]

    b.    In a 2007 version of the website, ShareBuilders claimed to be "pricing over $2 billion of local television and radio time each year," that "[t]his equates to 1 out of every 10 commercials sold in the country in local TV," and that its "clientele has grown to over 150+ stations in 28 different broadcast groups in just over 6 years!"[11]

    c.    In a 2011 version of the website, ShareBuilders claimed that "[i]n 2010, our local broadcast TV clients billed about $3.7 billion, which we estimate to be 1 out of every 5 commercials sold on English-speaking network affiliates" and that its "clientele has grown to over 200 stations . . . in just over 10 years!"[12]

    d.    In a 2021 version of the website, ShareBuilders claimed that "[i]n 2017, our local broadcast TV clients billed almost $6.2 billion, about 36% of the total spot TV revenue that year. Our clientele has grown to over 300 television stations, radio stations, and cable MSO's."[13]

**ANSWER:** TEGNA admits the cited sources contain the quoted language in Paragraph 104 and refers to the sources for their content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 104 and therefore denies the remaining allegations in Paragraph 104.

---

[10] https://web.archive.org/web/20031218181634/http://www.share-builders.com/.

[11] https://web.archive.org/web/20070808152738/http://www.share-builders.com/.

[12] https://web.archive.org/web/20110420021735/http://www.share-builders.com/.

[13] https://web.archive.org/web/20210412184347/https://www.share-builders.com/about-us/.

105. A website testimonial[14]—deleted since the inception of this litigation—explicitly revealed the interconnection between ShareBuilders and pricing: from Sarah Smith, General Sales Manager, KVUE: "I'll admit it took some time to trust the system and not waver from **the pricing structure**."

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 105 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in Paragraph 105 related to the deletion of the quoted language and therefore denies that allegation in Paragraph 105. TEGNA denies the remaining allegations in Paragraph 105.

106. Another website testimonial— again taken down since the inception of this litigation—featured another revealing testimonial from Defendant Scripps about how ShareBuilders's market insights influenced pricing: "ShareBuilders allows us to proactively price and have confidence to not engage in the '**race to the bottom**' . . . . We feel the accuracy in holding capacity continues to help us price aggressively to get more than our fair share at times. . . ."[15]

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 106 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 106 and therefore denies the remaining allegations in Paragraph 106.

107. Michelle Stiens, Director of Sales and Marketing, KHOU (owned by TEGNA), previously stated on ShareBuilders' website (that has since been deleted) that "Our traffic system downloads all the pertinent data in the Sharebuilder system and produces excellent **reports for pricing**."[16]

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 107 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in Paragraph 107 related to the deletion

---

[14] https://web.archive.org/web/20060721114723/http://www.share-builders.com/testimonials.htm (emphasis in original).

[15] https://web.archive.org/web/20190331181408/https://www.share-builders.com/.

[16] https://web.archive.org/web/20031125155250/http://share-builders.com/testimonials.htm.

of the quoted language and therefore denies that allegation in Paragraph 107. TEGNA denies the remaining allegations in Paragraph 107.

108. ShareBuilders shared detailed holding capacity information with some Defendants, including historical, current, and near-future holding capacity shares, across should-be competitor stations within a particular DMA.

**ANSWER:** TEGNA admits that ShareBuilders provided certain market information to some TEGNA stations. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in Paragraph 108 related to ShareBuilders' interaction with other Defendants and therefore denies that allegation in Paragraph 108. TEGNA denies the remaining allegations in Paragraph 108.

109. ShareBuilders also received "pacing feeds" from at least one Defendant.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 109 and therefore denies the allegations in Paragraph 109.

110. ShareBuilders promoted a yield management software to the Broadcaster Defendants as a way for them to effectively manage forecasting and pricing. ShareBuilders' marketing documents offered to give its clients a "picture of what is happening in the market as a whole" by giving access to "holding capacity" data.

**ANSWER:** TEGNA admits the ShareBuilders website contained the quoted language and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 110 and therefore denies the remaining allegations in Paragraph 110.

111. ShareBuilders' website described holding capacity as "a measurement of a station's ability to hold revenue within a Broadcast Television DMA... A useful Holding Capacity model will not only tell a client their expected share of a market's revenue, but also provide a picture of what is happening in the market as a whole. . . . Holding Capacity is a tool that can be used to predict future share trends. Remember, you're not forecasting and pricing in a vacuum!"

**ANSWER:** TEGNA admits the cited source contained the quoted language and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 111 and therefore denies the remaining allegations in Paragraph 111.

112. At least Defendants Cox Media Group, Dreamcatcher, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune received Holding Capacity Reports from ShareBuilders.

**ANSWER:** TEGNA admits some of its stations received certain reports from ShareBuilders that contain aggregated market information. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 112 and therefore denies the remaining allegations in Paragraph 112.

113. ███████████████████████████████████████

**ANSWER:** ████████████████████████

████████████████████████████████ TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 113 and therefore denies those allegations in Paragraph 113.

114. ███████████████████████████████████████



    **ANSWER:** TEGNA admits the cited source contains certain aggregated market information and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 114.

    115.





**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 115 and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 115.

116. In the Consent Decrees entered by the Department of Justice, some Defendants are prohibited from Communicating Competitively Sensitive Information to any Station in the same DMA Defendant does not own or operate; Knowingly use Competitively Sensitive Information[17] from or regarding any Station in the same DMA Defendant does not own or operate; Encourage or facilitate the Communication of Competitively Sensitive Information to or from any Station in the same DMA Defendant does not own or operate; or Attempt to enter into, enter into, maintain, or enforce any agreement to Communicate Competitively these prohibitions "apply to Defendant's Communicating or agreeing to Communicate Competitively Sensitive Information with any Station in the same DMA Defendant does not own or operate. Notably, these prohibitions "apply to Defendant's Communicating or agreeing to Communicate through a Sales Representative Firm or a third-party agent at Defendant's instruction or request."[18]

---

[17] As noted above *supra* note 8, Competitively Sensitive Information was defined by the U.S. Department of Justice as "Non-Public Information relating to pricing or pricing strategies, **pacing**, holding capacity, revenues, or market shares."

[18] *See* DOJ Consent Decree.

**ANSWER:** TEGNA admits that it entered into a consent decree with the DOJ. TEGNA refers to the DOJ consent decrees with TEGNA and other Defendants for their content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 116 related to other Defendants and therefore denies those allegations in Paragraph 116. TEGNA denies the remaining allegations in Paragraph 116.

117.





**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 117 and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 117.

118. 

**ANSWER:** TEGNA refers to the shared information for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 118 and therefore denies those allegations in Paragraph 118.

119. In addition to providing holding capacity and related market information, ShareBuilders also circulated weekly rate cards to some of its clients that contained recommended pricing for each time slot. ShareBuilders circulated so-called "weekly bottom" prices for broadcast television advertising which at least some of the Defendants used as the "lowest rates [they]... should go for any given program in a specific week."

**ANSWER:** TEGNA admits that ShareBuilders shared certain market information with certain TEGNA stations. TEGNA refers to the shared information for its content. TEGNA refers to the cited source for the content of the quoted language in Paragraph 119. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 119 regarding other Defendants or regarding ShareBuilders' relationship with its clients other than TEGNA and therefore denies those allegations. TEGNA denies the remaining allegations in Paragraph 119.

120. Documents from some Defendants show that these weekly bottom prices were used in conjunction with setting the prices they charged in what was supposed to be (and indeed, should have been) a competitive market.

**ANSWER:** Paragraph 120 states a legal conclusion for which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 120.

121.  For example, TEGNA used a ShareBuilders rate card to set TEGNA's price. In September 2016, Patrick O'Keefe sent an email to Gregory Toth (TEGNA) regarding "additional Michael Kors rate needed", asking "I received an additional rate request for CBS Sunday AM in the month of November. I took a look at the rate card. Our highest weekly bottom is $1300 for a :30. This has to be internal and a :60. Can you let me know if the below rate is ok to send? :60 sec rate - $3,000." Gregory Toth responds, "Yes, OK to send @ $3,000 for a :60. Thanks, Patrick."

**ANSWER:**  TEGNA admits the cited source contains the quoted language in Paragraph 121 and refers to the source for its content.  TEGNA denies the remaining allegations in Paragraph 121.

122.  Again, in January of 2017, Patrick O'Keefe sent an email regarding "KHOU – 4Q16 Six Flags 10-4-16.xls" to Gregory Toth, stating "I took the highest weekly bottom rate on the 2Q17 rate card and nearly doubled it. Can you let me know if the attached rates are ok to use?" Gregory Toth responded, "Perfect. Good to go. Thanks Patrick."

**ANSWER:**  TEGNA admits the cited source contains the quoted language after the word "stating" in Paragraph 122 and refers to the source for its content.  TEGNA denies the remaining allegations in Paragraph 122.

123.  At least Defendants Cox Media Group, Dreamcatcher, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune received weekly bottom rate cards from ShareBuilders.

**ANSWER:**    TEGNA admits that ShareBuilders shared certain market information with certain TEGNA stations.  TEGNA refers to the shared information for its content.  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 123 and therefore denies those allegations in Paragraph 123.

b.  *Extensive Communications among Defendants*

124.  A preliminary review of Defendants' employees' subpoenaed telephone records show the existence of an extraordinarily large number of calls between employees of Broadcaster Defendants during 2014 to 2019. TelephoG124ne records show that there were numerous calls between employees of (i) Defendants Raycom and Nexstar; (ii) Defendants Griffin and Sinclair; (v) Defendants Raycom and Tribune; and (vi) Defendants Sinclair and Raycom, among others.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 124 and therefore denies those allegations in Paragraph 124.

125. Some Defendants' executives also emailed each other. For example, in February of 2017, Pat LaPlatney [CEO Raycom] emailed Larry Wert [President, Tribune Media]: "Can [I] call [you] when I land around 5:45CT ?" Larry Wert responded, "No sweat. Calling about GNC spot in super bowl. Just spoke to Rosser." Jeff Rosser was a Senior Vice President at Raycom.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 125 and therefore denies those allegations in Paragraph 125.

    c. *Warnings Issued by Defendant Broadcast Station Executives to Subordinates To Not Create and/or To Destroy Evidence of Price Collusion Among Defendants*

126. Defendants were aware of the incriminating nature of memorializing the exchange of pricing and other competitively sensitive information with competitors. For example, emails show that a General Manager at Sinclair spoke with a General Manager at a CBS-owned affiliate to confirm sales information and memorialized the conversation in a written summary. Upon reading this summary, a General Sales Manager at Sinclair warned, "You can't say you talked to the GM of KDKA [CBS affiliate] **if you want to keep your job**. We need to couch that as word on the street." Jim Lapiana replied "I'll change. tx""

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 126 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 126 related to other Defendants and therefore denies those allegations in Paragraph 126. TEGNA denies the remaining allegations in Paragraph 126.

127. Emails from October 2017 show that an employee of Cox Reps noted in an email that "**all stations share numbers every quarter**, will be sharing in November." Employees in this email chain later wrote that the new employee was told to take that note out of what she sent around to her team because "that's something **we don't want to share in an open forum**."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 127 and therefore denies those allegations in Paragraph 127.

128. In another example, in February 2018 a Tegna's station employee in the Tampa DMA reiterated a directive from the station's President to destroy –*not stop getting*-competitors' rates: "if we end up with competitors' **rates**/data in our hands, we should not share or distribute, but rather print copy and give to manager and **then delete email**. He mentioned concern about collusion."

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 128 and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 128.

    d. *Using Code Words to Hide Conspiratorial Activity*

129. Rather than ask for prices from each other, some Defendants used code words to hide their conspiratorial activity. Doing so helped evade their actions from detection. They used code words in their communications with each other and as names of files.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 129 related to other Defendants and therefore denies those allegations in Paragraph 129. TEGNA denies the remaining allegations in Paragraph 129.

130. Bill Cowen (a Cox Reps employee) and Michael Weiss (Vice President, Director of Sales, Katz Television Group) had a text message thread ongoing for years where they would share competitive information for stations in various DMAs. They used euphemisms like "hotel options" and "hotel recommendations" as code for seeking competitive information. In one example, Weiss messages Cowan "Looking for a fresh new hotel option in OK City..." Cowan follows up minutes later to say, "Yes message received just got the number kfor 1335, Kaut 179." KFOR and KAUT are television stations in Oklahoma.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 130 and therefore denies those allegations in Paragraph 130.

131.  The General Manager of Nexstar-owned stations in Roanoke, VA used this same code word when he emailed a Katz represented and asked: "Hey my friend, did you get a **NY hotels** listing for Nov yet?" The Katz representative responded: "Please see attached...The ratings for these hotels are going down, despite the dollars going up!" The attachment, which is named "New York hotels" is a comprehensive spreadsheet of market information for all Roanoke stations, including Nexstar's competitors.

ANSWER:  TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 131 and therefore denies those allegations in

Paragraph 131.

132.  "Hotel" was just one of the code words used by Defendants to hide their collusive activity.

ANSWER:  TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 132 related to other Defendants and therefore denies

those allegations in Paragraph 132.  TEGNA denies the remaining allegations in Paragraph 132.

e.  *Participation, Knowledge and Approval of Executives of Collusive Activity*

133.  As seen from the evidence above, multiple executives had knowledge of the alleged collusive conduct.

ANSWER:  TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 133 related to other Defendants and therefore

denies those allegations in Paragraph 133.  TEGNA denies the remaining allegations in

Paragraph 133.

134.  In addition, Sinclair's Maria Stalter confirmed during her 2018 U.S. Department of Justice deposition that her superiors at Sinclair, including Regional Sales Managers and the Vice President of National Sales, not only knew that competitively sensitive information was routinely shared amongst competitors, but would also instruct their reports to gather competitive pacing information from competitors' representatives.

ANSWER:  TEGNA refers to the cited deposition testimony for its content.  TEGNA

lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

allegations in Paragraph 134 related to other Defendants and therefore denies those allegations

in Paragraph 134. TEGNA denies the remaining allegations in Paragraph 134.

