# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| IN RE: <br><br> LOCAL TV ADVERTISING ANTITRUST LITIGATION <br><br> *This Document Relates to All Actions* | MDL No. 2867 <br> No. 1:18-cv-06785 <br><br> Honorable Virginia M. Kendall <br><br> ***FILED UNDER SEAL*** <br> ***PUBLIC REDACTED VERSION*** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SHAREBUILDERS, INC.'S MOTION TO DISMISS CONSOLIDATED THIRD AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I. RELEVANT BACKGROUND ...................................................................................2

II. FACTUAL ALLEGATIONS IN THE COMPLAINT ADEQUATELY LINK SHAREBUILDERS TO THE CONSPIRACY .........................................................2

III. ARGUMENT ...............................................................................................................5

    A. PLAINTIFFS NEED NOT ELIMINATE SHAREBUILDERS' ALTERNATIVE EXPLANATIONS ......................................................5

    B. SHAREBUILDERS CANNOT DENY ITS CONSCIOUS COMITTMENT TO A COMMON SCHEME, ESPECIALLY WHERE IT SIGNED AGREEMENTS WITH DEFENDANTS TO PROVIDE SUCH SERVICES ........................................................................................................6

    C. SHAREBUILDERS EXCEEDS THE ROLE OF AGRI STATS ............................8

    D. WHILE NOT REQUIRED, SHAREBUILDERS HAD MOTIVE TO ENTER INTO A PRICE-FIXING CONSPIRACY WITH DEFENDANTS ................................................................................................9

    E. WEEKLY BOTTOM RATE CARDS ARE EVIDENCE OF A LIST PRICE CONSPIRACY .............................................................................11

    F. PLAINTIFFS ADEQUATELY ALLEGE THAT SHAREBUILDERS FACILITATED COMMUNICATIONS AMONG DEFENDANTS ....................12

    G. SIMULATANEOUS COMMUNICATIONS ARE NOT REQUIRED TO ESTABLISH AN ANTITRUST CONSPIRACY ................................................13

    H. PLAINTIFFS PLAUSIBLY ALLEGE SHAREBUILDERS FACILITATED AN INFORMATION EXCHANGE ..........................................14

    I. ALTERNATIVELY THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO REPLEAD. ...................................................................................14

IV. CONCLUSION..........................................................................................................15

# **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*,
   45 F.3d 1144 (7th Cir. 1995) ...................................................................................................5

*Bausch v. Stryker Corp.*,
   630 F.3d 546 (7th Cir. 2010) ..................................................................................................14

*Fears v. Wilhelmina Model Agency, Inc.*,
   2003 WL 21659373 (S.D.N.Y.2003).......................................................................................11

*In re Broiler Chicken Antitrust Litig.*,
   2019 WL 1003111 (N.D. Ill. Feb. 28, 2019) ...................................................................8, 9, 10

*In re Broiler Chicken Antitrust Litig.*,
   2021 WL 2207142 (N.D. Ill. June 1, 2021) ............................................................................10

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ..................................................................................7, 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2017 WL 5957654 (N.D. Cal. Feb.27, 2017) .........................................................................11

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ..................................................................................................11

*In re Industrial Diamonds Antitrust Litig.*,
   167 F.R.D. 374 (S.D.N.Y.1996) .............................................................................................11

*In re Lipitor Antitrust Litig.*,
   868 F.3d 231 (3d Cir. 2017)....................................................................................................10

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
   764 F. Supp. 2d 991 (N.D. Ill. 2011) ........................................................................................6

*In re Sulfuric Acid Antitrust Litig.*,
   743 F. Supp. 2d 827 (N.D. Ill. 2010) ......................................................................................10

*JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*,
   190 F.3d 775 (7th Cir. 1999) ....................................................................................................9

*Kleen Prods. LLC v. Georgia-Pacific LLC*,
   910 F.3d 927 (7th Cir. 2018) ....................................................................................................7

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
   775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...................................................................................6

*Marian Healthcare, LLC v. Becton Dickinson & Co.*,
   952 F.3d 832 (7th Cir. 2020) ................................................................................................6, 7

