# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **IN RE: LOCAL TV ADVERTISING ANTITRUST LITIGATION** | Master Docket No. 18 C 06785 |
| | MDL No. 2867 |
| *This document relates to all actions.* | Honorable Virginia M. Kendall |

## PLAINTIFFS' DISCOVERY MOTION #1:[1]

## TO COMPEL PRODUCTION OF RATINGS DATA FROM THE NIELSEN COMPANY (US), LLC AND FROM SINCLAIR BROADCAST GROUP, INC.

---

[1] Plaintiffs recognize that this is not in fact their first discovery motion in this case. But, as additional discovery motions are likely in the weeks and months to come, Plaintiffs employ this numbering for ease of reference.

Plaintiffs move to compel The Nielsen Company (US), LLC ("Nielsen") to produce ratings data pursuant to a third-party subpoena. Plaintiffs also move to compel defendant Sinclair Broadcast Group, Inc. ("Sinclair") to produce the same ratings data under Federal Rules of Civil Procedure 26(b), 37(a) and 45(d)(2)(B)(i). Nielsen, which was subpoenaed in New York, consents to litigation of the dispute in this Court.[2] Plaintiffs have complied with the meet and confer requirements of Local Rule 37.2, by attempting to resolve these issues for months, without success. For reasons made clear below, Plaintiffs also ask this Court for expedited review of the motion and the earliest opportunity for oral argument.[3]

## I. INTRODUCTION

This is a motion to compel the production of Nielsen television ratings data which Defendants agree will be highly relevant to both parties' expert witness reports. But it is also the story of a months-long concerted effort by Defendants and Nielsen to keep these data out of Plaintiffs' hands; to delay timely production of highly relevant evidence; to waste Plaintiffs' resources negotiating with Nielsen; and to allow Defendants—but *only* Defendants—access to this vital information.

Plaintiffs' expert reports are due in less than six months, on January 13, 2023. Television ratings data are a major ingredient in those reports. For the past two months, Plaintiffs have negotiated with Nielsen regarding the terms of compliance with an existing subpoena for its ratings data. After multiple phone calls and dozens of emails, Nielsen led Plaintiffs to believe that it was willing to sell Plaintiffs a limited license to access and use in this litigation the ratings data covered by the subpoena. Simultaneously, Defendant Sinclair told Plaintiffs it did not possess the ratings information Plaintiffs need. But all the while—and without Plaintiffs'

---

[2] *See* Section III, below.
[3] The July 20, 2022 Declaration of Samantha A. Miller ("Decl.") is attached as Ex. 1.

knowledge—Nielsen and Sinclair were brokering a deal that allows *Defendants* to use in this litigation Nielsen's ratings data, and leaves Plaintiffs with nothing. Now, with this deal in place, Sinclair still refuses to produce additional ratings data;[4] Nielsen has cut off negotiations about Plaintiffs' purchase of a Nielsen license; and Plaintiffs are in a *worse* position vis-à-vis Defendants than where they started. The Court should not allow such gamesmanship to go unchecked and should compel Nielsen's compliance with the subpoena or, alternatively, Sinclair's production of the same ratings data.

## II. STATEMENT OF FACTS

This multidistrict litigation concerns a scheme by Defendants to artificially inflate the prices of billions of dollars of broadcast television spot advertisements throughout the United States. *See generally* Consolidated Third Amended Antitrust Class Action Complaint ("TAC"), ECF No. 555. As part of this scheme, Defendants, including Sinclair, exchanged competitively sensitive information which enabled them to anticipate whether their co-Defendant competitors were likely to raise, maintain, or lower spot advertising prices. *Id.* Defendants' actions harmed the competitive price-setting process and resulted in increased prices paid by Plaintiffs and the proposed class. *See generally id.*

Nielsen is a marketing research firm that collects television ratings data across the country. It sells licenses to its ratings data under which licensees, like Defendants, can access and download the data. Nielsen ratings data are the industry standard. Indeed, the company's predominance is such that a Nielsen-specific term, "DMA" or "Designated Market Area," is used widely throughout the industry to refer to certain Nielsen-defined areas of the country. *See* TAC ¶ 17. Nielsen ratings data were key to the Defendants' scheme as it allowed them to better

