IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

IN RE:
LOCAL TV ADVERTISING ANTITRUST
LITIGATION

**MDL NO. 2867**

**NO. 18 C 6785**

**HONORABLE VIRGINIA M.
KENDALL**

## <u>**DEFENDANTS' MOTION TO COMPEL DISCOVERY**</u>

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................... 1

BACKGROUND .................................................................................................................... 3

LEGAL STANDARD............................................................................................................. 5

ARGUMENT .......................................................................................................................... 6

    I.    Defendants Are Entitled to Discovery Relevant to Determining Whether Thoughtworx and Hunt Adkins Acted as Agents for Their Advertising Clients ............................................................................................................ 6

    II.    Defendants Are Entitled to Discovery Related to Plaintiffs' Market Definitions.................................................................................................. 11

    III.    Hunt Adkins Must Identify Additional Custodians ............................................. 14

CONCLUSION...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agnew v. Nat'l Collegiate Athletic Ass'n,*
683 F.3d 328 (7th Cir. 2012) ................................................................11

*Burkhalter Travel Agency v. MacFarms Int'l, Inc.,*
141 F.R.D. 144 (N.D. Cal. 1991) ............................................................6

*Diskin v. Daily Racing Form, Inc.,*
1994 WL 330229 (S.D.N.Y. July 7, 1994) ................................................6

*Gorss Motels, Inc. v. Brigadoon Fitness, Inc.,*
29 F. 4th 839 (7th Cir. 2022) ................................................................6

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977)........................................................................1, 6, 7

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
720 F. App'x 835 (9th Cir. 2017) ..........................................................7

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.,*
767 F. Supp. 2d 880 (N.D. Ill. 2011) ....................................................12

*In re NASDAQ Mkt.-Makers Antitrust Litig.,*
169 F.R.D. 493 (S.D.N.Y. 1996) .........................................................6, 7

*In re Peregrine Fin. Grp. Customer Lit.,*
2015 WL 1344466 (N.D. Ill. Mar. 20, 2015)........................................5, 13

*In re Urethane Antitrust Litig.,*
237 F.R.D. 454 (D. Kan. 2006)............................................................10

*Kleen Prod. LLC v. Packaging Corp. of Am.,*
2012 WL 4498465 (N.D. Ill. Sept. 28, 2012) ...............................2, 14, 15

*Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.,*
245 F.R.D. 26 (D.D.C. 2007)..............................................................12

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.,*
2008 WL 2264252 (W.D. Pa. May 30, 2008)..........................................13

*Valley Drug Co. v. Geneva Pharmaceuticals.,*
350 F.3d 1181 (11th Cir. 2003) ............................................................11

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)...........................................................................................................1, 5, 10

## INTRODUCTION

After nearly a year and a half of discovery during which Defendants have produced over 14 million documents, Plaintiffs still refuse to respond to basic document requests or answer simple questions about how their businesses operate and how they purchase advertising. Defendants' discovery requests seek documents and information necessary to evaluate critical issues in this case, including whether named plaintiffs Thoughtworx, Inc. ("Thoughtworx") and Hunt Adkins, Inc. ("Hunt Adkins") (collectively, the "Agency Plaintiffs") are direct purchasers with standing to pursue the claims alleged in the complaint, whether the Agency Plaintiffs are adequate representatives for the alleged class, and whether Plaintiffs have correctly defined the relevant antitrust market. Because the documents and information sought by Defendants are "relevant to any party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), Defendants are entitled to documents responsive to RFPs 3, 25, 26, and 55-58, and complete responses to Interrogatories 3 and 11.

Plaintiffs' primary objections—that the requests seek downstream information or are irrelevant—lack merit. RFPs 3, 26, 55-58, and Interrogatory 3 request documents and information about whether the Agency Plaintiffs acted as agents for their advertiser clients. Although Plaintiffs allege a class of "direct purchasers," the Agency Plaintiffs' relationship with their advertiser clients, including how they were compensated, may show not only that the Agency Plaintiffs *could not have been injured* by any alleged overcharges, but also that they may have *benefited*. The requested facts and information are thus relevant to whether the Agency Plaintiffs are barred from recovering damages under *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 745–46 (1977), have antitrust standing, and are adequate representatives for the putative class, any of which could doom certification of Plaintiffs' putative class.

