**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| IN RE: LOCAL TV ADVERTISING ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) |

MDL No. 2867
No. 18 C 6785

Judge Virginia M. Kendall

**MEMORANDUM OPINION AND ORDER**

The Judicial Panel on Multidistrict Litigation consolidated before this Court antitrust actions pending in multiple jurisdictions because the cases involve common questions of fact and centralization will promote the just and efficient conduct of this litigation. (Dkt. 1). The actions each allege a conspiracy to artificially inflate the prices of local television spot advertisements throughout the United States. Now before the Court is Defendant ShareBuilders, Inc.'s ("ShareBuilders") Motion to Dismiss Plaintiffs'[1] Consolidated Third Amended Antitrust Class Action Complaint ("TAC") for failure to state a claim. (*See* Dkt. 588). For the reasons set forth below, ShareBuilders's Motion to Dismiss [588] is granted.

**BACKGROUND**

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor, but not its legal conclusions. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). Unless otherwise noted, the following factual allegations are taken from Plaintiffs' TAC,

---

[1] "Plaintiffs" refers collectively to Thoughtworx, Inc. d/b/a MCM Services Group; One Source Heating & Cooling LLC; Hunt Adkins, Inc.; and Fish Furniture. (Dkt. 555 ¶¶ 19–22).

(Dkt. 555) and are assumed true for purposes of this motion.[2]  *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

## A.  Framework of Defendants' Alleged Antitrust Scheme

Plaintiffs allege that during the Class Period,[3] Defendants[4] secretly orchestrated a unitary scheme to supra-competitively raise the prices of broadcast television spot advertisements by agreeing to fix prices and exchange sales data, including pacing data.[5]  (Dkt. 555 ¶ 2).  The existence of the data exchange and the data itself were kept secret from the purchasers of broadcast television spot advertising.  (*Id.* ¶ 3).  The information Defendants exchanged included both local and national broadcast television spot advertising data and was shared, with the Broadcaster Defendants'[6] knowledge and at their direction, with individuals within the Broadcaster Defendants' organizations with authority over pricing. (*Id.* ¶ 4). The scheme derailed the competitive process and allowed the Broadcaster Defendants to avoid price competition, harming direct purchasers of broadcast television spot advertising in Designated Market Areas ("DMAs") throughout the United States because it enabled the Broadcaster Defendants to better understand

---

[2] The Court assumes familiarity with the facts of this case not set forth herein, having recently provided a detailed background in *In re Local TV Advertising Antitrust Litig.*, No. 18-cv-6785, 2020 WL 6557665 (N.D. Ill. Nov. 6, 2020).
[3] The "Class Period" begins in the first quarter of 2014 and continues until "the effects of the unlawful conduct are adjudged to have ceased."  (Dkt. 555 ¶ 302).
[4] The Court uses the term "Defendants" to refer collectively to CBS Corporation ("CBS"); Cox Media Group, LLC ("Cox Media"); Dreamcatcher Broadcasting, LLC ("Dreamcatcher"); The E.W. Scripps Company ("E.W. Scripps"); Griffin Communications, LLC ("Griffin"); Fox Corporation ("Fox"); Katz Media Group, Inc. ("Katz"); Meredith Corporation ("Meredith"); Nexstar Media Group, Inc. ("Nexstar"); Gray Television, Inc. ("Gray TV"), through its acquisition of Raycom Media, Inc. ("Raycom"); Sinclair Broadcast Group, Inc. ("Sinclair"), TEGNA, Inc. ("TEGNA"), Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), Tribune Media Company ("Tribune Media"); and ShareBuilders.  (Dkt. 555 ¶¶ 25–50).
[5] According to the Complaint, pacing data "is used to compare a broadcast station's revenues booked for a certain time period (either a current or future period) to the revenues booked for the same point in time in the previous year. It is accompanied by a percentage figure (i.e., that a station's revenue indicates that it is pacing plus or minus 10%, 20%, 30%, or so on).  Pacing indicates how each station is performing compared to the rest of the market and provides insight into each station's remaining broadcast television spot advertising inventory for a current or future period.  The exchange of pacing information reveals the Broadcaster Defendants' remaining supply, with supply being a, if not the, key factor informing negotiations over price."  (Dkt. 555 ¶ 63).
[6] The Court uses the term "Broadcaster Defendants" to refer collectively to CBS, Cox Enterprises, Dreamcatcher, Fox, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune.  (Dkt. 555 ¶ 46).  The Court uses the term "Sales Rep Firms" to refer collectively to Cox Media and Katz.  (*Id.* ¶ 50).

the availability of their would-be competitors' inventory through the exchange of pacing data. (*Id.*).

