IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |
|---|---|
| IN RE: LOCAL TV ADVERTISING ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) ) | MDL No. 2867<br>No. 18 C 6785<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

The Judicial Panel on Multidistrict Litigation consolidated before this Court antitrust actions pending in multiple jurisdictions because the cases involve common questions of fact and centralization will promote the just and efficient conduct of this litigation. (Dkt. 1). The actions each allege a conspiracy to artificially inflate the prices of local television spot advertisements throughout the United States. Defendants Sinclair Broadcast Group, Inc. ("Sinclair") and Griffin Communications, LLC ("Griffin") moved for partial judgment on the pleadings of Plaintiffs'[1] Consolidated Third Amended Antitrust Class Action Complaint ("TAC") as deficient on their face. (*See* dkt. 637). For the reasons set forth below, Sinclair's and Griffin's motion [637, 638] is dismissed as moot.

## BACKGROUND

Plaintiffs allege that during the Class Period,[2] Defendants[3] secretly orchestrated a unitary scheme to supra-competitively raise the prices of broadcast television spot advertisements by

---

[1] "Plaintiffs" refers collectively to Thoughtworx, Inc. d/b/a MCM Services Group; One Source Heating & Cooling LLC; Hunt Adkins, Inc.; and Fish Furniture. (Dkt. 555 ¶¶ 19–22).
[2] The "Class Period" begins in the first quarter of 2014 and continues until "the effects of the unlawful conduct are adjudged to have ceased." (Dkt. 555 ¶ 302).
[3] The Court uses the term "Defendants" to refer collectively to all defendants in this action at the time the TAC was filed: CBS Corporation ("CBS"); Cox Media Group, LLC ("Cox Media"); Dreamcatcher Broadcasting, LLC ("Dreamcatcher"); The E.W. Scripps Company ("E.W. Scripps"); Griffin Communications, LLC ("Griffin"); Fox Corporation ("Fox"); Katz Media Group, Inc. ("Katz"); Meredith Corporation ("Meredith"); Nexstar Media Group,

agreeing to fix prices and exchange sales data, including pacing data.[4] (Dkt. 555 ¶ 2). Purchasers of broadcast television spot advertising knew nothing of the data exchange and the data itself. (*Id.* ¶ 3). The information Defendants exchanged included both local and national broadcast television spot advertising data and was shared, with the Broadcaster Defendants'[5] knowledge and at their direction, with individuals within the Broadcaster Defendants' organizations with authority over pricing. (*Id.* ¶ 4). The scheme derailed the competitive process and allowed the Broadcaster Defendants to avoid price competition, harming direct purchasers of broadcast television spot advertising in Designated Market Areas ("DMAs") throughout the United States because it enabled the Broadcaster Defendants to better understand the availability of their would-be competitors' inventory through the exchange of pacing data. (*Id.*)

Cox Media and Katz, the "Sales Rep Firms," function "as extensions of a station's sales staff and are familiar with various rate cards (prices) and program research demographics." (*Id.* ¶ 50). The Sales Rep Firms are industry participants that regularly communicate with each Broadcaster Defendant to serve the Broadcaster Defendants' demands. (*Id.*) The Sales Rep Firms facilitated the "exchange [of] real-time pacing information" between Defendants. (*Id.*) Defendants' alleged price-fixing cartel was facilitated in large part through a reciprocal exchange of competitively sensitive information, which included: (1) pacing information, (2) average price

---

Inc. ("Nexstar"); Gray Television, Inc. ("Gray TV"), through its acquisition of Raycom Media, Inc. ("Raycom"); Sinclair Broadcast Group, Inc. ("Sinclair"), TEGNA, Inc. ("TEGNA"), Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), Tribune Media Company ("Tribune Media"); and ShareBuilders. (Dkt. 555 ¶¶ 25–50). Only defendants Sinclair and Griffin joined this Motion for Partial Judgment on the Pleadings. (Dkt. 637).

[4] According to the TAC, pacing data "is used to compare a broadcast station's revenues booked for a certain time period (either a current or future period) to the revenues booked for the same point in time in the previous year. It is accompanied by a percentage figure (i.e., that a station's revenue indicates that it is pacing plus or minus 10%, 20%, 30%, or so on). Pacing indicates how each station is performing compared to the rest of the market and provides insight into each station's remaining broadcast television spot advertising inventory for a current or future period. The exchange of pacing information reveals the Broadcaster Defendants' remaining supply, with supply being a, if not the, key factor informing negotiations over price." (Dkt. 555 ¶ 63).

