IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | ) | |
|---|---|---|
| | ) | |
| | ) | MDL No. 2867 |
| IN RE: LOCAL TV ADVERTISING | ) | No. 18 C 6785 |
| ANTITRUST LITIGATION | ) | |
| | ) | Judge Virginia M. Kendall |
| | ) | |
| | ) | |

### MEMORANDUM OPINION AND ORDER
### DEFENDANTS' MOTION TO COMPEL DISCOVERY

Defendants[1] move to compel Plaintiffs[2] to produce documents responsive to Defendants' RFPs 3, 25, 26, and 55–58, and to provide complete responses to Interrogatories 3 and 11. Defendants also move to compel Plaintiff Hunt Adkins to designate an additional document custodian. (Dkt. 652). Defendants argue they are entitled to this discovery to challenge the Agency Plaintiffs' standing to pursue antitrust claims as direct purchasers and their adequacy to represent the putative class, as well as Plaintiffs' definition of the relevant antitrust market. (*Id.* at 1). For the following reasons, Defendants' motion is denied. (Dkt. 652).

### LEGAL STANDARD

"[D]istrict courts enjoy extremely broad discretion in controlling discovery." *Jones v. City of Elkhart*, 737 F.3d 1107, 1115 (7th Cir. 2013). Non-privileged information is discoverable if it

---

[1] "Defendants" refers collectively to CBS Corporation ("CBS"); Cox Media Group, LLC ("Cox Media"); Dreamcatcher Broadcasting, LLC ("Dreamcatcher"); The E.W. Scripps Company ("E.W. Scripps"); Griffin Communications, LLC ("Griffin"); Fox Corporation ("Fox"); Katz Media Group, Inc. ("Katz"); Meredith Corporation ("Meredith"); Nexstar Media Group, Inc. ("Nexstar"); Gray Television, Inc. ("Gray TV"), through its acquisition of Raycom Media, Inc. ("Raycom"); Sinclair Broadcast Group, Inc. ("Sinclair"), TEGNA, Inc. ("TEGNA"), Tribune Broadcasting Company, LLC ("Tribune Broadcasting"), and Tribune Media Company ("Tribune Media"). (Dkt. 555 ¶¶ 25–44; 46–50). The Court dismissed Defendant ShareBuilders, Inc., from this action after Defendants filed this Motion. (Dkt. 716).
[2] "Plaintiffs" refers collectively to Thoughtworx, Inc. d/b/a MCM Services Group ("Thoughtworx"); One Source Heating & Cooling LLC ("One Source"); Hunt Adkins, Inc.; and Fish Furniture. (Dkt. 555 ¶¶ 19–22). Plaintiffs Thoughtworx and Hunt Adkins are referred to collectively as the "Agency Plaintiffs."

is "relevant to any party's claim or defense and proportional to the needs of the case, considering . . . the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

## DISCUSSION

### A. Antitrust Standing

Defendants urge the Court to allow further discovery so they may challenge whether Plaintiffs Thoughtworx and Hunt Adkins have antitrust standing as direct purchasers of broadcast TV advertising.[3] The canonical cases on this issue, *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) guide the Court in evaluating the relevancy of the information Defendants seek in discovery.[4]

In *Hanover Shoe*, the Court rejected defendants' contention that the direct-purchaser plaintiffs lacked standing to sue because they suffered no antitrust injury if they passed down overcharges to downstream purchasers. *Hanover Shoe, Inc.*, 392 U.S. at 489 ("We hold that the buyer is equally entitled to damages if he raises the price for his own product. As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows."). The Court recognized that proving this defense would be near impossible, as a "wide range of factors influence a company's pricing policies" to their downstream customers. *Id.* at 492. Allowing antitrust defendants to seek evidence about whether direct purchasers passed overcharges along to indirect purchasers or even profited from such overcharges, the Court reasoned, would "often require additional long and complicated proceedings involving massive evidence and complicated

