**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| )<br>)<br>)<br>IN RE: LOCAL TV ADVERTISING )<br>ANTITRUST LITIGATION )<br>)<br>)<br>) | MDL No. 2867<br>No. 18 C 6785<br><br>Judge Virginia M. Kendall |

<u>**MEMORANDUM OPINION AND ORDER**</u>

<u>**PLAINTIFFS' DISCOVERY MOTION NO. 20 FOR SPOLIATION SANCTIONS AGAINST
DEFENDANT GRIFFIN COMMUNICATIONS, INC.**</u>

Plaintiffs[1] in this putative antitrust class action move under Federal Rule of Civil Procedure

37 and the Court's inherent authority for an order imposing spoliation sanctions on Defendant

Griffin Communications, Inc. ("Griffin") for its failure to preserve relevant electronically stored

information ("ESI").[2] (Dkt. 960). For the following reasons, Plaintiffs' Motion is granted in part

and denied in part. (*Id.*)

**BACKGROUND**

**A.      Department of Justice Investigations and Griffin's ESI Preservation Policies**

On September 11, 2017, the Department of Justice sent a Civil Investigative Demand

("CID") letter to Griffin (the "September 2017 CID letter"). (Dkt. 960-2 at 125). It described the

DOJ's "antitrust investigation to determine whether there is, has been, or may be a violation of

Section 7 of the Clayton Act, 15 U.S.C. § 18, by conduct, activities, or proposed action of the

following nature: Proposed merger of Sinclair Broadcasting Group and Tribune Media

---

[1] "Plaintiffs" refers collectively to Thoughtworx, Inc. d/b/a MCM Services Group; One Source Heating & Cooling LLC; Hunt Adkins, Inc.; and Fish Furniture. (Dkt. 960 n.1 at 1).
[2] Plaintiffs have complied with the meet-and-confer requirements of Local Rule 37.2. (Dkt. 973 at 1 n.1; Dkt. 973-1).

Company."[3] (*Id.*) The September 2017 CID letter instructed Griffin to "take all necessary steps to ensure that [it] preserves all documents, emails, and information, including hard copy and electronically stored information ("ESI") relevant to this investigation." (*Id.* at 136). The letter then listed potentially relevant documents and ESI, including:

- Sinclair's acquisition of Tribune or any other company's potential acquisition of Tribune;
- information provided to or received from lenders, investment bankers, or financial advisors relating to the sale or acquisition of Tribune;
- competition between any of Tribune, Sinclair, and Griffin;
- data, internal deliberations and discussions, and external communications regarding sales in the local advertising spot market in any of the following designated market areas [DMAs] as defined by The Nielsen Company: Seattle, WA; St. Louis, MO; Salt Lake City, UT; Oklahoma City, OK; Grand Rapids, MI; Harrisburg, PA; Greensboro, NC; Richmond, VA; Wilkes-Barre, PA; and Des Moines, IA ("Overlap DMAs"); and
- data, internal deliberations and discussions, and external communications regarding retransmission consent given to multichannel video programming distributor ("MVPDs"), including without limitation as to the retransmission consent fees and conditions of carriage.

(Dkt. 960-2 at 136–37). Griffin placed a companywide "email hold," plus a "hold on information that was responsive to the September 2017 CID." (Dkt. 960-2 at 6). Griffin has not produced any documentation of this email and information hold nor how it was implemented.

On February 8, 2018, the DOJ sent a CID letter (the "February 2018 CID letter") notifying Griffin that the DOJ's Antitrust Division had "recently become aware that Griffin . . . has been exchanging, directly or indirectly, with other Big 4 broadcast stations in the Oklahoma City DMA current and forward-looking competitive information. The Division's ongoing investigation suggests that direct or indirect exchange of competitive information has also been happening in

---

[3] Section 7 of the Clayton Act prohibits mergers, acquisitions, and certain joint ventures where the effect of such transactions "may be substantially to lessen competition." *See* 15 U.S.C. § 18.

other DMAs besides Oklahoma City." (Dkt. 960-2 at 139). The February 2018 CID letter required Griffin to preserve documents and ESI, including those related to:

- The direct or indirect exchange of competitive information, including without limitation pacing information, inventory, revenue, market shares, pricing information or any other information regarding the spot advertising market with Griffin's competitors;
- Internal consideration at Griffin of competitive information received from any of Griffin's competitors; and
- Griffin's use of competitive information, including without limitation Griffin's use of such information in the setting, evaluation, or negotiation of price or other terms for spot advertising.

(*Id.*) Further, the DOJ stated the preservation "should include documents in Oklahoma City and in any other DMA in which Griffin exchanged directly or indirectly, or continues to exchange directly or indirectly, competitive information with one or more other broadcast stations . . . ." (Dkt. 960-2 at 139). Griffin "implemented the document hold through its IT department within one week" of receiving the February 2018 CID letter. (Dkt. 960-2 at 6). It has produced no documentation of this document hold nor how it was implemented.

Finally, on March 16, 2018, the DOJ sent another CID letter indicating the Department was investigating "whether there is, has been, or may be a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by conduct, activities, or proposed action of the following nature: competitively sensitive information exchanges in unreasonable restraint of trade." (Dkt. 960-2 at 146).

