**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **IN RE: LOCAL TV ADVERTISING ANTITRUST LITIGATION**<br><br>*This document applies to all actions.* | Master Docket No. 18-06785<br><br>MDL No. 2867<br><br>Hon. Virginia M. Kendall |

**DEFENDANT SINCLAIR BROADCAST GROUP, LLC'S**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SPOLIATION SANCTIONS**

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ....................1

FACTUAL BACKGROUND ....................2

ARGUMENT ....................7

I. THERE IS NO EVIDENCE THAT SINCLAIR ACTED INTENTIONALLY FOR THE PURPOSE OF DEPRIVING PLAINTIFFS OF ADVERSE EVIDENCE ....................7

A. Sinclair's Efforts to Preserve and Recover Data Do Not Support a Finding of Intent to Deprive ....................8

B. There is No Indicia of Intent to Deprive ....................10

II. PLAINTIFFS' CLAIM OF PREJUDICE IS NOT SUPPORTED BY EVIDENCE ....................13

III. PLAINTIFFS' REQUESTED SANCTIONS SHOULD BE DENIED ....................14

CONCLUSION ....................15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bistrian v. Levi*, 448 F. Supp. 3d 454 (E.D. Pa. 2020)....................10

*Burris v. JPMorgan Chase & Co.*, 2024 WL 1672263 (9th Cir. Apr. 18, 2024) ....................11, 13

*Downing v. Abbott Lab'y*, 48 F.4th 793 (7th Cir. 2022)....................7

*DR Distribs., LLC v. 21 Cent. Smoking, Inc.*, 513 F. Supp. 3d 839 (N.D. Ill. 2021)....................8

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469 (E.D. Va. 2011)....................10

*hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944 (N.D. Cal. 2022)....................10, 11

*Larson v. Bank One Corp.*, 2005 WL 4652509 (N.D. Ill. Aug. 18, 2005) ....................13

*In re Local TV Advert. Antitrust Litig.*, 2023 WL 5607997 (N.D. Ill. Aug. 30, 2023) ....................7

*Malibu Media, LLC v. Tashiro*, 2015 WL 2371597 (S.D. Ind. May 18, 2015)....................11

*Pugh-Ozua v. Springhill Suites*, 2020 WL 6562376 (S.D.N.Y. Nov. 9, 2020) ....................13

*Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598 (S.D. Tex. 2010) ....................13

*Two Canoes LLC v. Addian Inc.*, 2024 WL 2939178 (D.N.J. Apr. 30, 2024), *report and recommendation adopted*, 2024 WL 3470851 (D.N.J. July 19, 2024) ....................10

## Statutes and Rules

Fed. R. Civ. P. 37(e) ....................15

Defendant Sinclair Broadcast Group, LLC f/k/a Sinclair Broadcast Group, Inc. ("Sinclair") submits this memorandum of law in opposition to Plaintiffs' Motion for Spoliation Sanctions (ECF No. 1146) ("Mot.").

## PRELIMINARY STATEMENT

Plaintiffs' request for sanctions should be denied. There is no evidence – circumstantial or otherwise – that Sinclair intentionally destroyed documents for the purpose of depriving Plaintiffs of relevant evidence to support their case. To the contrary, Sinclair's efforts to preserve and recover cell phone data, and its transparency with Plaintiffs since discovery began in 2021 – despite Plaintiffs' shifting positions and years-long silence regarding such data – preclude a finding of intent. Moreover, Plaintiffs' claim of prejudice is not only speculative, but belied by the extraordinarily low number of responsive text messages for Sinclair's custodians – none of which are "crucial" to proving Plaintiffs' claims, as required for a finding of prejudice. Sinclair has devoted immense resources to its discovery and preservation obligations in this litigation and, in response to the preservation issue identified in 2023, has – at significant expense – collected and reviewed text message data from 26 custodians.

