THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | ) | |
|---|---|---|
| | ) | MDL No. 2867 |
| IN RE: LOCAL TV ADVERTISING | ) | No. 18 C 6785 |
| ANTITRUST LITIGATION | ) | |
| | ) | Chief Judge Virginia M. Kendall |
| | ) | |

**MEMORANDUM OPINION & ORDER**

Pending before the Court is Plaintiffs' Discovery Motion No. 25 for Spoliation Sanctions Against Defendant Sinclair Broadcast Group. (Dkt. 1146 (sealed)). For the reasons below, Plaintiffs' Motion is granted in part and denied in part. [1146].

BACKGROUND

Since 2018, the parties have been engaged in an ongoing antitrust multidistrict litigation about an alleged conspiracy to fix the price levels of broadcast television spot advertisements. Discovery in this matter is ongoing, and here, Plaintiffs bring a Motion for spoliation sanctions against Defendant Sinclair for an alleged failure to preserve ESI.

The relevant timeline for this Motion traces that of this case. The legal obligation to preserve data dates at least to February 5, 2018, when the U.S. Department of Justice (DOJ) issued a letter to Sinclair regarding the preservation of documents in light of DOJ's investigation into competitive pacing information. (DOJ Letter, Dkt. 1146-3 at 6; Tabatabai Decl., Dkt. 1163-6 ¶ 3). The letter instructed Sinclair to take all necessary steps to preserve relevant ESI, including text messages. (Dkt. 1146-3 at 6). Substantively, the letter looked much like the one discussed in this Court's earlier spoliations opinion in this case. *In re Loc. TV Advert. Antitrust Litig.*, 2023 WL 5607997, at *2 (N.D. Ill. Aug. 30, 2023). That day, Sinclair's General Counsel sent a legal hold

1

"to all General Managers of Sinclair's broadcast television stations" requiring them to preserve documents, including text messages, and copied the Senior Director of Technical Operations to assist in the process. (Dkt. 1163-6 ¶ 3). Beyond the declaration testifying to that process, Sinclair did not provide any documentation of this hold.

Following DOJ's March 2018 service of a Civil Investigative Demand ("CID"), Sinclair issued another legal hold directing recipients to retain all documents relating to specific subjects, including electronic data such as text messages, until further notice, as well as the requirement of notifying the Director of Technical Operations prior to replacing or disposing of any laptop, tablet, or mobile device that might contain responsive data. (Civil Investigative Demand Letter, Dkt. 1146-3 at 48; Dkt. 1163-6 ¶ 4). On November 20, 2018, Sinclair re-sent a version of the April 2, 2018, legal hold after the class action complaints were consolidated into this multidistrict litigation. (Dkt. 1163-6 ¶ 5).

On December 11, 2020, Plaintiffs requested discovery materials from Sinclair, including ESI like text messages on employee-issued cell phones. (Dkt. 1146-2 at 14; Dkt. 1163-6 ¶ 6). Sinclair refused this request, claiming that the burden of collecting and reviewing text messages was undue and disproportionate, especially in the absence of information that the messages were likely to be relevant. (Dkts. 1163, 1163-6 ¶¶ 10–12). Sinclair asserts that Plaintiffs then "dropped the issue" until November 2022, after the Court's deadline for motions to compel, which Plaintiffs do not dispute in their Reply. (Dkts. 1163 at 3–4; 1169 at 5). Between May and September 2021, the parties ultimately agreed on a list of 160 custodians whose email data, but not cellphone data, Sinclair would collect, search, and produce. (Dkt. 1163 at 3). Additionally, Sinclair updated and re-issued the April 2, 2018, litigation hold on April 19, 2021, with a reminder to retain all documents in compliance with the CID and this litigation. (*Id.* at 5, 6).

Sinclair produced around 3.2 million documents from the agreed time period (January 1, 2013 to October 15, 2018 (the "Relevant Period"). (Dkt. 1163-6 ¶ 14). Though cell phone data was not apart of the agreed upon search, Sinclair asked its custodians for other potential sources of relevant information, and no custodian identified text messages as a source. (Dkt. 1163-6 ¶ 16). Plaintiffs contend, however, that after Fred Corbus's November 2022 deposition, it became necessary to ask for all relevant cell phone data for all Sinclair custodians, which Sinclair rejected in a December 2022 letter. (Dkts. 1146 at 11; 1169 at 5; 1146-2 at 28). But by April 2023, Plaintiffs reiterated their request based not only on Corbus's deposition, but those of Nikki Callea and Kaitlyn Flynn, as well. (Dkt. 1146-2 at 35). After multiple meet-and-confers on the topic in the spring of 2023, the Parties were left at an impasse. Dkt, 1146-2 at 42; Dkt. 1163-6 ¶¶ 20–23).