135. In September of 2016, a Vice President of Sales from Raycom emailed the President/CEO (Pat LePlatney), forwarding ShareBuilders' monthly core business forecasts in an email with the Re Line: "Pat: this is the latest I have from Sharebuilders [sic] .... **will talk to Scripps, Tribune, Tegna ....**" Not only does this indicate that a ShareBuilders' report was sent to an executive at Raycom, but also a clear intent by an employee to talk to Raycom's competitors.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 135 and therefore denies those allegations in

Paragraph 135.

136. Also in September of 2016, Wayne Freeman sent Pat LaPlatney an email about his conversation with a competitor where he received forward looking pacing information from Tribune: "Just wanted to touch base and let you know I had another – and longer – conversation with **Angela Betasso at Tribune** today, Pat.... She said both their 3Q and **4Q** pacing is down mid-to-high double digits, both locally and nationally. September is -18%. I told her that our 3Q was flat locally, and -5% national...." He goes on to detail his plans to contact other competitors: "Still haven't been able to connect with Paul Trestad at Tegna, Michael O'Brien at Scripps or Bill Salley at Nexstar (although Bill left me a message that he would be in Phoenix at NAB... I'll try and track him down there)." Upon receipt of this information, Pat LaPlatney replied, "Thanks."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 136 and therefore denies those allegations in

Paragraph 136.

137. On June 20, 2018, Ric Phillips, Regional Sales Manager for Sinclair Broadcast Group sent an email to Katz, stating "Going to see if we start having reps work together & PACKAGE all stations, so each is represented share-wise as to what makes sense without **creating a 'collusion' thing**."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 137 and therefore denies those allegations in

Paragraph 137.

138. On July 3, 2018, when asked about how they did about a particular order, Lisa Moore, Scripps National Sales Manager, replied, "Don't know yet, have yet to see totals and

shares. FYI...**intel has been slow to come for most orders...I think we're still feeling the effects of the collusion issue**."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 138 and therefore denies those allegations in Paragraph 138.

139.   In August of 2018, Tracy Rogers, Vice President/General Manager sent an article about collusion in the television industry, and stated "That was a good article. We now know the market that the **collusion** was so bad that the new GM self reported. Thanks for sharing." That article was forwarded to others, where another Director of Sales of WSAV stated, "Remember the new GM who said the collusion was so bad that they self reported it. Well now we know."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 139 and therefore denies those allegations in Paragraph 139.

140.   Some Defendants' executives appear to have joked about collusion or getting caught by the Department of Justice.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 140 related to other Defendants and therefore denies those allegations in Paragraph 140.   TEGNA denies the remaining allegations in Paragraph 140.

141.   In December 2014, Michael Yanuzzi, Group Manager of Sinclair Broadcast Group, sent an email to Teansie Garfield, Group Head of Sales at Chesapeake TV Group/Sinclair Broadcast Group, about the Superbowl on NBC in 2015, stating "I'm sure John Dittmier [sic] could utilize the below info from WTLH on last year's game when it aired on Fox. **Not sure if there might be any concerns over rate collusion which probably never stopped us in the past J**". John Dittmeier was Sinclair's VP & General Manager for WTWC in Tallahassee, FL.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 141 and therefore denies those allegations in Paragraph 141.

142.   In October 2017, a Sinclair Regional Sales Manager Shannon Eaker asks Cox Reps for KSTUs [Scripps] order "since they are in your office." The Cox Rep Sales manager replied, "THAT WOULD BE COLLUSION SHANNON! HAHAHA $72,060"

**ANSWER:**  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 142 and therefore denies those allegations in Paragraph 142.

143.   In a Nexstar document dated August 23, 2018, Bill Anderson, Vice President & General Manager for KRQE joked about getting caught by the Department of Justice: "if the DOJ ever really does go through my emails looking for **collusion**, I think we are safe because they won't understand what the hell we're talking about."

**ANSWER:**  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 143 and therefore denies those allegations in Paragraph 143.

144.   In October 2018, Nik Adams, Director of Sales at WMBD (Nexstar) told a Katz employee "Yesterday I was on a rant... the industry needs to reset. Agencies can't demand negotiated lower rates, ask for Added Value and also demand under delivery. Of course, she [sic] the industry get together and agree on how to change another lawsuit would be filed about **collusion**."

**ANSWER:**  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 144 and therefore denies those allegations in Paragraph 144.

f.   *Defendants' Internal Policies Define Anticompetitive Conduct and Prohibit Conduct Alleged in This Complaint*

145.   Following the final judgment in the DOJ action, Sinclair issued a new set of Antitrust Compliance Guidelines prohibiting the discussion or exchange of "any information that is competitively sensitive from competitors, directly or indirectly." In that document, Sinclair defined "**Competitively Sensitive Information**" as including:

   a.   "current rate cards of your station;"

   b.   "current rate cards of another station in the same DMA not owned or operated by Sinclair;"

c. "Your station's (or another station's stations in the same DMA not owned or operated by Sinclair) booked revenue or market share for the current quarter;"

d. "Your station's (or another station's stations in the same DMA not owned or operated by Sinclair) Q4 pacing figures versus last year's Q4;

e. Reports that are customized or confidential to a particular Station or station group, including paid subscriptions."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 145 and therefore denies those allegations in Paragraph 145.

146. When describing "Types of Agreements to Restrain Trade," Sinclair's Antitrust Compliance Guidelines state that "the word 'agreement' is used in its broadest sense. It is not limited to a written contract. It may, in fact, be a tacit understanding under which two parties have accepted a common approach or plan. An illegal agreement may be found to exist where competitors merely discuss generally their practices regarding rates and then subsequently adopt parallel prices."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 146 and therefore denies those allegations in Paragraph 146.

147. It also included Illustrative Examples:

| Example #1 | |
|---|---|
| A Sinclair station employee meets up with a friend who works at another station in the same DMA. The friend is looking forward to higher commissions because her station's advertising revenue is "pacing" over 25% ahead as compared to the same month last year.<br><br>The Sinclair employee knows its station's advertising revenues are also higher than they were for the same month last year. The Sinclair employee then uses the competitor's pacing information to affect its negotiation with customer. | |
| Consequence | ➤ This course of action is a communication of Competitively Sensitive Information in violation of these guidelines and the Final Judgment<br>➤ Note that a violation of the Final Judgment occurs whether or not the Sinclair employee uses the competitor's pacing information. The exchange of the information alone is a violation of the Final Judgment. |
| Proper Course of Action | ➤ The Sinclair employee should have cut off the conversation with her friend and reported it to Sinclair's Antitrust Compliance Officer. |

| Example #4 | |
|---|---|
| A station General Manager is nervous about the upcoming Miller Kaplan audit report. During lunch with the station's national sales representative, the General Manager says, "It would be nice to know how we're doing before the Miller Kaplan report comes out." After lunch, the national sales representative emails the General Manager a spreadsheet showing the national sales pacing for the stations in the DMA, saying, "I made some calls and hope this helps (but you didn't hear it from me)!" | |
| Consequence | ➤ The national sales representative's email is a communication of Competitively Sensitive Information.<br>➤ The General Manager's comments at lunch "encouraged" the exchange of the Competitively Sensitive Information in violation of these guidelines and the Final Judgment. |
| Proper Course of Action | ➤ The Sinclair General Manager should have exercised caution during the lunch and not implied that the national sales representative should share other stations' pacing information.<br>➤ The General Manager should report the exchange to the Antitrust Compliance Officer and preserve the email. |

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 147 and therefore denies those allegations in Paragraph 147.

148. The policy further instructed employees: "DON'T discuss prices, coordinate or collaborate with competitors on price terms, price, bids, sales volumes, customers, inventory, strategy, revenues, pacing and/or market shares..."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 148 and therefore denies those allegations in Paragraph 148.

149. Additionally, Sinclair stressed to its employees that "it is extremely important not to discuss any element of our business with representatives of any other media company," including "business, specific clients, rates, or strategies with [Sinclair's] competitors" and that any such conversations "can be construed as collusion which is a large hot button for the Department of Justice."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 149 and therefore denies those allegations in Paragraph 149.

150. Scripps had an Antitrust Compliance Policy approved on September 15, 2010 that stated:

    a. "Any agreement or understanding with a competitor that unreasonably restrains competition is illegal under the antitrust laws. Many such agreements with competitors, including price-fixing, market divisions, customer allocations, boycotts, or other agreements that limit the ways in which companies compete with each other, are illegal per se."

    b. "Per se unlawfulness means that such agreements are automatically illegal, regardless of their actual effect on competition, because decades of judicial experience have created a conclusive presumption that such agreements hurt competition and have no countervailing benefits. The Supreme Court has described such agreements as the 'supreme evil of antitrust.'"

    c. "Price fixing refers to agreements between or among competitors that affect any aspect of the prices that they charge, including list or rate card prices, discounts, rebates, promotions, or the availability or extent of credit to customers...."

     d.    "Unlawful agreements need not be in writing or expressly stated; they can be oral and can be inferred from circumstantial evidence, such as meetings or other communications among competitors that are then followed by suspicious conduct. Any such agreements would expose Scripps and the responsible employees to potential criminal prosecution and to civil liability."

     e.    "Scripps employees therefore must not discuss or agree with any competitor, actual or potential, the prices at which Scripps or the competitor sells or intends to sell its services or products, including any factors that affect those prices. Scripps employees also must not discuss or agree with any competitor any other terms or conditions of sale, including (for example) the number or nature of promotional programs, or any other aspect of how Scripps the competitor compete with each other for sales."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 150 and therefore denies those allegations in

Paragraph 150.

    151.  That same Scripps policy stated that "[i]n order to avoid any communications or contacts with any of Scripps competitors which could in any way be interpreted as an implied agreement or understanding, Scripps employees should strictly comply with the following rules:

     a.    "Do not discuss with or communicate to any competitor any present, past, or future price or any other term or condition of sale of any Scripps service or product."

     b.    "Do not make available to any competitor any past, present, or future rate card, price list, price quote, discount, rebate, or promotion schedule, or any other material that has been used or may be used by Scripps in establishing prices.

     c.    "Do not request or accept such information or materials from a competitor, even if the competitor offers it...."

     d.    "Generally avoid any contacts or communications with competitors relating in any way to the business operations of Scripps or the competitors...."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 151 and therefore denies those allegations in

Paragraph 151.

    152.  That same Scripps policy also stated:

Agreements or understandings involving price. Price-fixing agreements are the most frequently criminally prosecuted type of antitrust violation. Such agreements are unlawful, and potentially criminal, regardless of the form they take or the claimed justification for them. Price-fixing agreements are illegal even if they have no actual effect on competition, and even if they are never put into practice; the agreement itself is the violation.

It does not matter that the agreement or understanding reached seems to the parties to have a reasonable purpose, such as to "stabilize irrational pricing," avoid a "price war," maintain "reasonable prices" or an "orderly market," or to enable the parties to avoid losses or achieve a "fair profit." It also does not matter whether a price-fixing agreement results in raising, lowering, or stabilizing prices, or indeed, whether the agreement has any ultimate effect on prices at all. It also does not matter that the agreement only partly eliminates or reduces competition among the parties. Agreements or understandings among competitors as to prices and terms on which products are bought can be as illegal as those involving how products are sold. (The antitrust laws, however, do not forbid group purchasing organizations, such as the newsprint buying groups long used by newspaper companies.)

Scripps employees should not communicate with competitors concerning prices or any of the price-related subjects discussed above. Every communication, oral or written, with a competitor's representative should have a clearly lawful purpose. If the communication is in writing, that lawful purpose should be readily apparent on its face. Ambiguous statements that suggest an understanding with competitors should be carefully avoided. The

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 152 and therefore denies those allegations in

Paragraph 152.


153. On March 13, 2013, a Fox employee advised that "Please remember that it is against company policy to discuss competitive information on the station or market with competing organizations. We have a non-collusion policy that is very strict."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 153 and therefore denies those allegations in

Paragraph 153.

154. On March 11, 2014, a Fox Sales Meeting Agenda advised, "We cannot divulge the status of the station, rates, a buy or share %, programming, strategy and any related info. Collusion can be a reason for termination."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 154 and therefore denies those allegations in

Paragraph 154.

155. Tribune, in its 2018 Code of Ethics, directly addressed "Gathering information about our competitors in an ethical manner." It cautioned employees to "MAKE SURE YOU"

a.  "Never contact a competitor regarding their confidential information;"

b. "Do not induce or receive confidential information of other companies;"

c. "Never share the Company's competitively sensitive information with a competitor of the Company;" and

d. "Never share competitively sensitive information of business partners or other third parties with their competitors."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 155 and therefore denies those allegations in Paragraph 155.

156. Tribune's Code of Ethics also advised that employees to "WATCH OUT FOR:"

a. "Temptations to engage in informal conversations with competitors about competitively sensitive information. A conversation may be a breach of competition law whether it is formal or informal."

b. "Conversations with competitors that could be perceived as limiting competition. If such a conversation begins, leave the meeting immediately and report it to the Law Department."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 156 and therefore denies those allegations in Paragraph 156.

157. Tribune's Code of Ethics also included this example:



**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 157 and therefore denies those allegations in Paragraph 157.

158. Tribune's Code of Ethics also said the following activities are red flags and should be avoided and reported to your supervisor, the Human Resources Department, the Law Department or Internal Audit:

> a. "COLLUSION: when companies secretly communicate or agree on how they compete. This could include agreements of exchanges information on pricing, terms, wages, or allocations of markets."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 158 and therefore denies those allegations in Paragraph 158.

159. In its "Human Resources Handbook," Meredith states:

> a. "No employee should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other intentional unfair-dealing practice."
>
> b. "Employees must maintain the confidentiality of confidential information entrusted to them by the Company or its customers, employees, and business partners... Confidential information includes all nonpublic information that might be of use to competitors, or harmful to the Company or its customers, if disclosed..."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 159 and therefore denies those allegations in Paragraph 159.

**B. The Department of Justice Investigation and Requirement for Injunctive Relief Underscore the Conclusion That the Defendants Violated Section 1 of the Sherman Act**

160. Much of the conduct in the foregoing section was investigated by the DOJ in a probe that was first publicly reported in July of 2018.