*McFarland-Lawson v. Ammon*,
   847 Fed. Appx. 350 (7th Cir. 2021) ..........................................................................................5

*NCAA v. Bd. of Regents of the Univ. of Okla.*,
   468 U.S. 85 (1984) ..................................................................................................................10

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*,
   2020 WL 6134982 (N.D. Ill. Oct. 19, 2020) .........................................................................8, 9

*Spectators' Commc'n Network, Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ....................................................................................................9

*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) ................................................................................................6, 8

*Tamayo v. Blagojevich*,
   526 F.3d 1074 (7th Cir. 2008) ..................................................................................................6

*United States v. Socony–Vacuum Oil Co.*,
   310 U.S. 150 (1940) ................................................................................................................10

**Statutes**

Sherman Act § 1, 15 U.S.C. § 1 ...........................................................................1, 4, 5, 9, 11, 14

**Rules**

Federal Rules of Civil Procedures, § 12(b)(6) ..............................................................................10

Federal Rules of Civil Procedures, § 15(a) ...................................................................................14

**Other Authorities**

P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1436b2 (3d & 4th eds., 2018 Cum.
   Supp. 2010–17) .........................................................................................................................8

Plaintiffs[1] respectfully submit this response in opposition to Defendant ShareBuilders, Inc.'s ("ShareBuilders") Motion to Dismiss Consolidated Third Amended Antitrust Class Action Complaint, ECF No. 588 ("Motion"), and memorandum of law in support thereof, ECF No. 589.

ShareBuilders acknowledges that the Court previously upheld Plaintiffs' allegations regarding an unlawful price fixing conspiracy facilitated by an information exchange. ECF No. 589 at 1. Indeed, the Court determined that "Plaintiffs allege parallel conduct and a number of plus factors, that, when considered together, give rise to an inference of a price-fixing conspiracy sufficient to state a claim" for violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Mem. Opinion and Order, ECF No. 392, at 22. Plaintiffs' Consolidated Third Amended Antitrust Class Action Complaint, ECF Nos. 555, 599 ("TAC"), supplements those already-sustained allegations with additional evidence that has come to light through discovery. This evidence includes documents showing that ShareBuilders knowingly joined in and facilitated the alleged conspiracy. *See* TAC ¶¶ 99-123. ShareBuilders' hollow claim that the TAC's allegations as to it are mere legal conclusions (ECF No. 589 at 7-8 & n.9) is belied by the specific facts and documents outlined in the TAC. The question facing this Court about the plausibility of ShareBuilders' involvement in the cartel is, therefore, easily resolved in Plaintiffs' favor.

The simple fact that ShareBuilders admitted its facilitation of the anticompetitive information exchange on its own website ***and has since attempted to conceal its involvement by removing these admissions from its website***, *see, e.g.*, TAC ¶¶ 105-107, is enough to reject ShareBuilders' Motion. Nevertheless, Plaintiffs also plead additional facts sufficient to overcome the Motion. For the reasons stated herein, ShareBuilders' Motion should be denied.

---

[1] Plaintiffs refers collectively to Thoughtworx, Inc. d/b/a MCM Services Group, One Source Heating & Cooling, LLC, Hunt Adkins, Inc., and Fish Furniture.

1

I.   **RELEVANT BACKGROUND**[2]

The Parties commenced discovery after this Court denied the Defendants' earlier motion to dismiss. Subsequently, and in the course of reviewing documents produced by the Broadcaster Defendants,[3] Plaintiffs became aware that ShareBuilders facilitated the exchange of sensitive confidential information among the Broadcaster Defendants, and that this information was used to fix prices for local television spot advertising. *See, e.g.*, TAC ¶¶ 121-123. With this new knowledge, Plaintiffs served a document subpoena on ShareBuilders in July of 2021. After reviewing the documents produced by ShareBuilders (which ShareBuilders earlier produced to the U.S. Department of Justice ("DOJ")), Plaintiffs determined that there was a sufficient basis for adding ShareBuilders as a named Defendant in this action.[4]