---

[4] As detailed below, Sinclair produced in discovery some one-off slices of Nielsen ratings data. These data are far less than what Plaintiffs' experts need, and far less than what is contemplated by the subpoena.

estimate how pricing would be set at different times of day in different DMAs. *See id*. ¶¶ 73–74; *In re Loc. TV Advert. Antitrust Litig*., No. 18 C 6785, 2020 WL 6557665, at *2 (N.D. Ill. Nov. 6, 2020).

The TAC alleges concerted efforts by Sinclair and other Defendants to engage in an anticompetitive conspiracy that harmed Plaintiffs and members of the proposed class. This motion details Sinclair and Nielsen's concerted efforts to obstruct the discovery process, causing harm to Plaintiffs and members of the proposed class.

On May 11, 2022, Plaintiffs served a subpoena on Nielsen seeking ratings data from 2012 through 2021. Decl. Ex. A. Plaintiffs simultaneously wrote to Sinclair asking that Sinclair produce Nielsen ratings data in its possession pursuant to Plaintiffs' Request for Production No. 8.[5] Decl. Ex. B (C. Smith Ltr. to F. Tabatabai (May 11, 2022)). As detailed in the letter, Plaintiffs knew Sinclair possessed some Nielsen ratings data, as random and sporadic slices of that data had been produced in discovery. For example, one document produced in discovery is a spreadsheet showing one week of Nielsen ratings in Mobile-Pensacola. This type of one-off slice of ratings data is far less than the comprehensive sets of ratings data Plaintiffs seek to show trends over time and in multiple DMAs.[6]

On May 23, 2022, Nielsen responded with general responses and objections to the subpoena. Decl. Ex. C (R. Slobig Ltr. to C. Smith (May 23, 2022)). Nielsen's primary objection to compliance was that it would require "an intrusion into Nielsen's business or the appropriation of its property" "free of charge." *See id*.

---

[5] That Request seeks, *inter alia*, "[a]ll Documents concerning the competitive conditions You face, including, without limitation, . . . Documents concerning the demand for broadcast television or broadcast television viewership habits[.]" Request for Production No. 8, Ex. 2.
[6] This document, SINCTVADS-01591689, is not attached to this motion due to its designation as "confidential." If the Court wishes to review the document, Plaintiffs will securely transmit the document promptly.

The next day, Plaintiffs contacted Nielsen to discuss a reasonable price for the ratings data. *See* Decl. Ex. D (C. Smith email to R. Slobig (May 24, 2022)). Around the same time, Plaintiffs met and conferred with Sinclair on the issue of producing Nielsen data. *See* Decl. ¶ 6. On a May 25, 2022 call, Sinclair stated that (1) its contract with Nielsen prohibited disclosure of its data in litigation without Nielsen's consent, and (2) Sinclair accessed ratings data pursuant to its Nielsen license through an online portal and did not maintain a comprehensive repository of ratings data over the relevant time period. *Id*.

Plaintiffs first met and conferred with Nielsen on May 27, 2022. *See* Decl. ¶ 7. Nielsen's counsel, Robert Slobig, reiterated the company's desire not to provide its ratings for free, and also stated that Nielsen had a "policy" against providing its data in litigation. *Id*. Plaintiffs assured Nielsen they were not expecting the ratings data for free and asked for details about pricing. *Id*. Mr. Slobig was unable to provide those details, and the parties agreed to speak again on June 9, 2022. *Id*.

On that June 9 call, the only detail Mr. Slobig provided on price was that the "rock bottom" price for ratings data was fifteen thousand dollars. *See* Decl. ¶ 8. Mr. Slobig again raised the company's "policy" against licensing ratings data for use in litigation, while admitting the policy was not reduced to writing. *Id*. Mr. Slobig also stated that Nielsen has "probably" consented before to the release of Nielsen data in litigation. *Id*. Plaintiffs then asked Mr. Slobig whether Nielsen would sell Plaintiffs a license under *any* circumstances. *Id*. Mr. Slobig indicated he needed more time to consider the question and would provide an answer on the next call. *Id*.