Similarly, RFP 25 and Interrogatory 11 seek information regarding Plaintiffs' alleged

antitrust markets, an issue on which they bear the burden of proof. Plaintiffs allege that the relevant market in this case is "the market for broadcast television spot advertising," Third Amended Complaint, ECF No. 556 at ¶ 322. Defendants challenge that that is a proper antitrust market because there are many forms of advertising that are substitutes for broadcast television spot advertising. Yet Plaintiffs refuse to produce documents or answer interrogatories that bear on whether the Plaintiffs considered different forms of advertising when purchasing advertising and how their spending shifted across advertising media in response to changes in price or other market factors. This information goes directly to assessing the substitutability between broadcast television advertising and advertising on other media, including cable or digital advertising. By rejecting these legitimate requests, Plaintiffs seek to force the Court and Defendants to accept their market-definition allegations at face value.

Finally, Hunt Adkins, a media firm with dozens of employees,[1] refuses to offer more than a single document custodian, a media strategist who was with the company for only a portion of the relevant time period. Hunt Adkins's claim that this is the only individual at the company with discoverable information does not withstand scrutiny. Plaintiffs assert that he is the only person at Hunt Adkins that has "information about Hunt Adkins' purchases of broadcast television," Letter from H. Scherrer to E. Adelson (July 1, 2022), Ex. H at 22, but that narrow construction overlooks key issues in this case. Hunt Adkins must offer custodians "designed to respond fully to document requests and to produce responsive nonduplicative documents during the relevant period," *Kleen Prod. LLC v. Packaging Corp. of Am.*, 2012 WL 4498465, at *15 (N.D. Ill. Sept. 28, 2012), including requests related to Hunt Adkins' standing, class certification, liability, market

---

[1] Despite Defendants' repeated requests, Hunt Adkins has refused to produce an organizational chart or list of current and former employees, so Defendants can only estimate the company's size and structure from publicly available sources.

definition and damages.

For these reasons, the Court should grant this Motion.

## BACKGROUND

Plaintiffs allege that Defendants conspired to fix the price of broadcast television spot advertising in 127 different Designated Market Areas ("DMAs") across the country over several years. ECF No. 556 ¶ 2. Plaintiffs bring both per se and rule of reason claims on behalf of a putative class of all persons and entities that purchased broadcast television spot ads "and who paid one or more Broadcaster Defendants directly" during the alleged class period—a class that Plaintiffs allege "likely includes hundreds if not thousands of members."[2] ECF No. 556 ¶¶ 302-03. This putative class purports to include not only advertisers that purchased spot ads from Defendants, but also advertising agencies that purchased spot ads on behalf of their clients.

The Consolidated Second Amended Antitrust Class Action Complaint was filed by only two named plaintiffs, Thoughtworx[3] and One Source Heating & Cooling,[4] seeking to represent this broad nationwide class of advertisers and advertising agencies. ECF No. 292 ¶¶ 18–19. Plaintiffs amended their complaint again on March 16, 2022, adding two new plaintiffs: Hunt Adkins, an advertising agency based in Minnesota, and Fish Furniture, a furniture store in Ohio. ECF No. 556 ¶¶ 21-22.

---

[2] In fact, as Plaintiffs presumably know from the significant discovery they have taken from Defendants, the putative class likely includes tens of thousands of class members nationwide that vary in many important ways.

[3] Thoughtworx is an advertising agency that predominantly purchases low-cost spot ads on behalf of its clients, many of which are small, local law firms *See* MCM Services Group, About Us, *available at* https://www.linkedin.com/company/mcm-services-group (last accessed 7/21/2022).

[4] One Source is a "heating, cooling, and HVAC services provider headquartered in Alabama." (ECF 292 at 18–19.)

Although two of the four named Plaintiffs are advertising agencies, Plaintiffs have consistently rejected Defendants' efforts to understand how the Agency Plaintiffs fit in the class, if at all. In fact, after more than a year and a half of discovery, Defendants still have little to no insight into the business operations of Thoughtworx. Defendants served their first set of RFPs on February 12, 2021. Ex. A. After protracted negotiations on search terms and custodians, Plaintiffs produced only 11,000 documents. Plaintiffs failed to produce documents responsive to several requests, including RFP 3, and did not produce any documents from one of the agreed-upon custodians, Katie Hayes. Decl. of M. Kaiser at ¶ 3.