Cox Media and Katz, the "Sales Rep Firms," function "as extensions of a station's sales staff and are familiar with various rate cards (prices) and program research demographics." (*Id.* ¶ 50). The Sales Rep Firms are industry participants that regularly communicate with each Broadcaster Defendant to serve the Broadcaster Defendants' demands. (*Id.*). The Sales Rep Firms facilitated the "exchange [of] real-time pacing information" between Defendants. (*Id.*). Defendants' alleged price-fixing cartel was facilitated in large part through a reciprocal exchange of competitively sensitive information, which included: (1) pacing information, (2) average price data through a third-party called Kantar, available at a granular level broken down by DMA and inventory type (e.g., early news, late news, prime time), and (3) other forms of competitively sensitive sales information (including information exchanged through ShareBuilders, as discussed below). (*Id.* ¶ 59).

Certain Broadcaster Defendants retained ShareBuilders to assist with inventory management and pricing. (*Id.* ¶ 11). ShareBuilders provides yield management solutions[7] in the broadcast media sales industry nationwide. (*Id.* ¶¶ 17, 45, 99, 102 (adding that ShareBuilders helps broadcasters "navigate the complexities of a competitive [television advertising] market")). Its stated business goal is to "increase client profitability by decreasing their **pricing workload** and increasing their revenue." (*Id.* ¶ 102 (emphasis in original); *see also id.* ¶ 103 (stating that ShareBuilders's client stations yield "a profit margin of over 98% on average" in the first two years of working with it)). ShareBuilders currently serves over 300 clients – "some of which are

---

[7] ShareBuilders defines "yield management" as "the process of appropriately **managing pricing** and inventory to maximize or grow revenue. **It's a system of adjusting prices** in response to market behavior, and choreographic buying behavior, timing and pricing to get the best result." (Dkt. 555 ¶ 102 (emphasis in original)).

owned or affiliated with [Broadcaster Defendants]." (*Id.* ¶¶ 99, 100 (specifying that its clients include Defendants Sinclair, Tribune, Scripps, Cox, Raycom, and TEGNA)).

ShareBuilders allegedly facilitated the reciprocal exchange of competitively sensitive market information among the Broadcaster Defendants – and thus helped manipulate the market for broadcast television spot advertising. (*Id.* ¶¶ 18, 59, 101). More specifically, Plaintiffs allege that ShareBuilders's following business practices violated the Sherman Act.

First, ShareBuilders offered to provide Broadcaster Defendants with detailed reports concerning their competitors' holding capacity[8] data. (*Id.* ¶ 108 (specifying that these reports included "historical, current, and near-future holding capacity shares, across should-be competitor stations within a particular DMA")). ShareBuilders claimed that the holding capacity reports could demonstrate "what is happening in the market as a whole" and help the Broadcaster Defendants "effectively manage forecasting and pricing." (*Id.* ¶ 110). At minimum, Defendants Cox Media Group, Dreamcatcher, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune each received such reports from ShareBuilders. (*Id.* ¶ 112).

Second, ShareBuilders produced "custom station reports" for certain Defendants. (*Id.* ¶ 113). One such report was created for Defendant TEGNA on August 1, 2018. (*Id.* ¶ 114). Among other things, the report included TEGNA's <u>and its competitors'</u> local and national pacing information for September 2018 as well as <u>future looking data</u> for the balance of the fourth quarter. (*Id.* (including a figure which contains pacing information for TEGNA, CBS, and Fox stations); *see also id.* ¶ 117 (stating that at least one other Custom Station Report issued in 2019 also included

---

[8] Per ShareBuilders, holding capacity is "a measurement of a station's ability to hold revenue within a Broadcast Television DMA[. . . .] A useful Holding Capacity model will not only tell a client their expected share of a market's revenue, but also provide a picture of what is happening in the market as a whole. . . . Holding Capacity is a tool that can be used to predict future share trends. Remember, you're not forecasting and pricing in a vacuum!" (Dkt. 555 ¶ 111).

forward looking pacing information)). Aside from TEGNA, Defendants Cox Media Group, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, and Tribune have received ShareBuilders's custom station reports. (*Id.* ¶¶ 113, 118).