[5] The Court uses the term "Broadcaster Defendants" to refer collectively to CBS, Cox Enterprises, Dreamcatcher, Fox, Griffin, Meredith, Nexstar, Raycom, Scripps, Sinclair, TEGNA, and Tribune. (Dkt. 555 ¶ 46). The Court uses the term "Sales Rep Firms" to refer collectively to Cox Media and Katz. (*Id.* ¶ 50).

data through a third-party called Kantar, available at a granular level broken down by DMA and inventory type (e.g., early news, late news, prime time), and (3) other forms of competitively sensitive sales information (including information exchanged through ShareBuilders). (*Id.* ¶ 59).

Certain Broadcaster Defendants retained ShareBuilders to assist with inventory management and pricing. (*Id.* ¶ 11). ShareBuilders provides yield management solutions[6] in the broadcast media sales industry nationwide. (*Id.* ¶¶ 17, 45, 99, 102 (adding that ShareBuilders helps broadcasters "navigate the complexities of a competitive [television advertising] market")). Its stated business goal is to "increase client profitability by decreasing their **pricing workload** and increasing their revenue." (*Id.* ¶ 102 (emphasis in original); *see also id.* ¶ 103 (stating that ShareBuilders's client stations yield "a profit margin of over 98% on average" in the first two years of working with it)). ShareBuilders currently serves over 300 clients—"some of which are owned or affiliated with [Broadcaster Defendants]." (*Id.* ¶¶ 99, 100 (specifying that its clients include Defendants Sinclair, Tribune, Scripps, Cox, Raycom, and TEGNA)).

In March 2022, Plaintiffs filed their Consolidated Third Amended Antitrust Class Action Complaint ("TAC"), which added ShareBuilders as a defendant in this action. (*Compare* dkt. 555 ¶¶ 25–50 (identifying defendants) *and* dkt. 292 ¶¶ 21–42 (identifying defendants)). ShareBuilders moved to dismiss Plaintiffs' claims in the TAC that ShareBuilders acted as a conduit of information exchange between and among the Broadcaster Defendants. (Dkt. 588). After ShareBuilders's Motion to Dismiss was fully briefed and pending this Court's ruling, Defendants moved for Partial Judgment on the Pleadings on Plaintiffs' claims as to ShareBuilders's

---

[6] ShareBuilders defines "yield management" as "the process of appropriately **managing pricing** and inventory to maximize or grow revenue. **It's a system of adjusting prices** in response to market behavior, and choreographic buying behavior, timing and pricing to get the best result." (Dkt. 555 ¶ 102 (emphasis in original)).

involvement in the alleged Sherman Act violations. (Dkt. 637, 638). This Court subsequently granted ShareBuilders's Motion to Dismiss. (Dkt. 716).

## LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A Rule 12(c) motion for judgment on the pleadings is treated according to the same standard as a Rule 12(b)(6) motion to dismiss. *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 313 (7th Cir. 2020). The complaint's "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), must offer more than "labels and conclusions" or "a formulaic recitation of the elements." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "As with a motion to dismiss, the court views all facts and inferences in the light most favorable to the non-moving party." *Federated Mut. Ins. Co.*, 983 F.3d at 313.

## DISCUSSION

To state a claim for a violation of Section 1 of the Sherman Act, Plaintiffs must allege "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012) (quoting *Denny's Marina, Inc. v. Renfro Prods., Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993)) (internal quotation marks omitted). Exchange of information is not illegal per se but can be found unlawful under a "rule of reason" analysis, which considers "a number of factors including most prominently the structure of the industry involved and the nature of the information exchanged." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (citing *United States v. United*

4

*States Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978)). Although "[c]ourts have not prescribed what conspiratorial communications must look like" for a plaintiff to plausibly state a claim, "[t]here are certain well-established criteria used to help ascertain the anticompetitive potential of information exchanges." *Todd*, 275 F.3d at 211. One relevant factor is "the specificity of the information" exchanged. *Id.* at 212. Dissemination of *aggregated* information which "avoid[s] transactional specificity" (for example, data exchanged in the form of industry averages) is generally favored in the antitrust context. *Id.* By contrast, "[p]rice exchanges that identify **particular parties, transactions, and prices** are seen as potentially anticompetitive because they may be used to police a secret or **tacit conspiracy** to stabilize prices." *Id.* (emphasis added).

This Court's opinion granting ShareBuilders's Motion to Dismiss, (dkt. 716), moots Sinclair's and Griffin's motion for partial judgment on the pleadings, (dkt. 637, 638). The Court already reached the same conclusion to which Sinclair's and Griffin's arguments lead, albeit via an alternate analysis. The Court determined ShareBuilders did not plausibly facilitate either Broadcaster Defendants' alleged price-fixing conspiracy or their alleged exchange of competitively sensitive information. (Dkt. 716 at 15).