---

[3] On this issue, Defendants move Plaintiffs to produce documents responsive to RFPs 3, 26, 55–58, and to completely answer Interrogatory 3. (Dkt. 652 at 6, 8–10; *see also* dkt. 652-9 at 9, 14; dkt. 652-10 at 10–11; dkt. 652-8 at 10–12).
[4] Both *Hanover Shoe* and *Illinois Brick* construe Section 4 of the Clayton Act, 38 Stat. 731, 15 U.S.C. § 15, which confers antitrust standing to sue on: "[a]ny person who shall be injured in his business or property by reason of anything forbidden in antitrust laws . . . ." *See Hanover Shoe*, 392 U.S. at 488–89; *Illinois Brick*, 431 U.S. at 724–26.

theories." *Id.* at 493. The Court concluded antitrust injury occurs when the first purchaser buys from the seller, regardless of resale transactions. *Id.* at 494.

*Illinois Brick* reaffirmed *Hanover Shoe*'s holding that the first purchaser suffers a cognizable antitrust injury. *Illinois Brick Co.*, 431 U.S. at 729 ("[T]he overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' . . . ." (internal citation omitted)). Indirect purchasers, in contrast, lack antitrust standing to bring suit even if they pay higher prices due to a supplier's antitrust violations. *Id.* at 729. In so holding, the Court also confirmed the "narrow scope . . . for any exception to its rule barring pass-on defenses," because *Hanover Shoe* had only cited a single possible situation where the defense might be permitted, a pre-existing cost-plus contract. *Id.* at 735–36. The Court recognized, "*Hanover Shoe* itself implicitly discouraged the creation of exceptions to its rule barring pass-on defenses." *Id.* at 745.

Defendants here disclaim their intent to pursue pass-on defenses against the Agency Plaintiffs; rather, they seek only information related to Agency Plaintiffs' standing and class certification. (Dkt. 652 at 10). To support this basis for discovery, they cite the *Illinois Brick* "control exception" to *Hanover Shoe*. The *Illinois Brick* Court speculated in a footnote: "Another situation in which market forces have been superseded and the pass-on defense *might* be permitted is where the direct purchaser is owned or controlled by its customer." 431 U.S. at 736 n.16 (emphasis added). First, the so-called "control" exception to *Illinois Brick* remains a pass-on defense, just one the Court "might" entertain under specific circumstances. After all, Defendants seek use this exception to question the Agency Plaintiffs' antitrust standing, like the *Hanover Shoe* defendants.

Defendants here argue advertising agencies—though undisputedly purchasing broadcast television ads directly from Defendants—might just be acting as agents directly controlled by their clients, who are, in turn, the true purchasers injured by the alleged antitrust violations affecting spot ad prices. In this situation, Defendants claim Agency Plaintiffs would have no antitrust standing, and advertising agencies could not be certified as class members; therefore, discovery is relevant to the Agency Plaintiffs' claim to standing. In essence, Defendants seek to show through discovery that the Agency Plaintiffs were not really harmed by Defendants' actions, just as the *Hanover Shoe* defendants unsuccessfully argued. *Hanover Shoe*, 392 U.S. at 487–88.

This "control" exception, however, is narrower than Defendants would have the Court believe. According to the Seventh Circuit, *Illinois Brick*'s exception contemplated a showing of either ownership or control "through interlocking directorates, minority stock ownership, loan agreements that subject [direct purchasers] to the [indirect purchasers'] operating control, trust agreements, or other modes of control separate from ownership of a majority of the [direct purchasers'] common stock." *In re Brand Name Prescription Drugs Antitrust Litigation*, 123 F.3d 599, 605–06 (7th Cir. 1997), *abrogated on other grounds by Rivet v. Regions Bank of La.*, 522 U.S. 470 (1998). "Control" in this context is nearly synonymous with "ownership"—it is not simply a principal-agent relationship. *See also Jewish Hosp. Ass'n of Louisville, Ky., Inc. v. Stewart Mech. Enterprises, Inc.*, 628 F.2d 971, 975 (6th Cir. 1980) ("Mindful of the *Illinois Brick* Court's emphasis upon the narrow scope of exemptions to the indirect-purchaser rule . . . we read these citations [to *Perkins v. Standard Oil Co.*, 395 U.S. 642, 648 (1969) and *In re Western Liquid Asphalt Cases*, 487 F.2d 191, 199 (9th Cir. 1973)] as evidence that the 'control' exception is limited to relationships involving such functional economic or other unity between the direct purchaser and either the defendant or the indirect purchaser that there effectively has been only