Griffin's CEO, David Griffin, explained that after receiving the February 2018 CID letter, he met with IT personnel and legal counsel to discuss it. (Dkt. 969-3 at 161). He "made sure that [Griffin] put a document hold on everything and that no documents would be destroyed" and "instructed the staff." (Dkt. 969-3 at 161). He stated that the need to preserve documents "was communicated to all relevant staff." (*Id.* at 161–62). Derek Criss, Griffin's Director of Local Sales in Tulsa, testified that after the 2018 DOJ investigation began, Griffin's Vice President of Sales,

Wade Deaver, instructed employees to save all electronic and paper documents. (Dkt. 960-2 at 65–66). According to Criss, document-preservation responsibilities fell to the company's sales account representatives, who "were in charge of keeping their documents and uploading them to the common drive or the OneDrive so it could be backed up every night, and then IT was in charge of that." (*Id.* at 66; *see also id.* at 71–73). The extent to which Griffin's attorneys provided guidance to Griffin's employees or oversaw the litigation hold is unclear.[4]

Griffin declined to make its IT personnel available to Plaintiffs' e-discovery consultant to discuss its preservation policies and procedures. (Dkt. 960-3 ¶ 8). Companies of Griffin's size typically rely on a "ticketing system" to execute and track employees' IT requests and actions. (*Id.* ¶ 25). Ticketing systems help ensure effective implementation of litigation holds; companies track when and how a hold was implemented and what data is preserved. (*Id.* ¶ 26). Griffin appears to have neither a formal ticketing system nor an informal documentation scheme to track actions related to IT. (*Id.* ¶ 27). Nor does Griffin appear to track its physical IT assets, such as employees' computers, as would be typical for a similarly situated company. (*Id* ¶¶ 28–30). Because Griffin did not track its IT actions or IT physical assets, it would not be possible to determine precisely how Griffin implemented the litigation hold.

## B.     ESI Not Preserved for Litigation

### 1.     Lex Sehl's Emails

Lex Sehl supervised a group of account executives who sold advertising time for Griffin's Tulsa stations. (Dkt. 969-6 at 34:7–35:23). Sehl left Griffin for Sinclair Broadcasting on August

---

[4] At his deposition, Criss was asked, "Did any attorney tell you to preserve your documents?" To which he responded, "We were given instructions. We had training on this at this point and were told to save all documents, all electronic and all paper documents." (Dkt. 960-2 at 72:12–16). *See also* dkt. 960-3 ¶ 40 ("[I]t is unclear how Griffin implemented this second litigation hold 'through [its] IT department' or whether any lawyers were involved in this process (and if so, to what extent).").

10, 2017. (*Id.* at 60:6–9). Despite Griffin designating Sehl as one of its document custodians in this litigation, Griffin had failed to produce any of Sehl's documents by March 2022. (Dkt. 960-2 at 2). Griffin then admitted that it had not preserved Sehl's emails or other computer files following his departure but does not know precisely when they were deleted. (Dkt. 960-2 at 7). Nor does Griffin know which company-issued computer Sehl used before he left because Griffin did not track them. (960-3 ¶ 12; 960-2 at 7).

Griffin represents that "prior to the document hold being put in place, it was Griffin's practice to delete a departed employee's emails and files. Griffin did not have a practice of retaining a departed employee's emails and files, nor a practice of documenting when a departed employee's emails and files were deleted." (Dkt. 960-2 at 6). It was Griffin's regular practice for the IT department to disable a former employee's access to Griffin's network and their Office 365 email and OneDrive files. (Dkt 960-2 at 7). Then, if a supervisor did not need the former employee's data, Griffin deleted the user account, which in turn deleted his data and files. (*Id.*)

In Sehl's case, his access to Griffin's system was terminated when he departed on August 10, 2017. (Dkt. 960-2 at 7). His supervisor, Derek Criss, wanted to receive his incoming email until December 2018, so Sehl's email account was set to a "shared mailbox status." (*Id.*) Griffin turned over emails responsive to Plaintiffs' document requests sent to Sehl and received by Criss from August 10, 2017 to October 15, 2018. (*Id.*) Additionally, Griffin has produced over 3,000 emails and other documents sent by Sehl to others, or by others to Sehl, as well as over 100,000 documents relating to its Tulsa stations from Tulsa custodians. (Dkt. 969-2 ¶ 3). Griffin also worked with Sehl recently to obtain text messages from his personal cell phone and has turned over these messages that are responsive to Plaintiffs' document requests. (*Id.* ¶ 4). But otherwise, Sehl's pre-departure files and emails were deleted and are now unrecoverable. (Dkt. 960-2 at 7).

Griffin admits that it "cannot be certain that Mr. Sehl's files dated prior to his departure were deleted when he departed in August, 2017," and "cannot exclude the possibility that an error was made in 2018 in connection with the document hold." (Dkt. 960-2 at 7). Plaintiffs subpoenaed Microsoft, which indicated that Sehl's email account remained active and accessible to Griffin's IT department until at least November 8, 2017—90 days after account deactivation. (Dkt. 960-3 ¶¶ 17, 53–54). Plaintiffs' e-discovery consultant thus concluded that "[m]ethods existed for Griffin to preserve Lex Sehl's emails until at least November 8, 2017, though likely longer." (Dkt. 960-3 ¶ 5(a)). All agree, however, that this ESI is no longer recoverable.

### 2. Account Executives' ESI

After Griffin told Plaintiffs that Sehl's ESI was gone, Griffin offered to produce files from additional document custodians—six account executives ("AEs") whom Sehl purportedly supervised: Austin Wright, David Brace, Traci Hartman, Whitney Thornton, Sarah Tingler, and Britt Hammer. (Dkt. 969-2 ¶ 5; Dkt. 960-2 at 26–42). Months later, Griffin advised that Hammer's OneDrive files, hard drive, and text messages were no longer accessible; she had left Griffin in November 2017. (Dkt. 960-2 at 45, 52; Dkt. 969-2 ¶ 6). Her emails and paper files, though, were preserved and produced to Plaintiffs. (Dkt. 960-2 at 45, 52; Dkt. 969-2 ¶ 6).