***More than a year ago***, Sinclair discovered and promptly informed Plaintiffs that not all data on certain custodians' cell phones had been fully preserved. Sinclair then undertook a full investigation, cooperated with all of Plaintiffs' requests for information, and made significant efforts to recover data. Sinclair ultimately collected and searched 41,420 text messages that had been fully preserved for 26 custodians covering all levels of seniority, with responsibility for more than 50 markets across the United States. Sinclair spent six months and approximately $640,000 to investigate, collect, process, search, and review text messages, ***despite text messages not being within the scope of Sinclair's agreed production***. In the end, of those 26 custodians,

15 had ***no*** responsive text messages at all. In total, ***less than 0.6%*** of the 41,420 text messages were responsive, and even those were cumulative and redundant of the roughly 3.2 million documents from more than 160 custodians that Sinclair has already produced. None of the text messages concern any sharing of pacing information, and none evidence any illicit information exchange or agreement to fix prices. In light of those facts, no sanction is warranted here.

## FACTUAL BACKGROUND

### Sinclair's Legal Holds

Sinclair promptly issued legal holds covering the subject matter of this litigation. On February 5, 2018, shortly after the Department of Justice ("DOJ") advised Sinclair that it was considering commencing an investigation into the sharing of pacing information, Sinclair sent a legal hold to all General Managers of its broadcast stations. Tabatabai Decl. ¶ 3. On April 2, 2018, after DOJ served a Civil Investigative Demand, Sinclair issued a more fulsome legal hold to all individuals with responsibility for broadcast television spot advertising sales. *Id.* ¶ 4. Both holds expressly required preservation of text messages and other cell phone data. *Id.* The April 2 hold also instructed recipients to notify Sinclair's Director of Technical Operations prior to replacing or disposing of any mobile device, and required recipients to certify that they had reviewed and would comply with the hold. *Id.* In total, nearly **1,700** current and former Sinclair employees are under hold in connection with this litigation. *Id.* ¶ 8.

On November 20, 2018, following the filing of the class action complaints consolidated into this multidistrict litigation, Sinclair re-sent the April 2, 2018 hold, reminding recipients of their obligations under that hold. *Id.* ¶ 5. At the end of January 2021, after the Court denied Defendant's motions to dismiss and Plaintiffs served document requests, the parties began an intensive, months-long process to negotiate the scope of discovery. *Id.* ¶ 6.

On April 19, 2021, during the meet-and-confer process for discovery, Sinclair updated

and re-issued the April 2, 2018 legal hold. *Id.* ¶ 7. The updated hold continued to require preservation of text message and other cell phone data and to instruct recipients to notify specified individuals in the Corporate IT department before replacing or disposing of any mobile device. *Id.* Recipients of the updated hold were again required to certify that they had reviewed the hold and would comply with its instructions. *Id.*

**2021 Discovery Negotiations**

In early 2021, Plaintiffs requested that Sinclair produce text messages from its employees' cell phones. *Id.* ¶ 10. Sinclair did *not* agree to produce text messages because (i) the subject of the Complaint was the sharing of pacing information, and Sinclair allegedly received pacing reports from its sales representative firms via email; and (ii) the significant burden of collecting and reviewing text messages – which would likely have ***exceeded $1 million*** – was undue and disproportionate, particularly in the ***absence of information that any particular custodian was likely to have relevant messages***. *Id.* ¶ 11. For those reasons, Sinclair did not agree to produce text messages, and ***Plaintiffs simply dropped the issue***; thus, text message data was not in scope for Sinclair's production. *Id.* ¶ 12.

Between May and September 2021, Sinclair and Plaintiffs reached agreement on a list of 160 custodians whose email data Sinclair would collect, search, and produce. *Id.* ¶ 13. On October 29, 2021, Sinclair certified completion of its production from those custodians. *Id.* Sinclair ultimately produced roughly 3.2 million documents from the agreed time period of January 1, 2013 through October 15, 2018 (the "Relevant Period"). *Id.* ¶ 14. Sinclair's agreement to produce documents from such a large number of custodians over so many years was predicated, in part, on the understanding that text messages – which would have been unduly burdensome to collect – would not be part of that production. *Id.* In total, Sinclair incurred

roughly ***$6.5 million*** in fees to produce custodial emails, structured data, and other agreed documents. *Id.* ¶ 15.