In July 2023, Plaintiffs contacted Sinclair about submitting a motion to compel to the Court; on the understanding that the Plaintiffs sought data only from Corbus, Callea, and Flynn, undertook further investigation into those devices. (Dkt. 1163-6 ¶ 26). While Sinclair was able to access the iCloud accounts of the custodians by working with Apple and the e-discovery company FTI to get access to years-old accounts, there was no existing backup data for the Relevant Period because Apple stores iCloud backups for six months after a phone is lost or damaged and goes offline. (Dkt. 1146-2 at 48, 74; Dkt. 1163-6 ¶ 27).

The Plaintiffs responded in the fall, asking for a wider search. In October 2023, Sinclair agreed to assess the availability of text message data and responsive ESI on employee-issued cell phones for the 160 Sinclair custodians while maintaining that there was likely no responsive data on the company-issued phones. (Dkt. 1146-2 at 74; Dkt. 1163-6 ¶ 29). This search including contacting each employee, sometimes multiple times, and working with FTI, Apple, and Verizon to gain access; at the same time, Sinclair implemented new protocols for confirming and enabling

3

proper backup settings for employees with new phones. (Dkt. 1163-6 ¶¶ 33–35). This six-month investigation revealed that out of the 160 named Sinclair custodians, 81 had company-issued cell phones during the Relevant Period, and of these, Sinclair had fully preserved data for 26 of these phones. (Dkt. 1146-2 at 59–72; Dkt. 1163-6 ¶¶ 31, 42). Sinclair also learned that some custodians who were former Sinclair employees had left the company without notifying Corporate IT of the litigation hold on their employee-issued devices, and as such, their data was not preserved. (Dkt. 1146-2 at 65–68; Dkt. 1163-6 ¶ 32). In total, Sinclair collected 41,420 preserved text messages from 26 custodians covering various markets across the U.S. and ranging in levels of seniority. (Dkt. 1163-6 ¶ 42). In the spring of 2024, Sinclair implemented the agreed search methodology. (*Id.* ¶ 38). Sinclair reviewed the personal cell phone data of custodian Bill Fanshawe and the company-issued cell phone data of former General Counsel Barry Farber and did not identify any responsive material.[1] (*Id.* ¶¶ 40–41). In another process, Sinclair produced text messages from 24 custodians and found that 11 custodians had responsive text messages, which the company characterized as "not relevant," "cumulative and redundant of thousands of [produced] emails," and demonstrating no evidence of "sharing of pacing information." (*Id.* ¶ 39). All in all, of the 41,420 preserved messages, 233 were responsive. (*Id.* ¶ 43).

## LEGAL STANDARD

The Federal Rules of Civil Procedure hold that "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court may order measures, including and up to a default judgment, necessary to cure prejudice and address malintent. Fed. R. Civ. P. 37(e). This is not the first time a Rule 37(e)

---

[1] It appears that Plaintiffs do not count these two individuals, and only the 24, when they claim that Sinclair did not preserve ESI for 57 of the 81 individuals instead of 55. (Dkt. 1146 at 1).

4

motion has come before this Court in this case; thus, the relevant legal standard is incorporated and summarized here:

> The Court may sanction a party after finding, first, that "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," and second, finding either (1) that the loss prejudiced the party's opponent, or (2) that the party acted with intent to deprive an opponent of the information's use in litigation. Fed. R. Civ. P. 37(e); *see also Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 627–28 (7th Cir. 2018). Rule 37(e) sanctions thus require finding, as a threshold matter, that relevant ESI "should have been preserved in the anticipation or conduct of litigation." Fed. R. Civ. P. 37(e). . . . Loss of ESI through negligence or even gross negligence does not justify the harshest discovery sanctions.

*In re Loc. TV Advert. Antitrust Litig.*, 2023 WL 5607997, at *5.