**ANSWER:** TEGNA admits that a DOJ investigation was publicly reported in July of 2018 and refers to the cited report for its content. TEGNA denies the remaining allegations in Paragraph 160.

161. On November 13, 2018, December 13, 2018, and June 17, 2019, the DOJ filed complaints, which stated that "Defendants' agreements are restraints of trade that are unlawful under Section 1 of the Sherman Act."

**ANSWER:** TEGNA admits that the DOJ filed complaints on November 13, 2018, December 13, 2018, and June 17, 2019, and that the complaints contain the quoted language referred to in Paragraph 161. TEGNA denies the remaining allegations in Paragraph 161.

162. The DOJ also filed the Judgments and the Statement as to all Defendants except for Gray TV (after these dates, Gray TV finalized its acquisition of Raycom, which was implicated in the DOJ filings) and Katz for violating Section 1 through "concerted action between horizontal competitors in the broadcast television spot advertising market," describing the offense as having had anticompetitive effects by "disrupting the normal mechanisms for negotiating and setting prices and harming the competitive process," and that the "offense [was] likely to continue and recur unless the requested relief [was] granted."

**ANSWER:** TEGNA admits that the DOJ filed a Final Judgment and a Competitive Impact Statement against TEGNA and refers to the DOJ filings for their content. TEGNA denies the remaining allegations in Paragraph 162 in respect of TEGNA. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 162 and therefore denies those allegations.

163. The Judgments mandate Defendants' (less Katz, but including Gray TV, by virtue of its acquisition of Raycom, and Cox Media, by virtue of its subsidiary-parent relationship with Cox Enterprises), conduct for seven years, wherein Defendants must:

    a. refrain from sharing competitively sensitive information directly or indirectly, including information on:

        i. pricing;

        ii. pricing strategies;

        iii. pacing;

    iv.    holding capacity;

    v.    revenues; or

    vi.    market shares;

b.    establish antitrust whistleblower policies;

c.    designate Antitrust Compliance Officers responsible for implementing training and compliance programs;

d.    cooperate in the ongoing DOJ investigation; and

e.    certify annual compliance with the Judgments' terms and conditions.

**ANSWER:** TEGNA admits that DOJ's Final Judgment against TEGNA required certain conduct from TEGNA and refers to the Final Judgment for its content. TEGNA denies the remaining allegations in Paragraph 163 in respect of TEGNA. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 163 and therefore denies those allegations.

164. The injunctive relief required by the DOJ extends to all DMAs in the United States and is not limited to "certain" DMAs.

**ANSWER:** TEGNA refers to the Final Judgment for its content. TEGNA otherwise denies the allegations in Paragraph 164.

165. Both the November, December, and June DOJ complaints refer to the conduct at issue as "illegal" and "unlawful."

**ANSWER:** TEGNA admits that the DOJ complaints cited in Paragraph 165 contain the quoted word "unlawful" in Paragraph 165 and refers to the complaints for their content. TEGNA otherwise denies the allegations in Paragraph 165.

166. The Statement referred to the injunctive relief requested in the Judgments as "terminat[ing] Defendants' illegal conduct, prevent[ing] recurrence of the same or similar conduct, and ensur[ing] that Defendants establish an antitrust compliance program," thereby "putting a stop to the anticompetitive information sharing." The DOJ concluded in the Statement that this injunctive relief was "necessary in light of the extensive history of communications among rival stations that facilitated Defendants' agreements" in restraint of trade.

**ANSWER:** TEGNA admits that the DOJ Statement cited in Paragraph 166 generally contains the quoted language in Paragraph 166 and refers to the Statement for its content. TEGNA otherwise denies the allegations in Paragraph 166.

167. The then-Chief of the DOJ's Antitrust Division, Assistant Attorney General Makan Delrahim, elaborated: "The unlawful exchange of competitively sensitive information allowed these television broadcast companies to disrupt the normal competitive process of spot advertising in markets across the United States."

**ANSWER:** TEGNA admits that Assistant Attorney General Makan Delrahim of the DOJ's Antitrust Division made the quoted statement in Paragraph 167 and refers to the source for its content. TEGNA otherwise denies the allegations in Paragraph 167.

168. During the DOJ's Public Workshop on Competition in Television and Digital Advertising in May 2019, Makam Delrahim also stated that "[s]ince last November, [DOJ] ha[s] reached settlements with seven broadcast television companies who [DOJ] *alleged had colluded with their competitors* to reduce competition in the market for broadcast advertising."

**ANSWER:** TEGNA admits that Makan Delrahim made the quoted statement in Paragraph 168 during the DOJ's Public Workshop on Competition in Television and Digital Advertising in May 2019 and refers to the source for its content. TEGNA also admits that the DOJ has reached settlements with broadcast television companies including TEGNA. TEGNA otherwise denies the allegations in Paragraph 168.

169. The DOJ has been unequivocal, then, that the millions of pages of documents it reviewed contained proof of a violation of Section 1 of the Sherman Act.

**ANSWER:** TEGNA denies the allegations in Paragraph 169.

C.    **The Lack of Fines, Indictments, or Pleas is Immaterial**

170. For several reasons, the fact that the DOJ declined to prosecute criminally does nothing to undermine the plausibility of Plaintiffs' price fixing claims under the *per se* standard.

**ANSWER:** Paragraph 170 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 170.

171. First, both the 2016 DOJ and 2014 FTC guidance conclude that information exchanges are facilitating practices that can evidence a price fixing cartel. Likewise, the United States delegation to the Organization for Economic Cooperation & Development's Competition Committee in 2010 stated that "[i]nformation exchanges can be treated as circumstantial evidence of an unlawful price fixing or market allocation agreement among competitors, and in such a case are analyzed under the *per se* rule."

**ANSWER:** TEGNA admits that Paragraph 171 purports to describe the content of certain DOJ and FTC guidance and refers to the sources for their content. TEGNA also admits that the United States delegation to the Organization for Economic Cooperation & Development's Competition Committee in 2010 made the quoted statement in Paragraph 171 and refers to the source for its content. TEGNA otherwise denies the allegations in Paragraph 171.

172. Second, the priorities of the DOJ vary annually and across administrations. The DOJ's own statistics show that it allocates its resources differently from year to year. In 2018 and 2019 ***combined***, the DOJ has only filed 21 criminal antitrust complaints (7 of which relate to legacy investigations initiated by the prior administration). In 2017, the DOJ filed only 17 criminal antitrust complaints.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 172 and therefore denies those allegations.

173. Comparatively, the Antitrust Division of the DOJ filed roughly: 50 criminal complaints in 2008, 54 criminal complaints in 2009, 66 criminal complaints in 2010, 84 criminal complaints in 2011, 52 criminal complaints in 2012, 59 criminal complaints in 2013, 54 criminal complaints in 2014, 47 criminal complaints in 2015, and 32 criminal complaints in 2016.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 173 and therefore denies those allegations.

174. No inference can be drawn as to the seriousness of the legal violation at issue here from the lack of a parallel criminal prosecution; and this is particularly true in light of an apparent DOJ resource shift resulting in fewer criminal antitrust prosecutions.

**ANSWER:** TEGNA denies the allegations in Paragraph 174.

175. Moreover, the "fact that Defendants did not plead guilty to wide-ranging conduct does not limit the civil action. Relatively few defendants plead guilty to all of the charges against them, and limitations on government resources may play as much a role in the agreement as the

conduct involved." *In re Auto. Parts Antitrust Litig.,* No. 12-MD-02311, 2014 WL 4272784, at *8 (E.D. Mich. Aug. 29, 2014); *High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 664–665 (refusing to infer lack of a civil conspiracy from the government's decision not to move against certain defendants, acknowledging that the DOJ may decide to limit the scope of an investigation for numerous reasons, including differing standards of proof in a criminal case and the knowledge that the private bar "had both the desire and the resources to prosecute [the] suit").

**ANSWER:** Paragraph 175 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 175.

176. Third, the plausibility of Plaintiffs' *per se* price fixing claim is bolstered by the additional allegations in this action concerning economic evidence of cartel behavior (*infra*) and the existence of numerous "plus factors" evincing a cartel (*infra*).

**ANSWER:** Paragraph 176 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 176.

### D. The Economic Evidence—Namely, Increased Prices and Skyrocketing Revenues in the Face of Declining Demand—Supports the Existence of a Cartel

177. The sale of broadcast television spot advertising on respective television stations to advertising customers is a primary source of revenue for broadcasting companies, including Defendants.[19][20] The objective of the television station owner is to meet the needs of their advertising customers by reaching significant audiences across key demographics.

**ANSWER:** TEGNA admits that broadcasting companies can sell broadcast television spot advertising on respective local television stations to advertising customers, which is a source of revenue, and that television station owners attempt to meet the needs of their advertising customers. TEGNA otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 177 and therefore denies those allegations.

178. In a competitive market, one would expect horizontal competitors such as Defendants to compete for audience share and advertising revenue with other stations in their

---

[19]Nexstar and Sinclair's advertising revenues made up almost 50 percent of their total revenue in 2018. Tribune's "television and entertainment" advertising revenue made up roughly 65 percent of its total revenue in 2018.

respective DMAs by competing on price. This is particularly true in a market facing disruption and decreased demand. The broadcast television spot advertising market is such a market.

**ANSWER:** TEGNA admits that broadcasting companies' local television stations compete for audience share and advertising revenue with other local stations in their respective DMAs. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 178 and therefore denies those allegations.

179. The broadcast television spot advertising market has been faced with rapid change, as consumers' media time continues to shift away from traditional sources and towards digital and online mediums, such as Instagram, Netflix, Hulu, YouTube, and Facebook. Broadcast television spot advertising has been grappling with ratings erosion and viewers canceling television subscriptions in favor of, inter alia, streaming services, which, in a competitive market, should drive prices, profits, and revenues down.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 179 and therefore denies those allegations.

180. In a McKinsey 2015 Global Report, this was made clear: "Spending on media continues to shift from traditional to digital products and services at a rapid pace. By 2019, we believe digital spending will account for more than 50 percent of overall media spend. Within this, the digital video spending will overtake physical spending by 2018, two years earlier than we had previously forecast. Digital, consisting of Internet and mobile advertising, will become the largest advertising category by 2017, surpassing TV one year earlier than forecast, and mobile will more than double its share of the digital ad market."[20][21]

**ANSWER:** TEGNA admits that a McKinsey 2015 report contains the quoted language in Paragraph 180 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 180 and denies those allegations.

181. The number of persons who actually view television advertising has also been dwindling. The McKinsey report also states that "[a]s digital media gains ground, advertisers are increasingly accepting the validity and persuasiveness of advertising on these media, moving away from the typically high cost-per-thousand (CPM) traditional media to less expensive, low-

---

[20]While demand continues to decline, these projections turned out to be incorrect, as BIA Advisory Services showed that digital advertising spend had not surpassed television advertising spend as of the end of 2018 and is not projected to do so through at least 2023. *See* Section VIII.B., *infra*.

CPM Internet and mobile advertising—further accelerating the shift of analog dollars to digital." Those who consume television advertising are also declining: the rise of "cord cutters" and "cord nevers" continues to grow. In fact, eMarketer estimates that traditional television viewers will drop 2.4 percent (or by roughly 5 million people) by the end of 2018, while the cord-cutter and cord-never populations will grow by a total of 15 percent (or by almost 7 million people) this year. This impacts where advertisers spend their dollars, and a decreased demand for television advertising. The report opined that television's command over the United States advertising revenues has given way to digital, which in 2015 was expected in to bring in nearly half of all ad revenue in 2018—although digital advertising spend fell far short of this projection.





Share of estimated total US media spending, by media

| | 2017 | 2018 |
|---|---|---|
| Digital | 44% | 49% |
| TV | 34 | 32 |
| Print | 11 | 9 |
| Radio | 7 | 7 |
| Out-of-home | 4 | 4 |
| Directories | 1 | 1 |

**ANSWER:** TEGNA admits that a McKinsey 2015 report generally contains the quoted language in the second sentence of Paragraph 181 and refers to the source for its content. TEGNA refers to the chart in Paragraph 181 for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 181 and therefore denies those allegations

182. As depicted in Figure 1, from 2008 to 2016, viewership for morning news, early local evening news, and local late-night news has fallen 13, 18, and 29 percent, respectively. **Figure 1: Local News Viewership Has Declined**



**ANSWER:** TEGNA refers to the chart in Paragraph 182 for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 182 and therefore denies those allegations.

183. In light of these challenges, the broadcast television spot advertising market has not responded to declining demand in the way one would expect a competitive market to respond (*i.e.*, by lowering price to compete for and preserve market share); instead, it exhibits indicia of cartel activity, including *increased* prices and *increased* revenues.

**ANSWER:** TEGNA denies the allegations in Paragraph 183.

184. As depicted in Figures 2.a through 2.k, all but one of the Defendants' percent gains in over the air ("OTA") revenue have outpaced the market as a whole, which *lost 2 percent in revenue* over that same time period. All but one Defendant outpaced the industry over this time period, some by as much as 97 percent, 164 percent, and 218 percent. The sole Defendant that failed to outpace the industry, Fox, was also the only Defendant that was *selling* broadcast stations (and their attendant revenue streams) during the relevant period.

**Figure 2.a to 2.k:[21]**
**Most Defendants' Broadcast Spot Ad Revenues Have Outpaced the Industry**

**Figure 2.a (CBS)**

---

[21]Data for Dreamcatcher is only available from 2013 through 2016. Over that period, Dreamcatcher's revenue increased by 17%.



**Figure 2.b (Cox)**



**Figure 2.c (Fox)**



**Figure 2.d (Griffin)**



**Figure 2.e (Meredith)**



**Figure 2.f (Nexstar)**



**Figure 2.g (Raycom)**



**Figure 2.h (Scripps)**



**Figure 2.i (Sinclair)**



**Figure 2.j (TEGNA)**



**Figure 2.k (Tribune)**



**ANSWER:** TEGNA refers to the charts in Paragraph 184 for their content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 184 and therefore denies those allegations.