II.  **FACTUAL ALLEGATIONS IN THE COMPLAINT ADEQUATELY LINK SHAREBUILDERS TO THE CONSPIRACY**

Faced with documentary evidence and admissions from its own website, ShareBuilders seeks to minimize its role in the alleged conspiracy. Specifically, ShareBuilders grounds its Motion on an argument that it "is not the axle or suspension or bolts for any hub and spoke conspiracy." ECF No. 589 at 2. But Plaintiffs do not allege a "hub-and-spoke" conspiracy—indeed, that term never appears in Plaintiffs' TAC. Rather, Plaintiffs allege "a price fixing cartel

---

[2] Because Court is fully familiar with the pleading standards applicable to this case (ECF No. 348), Plaintiffs will not repeat them here and instead incorporate the pleading standards they articulated in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Consolidated Second Amended Antitrust Class Action Complaint and Motion to Strike. *See* ECF No. 348 at 12-13.

[3] Capitalized terms not defined herein have the meanings ascribed to them in the TAC.

[4] On May 13, 2022, Plaintiffs served formal document requests on ShareBuilders. Because ShareBuilders' production to the DOJ has substantial gaps (which Plaintiffs have repeatedly raised with ShareBuilders, and which ShareBuilders has thus far failed to cure), Plaintiffs expect to uncover significant additional evidence tying ShareBuilders to the alleged conspiracy once ShareBuilders makes a meaningful production in response to these document requests. Nevertheless, the evidence uncovered to date is more than sufficient to deny ShareBuilders' Motion.

facilitated by an anticompetitive information exchange between and among certain major television station owners and operators and sales representative firms to artificially inflate the prices of broadcast television spot advertisements . . ." TAC ¶ 1. Plaintiffs' complaint sets forth that ShareBuilders is one such facilitator.

ShareBuilders also mistakenly labels Plaintiffs' complaint as "conclusory." ECF No. 589 at 7. This mischaracterizes and ignores the pages of allegations included in the TAC. When Plaintiffs can include pictures of documents showing ShareBuilders' involvement, as well as quotes from ShareBuilders' own website and customers, plausibility is not a close call. Plaintiffs plead numerous specific facts to link ShareBuilders to the alleged price-fixing conspiracy. For example, Plaintiffs allege that ShareBuilders is a national company whose business objective is antithetical to competition: "It's a **system of adjusting prices** in response to **market** behavior,[5] and **choreographing buying behavior**, timing and pricing to get the best results." TAC ¶ 102 (emphasis added). Plaintiffs plead that ShareBuilders shared confidential information among Broadcaster Defendant stations, and specifically named the means by which ShareBuilders did so: Custom Station Reports, rate cards, Holding Capacity reports, and "weekly bottom" prices. TAC ¶ 101. Plaintiffs also allege that the content of those ShareBuilders reports include: pricing (TAC ¶ 120), ▮▮▮▮▮▮▮▮▮▮▮▮▮ ShareBuilders' activity likewise is specifically tied to anticompetitive harms, including raising prices charged to customers (TAC ¶¶ 121-22), harming a competitive

---

[5] Market behavior, by definition, must refer to more than a single market participant, i.e., Defendants.

market (TAC ¶ 120), and expanding ShareBuilders' influence over the pricing of broadcast television advertising (TAC ¶ 104). A website testimonial—taken down since the inception of this litigation—featured a revealing explanation about how competition decreased as a result of ShareBuilders' agreements with Broadcast Stations. Defendant Scripps stated: "ShareBuilders allows us to proactively price and have confidence t**o not engage in the 'race to the bottom'** . . . . We feel the accuracy in holding capacity continues to help u**s price aggressively to g**et **more than our fair share at times** . . .." (TAC ¶ 106). Plaintiffs also allege that during the Class Period, ShareBuilders was widely used and provided its services to at least seven Broadcaster Defendants: Sinclair, Tribune, Scripps, Cox, Raycom, Nexstar and TEGNA, evidenced by direct evidence in the form of written documents. TAC ¶¶ 100, 112, 113, 118, 123.