On June 14, 2022, Plaintiffs spoke with Nielsen's counsel for the third time. Decl. ¶ 9. Mr. Slobig stated Nielsen was willing to sell Plaintiffs a license under specified circumstances and provided preliminary terms and conditions, which he stated were subject to negotiation. *See*

Decl. Ex. E (S. Miller email to R. Slobig (June 14, 2022)). After discussing those terms internally, Plaintiffs took Mr. Slobig up on his offer for Nielsen to begin drafting an acceptable contract. *See* Decl. Ex. F & G (R. Slobig email to S. Miller (June 22, 2022); S. Miller email to R. Slobig (June 22, 2022)).

Plaintiffs never received the promised contract. Instead, on June 29, 2022, Nielsen informed Plaintiffs of a "development": *Defendants* had apparently met with Nielsen and secured consent for *their* use of ratings data. *See* Decl. Ex. H (R. Slobig email to S. Miller (June 29, 2022)). Nielsen's counsel stated that the company was willing to grant Plaintiffs consent to use "the same data Nielsen has given the defendants" (a term he did not define) but conditioned that consent on withdrawal of Plaintiffs' subpoena. *Id*. Plaintiffs outlined their objections to this course of action: it allows Defendants to cherry pick which fields and data are produced to Plaintiffs, and Defendants could choose not to use or produce anything helpful to Plaintiffs. *See* Decl. Ex. I (S. Miller email to R. Slobig (July 1, 2022)). Plaintiffs again asked to purchase a Nielsen license and scheduled a fourth call with Nielsen's counsel. *Id*. On that call, Plaintiffs explained that unless Nielsen had given Defendants permission to use all the ratings data covered in Plaintiffs' subpoena to Nielsen, *and* Defendants agreed to promptly produce that data to Plaintiffs, any "deal" between Defendants and Nielsen would not suffice. *See* Decl. ¶ 15. Mr. Slobig stated that Nielsen did not want to be the "middleman" (a position which made no sense because Nielsen was the original source of the data) and instructed Plaintiffs to contact Sinclair's counsel, who had brokered the deal on behalf of all Defendants. *Id*.

Plaintiffs promptly arranged a call with both Sinclair and Nielsen. Before that July 11, 2022 call, Plaintiffs asked both Sinclair and Nielsen to provide a copy of the written agreement between Nielsen and Defendants. *See* Decl. ¶ 15; Ex. J (S. Miller email to P. Giordano (July 7,

2022)). Both chose not to provide it. Instead, on the call, Sinclair spoke in generalities about the deal with Nielsen, and stated that Defendants were unwilling produce ratings data to Plaintiffs *until after Defendants' expert reports were due* (which is, according to the current schedule, March 13, 2023). *See* Decl. ¶ 18. Sinclair also stated that Defendants and Nielsen had been negotiating this deal for *over nine months*, a fact that Sinclair and Nielsen had concealed during all prior communications. *Id*. At this point, Plaintiffs stated their intention to file a motion to compel. *Id*. On July 19, 2022, Nielsen consented to litigate any motion to compel in this Court. *Id*. ¶ 20.[7]

As of the filing of this motion, and despite multiple requests for the letter agreement, neither Sinclair nor Nielsen has provided it. *See* Decl. Ex. K (W. Kolasky email to S. Miller (Jul. 13, 2022) stating Sinclair and Defendants' intention to withhold the letter); *id.* (S. Miller email to W. Kolasky (Jul. 13, 2022) again requesting the letter agreement).[8]

## III. JURISDICTION

This Court has jurisdiction to the conduct the consolidated pretrial proceedings of this MDL under 28 U.S.C. § 1407(b). As a party to this action, Sinclair is undoubtedly subject to this Court's rulings on discovery motions. Section 1407 also gives this Court—the "issuing court" for the Rule 45 subpoena served on Nielsen—jurisdiction to compel Nielsen's compliance with the subpoena. *See, e.g., United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 444 F.3d 462, 467–69 (6th Cir. 2006) (concluding that § 1407 empowers an MDL judge to "compel production by an extra-district nonparty; enforce, modify, or quash a subpoena directed to an