Seeking to clarify the nature of Plaintiffs' claims and identify facts relevant to standing and class certification, Defendants propounded their Second Coordinated Set of Interrogatories on February 18, 2022. Ex. B. Plaintiffs objected to Defendants' interrogatories on March 21, 2022, providing no answers, only objections. Ex. C. The parties met and conferred on March 28, April 1, and April 29. Only then, more than two months after the interrogatories were served, did Plaintiffs agree to answer *some* of Defendants' questions, and they continued to stand on their objections as to others. Plaintiffs served supplemental responses to Defendants' interrogatories on May 13, 2022, Ex. E, after which the parties held additional meet-and-confers on May 13 and June 13, 2022 regarding the sufficiency of those answers.

Defendants served additional RFPs on May 11, 2022. Ex. G. Again, Plaintiffs refused to produce any documents responsive to several of these requests, claiming that the requests seek "downstream" discovery. Repeatedly, Defendants explained that the requests go to several issues upon which Plaintiffs have the burden of proof. Plaintiffs stood on their objections to RFPs 26 and 55-58. Ex. H.

Plaintiffs stated that they intend to offer only a single custodian for Hunt Adkins: Matt Russell, a former media strategist who worked at the company from 2017 to 2021. Plaintiffs claimed that Russell is the only individual at Hunt Adkins with discoverable information because he is the sole Hunt Adkins employee with "information about Hunt Adkins' purchases of broadcast television." Ex. H at 22. Despite the fact that it is Plaintiffs' burden to identify individuals likely to have discoverable information, ESI Order, ECF No. 442 at § 4.1.1—and that Plaintiffs have refused to produce organizational charts or employee lists for any of the named plaintiffs, Kaiser Decl. at ¶ 17—Defendants identified several current Hunt Adkins employees likely to have relevant information, including the Chief Executive Officer, Director of Strategic Planning, Director of Client Services, and Director of Accounts. But Plaintiffs merely repeated their claim that these individuals do not possess information discoverable in this case. In an attempt to short-circuit Defendants' inquiries, Plaintiffs offered to add as a custodian Patrick Hunt, Hunt Adkins' CEO, but only if Defendants would drop the request for additional, relevant custodians. Because Defendants are unwilling to waive their right to obtain documents from any other Hunt Adkins employees with relevant information, Defendants declined this offer. Plaintiffs then refused to produce Mr. Hunt's documents.

With the parties at impasse on these requests, Defendants now seek relief from the Court.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26 allows a party to "obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). The party opposing discovery bears the burden of showing why discovery should be disallowed. *In re Peregrine Fin. Grp. Customer Lit.*, 2015 WL 1344466, at *1 (N.D. Ill. Mar. 20, 2015).

**ARGUMENT**

I.    **Defendants Are Entitled to Discovery Relevant to Determining Whether Thoughtworx and Hunt Adkins Acted as Agents for Their Advertising Clients**

Plaintiffs refuse to produce documents responsive to RFPs 3, 26, 55-58, and only incompletely answer Interrogatory 3, claiming that the requests seek impermissible "downstream" discovery.  Not so.  These requests seek documents and information related to the Agency Plaintiffs' ability to recover monetary damages, standing to pursue their claims, and their adequacy as class representatives, issues on which Plaintiffs bear the burden of proof.  *Gorss Motels, Inc. v. Brigadoon Fitness, Inc*., 29 F. 4th 839, 843 (7th Cir. 2022) ("plaintiffs seeking to certify a class bear the burden of demonstrating compliance with Rule 23").