Third, ShareBuilders provided some clients with "weekly rate cards" which set forth "recommended pricing for each time slot." (*Id.* ¶ 119).

Finally, ShareBuilders circulated "weekly bottom" prices – which some Defendants used as the "lowest rates [they] . . . should go for any given program in a specific week." (*Id.* ¶¶ 101, 119). Plaintiffs allege that some Defendants used these weekly listings to set the prices they charged on the market. (*Id.* ¶ 120; *see also id.* ¶¶ 121–22). At minimum, Defendants Cox Media Group, Dreamcatcher, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune received weekly bottom rate cards from ShareBuilders. (*Id.* ¶ 123).

## LEGAL STANDARD

When considering a motion to dismiss under Rule 12(b)(6), the Court must "accept as true all factual allegations in the amended complaint and draw all permissible inferences in [the plaintiff]'s favor." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 639 (7th Cir. 2015). To state a claim upon which relief may be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). Detailed factual allegations are not required, but the plaintiff must allege facts that when "accepted as true . . . 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Iqbal*, 556 U.S. at 678. In analyzing whether a complaint meets this standard, the "reviewing court [must] draw on its judicial experience and common sense." *Id.* at 679. When

there are well-pleaded factual allegations, the Court assumes their veracity and then determines

whether they plausibly give rise to an entitlement to relief. *Id.*

## DISCUSSION

To state a claim for a violation of Section 1 of the Sherman Act, Plaintiffs must allege "(1)

a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant

market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328,

335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th

Cir. 1993)) (internal quotation marks omitted).  Exchange of information is not illegal *per se* but

can be found unlawful under a "rule of reason" analysis, which considers "a number of factors

including most prominently the structure of the industry involved and the nature of the information

exchanged." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (citing *United States v. United

States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)).  Indeed, although "[c]ourts have not

prescribed what conspiratorial communications must look like" for a plaintiff to plausibly state a

claim, (Dkt. 607 at 13), "[t]here are certain well-established criteria used to help ascertain the

anticompetitive potential of information exchanges," *Todd*, 275 F.3d at 211.  One relevant factor

is "the specificity of the information" exchanged.  *Id.* at 212.  Dissemination of *aggregated*

information which "avoid[s] transactional specificity" (for example, data exchanged in the form

of industry averages) is generally favored in the antitrust context.  *Id.*  By contrast, "[p]rice

exchanges that identify **particular parties, transactions, and prices** are seen as potentially

anticompetitive because they may be used to police a secret or **tacit conspiracy** to stabilize prices."

*Id.* (emphasis added).

Plaintiffs allege that ShareBuilders participated in two separate horizontal trade restraints

which violated Section 1 of the Sherman Act: a price-fixing conspiracy and an information

6

exchange. (*See generally* Dkt. 555). More specifically, the TAC purports to implicate ShareBuilders as a conduit of information exchange between and among the Broadcaster Defendants. (*See, e.g.*, *id.* ¶¶ 2, 4, 11, 18, 59, 101; Dkt. 607 at 2 ("ShareBuilders facilitated the exchange of sensitive confidential information among the Broadcaster Defendants, and that this information was used to fix prices for local television spot advertising.")). The conduit theory of antitrust liability in this context is "fairly unique" in that it "does not tend to arise frequently." *E.g.*, *In re: Domestic Drywall Antitrust Litig.*, No. 2437 13-MD-2437, 2016 WL 2941114, at *5 (E.D. Pa. May 20, 2016). That said, conduits of competitively sensitive information may face Section 1 liability under certain circumstances. Several persuasive precedents from this district are instructive on this point.