Sinclair and Griffin first argue that Plaintiffs fail to allege sufficient facts showing the Broadcaster Defendants agreed amongst themselves to use ShareBuilders's reports to implement their price-fixing conspiracy. (*See* dkt. 637 at 7–11). Sinclair and Griffin focus on the element of *agreement* amongst market actors required to establish "a contract, combination, or conspiracy" that illegally restrains trade in violation of the Sherman Act. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) ("'The crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" (quoting *Theater Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). They argue the TAC

5

fails to allege facts showing Broadcaster Defendants agreed to use ShareBuilders generally, much less that they agreed "to use [ShareBuilders] to implement or facilitate a price-fixing conspiracy." (Dkt. 637 at 8). Sinclair and Griffin characterize Plaintiffs' allegations of ShareBuilders's involvement as a deficient "hub-and-spoke" conspiracy, because there is no alleged "rim" of agreement connecting the Broadcaster Defendants (the "spokes") to use ShareBuilders as a "hub" for fixing prices. (Dkt. 637 at 8). Sinclair and Griffin further argue Plaintiffs failed to allege sufficient facts showing they agreed to use ShareBuilders to exchange competitively sensitive information among stations in the same DMA. (Dkt. 637 at 11–13). Finally, Sinclair and Griffin argue there is an obvious alternative explanation for a Broadcaster Defendant to use ShareBuilders's reports. (Dkt. 637 at 13–15).

This Court found the "TAC is devoid of sufficiently concrete allegations that ShareBuilders's market reports and recommendations were crafted in such a way that enabled Broadcaster Defendants to tacitly communicate with one another about their anticompetitive scheme." (Dkt. 716 at 15). Because the ShareBuilders reports provided their clients with aggregated, broad-based market-level data alongside individual clients' own data, ShareBuilders's clients (Defendants) could not have used this data "to monitor specific competitors' activity on the market." (*Id.* at 14). The ShareBuilders reports "lack[] sufficient granularity to suggest that ShareBuilders facilitated the conspiracy." (*Id.* at 14). In other words, ShareBuilders could not have been a conduit—or a "hub"—to facilitate a price fixing conspiracy or exchange competitively sensitive information amongst the Broadcaster Defendants, with or without an agreement to do so. The reports ShareBuilders generated for each of their clients (stations owned by the Defendants), standing alone, did not allow those clients to identify "particular parties, transactions, and prices" and thereby tacitly communicate amongst competitors to control prices. *Todd*, 275 F.3d at 211.

6

Regarding the Broadcaster Defendants' general use of ShareBuilders data, this Court found "[a]ll that the TAC plausibly suggests is that ShareBuilders conducted market research, recommended pricing strategies to its clients on an ad hoc basis to help improve their profit margins, and that its clients at least sometimes accepted those recommendations." (Dkt. 716 at 15). This restates Sinclair's and Griffin's "obvious alternative explanation" for using ShareBuilders.

This Court, however, made "no finding as to whether the Broadcaster Defendants *unilaterally* used ShareBuilders's research in a manner that violated Section 1, or the terms of Consent Decrees entered by the United States Department of Justice." (Dkt. 716 at 15 (citing Dkt. 555 ¶¶ 59, 116)). The Court cannot say at this time whether Broadcaster Defendants themselves improperly exchanged their own stations' custom ShareBuilders reports amongst competitor stations in the same DMA. These reports contained client stations' own pacing information to compare with the larger aggregated market trends. (Dkt. 555 ¶ 109, 114, 117). Plaintiffs also alleged at least one instance where a Broadcaster Defendant may have exchanged a ShareBuilders report with its competitors. (Dkt. 555 ¶ 135 (quoting an internal email communication between Raycom executives: "Pat: this is the latest I have from Sharebuilders [sic] . . . . will talk to Scripps, Tribune, Tegna . . . .")). Plaintiffs have built their case on instances of Defendant Broadcasters improperly exchanging competitively sensitive information, including pacing information, amongst competitors in the same DMAs. (*See, e.g.*, dkt. 555 ¶ 59). If Defendants in fact exchanged their stations' custom ShareBuilders reports with direct competitors, Plaintiffs may use this as circumstantial evidence tending to prove their claims against Defendants.

## CONCLUSION

The Court dismisses as moot Sinclair's and Griffin's Motion for Partial Judgment on the Pleadings [637, 638] because the Court has already established ShareBuilders did not facilitate

Plaintiffs' alleged price-fixing conspiracy or their alleged exchange of competitively sensitive information in the Court's Opinion and Order granting ShareBuilders's Motion to Dismiss, (dkt. 716).

Date: October 21, 2022

_____
Virginia M. Kendall
United States District Judge