one sale."). In the control exception, the direct purchaser is not merely acting at the direction of the indirect purchaser; rather, the indirect purchaser is essentially the same entity as the direct purchaser, and thus incurs the antitrust injury directly.

The narrow "control exception" from *Illinois Brick* sets a high bar for relevancy to issues at stake in this case. To be discoverable, the information must be relevant to showing a comprehensive relationship of control exists via some degree of ownership of Agency Plaintiffs by their clients. Defendants make no claims that any information supporting this type of relationship exists, nor could they.

Defendants instead contend discoverable information relevant to the Agency Plaintiffs' antitrust standing may exist because two 10-K forms from nonparty advertising agencies "expressly state that they have a principal-agent relationship with the advertisers for whom they buy advertising airtime." (Dkt. 652 at 7). Even if true, this principal-agent relationship does not implicate control coextensive with ownership that the Seventh Circuit requires to qualify for the *Illinois Brick* control exception.

Even if a principal-agent relationship could in theory suffice to trigger the control exception, the existence of such a relationship insufficiently describes the market dynamics at play here. *See Illinois Brick*, 431 U.S. at 736 n.16 ("Another situation *in which market forces have been superseded* and the pass-on defense might be permitted is where the direct purchaser is owned or controlled by its customer." (emphasis added)). An ad agency may buy ads at the client's direction, but it does not mean this is all the agency does. The principal-agent relationship described in the 10-K forms says nothing of how the agency presents advertising prices and services to its clients, whether it includes any additional services and varying pricing structures along with the purchase

5

of advertising, how the agency packages spot advertisements in reselling to clients, or even how they make decisions as to which spots to offer to specific clients at specific prices.

Precisely because they lack such detailed information about the inner workings of ad agency business operations and product pricing structures, Defendants insist they need additional discovery to test the Agency Plaintiffs' antitrust standing. They must know:

> whether the first-level purchaser was reimbursed; whether the purchase itself was the ultimate service; whether the agent only executed the purchase at the request of the principal; whether the agent provided additional services such as strategic advice outside of—separate and apart from—purchasing and sales services; whether the purchaser has discretion over price, budget, and other factors; whether the purchaser held inventory; and whether the purchaser took title to the product before passing the product to the end purchaser.

(Dkt. 652 at 6–7). This extensive inquiry into the Agency Plaintiffs' operations and pricing structures edges dangerously close to the "massive evidence and complicated theories" *Hanover Shoe* warned against, risking pointless fishing expeditions seeking to pinpoint "virtually unascertainable figures" about overcharges passed along to downstream purchasers. 392 U.S. at 493. Moreover, the information's potential relevancy should consider "whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Given the Agency Plaintiffs' disclosed discovery about their operations thus far, the heavy burden of the proposed discovery outweighs its minimal benefit. Thoughtworx and Hunt Adkins provided evidence they purchase television ads as part of strategically developed, multi-pronged media advertising campaigns packaged for specific clients.[5] There is a very low probability that diving