Similarly, Griffin no longer has Tingler's OneDrive files, hard drive, and text messages. (Dkt. 960-2 at 45). But after volunteering Tingler as an additional document custodian and producing her emails, Griffin discovered that she never reported to Sehl and so made no further attempt to produce her documents. (Dkt. 960-2 at 53; Dkt. 969-2 ¶ 7). Tingler left Griffin in February 2018. (Dkt. 960-2 at 230; *id.* at 31). Finally, Griffin cannot access—and so has not produced—Wright's OneDrive files, hard drive, and text messages from mid-2016 through March 11, 2019. (Dkt. 960-2 at 53; Dkt. 969-2 ¶ 6).

6

Griffin retained all documents and ESI for the other three AEs and produced responsive information from them to Plaintiffs. (Dkt. 969-2 ¶ 8). In all, Griffin produced 14,850 documents from the files of the six AEs added as custodians after admitting that Sehl's ESI was lost. (*Id.* ¶ 9).

### 3. Rob Krier's Text Messages

Rob Krier is Griffin's President and its former COO. (Dkt. 969 at 6). Griffin's Vice President of Technology, Trevor Wiseman, reports to Krier. (*Id.* at 7). Krier "is not sophisticated with respect to technology matters," and his "habit has long been to delete almost all text messages, whether from business contacts or family members." (*Id.*) Krier thought his text messages were preserved, like his emails were, in "iCloud," although he does not know what his iCloud credentials are. (Dkt. 969-21 at 34–35). He remembers receiving "a note" around February 2018 instructing employees not to delete emails. (Dkt. 960-2 at 111–12). Nevertheless, Krier continued deleting text messages from his phone up until the Saturday before his deposition on January 12, 2023. (*Id.* at 100, 112). Krier communicated with employees of other Defendants in this case, including CoxReps. (Dkt. 960-2 at 116–17). Griffin has produced all responsive text messages involving Krier and another Griffin custodian. (Dkt. 969-2 ¶ 10). His emails and other electronic files were preserved and nearly 4,800 have been produced. (*Id.*)

**DISCUSSION**

### A. Legal Authority for Sanctions

Plaintiffs move under Federal Rule of Civil Procedure 37(e) and this Court's inherent authority to sanction Griffin for failing to preserve (1) Sehl's emails; (2) the AEs' ESI; and (3) Krier's text messages. (Dkt. 960 at 9–10). In the alternative, Plaintiffs move under Rule 37(b) to sanction Griffin for violating its agreement with Plaintiffs to produce the AEs' ESI. (Dkt. 960 at 14). A court has inherent authority to sanction a party that has abused the judicial process. *See*

*Chambers v. NASCO*, 501 U.S. 32, 44–45 (2011). But when the Federal Rules of Civil Procedure adequately address a party's conduct, courts should generally rely on the Rules rather than on inherent authority to impose sanctions. *Id.* at 50. Here, Rule 37 adequately addresses the challenged conduct: loss of relevant ESI.[5] Moreover, Rule 37(e) "provides the sole source [of sanctions] to address the loss of relevant ESI that was required to be preserved but was not because reasonable steps were not taken, resulting in prejudice to the opposing party." *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 956 (N.D. Ill. 2021); *see also, e.g.*, *Gruenstein v. Browning*, No. 17-cv-2328, 2022 WL 3213261, at *4 (N.D. Ill. June 21, 2022); *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 617 (N.D. Ill. 2022). The Court, therefore, analyzes Plaintiffs' Motion for Sanctions under Rule 37(e).[6]

## B.    Rule 37(e)

The Court may sanction a party after finding, first, that "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," and second, finding either (1) that the loss prejudiced the party's opponent, or (2) that the party acted with intent to deprive an opponent of the information's use in litigation. Fed. R. Civ. P. 37(e); *see also Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 627–28 (7th Cir.

---

[5] Plaintiffs' Motion seeks sanctions solely for the loss of electronically stored information (ESI). Although Plaintiffs state they use "documents" "when referring to both hardcopy documents and ESI," (dkt. 960 at 1 n.3), the Motion focuses entirely on discoverable materials saved electronically in the form of emails, electronic files, and text messages. (*See* dkt. 960).

[6] Plaintiffs suggest: "In the alternative, using its Rule 37(b) authority, the Court should sanction Griffin for violating its agreement with Plaintiffs to produce the AEs' ESI." (Dkt. 960 at 14). Plaintiffs provide no further argument as to why Griffin's failure to produce this ESI is sanctionable as a violation of a discovery order of this Court under Rule 37(b). *See* Fed. R. Civ. P. 37(b)(2)(A). First, Plaintiffs' argument for Rule 37(b) sanctions is perfunctory and underdeveloped, so it is forfeited. *Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 833 (7th Cir. 2014). Second, Rule 37(b) is an awkward fit here, where no Court order addresses the turnover of these AEs' missing ESI; indeed, Griffin cannot produce what it apparently does not have. By contrast, Rule 37(e) comprehensively addresses the issue at hand: Griffin's loss of ESI.

2018). Rule 37(e) sanctions thus require finding, as a threshold matter, that relevant ESI "should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e).

A party's duty to preserve evidence—including ESI—derives from the common law. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("[P]otential litigants have a duty to preserve relevant information when litigation is reasonably foreseeable. Rule 37(e) is based on this common-law duty . . . ."); *see also, e.g.*, *Hollis*, 603 F. Supp. 3d at 619 ("The duty to preserve under Rule 37(e) is based on the common law, and so is triggered when litigation is commenced or reasonably anticipated."). In determining whether and when a duty to preserve arose, "[c]ourts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *see Trask-Morton v. Motel 6 Operating L.P.*, 534 F.3d 672, 681 (7th Cir. 2008) ("[A] party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent."); *see also, e.g.*, *DR Distribs., LLC*, 513 F. Supp. 3d at 958 (Rule 37(e) requires "anticipated or actual litigation that triggers the duty to preserve ESI"). "[D]uty is a question of law determined by the factual circumstances presented." *Hollis*, 603 F. Supp. 3d at 619. In the traditional tort context, the moving party must show the existence of a duty. *Id.*; *cf. Waldon v. Wal-Mart Stores, Inc.*, 943 F.3d 818, 821–22 (7th Cir. 2019) (plaintiff must establish each element of negligence claim, including whether duty existed).