Notwithstanding that text messages were not within the scope of Sinclair's production, once the parties identified custodians whose email data would be collected, Sinclair went above and beyond to inquire with each agreed upon custodian then-employed by Sinclair as to any other likely sources of relevant information, including whether the custodian had a company cell phone and, if so, whether they used that phone to send substantive text messages regarding the issues in this litigation. *Id.* ¶ 16. No custodian identified text messages as a source of relevant documents. *Id.*

**<u>Discussions of Text Messages in Late 2022 and 2023</u>**

For nearly ***two years*** – from early 2021 until November 2022 – Plaintiffs did not raise the issue of text messages. *Id.* ¶ 19. The Court's September 2022 deadline for motions to compel passed without Plaintiffs moving to compel production of text messages from Sinclair. *Id.*

On November 23, 2022, Plaintiffs sent a letter requesting the production of text messages for all 160 Sinclair custodians because one custodian, Fred Corbus, testified at deposition that he had a company-issued cell phone, and his phone records reflected calls – *not text messages* – with employees of other stations. *Id.* ¶ 20. Sinclair responded on December 2, 2022, noting that Plaintiffs had no basis for the production of text messages from Mr. Corbus because, among other things, he testified that the only text messages he sent for work purposes were logistical, *i.e.*, to "ask a manager where are you today." *Id.* Plaintiffs did not reply to Sinclair's letter. *Id.*

On February 2, 2023, Plaintiffs requested text messages from Nikki Callea, a deponent who testified that, to the extent she texted for work, it was to send logistical texts such as "call me." *Id.* ¶¶ 21-22. Nevertheless, Sinclair investigated the availability of text message data for

Ms. Callea and, in early March 2023, promptly informed Plaintiffs that Ms. Callea had stored her work phone in her desk at the start of the COVID-19 lockdown and, following an office move and theft of electronics from that office, had not seen her phone again. *Id.* ¶ 22. Despite diligent efforts, Sinclair was unable to locate that phone. *Id.* Around the same time, Plaintiffs also requested text messages for another custodian, Kristen Flynn. *Id.* ¶ 23. Sinclair responded to that request in early March, noting that Ms. Flynn had testified that she "didn't use" her phone other than "[to] receive calls for work." *Id.*

A month later, the parties confirmed they were at an impasse on text messages. *Id.* ¶ 24. However, rather than filing a motion to compel, Plaintiffs waited *until late July 2023* to raise the issue again. At that time, Sinclair agreed in good faith to further investigate the availability of data for Ms. Callea, Ms. Flynn, and Mr. Corbus. *Id.* ¶ 25. Less than two weeks later, Sinclair advised Plaintiffs that, because those custodians had each lost or severely damaged their phones, and Ms. Callea and Ms. Flynn did not recall the credentials for their iCloud backup accounts, Sinclair faced issues accessing those backups and was working with Apple and its external eDiscovery professionals at FTI Consulting Technology, LLC ("FTI") to attempt to recover their data. *Id.* ¶ 26. In late August 2023, Sinclair informed Plaintiffs that it was able to access the custodian's iCloud accounts, but no backup data for the Relevant Period existed.[1] *Id.* ¶ 27. The preservation issue for those custodians' phones was related to unique circumstances of loss or severe damage. Counsel was not aware of any other or broader issue with preservation. *Id.* ¶ 28.

Plaintiffs did not follow up *until October 2023*, when they requested another meet-and-confer. Following that meet-and-confer, in the spirit of cooperation, Sinclair agreed to

[1] When a phone goes offline because of loss or severe damage, iCloud backups are only stored for a maximum of six months. McClure Decl. ¶ 13.

investigate the availability of text message data for all 160 custodians. *Id.* ¶ 29.