## DISCUSSION

"The touchstone for a party's duty to preserve evidence remains the reasonable foreseeability of its involvement in litigation." *In re Loc. TV Advert. Antitrust Litig* 2023 WL 5607997, at *7. Sinclair does not dispute that it had a duty to preserve relevant ESI since at least 2018, and in fact, Sinclair affirms that it took initiative to "promptly issue legal holds covering the subject matter of this litigation." (Dkt. 1163 at 2). In addition, Sinclair's own Antitrust Compliance Guidelines state that any communication of sensitive information in writing (such as text messages or emails) must be preserved, including communications on personal devices. (Dkt. 1146-3 at 9-17). Nor does either party dispute that the lost ESI realistically cannot be restored or replaced through additional discovery. The core issues, then, come down to whether the ESI was relevant and should have been preserved, and whether Sinclair took reasonable steps to preserve the ESI.

### I. Relevance

As a general rule, relevance includes "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issues that is or may be in that case." *Oppenheimer Fund Inc. v. Sanders*, 437 U.S. 340, 351 (1978) (interpreting the scope of discovery under Rule

5

26(b)(1)). The party seeking to compel discovery has the general burden of showing relevance, but the ability to demonstrate relevance should account for which party has access to the allegedly relevant information. *See DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 978–79 (N.D. Ill. 2021).

While the proportion of informative text messages is decidedly low, Plaintiffs have identified a few examples of text messages that Sinclair has produced as further evidence for their allegations. In one example, Sinclair employees shared news about a known individual joining the local market, exclaiming how they "need someone there to quit[] diving on rates!" (Dkt. 1146-2 at 89–90). Sinclair suggests that the message "expresses hope that a former colleague would continue insisting on high rates, which would help Sinclair win business away from Nexstar. It does not refer to any information-sharing or intent to coordinate on rates." (Dkt. 1163 at 14). In another, in response to a list of ads run by a competitor, one employee said that Sinclair needed to "find out rates on these local ads," and received a response of "No problem." (Dkt. 1146-3 at 2). Sinclair counters that the response "refers to contacting the listed local advertisers to see what they would pay for ads on Sinclair's station. . . . It does not suggest contacting a competitor to find out rates, and no one did." (Dkt. 1163 at 14). Plaintiffs' third and final example involves a portion of an email listing rates for a Media General station, which Sinclair states "most likely came from a local advertiser" and not Media General itself because it was "not uncommon for local advertisers to share rates from other stations with Sinclair sales personnel, often to persuade Sinclair to lower its rates to beat an offer from the competition." (*Id.*)

The infrequency of these examples indicates that text message was not a primary means of communication in support of Plaintiffs' allegations, but their general existence does suggest that the spoliated text message data of the 55 other custodians could have lead to other circumstantial

6

evidence of the price-fixing conspiracy claim (sharing price information and communication/coordination between competitors) and direct evidence of the price information-sharing claim. For its part, Sinclair notes that these three "innocuous messages from two custodians" out of 26 demonstrate just how disproportionate the resource-intensive nature of retrieving these text messages is compared to the relative value of the 41,420 preserved messages. (Dkt. 1163 at 14). Overall, though, the Court is inclined to find that there could have been some relevant information in the spoliated ESI. With that, it turns to the question of Sinclair's efforts to preserve the information.

## II. Reasonableness

In evaluating the reasonableness of a party's preservation efforts, courts use a fact-specific inquiry, considering the party's sophistication in litigation. Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment. Nor does the Rule call for perfection in preserving all relevant ESI, although the prospect of litigation can require a party to modify its otherwise routine ESI management system. *Id.* It may be reasonable for parties to choose a less costly form of information preservation if it is still substantially as effective as other forms. *Id.*

Sinclair seemingly failed to take reasonable steps to preserve relevant ESI. Despite issuing several litigation holds and having custodians certify their compliance, cell phone data for dozens of employee-issued phones was not preserved over the course of multiple years. Despite being one of the largest broadcasting companies in the United States, Sinclair appears to have had no standard system for tracking employees' company-issued mobile devices for years even after the 2018 litigation hold, despite the hold's requirement that IT be notified prior to the disposal of any cellphone that contains relevant ESI.