185. Figures 3.a, 3.b., and 3.c show that beginning in the first quarter of 2014 (the beginning of the conduct period identified by the DOJ and the Class Period here), broadcast television spot advertising price levels rose dramatically from their immediately preceding years.[22] Figures 3.a through 3.c include data on the Top 100 DMAs. Of the Top 100 DMAs reflected in Figures 3.a through 3.c, 92 are among the multi-defendant DMAs identified in Appendix A, representing 96 percent of households in the Top 100 DMAs. The Broadcaster Defendants are a collective of the largest broadcast station owners and operators in the nation and are thus the primary drivers of the price movement reflected in Figures 3.a through 3.c.

**Figure 3.a: Defendants' Conduct Has Caused
Broadcast Television Spot Advertising Prices to Rise (Early News)**



---

[22]Broadcast television spot advertising is priced on a cost per thousand ("CPM") basis, which is the cost for an advertisement per 1,000 viewers, or a cost per point ("CPP") basis, which is the cost to reach one percent of television households in a specified area.

**Figure 3.b: Defendants' Conduct Has Caused
Broadcast Television Spot Advertising Prices to Rise (Late News)**



**Figure 3.c: Defendants' Conduct Has Caused
Broadcast Television Spot Advertising Prices to Rise (Primetime)**



**ANSWER:** TEGNA refers to the charts in Paragraph 185 for their content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth of falsity of the remaining allegations in Paragraph 185 and therefore denies those allegations. TEGNA denies the allegations contained in Appendix A.

186. Finally, Figure 4 shows a commensurate jump in the Broadcaster Defendants' revenues at the start of the Class Period in 2014. This is not how a competitive market responds to *declining* viewership and *declining* demand; these effects would only be expected in a cartelized market not subject to normal competitive forces.

**Figure 4: Defendants' Conduct Caused The Broadcaster Defendants' Revenues to Rise**



**ANSWER:**  TEGNA refers to the chart in Paragraph 186 for its content.  TEGNA lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations in Paragraph 186 and therefore denies those allegations.

**VII.    DEFENDANTS EXERCISED MARKET POWER AND THEIR CONDUCT HAD
ANTICOMPETITIVE EFFECTS IN A RELEVANT ANTITRUST MARKET**

187.   Defendants' price fixing agreement is unlawful under the *per se* standard, while the
information exchange that facilitated the cartel is either unlawful *per se*, or alternatively is
unlawful under either a quick look[23][24] or full-fledged rule of reason analysis.

**ANSWER:**  TEGNA denies the allegations in Paragraph 187.

188.   Under the *per se* standard, and additionally where, as here, there are demonstrable
anticompetitive effects, a relevant product and geographic market need not be defined.

---

[23]"Quick look" is an abbreviated version of the rule of reason analysis, where the Court does not
need to conduct analysis of the market to show anticompetitive effects, but rather must only
show a form of market injury to the Plaintiffs and members of the Class.

**ANSWER:**  Paragraph 188 states legal conclusions to which no response is required.  To the extent a response is required, TEGNA denies the allegations in Paragraph 188.

189.  Should a relevant product market need to be defined in this action, it is the sale of broadcast television spot advertising on broadcast television stations.

**ANSWER:**  Paragraph 189 states legal conclusions to which no response is required.  To the extent a response is required, TEGNA denies the allegations in Paragraph 189.

190.  Should geographic markets need to be defined in this action, they are each individual, specific DMA in which two or more Broadcaster Defendants purportedly compete, identified in Appendix A.

**ANSWER:**  Paragraph 190 states legal conclusions to which no response is required.  To the extent a response is required, TEGNA denies the allegations in Paragraph 190 and in Appendix A.

191.  The broadcast television spot advertising landscape in the United States is comprised of parent companies like the Broadcaster Defendants that own and operate dozens of television stations. These stations carry programming distributed through their broadcast platforms, provided by third-party networks and syndicators, news stations, their own networks, and other original programming.

**ANSWER:**  TEGNA admits that Broadcaster Defendants own and operate dozens of television stations and that these stations carry programming distributed through various means. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 191 and therefore denies those allegations.

192.  Industry analysts and government regulators have consistently recognized that digital media advertising and other forms of advertising are not effective substitutes for broadcast television spot advertising.

**ANSWER:**  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 192 and therefore denies those allegations.

193.  Broadcast television spot advertising combines sight, sound, and motion that appeal to viewers and attract their attention in ways that other advertising mediums do not.

76

**ANSWER:** TEGNA admits that broadcast television spot advertising has sight, sound, and motion, and that it could appeal to viewers, TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 193 and therefore denies those allegations.

194. Radio, newspaper, billboard, and direct-mail advertising do not combine sight, sound, and motion, and consequently lack broadcast television spot advertising's ability to capture consumers with emotive storytelling. They also do not reach as many viewers as broadcast television spot advertising and so cannot drive brand awareness to the same extent as broadcast television spot advertising.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 194 and therefore denies those allegations.

195. Most forms of digital and Internet advertising (such as search page and website banner advertisements) lack the combination of sight, sound, and motion that characterize broadcast spot television advertising, and even those online video advertisements that do include that combination face prohibitive challenges in that they can be skipped, minimized, or blocked by computer programs. Digital advertising also serves a different purpose, targeting narrow demographic subsets of a population and seeking to generate an immediate response (in the form of a click through or purchase), while broadcast television spot advertising reaches the largest population of any form of advertising in a DMA (including but not limited to radio, e-mails, social media, the Internet, cable television spot advertising, and streaming services), making it particularly effective for promoting brand awareness in a lasting way.

**ANSWER:** TEGNA admits that broadcast television spot advertising reaches a large population and is effective for promoting brand awareness. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 195 and therefore denies those allegations.

196. Advertisers want to advertise on broadcast stations (as opposed to cable stations and digital mediums) because broadcast stations offer popular programming such as local news, sports, and primetime and syndicated shows that are especially attractive in reaching a broad demographic base and a large audience of viewers.

**ANSWER:** TEGNA admits that broadcast stations offer popular programming that are attractive in reaching a broad demographic base and a large audience of viewers. TEGNA lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations in Paragraph 196 and therefore denies those allegations.

197.  Cable television spot advertising reaches far fewer television households within a DMA, is limited in supply, and generally encompasses more specialized programs that appeal to niche audiences. Comparatively, broadcast television spot advertising can be viewed by anyone with a traditional cable package (which includes major broadcast stations like ABC, CBS, Fox, and NBC and their affiliated networks in addition to cable channels), people who stream their television through the internet on services like Hulu (which almost ubiquitously carry the local affiliates of the major broadcast stations), and can be viewed by anyone with an antenna, for free.

**ANSWER:**  TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 197 and therefore denies those allegations.

198.  With respect to digital advertising, in a 2011 review of top traditional and online advertising agencies, 24 of the top 25 online agencies did not offer television advertising services in-house and, similarly, 24 of the 25 top traditional advertising agencies did not offer search advertising in-house. This implies that clients for these two advertising verticals do not see the other as interchangeable or substitutable, but rather as complementary products (*i.e.*, advertisers need to purchase both to reach as many potential consumers as possible).

**ANSWER:**  To the extent that Paragraph 198 states legal conclusions, no response is

required, and to the extent any response is required, TEGNA denies those allegations in

Paragraph 198.  TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the remaining allegations in Paragraph 198 and therefore denies those

allegations.

199.  Indeed, Mark Lieberman, President and CEO of Viamedia, the nation's largest cross-media advertising company that offers advertising solutions through both television and digital media stated in May 2019 that:

> We're going to be talking a lot today about TV and digital, and from my standpoint, ***TV and digital are not equal***, and they are not yet considered a holistic buy, for a few reasons, one is . . . television provides a ***brand safe environment***, . . . second is that the [advertising] agencies actually have different buyers [for digital and television], . . . fourth . . . there is no connective tissue between the digital world, digital ad tech . . . and tv ad tech . . . [as to] ***measurement***, there is no unified cross-media measurement platform [to assess how TV advertising is performing versus digital], and lastly, when it comes to privacy . . . there is a privacy

paradox [with digital advertising] . . . regulation [of digital data]
will inhibit the use of [digital] data to hit [advertising targets].

**ANSWER:** TEGNA admits the cited source generally contains the quoted language in

Paragraph 199 and refers to the source for its content. TEGNA otherwise lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the remaining allegations in

Paragraph 199 and therefore denies those allegations.

200. Mark Lieberman therefore concluded that he views digital advertising "as a
complement, not a substitute," to television advertising.

**ANSWER:** TEGNA admits the cited source generally contains the quoted language in

Paragraph 200 and refers to the source for its content. TEGNA otherwise lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the remaining allegations in

Paragraph 200 and therefore denies those allegations.

201. As to "measurement," while audience size and other performance for broadcast
television spot advertising is measured by neutral third parties, such as Nielsen, for digital media,
"impressions," "views," and other digital media performance is measured by the self-interested
advertisement sellers themselves and often there are invalid, inaccurate, or outright fraudulent
reporting of impressions, clicks, and other metrics.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 201 and therefore denies those allegations.

202. Marc Pritchard, Chief Brand Officer at Procter & Gamble, stated in May 2019 that
digital advertising has a "dark side," including "outright fraud," where advertisers cannot tell if
digital advertisers are being viewed by a human or a fraudulent robot application, or "bot."

**ANSWER:** TEGNA refers to the cited source for its content. TEGNA otherwise lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations in Paragraph 202 and therefore denies those allegations.

203. As to "brand safety," while most television programming is "safe" for brands—it
is not unsavory, salacious, pornographic, or ideologically or politically charged and so unlikely
to associate the brand with divisive or detrimental content or imagery—digital advertisements
can and often do end up on websites, social media pages, or other digital media outlets that are

not "safe," either because they are politically charged and so may divide a consumer base, are pornographic or otherwise contain offensive imagery, or are otherwise inappropriate contexts.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 203 and therefore denies those allegations.

204. Marc Pritchard elaborated on the brand safety issue, noting that some of his digital advertisements had appeared in "unacceptable graphic and horrible content," including "***ISIS terrorist training videos***." This can obviously endanger a brand.

**ANSWER:** TEGNA admits the cited source generally contains the quoted language in

Paragraph 204 and refers to the source for its content. TEGNA otherwise lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the remaining allegations in

Paragraph 204 and therefore denies those allegations.

205. Additionally, "ad blocking" applications can automatically prevent a consumer from viewing a digital advertisement, while avoiding a broadcast television spot advertisement requires that a viewer take affirmative action (e.g., change the channel, leave the room) to avoid viewing a broadcast television spot advertisement.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 205 and therefore denies those allegations.

206. Finally, more broadcast television spot advertisements are actually viewed to their completion than digital advertisements. When a pop-up advertisement or other digital advertisement is played, many people immediately close the unwanted distraction after just a few seconds have passed, with the digital advertisement often playing only as long as it takes the consumer to find the "close" box. Marc Pritchard noted that the "average view time for a social media ad is 1.7 seconds" and that "it's kinda hard to get a message across in 1.7 seconds."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 206 and therefore denies those allegations.

207. As compared to cable, broadcast television spot advertisements typically penetrate about 90 percent of the households in a DMA, while cable television spot advertisements penetrate far fewer homes. A significant and growing number of television households do not even subscribe to a traditional cable provider, instead receiving broadcast television signals over the air for free. In households that subscribe to cable television, the package they receive almost always includes all broadcast channels, but often excludes many cable channels. As a result, some cable television spot advertisements cannot be seen even by households with cable.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 207 and therefore denies those allegations.

208. Additionally, broadcast television spot advertisement is much more appealing than cable television spot advertising, because most advertisers are looking to capture a wide audience and broadcast programming has broader appeal to viewers. A broadcast spot reaches more viewers with more ratings points than a single spot on a cable channel. Cable audiences are fragmented across numerous stations that cater to niche populations, and thus advertisers looking to reach a large share of a DMA cannot do so through cable television spot advertisements.

**ANSWER:** TEGNA admits that broadcast programming has a broad appeal to viewers.

TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of

the remaining allegations in Paragraph 208 and therefore denies those allegations.

209. Finally, broadcast stations have a larger advertising inventory than cable stations. Due to the limited inventory and lower ratings associated with cable spot advertising, cable providers cannot offer the same volume of ratings points or broad enough household penetration to match broadcast television spot advertising.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 209 and therefore denies those allegations.

210. Because of these factors, advertisers are not likely to respond to a small but significant increase in the prices charged for broadcast television spot advertising in a given DMA by switching to other forms of media in large enough numbers to make that price increase unprofitable. Accordingly, other forms of advertising are not a substitute for broadcast television spot advertising. Conversely, broadcast television stations *are* generally substitutable for one another. If a broadcast station suffers a blackout in a given DMA, viewers are likely to turn to another such station in the DMA to watch similar content, such as sports, primetime shows, local news, movies, and/or weather.

**ANSWER:** To the extent that Paragraph 210 states legal conclusions, no response is

required, and to the extent any response is required, TEGNA denies those allegations in

Paragraph 210. TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the remaining allegations in Paragraph 210 and therefore denies those

allegations.

211. In 2013 the DOJ stated that it "has repeatedly concluded that the purchase of broadcast television spot advertising constitutes a relevant antitrust market because advertisers

view spot advertising on broadcast television stations as sufficiently distinct from advertising on other media." The DOJ similarly stated that it has "repeatedly concluded that the purchase of broadcast television spot advertising constitutes a relevant market because advertisers view spot advertising on broadcast television stations as sufficiently distinct from other forms of media (such as radio and newspapers)."

**ANSWER:** TEGNA refers to the cited sources for their content. To the extent that

Paragraph 211 states legal conclusions, no response is required, and to the extent any response

is required, TEGNA denies those allegations in Paragraph 211. TEGNA denies the remaining

allegations in Paragraph 211.