The allegations set forth in the TAC and summarized above are sufficient to plausibly establish ShareBuilders' knowing participation in the alleged conspiracy.[6] By facilitating the exchange of Competitively Sensitive Information, ShareBuilders allowed the Broadcaster Defendants to effectively set prices for broadcast television spot advertising at artificially high levels. Indeed, the conduct by ShareBuilders parallels in many ways that of the Sales Rep Firms. *See, e.g.*, TAC ¶¶ 50, 61-75. In denying the previous motions to dismiss, this Court determined that Plaintiffs' "had plausibly alleged that [ a Sales Rep Firm] played a vital role in the price-fixing and information-sharing conspiracies" and that the allegations were sufficient to "plausibly give rise to the inference that [it] joined a horizontal conspiracy with all Broadcaster Defendants." ECF No. 392 at 31. Like the Sales Rep Firms, Plaintiffs allege that ShareBuilders "facilitated the

---

[6] ShareBuilders complains that "the [TAC] offers no allegations of explicit, direct evidence of any illicit agreement involving ShareBuilders: no incriminating documents, emails, admissions, attendance at meetings, or other direct evidence." ECF No. 589 at 7. Setting aside any potential confusion about what constitutes direct evidence and the nature of the documents described in the TAC, this Court previously rejected the argument that Plaintiffs are required to proffer direct evidence of conspiracy to survive a motion to dismiss. *See* ECF No. 392 at 15-22.

4

Broadcaster Defendants' ability to exchange competitively sensitive information with one another . . .." *Id.* at 19.

Among the Custom Station Reports made available to Plaintiffs thus far, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ In addition, the weekly rate cards circulated by ShareBuilders to its clients contained recommended pricing for specific time slots. Together with the "weekly bottom" prices, this information provided by ShareBuilders was used by the Broadcaster Defendants to fix prices to their customers rather than competing directly with one another. TAC ¶¶ 119-120.

### III. ARGUMENT

#### A. PLAINTIFFS NEED NOT ELIMINATE SHAREBUILDERS' ALTERNATIVE EXPLANATIONS

ShareBuilders offers a multitude of explanations for the documents and facts Plaintiffs plead. *See* ECF No. 589 at 4, 11.[7] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ However, ShareBuilders claims that while it did create pricing charts related to "market behavior" (TAC ¶ 102) and did so based on its agreement with multiple Defendants to provide ShareBuilders' pacing and pricing data,

---

[7] ShareBuilders also attaches a list of local television stations to its Motion. Such factual disputes cannot be resolved on a motion to dismiss. *See, e.g.*, *McFarland-Lawson v. Ammon*, 847 Fed. Appx. 350, 355 (7th Cir. 2021) (Lower court improperly "decided a factual dispute that should not have been resolved on a motion to dismiss.") (citing *Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1154 (7th Cir. 1995)).

5

ShareBuilders did not facilitate the exchange of any forward-looking pacing information "among Defendants." ECF No. 589 at 5. Plaintiffs also plead that multiple Defendants partnered with ShareBuilders to share pricing and pacing information in violation of the antitrust laws. TAC ¶¶ 100, 112, 113, 118, 123. In support, Plaintiffs include pictures of ShareBuilders' own documents. TAC ¶¶ 114, 115, 117. Nevertheless, ShareBuilders claims there is "no direct evidence of any conspiracy." ECF No. 589 at 7-8. At the pleading stage, it is inappropriate "to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). *See also In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1002 (N.D. Ill. 2011) (At the motion to dismiss stage, it is not "necessary that the factual allegations tend to exclude the alternative explanations offered by defendants. That is the standard appropriate for a summary judgment motion."); *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1078-79 (N.D. Ill. 2011) (Although defendants identified alternative, non-conspiratorial explanations for price increases, district court upheld complaint, noting "it must be remembered that the present context requires only the plausibility of Plaintiffs' version" of events.). Nor are Plaintiffs required to meet a probability standard. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). Rather, the TAC simply must go beyond the "speculative level" and move Plaintiffs' claims "from conceivable to plausible." *Id.* at 555, 570. The Court should disregard ShareBuilders' alternative explanations.