---

[7] Counsel for Sinclair did state, on July 20, 2022 call, that Defendants did not wish to stand in the way of Plaintiffs' efforts to obtain ratings data from Nielsen. Decl. ¶ 23. As a practical matter, however, Sinclair's actions have done just that.
[8] Plaintiffs have now issued a separate discovery request for the agreement between Nielsen and Defendants, as well as the communications surrounding it.

extra-district nonparty; and hold an extra-district nonparty deponent in contempt, notwithstanding the nonparty's physical situs in a foreign district where discovery is being conducted."); *In re: Broiler Chicken Grower Antitrust Litigation* (NO II), MDL No. 6:20-2977-RJS-CMR, 2022 WL 2812679, at *1–2 (E.D. Okla. Feb. 7, 2022) (section 1407's grant of authority extends to document-only subpoenas); *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 07-MD-1871, 2021 WL 4129426, at *4 (E.D. Pa. Sept. 10, 2021) (same); *In re Photochromic Lens Antitrust Litig.*, No. 8:10-MD-2173-T-27EAJ, 2012 WL 12904391, at *2 (M.D. Fla. Dec. 20, 2012) (same); *see also In re Disposable Contact Lens Antitrust Litig.*, 306 F. Supp. 3d 372, 378 (D.D.C. 2017) (collecting cases where courts have found that an MDL judge has jurisdiction under § 1407 to enforce a subpoena that requires compliance in another district) (Brown Jackson, J.).

Importantly, Nielsen has expressly consented to litigation of this motion in this Court. *See* Decl. ¶ 20. If Plaintiffs had moved to compel Nielsen's compliance with the subpoena in the Southern District of New York ("SDNY") under Federal Rule of Procedure 45(f)—a procedure not required in MDL litigation[9]—transfer of the motion to this Court also would be appropriate. Rule 45(f) authorizes transfer in two situations: (1) where the party subject to the subpoena consents, and (2) where "exceptional circumstances" exist. Both are present here. *See, e.g.*, *Disposable Contact Lens,* 306 F. Supp. 3d at 378 ("[T]he MDL status of the underlying litigation

---

[9] Several courts have held that Rule 45(f) does not divest MDL judges of their authority under § 1407. *See, e.g., In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2018 WL 2980879, at *3 (D. Kan. June 13, 2018) (Rule 45(f) does not apply to MDL proceedings, as § 1407's "remedial purpose of eliminating the potential for conflicting contemporaneous pretrial rulings would be frustrated if the MDL court could not entertain motions to compel"); *In re Blue Cross Blue Shield Antitrust Litig.*, No. 2:13-CV-20000-RDP, 2017 WL 11539533, at *2 (N.D. Ala. Dec. 4, 2017) ("The 2013 Amendments to Rule 45 [adding, *inter alia*, subsection (f)] do not substantively alter the reasoning in *United States ex rel. Pogue* regarding the MDL court's power to decide a motion to compel and order enforcement of a subpoena."). *But see In re 3M Combat Arms Earplug Prod. Liab. Litig.*, No. 3:19-MD-2885, 2020 WL 8673437, at *4–5 (N.D. Fla. Nov. 18, 2020) (notwithstanding the broad jurisdictional grant of § 1407, Rule 45(f) requires a motion to compel to be filed first in the "compliance court").

is surely an 'exceptional circumstance' that weighs strongly in favor of transfer to the Issuing Court under Rule 45(f), because the same concerns about orderliness and disruption that led to the consolidation of actions as an MDL in the first place arise with respect to pretrial disputes regarding subpoenas issued in the context of that complex litigation.") (Brown Jackson, J.).