Under the "control" exception to *Illinois Brick*, agents that purchase goods or services on behalf of secondary purchasers are not directly injured by higher prices, and are therefore not entitled to recover damages for any unlawful overcharges.  431 U.S. at 736 n.16.  Such claims are instead reserved for the principal.  *Id*.  Thus, "where an indirect purchaser is clearly the party sustaining the injury caused by the fixing of prices," its agent is not entitled to treble damages.  *Burkhalter Travel Agency v. MacFarms Int'l, Inc*., 141 F.R.D. 144, 148 (N.D. Cal. 1991).  For example, brokers who purchased securities "for the account of others . . . do not constitute a distinct link in the chain of distribution," and are therefore not direct purchasers.  *In re NASDAQ Mkt.-Makers Antitrust Litig*., 169 F.R.D. 493, 505-506 (S.D.N.Y. 1996) ("where a particular industry structure includes a principal-agent relationship . . . the [principal] has standing"); *see also Diskin v. Daily Racing Form, Inc.,* 1994 WL 330229 at *5 (S.D.N.Y. July 7, 1994) (magazine resellers are agents of publisher, not direct purchasers).

Courts weigh a variety of factors to determine whether a putative plaintiff falls within the "control" exception, including: whether the first-level purchaser was reimbursed; whether the

purchase itself was the ultimate service; whether the agent only executed the purchase at the request of the principal; whether the agent provided additional services such as strategic advice outside of—separate and apart from—purchasing and sales services; whether the purchaser has discretion over price, budget, and other factors; whether the purchaser earned a commission and could benefit from alleged inflation of prices; whether the purchaser held inventory; and whether the purchaser took title to the product before passing the product to the end purchaser. *See In re NASDAQ Market-Makers*, 169 F.R.D. at 506; *cf. In re Cathode Ray Tube (CRT) Antitrust Litig.*, 720 F. App'x 835, 838 (9th Cir. 2017) (finding a material issue of fact as to whether plaintiff had antitrust standing because plaintiff took title to the purchased product and retained possession if the plaintiff was not ultimately paid).

Third-party evidence suggests that advertising agencies may fall within the control exception to *Illinois Brick*. For example, the Form 10-K annual reports for Omnicom Group Inc. and The Interpublic Group of Companies, Inc. ("IPG"), two of the nation's largest ad agency groups and potential members of the putative class, state expressly that they have a principal-agent relationship with the advertisers for whom they buy advertising airtime. Ex. I at 13; Ex. J at 36.[5] These reports further show that Omnicom and IPG do not recognize as revenue the full amount the agencies receive from the advertiser to pay for airtime, but only the commission they receive for their services. *Id.* These agencies are not purchasing the airtime for their own use or for resale, but instead are operating as agents.

RFPs 3, 26, 55-58, and Interrogatory 3 seek documents and information about whether Thoughtworx and Hunt Adkins were direct purchasers or agents:

---

[5] Similarly, the American Association of National Advertisers' template Master Media Buying Services Agreement provides that the relationship between an ad agency and the advertiser for whom it buys media is a principal-agent relationship. Ex. K.

| Discovery Request | Relevance |
|---|---|
| RFP 3: "All Documents and Communications concerning or relating to Plaintiffs' policies, practices, or terms for purchasing, or arranging for the purchase of, Broadcast Television Advertising on behalf of themselves or any Advertiser clients or customers, including but not limited to those concerning or relating to Plaintiffs' commission, fee, or payment arrangements or structures, as well as any discounts, rebates, credits, or adjustments." | The payment structures governing transactions between the Agency Plaintiffs and their clients will show how the agency was reimbursed, whether the agency retained discretion over price or budget, the terms of reimbursement, and who retains liability in the event of nonpayment. |
| RFP 26: "Documents sufficient to show Plaintiffs' quarterly financial statements, including any profit and loss statements or other audited financials." | The Agency Plaintiffs' audited financial statements will show whether or not they reported as revenue the monies they received from advertisers to pass on to broadcasters. |
| RFP 55: "All Agreements between You and any advertiser on whose behalf you purchased Broadcast Television Advertising on any of the Broadcaster Defendants' stations, including any amendments to such Agreements." | Agreements between the Agency Plaintiffs and their clients will establish the nature of the parties' relationship, including the terms of reimbursement and liability, and whether the agency retained discretion over price or budget. These agreements will also show whether the agent executed the purchase only at the request of the principal, and whether the agent provided services other than purchasing and sales services. |
| RFP 56: "All invoices You sent to any advertiser on whose behalf You purchased Broadcast Television Advertising on any of the Broadcaster Defendants' stations or, in the alternative, documents sufficient to show (i) the name of each advertiser to which You sent an invoice in connection with Your purchase on that advertiser's behalf of Broadcast Television Advertising on any of the Broadcaster Defendants' stations; (ii) the date of each such invoice; and (iii) the amount of any commission or fee reflected in each such invoice." | The invoices sent from Agency Plaintiffs to advertisers will show whether the Agency Plaintiffs provided services other than purchasing and sales services, whether the Agency Plaintiff earned a commission on transactions, and the amount of such commission. To the extent the Agency Plaintiffs received commissions based on gross sales, they would have benefited from any overcharges. |
| RFP 57: "Documents sufficient to show any reimbursement You received from any advertiser for any amounts You paid to any | Documents showing reimbursements from advertisers to the Agency Plaintiffs will show that the Agency Plaintiffs purchased |