To begin, class plaintiffs in the *Broiler Chicken Antitrust Litigation* alleged that an industry analyst company – Agri Stats, Inc. ("Agri Stats") – facilitated a price fixing conspiracy among industrial producers of chicken meat (or "broilers"). *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 781–82, 800 (N.D. Ill. 2017) ("*Broiler Chicken I*"). Agri Stats disseminated subscription reports about the broiler industry based on information collected from the defendant-broiler producers. *Broiler Chicken I*, 290 F. Supp. 3d at 781 (adding that "only [b]roiler producers that supply data to Agri Stats are permitted to receive the Agri Stats reports"). Among other things, the reports described the size of competitors' production facilities along with "detailed information" about their production capacity, in terms of "numbers of eggs, the size of breeder flocks, and other inventory numbers." *Id.* Agri Stats ostensibly anonymized the competitively sensitive information contained in these publications insofar as they "d[id] not identify the [b]roiler producers by name." *Id.* Critically, however, "the reports [were] **so detailed that a reasonably informed producer [could] discern the other producers' identities**." *Id.* (emphasis added).

7

The defendant-broiler producers publicly acknowledged that Agri Stats's reports "provide[d] them knowledge of their competitors' production plans, and that they rel[ied] on this information to plan their own production." *Id.*; *see also id.* at 798 ("Defendants [allegedly] knew that they were all in agreement because **Agri Stats reports and briefings served as a mechanism to monitor each other's production cuts.**").  The *Broiler Chicken I* Court concluded, in relevant part, that Agri Stats "facilitated the conspiracy" because it was "a tool [defendant-broiler producers] used to help implement their conspiracy." *Id.* at 800.

Agri Stats was ultimately named a defendant in the litigation as the broiler producers' co-conspirator. *See In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, 2019 WL 1003111 (N.D. Ill. Feb. 28, 2019) ("*Broiler Chicken II*").  In moving to dismiss the claims against it, Agri Stats conceded that its reports facilitated the broiler producers' alleged conspiracy as set forth in *Broiler Chicken I*. *Id.* at *1 (reiterating *Broiler Chicken I* finding that Agri Stats facilitated the conspiracy by providing market reports that were "so detailed that the ostensible anonymity of the information [was] breached, and [defendant-broiler producers] were able to use [them] to communicate their [b]roiler production intentions, thereby conspiring to fix [b]roiler prices").  Nonetheless, Agri Stats argued that the complaint failed to allege that Agri Stats *joined* the conspiracy as required for Section 1 liability. *Id.*  The Court denied Agri Stats's motion to dismiss, however, explaining that the company "plausibly knew that it was providing [defendant-broiler producers] with a non-public means for communicating production plans, thereby enabling the price fixing conspiracy." *Id.* at *2.  The Court further opined that "[i]t is at least plausible (if not likely) that a person who facilitates a conspiracy knows about the conspiracy and engages in the facilitation knowing of its consequences." *Id.* (citing *In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1003 (N.D. Ill. 2011)).

8

Agri Stats was the subject of similar allegations in *Olean Wholesale Grocery Cooperative, Inc. v. Agri Stats, Inc.*, No. 19-cv-8318, 2020 WL 6134982 (N.D. Ill. Oct. 19, 2020). There, class plaintiffs maintained that turkey wholesalers agreed to exchange detailed, competitively sensitive information through Agri Stats. *Id.* at *1, *6. More specifically, the wholesalers were alleged to have provided their respective production and sales data to Agri Stats, which used that information to create industry reports. *Id.* at *1. Agri Stats delineated "the participants that provided data for each report," which in turn contained information "specific to each turkey producer" about their production levels, prices, and profits. *Id.* (emphasis added). Moreover, while Agri Stats again *appeared* to have anonymized the data it circulated, **its reports included such detailed information that "each [defendant-turkey wholesaler] could infer the company to which each data set referred."** *Id.* (emphasis added).

This Court ultimately denied Agri Stats and the turkey wholesalers' joint motion to dismiss in *Olean* – finding that plaintiffs plausibly alleged a hub-and-spoke conspiracy among Agri Stats (the hub) and the wholesalers (the spokes) in which the former agreed to facilitate anticompetitive information exchanges among the latter. *Id.* at *6. As in *Broiler Chicken II*, Agri Stats's role in the conspiracy was evinced by allegations that it anonymized its market reports in only the most superficial fashion, which effectively enabled the co-conspirators to "decipher the data pertaining to each producer" and raise their prices in concert. *Id.* at *1, *6.