---

[5] *See, e.g.*, Plaintiffs' Supplemental Responses and Objections to Defendants' Second Coordinated Set of Interrogatories to All Plaintiffs. (Dkt. 686-2, Ex. F at 12 ("Thoughtworx develops and conducts media advertising campaigns for its clients that can include, among other things, researching the issue being advertised, determining the geographic and demographic target audiences, determining the most appropriate advertising medium for reaching those target audiences, and procuring advertising placements, including broadcast television spots, radio spots, and other forms of advertising. Thoughtworx prices its media advertising campaigns on either a flat fee or a per lead generated basis.")). *See also, e.g.*, Hunt Adkins, Inc. Supplemental Responses and Objections to Defendants' First

into the minutia of their business operations will yield evidence—contrary to that already provided—that Thoughtworx and Hunt Adkins acted only to channel their clients' dictated orders to purchase designated ad spots from broadcasters, charging a commission for this service. And it would still not matter, because the Seventh Circuit's interpretation of "control" in this context contemplates more than a principal-agent relationship.

Finally, Defendants contend the Agency Plaintiffs' pricing, invoicing, and financial statements are relevant to determine if they were actually injured by allegedly anticompetitive conduct. They argue "any higher prices for class purchases caused by the alleged conduct may have generated higher commissions for the Agency Plaintiffs." (Dkt. 652 at 11). *Hanover Shoe* flatly rejects this basis for challenging plaintiffs' antitrust standing: "As long as the seller continues to charge the illegal price, he takes from the buyer more than the law allows. At whatever price the buyer sells, the price he pays the seller remains illegally high, and his profits would be greater were his costs lower." 392 U.S. at 489.[6]

In sum, there is little basis to find Defendants' proposed discovery relevant to issues at stake in this case. The information Defendants seek is not relevant to the Agency Plaintiffs' claim that as direct purchasers of broadcast television advertising, they have antitrust standing. The proposed discovery could only be relevant if it showed the Agency Plaintiffs were "controlled" by their clients in the manner contemplated by *Illinois Brick*'s narrow exception to *Hanover Shoe*. It

---

Coordinated Set of Interrogatories. (Dkt. 686-2, Ex. G at 11 ("Hunt Adkins designs a full media advertising campaign for each client based upon the client's needs and overall budget. Hunt Adkins selects from a broad range of possible media, that may include broadcast television spot advertising, when designing each campaign to ensure the client's marketing objectives are achieved.")).

[6] The Court granted Defendants leave to provide supplemental briefing on this motion following third-party discovery conducted since the original filing of this motion. (*See* dkt. 886). Defendants' supplemental brief makes no new legal arguments; they assert evidence only that ad agencies such as Carat USA, Stagwell, Inc., and Kelly Scott Madison (respondents to Defendants' third-party subpoenas) act as agents for their principals when purchasing spot advertising. (Dkt. 891 at 1–4). Even if a principal-agent relationship exists, this does not trigger the "control" exception to *Illinois Brick*.

is very unlikely to meet this high bar. Even were *Illinois Brick*'s control exception broad enough to encompass a principal-agent relationship, the information Defendants seek is unlikely to show the agencies took only directed orders for ads on behalf of their clients, with absolutely no value-add to their services. The burden and expense of discovery for such improbably relevant information outweighs its value given the evidence already disclosed at this stage. Finally, *Hanover Shoe* completely foreclosed the defense that evidence of direct purchasers' profits from sellers' antitrust activity destroys antitrust standing.

### B. Antitrust Market Definition

Defendants likewise urge the Court to compel Plaintiffs to produce evidence they claim is relevant to Plaintiffs' market definition of broadcast television spot advertising.[7] "As a threshold matter, a plaintiff must show that the defendant has market power—that is, the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing." *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). Defendants suggest further discovery is necessary because other forms of advertising, such as cable, digital, and radio advertising may be adequate substitutes for broadcast television spot ads in the broader market for advertising. If so, Defendants imply, their alleged price raises could not have had anticompetitive market effects, because purchasers in the relevant market for advertising would simply shift to other forms. Defendants' argument is unpersuasive.