When a duty to preserve relevant ESI existed, the Court must next consider whether the party failed to take reasonable steps to do so. Fed. R. Civ. P. 37(e). Reasonable does not mean perfect. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Reasonableness is a fact-specific inquiry and considers several factors, including "the party's sophistication with regard to litigation in evaluating preservation efforts." *Skanska USA Civ. Se. Inc. v. Bagelheads,*

*Inc.*, --- F.4th ---, 2023 WL 4917108, at *14 (11th Cir. Aug. 2, 2023) (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Proportionality is another factor: aggressive, overly expensive preservation methods are not required when substantially effective and less costly measures are available. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Once the Rule's threshold requirements are met, the Court may sanction a party if its loss of relevant ESI prejudiced its opponent. Fed. R. Civ. P. 37(e)(1); *Barbera*, 906 F.3d at 627. "'Prejudice' under Rule 37(e) includes the thwarting of a party's ability to obtain the evidence it needs for its case." *Hollis*, 603 F. Supp. 3d at 623. "An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment. Evaluating prejudice is inherently challenging; it is often not possible to determine the value of lost information when there is little basis for knowing precisely what the ESI contained. *See, e.g.*, *Hollis*, 603 F. Supp. 3d at 623; *Schmalz v. Village of N. Riverside*, No. 13 C 8012, 2018 WL 1704109, at *3 (N.D. Ill. Mar. 23, 2018). Recognizing this difficulty, "[t]he rule does not place a burden of proving or disproving prejudice on one party or the other. . . . The rule leaves judges with discretion to determine how best to assess prejudice in particular cases." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Alternatively, if the Court finds that a party intentionally deprived its opponent of evidence in litigation, the Court may impose any of the most severe spoliation sanctions: presuming the evidence unfavorable, giving an adverse-inference jury instruction, dismissing the action, or entering a default judgment. Fed. R. Civ. P. 37(e)(2); *Barbera*, 906 F.3d at 627. The intent-to-deprive determination equates to a finding of bad faith—that the spoliator had "a purpose of hiding adverse evidence," as in other spoliation contexts. *See Skanska*, 2023 WL 4917108, at *12–13; *see*

*also Lewis v. McLean*, 941 F.3d 886, 892 (7th Cir. 2019) ("For an adverse-inference instruction to be given, [plaintiff] needed to establish . . . destruction in bad faith."). Loss of ESI through negligence or even gross negligence does not justify the harshest discovery sanctions. *Skanska*, 2023 WL 4917108, at *12–13; *see also* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

### 1. Lex Sehl's Emails

Griffin's loss of Sehl's emails does not warrant Rule 37(e) sanctions. The duty to preserve ESI did not arise until, at earliest, Griffin received the DOJ's February 2018 CID letter. By then, Sehl had not been a Griffin employee for six months. Griffin did not typically retain former employees' emails and files after departure. And no evidence shows that Sehl's emails or other files existed beyond November 8, 2017—three months after he left Griffin, and three months before Griffin could have reasonably anticipated litigation. The evidence thus suggests that Sehl's emails were lost before a duty arose to preserve them. *See* Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("The rule does not apply when information is lost before a duty to preserve arises.").

Plaintiffs argue that Griffin's receipt of the September 2017 CID letter triggered its duty to preserve Sehl's ESI. Acknowledging that Sehl had left Griffin a month before this, Plaintiffs insist that Sehl's ESI was still accessible to Griffin's IT department at this point and could have been preserved had Griffin taken reasonable steps to do so. Even assuming this is true, Griffin had no duty at that point to preserve Sehl's ESI. The September 2017 CID letter did not suggest either imminent or likely litigation involving Griffin. *See Trask-Morton*, 534 F.3d at 681. That letter gave notice of the DOJ's investigation into the propriety of the proposed Sinclair-Tribune merger. The proposed merger did not involve Griffin. The scope of the documents sought for the investigation

11

at that time reveal that the DOJ considered the current competitive state of local media broadcasting marketplaces to be relevant to its analysis of the proposed merger's legality under the Clayton Act. (*See* Dkt. 960-2 at 136–37). But nothing about the September 2017 CID letter suggests that Griffin was the subject of an investigation into anticompetitive conduct at that time. Griffin had no reason to anticipate its involvement in litigation following from notice of a DOJ investigation of a proposed merger between two other companies.

Plaintiffs point to the September 2017 CID letter's instruction to preserve documents relating to "competition between any of Tribune, Sinclair, and Griffin" to argue that this letter triggered a duty to preserve Sehl's documents, which were likely still accessible. (Dkt. 973 at 8 n.9). Sehl oversaw advertising sales for Griffin's Tulsa stations, which competed with a Sinclair station in that market. (Dkt. 960-2 at 19). So, Plaintiffs insist, some of Sehl's communications about spot-advertising sales related to competition between Sinclair and Griffin and likely included the exchange of competitively sensitive information, which should have been preserved per the DOJ's instructions. But even if some of Sehl's communications might have been relevant to the competition between Sinclair and Griffin, the September 2017 CID letter did not, in itself, create a duty to preserve Sehl's ESI that might also be relevant to litigation *before* it was reasonably anticipated. On this point, the advisory committee's note on Rule 37(e)'s 2015 amendment is instructive:

> Although the rule focuses on the common-law obligation to preserve in the anticipation or conduct of litigation, courts may sometimes consider whether there was an independent requirement that the lost information be preserved. Such requirements arise from many sources—statutes, administrative regulations, an order in another case, or a party's own information-retention protocols. The court should be sensitive, however, to the fact that such independent preservation requirements may be addressed to a wide variety of concerns unrelated to the current litigation. The fact that a party had an independent obligation to preserve information does not necessarily mean that it had such a duty with respect to the litigation, and the fact that the party failed to observe some other preservation obligation does not itself prove that its efforts to preserve were not reasonable with respect to a particular case.