**Investigation and Production of Text Message Data**

During its investigation, Sinclair learned that, when certain employees handed in their phones for upgrade, replacement, or when they left Sinclair, and inadvertently did not inform the Corporate IT department prior to doing so (as they were instructed to do in the legal holds), data on those phones may not have been preserved. In early November 2023, Sinclair promptly informed Plaintiffs of that issue. *Id.* ¶ 32. Over the next six months, Sinclair undertook a full investigation and expended enormous resources – ***approximately $640,000 in total*** – to identify, collect, and recover text message data. *Id.* ¶¶ 30-42.

Counsel for Sinclair, often with forensic specialists at FTI, spoke with *each* custodian to confirm facts regarding their cell phone and text message usage, investigate all possible locations that text message data might exist, and collect any data from the Relevant Period. In many cases, that exercise required multiple conversations with each custodian – many of whom were former employees and not readily available to Sinclair – and significant technical and investigative work by FTI. *Id.* ¶¶ 33-34. In some cases, Sinclair also coordinated with Apple or Verizon to attempt to access backup data. *Id.* ¶ 33. Throughout that process, Sinclair updated Plaintiffs regularly, answered all of their questions, facilitated a call between Plaintiffs and Sinclair's IT personnel, and agreed to collect and review text messages from dozens of custodians whose data had been fully preserved. *Id.* ¶¶ 34, 36-37.

Of its 160 custodians, Sinclair confirmed that 81 had company-issued cell phones during the Relevant Period. *Id.* ¶ 31. Plaintiffs falsely assert that Sinclair had no system for tracking which of its employees had company cell phones. Mot. at 9. In fact, Sinclair's Procurement group tracks and maintains robust data on each individual with a company phone. Love Decl.

¶¶ 2-3. However, where Sinclair acquired a station, it could not vouch for the accuracy or completeness of that station's historical data on company phones, and that historical data often could not be integrated with Sinclair's data. *Id.* ¶ 5. To confirm its understanding of which custodians had company cell phones during the Relevant Period, Sinclair reviewed data from the Procurement group and information from its 2021 custodian interviews in combination with speaking to custodians and, in some cases, confirming with Verizon. Tabatabai Decl. ¶ 31.

On February 5, 2024, Plaintiffs proposed – for the first time, ***more than three years after discovery began*** – a search methodology and search terms for text messages. *Id.* ¶ 37. The parties subsequently agreed on a search protocol. *Id.* ¶ 38. In total, Sinclair collected 41,420 text messages from the Relevant Period for 26 custodians whose data had been fully preserved. Those custodians ranged from station personnel to regional sales managers and national sales directors, up to a C-suite executive, across more than 50 markets. *Id.* ¶¶ 43-44. Of those 41,420 messages, only 233 were responsive – meaning that they concerned, in any way, broadcast television spot advertising. *Id.* ¶¶ 39, 44. ***None*** of those messages concerned any sharing of pacing information or evidenced any illicit information exchange, price-fixing, or collusion. *Id.*

## ARGUMENT

### I. THERE IS NO EVIDENCE THAT SINCLAIR ACTED INTENTIONALLY FOR THE PURPOSE OF DEPRIVING PLAINTIFFS OF ADVERSE EVIDENCE.

Plaintiffs' request for an adverse inference sanction should be denied. Because of its draconian consequences, an adverse inference requires more than a showing that data was lost; rather, Plaintiffs must demonstrate that Sinclair intentionally deleted data "*for the purpose of hiding adverse information*." *Downing v. Abbott Lab'y.*, 48 F.4th 793, 812 (7th Cir. 2022) (emphasis added); *see also In re Local TV Advert. Antitrust Litig.*, 2023 WL 5607997, at *11 (N.D. Ill. Aug. 30, 2023) ("Loss of ESI through negligence or even gross negligence does not

justify the harshest discovery sanctions.”). Plaintiffs cannot make such a showing here.