Sinclair should have had a tracking system in place to know which employees had work-issued devices. This lack of knowledge prevented Sinclair from conducting a reasonable investigation for responsive ESI and also placed additional costs on the company to even have to carry out this investigation and attempt to contact these custodians individually in the first place. (Dkt. 1146-4 ¶¶ 7, 8; Dkt. 1163-6 ¶ 35). Sinclair could have turned on automatic data back-up options for their work-issued devices that would have preserved the relevant ESI at little to no cost. (Dkt. 1146-4 ¶¶ 13–16, 59). This would have protected text messages from being unrecoverable if something physically happened to the mobile device (which is exactly what Sinclair claims happens for several custodians who simply have no data from their employee-issued phones). (Dkt. 1146-4 ¶ 21–24, 31–38).

Most importantly, Sinclair's counsel should have conducted a more in-depth investigation into the custodian's compliance with the litigation hold, identifying which custodians had potentially relevant data independently of the custodian's own assessments, and ensuring that these custodians and (the IT department upon the departure of these custodians) fully understood and fulfilled the obligation to preserve data. *See In re Loc. TV Advert. Antitrust Litig.*, 2023 WL 5607997 at *9 ("The issuance of a litigation hold does not end counsel's duty in preserving ESI . . . . They must continue to monitor and supervise or participate in a party's efforts to comply with the duty to preserve." (internal citations omitted)).

Instead, Sinclair and its counsel chose to rely on custodians' self-reporting to determine that (1) they understood the contents and details of the litigation hold and that (2) their employee-issued devices did not contain responsive information. *See id.* at *10 ("Such pitfalls are emblematic and foreseeable when counsel rely on their clients to self-collect and self-monitor preservation of

8

their ESI."). A party's preservation approach need not be perfect, but Sinclair's response cannot be fairly squared with the reasonableness standard.

### III. Curative Measures

This Court may order measures no greater than necessary to cure the prejudice outside of a finding of intent to deprive. Fed. R. Civ. P. 37(e).[2] The Plaintiffs request 1) that Sinclair pay their fees and costs for investigating the issue, 2) the ability to present evidence of the spoliation at summary judgment and trial and argue the evidence would have helped Plaintiffs, 3) a jury instruction permitting the jury to consider said evidence, 4) a prohibition on Sinclair's ability to argue or defend with reference to the absence of text messages, and 5) an adverse inference jury instruction. (Dkt. 1146 at 14–15).

For the Court to presume the lost evidence to be unfavorable to Sinclair, or give a permissive or mandatory adverse-inference jury instruction, it must find evidence that Sinclair intended to deprive Plaintiffs of the ESI. Fed. R. Civ. P. 37(e)(2); Fed. R. Civ. P. 37(e) advisory committee note to 2015 amendment. Without that finding, care must be taken to ensure that other measures do not have the effect of measures permitted under Rule 37(e)(2). *Id.*

#### a. Intent to Deprive

Under Rule 37(e)(2), the Court may impose specified and severe sanctions only if it finds that the spoliating party acted with an intent to deprive another party of the ESI. *See DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 980 (N.D. Ill. 2021). Negligence or even gross negligence does not rise to the requisite level of bad faith. *See In re Loc.*

---

[2] When conduct could be adequately addressed under the Federal Rules of Civil Procedure or a specific statute, a court should generally rely on those rules or statutes to impose sanctions and remedies rather than on its inherent authority. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991).

9

*TV Advert. Antitrust Litig.*, 2023 WL 5607997 at *6. The Court finds insufficient evidence of bad faith intent.

To be sure, Sinclair's preservation practices and conduct regarding e-discovery were disorganized, careless, and inadequate. But Sinclair agreed to work with Plaintiffs in identifying which custodians had employee-issued phones, and it undertook considerable efforts (and costs) to investigate and identify which custodians' data could be recovered. (Dkt. 1146-2 at 59–72; Dkt. 1163 at 12, 13). Sinclair also kept Plaintiffs updated and informed during the course of the investigation. (Dkt. 1146-2 at 59–72; Dkt. 1163-6 ¶ 34). Further, from the beginning of this litigation, Sinclair issued and re-issued its litigation hold several times. Under the facts found by this Court, the evidence suggests that Sinclair acted carelessly, but without an intent to deprive.

b. **Prejudice to Plaintiffs**

An evaluation of prejudice from the loss of information necessarily includes an evaluation of the information's importance in the litigation, an enterprise that is particularly difficult "when there is little basis for knowing precisely what the ESI contained." *See In re Loc. TV Advert. Antitrust Litig.*, 2023 WL 5607997, at *5. The lost evidence may appear unessential, or at the least put the burden on the party seeking curative measures, where "the abundance of preserved information may appear sufficient to meet the needs of all parties." *See Schmalz v. Vill. of N. Riverside*, 2018 WL 1704109, at *3 (N.D. Ill. Mar. 23, 2018).