212. For example, in a 2014 enforcement action, the DOJ explained that the proper relevant antitrust market was broadcast television spot advertising and that the market excluded all other forms of advertising, including "radio," "billboards," "newspaper," as well as "cable or satellite television." The DOJ noted in that action that cable and satellite television was not "a desirable substitute for broadcast television spot advertising for two important reasons." First, the DOJ noted that they do not have the same "reach" as broadcast television advertising, which reaches "90% of homes in a DMA." Second, the DOJ noted that because subscription services can offer over 100 channels, they fragment the audience into small demographic segments, so that broadcast television spot advertising "has higher ratings points than subscription programming," and so is "viewed as providing a much easier and more efficient means for an advertiser to reach a high proportion of its target demographic." Thus, the DOJ has consistently concluded in its regulatory actions that these advertising outlets are "not [] a substitute for broadcast television spot advertising, but rather as a supplement [*i.e.*, a complement]." In that action, the DOJ extended this analysis to "online video distributors, such as Netflix and Hulu."

**ANSWER:** TEGNA admits that Paragraph 212 purports to describe a 2014 enforcement

action by the DOJ and refers to the source for its content. To the extent that Paragraph 212 states

legal conclusions, no response is required, and to the extent any response is required, TEGNA

denies those allegations in Paragraph 212. TEGNA denies the remaining allegations in

Paragraph 212.

213. Indeed, as recently as *July 31, 2019*, the DOJ has maintained its firm and oft-repeated stance, consistently adopted by the courts overseeing DOJ regulatory actions, that broadcast television spot advertising is a properly drawn relevant antitrust market that excludes all other forms of advertising.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations regarding the DOJ's stance in Paragraph 213 and therefore

denies those allegations. Paragraph 213 otherwise states legal conclusions to which no response is required. To the extent any response is required, TEGNA denies those allegations in Paragraph 213.

214. On average, the Broadcaster Defendants held 60 percent, and as high as 100 percent, market share in the multi-defendant DMAs listed in Appendix A (measured as of 2017 data, and including Raycom's, but not Gray TV's, commerce).

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 214 and therefore denies those allegations. TEGNA denies the allegations contained in Appendix A.

215. Defendants' conduct alleged herein has caused injury to Plaintiffs and the Class members in the form of having paid overcharges (*i.e.*, artificially inflated prices) for broadcast television spot advertising. This is injury is of the type that the antitrust laws were meant to deter, punish, and prevent. As shown in Figure 1, Figures 3.a to 3.c, and Figure 4, at the onset of the conduct period identified by the DOJ (the start of the Class Period here), the Broadcaster Defendants' prices and revenues have spiked in the face of *declining* demand. And Figures 2.a to 2.k show that the Broadcaster Defendants' revenues have outpaced their non-colluding rivals.

**ANSWER:** TEGNA refers to the charts cited in Paragraph 215 for their content. TEGNA denies the remaining allegations in Paragraph 215.

216. Moreover, the economic literature (discussed *supra*, in Section V.A.2) is clear that the conduct and market outcomes observed here evince cartel behavior, lead to anticompetitive harm, and cause a reduction in consumer welfare.

**ANSWER:** TEGNA refers to the economic literature cited in Paragraph 216 for their content. Paragraph 216 otherwise states legal conclusions to which no response is required. To the extent any response is required, TEGNA denies those allegations in Paragraph 216.

## VIII. "PLUS FACTORS" FURTHER EVINCE THE EXISTENCE OF DEFENDANTS' *PER SE* UNLAWFUL PRICE FIXING CARTEL

217. Prominent legal and economic antitrust scholars studying collusive behavior have developed the concept of "plus factors," which are "economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." They refer to the plus factors that provide the most probative value and "those that lead to a strong inference of explicit collusion as 'super plus factors.'"

**ANSWER:** Paragraph 217 states legal conclusions to which no response is required. To the extent any response is required, TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 217 and therefore denies those allegations.

218. Here, plus factors plausibly inferring the existence of a *per se* illegal cartel include: the defendants' exchange of competitively sensitive information, a motive to conspire, actions and conduct that would be against the Broadcaster Defendants' unilateral self-interest in the absence of an anticompetitive agreement, opportunities and invitations to collude at trade associations and otherwise, high market concentration, and high barriers to entry.

**ANSWER:** TEGNA denies the allegations in Paragraph 218.

### A.    Defendants' Information Exchange is a "Super Plus Factor" Evincing the Existence of a *Per Se* Unlawful Price Fixing Cartel

219. One of the "super plus factors" academics enumerate addresses the reciprocal sharing of firm-specific competitively sensitive information that would normally remain private to each firm, or where: "A firm or subset of firms has knowledge of the details of another firm's transactions, production, sales, and/or inventories where the latter firm would be competitively disadvantaged by conveying that information unilaterally."

**ANSWER:** TEGNA admits the language quoted in Paragraph 219 appears in an academic article and refers to the source for its content. Paragraph 219 otherwise states legal conclusions to which no response is required. To the extent any response is required, TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 219 and therefore denies those allegations.

220. A super plus factor plausibly inferring the existence of a *per se* illegal cartel includes the information exchange detailed *supra*.

**ANSWER:** Paragraph 220 states legal conclusions to which no response is required. To the extent any response is required, TEGNA denies those allegations in Paragraph 220.

### B.    The Broadcaster Defendants' Motive to Conspire—Declining Viewership and Revenue—is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful

221.   As discussed above, overall viewership and revenue have been falling for broadcast television spot advertising. While the Broadcaster Defendants' revenues have increased tremendously (as a result of their unlawful conduct), industry revenues overall are down, the result of pressure from Internet and other media outlets as certain consumers (e.g., "cord-cutters" and "cord-nevers") elect to consume non-traditional media.

**ANSWER:**   TEGNA denies that it has engaged in any unlawful conduct alleged in this

Complaint.   TEGNA lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the remaining allegations in Paragraph 221 and therefore denies those allegations.

222.   Television viewership has declined in recent years. According to the Pew Research Center, "[s]ince 2007, the average audience for late night newscasts has declined 31 percent, while morning audience declined 12 percent and early evening audience fell 19 percent." In 2018, the Pew Research Center found that "the gap between the share of Americans who get news online and those who do so on television is narrowing," with only 50 percent of United States adults regularly getting news from television in 2017, down from 57 percent in 2016. Typically, local news is the largest source of revenue for local broadcast affiliates, comprising roughly 50 percent of total revenue. In 2016, advertising revenue for local "news-producing stations" made up 84 percent of total advertising revenue for the industry overall.

**ANSWER:**   TEGNA admits that Paragraph 222 purports to describe certain statements

made by the Pew Research Center and refers to the source for its content.   TEGNA lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the remaining

allegations in Paragraph 222 and therefore denies those allegations.

223.   Broadcast television spot advertising sales have begun to decline in the last decade. In real terms, broadcast television spot advertising industry-wide revenue reached its non-election year peak in 2011 at $16.2 billion (in 2008 dollars). It has declined every two years since then to $14.9 billion in 2017 (again, expressed in 2008 dollars), a decline of 8.25 percent. The same pattern has held for election-years: in real terms, presidential election-year real local television advertising spending fell from $20.0 billion in 2008 to $18.1 billion in 2012 to $17.6 billion in 2016, a total decline of 12.1 percent. And, for mid-term election years, real spending fell by $1.9 billion dollars (4.9 percent) from $18. billion in 2010 to $17.4 billion in 2014.

**ANSWER:**   TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 223 and therefore denies those allegations.

224.   BIA Advisory Services forecasts that local television station OTA advertising revenues will grow slower than overall local advertising, predicting a 0.6 percent compound annual growth rate ("CAGR") from 2019 to 2023, outpaced by a forecasted CAGR of over 10 percent for local mobile video and over 15 percent for local online video. BIA Advisory Services

predicts that "by 2023, local online/interactive/digital advertising revenue will be $78.2 billion, growing to nearly 48 percent of total local media advertising revenue from roughly a 37 percent share in 2018."

**ANSWER:** TEGNA refers to the cited source for its content. TEGNA otherwise lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the allegations

in Paragraph 224 and therefore denies those allegations.

225. "In a healthy economy, we're looking at no growth in advertising from traditional media companies," said Michael Nathanson, an analyst with research firm MoffettNathanson. "That's a worrying trend." The decline in television viewership is accelerating as online rivals have increased their investments in the online video advertising market, capturing almost every new advertising dollar entering the marketplace. Almost half of the growth in local video ad spending during the next five years will go to digital platforms, including local mobile video, local online video and out-of-home video, according to a 2017 study on advanced television advertising published by BIA/Kelsey industry analysts. "Television ad sales have fallen even as global advertising grows, leading research firms and analysts to predict that the business may never recover."

**ANSWER:** TEGNA admits that the cited source contains the quoted language in

Paragraph 225 and refers to the source for its content. TEGNA otherwise lacks knowledge or

information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph

225 and therefore denies those allegations.

226. Declining viewership, coupled with a relatively fixed amount of available broadcast television spot advertising time, should lead to lower prices, revenues, and profits. These factors provide a strong motivation for horizontal competitors to form and maintain a cartel, particularly in this industry, where broadcast television spot advertising makes up the majority of the Broadcaster Defendants' revenues.

**ANSWER:** TEGNA admits that broadcast television spot advertising is a source of

revenue for broadcasting companies. Paragraph 226 otherwise states legal conclusions to which

no response is required. To the extent any response is required, TEGNA denies the remaining

allegations in Paragraph 226.

227. For example, according to Sinclair's most recent Form 10-K filed with the SEC, a primary source of revenue for local television stations is "the sale of advertising inventory on . . . television stations to . . . advertising customers." However, Sinclair also concedes that "advertising revenue can vary substantially from period to period based on many factors beyond

86

[its] control." Furthermore, "[t]his volatility affects [its] operating results and may reduce [its] ability to repay indebtedness or reduce the market value of [its] securities." Sinclair specifically admits that its "operating results depend on the amount of advertising revenue [it] generate[s]." The key revenue function underscores the strong incentive to collude rather than compete, which, as alleged above and below, the Broadcaster Defendants acted upon.

**ANSWER:** TEGNA denies that TEGNA has had an "incentive to collude" or "acted upon" the purported incentive. TEGNA admits that Paragraph 227 purports to describe financial statements of Sinclair and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 227 and therefore denies those allegations.

**C.    The Broadcaster Defendants' Action Against Their Unilateral Self-Interest (Rising Prices in the Face of Declining Demand) is a Plus Factor Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

228. As discussed in the allegations above and below, the Broadcaster Defendants undertook conduct that would be economically irrational as against their unilateral economic self-interest if it was undertaken in the absence of an agreement among the Broadcaster Defendants to fix prices.

**ANSWER:** TEGNA denies the allegations in Paragraph 228.

229. Specifically, the Broadcaster Defendants—faced with declining demand that should have caused prices for broadcast television spot advertising to fall—irrationally raised their prices.

**ANSWER:** TEGNA denies the allegations in Paragraph 229.

230. In the absence of an agreement among firms to maintain high prices, raising prices in the face of declining demand is against any one firm's unilateral economic self-interest because that firm would risk losing market share as customers shift their purchases away towards lower priced rivals. A firm acting alone is uncertain how a rival will price, and so the economically rational decision is to lower prices commensurate with the declining demand to retain existing, or even to gain additional, market share.

**ANSWER:** Paragraph 230 states legal conclusions to which no response is required. To the extent any response is required, TEGNA denies the allegations in Paragraph 230.

231. However, a firm acting in concert with its rival by agreeing to maintain high prices avoids this uncertainty about competitive outcomes and can confidently maintain high prices even in the face of declining demand, knowing its rival will not undercut it and steal market share

away. That the Broadcaster Defendants raised their prices in the face of declining demand strongly suggests that they were acting in concert as a cartel, rather than unilaterally.

> **ANSWER:** TEGNA denies the allegations in Paragraph 231.

**D.    Defendants' Opportunities and Invitations to Collude are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

232.    Further supporting the plausibility of the cartel were Defendants' frequent opportunities, and apparent invitations to one another, to collude rather than compete. As the FTC notes in its Spotlight on Trade Associations, "[d]ealings among competitors that violate the law would still violate the law even if they were done through a trade association[, including] . . . control[ing] or suggest[ing] prices of members[,] . . . . [and] us[ing] information-sharing programs . . . as a disguised means of fixing prices."

> **ANSWER:** TEGNA admits that the FTC's Spotlight on Trade Associations contains the quoted language in Paragraph 232 and refers to the source for its content.  TEGNA denies the remaining allegations in Paragraph 232.

**1.    Invitations and Opportunities to Collude Through the TIP Initiative**

233.    As one example, on November 20, 2017, a group of broadcast television companies, including Nexstar, Sinclair, TEGNA, and Tribune, announced the launch of the TV Interface Practices or "TIP" Initiative, described as "an industry work group dedicated to developing standard-based interfaces to accelerate electronic advertising transactions for local TV broadcasters and their media agency partners." The TIP Initiative is intended to be national in scope. It will provide for standardized automated transactions with customers for broadcast television spot advertising that will enable Defendants to share competitively sensitive information. Nexstar's President and CEO made a public statement regarding TIP indicating that Defendants "must work together as an industry." The President and CEO of Sinclair echoed this sentiment stating that "[t]he TIP Initiative demonstrates the industry's shared commitment to working together" to grow their advertising sales. Tribune's President and CEO also indicated that through the TIP Initiative, Defendants could "actively work[] together."

> **ANSWER:** TEGNA admits that the article cited in Paragraph 233 contains the language quoted in the first sentence of that paragraph, but denies that the quoted language represents the full statements of these individuals.  More specifically, TEGNA states that Nexstar's President and CEO's full statement said: "To sustain local television's advantages across all screens and devices we must work together as an industry to create a more efficient marketplace for advertisers to access local TV inventory in a manner that is cost effective for the buyer, while

88

maintaining the integrity of our product"; Sinclair's President and CEO's full statement said: "The TIP Initiative demonstrates the industry's shared commitment to working together with technology providers and advertising partners to develop open standards-based solutions for efficient automated buying and selling of broadcast TV spot inventory"; and Tribune's President and CEO's full statement said: "By actively working together to implement standards-based open APIs and technologies, we will be able to extract efficiencies and create a platform for advertisers to more effectively access our multi-screen inventory and transact business." TEGNA refers to the cited article for its content and denies the remaining allegations in Paragraph 233.