    **B.**    **SHAREBUILDERS CANNOT DENY ITS CONSCIOUS COMITTMENT TO A COMMON SCHEME, ESPECIALLY WHERE IT SIGNED AGREEMENTS WITH DEFENDANTS TO PROVIDE SUCH SERVICES**

ShareBuilders cites *Marian Healthcare, LLC v. Becton Dickinson & Co.*, 952 F.3d 832, 841 (7th Cir. 2020), in an attempt to claim that it did not consciously commit to a common scheme designed to achieve an unlawful objective. ECF No 589 at 6. *Marion*, however, is distinguishable

6

because it focused on whether, in a hospital group buying case, distributors were part of the scheme or actual purchasers themselves. Following industry practice, the hospitals there did not buy directly from Defendant Becton. *Marian*, 952 F.3d at 841. The distributors purchased the medical devices from Becton at the rates negotiated by the group purchasing organizations (GPOs), and the hospitals then purchased the devices from the distributors. Because they did not purchase directly from Becton, the court held that the hospitals may pursue Becton itself only if they have properly alleged a conspiracy.

> The role of the distributors is critical to the Providers' case. That is because the distributors are the entities from which the Providers purchased the products at issue. If the distributors were not part of the alleged conspiracy, then Providers' case falls apart: no conspiracy, no direct purchaser status, no right to recover. The distributors would be the proper plaintiffs in such a situation and could sue Becton, as other distributors have done in other cases against Becton.

*Id.* at 841. ShareBuilders is not similarly situated to a distributor here. In no scenario can ShareBuilders be construed as a purchaser of broadcast television spot advertising.

Here, Plaintiffs plead, among other facts, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ had steadily expanded ShareBuilders' customer base (TAC ¶ 104), and even had some Defendants touting its services on the ShareBuilders' website (TAC ¶¶ 105-107). Thus, Plaintiffs sufficiently allege that ShareBuilders and Defendants had "a unity of purpose," or a "common design and understanding" to keep prices artificially high. *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 789 (N.D. Ill. 2017) ("*Broiler I*"); *see also Kleen Prods. LLC v. Georgia-Pacific LLC*, 910 F.3d 927, 936 (7th Cir. 2018) ("even a wink and a nod [suffice]—formal agreements have never been required").[8] ShareBuilders' suggestion that the TAC fails to allege that it "joined any agreement

---

[8] Defendant mistakenly relies on a summary judgment case, *Omnicare*, in attempting to define what Plaintiffs must show at the pleading stage. ECF No. 589 at 7.

7

involving the other defendants to do anything," ECF No. 589 at 8, simply ignores that the "information exchange itself embodies a conspiracy to [] exchange, and that conspiracy may be illegal if unreasonable because it is likely to contribute to anticompetitive results without adequate justification." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1436b2 (3d & 4th eds., 2018 Cum. Supp. 2010–17). The TAC unquestionably contains enough facts, taken as true, to meet the pleading standard in this Circuit.

### C. SHAREBUILDERS EXCEEDS THE ROLE OF AGRI STATS

As this Court knows, Agri Stats is a company that collects competitively sensitive information from producers in a variety of agricultural industries and then redistributes that information, purportedly in an aggregated format, to those same producers. *See Olean Wholesale Grocery Coop., Inc. v. Agri Stats, Inc.*, 2020 WL 6134982, at \*\*1-2 (N.D. Ill. Oct. 19, 2020) ("*Olean*").