## IV. ARGUMENT

Plaintiffs move to compel production of Nielsen ratings data from both Sinclair and Nielsen pursuant to Federal Rule of Civil Procedure 37(a)(1), which provides that "a party may move for an order compelling disclosure or discovery." With respect to Nielsen, Plaintiffs move also pursuant to Rule 45(d)(2)(B)(i), which provides that "[a]t any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection."[10]

"In ruling on a motion to compel, the discovery standard set forth in Rule 26(b) applies." *See Hoerchler v. Equifax Info. Servs.*, LLC, 568 F. Supp. 3d 931, 934 (N.D. Ill. 2021) (quoting *Mendez v. City of Chicago*, 18-cv-6313, 2020 WL 4736399, at *3 (N.D. Ill. Aug. 14, 2020)). Rule 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" "The limits and breadth of discovery expressed in Rule 26 are applicable to non-party discovery under Rule 45." *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 307 (S.D. Ind. 2016) (citing Advisory Committee Note regarding 1991 amendments to Rule 45). Where a motion to compel seeks compliance with a subpoena, a court should enforce the subpoena so long as it "is reasonable in the circumstances." *See Colborn v. Netflix Inc.*, --- F. Supp. 3d ----,

---

[10] As explained above, the command to file a motion seeking compliance with a Rule 45 subpoena in the "compliance court" does not apply where, as here, the underlying action is an MDL. *See* Section III, *supra*.

No. 19-CV-0484-BHL, 2022 WL 2275148, at *2 (E.D. Wis. June 23, 2022) (quoting *McKevitt v. Pallasch*, 339 F.3d 530, 533 (7th Cir. 2003)).

Because "there is a strong public policy in favor of disclosure of relevant materials," a party can avoid producing relevant, nonprivileged materials only if the burden of production outweighs the value of the material sought. *See Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002) (citation omitted); *see also In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 360 (N.D. Ill. 2005). The party objecting to production bears the burden of demonstrating that the alleged burden is undue. *In re Sulfuric Acid,* 213 F.R.D. at 361 (citing cases).

### A. The Nielsen ratings data are indisputably relevant.

There is no dispute that the Nielsen ratings data are highly relevant to this litigation. *See, e.g.,* TAC ¶¶ 73–74 (discussing centrality of Nielsen ratings data to efficacy of competitively sensitive information exchanges); *In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665, at *2 (N.D. Ill. Nov. 6, 2020) (noting the role of Nielsen ratings data). Moreover, Plaintiffs and Defendants are aware of each side's intention to use Nielsen ratings data in their expert reports. *See* Decl. ¶ 18. Nielsen ratings data are an important part of Plaintiffs' case, as well as an important part of their experts' damages analysis. Defendants clearly view the data as relevant too, as evidenced by Sinclair's nine-month negotiation with Nielsen on behalf of Defendants, and their intention to rely on that data in their own expert analyses. Any argument that the Nielsen ratings data are irrelevant is therefore flatly contradicted by Defendants' own efforts—led by Sinclair—to secure *their* use of the same data.

### B. The burden on Sinclair is nonexistent.

Sinclair has maintained that it does not keep a comprehensive repository of Nielsen ratings data. *See* Decl. ¶ 6. But the *reason* no comprehensive repository is necessary is because of the way Nielsen licensees access ratings data: via an online portal where one can view the data and download whatever is necessary. *See id*.

Under Defendants' secret deal with Nielsen to use ratings data in this case, Defendants almost certainly will access Nielsen ratings data just as they do in the normal course of business, via the portal. And because Defendants and Nielsen have, apparently, arrived at an agreement that allows the use of ratings data, Defendants already know what ratings data they intend to use. It is no burden at all for Sinclair to now produce the ratings Plaintiffs have requested.

### C. Any burden on Nielsen will be remedied by Plaintiffs' willingness to pay a reasonable price for the ratings data.

Nielsen may contend that compliance with the subpoena would represent an undue burden on the company. But this argument is without merit. Nielsen already provides these data to Sinclair and other Defendants pursuant to their licenses. Indeed, the ratings data is "Nielsen's commercial product, its stock and trade." *See* Decl. Ex. C (R. Slobig Ltr. to C. Smith (May 23, 2022)). The Nielsen ratings are a product available for purchase on the marketplace, and simply asking Nielsen to take on another customer (Plaintiffs) cannot be an undue burden.