| Discovery Request | Relevance |
|---|---|
| Broadcaster Defendant's station for the purchase of Broadcast Television Advertising on that advertiser's behalf, including, but not limited to, documents sufficient to show (i) the date of each such reimbursement, (ii) the amount of each such reimbursement, and (iii) whether each such reimbursement was a full or partial reimbursement of the amount You paid to any Broadcaster Defendant's station." | advertising airtime solely on behalf of the advertiser, and did not take title of such airtime for resale purposes. |
| RFP 58: "Documents sufficient to show any fee or commission You received from any advertiser on whose behalf You purchased Broadcast Television Advertising from any of the Broadcaster Defendants' stations, including, but not limited to, documents sufficient to show (i) the date of each such fee or commission, (ii) the amount of each such fee or commission, and (iii) the method by which each advertiser paid your fee or commission." | This request tests whether the Agency Plaintiffs earned commissions and could benefit from alleged overcharges. |
| Interrogatory 3: "Describe with specificity Thoughtworx's pricing policies and practices, including: (a) how pricing for its services is determined for each of its customers; (b) whether Thoughtworx receives a commission on any service it provides and, if so, how each such commission is calculated; (c) whether customers ever receive discounts for any service Thoughtworx provides, and if so, on what basis and how each such discount is calculated; (d) all factors taken into consideration when determining pricing of each transaction for each service Thoughtworx has provided to each customer; (e) any analyses conducted by You or by a third party on Your behalf of competitor pricing on how Thoughtworx's pricing compares to that of any competitor or to any industry pricing norms or trends; (f) how often, under what circumstances, for what reasons, and upon whose authority Thoughtworx changes its pricing, including pricing strategies, practices, and policies; and (g) the name(s) of all persons at Thoughtworx with responsibility for | This interrogatory seeks information as to how pricing is calculated, whether the agency is reimbursed, whether the agency has discretion to change pricing and/or budgets, and whether the agency earns a commission and could benefit from alleged overcharge. |

| Discovery Request | Relevance |
|---|---|
| determining pricing strategies, practices, or policies." | |

Plaintiffs' primary objection to these requests is a purported categorical ban on downstream discovery.  Plaintiffs allege that the Agency Plaintiffs are direct purchasers, and now assert that any information about their clients is "downstream."  But these requests do not seek information that is downstream of the transactions at issue.  Rather, Defendants seek information about the purchase of broadcast television airtime that is at the heart of this lawsuit.  As noted above, evidence shows that advertising agencies like the Agency Plaintiffs may act as agents for their advertising clients, and the discovery Defendants seek is relevant to understanding that relationship.  Plaintiffs' mere allegation that a particular purchase is "direct" does not make it so; likewise, discovery is not "downstream" simply because Plaintiffs say that it is.  Like any allegation that Plaintiffs made, Defendants are entitled to explore the allegation through discovery. *See* Fed. R. Civ. P. 26(b)(1).

In any event, there is no categorical ban on downstream discovery.  Although downstream data cannot be used to support a pass-through defense, it is discoverable if it is relevant to class certification or standing.  *See*, *e.g.*, *In re Urethane Antitrust Litig.*, 237 F.R.D. 454, 463 (D. Kan. 2006) (overruling direct purchasers' objections to requests for downstream data because the requested discovery was relevant to class certification).  Such discovery is particularly relevant "when specific issues are raised regarding the named plaintiffs' adequacy as representative."  *Id*. Defendants do not assert a pass-through defense, and their discovery requests are not intended to support any such defense.  Rather, as explained above, these discovery requests seek information related to standing and class certification.