Finally, a recent decision from the *Broiler Chicken Antitrust Litigation* provides an informative counterbalance to the *Broiler Chicken II* and *Olean* rulings. *See In re Broiler Chicken Antitrust Litig.*, No. 16-cv-8637, 2021 WL 2207142 (N.D. Ill. June 1, 2021) ("*Broiler Chicken III*"). In *Broiler Chicken III*, plaintiffs alleged that a new defendant, Rabobank, "played a similar [conduit or facilitatory] role" as Agri Stats in the underlying conspiracy among defendant-broiler

9

producers. *Id.* at \*1. More specifically, plaintiffs alleged they discovered emails in which Rabobank claimed to have "relayed communications" between certain other defendants, which "raise[d] the specter of Rabobank serving as a communications conduit akin to Agri Stats." *Id.* Nonetheless, Court granted Rabobank's motion to dismiss because the complaint lacked sufficient factual detail to affirmatively link Rabobank to an anticompetitive conspiracy. *Id.* Among other things, it was generally "unsurprising and unsuspicious" for Rabobank to communicate with its clients, the defendant-broiler producers. *Id.* Absent more specific allegations that Rabobank's communications to the other defendants were in some way unlawful, plaintiffs' claims against Rabobank could not proceed. *Id.* ("Rule 12(b)(6) . . . does not permit Plaintiffs to chase ghosts. The mere possibility that the subject matter of Rabobank's communications was the alleged conspiracy . . . is insufficient to state a claim."). Significantly, the Court distinguished Agri Stats and Rabobank's alleged roles as conduits or facilitators of the conspiracy. *Id.* at \*2. It explained as follows:

> Plaintiffs' allegations against Agri Stats were much more concrete [than those against Rabobank]. Plaintiffs alleged that **Agri Stats['s] "reports are so detailed that the ostensible anonymity of the information is breached, <u>and</u> Defendants were able to use the reports to communicate their Broiler production intentions, thereby conspiring to fix Broiler prices."** [*Broiler Chicken II*], 2019 WL 1003111, at \*1. And since Agri Stats produced the reports, the Court found it plausible that Agri Stats knew the reports were being used to facilitate conspiracy. There is no similar factual basis regarding Rabobank's communications with Defendants from which the Court can infer that those communications concerned the alleged supply reduction conspiracy.

*Id.* (emphasis added).

Thus, to plausibly infer that a defendant *facilitated* a conspiracy, plaintiffs must allege facts showing that the conduit's circulation of information enabled co-conspirators to tacitly communicate with one another. Courts seek "concrete" allegations that the conduit-defendant compromised "the ostensible anonymity" of competitively sensitive information through its

10

publication of market research analytics, among other things. *E.g.*, *Broiler Chicken III*, 2021 WL 2207142, at \*1; *Broiler Chicken II*, 2019 WL 1003111, at \*1; *Olean*, 2020 WL 6134982, at \*6. This premise is borne out by the law of other jurisdictions, as well. *See, e.g.*, *Todd*, 275 F.3d at 212–13 (reversing dismissal where third-party consulting firm disseminated reports consisting of competitively sensitive information **"broken down to subsets consisting of as few as three competitors,"** which enabled defendants to "easily and quickly" coordinate employee compensation levels with their competitors); *Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 166–67 (D.D.C. 2004) (citing *Todd*, 275 F.3d at 212) (denying motion to dismiss where defendant annually collected and disseminated data about employee compensation rates; defendant's reports plausibly facilitated the price-fixing conspiracy because "once salary information [in the report] is broken down into subsets based on year of employment, region, and ownership type, **those subsets consist of as few as five employers**") (internal quotation marks omitted). *Cf. In re Domestic Drywall Antitrust Litig.*, 163 F. Supp. 3d 175, 243, 248 (E.D. Pa. 2016) (denying defendants' motion for summary judgment where third-party research analysts "directly communicated information shared by one Defendant with another Defendant either directly . . . or indirectly (e.g., by quoting a manufacturer in an analyst report [verbatim] and then circulating those reports among Defendants)"); *In re Titanium Dioxide Antitrust Litig.*, 959 F. Supp. 2d 799, 829 (D. Md. 2013) (denying defendants' motion for summary judgment where third-party consultant was alleged to directly siphon anticompetitive information between defendants – regarding, for example, their relative inventory and pricing levels).