---

[7] On this issue, Defendants move Plaintiffs to produce documents responsive to RFP 25, and to answer Interrogatory 11. (Dkt. 652 at 12). RFP 25 seeks documents concerning purchases of "any advertising other than Broadcast Television Advertising." (Dkt. 652-9 at 13–14). Interrogatory 11 asks Plaintiffs to "Describe with specificity how You determined Your budget(s) for broadcast television spot advertisements, cable television advertisements, digital media advertisements, and radio advertisements during the Class Period." (Dkt. 652-8 at 25–26).

The Court first notes this request for production of documents at this stage would significantly expand the scope of discovery in the final months of a years' long process. (*See* dkt. 844 (ruling close-of-fact discovery for April 15, 2023)). Further, the Court finds highly persuasive the fact that the FCC considers local broadcast television programming to be the relevant market for antitrust purposes, finding that "non-broadcast video offerings still do not serve as meaningful substitutes for local broadcast television." *In the Matter of 2014 Quadrenniel Regul. Rev. F Rev. of the Commn's Broad. Ownership Rules & Other Rules Adopted Pursuant to Section 202 of the Telecomm's Act of 1996*, 31 F.C.C. Rcd. 9864, 9873 (2016). While the FCC's administrative guidance concerned the market for video programming content rather than advertising, the reasoning holds true for both: "While non-broadcast video programming may offer consumers additional programming options in general, they do not serve as a meaningful substitute in local markets due to their national focus. Unlike broadcast television stations, national programmers are not responsive to the specific needs and interests of local markets . . . ." *Id.* at 9874. Similarly, advertising across nationwide cable or online media platforms would not offer advertisers the specificity of local television broadcast markets. Additionally, in its enforcement action against several of the Defendants, the DOJ also considered broadcast television spot advertising to be the relevant antitrust market in this context.[8]

Moreover, Defendants do not need Plaintiffs' advertising budgets and internal allocations of this budget to different forms of advertising to challenge the proposed market definition. Defendants may provide expert witness evidence on this topic or other statistical market analyses showing substitutability between different forms of advertising within local media markets. They

---

[8] For links to the related complaints and settlements, see Press Release, *Justice Department Reaches Settlement with Five Additional Broadcast Television Companies, Including One National Sales Representative Firm, in Ongoing Information Sharing Investigation*, U.S. DEP'T OF JUST. (June 17, 2019), https://www.justice.gov/opa/pr/justice-department-reaches-settlement-five-additional-broadcast-television-companies-0.

have their own sales data for non-broadcast-television advertising, so they surely can extrapolate substitutability from this data. Considering the burden of additional document discovery at this stage of the case—when Defendants themselves have not had to disclose transactional data or documents related to their sales of other forms of media advertising—this discovery would be disproportionate to the needs of the case.[9]

### C. Additional Document Custodians Unnecessary

Finally, the Court finds it unnecessary to compel Hunt Adkins to name additional document custodians beyond the two individuals Hunt Adkins has already offered to designate. Defendants request as document custodians Hunt Adkins's Director of Strategic Planning, Director of Client Services, and Director of Accounts as individuals likely to possess "documents that have information describing their clients' purchase of advertising, to include airtime on broadcast television, and the contractual relationship between Hunt Adkins and its clients that governed these purchases." (Dkt. 652 at 14). The Court finds the contractual relationship between Hunt Adkins and its clients irrelevant, and the production of non-broadcast-television advertising transactions disproportionate to the needs of the case. *See supra*. Therefore, Hunt Adkins need not produce such documents, nor additional custodians.

---

[9] Defendants' supplemental brief likewise cites additional evidence disclosed from third-party production that they claim supports their argument that cable television spot advertising competes with local television spot advertising. (*See* dkt. 891 at 4–6). Defendants may offer this evidence in their opposition to Plaintiffs' motion for class certification in due course; however, the Court nevertheless finds that additional discovery would still be disproportionate to the needs of the case.

**CONCLUSION**

To conclude, the Court denies Defendants' Motion to Compel Discovery [652].

_____
Virginia M. Kendall
United States District Judge

Date: February 9, 2023