The touchstone for a party's duty to preserve evidence remains the reasonable foreseeability of its involvement in litigation. *See Trask-Morton*, 534 F.3d at 681.

Plaintiffs cite *Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1278 (M.D. Fla. 2009), for the proposition that "[a] government investigation puts a company on reasonable notice of follow-on litigation, and thus gives rise to a duty to preserve documents for the subsequent litigation." (Dkt. 960 at 10). Plaintiffs mischaracterize that case's holding. The *Swofford* court did not determine that the defendants' duty to preserve documents for a civil suit arose solely from a government investigation into the conduct at issue. Rather, the court cited multiple communications from plaintiffs' counsel to defendants requesting that all evidence be preserved, counsel's notice of intent to sue formally served on defendants, and counsel's public-records requests that, taken together, put defendants on reasonable notice of imminent litigation. *See Swofford*, 671 F. Supp. 2d at 1278. The court then noted that the defendants had an *additional* obligation to preserve evidence while a law-enforcement investigation into their conduct was pending. *Id.* But the court focused its duty-to-preserve analysis on the preservation letters that gave notice of anticipated litigation. *See id.* at 1278–79.

Moreover, the law-enforcement investigation in *Swofford* targeted the defendants for the same conduct that the plaintiffs later challenged in the civil suit. *See id.* So, the defendants reasonably could have anticipated follow-on litigation for the very conduct under investigation. The same is not true here. The DOJ's investigation into the propriety of a merger between two other companies did not suggest that Griffin was under scrutiny for its exchange of competitively sensitive business information. Plaintiffs' other cited cases for its duty-to-preserve argument are likewise inapposite.[7]

---

[7] *M & T Mortg. Corp. v. Miller*, No. CV 2001-5410, 2007 WL 2403565, at *5 (E.D.N.Y. Aug. 12, 2007) (finding that duty to preserve arose when an earlier, "strikingly similar" complaint alleging similar conduct was filed against

The September 2017 CID letter may have created an independent obligation to preserve ESI relevant to the DOJ's separate investigation of the proposed Sinclair-Tribune merger at that time. Such ESI might also be relevant to the anticompetitive conduct alleged in this lawsuit. But the September 2017 CID letter did not provide Griffin with reasonable notice of impending litigation for its own anticompetitive conduct. Griffin's independent obligation to preserve ESI for the DOJ's 2017 merger investigation is distinct from its duty to preserve ESI here.

By contrast, after receiving the February 2018 CID letter, Griffin *was* on notice that private civil litigation could reasonably follow from the DOJ's investigation into its alleged anticompetitive conduct. The February 2018 CID letter explicitly named Griffin as a subject of investigation. It also specified the alleged anticompetitive conduct that the Department suspected. It further directed Griffin to preserve evidence of all exchanges of competitively sensitive information with competitors within any DMA. The scope of the investigation and relevant evidence is clear: Griffin could reasonably anticipate litigation related to its exchange of competitive information in violation of antitrust laws prohibiting such conduct. So, Griffin's duty to preserve Sehl's emails arose in February 2018. *See Trask-Morton*, 534 F.3d at 681.[8] Because

---

defendant); *Williams v. BASF Catalysts LLC*, Civ. A. No. 11-1754, 2016 WL 1367375, at *7 (D.N.J. Apr. 5, 2016) (finding that, in 1984, "a party had a duty to preserve evidence when it was relevant in a prior lawsuit, and where it was reasonably foreseeable that the evidence would be relevant to anticipated lawsuits of *nearly identical subject matter* and *similarly situated adversaries*" (emphasis added)); *Stinson v. City of New York*, No. 10 Civ. 4228, 2016 WL 54684, at *4 (S.D.N.Y. Jan. 5, 2016) (finding that duty to preserve relevant evidence about NYPD's handling of summonses arose when complaint was filed in prior litigation where the specific issue of "summons quotas" was "hotly contested"); *Phillip M. Adams & Assocs., L.L.C. v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1191 (D. Utah 2009) (finding that defendant's knowledge of prior class-action lawsuits over the same floppy-disk errors at issue in current lawsuit—and defendant's ongoing attempts to prevent such errors—showed it anticipated related litigation).

[8] *See also, e.g.*, *AOT Holding AG v. Archer Daniels Midland Co.*, No. 19-2240, 2021 WL 6118175, at *6 (C.D. Ill. Sept. 3, 2021) (finding defendant's duty to preserve triggered by commodity-exchange regulation department's investigations into defendant's ethanol trading, as related litigation into ethanol price manipulation was reasonably foreseeable at that point); *Haraburda v. Arcelor Mittal USA, Inc.*, No. 11 cv 93, 2011 WL 2600756, at *3 (N.D. Ind. June 28, 2011) (defendant on notice of potential employment-discrimination litigation when it learned of EEOC investigation into her claim); *but see, e.g.*, *In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, MDL No. 2385, 2013 WL 5377164, at *12–14 (S.D. Ill. Sept. 25, 2013) (finding that pharmaceutical company did not have pre-litigation duty to preserve evidence because isolated clinical-trial litigation, privilege-log entries, adverse-event reports, and "internet chatter" did not reasonably give notice of post-launch Pradaxa product-liability litigation).

no evidence shows that Sehl's emails would have been retrievable at that point, it follows that they were lost before a duty to preserve them arose.