### A. Sinclair’s Efforts to Preserve and Recover Data Do Not Support a Finding of Intent to Deprive.

Plaintiffs’ accusation that Sinclair “did nothing to preserve ESI on cell phones” (Mot. at 11) is false. Sinclair promptly issued legal holds that expressly required recipients to preserve cell phone data and inform designated individuals in Sinclair’s Corporate IT department prior to replacing or disposing of any mobile device. Tabatabai Decl. ¶¶ 3-8. Contrary to Plaintiffs’ assertions, Sinclair has a robust system for tracking employees with company cell phones. Love Decl. ¶¶ 2-3. Although Plaintiffs argue that Sinclair “could have turned on various auto-sync or cloud back-up options” for its employees’ cell phones (Mot. at 9), ***that is simply not true***. There is no technology available that would have allowed Sinclair to do so, or to maintain any centralized backup of its employees’ cell phone data. McClure Decl. ¶¶ 5-9.[2]

Plaintiffs now suggest that Sinclair should have collected, processed, and reviewed text message data for everyone under hold at the outset of discovery, despite text messages being out of scope for Sinclair’s agreed production. Sinclair’s obligation was to take ***reasonable*** steps to preserve data, where the burden was ***proportional*** to the likelihood of relevant information. *See, e.g.*, *DR Distribs., LLC v. 21 Cent. Smoking, Inc.*, 513 F. Supp. 3d 839, 978 (N.D. Ill. 2021) (duty to preserve extends only to evidence “that is expected to be relevant and proportional to the

---

[2] Plaintiffs’ argument that Sinclair should have instructed hold recipients to back-up data on their phones ignores the difficulties of providing (and ensuring compliance with) technical instructions to large numbers of individuals with different levels of technological savvy, using different makes and models of phones running on different operating systems. *Id.* ¶¶ 8-9. When Sinclair later attempted to provide such instructions, it required in-house counsel to call every custodian to walk them through those instructions and ensure the proper settings were enabled (Tabatabai Decl. ¶ 35) – an unreasonable and disproportionate process where hundreds or thousands of individuals are under hold. Moreover, Apple and Android backups will not store historical text message data – they will only store the phone’s most recent backup – and Verizon’s cloud backup feature does *not* include messages for Apple devices. McClure Decl. ¶ 13.

claims or defenses in the litigation"). The cost just to collect and process text message data for even 1,500 of the nearly 1,700 individuals under hold would have been ***in excess of $3-$5 million***. Hammerquist Decl. ¶ 11. The costs of collecting, processing, and reviewing text message data for the 81 agreed custodians who had company cell phones would likely have been ***more than $1 million*** (Tabatabai Decl. ¶ 10) – a disproportionate cost in light of all of the other discovery Sinclair agreed to provide, and in the absence of any information that a particular custodian was likely to have relevant text messages.

Sinclair took the reasonable and proportional step of inquiring with its custodians as to whether text messages were likely to contain relevant information. Plaintiffs now argue that Sinclair should have asked its custodians to run "simple searches" on their phones to confirm they had no relevant messages. Matzen Decl. ¶ 56. Plaintiffs do not identify *any* standard requiring counsel to supervise custodians in running *ad hoc* searches through all possible sources of data. In any event, there is no reason to believe that those searches would have indicated that custodians had relevant text messages. Of the 26 cell phones that were preserved, only two messages hit on the term "pacing" (neither of which concerned any sharing of pacing information), only two responsive messages hit on the term "pricing" (neither of which concerned any sharing of pricing information), and – following a full review of all 26 phones – 15 had no responsive messages at all. Tabatabai Decl. ¶ 18. The messages that were responsive were cumulative and redundant of similar discussions in the millions of emails that Sinclair produced. *Id.* ¶ 39.

Sinclair fully engaged with Plaintiffs, despite Plaintiffs' nearly two-year delay in requesting text message data after Sinclair declined to produce it. Sinclair made significant and costly efforts over several months to investigate any inadvertent loss of text message data,

attempt to recover that data, and collect and review text messages from dozens of cell phones that were properly preserved – all while cooperating with Plaintiffs' requests for information. Tabatabai Decl. ¶¶ 30-43; Hammerquist Decl. ¶¶ 3-6. Sinclair also invested significant time and effort to ensure that cell phone data would be fully preserved in the future, including implementing a workflow requiring all mobile device managers, local business managers, and local IT engineers to confirm with Sinclair's Corporate IT and Legal departments before taking any action with respect to any cell phone handed in. Tabatabai Decl. ¶ 35; McClure Decl. ¶¶ 14-15.