Turning to the relevant ESI's importance in this litigation, the lost text message data for 55 custodians is likely important to Plaintiffs' price-fixing and price information-sharing claims. Sinclair's central defense in this litigation is that Plaintiffs lack sufficient evidence to prove their price-fixing conspiracy and price information-sharing claims. (Dkt. 1163 at 4). It follows then, that the spoliation of relevant ESI is highly significant to Plaintiffs' ability to obtain evidence in support

10

of their claims. And indeed, Sinclair's spoliation has forced the parties to unnecessarily litigate e-discovery issues. *DR Distributors*, 513 F. Supp. 3d at 981.

Sinclair argues that the evidence Plaintiffs put forth does not indicate that the lost ESI would have contained responsive information related to Plaintiffs claims. (Dkt. 1163 at 4). On the contrary, Plaintiffs point to the testimony of three custodians who stated that they used their cell phones to text about work-related issues. (Dkt. 1146 at 12). Furthermore, the "content of the lost text messages cannot be replaced simply by eliciting testimony from the Defendants, and by having Plaintiff accept that testimony rather than relying on the actual messages to use as they deem fit." *Schmalz*, 2018 WL 1704109 at *4. Instead, Plaintiffs are deprived of the opportunity to know "the precise nature and frequency of those private communications." *Id.*

Given that both parties dispute the content of the spoliated ESI, and that key factors of both parties' case hinge on the lost ESI, this Court will not, at this juncture, grant Plaintiffs' request to present reasonable evidence and argument of Sinclair's spoliation at summary judgment and trial. As with the Court's prior spoliations finding in this matter, the parties will have further opportunity to brief the admissibility of ESI spoliation at the motions *in limine* stage. *See In re Loc. TV Advert. Antitrust Litig.*, 2023 WL 5607997 at *12. To be clear, the possibility remains on the table, but given the Parties' ongoing discovery efforts, it would be premature to make a determination now.

Nonetheless, monetary sanctions are appropriate here, and Sinclair makes no meaningful attempt to dispute that fact. (*See* Dkt. 1163). Sinclair's failure to preserve the ESI at issue was not discovered until years into discovery, and Plaintiffs learned that the cell phone data for over 50 custodians was not preserved only after deposing Sinclair employees.[3] (Dkt. 1146-2 at 35). While text messages were not a part of the discovery plan in this particular case, Sinclair was still

---

[3] Of course, Plaintiffs are not entitled to the costs of discovery efforts, such as depositions, that they would have undertaken regardless of the spoliation issue.

operating under a litigation hold pursuant to its various legal matters, including the DOJ's 2018 letter. Following this new insight, the parties had numerous exchanges over the course of a year, and Plaintiffs undertook considerable efforts to discover what happened and whether ESI relevant to their claims was preserved and able to still be recovered. While Sinclair certainly incurred its own notable costs in that process, reasonable steps from the outset could have vastly reduced the company's own internal bills. As such, the Court directs Sinclair to make Plaintiffs whole for the costs of their investigation into the text message issue between the April 30, 2024, agreement as to the search term methodology, and the filing of the present Motion.

## CONCLUSION

The Court grants in part and denies in part Plaintiff's motion for spoliation sanctions. [1146]. Sinclair had a duty to preserve relevant ESI (in this case, text messages from Sinclair custodians' work-issued cell phones) and should have preserved it in light of anticipated and ongoing litigation. Sinclair failed to take reasonable steps to preserve the ESI, and it cannot be restored or replaced through additional discovery. Plaintiffs must file a bill of costs and supporting documents within 30 days of this Order. If Sinclair wishes to respond to the bill of costs, it must file a response within 14 days of when the bill of costs is filed.

_____
Virginia M. Kendall
United States District Judge

Date: November 18, 2025