234.   Through the TIP Initiative, Defendants thus signaled their invitation to the industry to come together and collude rather than compete, and continue to disseminate competitively sensitive information, in order to maintain industry profitability in the face of declining demand.

**ANSWER:**  TEGNA denies the allegations in Paragraph 234.

### 2.    Opportunities to Collude Through Joint Service Agreements

235.   In addition, the Broadcaster Defendants had numerous opportunities to meet and conspire with each other under the guise of legitimate business contacts and to perform acts necessary for the operation and furtherance of the cartel.

**ANSWER:**  TEGNA denies the allegations in Paragraph 235.

236.   In particular, almost 300 full-power local television stations changed hands in 2013 and many of these deals resulted in stations in the same market being separately owned on paper but operated jointly, a practice that has grown exponentially in recent years. The practice proliferated beginning in 2011, and was widespread by 2013. As of 2014, joint service agreements of one kind or another existed in at least 94 markets (almost half of the 210 local television DMAs throughout the country), and up from 55 in 2011. As of March 2019, the Broadcaster Defendants operated stations owned by different owners in 79 DMAs.

**ANSWER:**  TEGNA admits that certain individual TEGNA stations have entered into shared service agreements or similar arrangements in certain DMAs. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 236 and therefore denies those allegations.

237. Specifically, Sinclair admits that "[c]ertain of [its] stations have entered into agreements with other stations in the same market, through which [it] provide[s] programming and operating services[,] . . . sales services[,] and other non-programming operating services."

**ANSWER:** TEGNA admits the document cited in Paragraph 237 contains a sentence that in part contains the quoted language. TEGNA refers to that document all of Sinclair's public filings for their content. To the extent a response is otherwise required, TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 237 and therefore denies those allegations.

### 3. Opportunities to Collude Through the TVB Trade Association

238. Additionally, Defendants and their co-conspirators had numerous opportunities to conspire through industry associations such as the Television Bureau of Advertising, Inc. ("TVB"), the National Association of Broadcasters ("NAB"), and the Media Rating Council ("MRC"), conferences and meetings held by those associations, and merger negotiations.

**ANSWER:** TEGNA denies the allegations in Paragraph 238.

239. Cox Media, Katz, Nexstar, Sinclair, and Tribune are members of the TVB. Katz's president and Cox Media's Executive Vice President presently serve as chairpersons on TVB's Board of Directors. Nexstar's president and CEO, and TEGNA's president and CEO, are both former chairs of TVB. TVB is a "not-for-profit trade association representing America's $21 billion local broadcast television industry." The TVB is designed to bring together and encourage information sharing among employees of broadcast television companies, including Defendants, especially advertising sales representatives.

**ANSWER:** TEGNA admits that TEGNA's President and CEO was former chair of TVB. TEGNA admits that the TVB's website contains the language quoted in the fourth sentence of Paragraph 239 and refers to the website for its content. TEGNA denies the remaining allegations in Paragraph 239 in respect of TEGNA. TEGNA otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 239 and therefore denies those allegations.

### 4. Opportunities to Collude Through the NAB Trade Association

240. CBS, Cox Media, Fox, Scripps, Sinclair, TEGNA, Tribune, Meredith, and Nexstar are also members of the NAB, which describes itself as the "premier trade association for broadcasters."

**ANSWER:** TEGNA admits it is a member of NAB. TEGNA further admits the cited website contains the language quoted in Paragraph 240 and refers to the website for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 240 and therefore denies those allegations.

241. CBS' Executive Vice President, Cox Media's Executive Vice President, Fox's Senior Vice President, Scripps' President of Local Media, TEGNA's President and CEO, Nexstar's Chairman, President and CEO, Sinclair's President and CEO, Tribune's COO, and Meredith's President, all serve on the NAB Television Board of Directors.

**ANSWER:** TEGNA denies that TEGNA's President and CEO serves on the NAB television Board of Directors. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 241 and therefore denies those allegations.

242. The President of Cox Media Group, owner of Cox Reps, also serves on the NAB's Executive Committee. NAB hosts numerous meetings and other events for industry members throughout the year, which are attended by Defendants' executives.

**ANSWER:** TEGNA admits that certain of its executives have attended NAB meetings. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 242 and therefore denies those allegations.

5. **Opportunities to Collude Through the MRC Trade Association**

243. Every named Defendant and many other local television station owners are also members of the MRC.

**ANSWER:** TEGNA admits that it is a member of the MRC. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 243 and therefore denies those allegations.

244. The MRC boasts that one of the "[b]enefits of MRC [m]embership" is that "[m]embers are exposed to other members' ideas and thoughts" and that "[m]embers can attend formal education seminars" together.

**ANSWER:** TEGNA admits the website cited in Paragraph 244 contains the quoted language and refers to the website for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 244 and therefore denies those allegations.

245. These invitations and opportunities to collude served to bolster and facilitate the formation and maintenance of Defendants' price fixing cartel.

**ANSWER:** TEGNA denies the allegations in Paragraph 245.

6. **Opportunities To Collude Through the Ancient Order of Hiberanians**

246. Certain employees of Defendants are members of the Ancient Order of Hibernians in Atlanta, GA.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 246 and therefore denies those allegations.

247. Emails were sent to personnel from across the advertising industry in Atlanta, including cable, radio, broadcast tv, and sales representatives, including:

  a.   Tim Bennett, CBS/Viacom VP for Southern Region (based in Atlanta);

  b.   Sant Perez, VP/GSM of WAGA (Fox TV);

  c.   Eric Longley, VP/GSM of WAGA (Fox TV);

  d.   Mike Bramel (Katz);

  e.   Jason Morrow (Cox Reps);

  f.   John Stumpfig, Account Executive WAGA (Fox TV);

  g.   Mark Marino (Cox Reps);

  h.   Bill Cowen (Cox Reps);

  i.   Jeff Quick (Katz);

  j.   Tim McNamara, DOS of WATL/WXIA (Tegna);

k.    Thomas Canedo, GM of WUPA (CBS).

**ANSWER:**  TEGNA refers to the cited sources for their content.  TEGNA denies the remaining allegations in Paragraph 247.

248.  On January 1, 2015, Tim Bennett emailed a photo, stating "Forgive me Hibernians for I have sinned... it has been 215 days since my last chapter meeting ...."

**ANSWER:**  TEGNA admits the cited source contains the quoted language in Paragraph 248 and refers to the source for its content.  TEGNA denies the remaining allegations in Paragraph 248.

249.  On January 1, 2016, Tim Bennett sent another email stating that it is time to "congregate."

**ANSWER:**  TEGNA admits the cited source contains the quoted language in Paragraph 249 and refers to the source for its content.  TEGNA denies the remaining allegations in Paragraph 249.

250.  On August 22, 2016, Tim Bennett sent another email stating that it was "time to get the band back together."

**ANSWER:**  TEGNA admits the cited source contains the quoted language in Paragraph 250 and refers to the source for its content.  TEGNA denies the remaining allegations in Paragraph 250.

251.  One email dated June 6, 2014, described the existence of a LinkedIn group for the Ancient Order of Hibernians.

**ANSWER:**  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 251 and therefore denies those allegations.

7.    **Other Opportunities to Collude**

252.  Some employees from at least one Defendant met at a local broadcaster association. For example, a Raycom employee wrote in an email to Raycom's Vice President of Sales: "... I'm hoping somehow we can figure out a way **for all of us broadcasters to stick together**. I'm on the Idaho Broadcasters Board with 2 of the other GM's and we've had some good discussions."

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 252 and therefore denies those allegations in Paragraph 252.

253. ████████████████████████████████████████████████████

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 253 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 253 and therefore denies those allegations in Paragraph 253.

254. Some Defendants from Sinclair, Raycom, Tribune, Tegna and Fox discussed an initiative named OxMyx: "to support the Network sales efforts of SBG [Sinclair Broadcast Group] *and other broadcaster groups* teaming up with us to form the *network sales alliance* called OxMyx – a business concept both companies have been marketing since mid-2015." (emphasis added). In 2016, a meeting was hosted by Sinclair to present OxMyx to Fox, TEGNA, & Tribune. The PowerPoint prepared by Sinclair began by describing OxMyx as "**a National Advertising Alliance for the Broadcast Industry**":



A National Advertising Alliance for the Broadcast Industry

**OPPORTUNITY.**
**OPTIMIZED.**

**ANSWER:** TEGNA admits that in 2016 at least one TEGNA employee received information about an initiative named OxMyx and attended a meeting to discuss the initiative.

94

TEGNA admits the cited source contains the quoted language in Paragraph 254 and refers to the source for its content. TEGNA denies the remaining allegations in Paragraph 254.

255. That Powerpoint, for a meeting of competitors, stressed that in a "post consolidation landscape, "**COLLABORATION IS KEY**:"



**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 255 and therefore denies those allegations.

E.     **The Broadcaster Defendants' High Market Shares and High Concentration in the Broadcast Television Spot Advertising Market are Plus Factors Supporting the Existence of a Price Fixing Cartel that is *Per Se* Unlawful**

256. As shown in Appendix A and alleged above, in the DMAs in which the Broadcaster Defendants purportedly compete they consistently hold dominant shares of the market, averaging 60 percent and as high as 100 percent. Sinclair is the largest broadcast company in the nation, while Nexstar and Tribune are among the top five.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 256 and therefore denies those allegations. TEGNA denies the allegations contained in Appendix A.

257.  As of 2017, the Broadcaster Defendants in total owned 471 full-power stations, up 85 percent from 254 stations in 2008. The Broadcaster Defendants in total own 688 revenue generating stations, up over 150 percent from 268 stations in 2008. As discussed in more detail *infra*, a wave of consolidation and station purchases has made some broadcast media owners considerably larger.

**ANSWER:**  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 257 and therefore denies those allegations.

258.  A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

**ANSWER:**  Paragraph 258 states legal conclusions to which no response is required.  To the extent any response is required, TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 258 and therefore denies those allegations.

259.  In response to decreased advertisement spending, the local television industry has been consolidating in recent years. This consolidation of the industry continues "as station owners look to increase their leverage with broadcast networks, which supply much of their programming, and pay-TV distributors, which carry their channels." In 2013, "big owners of local TV stations got substantially bigger, thanks to a wave of station purchases." That wave is

reflected in the following chart taken from a 2013 report by the Pew Research Center:



**Buying binge continues for local TV companies**

*Number of local TV stations owned by each company, as reported in SEC filings*

PEW RESEARCH CENTER

**ANSWER:** TEGNA admits the cited articles contain the quoted language in the second and third sentences in Paragraph 259 and refers to the sources for their content. TEGNA refers to the chart in Paragraph 259 for its content. TEGNA denies the remaining allegations in Paragraph 259.

260. As the Pew report states:

> Many of the 290 TV station purchases in 2013 occurred as group acquisitions by some of the largest owners, building their portfolios of stations even more. The Tribune Co. emerged from bankruptcy to make the richest single deal, spending $2.73 billion to acquire 19 stations from Local TV Holdings. Gannett completed a $2.2 billion transaction to buy 17 stations from Belo Corp., almost doubling Gannett's TV holdings and giving it national reach. Twelve stations changed hands when Media General merged with New Young Broadcasting.

> Sinclair Broadcasting acquired more individual stations than any other buyer, snapping up outlets owned by locally based companies like Fisher Communications in Seattle and Allbritton Communications in Washington, D.C. The company already

97

owned the most local stations of any group; if all pending sales go through, Sinclair will own or provide services to 167 television stations in 77 markets, reaching almost 40 percent of the United States population. Nexstar Broadcasting made moves to increase its portfolio to 108 stations in 56 markets. In 37 of those markets, it will own or provides services to more than one station. Nexstar's chief executive, Perry Sook, predicted the "rolling M&A thunder" would continue throughout 2014, and it has. In March, Media General announced plans to buy LIN Media's 43 stations for $1.6 billion.

**ANSWER:** TEGNA admits the cited report contains the quoted language in Paragraph 260 and refers to the report for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 260 and therefore denies those allegations.

261. Consolidation in the industry was also fueled by the proposed acquisition of Tribune by Sinclair, announced on May 8, 2017, which would have created the largest station owner. Wary of Federal Communications Commission ("FCC") rejection of the deal, Sinclair and Tribune submitted a revised version of the merger plan to antitrust regulators, whereby Sinclair would acquire Tribune for $3.9 billion, forming a company that would own 215 broadcast television stations in 102 cities, reaching close to 60 percent of all United States television households. Sinclair and Tribune jointly have extreme market penetration, with Tribune currently reaching 43 percent of the nation's households and Sinclair reaching 38 percent of American homes.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 261 and therefore denies those allegations.

262. Indeed, analysts called the proposed merger between Sinclair and Tribune "a very transformative acquisition" that would create "a broadcaster with as close to a national footprint as you can get." Sinclair's CEO, Chris Ripley, echoed this belief, stating the combined company would reach "72 percent of United States homes across 108 markets including 39 of the top 50" and "[t]his combination creates the largest TV broadcasting company in the country."

**ANSWER:** TEGNA admits that the cited source contains the quoted language in Paragraph 262 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 262 and therefore denies those allegations.

263.   The revised merger plan could only be accomplished by selling certain television stations to reduce the number of households jointly reached by Tribune and Sinclair (which currently is over 80 percent). However, Sinclair's revised plan called for selling certain stations to friends and other parties with whom it has a business relationship, for significantly less than fair value, raising questions about whether Sinclair would actually continue to control these stations.

**ANSWER:**  TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 263 and therefore denies those allegations.

264.   The FCC expressed concerns that Sinclair did not intend to actually relinquish control over television stations that it proposed to divest in order to comply with the National TV Ownership rule, and that Sinclair had been less than candid with the FCC. Indeed, the FCC suspected that certain "'sidecar agreements' [ ] would allow Sinclair to retain control of stations without owning them." According to FCC Commissioner Michael O'Reilly, the vote to send the merger to an administrative law judge was a "de facto merger death sentence."