Like Agri Stats, ShareBuilders argues here that Plaintiffs' allegations "are insufficient to indicate that [ShareBuilders] joined the asserted conspiracy." *In re Broiler Chicken Antitrust Litig.*, 2019 WL 1003111, at \*1 (N.D. Ill. Feb. 28, 2019) ("*Broiler II*"). Claiming that it is merely "a small privately-held company that provides certain information and consulting services for individual TV advertiser clients," ECF No. 589 at 2, ShareBuilders downplays the significance of Plaintiffs' allegations and suggests there is no basis for inferring its knowing participation in any conspiracy. But as Judge Durkin noted about Agri Stats, "the mere *possibility* that [ShareBuilders'] 'facilitation' of the alleged conspiracy was 'unwitting' does not mean that the allegation that [ShareBuilders] was a knowing co-conspirator is not *plausible*." *Broiler II*, 2019 WL 1003111, at \*2 (emphasis in original) (citing *Swanson*, 614 F.3d at 404 and denying motion to dismiss Agri Stats). And as this Court noted in *Olean*, "although Agri Stats ostensibly anonymized the data in the reports," "the data was so detailed that Turkey Defendants were able to infer which data

8

corresponded to which Defendant." *Olean*, 2020 WL 6134982, at *6.



Despite ShareBuilders' efforts to distinguish itself, its conduct actually exceeds that of Agri Stats in both *Olean*, pending before this Court, and *Broiler Chicken*, pending before The Honorable Thomas M. Durkin.

### D. WHILE NOT REQUIRED, SHAREBUILDERS HAD MOTIVE TO ENTER INTO A PRICE-FIXING CONSPIRACY WITH DEFENDANTS

ShareBuilders contends that it had no plausible motive to engage in or facilitate any conspiracy among the Broadcaster Defendants. ECF No. 589 at 12-13. Of course, it did;

In return, ShareBuilders was paid by, and achieved extraordinary growth due to, the Defendants.[9] Moreover, while motive is not an element of a Sherman Act claim,[10] Plaintiffs allegations against

---

[9] *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 778 (7th Cir. 1999) (producers of asphalt had motive to facilitate cartel among asphalt applicators because applicators could pay producers more from the excess profts generated by the cartel; "If by refusing to sell to mavericks the producers increase the profits of the applicators' cartel, they create a fund out of which the cartel can compensate them, in the form of a higher price for the purchase of the product, for their services to the cartel.").

[10] *See, e.g.*, *ABA Model Jury Instructions in Civil Antitrust Cases at 2-B-3* ("If you find that defendant engaged in a price-fixing conspiracy, it is not a defense that defendant acted with good motives, thought its conduct was legal, or that the conduct may have had some good results."); *Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 220-222 (5th Cir. 2001) ("Antitrust law has never required identical motives among conspirators, and even reluctant participants have been held liable for conspiracy. . . . Applying these precedents, we conclude that there can be sufficient evidence of a combination or conspiracy when one conspirator lacks a direct interest in precluding competition, but is enticed or coerced into knowingly curtailing competition by another conspirator who has an anticompetitive motive."); *Broiler II*, 2019 WL 1003111, at *2 ("[M]otive is not an element of a Sherman Act claim.")

9

ShareBuilders in fact do support an inference of motive because "it is plausible to infer that [ShareBuilders] is motivated to serve its clients' demands, and that in serving its clients, [ShareBuilders] understood its clients' motivation for making those demands." *Broiler II*, 2019 WL 1003111, at *2. Here, Plaintiffs allege that ShareBuilders greatly expanded its television station client base over time and promoted its ability to increase revenues and profits for broadcast station owners, ███████████████████████████████████████████████████ ███████████████████████████████████

Plaintiffs' allegations here are also easily distinguished from those put forth against Rabobank, a lender to many of the producer defendants in the *Broiler Chicken* case. In granting Rabobank's motion to dismiss, the court noted that "Rule 12(b)(6) . . . does not permit Plaintiffs to chase ghosts. The mere possibility that the subject matter of Rabobank's communications was the alleged conspiracy to reduce supply is insufficient to state a claim." *In re Broiler Chicken Antitrust Litig.*, 2021 WL 2207142, at *1 (N.D. Ill. June 1, 2021) ("*Broiler III*"). Unlike Rabobank, ShareBuilders did much more than campaign for the broadcast television industry. Rather, it provided detailed Competitively Sensitive Information to its Broadcaster Defendant clients ███████████████████████████ with the stated goal of increasing client profitability. Like the Sales Rep Firms (and Agri Stats), ShareBuilders is a key facilitator of the information exchange that allowed the Broadcaster Defendants to conduct their conspiracy and raise prices to purchasers of local television spot advertising. And like Agri Stats, it is "plausible that [ShareBuilders] knew

---

(citing *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 101 n.23 (1984); *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 263 (3d Cir. 2017)); *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 870–71 (N.D. Ill. 2010) ("[R]egardless of the motives driving an unlawful conspiracy, '[a]ny combination which tampers with price structures is engaged in an unlawful activity.'") (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 221 (1940)).