In a similar case, the SDNY found that Nielsen faced no undue burden in complying with a subpoena for its data where (1) the plaintiffs were willing to pay, and (2) there was a protective order in place that would adequately safeguard the data. *In re Nielsen Co. (US), LLC*, No. 20 MISC. 300 (LGS), 2020 WL 6130674 (S.D.N.Y. Oct. 16, 2020). There, Nielsen argued that compliance with the subpoena could (1) harm its business, as Nielsen could be seen as working against Nielsen clients, who were defendants in the case; (2) open the floodgates to other

subpoenas, which would take Nielsen employees away from their primary tasks; and (3) cost Nielsen too much time and money, as Nielsen employees would have to "formulate and execute a query" to pull the requested data. *Id*. at *2. The court rejected all of these arguments, finding that they were either too speculative or did not address the plaintiffs' willingness to pay. *Id*. Accordingly, the court ordered the parties to arrive promptly at a mutually agreeable price, after which Nielsen would produce the requested data subject to the protective order. *Id*. at *3.[11]

### D. Neither Sinclair nor Nielsen has a legal basis to refuse production of the ratings data.

#### 1. Sinclair has obtained Nielsen's consent to use ratings data in this case.

On the May 25, 2022 meet and confer, Sinclair told Plaintiffs it could not produce additional ratings information because its contract with Nielsen prohibited use of the ratings data in litigation. Because Nielsen and Defendants then reached an agreement allowing Defendants to use ratings data in this case, any argument based on that contract falls away, and Sinclair has no legal basis to withhold relevant data that would not be burdensome to produce.[12]

#### 2. The subpoena does not require disclosure of Nielsen's trade secrets.

Nielsen may object to the subpoena on the ground that compliance will require disclosure of trade secrets. This argument is untenable. Plaintiffs seek to purchase access to the Nielsen ratings data, a product that is available for sale on the marketplace and *which Defendants have*

---

[11] Nielsen's counsel also raised, in a July 19, 2022 email to Plaintiffs' counsel, the concern that Nielsen would have to create "customized queries" to comply with the subpoena. *See* Decl. Ex. M. This Court, like the court in *In re Nielsen*, should reject that argument. Presumably, any licensee with access to the Nielsen database (like Defendants) must exercise a "customized query" (i.e., a search) to access any particular dataset. This routine process does not represent an undue burden.

[12] On the July 11, 2022 call, Sinclair asserted that Defendants had a basis to withhold these data under Fed. R. Civ. P. 26(a), addressing the timing and contents of expert disclosures. Decl. ¶ 18. The claim, apparently, is that the data Sinclair and other Defendants have obtained from Nielsen are work-product. The ratings data are not, however, work product as contemplated by the Rule—they are commercial products available for sale on the marketplace that Defendants purchased long before this case. And if any privilege or protection had *ever* attached to these data, Defendants waived it through their nine months of discussions with Nielsen, a third party.

*already bought*. This is not a case where Plaintiffs are asking Coca-Cola for the recipe for Coke—Plaintiffs are asking *to buy a Coke. See Robertson v. McCloskey*, No. 87 C 3511, 1987 WL 12816, at *1 (N.D. Ill. June 16, 1987) (no trade secret implication where subpoena sought a Nielsen report that had already been sold to a third party, and the subpoena sought "neither testimony nor methodology"); *In re Nielsen*, 2020 WL 6130674, at *1–2 (no trade secret implications where plaintiffs sought raw retail sales data, not Nielsen's opinions or analyses of that data). Moreover, any speculative fear of trade secret disclosure did not stop Nielsen from consenting to *Defendants'* use of ratings data in this case.