*Valley Drug Co. v. Geneva Pharmaceuticals* is on point. 350 F.3d 1181 (11th Cir. 2003). There, the district court certified a class of direct purchasers after denying discovery that would have shed light on whether the "the most significant members of the certified class arguably experienced a net gain from the conduct alleged to be illegal." *Id*. at 1188. The Eleventh Circuit reversed, finding that class certification was inappropriate because national wholesalers "appear[ed] to benefit from the effects of the conduct alleged to be wrongful by the named plaintiffs." *Id*. at 1191. This is because "economic reality would lead the national wholesalers and other similarly situated class members to have divergent interests and objectives from the named representatives with respect to the fundamental issues in controversy in this litigation." *Id*. at 1193. To properly evaluate these issues, the court held that the district court was *required* to permit downstream discovery to determine whether such a fundamental conflict exists. *Id*. at 1195. The same reasoning applies here.

RFP 3, 26, 55-58, and Interrogatory 3 seek discovery related to the "economic reality" of the Agency Plaintiffs' business models, which bear on their adequacy as class representatives and whether common questions of fact predominate. *Id*. at 1192-94. Because any higher prices for class purchases caused by the alleged conduct may have generated higher commissions for the Agency Plaintiffs, the Agency Plaintiffs may have stood to gain from the alleged conduct. Defendants are entitled to discover information to test this potential conflict.

## II. Defendants Are Entitled to Discovery Related to Plaintiffs' Market Definitions

Plaintiffs bear the burden to prove a relevant antitrust market for their rule of reason claim. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Plaintiffs allege that the relevant product market is "the market for broadcast television spot advertising," ECF No. 556 ¶ 322, but refuse to produce documents or answer interrogatories that would reveal the boundaries of that market, including whether other types of advertising are substitutable for broadcast

television advertising. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011) ("[T]he products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market.").

RFP 25 seeks documents concerning purchases of "any advertising other than Broadcast Television Advertising," including cable, digital, and radio advertising. Ex. A. This RFP goes to the core of the relevant-market analysis because it seeks documents that bear on whether, to what extent, and why Plaintiffs used other forms of advertising (including, for example, cable) in place of broadcast television ads. Plaintiffs agreed to produce documents responsive to this request only "to the extent that [the document] (a) hits on an agreed search term, and (b) also mentions broadcast television spot advertising." Ex. H at 11. This narrowing is insufficient, as relevant documents regarding Plaintiffs' purchases of non-broadcast-television advertising may not have "also mention[ed]" broadcast television advertising.

Interrogatory 11 asks Plaintiffs to "Describe with specificity how You determined Your budget(s) for broadcast television spot advertisements, cable television advertisements, digital media advertisements, and radio advertisements during the Class Period." Ex. B. Notwithstanding that substitution between various forms of advertising is core to the market-definition inquiry, Plaintiffs object that Plaintiffs' budgets for non-broadcast-television advertisements "are irrelevant as Plaintiffs' claims are based on Defendants' decision-making process on the sales of broadcast television spot advertisements, not Plaintiffs' advertising budgets." Ex. C.

Courts routinely compel antitrust plaintiffs to produce documents bearing on market definition. In *Meijer, Inc. v. Warner Chilcott Holdings Co., III, Ltd.*, a class of direct purchasers alleged that pharmaceutical companies artificially inflated prices for an oral contraceptive

medication. 245 F.R.D. 26 (D.D.C. 2007). Defendants moved to compel the production of pricing and sales data for competing contraceptive pills, arguing that "such information is relevant to its theory of market definition, wherein such product market involves interchangeability of products and/or cross-elasticity of demand." *Id*. at 30-31. In granting the defendants' motion, the court emphasized that market definition and market power are legitimate topics for discovery, noting that plaintiffs' contrary argument "may even be disingenuous in light of the fact that '[P]laintiffs themselves raised the question of market definition **in their Complaints**.'" *Id*. at 31; *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 2008 WL 2264252 at *3 (W.D. Pa. May 30, 2008) (granting motion to compel documents regarding sales of all tires manufactured by plaintiff, where plaintiff defined a market consisting of "racing tires for cars that race on dirt oval tracks").