Turning to the case at bar: Plaintiffs take issue with ShareBuilders's business of (1) amassing "detailed holding capacity information" entailing "historical, current, and near-future holding capacity shares," (Dkt. 555 ¶¶ 101, 108, 110–12); (2) creating "custom station reports" for

11

its clients which set forth current and forward-looking pacing data, (*id.* ¶¶ 101, 113–15, 117–18); (3) circulating weekly rate cards containing "recommended pricing for each time slot," (*id.* ¶¶ 101, 119); and (4) recommending minimum prices that its clientele (including some Defendants in this case) should charge for advertising time slots on a weekly basis, (*id.* ¶¶ 101, 119). ShareBuilders's product allegedly help companies "adjust[] prices in response to market behavior" to maximize their profits. (*Id.* ¶ 102 (emphasis added); *see also id.* ¶¶ 105–07). However, Plaintiffs' charge falls short of plausibly alleging that ShareBuilders facilitated underlying misconduct as a conduit of communication, in the vein of Agri Stats in the *Broiler Chicken Litigation*. Specifically, they fail to allege that ShareBuilders's analytics were presented with so much specificity that the Broadcaster Defendants could use them to "police a secret or tacit conspiracy to [fix] prices." *Todd*, 275 F.3d at 212. Absent such allegations, the TAC lacks any plausible inference that ShareBuilders facilitated Broadcast Defendants' scheme. *Compare Broiler Chicken II*, 2019 WL 1003111, at *1 (denying motion to dismiss conduit liability claim where defendant-market researcher disseminated data that was "so detailed that the ostensible anonymity of the information [was] breached, and [other defendants] were able to use [that data] to communicate [about] their [antitrust scheme]"), *and Olean*, 2020 WL 6134982, at *6 (holding same), *with Broiler Chicken III*, 2021 WL 2207142, at *1 (granting motion to dismiss where complaint raised only an ambiguous "specter" that defendant served as defendants' conduit of indirect communications).

For example, while Plaintiffs challenge ShareBuilders's circulation of holding capacity data, they also recognize that ShareBuilders uses this data to show clients **"a picture of what is happening in the market as a whole"** alongside each client's *own* "expected share of a market's revenue." (Dkt. 555 ¶¶ 110–11 (emphasis added)). By contrast, the TAC lacks any well-pled allegation that this practice secretly served to channel Defendant Company A's holding capacity

12

data to Defendant Company B.  Allegations surrounding the holding capacity data thus do not support Plaintiffs' antitrust claim.

Plaintiffs' position about the custom station reports is unpersuasive for similar reasons. (*See id.* ¶¶ 113–18).  ShareBuilders's reports document and forecast several measures of "local [and] national pacing." (*Id.* ¶ 114).  Plaintiffs point to the following excerpt from one such report:

**EXHIBIT A**

Local+National Pacings - Q3 & Q4 (1/2)