### 2. Account Executives' ESI

As Griffin's duty to preserve relevant ESI began no earlier than February 8, 2018, this date provides a starting point for the Rule 37(e) analysis for the three AEs whose complete ESI was not preserved. In addition to Griffin's original 13 document custodians, the parties agreed to the production of ESI from six AEs who reported to Sehl to mitigate the loss of his ESI. Of those three, it is undisputed that one—Britt Hammer—left Griffin in November 2017. This was about three months before Griffin had a duty to preserve relevant ESI. The record does not show that her ESI was still preservable by February 8, 2018. Therefore, no sanctions are warranted for failing to preserve Hammer's OneDrive files, hard drive, and text messages. This leaves the missing ESI of two other AEs: Sarah Tingler and Austin Wright.

The parties dispute precisely when Tingler left Griffin, but she apparently left in February 2018, around the same time that Griffin's duty to preserve relevant ESI arose. (Dkt. 960-2 at 230; *id.* at 31). Wright was employed at Griffin until March 11, 2019—well after a preservation duty arose. (Dkt. 960-2 at 55). The record provides very few facts about why the OneDrive files, hard drive, and text messages of these employees were not preserved. For both, the Court assumes for purposes of this Motion that all the Rule 37(e) threshold requirements are met: that Griffin should have preserved Tingler's and Wright's relevant ESI, but because of its failure to take reasonable preservation steps, their ESI is unrecoverable. The Court declines, however, to impose sanctions because no prejudice to Plaintiffs resulted from its loss. *See* Fed. R. Civ. P. 37(e)(1). Nor did Griffin act with intent to deprive Plaintiffs of its use in litigation. *See* Fed. R. Civ. P. 37(e)(2).

Evidence in the record does not support a finding of prejudice. *See* Fed. R. Civ. P. 37(e)(1). Griffin only offered to produce ESI from these two custodians—along with the other four AEs— because it could not produce Sehl's ESI. But as the Court has found that Griffin had no duty to preserve Sehl's ESI, there is little need to mitigate any potential prejudice resulting from that loss. Further, the record does not show the value of the missing information in the full context of Griffin's voluminous ESI production. Although "a case can turn on only a few key documents," *Philips Elec. N. Am. Corp.*, 773 F. Supp. 2d at 1156, Plaintiffs fail to support their suspicion that Tingler's and Wright's missing ESI—a very small fraction of the overall ESI production— contains essential information for their case against Griffin. *See, e.g.*, *Larson v. Bank One Corp.*, No. 00 C 2100, 2005 WL 4652509, at *13 (N.D. Ill. Aug. 18, 2005) ("To suffer substantive prejudice due to spoliation of evidence, the lost evidence must prevent the aggrieved part the use of an essential or 'crucial' piece of evidence to their underlying claim." (citing *Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 515 (7th Cir. 1997))). Griffin produced all emails from all six AEs and complete ESI from three of them. This totals nearly 15,000 documents from the six AEs, five of whom reported to Sehl. In all, Griffin has produced about 150,000 documents from 19 custodians. (Dkt. 969-2 ¶ 2). Lacking a strong justification for the importance of a relatively small number of files and text messages from two AEs whose documents were not even initially sought, "the abundance of preserved information . . . appear[s] sufficient to meet the needs of all parties." Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

Further, there is no evidence that Griffin intended to deprive Plaintiffs of the information's use in litigation. Fed. R. Civ. P. 37(e)(2). To the contrary, Griffin voluntarily offered up six additional document custodians after discovering the loss of Sehl's emails. It provided all relevant ESI from three AEs and emails from the other three. While its explanations have not been entirely

consistent as to when and why certain employees' ESI was lost, this appears due to Griffin's generally haphazard approach to its IT systems. (*See* dkt. 960-3). Negligent failure to preserve, however, does not clear the high bad-faith bar. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *see also Lewis*, 941 F.3d at 892; *Skanska*, 2023 WL 4917108, at *12–13.

### 3. Rob Krier's Text Messages

#### a. Rule 37(e) Threshold Requirements

Despite receiving instructions to refrain from deleting emails and other documents, Krier deleted nearly all his text messages until January 2023—well beyond when Griffin's duty to preserve relevant information arose in February 2018. Some information in the text messages was likely relevant; Krier did not have a work phone separate from his personal phone, and he was in contact with some of Griffin's competitors, including CoxReps.[9] The messages cannot be recovered. So all that remains to be determined under the Rule's threshold requirements is whether Griffin failed to take reasonable steps to preserve this ESI. Fed. R. Civ. P. 37(e); *Barbera*, 906 F.3d at 627–28. On this record, it did fail to do so.

Griffin has produced no documentation of its litigation holds nor how they were implemented beyond generalized testimony from a handful of company officers and employees. These individuals all recalled receiving instructions in February 2018 not to delete their emails and other documents. They also received some training. IT generally oversaw the document-preservation policies, such as they were, although responsibility for saving files fell to account executives. Nothing in the record shows direction and oversight of this process by legal counsel. *See, e.g.*, *DR Distribs., LLC*, 513 F. Supp. 3d at 929 ("[T]he preservation obligation runs first to

---

[9] Griffin states in its Response, "While Mr. Krier did engage in communications from time to time with other stations' general managers, they concerned such subjects as security breaches, social contacts, efforts to purchase advertising on a Griffin station by another station, and how to grow the broadcast TV 'pie.'" (Dkt. 969 at 6–7). Griffin cites only to Krier's own deposition testimony for this proposition.

counsel, who has a duty to advise his client of the type of information relevant to the lawsuit and the necessity of preventing its destruction." (internal citation omitted)); *see also id.* at 933 ("The issuance of a litigation hold does not end counsel's duty in preserving ESI. . . . They must continue to monitor and supervise or participate in a party's efforts to comply with the duty to preserve." (internal citations omitted)). This lack of attorney involvement rendered Griffin's preservation efforts substandard.