Sinclair's extensive efforts belie Plaintiffs' claim that it acted in bad faith or with intent to deprive. *See, e.g.*, *Two Canoes LLC v. Addian Inc.*, 2024 WL 2939178, at *11 (D.N.J. Apr. 30, 2024), *report and recommendation adopted,* 2024 WL 3470851 (D.N.J. July 19, 2024) ("[Defendant] attempted to recover the spoliated messages by engaging a professional discovery vendor . . . . Although these efforts proved insufficient, I find that [they] weigh against a finding of bad faith."); *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 978 (N.D. Cal. 2022) ("Although largely unsuccessful, such [recovery] attempts, coupled with [] partial production . . . indicate a lack of intent to deprive [movant] of evidence.").

**B. There is No Indicia of Intent to Deprive.**

There is no evidence that Sinclair "preserve[d] helpful or neutral information while deleting harmful information." *Bistrian v. Levi*, 448 F. Supp. 3d 454, 476 (E.D. Pa. 2020); *see also E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 803 F. Supp. 2d 469, 501 (E.D. Va. 2011) (finding intent based on evidence that employees identified specific material to delete); *cf. hiQ Labs*, 639 F. Supp. 3d at 978 (absence of selective preservation weighed against intent to deprive). Where a custodian's text message data was not preserved, all data from the Relevant Period is missing – there was no selective deletion. Nor is there any evidence that Sinclair

selectively identified the 26 custodians whose data was preserved. Those custodians represent a cross-section of positions and markets within Sinclair and include several individuals whom Plaintiffs identified as deponents or named in the Complaint. Tabatabai Decl. ¶ 43. Those facts are consistent with inadvertent – not selective – data loss.

In addition, "the most decisive factor in the intent analysis" – the "timing" of deletion of data – weighs in Sinclair's favor. *hiQ Labs*, 639 F. Supp. 3d at 979; *see, e.g.*, *Burris v. JPMorgan Chase & Co.*, 2024 WL 1672263, at *2 (9th Cir. Apr. 18, 2024) (finding intent where defendant wiped device the day before production); *Malibu Media, LLC v. Tashiro*, 2015 WL 2371597 (S.D. Ind. May 18, 2015), *report and recommendation adopted*, 2015 WL 3649359, at *16 (S.D. Ind. June 11, 2015) (timing of deletion was "damning" where files were deleted the night before production). Here, the data loss at Sinclair occurred at various times depending on when a custodian replaced or upgraded a phone, or left Sinclair. That timing indicates a lack of intent. *hiQ Labs*, 639 F. Supp. 3d at 978 (no inference of intent where emails were deleted years after litigation began and "[t]here was no rush to delete relevant evidence").

Plaintiffs argue that Sinclair acted with intent to deprive because it purportedly "knew" that cell phones contained relevant information and "concealed" its failure to preserve cell phone data. Mot. at 10-12. Both of those assertions are purely speculative – and false.

*First*, Plaintiffs' contention that Sinclair "knew" cell phones contained relevant information is based solely on Sinclair's antitrust guidelines "acknowledg[ing] that cell phones *could* contain information relevant to antitrust cases."[3] Mot. at 11 (emphasis added). That Sinclair's antitrust guidelines acknowledge the *possibility* that a cell phone could contain

---

[3] Those guidelines states that, "*if* [a] communication[ ] of Competitively Sensitive Information was in writing, such as via text message or email, the communication(s) must be preserved." Mirzadeh Decl. Ex. 15 at SINCTVADS-00243481.

relevant information in no way supports the contention that Sinclair *knew* such information existed. In fact, there was *nothing* of relevance on most custodians' cell phones and minimally responsive, redundant messages on the remainder. There is no reason to believe that the loss of irrelevant or redundant data was motivated by a desire to deprive Plaintiffs of adverse evidence.