**ANSWER:**  TEGNA admits that the cited source contains the quoted language in

Paragraph 264 and refers to the source for its content.  TEGNA lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 264

and therefore denies those allegations.

265.   The failure of the Sinclair-Tribune merger led Nexstar to announce its intention to acquire Tribune for over $4 billion in December of 2018. As one article noted:

> The deal would make Nexstar, whose stations reach nearly 39 percent of all United States television households, the biggest operator of local TV stations in the United States.
>
> ****
>
> Tribune Media owns or operates 42 local TV stations that reach 50 million households, as well as the national network WGN. It also has a stake in the TV Food Network.
>
> Nexstar is the second-largest television station owner in the United States, with 171 outlets across the country, typically operating as affiliates with the four "major" United States television networks in small to mid-size markets. It also operates through local marketing agreement the stations owned by affiliate
>
> company Mission Broadcasting.

**ANSWER:** TEGNA admits that the cited article generally contains the quoted language in Paragraph 265 and refers to the article for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 265 and therefore denies those allegations.

266. Similarly, on June 25, 2018, as noted above, Gray TV agreed to buy Raycom in a $3.65 billion deal that would create a company that reaches nearly a quarter of United States television households. The combined company owns 142 television stations in 92 DMAs reaching 24 percent of television households and owning the third-highest number of stations.



**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 266 and therefore denies those allegations.

267. Herfindahl-Hirschman Index ("HHI") calculations further reveal industry concentration. HHI is a tool commonly employed in antitrust economics to measure market concentration. It is calculated by squaring the market share of each firm competing in a market and then summing the resulting numbers.

**ANSWER:** Paragraph 267 states legal conclusions to which no response is required. To the extent a response is required, TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 267 and therefore denies those allegations.

268. Here, the average HHI across the DMAs in which two or more Broadcaster Defendants compete is 2,213 when considering ownership of stations and 2,303 when considering operation of stations, some of which station operators do not own.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 268 and therefore denies those allegations.

269. Of the 127 DMAs in which two or more Broadcaster Defendants compete, 80 have HHI measures over 2,500 when considering ownership of stations, and 89 have HHI measures over 2,500 when considering operation of stations.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 269 and therefore denies those allegations.

270. The DOJ considers an HHI measure between 1,500 and 2,500 to be a moderately concentrated market and above 2,500 to be a highly concentrated marketplace.

**ANSWER:** Paragraph 270 states legal conclusions to which no response is required. To

the extent a response is required, TEGNA lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the allegations in Paragraph 270 and therefore denies those

allegations.

### F. High Barriers to Entry in the Broadcast Television Spot Advertising Market are a Plus Factor Supporting the Existence of a Price Fixing Cartel That is *Per Se* Unlawful

271. A collusive arrangement that raises product prices above competitive levels, under basic economic principles, would normally tend to attract new entrants seeking to benefit from the supracompetitive pricing, which in turn could erode prices. But there are significant, even prohibitive, barriers to entry in the spot television broadcasting market that prevent entry from new, non-collusive rivals and the erosion of collusively increased profits. Thus, barriers to entry help facilitate the formation and maintenance of cartels and market-allocation agreements.

**ANSWER:** TEGNA denies the allegations in Paragraph 271.

272. New entrants planning to enter into broadcasting markets typically face six critical barriers: (1) governmental policy; (2) the presence of dominant broadcasters; (3) access to content; (4) audience behavior; (5) consumer costs; and (6) capital requirements.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations in Paragraph 272 and therefore denies those allegations.

273. Governmental policy, including regulatory or administrative practices, may restrict market access. The FCC issues licenses for television stations, and an entrant would be required to petition the Commission to assign a new channel to a community.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 273 and therefore denies those allegations.

274. Responsible authorities take into account economic, as well as cultural and social, factors when issuing broadcasting licenses that may lead to distortions of competition.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 274 and therefore denies those allegations.

275. The existing dominant broadcasters usually have long-established relationships with their viewers and (most likely) also with advertisers. New entrants in the market would have to offer a better deal than the existing broadcasters in order to usurp any market share. Additionally, bigger companies have more clout to negotiate programming deals with networks or syndicators. "If you wanted a decent seat at the table talking to those guys, you had to have scale," said Barry Lucas, Senior Vice-President of Research at the investment firm Gabelli & Co. "Otherwise you were irrelevant and got pushed around."

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 275 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 275 and therefore denies those allegations.

276. A newer entrant to the market would have to invest significant capital and time in establishing itself before it could work with networks.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 276 and therefore denies those allegations.

277. Additionally, successful entry into television broadcasting markets requires access at reasonable prices to desirable programming, including production and/or acquisition from third parties. Acquisition of this content, which is critical to attract viewers, is likely to constitute a significant cost to new market players.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 277 and therefore denies those allegations.

278. Commercial broadcasters, whose operations are primarily financed through advertising fees, must establish within a short period an audience base that will also attract a sufficient number of advertisers. Therefore, in the presence of established dominant broadcasters, new entrants must provide offers attractive enough to convince viewers to alter their already existing patterns of viewing and channel choice—a task that proves to be difficult.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 278 and therefore denies those allegations.

279. Finally, it would require considerable funding, time, and technical sophistication for a potential market entrant to gain the economies of scale and audience base achieved by Defendants necessary to compete in the market for broadcast television spot advertising. Where the level of capital required is prohibitively high, it constitutes a significant barrier to entry.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 279 and therefore denies those allegations.

280. For these reasons, there has not been meaningful recent entry into the industry. Of the major local broadcast station owners, Nexstar and Raycom (recently acquired by Gray TV), are the most recent to enter the industry, both in 1996. Many of the large station owners have been in the industry since the 1940s and 1950s, including Tribune, Meredith, and Griffin.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 280 and therefore denies those allegations.

IX. **DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONDUCT THROUGH, INTER *ALIA*, PUBLIC STATEMENTS IN SECURITIES FILINGS THAT THEY AND THE MARKET WERE FUNCTIONING COMPETITIVELY**

281. Any applicable statute of limitations has been tolled by Defendants' knowing and active concealment of their unlawful conduct. Throughout the Class Period, Defendants affirmatively and fraudulently concealed their unlawful and anticompetitive conduct.

**ANSWER:** TEGNA denies the allegations in Paragraph 281.

282. Plaintiffs and the Class members did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conduct alleged herein prior to disclosure of a DOJ investigation of certain Defendants on July 26, 2018.

**ANSWER:** TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 282 and therefore denies those allegations.

283.  Further, the very nature of Defendants' conduct was secret and self-concealing. Defendants engaged in secret market manipulation that could not be detected by Plaintiffs and the Class.

**ANSWER:**  TEGNA denies the allegations in Paragraph 283.

284.  Throughout the Class Period, each of the publicly-traded Defendants made various representations in filings with the Securities and Exchange Commission ("SEC") that describe a competitive landscape in which they purport to vie for advertising revenue not only with other spot television broadcast companies, but also with numerous other entities

**ANSWER:**  TEGNA admits it made representations in filings with the SEC and refers to those filings for their content.  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations contained in Paragraph 284 and therefore denies those allegations.

285.  For example, in its Form 10-K Annual Report filed with the SEC in June 2015, Meredith stated that its "television stations compete directly for advertising dollars and programming in their respective markets with other local television stations, radio stations, cable television providers, and digital websites and mobile sites."

**ANSWER:**  To the extent the allegations contained in Paragraph 285 purport to describe the content of Meredith's form 10-K Annual Report cited in Paragraph 285, TEGNA refers to that report and all of Meredith's public filings for their content.  To the extent a response is otherwise required, TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 285 and therefore denies those allegations.

286.  Sinclair consistently claimed in its Form 10-K Annual Reports that its "television stations are located in highly competitive DMAs," while Tribune consistently listed among its main competitors the major networks and the "major broadcast television station owners," including Nexstar and Sinclair. Nexstar made similar statements in its Form 10-K Annual Reports throughout the Class Period.

**ANSWER:**  To the extent the allegations contained in Paragraph 286 purport to describe the content of financial filings cited in Paragraph 286, TEGNA refers to those cited financial filings and all of the referenced companies' public filings for their content.  To the extent a response is otherwise required, TEGNA lacks knowledge or information sufficient to form a

104

belief as to the truth or falsity of the allegations in Paragraph 286 and therefore denies those allegations.

287.   Such representations by Defendants were intentionally misleading and concealed the unlawful anticompetitive activity described herein from Class members.

**ANSWER:**  TEGNA denies the allegations in Paragraph 287.

288.   Additionally, Defendants had corporate codes of conduct that members of the Class reasonably relied on to assume that they were complying with federal antitrust laws.

**ANSWER:**  TEGNA admits that it had corporate codes of conduct and refers to the sources for their content.  To the extent that Paragraph 288 states legal conclusions, no response is required, and to the extent a response is required, TEGNA denies those allegations in Paragraph 288.  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 288 and therefore denies those allegations.

A.    **SINCLAIR**

289.   For example, Sinclair has a publicly-posted "Code of Business Conduct and Ethics" that states that "Officers, directors and employees must comply with all laws, rules and regulations applicable to them or the Corporation, including, without limitation, . . . antitrust laws[.]"

**ANSWER:**  TEGNA admits the cited source contains the quoted language in Paragraph 289 and refers to the source for its content.  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 289 and therefore denies those allegations.

B.    **NEXSTAR**

290.  Nexstar likewise has a public "Code of Business Conduct" that states:

> All employees must comply fully with the laws and regulations that apply to the Company. When the application of such laws or regulations is uncertain, employees are urged to seek the guidance and advice of the General Manager or Chief Financial Officer.

> Employees are expected to recognize this duty to society above and beyond their obligations to the Company and their personal financial interests. While the Company must compete vigorously to maximize profits, Nexstar will at the same time do so in strict compliance with all laws and regulations applicable to our activities. No employee should at any time take any action on behalf of the Company, which is known or should be known to violate any applicable law or regulation.

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 290 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 290 and therefore denies those allegations.

291. Nexstar maintains a "Code of Ethics," which was originally filed with the SEC on March 31, 2004 by Nexstar Broadcasting Group, Inc. and incorporated as an exhibit to Nexstar's Annual Report for the year ending December 31, 2003 on Form 10-K. The "Code of Ethics" states, "Each Relevant Officer owes a duty to the Company to act with integrity. . . . Specifically, each Relevant Officer must: . . . . Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices."

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 291 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 291 and therefore denies those allegations.

### C. SCRIPPS

292. Scripps has a "Company Code of Conduct" that directs employees to "not discuss pricing or price-related information with our competitors."

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 292 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 292 and therefore denies those allegations.

### D. FOX

293.  Fox maintains in its "Standard of Business Conduct" that it "is committed to fair competition" and that it "always engage[s] in fair competition in the free market, obeying all applicable antitrust and competition laws."

**ANSWER:**  TEGNA admits the cited source contains the quoted language in Paragraph

293 and refers to the source for its content.  TEGNA lacks knowledge or information sufficient

to form a belief as to the truth or falsity of the remaining allegations in Paragraph 293 and

therefore denies those allegations.

### E.  **TEGNA**

294.  TEGNA's "Ethics Policy" states that the company "is committed to the concept of fair dealings, and free, fair and open competition . . . and [a]void[s] actions that restrict freedom of competitive opportunities."

**ANSWER:**  TEGNA admits that it has an "Ethics Policy" cited in Paragraph 294 and

refers to that document for its content.

### F.  **COX**

295.  Cox Media's "Code of Conduct" details the company's purported commitment to "conduct[ing] business lawfully." The Code states:

> Cox Media Group employees should not enter into any
> agreements or arrangements with other parties (competitors,
> vendors, customers, etc.) that could illegally limit or restrict
> competition.
>
> ****
>
> Don't communicate with our competitors about "fixing" prices
> (for example, setting minimum or maximum prices) . . .
> interfering with the competitive bidding process.

**ANSWER:**  TEGNA admits the cited source contains the quoted language in Paragraph

295 and refers to the source for its content.  TEGNA lacks knowledge or information sufficient

to form a belief as to the truth or falsity of the allegations in Paragraph 295 and therefore denies

those allegations.

### G.  **KATZ**

296.   Likewise, in its "Code of Business Conduct and Ethics," iHeartMedia, Inc., Katz's parent, outlines its commitment to "competing for business fairly" and states that it "complies with competition laws wherever we do business." The Code also states that competition laws "generally forbid entering into formal or informal agreements with competitors that restrain trade, such as . . . sharing information regarding prices, terms or conditions, costs, marketing plans, customers or any other proprietary or confidential information," and warns its employees to "[b]e particularly cautious when attending trade events, seminars, or industry conferences [and] avoid conversations about competitively sensitive information with representatives of our competitors."

**ANSWER:**  TEGNA admits the cited source contains the quoted language in Paragraph 296 and refers to the source for its content.  TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 296 and therefore denies those allegations.

H.      **CBS**

297.   CBS has a lengthy "Business Conduct Statement" that lays out its responsibilities under the antitrust laws in significant detail:

> CBS seeks to excel and outperform its competition honestly and fairly. CBS seeks competitive advantages through superior performance, not from illegal or unethical business practices.
>
> The purpose of the antitrust trade and practice laws is to preserve a competitive economy in which free enterprise can flourish. CBS is committed to this principle and to full compliance with these laws in each jurisdiction within which it operates.
>
> ****
>
> CBS's policy requires that all of its prices be determined independently in light of costs, market conditions and competitive factors. Any agreement, written or unwritten, explicit or tacit, formal or informal, between competitors to fix, raise, peg, stabilize or even lower prices, or to eliminate or reduce price competition, is *per se* unlawful.
>
> ****
>
> If you participate in trade association meetings or other activities on behalf of CBS or your Company, you must be very careful to avoid even the appearance of reaching or seeking an agreement as to prices . . . including by sharing nonpublic price or market information, whether as part of "official" trade association

meetings or in less formal discussions that may occur in
conjunction with trade association activities.

**ANSWER:** TEGNA admits the cited source generally contains the quoted language in

Paragraph 297 and refers to the source for its content. TEGNA lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 297

and therefore denies those allegations.