10

[its] reports were being used to facilitate conspiracy." *Id.*, at *2*.

### E. WEEKLY BOTTOM RATE CARDS ARE EVIDENCE OF A LIST PRICE CONSPIRACY

ShareBuilders does not deny it sent weekly bottom rate cards to Defendants. Weekly bottom prices are list prices used by many of the Broadcaster Defendants. TAC ¶¶ 119-123. Multiple Defendants received "Weekly Bottom" rate cards from ShareBuilders during the class period, the distribution of which by ShareBuilders is plausible evidence of a list price conspiracy. *Id*. An agreement to fix list prices is

> a *per se* violation of the Sherman Act even if most or for that matter all transactions occur at lower prices. Anyway[,] sellers would not bother to fix list prices if they thought there would be no effect on transaction prices. Many sellers are blessed with customers who are 'sleepers,' that is, customers who don't shop around for the best buy; and even for those who do bargain for a lower price, the list price is usually the starting point for the bargaining and the higher it is (within reason) the higher the ultimately bargained price is likely to be. The defendants acknowledge that their 'price lists served a useful purpose.' The only useful purpose they might serve is as a guide to likely transaction prices.

*In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002). See *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 5957654, *2 (N.D. Cal. Feb.27, 2017) (at summary judgment, court found discussion of "bottom price of $67" consistent with anticompetitive conduct); *Fears v. Wilhelmina Model Agency, Inc.*, 2003 WL 21659373, at *6 (S.D.N.Y.2003) (noting that, even if plaintiffs had been able to negotiate for a lower commission rate with defendant modeling agencies, they were nonetheless impacted by the conspiracy because those negotiations still began at the artificially elevated rate established by the cartel); *In re Industrial Diamonds Antitrust Litig.*, 167 F.R.D. 374, 383 (S.D.N.Y.1996) (noting that "[t]he theory that underlies these decisions is, of course, that the negotiated transaction prices would have been lower if the starting point for negotiations had been list prices set in a competitive market. Hence, if a plaintiff proves that the alleged conspiracy resulted in artificially inflated list prices, a

11

jury could reasonably conclude that each purchaser who negotiated an individual price suffered some injury").

F.     **PLAINTIFFS ADEQUATELY ALLEGE THAT SHAREBUILDERS FACILITATED COMMUNICATIONS AMONG DEFENDANTS**

ShareBuilders denies that it facilitated the sharing of information between Defendants. ECF No. 589 at 8-9. Plaintiffs, however, set forth this exact information and what they shared: "ShareBuilders shared information among Defendant Broadcast stations, including Custom Station Reports, rate cards, and 'Holding Capacity.' ShareBuilders also provided "weekly bottom" prices for broadcast television advertising to several Defendants, which at least some of the Defendants used as the "lowest rates [they]... should go for any given program in a specific week." TAC ¶ 101. ██████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[11] ██████████████████████████████████████████████████████████, when Judge Chutkan entered consent decrees prohibiting "Defendants from Communicating Competitively Sensitive Information to any Station in the same DMA Defendant does not own or operate" and "Knowingly use Competitively Sensitive Information from or regarding any Station in the same DMA Defendant does not own or operating." TAC ¶¶116-117. These prohibitions "apply to Defendant's Communicating or agreeing to Communicate through a Sales Representative Firm or a third-party agent at Defendant's instruction or request." *Id*.