### E. Expedited consideration of the motion is warranted.

Two months after serving the subpoena on Nielsen, largely due to Sinclair and Nielsen's coordinated efforts, Plaintiffs are no closer to obtaining the necessary ratings data.[13] Under the current scheduling order, Plaintiffs' expert reports are due January 13, 2023—in less than six months. Plaintiffs need the requested Nielsen ratings data *now* to give Plaintiffs' experts time to prepare their report. Accordingly, Plaintiffs ask the Court to review this motion on an expedited basis, set the earliest possible date for oral argument, and promptly compel production of these data.

## V. CONCLUSION

Plaintiffs are entitled to the Nielsen ratings data from both Nielsen, pursuant to the subpoena, and from Sinclair, pursuant to Request for Production No. 8. Plaintiffs undertook protracted negotiation with Nielsen based on the assumption that Nielsen's discussions with

---

[13] Sinclair may argue that Plaintiffs somehow gave up their rights under Request for Production No. 8 by not insisting on full production of Nielsen data during earlier, protracted meet-and-confers about discovery issues. Not so. Discovery remains open, and Plaintiffs never waived the right to seek additional production under existing Requests for Production. Moreover, the secret Sinclair-Nielsen deal allowing use of Nielsen data is a material change in circumstances. Sinclair cannot frustrate Plaintiffs' third-party subpoena negotiations and then abdicate responsibility for the delay.

Plaintiffs were in good faith, and that Nielsen would sell Plaintiffs a commercial license to the ratings data.

Plaintiffs' assumption of good faith was misplaced. While Plaintiffs negotiated with Nielsen, Nielsen was simultaneously (and secretly) reaching a still-undisclosed deal with Defendants. And now that the deal is final, Nielsen wishes to wash its hands of the subpoena, while Sinclair refuses to produce to Plaintiffs the fruits of that arrangement. To reiterate, Nielsen's deal with Sinclair gives Defendants access to the ratings data *they* want and, because of the delay, leaves Plaintiffs worse off than before. The Court should not reward Sinclair and Nielsen's behavior.

This Court should grant Plaintiffs motion to compel Nielsen's compliance with the subpoena or, in the alternative, should order production of those ratings data from Sinclair. And if the Court views Nielsen and Sinclair's failure to negotiate in good faith as a violation of Local Rule 37.2—a view strongly supported by the evidence—it should consider an appropriate sanction.

|  |  |
|---|---|
| Dated: July 20, 2022 | Respectfully submitted,<br><br>*/s/ Cyril V. Smith*_____<br>Cyril V. Smith*<br>Samantha A. Miller*<br>**ZUCKERMAN SPAEDER LLP**<br>100 East Pratt Street, Suite 2440<br>Baltimore, MD 21202<br>Tel: (410) 332-0444<br>csmith@zuckerman.com<br>samiller@zuckerman.com<br><br>*Counsel for Plaintiffs and the Proposed Class* |

---

* Admitted *pro hac vice*

*Megan E. Jones\**
**HAUSFELD LLP**
600 Montgomery St. #3200
San Francisco, CA 94111
Tel: (415) 633-1908
Fax: (415) 358-4980
mjones@hausfeld.com

Gary I. Smith, Jr.*
**HAUSFELD LLP**
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
Fax: (215) 985-3271
gsmith@hausfeld.com

Michael D. Hausfeld*
Hilary K. Scherrer*
Nathaniel C. Giddings
Farhad Mirzadeh*
In Kyung "Jane" Shin*
888 16th Street NW, Suite 300
Washington, DC 20006
(202) 540-7200
mhausfeld@hausfeld.com
hscherrer@hausfeld.com
ngiddings@hausfeld.com
fmirzadeh@hausfeld.com
jshin@hausfeld.com

*Lead Counsel*

Meegan Hollywood*
**ROBINS KAPLAN LLP**
399 Park Avenue,
Suite 3600 New
York, NY 10022
Tel: (212) 980-740
Fax: (212) 980-7499
mhollywood@robinskaplan.com

Kimberly A. Justice
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
Fax: (224) 632-4521
kjustice@fklmlaw.com

*Plaintiffs' Steering Committee*

Robert J. Wozniak
Steven A. Kanner
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
skanner@fklmlaw.com
rwozniak@fklmlaw.com
*Liaison Counsel*