The same reasoning applies here. RFP 25 and Interrogatory 11 request information directly relevant to market definition.[6] Indeed, the Court noted in its order denying Defendants' motion to dismiss that "market definition is a deeply fact-intensive inquiry." ECF 392 at 24 (quoting *Int'l Equip. Trading, Ltd. v. AB Sciex LLC*, 2013 WL 4599903 at *3 (N.D. Ill. Aug. 29, 2013). In refusing to respond to Defendants' legitimate requests, Plaintiffs attempt to preclude Defendants from carrying out that inquiry.

---

[6] Plaintiffs' other boilerplate objections to Interrogatory 11 lack merit. Plaintiffs object that this interrogatory is not relevant and not proportional to the needs of the case. Ex. C at 21-22. But "[i]t is well-established that such generalized boilerplate objections have no effect." *In re Peregrine Fin. Group Customer Litig.*, 2015 WL 1344466, at *3. Plaintiffs' burden "cannot be met by a reflexive invocation of the same baseless, often abused litany that the requested discovery is vague, ambiguous, overly broad, unduly burdensome or that it is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence." *Id*. (quoting *Burkybile v. Mitsubishi Motors Corp.*, 2006 WL 2325506, at *6 (N.D. Ill. Aug. 2, 2006) (collecting cases)).

### III.  Hunt Adkins Must Identify Additional Custodians

Defendants are entitled to discovery from more than a single Hunt Adkins custodian. Plaintiffs assert that only one Hunt Adkins employee, current or former, has relevant documents or information.  This dubious claim runs counter to common sense and the Federal Rules.  Hunt Adkins' "selection of custodians must be designed to respond fully to document requests and to produce responsive nonduplicative documents during the relevant period." *Kleen Prod. LLC*, 2012 WL 4498465, at *15.

At least part of Plaintiffs' basis for refusing to produce information for other custodians is their myopic view of the type of information that is relevant in this matter.  Contrary to Plaintiffs' assertions, the issues in this case go beyond "Hunt Adkins' purchases of broadcast television."  Ex. H at 22.  Plaintiffs' overly narrow definition of the case ignores critical issues, including standing and market definition, which Defendants are entitled to explore through discovery.  The Hunt Adkins employees identified by Defendants as potential custodians are likely to have this information.  Indeed, Plaintiffs admit that the job duties of three of Defendants' suggested custodians, Josh Smerick (Director of Strategic Planning), Holli Maines (Director of Client Services), and Alex Denholm (Director of Accounts) involved "interactions with Hunt Adkins' clients."  *Id*.  These individuals are almost certainly in possession of documents that have information describing their clients' purchase of advertising, to include airtime on broadcast television, and the contractual relationship between Hunt Adkins and its clients that governed these purchases.

There may be even more Hunt Adkins employees who have discoverable information. However, Plaintiffs refused to produce organizational charts or employee lists—much less engage in a good faith discussion about Hunt Adkins employees who might have relevant information sufficient to satisfy Plaintiffs' discovery obligations in this case.  Defendants, therefore, request

that the Court compel Hunt Adkins to conduct an adequate investigation and identify a set of custodians that will allow it to "respond fully to [Defendants'] document requests." *Kleen Prod. LLC*, 2012 WL 4498465 at *15.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court grant their motion to compel and require Plaintiffs to: (1) respond fully to the foregoing discovery requests, and (2) identify proper Hunt Adkins custodians within two weeks of the Court's Order.

Dated: July 22, 2022

/s/ Eliot A. Adelson
MORRISON & FOERSTER LLP
Eliot Adelson (admitted *pro hac vice*)
Bonnie Lau (admitted *pro hac vice*)
Margaret A. Webb (admitted *pro hac vice*)
425 Market Street
San Francisco, CA 94105
(415) 268-7000
eadelson@mofo.com
blau@mofo.com
mwebb@mofo.com

David D. Cross (admitted *pro hac vice*)
Mary G. Kaiser (admitted *pro hac vice*)
2100 L Street NW
Washington, D.C. 20037
(202) 887-1500
dcross@mofo.com
mgerking@mofo.com
mkaiser@mofo.com

MOLOLAMKEN LLP
Gerald P. Meyer
300 N. LaSalle St.
Chicago, IL 60654
(312) 450-6700
gmeyer@mololamken.com