| Local+National Pacing | Jul '18 | Aug '18 | Sep '18 | Quarter 3 | Oct '18 | Nov '18 | Dec '18 | Quarter 4 | Semi-Annual |
|---|---|---|---|---|---|---|---|---|---|
| 2018 Station Forecast or Actual | 3,070,000 | 3,865,000 | 3,785,000 | 10,720,000 | 2,700,000 | 3,460,000 | 3,380,000 | 9,540,000 | 20,260,000 |
| 2017 Final | 3,164,197a | 4,733,000a | 3,670,803a | 11,568,000 | 3,861,000a | 4,405,000a | 3,702,000a | 11,968,000 | 23,536,000 |
| KPNX Pacing % Change | -3.0% | -14.2% | 15.2% | -3.1% | -32.5% | -7.8% | -3.0% | -15.4% | -6.9% |
| | | | | | | | | | |
| TEGNA Stations Local+Nation | -12.2% | -9.0% | -5.3% | -9.0% | -4.5% | -3.1% | -4.0% | -3.9% | -7.4% |
| All SB TV Stations Local+Natio | -5.6% | -4.4% | 0.6% | -3.4% | 1.0% | -0.1% | -1.9% | -0.2% | -2.5% |
| SB Forecast | -5.4% | -5.7% | -4.3% | -5.2% | -13.7% | -4.0% | -2.0% | -7.1% | |
| | | | | | | | | | |
| ABC Stations Local+National P | -5.2% | -1.5% | 2.2% | -2.1% | 2.7% | -0.9% | -1.1% | 0.4% | -1.3% |
| CBS Stations Local+National P | -7.3% | -3.0% | -2.1% | -4.2% | -3.7% | -1.1% | 1.7% | -1.4% | -3.3% |
| NBC Stations Local+National | -6.8% | -8.2% | 0.5% | -5.3% | -1.6% | -1.3% | -3.3% | -1.9% | -4.3% |
| FOX Stations Local+National P | 0.6% | -1.7% | 3.6% | 0.7% | 3.7% | 1.8% | -7.9% | -0.5% | 0.3% |
| CW Stations Local+National Pa | -2.5% | -5.1% | 0.6% | -2.7% | 4.3% | -2.6% | -2.7% | -0.1% | -2.0% |
| MNTV Stations Local+National | -3.8% | -6.0% | 1.2% | -3.3% | 13.3% | 0.3% | -3.4% | 4.0% | -1.4% |
| TV Independent Stations Local+ | -6.5% | -3.4% | 3.6% | -2.7% | 6.9% | 2.0% | -0.9% | 2.9% | -1.3% |
| | | | | | | | | | |
| Midwest TV Stations Local+Nati | -7.1% | -3.5% | 0.9% | -3.6% | -2.5% | -2.2% | -4.2% | -2.9% | -3.4% |
| Northeast TV Stations Local+N | -5.2% | -9.1% | -3.7% | -6.2% | -2.6% | -1.7% | 2.0% | -1.0% | -4.9% |
| South Atlantic TV Stations Local | -7.0% | -0.6% | 5.4% | -1.3% | 6.1% | -0.8% | 1.5% | 2.4% | -0.1% |
| South Central TV Stations Local | -5.6% | -5.3% | -2.7% | -4.7% | 2.2% | 1.7% | 1.1% | 1.8% | -2.7% |
| West TV Stations Local+Natio | -1.7% | -5.6% | 2.0% | -2.1% | -0.6% | 1.8% | -9.2% | -2.3% | -2.2% |
| | | | | | | | | | |
| TV DMA Rank 1->20 Stations | -8.3% | -5.6% | -2.9% | -5.8% | 3.8% | 1.8% | 1.7% | 2.5% | -3.4% |
| TV DMA Rank 21->65 Stations | -5.1% | -3.3% | 1.3% | -2.6% | 2.0% | 2.5% | -0.5% | 1.5% | -1.3% |
| TV DMA Rank 66->100 Stations | -5.7% | -8.5% | -3.2% | -6.0% | -11.5% | -11.5% | -14.5% | -12.3% | -8.1% |
| TV DMA Rank 101+ Stations Lo | -2.4% | -1.3% | 8.5% | 0.7% | 4.3% | 0.7% | -1.1% | 1.7% | 1.0% |

The first group of data in Exhibit A sets forth various pacing information belonging to KPNX, a local television station based in Phoenix.[9]  The second group of data relates to TEGNA – KPNX's parent company[10] – as well as "All [ShareBuilders] TV Stations."  That said, according to the TAC, ShareBuilders's "clientele includes **over 300 television stations**" in total, (*id.* ¶ 45 (emphasis added)), and it provides services "throughout the United States," (*id.* ¶¶ 17, 45).  In other words, there are many companies included in the "All TV Stations" statistic and they

---

[9] *See* https://www.12news.com/about-us ("12News [KPNX] is the Phoenix NBC affiliate owned by TEGNA Inc.").
[10] *See id.*

apparently are not geographically concentrated. Next, the third group of data provides pacing information for several major national broadcast television networks, including ABC, CBS, and NBC (with which TEGNA is affiliated[11]). The fourth set of pacing data covers all television stations located in five significant geographic regions of the United States, such as the west coast (where KPNX is located). Finally, the last group of data concerns all 210 DMAs located throughout the country. (*Cf. id.* ¶ 236). The first row in this group is labeled "TV DMA Rank 1 [through] 20 Stations," referring to "Nielson DMA Rankings" that are based on regional population.[12] (*Cf. id.* ¶ 17).