Griffin's IT tracking system—at least, as of 2018—was also lacking. Griffin did not even maintain a standard IT ticketing system to track IT actions. Griffin largely fails to rebut Plaintiffs' e-discovery expert's conclusions that Griffin's preservation practices were deficient and below industry standards. (*See* dkt. 969 at 12 n.8); *see also DR Distribs., LLC*, 513 F. Supp. 3d at 929–934 (discussing standards for initiating and maintaining litigation holds to preserve relevant ESI). Griffin does not even argue that more aggressive preservation efforts would have been prohibitively expensive in comparison with its policies. *See* Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment. Rather, it admits that "there were errors in Griffin's document preservation and production process" without putting up a defense of that process at all. (*Id.* at 1).

As to Krier, the fact that no one discovered that he was deleting his text messages until January 2023—nearly five years after Griffin received the February 2018 CID letter—indicates a complete failure of oversight.[10] Krier remembered that someone (exactly who is not clear) told him not to delete his messages, yet he continued to do so on the general assumption that they were being stored in the "Cloud." Such pitfalls are emblematic and foreseeable when counsel rely on their clients to self-collect and self-monitor preservation of their ESI. *See, e.g.*, *DR Distribs., LLC*,

---

[10] Apparently, the first time Griffin's in-house counsel, Rick Mullins, spoke with Krier about deleting his text messages was days before Krier's deposition in January 2023. (Dkt. 969-21 at 34:2–7 ("I assume that everything, my text messages and my emails, were stored in the cloud. And that was my belief until Sunday, when Rick Mullins called me and said, 'Did you delete your text messages?' And I said, 'yeah, I do it all the time.'")).

513 F. Supp. 3d at 935.[11] Thus, Griffin failed to take reasonable preservation steps in general, and to preserve Krier's text messages specifically. Griffin is a sophisticated enough corporate entity that the lack of documented attorney involvement in and oversight of a significant litigation hold is baffling.[12] *See Skanska*, 2023 WL 4917108, at *14 (quoting Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment). Rule 37(e)'s threshold requirements are all met here.

### b. Prejudice to Plaintiffs

Next, Plaintiffs were prejudiced by the loss of Krier's text messages. At least some of the messages very likely contained exchanges of competitive information with employees of other Defendant competitor stations. Krier communicated with other broadcast stations' senior leadership about "how to grow the broadcast TV pie" in Griffin's DMAs. (Dkt. 969 at 6–7; Dkt. 969-21 at 89). He coordinated a meeting between competitor stations' general managers about television advertising revenue in the Oklahoma City market. (Dkt. 969-21 at 88–93). Although he was not able to attend the meeting, he was copied on emails about it. (*Id.* at 88–89). Because he also "texted individuals from time to time" within the broadcast television industry, (*id.* at 31), a reasonable factfinder could infer that he texted with those managers who attended the meeting

---

[11] The court in *DR Distributors, LLC v. 21 Century Smoking, Inc.*, provides an excellent, comprehensive explanation of why this practice is not advisable:

> Custodian self-collection occurs when counsel direct their clients to identify, preserve, collect, and produce documents and electronic information in response to discovery requests. . . . The first pitfall counsel may encounter is the client's failure to identify all sources of responsive information. Clients may not have the technical or legal understanding to identify all possible sources of information, especially ESI. Although some sources of information are obvious such as documents or e-mails, other potential sources of electronic information are less obvious, including social media, messaging apps, thumb drives, and cloud storage. . . . Relying solely on the client to identify the universe of relevant information, without reasonable inquiry to verify that the client accurately captured that universe, can lead to sources of information being overlooked. . . . The second pitfall counsel may fall into after embarking on self-collection is the client's failure to preserve evidence. . . . "[I]t is not sufficient to notify all employees of a legal hold and expect that the party will then retain and produce all relevant information." Instead, counsel must take affirmative steps to monitor compliance.

513 F. Supp. 3d at 934–36 (citations omitted). Griffin's failure to preserve Krier's text messages aptly illustrates each of the *DR Distributors* court's points.

[12] Griffin is a company of more than fifty employees, and as of December 31, 2017, it had a fair market value of over $200 million. (Dkt. 960-3 at 6 n.11).

about advertising revenue. *See, e.g.*, *Schmalz*, 2018 WL 1704109, at *3 (finding prejudice where deleted text messages were relevant because they "involve[d] private communications between the primary defendants and decision-makers in the case during a critical time period, and the alleged subject matter of the text messages involve issues highly pertinent to the underlying claim").

Although neither the fact of the prior existence of text messages nor their contents can be known for certain, there is enough evidence to suggest their relevance to Plaintiffs' claims that Griffin engaged in anticompetitive, collusive behavior. As COO and an officer in regular communication with Griffin's Vice President of Sales, Krier's senior leadership position within Griffin makes his ESI relatively more valuable than that of Griffin's lower-level employees. Plaintiffs' ability to use Krier's text messages as evidence of such behavior would go a long way toward proving their claim that the highest levels of Griffin's leadership engaged in anticompetitive conduct. *See, e.g.*, *Larson*, 2005 WL 4652509, at *13. Plaintiffs do, however, have some evidence of Krier's communications to use in their case. Krier's emails and other electronic documents have been produced. Still, like the court found in *Schmalz*, Plaintiffs are "deprived of the opportunity to know 'the precise nature and frequency' of those private communications, which occurred during a critical time period" and could support their claims. 2018 WL 1704109, at *4 (quoting *Ronnie Van Zant, Inc. v. Pyle*, 270 F. Supp. 3d 656, 670 (S.D.N.Y. 2017)). The Court therefore finds prejudice here.