*Second*, Sinclair did not "conceal" anything. Sinclair was transparent with Plaintiffs that it would not agree to produce text messages absent information that any custodian was likely to have relevant texts, and it was not prepared to undertake the disproportionate burden of collecting and reviewing text message data for all of its custodians. Tabatabai Decl. ¶ 10. Thus, Plaintiffs cannot have relied on any representation that Sinclair would do so.

Plaintiffs argue that Sinclair refused to produce text messages despite evidence that employees were "using their phones for work purposes" and "being asked to delete incriminating content." Mot. at 11. Using a phone for work purposes – such as to receive calls or send logistical text messages – does not equate to sending or receiving *relevant text messages*. The three custodians from whom Plaintiffs demanded text messages in late 2022 and 2023 each testified that they did *not* send substantive text messages for work. Tabatabai Decl. ¶¶ 20-21, 23. The only document Plaintiffs cite for their argument that Sinclair employees were "being asked to delete incriminating content" is an ***email*** in which a sales representative from ***Katz*** suggests deleting that email. Mot. at 11 (citing Mirzadeh Decl. Ex. 19). Not only did that suggestion come from a third party (*not* Sinclair), the Sinclair employee ***did not delete the email***.

Plaintiffs' argument that Sinclair "obfuscated" issues concerning preservation is contrary to the facts. Sinclair promptly responded to all of Plaintiffs' inquiries – followed by, in many cases, months of silence from Plaintiffs – and kept Plaintiffs fully apprised of preservation issues when they were discovered. Tabatabai Decl. ¶¶ 22-34.

*Finally*, Plaintiffs' argument that the "scope" of data loss is sufficient to demonstrate intent is meritless. The only case that Plaintiffs cite for that argument did *not* find intent based on "scope" of data loss; rather, it found intent based on evidence that the plaintiff engaged in "systematic efforts to destroy ESI from an array of phones, laptops, email accounts, and external storage devices," including wiping at least one device the day before its scheduled production. *Burris v. JPMorgan Chase & Co.*, 2024 WL 1672263, at *2 (9th Cir. Apr. 18, 2024). Sinclair did not engage in any such conduct here.

## II. PLAINTIFFS' CLAIM OF PREJUDICE IS NOT SUPPORTED BY EVIDENCE.

Prejudice requires a finding that the missing data would "prevent the aggrieved party the use of an ***essential*** or '***crucial***' piece of evidence to their underlying claim." *Larson v. Bank One Corp.*, 2005 WL 4652509, at *13 (N.D. Ill. Aug. 18, 2005) (emphasis added). "[T]he mere fact that deleted materials were relevant does not itself establish prejudice." *Pugh-Ozua v. Springhill Suites*, 2020 WL 6562376, at *4 (S.D.N.Y. Nov. 9, 2020). Here, Plaintiffs' claim of prejudice is "insufficient" because it is based on "speculative or generalized assertions that the missing evidence would have been favorable to [them]." *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 616 (S.D. Tex. 2010). The evidence shows the opposite: there are no messages that concern any alleged sharing of pacing information or that evidence any price-fixing or collusion, let alone any messages that are "essential" to proving Plaintiffs' case.

Of the 41,420 text messages that Sinclair collected, only 233 – or ***less than 0.6%*** – were responsive. Fifteen custodians had ***no*** responsive messages. Most of the responsive messages are discussions between Sinclair employees about specific advertising buys, just like thousands of emails in Sinclair's production. Tabatabai Decl. ¶ 39. None of those messages concern any sharing of pacing information, evidence any illicit information exchange, or are in any way "crucial" to Plaintiffs' claims.

Plaintiffs cite three text messages to suggest that Sinclair's employees "routinely used their cell phones" to collude on rates for spot advertising. Mot. at 2, 8. Those messages do not show any collusion. Plaintiffs' reliance on three innocuous messages from two custodians[4] – and nothing from the remaining 24 custodians – further demonstrates the lack of prejudice:

- In a November 2016 text thread, [redacted] Mirzadeh Decl. Ex. 11. [redacted] It does not refer to any information-sharing or intent to coordinate on rates.