**I.** **MEREDITH**

298. And Meredith has a "Code of Business Conduct and Ethics" that states:

> Obeying the law, both in letter and in spirit, is the foundation on
> which the Company's ethical standards are built. All employees
> must respect and obey the laws of the cities, states, and countries
> in which we operate. Although not all employees are expected to
> know the details of these laws, it is important to know enough to
> determine when to seek advice from supervisors, managers, or
> other appropriate personnel.
>
> We do not condone any act that violates the law, even when such
> action appears to be in the Company's best interest.

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph

298 and refers to the source for its content. TEGNA lacks knowledge or information sufficient

to form a belief as to the truth or falsity of the remaining allegations in Paragraph 298 and

therefore denies those allegations.

**J.** **TRIBUNE**

299. Tribune has an extensive "Code of Ethics and Business Conduct" that spells out its
obligations under the antitrust laws in great detail:

> We believe in free and open competition and never engage in
> improper practices that may limit competition and we never look
> to gain competitive advantages through unethical or illegal
> business practices, but rather through superior performance.
>
> We do not enter into agreements with competitors to engage in
>
> any anti-competitive behavior, including setting prices or dividing
> up customers, suppliers or markets.

\*\*\*\*

Also, anti-trust and fair competition laws are complex and

compliance requirements can vary depending on the circumstance, but in general, the following activities are red flags and should be avoided and reported to your supervisor, the Human Resources Department, the Law Department or Internal Audit:

COLLUSION — when companies secretly communicate or agree on how they will compete. This could include agreements or exchanges of information on pricing, terms, wages, or allocations of markets.

**ANSWER:** TEGNA admits the cited source contains the quoted language in Paragraph 299 and refers to the source for its content. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 299 and therefore denies those allegations.

300. These statements have now been demonstrated to be materially misleading; they suggest that Defendants were law-abiding companies that recognized their antitrust obligations and that Defendants and the broadcast television spot advertising market were functioning competitively.

**ANSWER:** TEGNA refers to the statements cited in Paragraph 300 for their content. Paragraph 300 otherwise states legal conclusions to which no response is required. To the extent a response required, TEGNA denies the allegations in Paragraph 300.

301. As a result of Defendants' fraudulent concealment, all applicable statutes of limitations affecting the Plaintiffs' and the Class members' claims have been tolled.

**ANSWER:** TEGNA denies the allegations in Paragraph 301.

## X.    CLASS CERTIFICATION IS APPROPRIATE HERE

302. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

All persons and entities in the United States who purchased broadcast television spot advertising from one or more

Broadcaster Defendants in a DMA within which two or more the Broadcaster Defendants sold broadcast television spot

110

advertisements on broadcast television stations and who paid one or more Broadcaster Defendants directly for all or a portion of the cost of such broadcast television spot advertisements, or any current or former subsidiary or affiliate of a Broadcaster

Defendants during the period from at least and including January 1, 2014 until the effects of the unlawful conduct are adjudged to have ceased (the "Class Period").[24]

**ANSWER:** Paragraph 302 states legal conclusions to which no response is required. To

the extent a response is required, TEGNA denies the allegations in Paragraph 302.

303. While Plaintiffs do not know the exact number of members of the Class, Plaintiffs believe the class size is numerous, and likely includes hundreds if not thousands of members.

**ANSWER:** Paragraph 303 states legal conclusions to which no response is required. To

the extent a response is required, TEGNA denies the allegations in Paragraph 303.

304. Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' unlawful anticompetitive conduct, which focuses on the conduct of Defendants, not of any particular class member, and was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

- Whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the price levels of broadcast television spot advertising time, that is *per se* illegal;

- The identity of the participants of the alleged cartel;

- The duration of the alleged cartel, and the acts carried out by Defendants and their co-conspirators in furtherance of the cartel;

- Whether the conduct alleged herein violated Section 1 of the Sherman Act; and

---

[24]Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, officers, directors, employees, assigns, successors, agents, or co-conspirators; the court, court staff, defense counsel, all respective immediate family members of these excluded entities, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

111

- Whether the conduct alleged herein caused damages to the members of the Class in the form of overcharges paid for broadcast television spot advertising and the proper measure of such overcharge damages.

**ANSWER:** Paragraph 304 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 304.

305. Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs and all members of the Class are similarly affected by Defendants' unlawful conduct in that they paid artificially inflated prices for broadcast television spot advertising time provided by the Broadcaster Defendants.

**ANSWER:** Paragraph 305 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 305.

306. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with and typical of, and not antagonistic to, those of the other members of the Class.

**ANSWER:** Paragraph 306 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 306.

307. Plaintiffs have retained counsel with substantial experience litigating complex antitrust class actions in myriad industries and courts throughout the nation.

**ANSWER:** TEGNA admits Plaintiffs have retained counsel. TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in Paragraph 307 and therefore denies those allegations.

308. The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including issues relating to liability and damages.

**ANSWER:** Paragraph 308 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 308.

309. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of

similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. Moreover, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**ANSWER:** Paragraph 309 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 309.

310. Plaintiffs know of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**ANSWER:** Paragraph 310 states legal conclusions to which no response is required. To the extent a response is required, TEGNA lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 310 and therefore denies those allegations.

### COUNT ONE
### Price Fixing in Violation of
### Section 1 of the Sherman Act (15 U.S.C. § 1)

311. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

**ANSWER:** TEGNA repeats the responses set forth above as if fully set forth herein.

312. During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy with regards to broadcast television spot advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:** TEGNA denies the allegations in Paragraph 312.

313. The contract, combination or conspiracy consisted of an agreement among the Defendants to fix, raise, stabilize or maintain at artificially high levels the prices they charged for broadcast television spot advertising in the United States.

**ANSWER:** TEGNA denies the allegations in Paragraph 313.

314. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharge damages paid for broadcast television spot advertising time purchased from the Broadcaster Defendants and their co-conspirators.

113

**ANSWER:** TEGNA denies the allegations in Paragraph 314.

315. This conduct is unlawful under the *per se* standard.

**ANSWER:** TEGNA denies the allegations in Paragraph 315.

316. Plaintiffs and members of the Class are entitled to treble damages, their attorneys' fee and costs, and an injunction against Defendants restraining the violations alleged herein.

**ANSWER:** TEGNA denies the allegations in Paragraph 316.

**COUNT TWO**
**Information Exchange in Violation of**
**Section 1 of the Sherman Act (15 U.S.C. § 1)**

317. Plaintiffs repeat the allegations set forth above as if fully set forth herein.

**ANSWER:** TEGNA repeats the responses set forth above as if fully set forth herein.

318. During the Class Period, Defendants entered into and engaged in a contract, combination, or conspiracy with regards to broadcast television spot advertising in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

**ANSWER:** TEGNA denies the allegations in Paragraph 318.

319. The contract, combination or conspiracy involved the exchange of competitively sensitive information between and among Defendants, causing anticompetitive effects without sufficient procompetitive justifications.

**ANSWER:** TEGNA denies the allegations in Paragraph 319.

320. Plaintiffs and members of the Class have been injured and will continue to be injured in the form of overcharge damages paid for broadcast television spot advertising time purchased from the Broadcaster Defendants and their co-conspirators.

**ANSWER:** TEGNA denies the allegations in Paragraph 320.

321. This conduct is unlawful under the *per se* standard or alternatively under a quick look or full-fledged rule of reason mode of analysis.

**ANSWER:** TEGNA denies the allegations in Paragraph 321.

322. As described above, the relevant product market affected adversely by the challenged conduct is the market for broadcast television spot advertising and the relevant geographic markets are those DMAs where two or more Defendants compete, markets where Defendants collectively have significant market power.

114

**ANSWER:** Paragraph 322 states legal conclusions to which no response is required. To the extent a response is required, TEGNA denies the allegations in Paragraph 322.

323. Plaintiffs and members of the Class are entitled to treble damages, their attorneys' fees and costs, and an injunction against Defendants restraining the violations alleged herein.

**ANSWER:** TEGNA denies the allegations in Paragraph 323.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class respectfully request that:

A. The Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

B. The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a per se violation (or alternatively illegal under a quick look or full-fledged rule of reason violation) of Section 1 of the Sherman Act (15 U.S.C. § 1);

C. The Court permanently enjoin and restrain Defendants, their affiliates, successors, transferees, assignees, and other officers, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D. Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Class for treble the amount of damages sustained by Plaintiffs and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

E. The Court award Plaintiffs and members of the Class such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

**ANSWER:** TEGNA denies that Plaintiffs' purported class is certifiable or that Plaintiffs or the members of the purported class suffered injury or damage of any kind, and further denies that Plaintiffs or the putative members of the purported class are entitled to relief of any kind including but not limited to any of the relief sought in paragraphs (A) through (E) of their demand for relief.

115

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

**ANSWER:** To the extent any response is required to Plaintiffs' Jury Trial Demand, TEGNA admits that Plaintiffs purport to demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b).

**AFFIRMATIVE DEFENSES**

Without admitting liability as to any of the claims asserted in the Complaint, and without assuming the burden of proof on any claims, defenses, or legal or factual issues that otherwise would rest with Plaintiffs, TEGNA asserts the affirmative defenses numbered below.

In addition to the affirmative defenses below, TEGNA also asserts the following defenses: lack of Article III standing; failure to satisfy the requirements for class certification; failure to state a claim, including failure to plead with the particularity required by law; unclean hands; *in pari delicto*; preemption by forum-selection clauses in the parties' contracts, including arbitration clauses; lack of injury or damage caused by TEGNA's alleged conduct; failure to establish *per se* illegality or rule-of-reason claims; speculative and/or excessive damages; failure to show continuing harm or the need for equitable relief; and failure to join indispensable parties or improper joining of parties.

As noted above, TEGNA's investigation in this matter continues and TEGNA reserves the right to supplement or modify any portion of this Answer, including but not limited to by asserting additional affirmative or other defenses or claims not yet asserted herein, at any time and consistent with the Federal Rules of Civil Procedure.

**DEFENSE 1:** Plaintiffs and the putative class members do not have standing to sue for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15, or for injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, including at least because they will not be able to prove that they suffered antitrust injury caused by TEGNA's alleged conduct.

**DEFENSE 2:** Plaintiffs and the putative class members' claims are barred, in whole or in part, by the statutes of limitations applicable to their claims, with respect to purchases they made more than four years prior to filing this action.

117

**DEFENSE 3:** Plaintiffs and the putative class members' claims are barred, in whole or in part, by the doctrines of waiver, laches, or estoppel, by reason of their ratification of, or acquiescence, agreement, or consent to TEGNA's alleged conduct, or by the voluntary payment doctrine, including but not limited to Plaintiffs or any putative class members' purchase of advertising with actual or constructive knowledge of available information regarding advertising costs and pricing.

**DEFENSE 4:** Plaintiffs and the putative class members' claims to certain remedies are barred, in whole or in part, to the extent that they have waived, under any applicable contract or otherwise, their rights to those remedies, including but not limited to treble damages and attorneys' fees, including but not limited to through entering into Standard Advertising Terms and Conditions with TEGNA that contains limitation of liability provisions.

**DEFENSE 5:** Plaintiffs and the putative class members' claims are barred, in whole or in part, by the doctrines of accord and satisfaction, release, or settlement, including but not limited to by settlements Plaintiffs and the putative class members have entered or will enter into with other Defendants in this action, or because any claimed injury or damage has been offset by benefits they received or are duplicative of damages they sought in other actions.

**DEFENSE 6:** Plaintiffs and the putative class members' claims are barred, in whole or in part, because the conduct complained of was lawful and justified, was carried out in furtherance of legitimate business interests, constitutes bona fide business competition, and is pro-competitive or the pro-competitive benefits of the conduct alleged by Plaintiffs outweigh any alleged anti-competitive effects.

**DEFENSE 7:** This Court lacks subject matter jurisdiction, pursuant to the Foreign Trade Antitrust Improvements Act, 15 U.S.C. § 6a, to the extent that Plaintiffs and the putative class members' claims encompass conduct involving foreign commerce.

**DEFENSE 8:** Plaintiffs' claims, as well as the claims of any putative class members, are barred by the holding of *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) to the extent any putative class member was an indirect purchaser of advertising, such as any advertising agency.

**DEFENSE 9:** Plaintiffs and the putative class members' claims are barred by the *Noerr-Pennington* doctrine, to the extent when the purpose of any alleged meeting between TEGNA and other Defendants was for collective petition to the government.

**DEFENSE 10:** Plaintiffs and the putative class members' claims are barred in whole or in part because the named plaintiffs are not proper class representatives.

**DEFENSE 11:** Plaintiffs' claims, as well as the claims of any putative class members, are barred in whole or in part by the primary jurisdiction doctrine and the filed rate doctrine insofar as they relate to political advertising because the rates for such advertising are regulated and filed with the governing regulatory agencies.

**DEFENSE 12:** TEGNA incorporates by reference and asserts to the extent applicable all other affirmative defenses set forth in the Answers of each of the other Defendants.

## RESERVATION OF RIGHTS

TEGNA hereby gives notice that it intends to rely upon any other defense that may become available or appear during the discovery process in this case and hereby reserves its right to amend its Answer to assert any such defenses.

TEGNA hereby reserves the right to assert other defenses as this action proceeds up to and including the time of trial and any appeal thereof.

119

Dated:  April 13, 2022

By:  */s/ Ross B. Bricker*
JENNER & BLOCK LLP
Ross B. Bricker (Ill. Bar No. 3126882)
John F. Ward, Jr. (Ill. Bar No. 6208004)
Andrew F. Merrick (Ill. Bar No. 6290213)
Shaun M. Van Horn (Ill. Bar No. 6297822)
353 N. Clark Street
Chicago, IL 60654-5474
(312) 222-9350
rbricker@jenner.com
jward@jenner.com
amerrick@jenner.com
svanhorn@jenner.com

*Counsel for TEGNA Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 13, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will provide notice to all counsel of record.

*/s/* Shaun M. Van Horn

Shaun M. Van Horn