12



### G. SIMULATANEOUS COMMUNICATIONS ARE NOT REQUIRED TO ESTABLISH AN ANTITRUST CONSPIRACY

ShareBuilders claims that because there is no proof of "any communication[s] with multiple defendants simultaneously or sequentially," Plaintiffs cannot plausibly establish an antitrust conspiracy. ECF No. 589 at 8-9. Notably, ShareBuilders cites no case for this proposition because it is not a requirement of an antitrust claim. Courts have not prescribed what conspiratorial communications must look like because "a price fixing conspiracy would be expected to leave little publicly available evidence of its existence. Price fixing conspiracies are therefore often inferred from context." *Broiler I*, 290 F. Supp. 3d at 804.

13

H. **PLAINTIFFS PLAUSIBLY ALLEGE SHAREBUILDERS FACILITATED AN INFORMATION EXCHANGE**

The Court previously concluded that Plaintiffs' prior complaint plausibly alleged an information exchange in violation of the Sherman Act. ECF No. 392 at 28. In fact, the Court found that "Plaintiffs have pleaded that a third-party called Kantar facilitated the Broadcaster Defendants' ability to exchange competitively sensitive information with one another and that the Sales Rep Firms also facilitated such exchanges." *Id*. at 19. ShareBuilders does not take issue with the Court's prior findings on the sufficiency of Plaintiffs' information exchange allegations. Instead, ShareBuilders attempts to distinguish itself from Kantar or the Sales Rep Firms. As set forth above, ShareBuilders played the same key role in the information exchange as Kantar and the Sales Rep Firms. Accordingly, the Court should sustain the TAC's information exchange count against ShareBuilders.

I. **ALTERNATIVELY THE COURT SHOULD GRANT PLAINTIFFS LEAVE TO REPLEAD.**

Plaintiffs have more than satisfied the standard to sustain the TAC in this Circuit. However, if this Court finds otherwise, Plaintiffs respectfully request permission to amend the complaint. *See, e.g.*, *Bausch v. Stryker Corp.*, 630 F.3d 546, 561-62 (7th Cir. 2010) (leave to replead should be freely granted under Fed. R. Civ. P. 15(a)). While not pled in the TAC, Plaintiffs have uncovered additional documentary evidence that would permit them to add additional allegations against ShareBuilders if required to do so. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

IV. **CONCLUSION**

For the reasons stated herein, the Court should deny ShareBuilders' Motion. If the Court is inclined to grant the Motion in any respect, Plaintiffs respectfully request leave to replead.

Dated: May 16, 2022

Respectfully submitted:

*/s/ Robert J. Wozniak*
Robert J. Wozniak
**FREED KANNER LONDON0
 & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
rwozniak@fklmlaw.com

***Liaison Counsel for Plaintiffs***


**HAUSFELD LLP**

*/s/ Megan E. Jones*
Megan E. Jones (admitted *pro hac vice*)
600 Montgomery St., #3200
San Francisco, CA 94111
Tel: (415) 633-1908
mjones@hausfeld.com

Michael D. Hausfeld (admitted *pro hac vice*)
Hilary K. Scherrer (admitted *pro hac vice*)
Nathaniel C. Giddings
888 16th Street, N.W. #300
Washington, DC 20006
Tel: (202) 540-7200
mhausfeld@hausfeld.com
hscherrer@hausfeld.com
ngiddings@hausfeld.com

Gary I. Smith, Jr. (admitted *pro hac vice*)
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
gsmith@hausfeld.com

***Lead Counsel for Plaintiffs***

15

*s/ Kimberly A. Justice*
Kimberly A. Justice
**FREED KANNER LONDON
  & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
kjustice@fklmlaw.com

*/s/ Meegan Hollywood*
Meegan Hollywood (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
900 Third Avenue, Suite 1900
New York, NY 10022
Tel: (212) 980-7400
mhollywood@robinskaplan.com

***Plaintiffs' Steering Committee***

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2022 the forgoing Memorandum of Law in Opposition to ShareBuilders, Inc.'s Motion to Dismiss Third Amended Consolidated Class Action Complaint was filed under seal via the Court's CM/ECF system and served via electronic mail on counsel of record for all parties.

*/s/ Robert J. Wozniak*
Robert J. Wozniak

16