*Counsel for Defendants Dreamcatcher Broadcasting LLC, Nexstar Media Group, Inc., Tribune Broadcasting Company, LLC, and Tribune Media Group, Inc.*

/s/ Gregory J. Commins Jr.
BAKER & HOSTETLER LLP
Gregory J. Commins, Jr. (admitted *pro hac vice*)
1050 Connecticut Avenue, NW
Suite 11000
Washington, D.C. 20036-5304
(202) 861-1500
gcommins@bakerlaw.com

Bridget S. McCabe (CA 272545)
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025
(310) 820-8800
bmccabe@bakerlaw.com

John M. Touhy s(Bar No. 3128400)
One North Wacker Drive, Suite 4500
Chicago, IL 60606-1901
(312) 416-6200
jtouhy@bakerlaw.com

*Counsel for Defendant The E.W. Scripps Company*

/s/ Matthew L. Kutcher
COOLEY LLP
Matthew L. Kutcher (IL Bar No. 6275320)
444 W. Lake Street
Suite 1700
Chicago, IL 60606
Telephone: (312) 881-6500
mkutcher@cooley.com

David E. Mills (admitted *pro hac vice*)
Deepti Bansal (admitted *pro hac vice*)
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 842-7800
dmills@cooley.com
dbansal@cooley.com

Mazda K. Antia (admitted *pro hac vice*)
4401 Eastgate Mall
San Diego, CA 92121
Telephone: (858) 550-6000
mantia@cooley.com

Beatriz Mejia (admitted *pro hac vice*)
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone: (415) 693-2000
mejiab@cooley.com

Alexander G. Galicki
(admitted *pro hac vice*)
1333 2nd Street, Suite 400
Santa Monica, CA 90401
Telephone: (310) 883-6400
agalicki@cooley.com

*Counsel for Defendant Gray Media Group, Inc.*

/s/ David A. Ettinger
HONIGMAN LLP
David A. Ettinger (admitted *pro hac vice*)
2290 First National Building
660 Woodward Ave.
Detroit, MI 48226
(313) 465-7368
dettinger@honigman.com

MCAFEE & TAFT
Mark Richard Mullins (admitted *pro hac vice*)
211 N. Robinson Ave., 10th Floor
Two Leadership Square
Oklahoma City, OK 73102
(405) 552-2263
rick.mullins@mcafeetaft.com
*Counsel for Defendant Griffin Communications, LLC*

/s/ William J. Kolasky
William J. Kolasky (admitted *pro hac vice*)
Philip A. Giordano (admitted *pro hac vice*)
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, D.C. 20006
Tel: (202) 721-4600
william.kolasky@hugheshubbard.com
philip.giordano@hugheshubbard.com

Fara Tabatabai (admitted *pro hac vice*)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, NY 10004
Tel: (212) 837-6000
fara.tabatabai@hugheshubbard.com

Gregory J. Scandaglia
SCANDAGLIA RYAN LLP
55 E. Monroe Street, Suite 3440
Chicago, IL 60603
Tel: (312) 580-2020
gscandaglia@scandagliaryan.com

*Attorneys for Defendant Sinclair Broadcast Group, Inc.*

/s/ Ross B. Bricker
JENNER & BLOCK LLP
Ross B. Bricker (Ill. Bar No. 3126882)
John F. Ward, Jr. (Ill. Bar No. 6208004)
Andrew F. Merrick (Ill. Bar No. 6290213)
Shaun M. Van Horn (Ill. Bar No. 6297822)
353 N. Clark Street
Chicago, IL 60654-5474
(312) 222-9350
rbricker@jenner.com
jward@jenner.com
amerrick@jenner.com
svanhorn@jenner.com
*Counsel for TEGNA Inc.*

<u>**CERTIFICATE OF SERVICE**</u>

I, Eliot A. Adelson, certify that on July 22, 2022, I caused the **DEFENDANTS' MOTION TO**

**COMPEL DISCOVERY** to be served by e-mail on all counsel of record, pursuant to and in

accordance with the Stipulation, filed on April 17, 2020 (ECF No. 397), in this Action.

*/s/ Eliot A. Adelson*
Eliot A. Adelson