Again, fatal to Plaintiffs' claim is the fact the data challenged in Exhibit A lacks sufficient granularity to suggest that ShareBuilders facilitated the conspiracy. As explained here, each group of data in Exhibit A either pertains exclusively to one of ShareBuilders's clients, or else aggregates data belonging to tens if not hundreds of completely anonymous local media companies across the country. These allegations thus do not permit an inference that ShareBuilders's reports, standing alone, allowed Broadcaster Defendants to monitor specific competitors' activity on the market. *Contra Olean*, 2020 WL 6134982, at *6 (denying Agri Stats's motion to dismiss where complaint plausibly alleged that it facilitated a by supplying analytics which included such detailed information that "each [defendant-turkey wholesaler] could infer the company to which each data set referred"); *Broiler Chicken II*, 2019 WL 1003111, at *1–2 (citing *Broiler Chicken I*, 290 F. Supp. 3d 772) (same where Agri Stats provided research results in such a detailed format that all "ostensible anonymity of the information [was] breached, and [other defendants] were able to use

---

[11] *See id.*

[12] *See, e.g.*, https://mediatracks.com/resources/nielsen-dma-rankings-2020/ ("Nielsen's DMA rankings are based on the population of [or "total homes" in] each surveyed market region."); *see also* https://oaaa.org/Portals/0/Public%20PDFs/OAAA%202021%20NIELSEN%20DMA%20Rankings%20Report.pdf (setting forth 2021 Nielsen DMA rankings, wherein the Phoenix region was ranked eleventh).

[the reports] to [indirectly] communicate their [competitive] intentions"). Suffice it to say that the second custom station report excerpt challenged by Plaintiffs, (*see* Dkt. 555 ¶ 115 (providing individual client's "pricing targets" and budget, among other non-competitor specific data points)), is deficient for the same reason.

Finally, TAC allegations about ShareBuilders's weekly rate cards and bottom prices – through which ShareBuilders recommended various pricing strategies to its clients – also fail to state a Section 1 claim. (*See id.* ¶¶ 119–20). All that the TAC plausibly suggests is that ShareBuilders conducted market research, recommended pricing strategies to its clients on an ad hoc basis to help improve their profit margins, and that its clients at least sometimes accepted those recommendations. (*E.g.*, *id.* ¶¶ 100 (citing email exchange between TEGNA employees concerning TEGNA's contracts with ShareBuilders), 121–22 (same regarding ShareBuilders's price recommendations)). In this respect, too, the TAC suggests no unlawful conduct on ShareBuilders's part.

Considering the foregoing discussion, the Court finds that ShareBuilders's purported role in this case is more akin to that of Rabobank's, rather than Agri Stats's, in the *Broiler Chicken Antitrust Litigation*. The TAC is devoid of sufficiently concrete allegations that ShareBuilders's market reports and recommendations were crafted in such a way that enabled Broadcaster Defendants to tacitly communicate with one another about their anticompetitive scheme. *E.g.*, *Todd*, 275 F.3d at 212; *Olean*, 2020 WL 6134982, at *1; *Broiler Chicken II*, 2019 WL 1003111, at *1–2. Accordingly, ShareBuilders's Motion to Dismiss is granted. The Court makes no finding as to whether the Broadcaster Defendants *unilaterally* used ShareBuilders's research in a manner that violated Section 1 or the terms of Consent Decrees entered by the United States Department of Justice. (*E.g.*, Dkt. 555 ¶¶ 59, 116).

15

## CONCLUSION

ShareBuilders's motion to dismiss [588] is granted and ShareBuilders is dismissed without prejudice. Plaintiffs may timely amend their complaint should they discover additional facts that plausibly implicate ShareBuilders in the underlying conspiracy.

_____
Virginia M. Kendall
United States District Judge

Date: August 29, 2022

16