By contrast, though, there is insufficient evidence of bad-faith intent. Again, the Court stresses the inadequacy of Griffin's preservation efforts. But Krier's deposition testimony, corroborated by the observations of several other Griffin officers' deposition testimony, suggests negligence (perhaps even gross negligence) rather than intent to conceal adverse information. By all accounts, Krier was simply inept at technology. He believed his texts were backed up in the

20

"Cloud" like his emails, despite having no substantive knowledge to support this assumption. Further, he deleted not only his work text messages, but also his personal text messages from family members and friends. It was his regular practice for years before and after this litigation to delete nearly all text messages. Rule 37(e)(2) reserves sanctions for intentional ESI spoliators, not those who are merely incompetent. Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment; *see also Lewis*, 941 F.3d at 892; *Skanska*, 2023 WL 4917108, at *12–13.

### c. Remedy

The Court's final tasks are to determine whether to issue spoliation sanctions and, if so, what sanctions are appropriate. *See* Fed. R. Civ. P. 37(e)(1) ("[T]he court . . . *may order* measures no greater than necessary to cure the prejudice"). Sanctions for ESI spoliation must be proportionate to the harm done. *See id.*; *see also* Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment ("[T]he severity of given measures must be calibrated in terms of their effect on the particular case."); *Barbera*, 906 F.3d at 627–28.

Plaintiffs propose several possible sanctions for Griffin's spoliation: (1) discovery into Griffin's written litigation hold; (2) appointment of a neutral forensic expert "to opine on whether ESI was destroyed, and recover deleted ESI"; (3) shifting the cost of investigating this issue and bringing the present motion; and (4) presentment and prohibition of evidence related to loss of this ESI. (Dkt. 960 at 14–15).[13] Neither of Plaintiffs' first two suggested sanctions is warranted. Requiring Griffin to produce its written litigation hold at this point will not help move this case forward. Griffin had an opportunity to defend its preservation efforts and failed to do so; the Court has determined that Griffin's efforts were unreasonable. There is little point to litigating this issue

---

[13] Plaintiffs also request an adverse-inference jury instruction. (Dkt. 960 at 15). But as the Court has found Griffin did not act in bad faith with regard to the deletion of Krier's text messages, such a jury instruction is inappropriate. Fed. R. Civ. P. 37(e)(2); Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment; *Barbera*, 906 F.3d at 628.

further. Similarly, there is nothing to be gained from appointing a forensic expert when all available evidence shows that Krier's text messages are irretrievable. Both suggested sanctions would send the parties down a rabbit hole for little tangible gain.

Limited cost-shifting sanctions, on the other hand, are appropriate here. It did not become apparent until several years into this litigation that Griffin had failed to preserve the ESI at issue in Plaintiffs' Motion. Indeed, Griffin only realized that Krier had been deleting his text messages for years on the eve of Krier's deposition, which became a significant topic of that deposition for which Plaintiffs had little time to prepare. To discover what happened and whether ESI relevant to their claims might still be available well after it should have been preserved and produced, Plaintiffs had numerous exchanges with Griffin's counsel over several months. They also reasonably engaged an e-discovery consultant to assist in evaluating the recoverability of ESI. Finally, Plaintiffs' Motion for Sanctions under Rule 37(e)—although not fully successful—had merit, particularly considering Griffin's generally inadequate preservation efforts. The Court has discretion to award appropriate fee-shifting sanctions to make Plaintiffs whole for their investigation into discovery to which they were entitled. *Cf. Klipsch Grp., Inc. v. ePRO E-Com. Ltd.*, 880 F.3d 620, 632–33 (2d Cir. 2018) (affirming district court's grant of remedial monetary sanctions against defendant for discovery misconduct, including ESI spoliation, under court's inherent authority when carefully limited to costs incurred as direct response to misconduct); *see also, e.g.*, *Nacco Materials Handling Grp., Inc. v. Lilly Co.*, 278 F.R.D. 395, 402–07 (W.D. Tenn. 2011) (finding prevailing party entitled to reasonable costs, including attorneys' fees associated with bringing motion for sanctions under Rule 37(e), when defendant failed to timely issue an effective litigation hold and take appropriate steps to preserve ESI).

Here, Plaintiffs prevailed in their Motion regarding only on one of the three sets of missing ESI. Recognizing the difficulty of disentangling the time and resources expended investigating the ESI at issue, the Court will award as sanctions no more than one-third of the reasonable fees and costs associated with bringing this Motion. Plaintiffs shall submit a detailed fee petition for the Court's consideration by 9/21/23, with Griffin's objections to be filed by 10/5/23. The Court will not consider fees associated with preparing the fee petition.

Finally, Plaintiffs request that the Court "permit Plaintiffs to present evidence of Griffin's spoliation at summary judgment and trial and argue that this evidence would have been helpful to Plaintiffs' claims," as well as "prohibit Griffin from presenting defenses or arguments at summary judgment or trial based on the absence of documents or ESI from the identified sources," and finally, "instruct the jury that it may consider that evidence, along with all other evidence in the case, in making its decision." (Dkt. 960 at 15). The Court finds that such rulings on the presentation or prohibition of evidence is premature at this point. Within the context of the voluminous discovery marshaled over the course of this years-long multidistrict litigation, ruling on the admissibility of this ESI's spoliation at this juncture could prove unduly prejudicial to Defendants. Moreover, as the 2015 advisory committee note to Rule 37(e) cautions, "[c]are must be taken . . . to ensure that curative measures under subdivision (e)(1) do not have the effect of measures that are permitted under subdivision (e)(2) only on a finding of intent to deprive another party of the lost information's use in the litigation." Should Plaintiffs' claims against Griffin proceed to trial, the parties will have further opportunity to brief the admissibility of ESI spoliation at the motions *in limine* stage.

## CONCLUSION

For these reasons, the Court grants in part and denies in part Plaintiffs' Motion for Spoliation Sanctions against Defendant Griffin Communications, Inc. [960] The Court grants fee-shifting sanctions against Griffin as described in this Opinion. Plaintiffs shall file their fee petition by 9/21/23 with any objections by Griffin to be filed by 10/5/23.

Virginia M. Kendall
United States District Judge

Date: August 30, 2023