- In a December 2014 text message exchange, [redacted] *Id.* Ex. 10. It was not uncommon for local advertisers to share rates from other stations with Sinclair sales personnel, often to persuade Sinclair to lower its rates to beat an offer from the competition. Hardesty Decl. ¶¶ 3-4; Vaters Decl. ¶¶ 4-5.[5] [redacted] *Id.*

- In September 2016, [redacted] Mirzadeh Decl. Ex. 12. That text reflects Sinclair's practice of monitoring sports games on competitor stations to identify advertisers to target for buys on Sinclair's station. [redacted] Montgomery Decl. ¶¶ 3-6. It does not suggest contacting a competitor to find out rates, and no one did. *Id.*; Smith Decl. ¶¶ 4-5.

## III. PLAINTIFFS' REQUESTED SANCTIONS SHOULD BE DENIED.

Plaintiffs' requested sanctions are inappropriate. Sinclair has taken significant steps to

---

[4] Plaintiffs gratuitously cite a text exchange involving a Nexstar employee that does not reference or involve anyone from Sinclair, or contain any discussion of pacing, pricing, or anything related to this litigation. *See* Mot. at 11 (citing Mirzadeh Decl. Ex. 13).

[5] Multiple deponents testified about that practice, which is also borne out in contemporaneous documents. *See, e.g.*, Tabatabai Decl. ¶ 39 n.4 & Ex. 7.

address the preservation issue it identified, including spending several months and approximately $640,000 investigating and attempting to recover data, and collecting, reviewing, and producing any responsive text messages from 26 custodians. No sanction is warranted.

Because Sinclair did not act with intent to deprive, an adverse inference sanction is unavailable. Even finding intent to deprive "does not require a court to adopt" any particular sanction. Fed. R. Civ. P. 37(e) Advisory Comm. Notes. Here, an adverse inference would be especially unfair because it would instruct the jury to find the existence of a nationwide price-fixing conspiracy based on missing text message data for a subset of employees in a subset of markets at one company. It would also unfairly penalize the other Defendants by instructing the jury to find that the missing data evidenced collusion and price-fixing among some or all Defendants.

Plaintiffs' other requested sanctions are available only upon a finding of prejudice, where the sanction is "no greater than necessary to cure the prejudice." Fed. R. Civ. P. 37(e)(1). Plaintiffs' claim of prejudice fails. Even if there were prejudice here, Plaintiffs' requested "presentment and prohibition of evidence" sanction is exactly the kind of "inappropriate (e)(1) measure" that the Advisory Committee Notes caution against because it would "preclud[e] a party from offering any evidence in support of the central or only claim or defense in the case." Sinclair's central defense is that the alleged price-fixing conspiracy did not exist; that defense requires pointing to the absence of any evidence of such a conspiracy. Given the nature of Plaintiffs' claims, prohibiting Sinclair from pointing to that lack of evidence would be disproportionate and "inappropriate" under Rule 37(e)(1).

## CONCLUSION

For the foregoing reasons, Sinclair respectfully requests that the Court deny Plaintiffs' Motion in its entirety.

Dated: January 15, 2025

*/s/ Gregory J. Scandaglia*

William J. Kolasky (admitted *pro hac vice*)
Philip A. Giordano (admitted *pro hac vice*)
HUGHES HUBBARD AND REED LLP
1775 I St. NW
Washington, DC 20006
(202) 721-4600
william.kolasky@hugheshubbard.com
philip.giordano@hugheshubbard.com

William R. Maguire (admitted *pro hac vice*)
Fara Tabatabai (admitted *pro hac vice*)
HUGHES HUBBARD AND REED LLP
One Battery Park Plaza
New York, NY 10004
(212) 837-6000
bill.maguire@hugheshubbard.com
fara.tabatabai@hugheshubbard.com

Gregory J. Scandaglia
SCANDAGLIA LAW LLP
321 North Clark Street, Suite 400-A
Chicago, IL 60654
Tel: (312) 580-2020
gscandaglia@scandaglialaw.com

*Attorneys for Defendant Sinclair Broadcast Group, LLC f/k/a Sinclair Broadcast Group, Inc.*